COURT BOX
**FILED**

# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

JAN 07 2002

ERK, USDC / SDFL / WPI

| | |
|---|---|
| **WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., a Delaware Corporation,** ) ) ) ) | |
| Plaintiff, ) | |
| vs. ) | **CASE NO. 00-CIV-8616 (DC)** **(Southern District of New York)** |
| **L. BRENT BOZELL, III, an individual; MEDIA RESEARCH CENTER, INC., a Virginia non-profit corporation, d/b/a Parents Television Council; PARENTS TELEVISION COUNCIL, INC., a Delaware non-profit Corporation; JAMES LEWIS, an Individual; MARK HONIG, an Individual; CYNTHIA DELORES TUCKER, an individual; and Various John and Jane Does,** ) ) ) ) ) ) ) ) ) ) ) ) | **CASE NO.: 01-7913 CIV Hurley** **Magistrate Lynch** |
| Defendants. ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO RICHARD L. ROSENBAUM'S MOTION TO QUASH OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER

Plaintiff World Wrestling Federation Entertainment, Inc. ("WWFE") respectfully requests that the Court deny Richard L. Rosenbaum's ("Rosenbaum") Motion to Quash a Rule 45 document subpoena that WWFE served on him, because the grounds set forth in the motion are without factual or legal merit.

***First***, Rosenbaum's "undue burden" objection is unavailing, because (a) WWFE has already agreed to give Rosenbaum ample additional time to respond to the subpoena; (b) the documents requested come from a discrete set of files that Rosenbaum received directly from James Lewis, an attorney and a defendant in the underlying defamation case; and (c) WWFE has

**Kirkpatrick & Lockhart LLP**

offered to review and copy responsive, "non-privileged" documents from the Lewis file, thus sparing Rosenbaum the "burden" of reviewing and copying the same.[1]

**Second**, Rosenbaum's objection that certain requested documents are "publicly available" misses the point of the subpoena. WWFE is not interested in whether other persons might have had access to these documents, because, irrespective of what the *public* knew, in order to prove its defamation case against Lewis, WWFE must show what *Lewis* knew when he made his defamatory pronouncements about WWFE. Only Lewis's own files can tell us that.

**Third**, Rosenbaum's objection that "work product" protection prohibits disclosure of certain documents must fail, because (a) Rosenbaum has not carried his burden of proving any such protection on behalf of Lewis; (b) Lewis has waived the protection through disclosure of his purported work product to third parties; and (c) WWFE has substantial need of the materials and would suffer undue hardship without their production.

**Fourth**, Rosenbaum has not carried his burden of proving that any of the documents at issue is covered by the "attorney-client privilege." Moreover, any claim of "attorney-client privilege" that Rosenbaum might have asserted has been waived, because (a) both Lewis and Rosenbaum have failed to produce a log of the allegedly "privileged" documents; and (b) both Lewis and his client, Lionel Tate, waived any applicable privilege by disclosing the subject matter of Tate's communications in various public forums.[2]

---

[1]     In a pre-motion conversation between Rosenbaum's counsel and members of the undersigned's law firm counsel for Mr. Rosenbaum never so much as *mentioned* either the size of Rosenbaum's staff or Rosenbaum's briefing schedule on the Tate appeal as bases for his "inadequate time" and "undue burden" claims. WWFE learned of these "objections" only upon receipt of the Motion to Quash. These omissions are not in keeping with the "meet and confer" requirements of Local Rule 7.1(3).

[2]     Also included in Rosenbaum's litany of objections to the subpoena is a claim that "service" of the subpoena was "defective," because WWFE allegedly did not give prior notice to

**Kirkpatrick & Lockhart** LLP

In sum, Rosenbaum has no legally valid grounds for refusing to comply with the subpoena, and WWFE respectfully requests that the Court order full and immediate production in compliance therewith.

## FACTUAL BACKGROUND

### The Murder of Tiffany Eunick[3]

On the night of July 28, 1999, Lionel Tate murdered Tiffany Eunick. Prior to the murder, Deweese Eunick had left her daughter in the care of Tate's mother, Kathleen Grossett-Tate, a Florida Highway Patrol Trooper whom Ms. Eunick had recently met. That night, while Ms. Eunick went to work, Ms. Tate had agreed to watch Tiffany at Ms. Tate's townhouse in Pembroke Park, Florida, as she had done on a few prior occasions. With Ms. Tate at the townhouse that particular night was her son, Lionel, a 5 foot 4 inch, 166-pound, 12 year old boy. Tiffany was 6 years old, stood 4 feet 2 inches tall, and weighed 48 pounds.

After dinner that night, Ms. Tate went upstairs to her bedroom to sleep, leaving Lionel alone with Tiffany. At some point later in the evening, Ms. Tate heard a commotion downstairs. In response, she cracked her bedroom door and demanded to know what was happening. Lionel responded that Tiffany was making noise. Ms. Tate yelled down the stairs that she would spank Tiffany if Tiffany didn't keep quiet.

---

defense counsel. This assertion is false. As shown below, WWFE sent notice to all counsel, including Lewis's, the day after the subpoena was served and several days before the date for compliance. *See infra.* at 14. Furthermore, Rosenbaum's objection that the requests are vague as to time warrants no response, because the requests themselves prove otherwise. WWFE will not address these two less than convincing arguments in the body of this brief.

[3]      WWFE is reciting the facts of Tiffany Eunick's murder in order to give the Court an understanding of the evidence either known, or available, to defendant James Lewis at the time he attempted to blame WWFE and its SMACKDOWN! wrestling program for Tiffany's death during his many and varied appearances in the media.

Tiffany's noisemaking was understandable; Lionel was beating her to death at the time. After he finished beating Tiffany into unconsciousness, Lionel went upstairs to tell his mother that Tiffany was not breathing. Ms. Tate finally came down to investigate, then quickly called 9-1-1. When police and emergency personnel responded to Ms. Tate's townhouse, she told them that Tiffany had been ill that evening and suggested that she had choked on some regurgitated ox tail soup. Lionel, the only witness to Tiffany's death, said nothing to suggest that he had had any contact whatsoever with Tiffany.

### Tiffany Eunick's Autopsy and Lionel Tate's Arrest

Examination of Tiffany at the hospital and in an autopsy readily established that Tiffany had been violently killed. Indeed, far from choking on some soup, Tiffany had suffered over 35 separate injuries at the hands of Lionel Tate that night, including three brain contusions, a fractured skull, a broken rib, and a lacerated liver, a portion of which was left floating in her abdomen. Not surprisingly, her injuries quickly proved fatal. (Copy of Autopsy Report attached at **Appendix Tab 1**)

On July 30, as a result of the autopsy, two Broward County Sheriff's Office detectives took Lionel Tate into custody. In his initial statement to the detectives, Lionel claimed that he and Tiffany had been playing "tag," during which Lionel had given Tiffany a "bear hug." He also stated that he had accidentally bumped Tiffany's head on a table while trying to move her from the floor to the couch as she slept. At no time did Lionel ever mention *anything* about "wrestling." Indeed, Lionel told the detectives that, at the time of the murder, he had been watching "The Flintstones" and "Cow and Chicken," two Cartoon Network programs, on television. (Copy of 7/30/99 Statement of Lionel Tate attached at **Appendix Tab 2**)

**Kirkpatrick & Lockhart** LLP

After Ms. Grossett-Tate arrived at the police station, detectives re-interviewed Lionel in his mother's presence. Once again, Lionel told his "tag" story and denied any other contact with Tiffany. He did claim, however, that Tiffany had already injured her face earlier in the day when she accidentally hit herself with a videotape, a story his mother supported. Neither Lionel nor his mother ever mentioned *anything* about Lionel "wrestling" with Tiffany that night. (Copy of 7/30/99 Statement of Lionel Tate attached at **Appendix Tab 3**)

When Tate's statements about the events of July 28 became public, Dr. Joshua Perper, the Chief Medical Examiner of Broward County, flatly stated that Tiffany's injuries were totally inconsistent with Lionel's story and that these injuries were *not* the result of "roughhousing." (August 5, 1999, Report of Dr. Joshua Perper, attached at **Appendix Tab 4**)

### Defendant James Lewis and the "Wrestling Defense"

Shortly after Lionel Tate's arrest and indictment for First Degree Murder, his court-appointed attorney, James S. Lewis, began an aggressive and sustained public campaign to paint Tiffany Eunick's death as a "tragic accident," first as a result of childish "horseplay," then, later, as a result of Lionel's alleged imitation of "wrestling moves" he had learned by watching WWFE programs, including SMACKDOWN!. As part of this process, Lewis conspired with the other defendants to divert attention from his client's guilt and to defame WWFE by claiming that WWFE programming had inspired Lionel and several other children across the country to kill their "peers" by using "wrestling moves."[4]

Although a full description of Lewis's numerous public statements is beyond the scope of this Memorandum, his public media blitz included appearances on "Dateline NBC;" "Leeza;"

---

[4]    A sampling of public defamatory statements that Lewis made is set forth in Response 7 to WWFE's Response to Defendant Lewis's First Set of Interrogatories, attached at **Appendix Tab 5.**

**Kirkpatrick & Lockhart** LLP

MSNBC's "Today in America;" "Crier Today;" Court TV; Fox News's "The O'Reilly Factor;" Fox News's "The Edge with Paula Zahn;" WSVN-TV Miami; WTVJ-NBC TV Miami; WPLG-TV Miami; WWOR-TV Secaucus, New Jersey; the NBC "Today" Show; ABC's "The View;" The Queen Latifah talk show; and CNN's "Larry King Live." He also gave interviews to numerous other media outlets, including the Miami Herald; the Ft. Lauderdale Sun-Sentinel; the Associated Press; CBS Radio; APBNews.com; WFOR News Miami; and "wrestleboard.com."

The indisputable thrust of Lewis's public statements – conveyed through this dizzying variety of media – was to lay the blame for Tiffany Eunick's death squarely on WWFE and its wrestling programs, which were not even available on broadcast network television until *after* Lionel Tate murdered Tiffany Eunick.[5]

More importantly, in his public statements, Lewis repeatedly described his and Tate's version of the events that led to Tiffany's death on July 28, for which there are only *two* possible sources. *First*, because Lionel Tate was the only living witness to Tiffany's murder, Lewis's statements might reflect information that Tate had provided to him, either directly or through third parties. *Second*, to the extent that Tate never told Lewis what actually happened the night he killed Tiffany, Lewis's stories about that night were simply part of a hoax that sought to blame WWFE for a murder his client committed. Either way, the implications of these public disclosures for the "attorney-client privilege" are profound.

The most direct example of a public disclosure, however, was a videotape that Tate created with one Dr. Joel Klass, a psychiatrist whom Lewis had hired to help defend Lionel on numerous issues (*e.g.*, competence to waive his *Miranda* rights, intent to kill, and the "wrestling

---

[5]     WWF SMACKDOWN! did not begin airing on network television until August 26, 1999, when UPN started carrying the program. No WWFE program was on the air the night Lionel Tate killed Tiffany Eunick.

defense").[6]  (Copy attached at **Appendix Tab 6**).  In this videotape, *Tate himself* purports to "recreate" what happened the night he killed Tiffany.  Among other things, the tape shows Tate exchanging a flurry of punches with Klass – who is playing the role of Tiffany – then describing how he had flung Tiffany head-first into an iron railing, supposedly the way a professional wrestler would throw his opponent into the ring ropes.  Tate also contends that his brutal beating of Tiffany was consensual, as Tiffany had agreed to "play wrestle" with Lionel that evening.[7]

### The Investigation into Tiffany Eunick's Murder

Long before Lionel Tate's murder case came to trial – and while Lewis was out peddling his "wrestling defense" to an unsuspecting public – the investigation into Tiffany Eunick's death was providing no support for Lewis's trial strategy.  Setting aside his own client's failure even to *mention* "wrestling" prior to Lewis's appointment, numerous pieces of evidence contradicted Lewis's public statements decrying WWFE's programs.  Samples include the following:[8]

### Witness Statements

In her deposition, **Deweese Eunick** testified that, in the few times that she had "babysat" Lionel for Ms. Tate, Lionel had not imitated, or even spoken about, wrestling, nor had he ever

---

[6]     This videotape, and all materials relating thereto, is one of the subjects of Request 14 from WWFE's subpoena to Rosenbaum.

[7]     This videotaped "reenactment" included numerous actions that Tate had never described to the police when he was questioned about the events of July 28.  The tape also managed to leave out several undisputed facts about those events, which is one of the reasons why the trial judge later blasted the tape as a defense concoction.  In fact, it was the prosecution that used the tape at trial, in order to show the jury that Lionel Tate was a liar.  Of course, Lewis knew that he could never have used the tape affirmatively, because it was rank hearsay.  The only purpose in creating the tape was to perpetuate Lewis's "wrestling defense" hoax by getting the tape into the public domain.  He succeeded.  Indeed, another defendant in the defamation case, C. Delores Tucker, relied on the tape to support her defamatory opinions about WWFE!

[8]     In the interests of time, WWFE will not burden the Court with a full recitation of all of the facts that prove the falsity of Lewis's "wrestling defense."  The evidence cited is merely a sample of the evidence disproving any actual connection between WWFE professional wrestling programs and the horrific murder of Tiffany Eunick.

**Kirkpatrick & Lockhart** LLP

played any type of physical game with Tiffany.  Likewise, she testified that Tiffany had never watched professional wrestling.  Finally, and perhaps most disturbingly, Ms. Eunick testified that during the short time she had known Lionel, he had repeatedly told her how "fine" she was and that he loved her.  Following Tiffany's murder, Lionel had also asked Ms. Tate if he could have Tiffany's toys and if he could move in with Ms. Eunick and live in Tiffany's room.  (November 2, 2000, Telephonic Deposition of Deweese Eunick, pp. 16, 17, 19, 44, 45, 55, 56, 57 (attached at **Appendix Tab 7**))

Likewise, Ms. Eunick's fiancé, **Bradley Henry**, testified in deposition that he had never seen Lionel "play wrestle" before and that, to his knowledge, Tiffany did not watch wrestling. (March 14, 2000, Statement of Bradley Henry (Via Telephone), p. 24; March 15, 2000, Statement of Bradley Henry (Via Telephone), pp. 6-8 (attached at **Appendix Tab 8**))

Before she was ever deposed in the case, Lionel's mother, **Kathleen Grossett-Tate**, told "Dateline NBC" that Lionel had watched only "an hour or two" of professional wrestling prior to July 28, 1999.  She also stated that she "wouldn't say" that wrestling had anything to do with Tiffany's death, because "some people may say watching cops and robbers has a bad influence on children."  When asked whether Lionel was "imitating" wrestling when he killed Tiffany, Ms. Tate responded that:  "My son watches wrestling.  My son watches cartoons.  So I can't say it's just wrestling."  ("Dateline NBC" Transcript (attached at **Appendix Tab 9**))

At her deposition, **Ms. Tate** testified that she had never seen Lionel "play wrestle" with anyone before and that Lionel had lived with his father in Mississippi from mid-1998 until June of 1999, one month before the murder.  (August 11, 1999, Excerpt of Testimony of Kathleen Grossett Tate, pp. 4, 46-47 (attached at **Appendix Tab 10**))

Lionel's father, **John Tate**, testified that while Lionel was living with him through *June of 1999*, Lionel could not have watched professional wrestling, because Mr. Tate did not have cable, and wrestling shows were not available on network television. Mr. Tate described Lionel as immature and a liar. He also noted that Lionel had a long history of disruptive and aggressive behavior at school, for which he was suspended on several occasions. (*See* March 2, 2001, Presentence Investigation Report, p. 10 (attached at **Appendix Tab 11**))

This testimony was in keeping with that of the **law enforcement officers and emergency medical personnel** who spoke with Lionel and/or his mother immediately after the murder. They testified that neither one said anything about Lionel "wrestling" with Tiffany that night. *See, e.g.*, Depositions of Deputy Arthur (Robert) Chouinard (no contact between Lionel and Tiffany); Deputy Kelly Baranyai (Lionel and Tiffany had been "playing" before the murder); John Casey (Ms. Tate told him she was alone in the house).

### Expert Evaluation

During the pre-trial process, Lewis, the prosecutor and the Court each retained its own expert to assess Lionel's mental capacity. During an August 19, 1999, examination by the Court-appointed psychologist, **Dr. Michael Brannon**, Dr. Brannon questioned Lionel in detail about the underpinnings of the "wrestling defense" theory. Lionel made it clear to Dr. Brannon that *he knew that wrestling was "fake"* and that it if the wrestlers were actually hitting each other as hard as it seemed, they would be seriously injured and could not come back to wrestle in subsequent matches. Tate told Dr. Brannon that he had even seen a documentary on television describing how professional wrestlers make their carefully choreographed matches look "real," but, despite repeated challenges by Dr. Brannon, Tate stuck to his position that wrestling was "fake" and that no one could take that kind of abuse and come back for more. **Dr. Sheri Bourg-**

**Kirkpatrick & Lockhart LLP**

**Carter**, the State's psychologist, witnessed the whole exchange. (February 29, 2000, Letter from Dr. Michael Brannon, and March 4, 2001, Letter from Dr. Sherie Bourg-Carter (attached at **Appendix Tab 12**))

### Third Party Observers

In various statements, several of Lionel Tate's **former teachers** stated that Lionel was "out of control," a constant disruption to class order, inattentive, aggressive, a "bully," a thief, disrespectful of others, and hostile toward authority. On one occasion, Lionel had even engaged in a schoolyard fight with a younger, smaller girl. (Presentence Investigation Report, pp. 15-17) (**Appendix Tab 11**)

### Lewis's Dogged Pursuit of the "Wrestling Defense"

In the face of the foregoing evidence, which was either known, or available, to Lewis, he continued his public defamatory attacks on WWFE throughout the course of pretrial proceedings in the Tate criminal case. He even continued his smear campaign after Judge Joel T. Lazarus, the trial judge in Tate's criminal case, barred Lewis from presenting expert testimony on the "wrestling defense," having found, after a lengthy *Frye* hearing, that there was no scientifically valid basis for any such defense. *See* October 23, 2000, Order, attached at **Appendix Tab 13**.

### The Tate Verdict and Judge Lazarus's Sentencing Opinion

So caught up was Lewis in his "wrestling defense" hoax that he, Tate, and Tate's mother even rejected a generous plea offer from the State, which would have sent Lionel to a juvenile facility for three years, followed by ten years of probation, during all of which Lionel would have received various forms of counseling. *See, e.g.,* January 23, 2001, Hearing Transcript, p. 115 (copy attached at **Appendix Tab 14**). Instead, Tate went to trial in January of 2001.

**Kirkpatrick & Lockhart** LLP

During the trial, the State's evidence conclusively proved that Tiffany Eunick's numerous and severe injuries were totally inconsistent with any version of events touted by Tate and Lewis. In fact, in stark contrast to Lewis's claim that Tiffany's death was a wrestling-related "accident" - made both in the media and in his opening statement – *Lewis's own hired expert* testified that Tiffany Eunick's death was no "accident;" it was a *homicide*. *See* March 9, 2001, Sentencing Order of Judge Joel T. Lazarus, p. 13 (attached at **Appendix Tab 15**).

On January 25, after deliberating for only about 3 hours, the jury found Lionel Tate Guilty of the First Degree Murder of Tiffany Eunick. During post-trial interviews, **several jurors** flatly rejected the "wrestling defense," stating that wrestling was not an issue in the case, because, among other things, (a) the injuries were so extensive that it could not have been "wrestling;" and (b) Tate could not have "done that kind of damage" to Tiffany and not realized what he was doing.[9]

Despite the verdict – and its total rejection of the "wrestling defense" – Lewis and Tate's mother jetted off to New York the very next day to appear on the "Today" show, where they continued to flog the fraudulent defense. During this appearance, Lewis maintained that Tiffany's death was an "accident" and that it was simply "child's play that went wrong." Continuing to beat the WWFE drum, Lewis went on to state that "[e]veryone who saw the trial understood that this child was simply imitating what he'd seen on TV" and that "everyone who was there knew that wrestling played a major part in Lionel's make-up and in what happened to Tiffany." (January 26, 2001, "Today" Show Transcript attached at **Appendix Tab 17**) Apparently, the Tate jurors were not among the "everyone" who had seen the trial.

---

[9]     *See, e.g.,* 1/25/01 Ft. Lauderdale Sun-Sentinel; 1/26/01 Detroit News; 1/26/01 Miami Herald, attached at **Appendix Tab 16**.

Lewis's continuing attacks on WWFE, even in the face of the jury's rejection of his theory, did not sit well with the trial judge. On March 9, 2001, Judge Lazarus sentenced Lionel Tate to life in prison on his First Degree Murder conviction. In his Order, Judge Lazarus all but called Lewis's "wrestling defense" a sham and a hoax. As Judge Lazarus put it:

> But the facts on which the jury relied are deceptively simple in *rejecting the involvement of professional wrestling replication*; thus by necessary implication, accident:
>
> 1. In the two statements to the police, Lionel Tate's own words failed to indicate that wrestling played any part in Tiffany's brutal murder. The statements did not come close to explaining what happened in that townhouse.
>
> 2. In statements made to EMS and the police by the defendant's mother, neither accident nor wrestling played any part in Tiffany's fatality.
>
> *Not until there was a defense-initiated reenactment did actions initiating professional wrestling start to emerge as a defense.* This reenactment totally failed to explain to the jury during trial, and to this judge sitting as a thirteenth juror in the motion for new trial/reduction of charge, the extent and severity of the injuries to Tiffany Eunick. Even though the reenactment depicted a connection to professional wrestling, the testimony of Dr. Brannon shows that Lionel Tate disbelieved the authenticity of what he saw on television. *The reenactment in all due respect, seemed to be trying to fit the facts, rather than a true depiction of the events.*
>
> Accordingly, the jury obviously then, and this court now, did not and does not accept that replicating what may or may not have been seen in various televised wrestling shows as a reason to call Lionel Tate's actions 'accidental.'

After listing the numerous injuries that Tiffany had suffered at Lionel Tate's hands, Judge Lazarus found that it was "inconceivable that such injuries could be caused by 'roughhousing,' 'horseplay,' or by replicating professional wrestling moves." (Appendix Tab 15) (emphasis added).

## WWFE's Defamation Lawsuit Against Lewis and Others

As Lewis took the Tate case from indictment toward trial, his public defamatory comments about WWFE did not stand alone. Rather, Lewis conspired and cooperated with the other defendants in this case – including L. Brent Bozell and the Parents Television Council – in a concerted effort to damage WWFE in its business and to generate more notoriety and/or funding for themselves. As the facts of the Tate case – and of the other child death cases that Lewis and his co-conspirators cited in their attacks – developed, however, it became clear that none of these cases had any connection to WWFE or its wrestling programs.

Nevertheless, in an effort to grab headlines and to harm further the WWFE's image, Lewis served a subpoena on WWFE wrestler Dwayne Johnson, a/k/a "The Rock," who had absolutely no connection whatsoever to the Tate case, but who happened to reside in South Florida. When WWFE moved to quash the subpoena and warned Lewis about his public defamatory statements, Lewis ran to the media and proclaimed his defiance by daring WWFE to sue him. *See, e.g.*, 3/20/00 Sun-Sentinel, attached at **Appendix Tab 18**.

When all other efforts to halt the defendants' smear campaign failed, WWFE filed a defamation suit against the defendants in Federal Court in New York on November 9, 2000. In the lawsuit, WWFE seeks damages for false and defamatory statements that Lewis made *in the media*. Although Lewis's in-court statements are relevant to his *waiver* of "work product" and "attorney-client privilege" protections, WWFE in no way seeks to hold Lewis *liable* for statements that he made in the courtroom in defense of his client.

But WWFE's lawsuit was not the end of its effort to convince the defendants to repudiate their lies. Even after filing suit, WWFE continued to request that the defendants cease defaming it. Indeed, when the Tate verdict came down on January 25, 2001, counsel for WWFE twice wrote to the Bozell defendants to demand a public retraction of their defamatory statements, all

**Kirkpatrick & Lockhart LLP**

to no avail.   (January 30, 2001, and March 13, 2001, Letters from Jerry McDevitt to Robert Sparks, attached at **Appendix Tab 19**).

WWFE is not alone in believing that it has valid claims against Lewis for his out-of-court statements defaming WWFE.  When Lewis and his co-conspirators moved to dismiss WWFE's complaint, the Honorable Denny Chin, United States District Judge for the Southern District of New York, *denied* the motions in all respects.  In doing so, Judge Chin noted that WWFE's allegations, if proved, suggested that Lewis – through his media blitz on the "wrestling defense" – was placing his own notoriety above the interests of his young client.  *See* Transcript of April 26, 2001, Hearing on Defendants' Motion to Dismiss, pp. 6-7 (attached at **Appendix Tab 20**).

### Discovery in the Lawsuit Against Lewis, et al.

On November 15, 2000, WWFE served the defendants with its First Set of Interrogatories and First Request for Production of Documents.  In response, Lewis provided virtually no information and absolutely *no documents that would be responsive to the current subpoena.* Instead, he repeatedly objected that the materials requested were "privileged as attorney/client and work product."  *See* Lewis's Response to First Set of Interrogatories and Response to First Request for Production of Documents, dated May 10, 2001, attached at **Appendix Tab 21**. Despite the objection, however, Lewis never produced a log of purportedly "privileged" documents, as required by the Federal Rules of Civil Procedure and by the Local Rules of the United States District Court for the Southern District of New York. *See* Fed. R. Civ. P. 26(b)(5); SDNY Local Rule 26.2.

When the issue of Lewis's inadequate responses came before Judge Chin, Lewis defended his non-response by claiming that he no longer had custody or control over the files he had developed for the Tate case, including any and all documents responsive to WWFE's

discovery requests. Instead, Lewis said, he had turned over the entire file to Tate's appellate counsel, Richard Rosenbaum, Esq., who was purportedly denying Lewis access to his own files. Lewis even filed an Affidavit in the defamation case attesting to the foregoing facts. *See* June 1, 2001, Letter from James S. Lewis to Jerry McDevitt, and July 12, 2001, Affidavit of James S. Lewis, (attached at **Appendix Tab 22**). Thus, according to Lewis, and as Judge Chin found, in order for WWFE to obtain the responsive documents to which it was entitled, it would have to serve a Rule 45 subpoena *duces tecum* on Mr. Rosenbaum. That's just what WWFE did.

### WWFE's Rule 45 Subpoena *Duces Tecum*

On December 13, 2001, WWFE served a Rule 45 subpoena on Mr. Rosenbaum's wife at their Broward County home.[10] (Copy of Subpoena *Duces Tecum* attached at **Appendix Tab 23**) On December 14, counsel for the WWFE in the New York action sent a copy of the subpoena to all counsel of record in the case, including Michael J. Quarequio, Esq., counsel for Lewis. (Copy of 12/14/01 Letter attached at **Appendix Tab 24**) The subpoena – with a return date of December 21, 2001 – contained 14 requests, which may fairly be divided into the following groups of documents: (1) publicly available records (Requests 1-5 and 9, and parts of 8 and 12-14); (2) documents reflecting statements that Lewis made to third parties, including the media (Requests 10-13); and (3) documents reflecting the statements of any prospective witness, including Lionel Tate, however generated (Requests 6, 7, 14).

On December 19, Stephen M. Zukoff, Esq., counsel for Richard Rosenbaum, called counsel for the WWFE and stated that Mr. Rosenbaum would be moving to quash the subpoena and would not produce *any* documents until the Court had ruled on his objections. When pressed

---

[10]     This subpoena complied fully with all applicable Federal Rules and Local Rules, including those governing service and the timing of a response. Nowhere in Rosenbaum's motion is there any contrary suggestion.

**Kirkpatrick & Lockhart** LLP

for a reason for the motion, Mr. Zukoff simply stated that the documents requested were "privileged." Counsel for the WWFE then received a copy of the motion to quash via facsimile on Friday, December 21. The motion contained numerous grounds that Mr. Zukoff had never addressed with counsel for the WWFE during the December 19 telephone call.

On Wednesday, December 26, counsel for the WWFE spoke again with Mr. Zukoff, this time to address the "new" objections that Mr. Rosenbaum had first made in his motion. Specifically, counsel for the WWFE told Mr. Zukoff that (a) the return date on the subpoena was not an issue, because WWFE had already agreed to give Mr. Rosenbaum substantial additional time in which to comply; (b) WWFE could relieve any "burden" on Mr. Rosenbaum's staff by reviewing the Lewis files itself; (c) WWFE was entitled to any "publicly-available" records, as well as alleged work product, as part of its need for documents relevant to Lewis's state of mind when he made his various defamatory statements; and (d) Lewis had waived any "attorney-client privilege" by his repeated public disclosures of his conversations with his client. Counsel for the WWFE confirmed each of these points in a letter dated December 27, 2001. (Copy attached at **Appendix Tab 25**)

In response, Mr. Zukoff faxed a letter that (a) confirmed his client's steadfast refusal to produce *any* documents until this Court rules on the Motion to Quash and (b) contained several comments on Tate's criminal conviction. (Copy of 12/27/01 Letter attached at **Appendix Tab 26**). The following day, counsel for the WWFE replied to Mr. Zukoff's letter and clarified WWFE's position on the subpoena. (Copy of 12/28/01 Letter attached at **Appendix Tab 27**)

As it stands today, Mr. Rosenbaum has refused to produce *any* of the Lewis documents to WWFE in response to the subpoena.

**Kirkpatrick & Lockhart** LLP

## ARGUMENT

### I.   THE SUBPOENA IMPOSES NO "UNDUE BURDEN" ON ROSENBAUM.[11]

In various places throughout his motion, Rosenbaum complains that the WWFE subpoena would impose an "undue burden" on him and his small staff, especially in light of his appellate brief in the Tate case, which was originally due on Friday, January 4, 2002.[12]   In making this claim, Rosenbaum bears the burden of proving "undue burden," with citation to specific facts regarding the nature or volume of production that makes compliance "unduly burdensome." *See Flatlow v. Islamic Republic of Iran*, 196 F.R.D. 203, 206 (D.D.C. 2000) (bare assertions of a burden do not satisfy the specificity requirement of an undue burden objection; showing of burden must be specific). *See also Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C.Cir.1984); *Equal Employment Opportunity Commission, v. Roadway Express, Inc.*, 75 F. Supp. 2d 767, 772 (N.D. Ohio 1999); *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D. Tex. 1998); *Plant Genetic Systems v. Northrup King Co., Inc*, 6 F. Supp. 2d 859, 862 (E.D. Mo. 1998) (holding that bare assertion by a party that it would be burdensome for it to comply with subpoena is insufficient to grant motion to quash).   The vague assertions in Rosenbaum's motion are inadequate to meet this burden and, in fact, are contrary to the facts, as shown below.

---

[11]     Ironically, Rosenbaum's motion imposes an "undue burden" on WWFE, because nowhere in his motion does Rosenbaum specify which of his myriad objections applies to which of WWFE's requests.  Consequently, WWFE will simply have to assume that Rosenbaum's objection to producing "publicly available" documents applies to *any* such documents, but that his objections on "work product" and "privilege" grounds apply only to those requests that theoretically call for such materials.

[12]     Rosenbaum's lawyer, Stephen M. Zukoff, has since informed the undersigned that Rosenbaum has requested an extension of this date, further raising the specter that Rosenbaum's objections are simply calculated to deny WWFE the timely discovery to which it is entitled.

*First*, WWFE has already told Rosenbaum's counsel that WWFE has no objection to postponing until January 18 the date for compliance with the subpoena. This should allow Rosenbaum and his staff ample time to review the Lewis files and to produce all documents as to which no claim of privilege is properly made in writing.

*Second*, the Lewis files are a discrete set of documents, and it is highly likely that, in carrying out his duties as Tate's appellate counsel, Rosenbaum has carefully segregated and categorized all of these materials. It is also highly likely that Rosenbaum has compiled many of these documents into one or more appendices for his appellate brief. The time required to copy these documents should impose no *undue* burden on Rosenbaum.

*Third*, WWFE has offered to fly to Ft. Lauderdale to review and copy all of the Lewis documents as to which Rosenbaum makes no claim of privilege. Surely, this will eliminate *any* possible "burden" on Rosenbaum and his staff.

*Fourth*, whatever "burden" remains is attributable not to WWFE but to Lewis, who denied custody and control over the requested documents and who required WWFE to obtain them from Rosenbaum via subpoena. Rosenbaum's complaint, then, is not with WWFE.

Consequently, the Court should overrule Rosenbaum's blanket objection to the subpoena on the grounds of alleged "undue burden."

**Kirkpatrick & Lockhart** LLP

## II.    WWFE IS ENTITLED TO "PUBLICLY AVAILABLE" DOCUMENTS.

Rosenbaum next complains that many of the documents requested are "publicly available" and that WWFE should seek them from "other more qualified records custodians." Motion to Quash at 5.[13]   Rosenbaum's objection misses the boat.

James Lewis, whose files Rosenbaum now controls, is a defendant in a defamation case pending in the Southern District of New York.  In order to prevail in its defamation claim against Lewis, WWFE will have to prove, among other things, that Lewis's defamatory public statements about WWFE were false and, perhaps, that Lewis made them with actual malice, *i.e.*, with knowledge that the statements were false or with reckless disregard as to their falsity.  *See* May 24, 2001, Opinion of the Honorable Denny Chin, p. 11 (attached at **Appendix Tab 28)**.  *See also New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Celle v. Filipino Reporter Enterps.*, 209 F.3d 163, 182 (2nd Cir. 2000).  "Malice," in turn, is defined as "spite, ill will, hatred, or the intent to inflict harm, or . . . a reckless disregard of the [defamed party's] rights." Chin Opinion at 19 (citation omitted).  In other words, "malice" is a *state of mind*, proven by "objective facts," such as what the party making the defamatory statement knew and when he knew it.  *E.g.*, Chin Opinion at 20, citing *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982).

In Requests 1, 2, 3, 4, 5, and 9, as well as in parts of 8, 12, 13, and 14, WWFE seeks publicly available evidence *that was actually in Lewis's possession* when he was making his defamatory public statements.  By exploring the information that Lewis, himself, had, WWFE can adduce "objective facts" showing that Lewis either *knew* his public statements were false or

---

[13]     In support of this contention, Rosenbaum cites only Requests 1-5, though several other requests may call for documents that Lewis obtained from public sources or that found their way into the public forum through Lewis or others, *i.e.*, Requests 6, 7, 8, 9, 12, 13, and 14.  WWFE's "public record" argument applies with equal force to any such documents.

had *no basis* on which to make them, both of which show malice. Access to these documents is especially critical here, because Judge Chin has imposed a strict **15 deposition limit** on the parties, despite the complexity of the factual issues in this defamation case. Because WWFE needs these documents to prove its case, and because Rosenbaum has no other conceivable objection to the production of documents covered by Requests 1, 2, 3, 4, 5, and 9, WWFE respectfully requests that the Court order their immediate production.[14] *See, e.g., Williams v. City of Dallas*, 178 F.R.D. 103, 111 (N.D. Tex. 1998) (finding that "public availability" of the documents was no defense to production where the relevant issue was the movant's *possession* of the documents).

**III.  "WORK PRODUCT" PROTECTION DOES NOT PROHIBIT DISCLOSURE OF THE REQUESTED DOCUMENTS.**

    **A.  Rosenbaum Has Not Carried His Burden of Proving the Applicability of "Work Product" Protection to Any Documents at Issue.**

As a threshold matter, the party claiming a "work product" protection with respect to requested materials bears the burden of proving each element of this defense to production. *See, e.g., In re Air Crash Near Cali, Colombia on December 20, 1995*, 959 F. Supp. 1529, 1531 (S.D. Fla.1997) (finding that "[i]n order to preserve the liberal discovery contemplated by the Federal Rules, the burden falls on the party opposing discovery . . . to prove its entitlement to a privilege for otherwise relevant documents"); *In re Air Crash Disaster at Sioux City, Iowa*, 133 F.R.D. 515, 518 (N.D. Ill.1990) (reaffirming the well-settled proposition that "the party seeking the privilege has the burden of establishing all of its essential elements").

---

[14]    To the extent that Rosenbaum is claiming "work product" protection or "attorney-client privilege" for documents covered by Requests 8, 12, 13, and 14, WWFE will address such claims in the following sections.

**Kirkpatrick & Lockhart** LLP

Thus, as to each document that Rosenbaum seeks to withhold on grounds of "work product" protection, he must establish: (1) that an attorney or his agent prepared a particular document; (2) that such person was acting on behalf of the client when he or she did so; and (3) that such person prepared the document in anticipation of litigation. *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979), citing *Hickman v. Taylor*, 329 U.S. 495 (1947).

Although Rosenbaum makes a vague, sweeping claim to work product protection on Lewis's behalf, he has not even attempted to show how each document withheld on this basis meets these criteria."[15] As such, Rosenbaum has not met his burden on this issue, and the Court should reject his blanket assertion of "work product" protection.

## B. Both Lewis and Rosenbaum Waived Any "Work Product" Protection by Failing to Produce a Privilege Log.

Assuming, *arguendo*, that Rosenbaum made his "work product" objection in good faith, and not for the purposes of obstruction or delay, he was still required to produce a "privilege log" that sets forth detailed information about every document as to which he is claiming such protection. *See* Fed. R. Civ. P. 45(d)(2); United States District Court for the Southern District of Florida, Local Rule 26.1(G)(3)(b). As noted above, Lewis had the same obligation in response to WWFE's discovery requests in the underlying defamation case. *See supra* at 13. Neither attorney has produced any such log.

Under these circumstances, this Court may find that Lewis and Rosenbaum have waived any "work product" protection that might otherwise have applied. *See, e.g., TIG Insurance Corporation of America v. Johnson*, 799 So.2d 339, 340 (Fla. Dist. Ct. App. 2001); *A.I.A.*

---

[15] Theoretically, Rosenbaum could raise work product objections on Lewis's behalf with respect to *certain* documents sought in Requests 6, 7, 8, 9, 10, 11, 12, 13, and 14. His failure to provide a privilege log, however, leaves WWFE *and this Court* guessing as to what requests – and what documents – Rosenbaum is even raising the "work product" objection.

**Kirkpatrick & Lockhart** LLP

*Holdings, S.A. v. Lehman Brothers, Inc. and Bear Stearns & Co., Inc.*, 2000 WL 1538003, at *3 (S.D.N.Y. Oct. 17, 2000) (holding that "[w]here a party has completely failed to provide an index of documents withheld on the ground of privilege, a finding of waiver is appropriate") (copy attached hereto as **Exhibit A**); *Hurst v. F.W. Woolworth Co.*, 95 Civ. 6584 (CSH), 1997 WL 61051 at *6 (S.D.N.Y. Feb 11, 1997) (copy attached hereto as **Exhibit B**); *John Labatt Ltd. v. Molson Breweries*, 93 Civ. 75004, 94 Civ. 71540 (RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995), *aff'd*, 100 F.3d 919 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1275 (1997) (copy attached hereto as **Exhibit C**).[16]  WWFE would ask the Court to do just that.

## C.   Lewis Waived Any "Work Product" Protection Through Public Disclosure.

Even if the Court were to excuse Rosenbaum and Lewis's failure to produce a privilege log, the Court should still reject Rosenbaum's claim, to the extent that Lewis disclosed the contents of any such documents to third parties.  For example, any public use or disclosure of any witness statements sought in Requests 6, 7, and 8 would operate as a waiver of the "work product" protection, because "[t]he privilege derived from the work-product doctrine is not absolute.  Like other qualified privileges, it may be waived." *United States v. Noble*, 422 U.S. 225, 239 (1975).

Likewise, there can be no claim of protection as to Request 9, because that Request seeks only documents that Lewis actually *used* as part of his defense of Lionel Tate.  As the Supreme Court held in *Noble*, where an attorney disclosed the work product of his investigator through trial testimony, he waived "work product" protection with respect to the entire subject matter of such testimony. *Id.* at 240 (observing that "Respondent can no more advance the work-product

---

[16]     "Although most of the reported cases arise in the context of a claim of attorney-client privilege, the 'specify or waive' rule applies equally in the context of claims of work product privilege." *In re Grand Jury Subpoena*, 2001 WL 1356363 at *9 , __ F.3d___, (1st Cir. Nov. 8, 2001) (copy attached hereto as **Exhibit D**).

**Kirkpatrick & Lockhart** LLP

doctrine to sustain a unilateral testimonial use of the work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination").

Finally, Rosenbaum can claim no "work product" protection as to Requests 11, 12, and 13, because these Requests seek, among other things, materials that Lewis shared with persons or entities that were not parties to the State criminal case against Lionel Tate.  By sharing with third parties whatever facts, impressions, or conclusions such materials might contain, Lewis has waived any "protection" that might otherwise have attached to them.

### D.   WWFE Has "Substantial Need" of the Requested Documents and Would Suffer "Undue Hardship" Without Them.

Finally, even if the Court were to hold that the work product doctrine *applied* in this case *and* that Lewis had not *waived* it through third-party disclosures, WWFE can still overcome the claim on the basis of "substantial need" and "undue hardship."  *See Hickman v. Taylor*, 329 U.S. 495, 511-12 (1947) (holding that a party seeking production of an opposing counsel's "work product" must show substantial need and undue hardship).

As noted above, the defamation claim against Lewis will require proof of both falsity and malice.  In order to get inside Lewis's mind – and to understand what he knew or believed about his "wrestling defense" at the time he made his defamatory statements – WWFE needs access to Lewis's files.  Only those files can tell us whether Lewis (a) *knew* his defamatory statements to be false; (b) *believed* them to be false; or (c) had done an investigation inadequate to justify his statements, which would show reckless disregard for their falsity.  *There is no other source for documents evidencing Lewis's state of mind when he made his false, defamatory statements about WWFE.*

Moreover, without these documents, WWFE will be severely prejudiced in the presentation of its defamation case, because, while WWFE could certainly produce evidence to show the *falsity* of Lewis's statements, WWFE would be unable to show that Lewis *knew* the objective truth and was, therefore, acting with *malice* when he made his statements.

In light of the foregoing, WWFE respectfully requests that the Court overrule Rosenbaum's non-specific claims to "work product" protection and order production of the Lewis files.

## IV.   THE "ATTORNEY-CLIENT PRIVILEGE" DOES NOT PROHIBIT DISCLOSURE OF THE REQUESTED DOCUMENTS.

### A.   Rosenbaum Has Not Carried His Burden of Proving the Applicability of the "Attorney-Client Privilege" to Any Document at Issue.

In order to invoke the attorney client privilege, the claimant must establish that: (1) the asserted holder of the privilege is, or sought to become, a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate . . . (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *See U.S. v. Noriega*, 917 F.2d 1543, 1551 (11th Cir.), *cert. denied*, 498 U.S. 976 (1990), citing *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.), *cert. denied*, 439 U.S. 829 (1978). Once again, despite a lengthy exposition on the law of attorney-client privilege, Rosenbaum nowhere attempts to explain *how* this privilege applies to any document that WWFE requested in its subpoena, nor does he show how each purportedly "privileged" document meets each of the

24

**Kirkpatrick & Lockhart LLP**

criteria for application of attorney-client privilege.[17]   As such, the Court should deny Rosenbaum's motion on this ground.

**B.**     **Both Lewis and Rosenbaum Waived the Privilege by Failing to Produce a Privilege Log.**

As noted above, the Federal Rules of Civil Procedure and the Local Rules of this Court required Rosenbaum – and Lewis – to file a "privilege log" with respect to any documents withheld on the grounds of "attorney-client privilege." *See supra* at 20.  Having failed to file such a log – which would allow WWFE to contest the assertion of privilege and permit this Court to evaluate Rosenbaum's claims – Rosenbaum has waived any attorney-client privilege that might otherwise have attached to these documents.  *See, e.g., TIG Insurance*, 799 So.2d at 340; *A.I.A. Holdings*, 2000 WL 1538003, at *3 (**Exhibit A**); *Hurst*, 1997 WL 61051 at *6 (**Exhibit B**); *John Labatt Ltd.*, 1995 WL 23603 at *1 (**Exhibit C**).

**C.**     **Tate and Lewis Waived the Privilege Through Public Disclosures.**

Setting aside the defective *manner* in which Lewis and Rosenbaum asserted a privilege on Tate's behalf, and *assuming*, for argument's sake, that Tate and Lewis actually had communications for the purpose of securing, or rendering, legal advice, Tate and Lewis waived any privilege by failing to keep such communications confidential, a key requirement for the assertion of the privilege.  *See U.S. v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) (holding that "at the point where the attorney-client communications are no longer confidential, i.e., where there has been a disclosure of a privileged communication, there is no justification for retaining the privilege").  *See also United States v. Gordon-Nikkar*, 518 F.2d 972, 975 (5th Cir.1975); *In re*

---

[17]     WWFE will assume, without conceding, that Requests 6 and 8-14 could *conceivably* call for "privileged" documents, though most of these requests are geared, in the main, toward documents surrounding Lewis's public defamation of WWFE through the media.

**Kirkpatrick & Lockhart** LLP

*Weiss*, 596 F.2d 1185, 1186 (4th Cir.1979); *United States v. Arnoff*, 466 F. Supp. 855, 862 (S.D.N.Y. 1979); *United States v. Mierzwicki*, 500 F. Supp. 1331, 1334 (D. Md. 1980).

In this case, the basis of WWFE's lawsuit against Lewis is his relentless public campaign to explain his client's actions by attacking WWFE. As part of this campaign, Lewis repeatedly described for a sensationalist media how Lionel Tate had "accidentally" killed Tiffany Eunick while "mimicking wrestling moves" he had supposedly learned from WWFE programming. For example, Lewis made the following statements to the national media:

- On October 22, 1999, Lewis trotted out his bogus "wrestling defense" on the "Leeza" show. During the taping, Lewis told Leeza Gibbons that "you have a child here [Tate] *basically who indicates that he was horsing around with her [Tiffany Eunick] . . . acting out wrestling moves . . . .*" He then told Leeza that Tate had "*told the child psychiatrist in this case* that that's exactly what happened. That he was throwing her . . . like they would whip her into a ring rope." ("Leeza" Transcript attached at **Appendix Tab 29**) (emphasis added)

- On January 28, 2000, Lewis told the Miami Herald that "*Lionel didn't mean to hurt this girl, he wasn't* angry and he didn't have any reason to hurt her. *He was just acting out what he'd seen on television . . . .*" (1/28/2000 Article attached at **Appendix Tab 30**) (emphasis added)

- On March 9, 2000, Lewis told the Miami Herald that "You have a young boy acting out a move he sees on television" and that it was a "Sprite Commercial featuring Sting [a professional wrestler] that was apparently what was being mimicked." (3/9/2000 Article attached at **Appendix Tab 31**)

- On March 22, 2000, Lewis appeared on a "Court TV" special with Catherine Crier, at which time Lewis volunteered that: "*My client basically said that they were playing wrestling and that he came up behind her and dropped her to the floor and she hit her head . . . .*" (Transcript attached at **Appendix Tab 32**) (emphasis added)

- On April 28, 2000, Lewis appeared on the Fox News program "The O'Reilly Factor" and repeated his story that Lionel and Tiffany "were acting out what they saw on television – the WWF and the WCW. He [Tate] had watched wrestling over a period of years and was basically playing with this little girl when he killed her." (Transcript attached at **Appendix Tab 33**)

- On January 16, 2001, Lewis told a national audience watching the Tate trial on "Court TV" that Tiffany Eunick died while she and Lionel Tate were "play wrestling." According to Lewis, Tiffany punched Lionel several times, and Lionel punched her back. When Lionel tried to swing Tiffany onto a couch, he caught his foot on a table and propelled her into an iron railing. *See* January 16, 2001, Transcript of Trial Proceedings, Volume 5, p. 554 (attached at **Appendix Tab 34**).

- In the Klass videotape, which aired on national television and which the prosecution introduced into evidence at trial, *Lionel Tate himself* purports to describe the events of July 28, 1999, including how his alleged "play wrestling" resulted in the violent death of Tiffany Eunick. (**Appendix Tab 6**)

At a minimum, unless Lewis's "wrestling defense" was *solely* his own concoction, all of these statements reveal the content of purportedly "confidential" communications between Tate and Lewis (or his agents) about *how* Tiffany Eunick died. Because Lewis and Tate chose to make public disclosure of the contents of such communications, they have waived any attorney-client privilege claim with regard to all communications on the same *subject matter. See, e.g., Urban Outfitters, Inc. v. DPIC Companies, Inc.,* 203 F.R.D. 376, 381 (N.D. Ill. 2001) (holding that "[v]oluntary disclosures, as opposed to inadvertent disclosures, waives the privilege as to remaining documents of the same subject matter"); *Golden Valley Microwave Foods, Inc, v. Weaver Popcorn Company, Inc.,* 132 F.R.D. 204, 207 (N.D. Ind. 1990); *Greene, Tweed of Delaware, Inc. v. Dupont Dow Elastomers, L.L.C.,* 202 F.R.D. 418, 420 (E.D. Pa. 2001) (holding that the voluntary disclosure of attorney-client communications waives the privilege to all other communications on the same subject).

Likewise, all of Lewis's public statements regarding Tate's personal history – including his alleged infatuation with professional wrestling– serve as a waiver of any purported attorney-client privilege regarding *that* subject. Because the documents that WWFE seeks through its subpoena address these two subjects, the Lewis and Tate disclosures waived any otherwise applicable privilege with respect to these documents, and they cannot reclaim it now. *See*

**Kirkpatrick & Lockhart** LLP

*Suarez*, 820 F.2d at 1160 (finding that "it has long been held that once waived, the attorney-client privilege cannot be reasserted").

Although Rosenbaum may argue that only Lionel Tate could have waived the privilege, *Tate's own disclosures* evidence this waiver. As noted above, it was Lionel Tate himself who appeared on the Klass videotape, purporting to recount how he had "accidentally" killed Tiffany Eunick on July 28, 1999. This tape – condemned as a sham by Judge Lazarus – was designed for public consumption and was, in fact, disclosed to the public. Clearly, then, the *subject matter* of how Tate killed Tiffany is no longer confidential, and the privilege is waived.

In addition, even *Lewis's* "solo" disclosures may fairly be attributed to Tate. **First**, as Rosenbaum himself points out in his motion, Lewis had a fiduciary duty to Tate and an ethical obligation not to make public statements about Tate's case without Tate's consent. *See* The Florida Bar, Rule of Professional Conduct 4-1.6 (stating that a lawyer "shall not reveal information relating to representation of a client . . . unless the client consents after disclosure to the client"). There is no record evidence that Lewis violated this Rule, nor has Rosenbaum contended that Lewis did.

**Second**, Tate and his mother never objected to any of Lewis's public pronouncements about the bogus "wrestling defense." Moreover, Tate and his mother both sat through his criminal trial, during which Lewis made statements, and put on evidence, in support of his concocted theory about how Tiffany Eunick met her untimely demise. And Tate's mother, his legal guardian, went on the "Today" show and on "Dateline NBC" to perpetuate the "wrestling defense" hoax and to put her "spin" on her child's case.

These facts provide compelling evidence that Tate was part and parcel of the hoax and that he agreed to waive the attorney-client privilege when he believed it would benefit his

**Kirkpatrick & Lockhart** LLP

defense, whether in the eyes of the public or at trial.[18]  *See Suarez*, 820 F.2d at 1160-61 (finding waiver where client allowed his attorney to disclose communications to third parties); *In Re Claus von Bulow*, 828 F.2d 94, 100-101 (2nd Cir. 1987) (holding that a client, by his actions, may impliedly waive the attorney-client privilege or consent to disclosure); *United States v. Bump*, 605 F.2d 548,551 (10th Cir. 1979) (finding waiver where client made no showing that attorney's disclosures were without his consent); *Griffith v. Davis*, 161 F.R.D. 687, 698 (C.D. Cal. 1995) (holding client's consent to disclosure waived the privilege, even in the absence of an explicit waiver); *Drimmer v. Appleton*, 628 F. Supp. 1249, 1252 (S.D.N.Y. 1986) (finding implied waiver).

In sum, Rosenbaum has not established the elements of the attorney-client privilege, and, to the extent he may try, Lewis and Tate have already waived any possible claim to the privilege. Therefore, any documents that Rosenbaum seeks to withhold on privilege grounds – including all documents responsive to Requests 6 and 14 – should be ordered produced.[19]

---

[18]    Rosenbaum suggests in his motion that Lionel Tate actually refused to waive his attorney-client privilege. Rosenbaum's "Exhibit A" provides absolutely no support for this assertion and has nothing to do with the waiver at issue in this response. Moreover, as Rosenbaum neglects to mention, Judge Lazarus *overruled* defense objections regarding Tate's competence to waive his rights. *See* March 8, 2001, Order, attached at **Appendix Tab 35**.

[19]    Even if the Court holds that the privilege has not been waived, the Court should order Rosenbaum to produce all purportedly privileged documents for an *in camera* review under the crime/fraud exception to the attorney-client privilege.  The foregoing facts – including Judge Lazarus's sentencing order and Judge Chin's comments upon denying Lewis's motion to dismiss strongly suggest that Lewis (possibly in concert with Tate and/or Tate's mother) concocted the "wrestling defense" as a fraud upon the court. This showing should be sufficient to trigger an *in camera* review. *See United States v. Zolin*, 109 S. Ct. 2619, 2631-32 (1989) (holding that an *in camera* review is appropriate where the moving party has presented sufficient evidence to support a reasonable belief that such review may yield evidence to establish the crime/fraud exception); *In Re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 829-30 (9th Cir. 1994) (finding that the party opposing the privilege need only make a showing "sufficient to establish a reasonable belief that *in camera* review *may lead to evidence* that the exception applies" and that the court need consider only *that* party's presentation); *Gutter v. E.I. DuPont de Nemours & Co.,*

## CONCLUSION

WWFE's subpoena imposes no "undue burden" on Rosenbaum, and Rosenbaum has no factually or legally valid objection on grounds of "public availability" or "work product." To the extent that any of the requested documents might otherwise be privileged, Rosenbaum, Lewis, and Tate have all waived the privilege, and, in any event, the crime/fraud exception to the "work product" and "attorney-client" privileges may apply. Therefore, WWFE respectfully requests that the Court deny Rosenbaum's Motion to Quash in its entirety and order the immediate production of all the requested documents.

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP

Daniel A. Casey
KIRKPATRICK & LOCKHART LLP
201 South Biscayne Boulevard, 20th Floor
Miami, FL 33131
(305) 539-3324 (phone)
(305) 358-7095 (fax)

Attorneys for World Wrestling
Federation Entertainment, Inc.

---

124 F. Supp. 2d 1291, 1299, 1306-07 (S.D. Fla. 2000) (holding that the party opposing the privilege need only make a "prima facie" showing that the client and the attorney were committing or about to commit some type of fraud upon the court), citing *In Re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987). WWFE respectfully submits that the attached Appendix contains such a "prima facie" showing, which applies equally to Rosenbaum's "work product" objections. *See In Re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994).

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 7th day of January, 2002, via United States, mail on the following counsel:

Thomas A. Leghorn, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, New York  10017-5639

Michael J. Quarequio, Esquire
500 Southeast 6th Street, Suite 100
Fort Lauderdale, Florida  33301

Robert R. Sparks, Jr., Esquire
Herge, Sparks & Christopher, LLP
6862 Elm Street, Suite 360
McLean, VA  22101

Stephen Zukoff, Esq.
19 West Flagler Street, Suite 510
Miami, Florida  33130

Daniel Casey

**Kirkpatrick & Lockhart** LLP

2000 WL 1538003                                    **Page 1**
(Cite as: 2000 WL 1538003 (S.D.N.Y.))
<KeyCite Yellow Flag>

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

**A.I.A. HOLDINGS, S.A., et al., Plaintiffs,**
v.
**LEHMAN BROTHERS, INC. and BEAR STEARNS & CO., INC., Defendants.**

No. 97CIV4978(LMM)(HBP).

Oct. 17, 2000.

Peter N. Wang, Esq., Friedman, Wang & Bleiberg, P.C., New York.

K. Chris Todd, Esq., Kellogg Huber Hansen Todd & Evans P.L.L.C., Washington, D.C.

Jayant W. Tambe, Esq., Jones, Day, Reavis & Pogue, New York.

Robert W. Gaffey, Esq., Layton, Brooks & Hecht, New York.

Stephen L. Ratner, Esq., Rosenman & Colin, LLP, New York.

MEMORANDUM OPINION AND ORDER

PITMAN, Magistrate J.

**\*1** Currently pending are (1) plaintiffs' motion to compel defendants to produce (a) information concerning complaints against introducing brokers other than Daouk and his affiliated entities and (b) a May 17, 1995 audio tape that is being withheld on the basis of the work-product privilege and (2) Bear Stearns' motion for a protective order precluding the deposition of its chairman, Alan C. Greenberg. For the reasons set forth below, plaintiffs' motion is denied in part and granted in part. Bear Stearns' motion is denied.

*A. Introducing Broker Information*

Plaintiffs seek to compel defendants to answer the following interrogatory and document request concerning introducing

brokers:
Identify any communication, whether oral or written, between [defendant] and any [self regulatory organization], state, or federal regulatory organization regarding any complaints or inquiries concerning, referring or relating to [your] introducing brokers or entities alleged to be [your] introducing brokers; and identify for each such communication, the person(s) involved, and the date, place and content of the communication.

\* \* \*

[Produce] [a]ll documents concerning, referring or relating to any warnings, complaints, reprimands, questionnaires, requests, compliance inquiries, or citations issued by any [self regulatory organization], federal, or state regulatory authority to [you], concerning or regarding [your] introducing brokers, including [your] response thereto.
(Letter of Antonia Apps, Esq., dated June 9, 2000, tab 1 at 2 and 4, tab 2 at 2 and 4). Plaintiffs contend that the information sought may constitute relevant "similar act" evidence. Defendants contend that the information sought is irrelevant and that even if it does have some relevance, the burden of compiling and producing the information outweighs any potential relevance that it may have.

An introducing broker is a securities or commodities broker that uses the services of another broker, usually referred to as a clearing broker, to execute and process securities and/or commodities transactions. *See generally Greenberg v. Bear. Stearns & Co.,* 220 F.3d 22, 29 (2d Cir.2000); *Gilman v. BHC Sec., Inc.,* 104 F.3d 1418, 1423 (2d Cir.1997); *Katz v. Financial Clearing & Servs. Corp.,* 794 F.Supp. 88, 90 (S.D.N.Y.1992); *Stander v. Financial Clearing & Servs. Corp.,* 730 F.Supp. 1282, 1285 (S.D.N.Y.1990). At oral argument, defendants represented that they have had relationships with several hundred introducing brokers and that complaints concerning introducing brokers are maintained only in the files of the complaining customer. Thus, in order to compile the complaints regarding introducing

Copr. ® West 2002 No Claim to Orig. U.S. Govt. Works



EXHIBIT ___A___

brokers, a search would have to be made of the files of all the customers of all the introducing brokers.

Although defendants' handling of complaints concerning introducing brokers *may* have some probative value, I conclude that the burden and expense of retrieving complaints against clearing brokers other than Daouk and his affiliated entities outweighs the likely benefit of the information. Based on the representations of defendants' counsel, it appears that defendants have had relationships with a large number of introducing brokers in many parts of the world. Presumably, the relationships of each of these introducing brokers with their customers are subject to local regulation or local custom and practice. Given this variety, complaints about an introducing broker in one jurisdiction may have little to do with an introducing broker in another jurisdiction. The relevance of the information sought is further attenuated by the fact that the request is unlimited in time and seeks information concerning complaints made both before and after May 1995. Finally, the relevance of the information sought is still further attenuated by the fact that the discovery requests do not seek proven instances of misconduct by introducing brokers, but rather mere complaints which may or may not have merit. Although the scope of relevance is extremely broad for discovery purposes, *see generally Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991), the burden of recovering the information would be great and it appears that its potential probative value would be *de minimis.* Accordingly, I conclude that the potential relevance of the complaints concerning introducing brokers other than Daouk and his affiliated entities is substantially outweighed by the burden of compiling this information, and the motion to compel production of this information is denied. *See Food Lion, Inc. v. United Food & Commercial Workers Int'l Union,* 103 F.3d 1007, 10012-13 (D.C.Cir.1997); *Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602, 608 (S.D.N.Y.1989).

B. May 17, 1995 *Audio Tape*

*2 Plaintiffs next seek to compel production of an audio tape being withheld by Bear Stearns on the basis of the work-product doctrine. The only information provided by Bear Stearns concerning the tape is the date on which it was recorded, the claim that it is a "[c]onversation in anticipation of litigation" and that the work-product doctrine is being asserted (Letter of Antonia Apps, Esq ., dated June 9, 2000, tab 7).

Fed.R.Civ.P. 26(b)(5) provides:
When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.
Rule 26(b)(5) is supplemented by Local Civil Rule 26.2, which provides:
(a) Where a claim of privilege is asserted in objecting to any means of discovery or disclosure, ... and an answer is not provided on the basis of such assertion,
(1) the attorney asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed ...; and
(2) the following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:
(A) for documents: (i) the type of document; e.g., letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena *duces tecum,* including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other;
(B) for oral communications: (i) the name of the person making the communication and the names of persons present while the communication was made and, where not

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of the communication; and (iii) the general subject matter of the communication.

In order to satisfy these requirements, an index of documents withheld on the ground of privilege must, "as to each document, ... set[ ] forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." *Golden Trade, S.r.L. v. Lee Apparel Co.*, 90 Civ. 6291(JMC), 1992 WL 367070 at *5 (S.D.N.Y. Nov. 20, 1992). *See also Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.*, 707 F.Supp. 1429, 1439 (D.Del.1989) ("[A] party asserting work product protection must 'identify the withheld documents with sufficient particularity that the opposing counsel can intelligently argue that the privilege ought not to apply." '), *quoting Petz v. Ethan Allen, Inc.*, 113 F.R.D. 494, 497 (D.Conn.1985).

**\*3** Judged by these standards, Bear Stearns' description of the basis for the assertion of work product protection is inadequate. Neither the parties to nor the subject matter of the conversation are identified in any way. Rather, in describing the subject matter of the recording, the index listing merely states the definition of work product with no elaboration whatsoever. Since the definition of work product is implicit in Bear Stearns' assertion of work product, the description of the audio tape offered by Bear Stearns effectively provides no information at all and seems to have been designed with an intent to obfuscate rather than to illuminate.

Having concluded that Bear Stearns' index listing of the tape recording is deficient, the next issue is what consequence should result. On the facts of this case, I find that it is appropriate to conclude that Bear Stearns has waived whatever claim of work product it may have otherwise had. This is not a case where the record suggests that a good faith attempt was made to assert work product and that the index approaches, but does not quite meet, the requisite standard. The dearth of information in the index listing is so complete that the

listing is the functional equivalent of no listing at all. *See Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc., supra*, 707 F.Supp. at 1440 ("Because defendant's responses claiming the privilege are evasive and incomplete, they are the equivalent of a failure to answer for the purposes of a motion to compel."). Where a party has completely failed to provide an index of documents withheld on the ground of privilege, a finding of waiver is appropriate. *Hurst v. F.W. Woolworth Co.*, 95 Civ. 6584(CSH), 1997 WL 61051 at *6 (S.D.N.Y. Feb. 11, 1997); *John Labatt Ltd. v. Molson Breweries*. 93 Civ. 75004, 94 Civ. 71540(RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995), *appeal transferred sub nom.*, *Dorf & Stanton Communications, Inc. v. Molson Breweries*, 56 F.3d 13 (2d Cir.1995), *aff'd.* 100 F.3d 919 (Fed.Cir.1996); *Smith v. Conway Org., Inc.*, 154 F.R.D. 73, 76 (S.D.N.Y.1994); *Allstate Life Ins. Co. v. First Trust, N.A.*, 92 Civ. 4865 (SWK), 1993 WL 138844 at *3 (S.D.N.Y. Apr. 27, 1993); *Bank v. Manufacturers Hanover Trust Co.*, 89 Civ. 2946(MJL), 1990 WL 155591 at *2 S.D.N.Y. Oct. 9, 1990); *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y.1990); *Jackson v. Edwards*, 99 Civ. 0982(JSR) (HBP), 2000 WL 782947 at *2 (S.D.N.Y. June 16, 2000); *Large v. Our Lady of Mercy Medical Center*, 94 Civ. 5986(JGK)(THK), 1998 WL 65995 at *4 (S.D.N.Y. Feb. 17, 1998); *PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp.*, 93 Civ. 5375(SAS)(HBP), 1996 WL 525862 at *3-*4 (S.D.N.Y. Sept. 17, 1996). [FN1] Since Bear Stearns' index listing concerning this audio tape is the equivalent of no listing at all, the consequence should be the same as if there had been a total failure to list the tape on the index of documents withheld on the ground of privilege.

> FN1. Although there is authority reaching a contrary result and limiting the remedy to the belated preparation of the index of withheld documents, I do not find those cases persuasive. "Limiting the remedy to the belated preparation of a privilege log effectively tells practitioners they can flout the Court's Rules and incur no sanction other than an Order directing compliance with the rules." *PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp., supra*, 1996 WL 525862 at *4. *See* 2 Michael C.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Silberberg, *Civil Practice in the Southern District of New York* § 22.11 at 22-28 (2d ed. 2000) ("[T]he cases imposing waiver appear to express the better view of the appropriate remedy in the event a party fails to timely provide the privilege list.").

**\*4** Accordingly, within ten (10) days of the date of this Order, Bear Stearns shall produce a copy of the May 17, 1995 audio tape to counsel for plaintiffs.

### C. *Greenberg Deposition*

Finally, Bear Stearns seeks a protective order precluding the deposition of its chairman Alan C. Greenberg. At a conference on September 1, 2000, plaintiffs claimed that it was appropriate to take Greenberg's deposition because a May 1995 Memorandum by Ron Hersch, the director of Bear Stearns' futures department, indicates that Greenberg himself made inquiry of Hersch in 1995 concerning one of Daouk's affiliated entities. Plaintiffs also argued that it is appropriate to depose Greenberg because two of the plaintiffs (Debs and Baalbaki) claim to have had some direct contact with Greenberg concerning the subject matter of this action. Greenberg has submitted an affidavit in which he claims to have no recollection of any of the facts underlying this litigation, the subject matter of the Hersch memorandum and the alleged contacts with Debs and Baalbaki.

As I noted in *Holman v. ICN Pharmaceuticals, Inc.*, 98 Civ. 0674(AKH)(HBP), 1999 WL 1267459 at *1 (S.D.N.Y. Dec. 29, 1999): "[A]n order to vacate a notice of taking [a deposition] is generally regarded as both unusual and unfavorable ...." *Investment Properties Int'l, Ltd. v. IOS, Ltd.*, 459 F.2d 705, 708 (2d Cir.1972). *Accord Speadmark, Inc. v. Federated Dep't Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y.1997); *Naftchi v. New York Univ. Med. Ctr.*, 172 F.R.D. 130, 132 (S.D.N.Y.1997) ; *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co.*, 90 Civ. 7811(KC), 1993 WL 34678 at *2 (S.D.N.Y. Feb. 4, 1993); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 87 Civ. 3297(CSH), 1990 WL 138968 at *3 (S.D.N.Y. Sept. 20, 1990). Although there is serious reason to doubt (1) whether [conducting the deposition

in issue] will advance discovery on the case, and (2) whether taking [the deposition in issue] in California is the most prudent and economical way for an individual plaintiff to spend his litigation budget, I cannot conclude that [the witness in issue] is so completely without knowledge that his deposition should be precluded altogether .... In addition, the fact that [the witness] may have no personal knowledge of the [events in issue] and knows only what he was told by others does not affect the appropriateness of taking his deposition. *Naftchi v. New York Univ. Med. Ctr.*, *supra.* 172 F.R.D. at 132-33. Even hearsay is fair ground in discovery. *See Litton Systems, Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 827 (2d Cir.1983). Moreover, [the witness's] testimony concerning the statements made to him by [defendant's] employees may well be admissible against [defendant] as admission testimony. Fed.R.Evid. 801(d)(2).

Although I have no reason to doubt the veracity of Greenberg's Affidavit, the Hersch memo supports an inference that, at least in 1995, Greenberg had actually considered at least some of the allegations that gave rise to this action and participated in internal discussions of those alleged facts. Defendants have cited no authority demonstrating that plaintiffs are not entitled to an opportunity to refresh Greenberg's memory with respect to these events.

**\*5** Accordingly, no later than twenty (20) days from the date of this Order, Bear Stearns shall make Greenberg available for deposition by plaintiffs' counsel. It is, however, appropriate that guidelines be set to ensure that Greenberg's deposition is not used as an opportunity for harassment. Accordingly, unless Greenberg's testimony reveals that he has discoverable information relevant to this action, his deposition is limited to two (2) hours. In addition, unless Greenberg's testimony reveals that he has other discoverable information relevant to this action, the subject matter of the deposition shall be limited to the May 1995 Hersch memo and his putative contact with the plaintiffs Debs and Baalbaki. Plaintiffs shall start the deposition by questioning Greenberg

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2000 WL 1538003
**(Cite as: 2000 WL 1538003, \*5 (S.D.N.Y.))**

**Page   5**

concerning these subjects. Plaintiffs are not to start the deposition with background questions since such information has no relevance if Greenberg currently has no knowledge concerning the subject matter of this action. If Greenberg has no recollection of the May 1995 Hersch memo and his putative contact with the plaintiffs Debs and Baalbaki, and reasonable attempts to refresh his recollection concerning these subjects are unsuccessful, the deposition shall terminate. Counsel are again reminded that I accept telephonic applications for both protective orders and orders to compel in the event the deposition does not proceed amicably.

D. *Summary*

Accordingly, for all the foregoing reasons, (1) plaintiffs' application to compel responses to interrogatories and document requests concerning introducing brokers is denied; (2) Bear Stearns is directed to produce the May 17, 1995 audio tape to counsel for plaintiffs within ten (10) days of the date of this Order, and (3) Bear Stearns is directed to produce Alan C. Greenberg for deposition within twenty (20) days of the date of this Order.

SO ORDERED

END OF DOCUMENT

Copr. ® West 2002 No Claim to Orig. U.S. Govt. Works

1997 WL 61051
(Cite as: 1997 WL 61051 (S.D.N.Y.))
<KeyCite Yellow Flag>

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

**James F. HURST, Plaintiff,**
v.
**F.W. WOOLWORTH CO. and Woolworth Corp., Defendants.**

**No. 95 CIV. 6584 CSH.**

Feb. 11, 1997.

*MEMORANDUM AND ORDER*

HAIGHT, Senior District Judge:

**\*1** This matter is currently before the Court for consideration of plaintiff's motion to compel the production of four documents which defendants F.W. Woolworth Co. and Woolworth Corp. (referred to collectively as "Woolworth") claim are privileged. For the reasons stated below, plaintiff's motion is granted.

*BACKGROUND*

Plaintiff was terminated from Woolworth in 1995, at the age of 58. Although Woolworth claims plaintiff's discharge was part of a reduction in force (RIF), plaintiff alleges that he was selected for termination because of his age. Shortly after his termination, plaintiff filed a charge of discrimination with the EEOC, and initiated the instant suit for age discrimination after receiving notice from the EEOC of his right to sue.

On August 18, 1995, plaintiff served Woolworth with his complaint and his First Set of Document Requests. In these requests, plaintiff asked for "[a]ll documents concerning Defendant's alleged decision to implement a reduction in force in 1995," "[a]ll documents concerning the factors that lead to Defendant's alleged decision to implement a reduction in force in 1995," and "[a]ll documents concerning the actual implementation of the alleged reduction in force in 1995." Included

in the instructions to these requests was a direction that "any objections to these document requests on the grounds of privilege (including work product) should be accompanied by a privilege log that complies with Local Civil Rule 46."

Woolworth responded to these requests on November 13, 1995 by producing some responsive documents and stating that additional documents would be produced after a confidentiality stipulation had been executed. In a letter to Woolworth's counsel dated December 7, 1995, plaintiff noted that Woolworth had also raised confidentiality objections in its response, but had not produced a privilege log:

You have raised many privilege objections without complying with Local Rule 46, which requires a detailed description of each document claimed as privileged. Your failure to comply with Local Rule 46 results in a waiver of any privilege claims. Please provide a privilege log promptly or risk waiver.

At a subsequent discovery conference between the parties, Woolworth represented that it had produced all documents related to the 1995 reduction in force, and agreed to forward any further documents that were located or list them on a privilege log.

In January 1996, the parties began to negotiate for a confidentiality agreement, pursuant to which Woolworth would produce additional documents. By March 29, 1996, both parties had executed an appropriate stipulation. However, additional documents were not forwarded to plaintiff until several months later, due to further negotiations over which party should bear the copying costs. After reviewing Woolworth's supplemental production, plaintiff again expressed concern over the absence of a privilege log and reminded Woolworth, in a letter dated May 23, 1996, that it was "required to [provide a privilege log] under the Local Rules to the extent you have withheld any documents on the basis of a privilege claim."

**\*2** In June 1996, Peter Clay was deposed. As

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT___B___



1997 WL 61051
(Cite as: 1997 WL 61051, *2 (S.D.N.Y.))

Page 2

Woolworth's vice-president for Human Resources, Clay was actively involved in implementing the 1995 RIF. At one point in the deposition, plaintiff's counsel asked whether Clay had sought legal advice regarding the RIF. Clay responded:

A: I approached corporate counsel that once I have a plan prepared, I would go to corporate counsel and ask them to review it to be sure that what I'm doing or what I plan to do is appropriate and to seek their counsel.
Q: To ensure that your plan complies with the law?
A: Yes.
Q: And did you relay that plan to [counsel] in writing?
A: Um, I - I honestly - I just don't recall specifically. I probably did prior to implementation.

Yet, when asked whether all documents relating to the 1995 RIF had been produced, Clay repeatedly assured plaintiff's counsel that all such documents in his files had been turned over.

In a letter dated July 11, 1996, counsel for plaintiff demanded production of the written plan to which Clay had referred in his deposition testimony. Anticipating a possible defense of attorney-client privilege, plaintiff asserted in this letter that "any claim of attorney-client privilege over the document has been waived under the circumstances pursuant to Fed. R. Civ. P. 26(b)(5) and Local Civil Rule 46 ...." In response, counsel for Woolworth sent plaintiff's counsel a letter dated July 22, 1996 which stated:

Defendant hereby provides a log of documents not produced during discovery because they are protected by the attorney-client privilege.
1. F.W. Woolworth Co. Master Employee List As Of 01/13/95, with handwritten notes, prepared by Peter Clay at the request of counsel (6 pages).
2. Handwritten list of Buying Department employees prepared by Peter Clay at the request of counsel (1 page).
3. January 26, 1995 chart of regional office employees and list of terminating or retiring buyers, with handwritten notes, prepared by Pete Clay at the request of counsel (1 page).

4. March 24, 1995 letter from Pete Clay to Christopher J. Hoey of Jackson, Lewis, Schnitzler & Krupman regarding EEOC charge filed by James F. Hurst (4 pages). [FN1]

> FN1. These documents were submitted to the Court for *in camera* review in connection with plaintiff's motion.

Clay's deposition was continued on October 18, 1996. At that time, plaintiff's counsel inquired about Clay's recollection of the documents listed in the July 22 privilege log. For example, the following exchange took place regarding the first document on Woolworth's list:

Q: Did you make notes on the master employee list in connection with the 1995 reduction in force?
A: I probably did, as I used it as a check sheet to make sure I had everybody in a spot either in or out.
Q: Is that the only reason that you worked with it?
A: Uh-huh.

When asked about the remaining documents, Clay had only a vague recollection or no recollection at all. Although plaintiff's counsel also attempted to inquire whether these documents were given to an attorney at the request of that attorney, Woolworth's counsel directed the witness not to answer each of these questions.

*3 However, in response to plaintiff's motion to compel, Clay submitted an affidavit alleging that his recollection of these documents had been refreshed after reviewing them carefully. According to Clay, these documents came exclusively from his confidential files. He now testifies that he made markings on the Master Employee List "[i]n response to meetings I had with counsel, and in preparation for future discussions with counsel regarding the 1995 terminations." In addition, Clay states that he met with counsel to seek legal advice before finalizing certain termination decisions, "after making numerous markings on the document."

With respect to the second document listed on

the July 1996 privilege log, Clay states that he prepared this document "pursuant to a request from counsel at Woolworth to assist them in ... preparing a strategy and/or legal defense in an action brought by another former Buying Department employee, Lois Hunziker." Finally, Clay testified that he made several handwritten notations on the third document and reviewed the document with counsel on several occasions, "in response to a request from counsel at Woolworth to provide them with certain information necessary to give me legal advice with respect to implementing the 1995 terminations." Clay also notes in his affidavit that he placed the following stamp on documents one and three:
PRIVILEGED AND CONFIDENTIAL
PREPARED AT THE REQUEST OF
COUNSEL
The basis for the claim of privilege as to the fourth document is readily apparent from its description.

In his motion to compel production of these documents, plaintiff makes three arguments. First, plaintiff argues that defendant has failed to meet its burden of establishing the essential elements of privilege protection for the first three documents included in the July 1996 privilege log. Second, plaintiff urges the Court to reject Clay's affidavit in opposition to this motion, since defendant previously obstructed plaintiff's efforts to challenge the privilege assertion by directing Clay not to respond to certain questions during his deposition. Third, plaintiff argues that Woolworth has waived any privilege that might exist by its failure to produce a privilege log in a timely manner. Woolworth, of course, contests each of plaintiff's assertions.

### DISCUSSION

Although plaintiff has objected to Woolworth's claim of privilege on the substantive grounds that an attorney-client privilege has not been proven with respect to the first three documents on the July 1996 privilege log, I need not reach this issue since I find plaintiff's last argument persuasive. It is clear from the facts presented on this motion that Woolworth has waived any privilege that might exist for the four documents at issue as a result of its unjustified failure to comply with the Federal Rules of Civil Procedure and Local Civil Rule 46(e).

Federal Rule of Civil Procedure 34(b) directs that:
the party upon whom the [document] request is served shall serve a written response within 30 days after the service of the request. A shorter or longer time may be directed by the court or, in the absence of such an order agreed to in writing by the parties ....
*4 If the responding party objects to a particular request, "the reasons for the objection shall be stated." Fed. R. Civ. P. 34(b). When such an objection is based on a claim of privilege, the responding party must not only identify the nature of the privilege, but also provide specific information sufficient to identify the document. Fed. R. Civ. P. 26(b)(5); Local Civ. R. 46(e)(2). This information is often referred to as a "privilege log."

Failure to state a privilege objection, or provide the attendant privilege log, "within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof" can result in a waiver of the privilege. Local Civ. R. 46(e)(1); *see also* Fed. R. Civ. P. 26(b)(5), Advisory Committee Notes ("To withhold materials without such notice is contrary to the rule ... and may be viewed as a waiver of the privilege or protection."); *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC*, 964 F.2d 159, 166 (2d Cir. 1992) (noting that failure to comply with the privilege log requirement of Rule 46(e)(2) may result in a finding that the privilege has been waived); *Wilson v. New York City Housing Authority*, 1996 WL 524337, *2 (S.D.N.Y. 1996) ("To the extent that defendants attempt to assert privilege, their failure to serve an index of privilege documents in conformity with Local Civil Rule 46(e)(2) has resulted in waiver of any privilege they may have otherwise had.").

Plaintiff submitted his First Set of Document Requests to Woolworth in August 1995.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Pursuant to subsequent agreements between the parties, Woolworth's response to these requests was not due until November 13, 1995. As discussed above, Rule 46(e) mandates that a privilege log be produced within the time agreed to by the parties if any responsive documents are withheld on a claim of privilege. Yet, it is undisputed that Woolworth did not produce a Rule 46(e)(2) privilege log on November 13, 1995 when it responded to plaintiff's First Set of Document Requests, and there was no agreement between the parties giving Woolworth an extension of time in which to comply with this local rule.

In fact, plaintiff explicitly warned Woolworth on two separate occasions within a five month period that it had failed to comply with Local Rule 46 and was risking waiver of any privilege protecting documents which were still being withheld on that basis. After Clay indicated in his deposition that he had probably created a written plan for the implementation of the 1995 reduction in force, plaintiff again asserted that any privilege had been waived as a result of Woolworth's failure to comply with Rule 46(e), and demanded production of the document. Only then did Woolworth produce its privilege log in a letter dated July 22, 1996, eight months after the original due date of November 13, 1995.

There is no question that Woolworth did not comply with Local Rule 46(e), since it did not produce a privilege log "within the time provided by the Federal Rules of Civil Procedure or any extensions thereof." The question is whether the circumstances of this case warrant a finding of waiver on that basis. "Of relevance to such a determination is the nature of the violation, its willfulness or cavalier disregard for the rule's requirements, and the harm which results to other parties." *AFP Imaging Corp. v. Philips Medizin Systems*, 1993 WL 541194, *3 (S.D.N.Y. 1993).

**\*5** In its opposition to plaintiff's motion, Woolworth argues that its delayed production of the privilege log was not a serious violation of Rule 46(e). Woolworth points out that the parties were engaged in protracted negotiations over a confidentiality stipulation and the costs of copying between January and May of 1996. Based on this chronology, Woolworth asserts that its privilege log was not as untimely as plaintiff would like the Court to believe. While I accept Woolworth's version of the facts as accurate, the time spent in negotiations over a protective order and the cost of copying documents is totally irrelevant to Woolworth's obligation to produce a privilege log within the time agreed to by the parties, that is, November 13, 1995.

Woolworth does not claim, nor could it, that the entry of a confidentiality order, or the resolution of who would bear copying costs, had any bearing whatsoever on whether Woolworth would provide plaintiff with copies of documents that it claims are privileged. These issues affected the terms under which Woolworth would produce additional documents; but, Woolworth had no intention of producing these allegedly privileged documents to plaintiff under any circumstances. In any case, there is no evidence that Woolworth was holding its privilege log in abeyance until these issues were resolved. Woolworth never asked for an extension on this basis, or referred to the ongoing negotiations in response to plaintiff's repeated requests for a privilege log. As a result, these negotiations do not provide an excuse for Woolworth's failure to comply with Rule 46(e).

Nonetheless, Woolworth insists that "this is not a situation where Defendants stubbornly refused to identify these documents as privileged or where Defendants sought willfully to avoid compliance with the Local Rules." However, there is no evidence that Woolworth did anything but simply ignore the requirements of Rule 46(e). *Cf. AFP Imaging Corp.*, 1993 WL 541194 at \*3 (finding no waiver because party did not simply ignore the requirements of Rule 46). Woolworth does not claim that it was unaware that these documents existed at the time its privilege log was due. *Cf. AFP Imaging Corp.*, 1993 WL 541194, at \*3 (finding no waiver because the document at issue was "only recently identified and located."). There is also no evidence that Woolworth was mistaken about

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1997 WL 61051                                                      **Page 5**
(Cite as: 1997 WL 61051, *5 (S.D.N.Y.))

the rule's requirements. *Cf. D56, Inc. v. Zuckers Gifts, Inc.*, 1996 WL 280797, *1 (finding no waiver because party produced the privilege log as soon as it realized its error in interpreting the rule and the total delay was only five weeks). In fact, Woolworth gives no explanation at all for its failure to comply with the rule.

Finally, Woolworth argues that plaintiff has not suffered any prejudice as a result of receiving the privilege log in July 1996. I disagree with this conclusion considering that the plaintiff has been forced to spend substantial time and expense to compel Woolworth to comply with its discovery obligations. *Cf. D56*, 1996 WL 280797, at *1 (finding no prejudice because party requesting privilege log had not made Rule 37 motion or incurred any significant expense).

**\*6** In sum, this case is almost identical to the circumstances described in *Pfkinans Int'l Corp. v. IBJ Schroder Leasing Corp.*, 1996 WL 525862, *2 (S.D.N.Y. 1996), where Magistrate Judge Pitman found that the defendants had waived the protection of privilege by not producing the privilege log required by Local Civil Rule 46(e)(2) in a timely manner. In that case, the plaintiff first sought discovery of certain audit documents on September 9, 1993. *Id.* at * 2. Since no extensions had been agreed to between the parties, Magistrate Judge Pitman noted that timely production of a privilege log would have been thirty days after this first request for documents was served on the defendants. *Id.* at *3. However, no audit documents were produced by the defendants and no privilege log was prepared. *Id.* at *2. Despite plaintiff's repeated requests, and subsequent confirmation through depositions that the documents existed, defendant produced neither the documents nor a privilege log. *Id.* On these facts, the Court concluded that "a finding of waiver is clearly justified." *Id.* at *4. I conclude that the same result is warranted here. [FN2]

FN2.  Woolworth's belated production of a privilege log on July 22, 1996, eight months after it was due, does not operate as a cure to the waiver of privilege protection. *Cf. Allstate Life Insurance Co. v. First*

*Trust National Assoc.*, 1993 WL 138844, *3 (S.D.N.Y. 1993) ("Having waived the documents' immunity [by failure to produce a privilege log], Oppenheimer cannot now resurrect their allegedly privileged status. by simply complying with the rules.").

Although waiver may be a serious sanction for such a violation, the importance of local rules "should not be diminished by skirting their application when the results prove harsh to a party." *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l Inc.*, 130 F.R.D. 28, 32 (S.D.N.Y. 1990); *see also Pfkinans Int'l Corp.*, 1996 WL 525862, at * 4 (noting that reluctance to find waiver would only encourage disregard of the Court's Rules and encourage motion practice). Accordingly, I conclude that Woolworth has waived any privilege protection for the four documents listed in its letter to plaintiff dated July 22, 1996, by its failure to comply with Local Rule 46(e). *See Baron Philippe De Rothschild, S.A. v. Paramount Distillers. Inc.*, 1995 WL 86476, *1 (S.D.N.Y. 1995) ("Given the delay in producing a privilege log despite numerous requests, defendants have waived any possible privilege.").

### CONCLUSION

For the foregoing reasons, plaintiff's motion for an order compelling production of the four documents discussed above is granted. Defendant is directed to retrieve these four documents from the Court within five days of the date of this opinion. These documents must be produced to plaintiff no later than February 17, 1997.

It is SO ORDERED.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 23603
(Cite as: 1995 WL 23603 (S.D.N.Y.))
<KeyCite History>

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

**John LABATT LIMITED, Labatt Brewing Company Limited, Labatt's USA Inc., and Labatt Importers, Inc., Plaintiffs,**
v.
**MOLSON BREWERIES, Molson Breweries U.S.A. Inc., Miller Brewing Co., Martlett Importing Co., and Molson Breweries of Canada, Ltd., Defendants.**

**Nos. 93 CV 75004, 94 CV 71540.**

Jan. 20, 1995.

McDermott, Will & Emery by Roger W. Wenthe, Chicago, IL, for plaintiffs.

Darby & Darby, P.C. by Amy J. Benjamin, Ira Jay Levy, New York City, for defendants and third party respondents.

OPINION & ORDER

ROBERT P. PATTERSON, District Judge.

*1 Motion for reargument denied.

At the original hearing on November 22, 1994 in this Part I motion to compel, third party respondents Dorf & Stanton Communications, Inc. and Hill, Holliday, Connors, Cosmopulous, Inc. ("Third Parties"), failed to comply with Local Civil Rule 46(e) and Rules 45(d)(2) and 26(b)(5) of the Federal Rules of Civil Procedure in their assertions of privilege by failing to provide a complete privilege log demonstrating sufficient grounds for taking the privilege. Their counsel, who is also counsel to Plaintiffs, also failed to bring the documents demanded to the hearing on Defendant's motion to compel, so that when the Court requested review of the documents in camera, they were not available. Accordingly, Defendants' motion to compel was granted from the bench at the hearing on November 22, 1994.

On December 16, 1994, the Third Parties filed a motion to modify the Court's order of November 22, 1994 to preclude discovery of one of the documents covered by that order and two other documents which were not on the privilege log and which had been withheld from production to Defendants. [FN1] On December 28, 1994, Defendants cross-moved for production of the additional documents and for copies of the depositions of witnesses from the two Third Parties in a related litigation between Plaintiffs and Anheuser-Busch, *Anheuser-Busch v. Labatt*, No. 93 Civ. 251 GFG (E.D.Mo.), (the "*Anheuser- Busch* Litigation"), based on a waiver it had received from Anheuser-Busch. After initially objecting to Defendants' late cross-motion, Plaintiffs waived said late notice allowing the Court to proceed to consider the cross-motion.

On its motion for modification, Plaintiffs' so-called new evidence consists of material it had a duty under the Federal Rules of Civil Procedure to bring to the Court's attention in order to carry its burden to establish its claims of privilege. *See United States v. Schwimmer*, 892 F.2d 237, 244 (2d Cir.1989). Having ignored that obligation, Plaintiffs' counsel, who is also appearing for the Third Parties, should not be entitled to readdress the question here. To hold otherwise would make Local Civil Rule 46(e) and Rules 45(d) and 26(g) of the Federal Rules of Civil Procedure meaningless.

Furthermore, the Third Parties still have not established that the privilege ever existed as to any of the documents sought to be protected. The documents are notes of personnel of the independent advertising agencies representing Plaintiffs made at a meeting scheduled to assist them in marketing and advertising Plaintiffs' product, "Ice Beer"; Plaintiffs' attorneys were present at this meeting. There has been no showing that the Third Parties were seeking legal advice at the meeting. Rather, it appears that Plaintiffs were briefing the personnel of the Third Parties so that the content of the advertising placed by the agencies would not undercut the theories expounded in the litigation. The documents themselves do not

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT _C_

indicate either the seeking of legal advice or the confidentiality of their contents    Having explained these theories and, incidentally, the pending litigation to Third Parties rather than conducting such discussions in-house, Plaintiffs are not entitled to claim attorney-client privilege.

**\*2** Accordingly, the Court adheres to its original ruling, and the documents submitted under seal are ordered unsealed for production to Defendants by January 23, 1994.

With respect to Defendants' motion for copies of the depositions of the witnesses of the Third Parties taken pursuant to a confidential order issued by Judge Gunn in the *Anheuser-Busch* Litigation, although Defendants have shown that such depositions could lead to relevant evidence, they have not shown need for such depositions until after the testimony in the *Anheuser-Busch* trial is completed this spring. Accordingly, these depositions are ordered to be produced to Defendants by the Third Parties within ten days of the close of testimony in that litigation unless the Third Parties move from an order by Judge Gunn setting aside this order prior thereto.

Because there is no just reason for the delay of an appeal from this order, the Court directs that this order be entered as a final judgment under Fed.R.Civ.P. 54(b).    The production of documents shall thereafter be stayed until further order of this Court if Dorf & Stanton files a Notice of Appeal from this order within 30 days after its entry.    If no Notice of Appeal is filed within that period, this order shall become enforceable on the 31st day after its entry.

IT IS SO ORDERED.

FN1. Plaintiffs' motion for reargument is timely since it was brought within ten days of the docketing of the original order which was delayed due to the moving of the Clerk's Office.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

--- F.3d ---
**(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))**
**< KeyCite Citations >**

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.

**In re GRAND JURY SUBPOENA
(Custodian of Records, Newparent, Inc.),
A. Nameless Lawyer (A Pseudonym) et al.,
Intervenors, Appellants.**

No. 01-1975.

Heard Sept. 14, 2001.
Decided Nov. 8, 2001.

Former officers of subsidiary corporation, and attorney who had served as subsidiary's outside counsel and also represented officers in their personal capacities, moved to quash subpoena duces tecum in which federal grand jury sought to compel parent corporation to produce records pertaining to subsidiary's affairs. The United States District Court for the District Of Massachusetts, Reginald C. Lindsay, J., denied motion. Intervenors appealed. The Court of Appeals, Selya, Circuit Judge, held that: (1) officers and attorney had sufficient interest in proceedings to intervene in order to seek to quash subpoena; and (2) denial of motion to quash was appealable even though it was not a final judgment; but (3) subsidiary's waiver of attorney-client and work product privilege was effective as to any privilege protecting communications between officers and attorney, regardless of any joint defense agreement; (4) failure to present sufficient information regarding nature of materials withheld resulted in waiver of any privileges; and (5) district court did not abuse its discretion by declining to hold evidentiary hearing.

Affirmed.

West Headnotes

**[1] Grand Jury ⟜ 36.4(1)**
193k36.4(1) Most Cited Cases

Former officers of subsidiary corporation, and attorney who had formerly represented subsidiary and officers, had sufficient interest in proceedings in which subpoena duces tecum had been issued by federal grand jury to subsidiary's parent corporation seeking records pertaining to subsidiary's affairs, based on their allegation that attorney-client privilege protected records of corporation from disclosure, to allow them to intervene as of right for purposes of pursuing quashal of subpoena. Fed.Rules Civ.Proc.Rule 24(a)(2), 28 U.S.C.A.

**[2] Federal Civil Procedure ⟜ 315**
170Ak315 Most Cited Cases

Intervention is appropriate as of right when the disposition of an action may impair or impede the applicant's cognizable interest. Fed.Rules Civ.Proc.Rule 24(a)(2), 28 U.S.C.A.

**[3] Federal Civil Procedure ⟜ 315**
170Ak315 Most Cited Cases

Colorable claims of attorney-client and work product privilege qualify as sufficient interests to ground intervention as of right. Fed.Rules Civ.Proc.Rule 24(a)(2), 28 U.S.C.A.

**[4] Federal Courts ⟜ 594**
170Bk594 Most Cited Cases

Denial of a motion to quash a subpoena is not usually considered a final judgment and thus is not ordinarily an appealable event.

**[5] Federal Courts ⟜ 576.1**
170Bk576.1 Most Cited Cases

Court of Appeals had jurisdiction to consider appeal from denial of motion by former officers of subsidiary corporation, and attorney who had formerly represented them, to quash subpoena duces tecum in which federal grand jury sought to compel subsidiary's parent corporation to produce records pertaining to subsidiary's affairs, even though denial of motion was not a final judgment, as absent an immediate appeal, records in question, which

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___D___

2001 WL 1356363
(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))

officers and attorney claimed were protected by attorney-client privilege, would be disclosed.

**[6] Federal Courts** ☞ **574**
170Bk574 Most Cited Cases

An exception to the requirement of finality exists to allow appeal following denial of motion to quash a subpoena when a substantial privilege claim cannot effectively be tested by the privilege-holder through a contemptuous refusal to produce the documents.

**[7] Witnesses** ☞ **198(1)**
410k198(1) Most Cited Cases

Attorney-client privilege protects communications made in confidence by a client to his attorney.

**[8] Grand Jury** ☞ **36.3(2)**
193k36.3(2) Most Cited Cases

Because it stands in the way of a grand jury's right to every man's evidence, attorney-client privilege applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through open communication between lawyer and client.

**[9] Witnesses** ☞ **219(3)**
410k219(3) Most Cited Cases

A corporation's attorney-client privilege may be waived by current management.

**[10] Witnesses** ☞ **199(2)**
410k199(2) Most Cited Cases

**[10] Witnesses** ☞ **222**
410k222 Most Cited Cases

Default assumption is that a corporation's attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is burden of individuals claiming that their communications with corporation's attorney are protected by attorney-client privilege to dispel that presumption.

**[11] Witnesses** ☞ **199(2)**
410k199(2) Most Cited Cases

Corporate employees seeking to assert a personal claim of attorney-client privilege with respect to communications with corporation's attorney must meet five benchmarks: they must show they approached counsel for the purpose of seeking legal advice, must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities, must demonstrate that counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise, must prove that their conversations with counsel were confidential, and must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

**[12] Grand Jury** ☞ **36.3(2)**
193k36.3(2) Most Cited Cases

Attorney who had served as principal outside counsel for subsidiary corporation, and who had also represented former officers of subsidiary in their personal capacities, could theoretically have represented officers individually with respect to grand jury investigation, so that their communications would be protected by attorney-client privilege; however, this attorney-client relationship would only extent to those communications which involved officers' individual rights and responsibilities arising out of their actions as officers of corporation.

**[13] Witnesses** ☞ **199(2)**
410k199(2) Most Cited Cases

Requirement that corporate officer who alleges that his communications with corporation's counsel are protected by attorney-client privilege must show that substance of his conversations with counsel did not concern matters within the company or the general affairs of the company only precludes an officer from asserting an individual attorney client privilege when the

Copr. ® West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))

Page 3

communication concerns the corporation's rights and responsibilities; however, if communication between a corporate officer and corporate counsel specifically focuses upon the individual officer's personal rights and liabilities, requirement can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company.

**[14] Grand Jury ☞ 36.3(2)**
193k36.3(2) Most Cited Cases

All communications made between two officers of subsidiary corporation, and attorney who served as outside counsel for subsidiary and also represented officers in their personal capacities, were corporate communications, so that subsidiary's waiver of attorney-client privilege was effective to waive any privilege that protected communications between officers and attorney, for purposes of grand jury investigation into subsidiary's actions, where there was no indication that any particular communication related solely to attorney's representation of officers, apart from his representation of subsidiary.

**[15] Witnesses ☞ 199(2)**
410k199(2) Most Cited Cases

"Joint defense privilege" protects communications between an individual and an attorney for another when the communications are part of an ongoing and joint effort to set up a common defense strategy.

**[16] Witnesses ☞ 199(2)**
410k199(2) Most Cited Cases

Because so-called joint defense privilege sometimes may apply to protect communications between attorney and client outside the context of actual litigation, it is more aptly termed the common interest rule; even when this rule applies, however, a party always remains free to disclose his own communications.

**[17] Witnesses ☞ 199(2)**
410k199(2) Most Cited Cases

**[17] Witnesses ☞ 219(3)**
410k219(3) Most Cited Cases

Existence of a joint defense agreement does not increase the number of parties whose consent is needed to waive the attorney-client privilege; rather, it merely prevents disclosure of a communication made in the course of preparing a joint defense by the third party to whom it was made.

**[18] Witnesses ☞ 199(2)**
410k199(2) Most Cited Cases

Joint communications with a single attorney are privileged with respect to the outside world because clients must be entitled to the full benefit of joint representation undiluted by fear of waiving the attorney-client privilege; nevertheless, privilege does not apply in subsequent litigation between the joint clients, as in that sort of situation, one client's interest in the privilege is counterbalanced by the other's interest in being able to waive it.

**[19] Witnesses ☞ 219(3)**
410k219(3) Most Cited Cases

A corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an individual attorney-client relationship between him and the corporation's counsel.

**[20] Federal Civil Procedure ☞ 1600(3)**
170Ak1600(3) Most Cited Cases

"Work product rule" protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party.

**[21] Federal Civil Procedure ☞ 1600(3)**
170Ak1600(3) Most Cited Cases

Work product rule facilitates zealous advocacy in the context of an adversarial system of justice by ensuring that the sweat of an attorney's brow is not appropriated by the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))

Page   4

opposing party.

**[22] Grand Jury ⬅ 36.3(2)**
193k36.3(2) Most Cited Cases

Subsidiary corporation's waiver of work product privilege with respect to work that had been performed by attorney who served as corporation's outside counsel also waived privilege with respect to attorney's simultaneous representation of two officers of subsidiaries in their personal capacities, and thus, attorney and officers could not rely on privilege to preclude disclosure of attorney's interviews of subsidiary's employees during internal investigation, and his notes and mental impressions of investigation, during grand jury investigation into actions of subsidiary.

**[23] Federal Civil Procedure ⬅ 1600(3)**
170Ak1600(3) Most Cited Cases

While a valid joint defense agreement may protect work product, one party to such an agreement may not preclude disclosure of work product by another party on whose behalf the work originally was performed, nor can the parties, by agreement, broaden the scope of the privilege that the law allows, as such an agreement would contravene public policy.

**[24] Attorney and Client ⬅ 21.5(1)**
45k21.5(1) Most Cited Cases

A primary requirement of a joint defense agreement is that there be something against which to defend, and in other words, a joint defense agreement may be formed only with respect to the subject of potential or actual litigation.

**[25] Attorney and Client ⬅ 21.5(3)**
45k21.5(3) Most Cited Cases

Purported joint defense agreement entered by attorney who served as outside counsel for subsidiary corporation, in which attorney was also to represent two officers of subsidiary in their personal capacities, even though no particular litigation or investigation was in

prospect, and there thus was no joint defense to pursue, was null and void; the law does not countenance such a "rolling" joint defense agreement, which would undermine rationale for allowing such agreements.

**[26] Attorney and Client ⬅ 21.5(1)**
45k21.5(1) Most Cited Cases

Rationale for recognizing joint defense agreements is that they permit parties to share information pertinent to each others' defenses, and in an adversarial proceeding, a party's entitlement to this enhanced veil of confidentiality can be justified on policy grounds, but outside the context of actual or prospective litigation, there is more vice than virtue in such agreements.

**[27] Grand Jury ⬅ 36.3(2)**
193k36.3(2) Most Cited Cases

Former officers of subsidiary corporation, and attorney who had formerly represented officers, did not present sufficient information regarding nature of materials in possession of parent corporation for which grand jury subpoena had been issued, and as to which they asserted claims of attorney-client privilege and work-product privilege, and thus, privileges were waived and could not be basis to quash subpoena, where officers and attorney made no intervention to prepare a privilege log, even though they had knowledge of communications as to which subpoena pertained.  Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[28] Witnesses ⬅ 222**
410k222 Most Cited Cases

Operative language of rule under which party who withholds information subject to a subpoena on basis that it is protected by privilege must provide a description of nature of withheld information is mandatory. Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[29] Witnesses ⬅ 221**
410k221 Most Cited Cases

A party that fails to submit a privilege log

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

when withholding information subject to a subpoena on basis that it is protected by privilege is deemed to waive the underlying privilege claim, whether privilege asserted is attorney- client privilege, or work product privilege. Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[30] Witnesses ⟨⟨⟩ 222**
410k222 Most Cited Cases

Privilege logs do not need to be precise to the point of pedantry in order for party who withholds information subject to a subpoena on basis that it is protected by privilege to avoid waiver of privilege, and thus, a party who possesses some knowledge of the nature of the materials to which a claim of privilege is addressed cannot shirk his obligation to file a privilege log merely because he lacks infinitely detailed information; rather, rule requires a party who asserts a claim of privilege to do the best that he reasonably can to describe the materials to which his claim adheres. Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[31] Federal Courts ⟨⟨⟩ 820**
170Bk820 Most Cited Cases

Court of Appeals tests a trial court's decision on whether or not to convene an evidentiary hearing in connection with motion to quash subpoena for abuse of discretion.

**[32] Witnesses ⟨⟨⟩ 16**
410k16 Most Cited Cases

Courts prefer use of a pragmatic approach in resolving question of whether, in a given situation, an evidentiary hearing is required in connection with motion to quash subpoena, and key determinant is whether, given the nature and circumstances of the case, the parties had a fair opportunity to present relevant facts and arguments to the court and to counter the opponent's submissions.

**[33] Grand Jury ⟨⟨⟩ 36.3(2)**
193k36.3(2) Most Cited Cases

District court did not abuse its discretion by

declining to hold an evidentiary hearing in connection with motion by former officers of subsidiary corporation, and attorney who had represented officers, to quash subpoena duces tecum in which federal grand jury sought to compel subsidiary's parent corporation to produce records pertaining to subsidiary's affairs, where paper record was quite extensive, and officers and attorney had ample opportunity to respond to arguments of other side.

**[34] Federal Courts ⟨⟨⟩ 625**
170Bk625 Most Cited Cases

Former officers of subsidiary corporation, and attorney who had represented officers, who had moved to quash subpoena duces tecum in which federal grand jury sought to compel subsidiary's parent corporation to produce records pertaining to subsidiary's affairs, waived any right to object to timing of district court in simultaneously entering adverse rulings on their motions to quash, and for immunity, where officers and attorney neither contemporaneously objected to procedural ruling, nor sought a continuance.

**[35] Federal Civil Procedure ⟨⟨⟩ 928**
170Ak928 Most Cited Cases

Although it is plainly the better practice for a district court to rule explicitly on every substantial motion, it has long been accepted that a court may implicitly deny a motion by entering judgment inconsistent with it.
Andrew Good, with whom Harvey A. Silverglate, Silverglate & Good, Norman Zalkind, David Duncan, Zalkind, Rodriguez, Lunt & Duncan, Martin G. Weinberg, Oteri, Weinberg & Lawson, Elizabeth B. Burnett, and Mintz Levin Cohn Ferris Glovsky & Popeo were on consolidated brief, for appellants.

John M. Hodgens, Jr., Assistant United States Attorney, with whom James B. Farmer, United States Attorney, and Stephen P. Heymann, Assistant United States Attorney, were on brief, for the United States.

Before Selya and Lipez, Circuit Judges, and

2001 WL 1356363
(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))

Doumar, [FN*] Senior District Judge.

SELYA, Circuit Judge.

**\*1** This appeal requires us to traverse largely unexplored terrain concerning the operation of the attorney-client and work product privileges. The underlying controversy arises out of a subpoena duces tecum issued by a federal grand jury to a corporation, seeking records pertaining to the affairs of a subsidiary. Although the corporation and the subsidiary waived all claims of privilege, the subsidiary's former attorney and two of its former officers intervened and moved to quash the subpoena. They claimed that the subsidiary had entered into a longstanding joint defense agreement with the former officers and contended that the subpoenaed materials were privileged (and, thus, not amenable to disclosure). The district court eschewed an evidentiary hearing and denied the motion to quash, but stayed production of the documents pending appeal.

We affirm the district court's order. We hold that an individual privilege may exist in these circumstances only to the extent that communications made in a corporate officer's personal capacity are separable from those made in his corporate capacity. Because the intervenors do not allege that any of the subpoenaed documents are solely privileged to them but rest instead on the theory that all the documents are jointly privileged, their claim, as a matter of law, does not survive the subsidiary's waiver. The joint defense agreement does not demand a different result: privileges are created, and their contours defined, by operation of law, and private agreements cannot enlarge their scope. Moreover, this particular joint defense agreement is unenforceable.

We have a second, independently sufficient ground for our decision. The denial of the motion to quash must be upheld in all events because the intervenors failed to generate a descriptive list of the documents alleged to be privileged.

**I. BACKGROUND**

We start by recounting the events leading to this appeal. Consistent with the secrecy that typically attaches to grand jury matters, see, e.g., Fed.R.Crim.P. 6(e), this case has gone forward under an order sealing the proceedings, the briefs, and the parties' proffers. To preserve that confidentiality, we use fictitious names for all affected persons and corporations.

On March 26, 2001, Oldco--a Massachusetts corporation in the business of processing, packaging, and distributing food products--entered into a plea agreement with the United States Attorney for the District of Massachusetts. Under the agreement's terms, Oldco pled guilty to charges of conspiracy to defraud the Internal Revenue Service and agreed to cooperate with the government's ongoing investigation of certain present and former officers, employees, and customers. As part of this cooperation, Oldco expressly waived applicable attorney-client and work product privileges. Soon thereafter, a federal grand jury issued a subpoena duces tecum to Oldco's parent corporation, Newparent, Inc., demanding the production of documents relating to its "rebate program"--a program under which, according to the government, Oldco would charge certain complicit customers more than the going rate for its products, but would then refund the difference by payments made directly to principals of these customers.

**\*2** At the time the subpoena was served, Oldco was a wholly-owned subsidiary of Newparent. Its records were in the possession of Newparent's counsel, a law firm that we shall call Smith & Jones. Newparent had acquired Oldco in June of 1998, but the grand jury investigation focused on conduct that occurred prior to the acquisition date. During that earlier period, Oldco had operated as a closely held corporation, owned by a number of members of a single family; one family member (Richard Roe) served as its board chairman and chief executive officer, and another (Morris Moe) served on the board and as executive vice- president for sales and marketing. A. Nameless Lawyer was Oldco's principal outside counsel. These three

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

individuals--Roe, Moe, and Lawyer--intervened in the proceedings and filed a motion to quash the subpoena.

The factual premise for the motion to quash is derived largely from Lawyer's affidavit. He states that while representing Oldco he also represented Roe and Moe in various individual matters. Moreover, he claims to have conducted this simultaneous representation of corporate and individual clients under a longstanding joint defense agreement. According to Lawyer, this agreement, although never committed to writing, provided that communications among the three clients were jointly privileged and could not be released without unanimous consent. Despite the absence of any reference to this agreement in the corporate records--there was no resolution or other vote of the board of directors authorizing Oldco to participate in such an arrangement--the intervenors assert that Roe, as chief executive officer, had the authority to commit the corporation to it.

Pertinently, Lawyer claims to have represented Oldco and its officers in connection with the grand jury investigation from and after October 1997 (when the grand jury served Oldco with an earlier subpoena requesting the production of certain customer records). He says that the oral joint defense agreement applies to this multiple-party representation and that he told the government that he represented Oldco and "all of its executives."

There is, to be sure, a written joint defense agreement entered into by and between Lawyer, as counsel for Roe/Moe, and Smith & Jones, as counsel for Newparent/Oldco. [FN1] However, that agreement was not executed until the fall of 1999 (by which time Lawyer was no longer representing Oldco). There is no evidence in the voluminous record (apart from Lawyer's affidavit) that any joint defense agreement existed before that time. Moreover, the intervenors neglected to mention the existence of an oral joint defense agreement when Newparent acquired Oldco and likewise failed to incorporate any reference to such a pact into the subsequent written agreement.

*3 Notwithstanding these discrepancies, the intervenors solemnly maintain that the oral joint defense agreement existed from 1990 forward; that its terms apply to the grand jury investigation; and that it gives them a joint privilege--they mention both attorney-client and work product privileges--in the Oldco documents currently in the hands of Smith & Jones. But they do not identify any particular documents as privileged, nor do they specify the reasons why certain communications should be considered privileged. Thus, like soothsayers scrutinizing the entrails of a goat, we are left to scour the record for indications of what these documents might be and what they might contain. As best we can tell, some of the documents comprise transcripts of interviews with Oldco employees (including Roe and Moe); others comprise Lawyer's written summaries of Oldco's internal investigation into the rebate program.

Not surprisingly, the government and Oldco both filed oppositions to the intervenors' motion to quash. In response, the intervenors sought leave to present immunized evidence with respect to the privilege claims. They also filed a formal offer of proof and requested an evidentiary hearing. The district court denied the motion to quash at a non-evidentiary hearing held on July 2, 2001, thereby implicitly denying the intervenors' other requests. This expedited appeal ensued.

## II. JUSTICIABILITY

We turn first to a pair of threshold questions that implicate our authority to hear and determine this appeal. Neither question need occupy us for long.

[1][2][3] First, we are satisfied that Roe, Moe, and Lawyer were properly allowed to intervene in the proceedings below for the purpose of pursuing quashal of the subpoena. Intervention is appropriate as of right when the disposition of an action may impair or impede the applicant's cognizable interest. Fed.R.Civ.P. 24(a)(2). Colorable claims of attorney-client and work product privilege qualify as sufficient interests to ground intervention as of right. *See In re Grand Jury*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363, *3 (1st Cir.(Mass.)))

**Page 8**

*Proceedings (Diamante )*, 814 F.2d 61, 66 (1st Cir.1987) (implying that "the existence of a privileged relationship or of a legitimate property or privacy interest in the documents possessed by the third party" is sufficient to establish standing). Clearly, those interests would be forfeited if Newparent were to comply with the grand jury subpoena-- and, as matters now stand, Newparent has no incentive to protect the intervenors' interests. Consequently, this is a textbook example of an entitlement to intervention as of right.

[4][5][6] Second, although denial of a motion to quash a subpoena is not usually considered a final judgment and thus is not ordinarily an appealable event, we believe that we have appellate jurisdiction in this instance. An exception to the requirement of finality exists when "a substantial privilege claim ... cannot effectively be tested by the privilege- holder through a contemptuous refusal [to produce the documents]." *FDIC v. Ogden Corp.*, 202 F.3d 454, 459-60 (1st Cir.2000); *see also Perlman v. United States*, 247 U.S. 7, 12-13, 38 S.Ct. 417, 62 L.Ed. 950 (1918) (recognizing that, as a practical matter, denials of an intervenor's privilege-based motion to quash a subpoena must be immediately appealable because no effective post- judgment remedy otherwise would exist). Courts have invoked this exception when, as now, "a client (who is herself a party or a grand jury target) seeks to appeal an order compelling her attorney ... to produce allegedly privileged materials." *Ogden*, 202 F.3d at 459; *accord In re Grand Jury Subpoenas*, 123 F.3d 695, 697 (1st Cir.1997). Although in this case the documents are in the hands of Newparent's counsel rather than in the custody of the intervenors' counsel, this only reinforces the essential fact that, absent an immediate appeal, the allegedly privileged material will be disclosed. Accordingly, we have jurisdiction to hear and determine this appeal.

## III. THE MERITS

*4 This appeal presents a smorgasbord of legal issues, but we must forgo the temptation to sample them all. Instead, we masticate only those issues that are necessary to a principled resolution of the matter.

We begin by discussing the ramifications of Roe's and Moe's claim that they were individual clients of Lawyer with respect to the grand jury investigation. We conclude that although such individual representation might have occurred in theory, no individual privilege exists as to documents in which Oldco also has a privilege. Because no independently enforceable privilege is alleged here, the corporation's waiver is effective for all communications covered by the subpoena, notwithstanding the existence *vel non* of the oral joint defense agreement. In all events, the intervenors failed adequately to inform the district court of the particular communications to which their claims of privilege allegedly attached. In the pages that follow, we proceed to discuss these issues one by one.

### A. *Privilege Claims.*

Because the attorney-client and work product privileges differ, we treat them separately.

[7][8] 1. *Individual Attorney-Client Privilege Claims.* The attorney- client privilege protects communications made in confidence by a client to his attorney. *See, e.g., United States* v. *Mass. Inst. of Tech.*, 129 F.3d 681, 684 (1st Cir.1997) (limning the scope of the privilege). Because it stands in the way of a grand jury's right to every man's evidence, the privilege applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through open communication between lawyer and client. *See Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

[9] Roe and Moe can mount a claim of attorney-client privilege only if, and to the extent that, Lawyer represented them individually. If the only attorney- client privilege at stake is that of their corporate employer, then Oldco's waiver defeats the claim of privilege. After all, the law is settled that a corporation's attorney-client privilege may be waived by current management. *See CFTC v. Weintraub*, 471 U.S. 343, 349, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) ("[W]hen

Copr. ® West 2002 No Claim to Orig. U.S. Govt. Works

control of a corporation passes to new management, the authority to assert and waive the corporation's attorney client privilege passes as well.").

**\*5** [10] It is often difficult to determine whether a corporate officer or employee may claim an attorney-client privilege in communications with corporate counsel. The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption. *See United States v. Bay State Ambul. & Hosp. Rental Serv., Inc.,* 874 F.2d 20, 28 (1st Cir.1989). This makes perfect sense because an employee has a duty to assist his employer's counsel in the investigation and defense of matters pertaining to the employer's business. *See United States v. Sawyer,* 878 F.Supp. 295, 296 (D.Mass.1995).

[11] To determine when this presumption bursts, several courts have adopted the test explicated in *In re Bevill, Bresler & Schulman Asset Mgmt. Corp.,* 805 F.2d 120 (3d Cir.1986). That test enumerates five benchmarks that corporate employees seeking to assert a personal claim of attorney-client privilege must meet:

First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.

*Id.* at 123; *accord Grand Jury Proceedings v. United States,* 156 F.3d 1038, 1041 (10th Cir.1998); *United States v. Int'l Bhd. of Teamsters,* 119 F.3d 210, 215 (2d Cir.1997); *In re Sealed Case,* 29 F.3d 715, 719 n. 5 (D.C.Cir.1994).

We think that *Bevill* 's general framework is sound. Of course, the first four elements of its test are most relevant when an attorney disputes a corporate officer's claim of individual privilege. Here, however, Lawyer's affidavit makes it clear that he represented both Roe and Moe in their personal capacities. Thus, even though the intervenors' brief does not specifically address the *Bevill* factors, we assume for argument's sake that the first four prongs of the test are satisfied.

[12][13] With respect to the final prong, the government claims that all of Roe's and Moe's communications were within the orbit of Oldco's general affairs, and therefore could not be individually privileged. In the government's view, *Bevill* precludes a finding of individual representation with respect to matters--such as the grand jury investigation into the rebate program--that involve the corporation. We do not read *Bevill* so grudgingly. As the Tenth Circuit explained:

**\*6** The fifth prong of *In Matter of Bevill,* properly interpreted, only precludes an officer from asserting an individual attorney client privilege when the communication concerns the *corporation's* rights and responsibilities. However, if the communication between a corporate officer and corporate counsel specifically focuses upon the *individual officer's* personal rights and liabilities, then the fifth prong of *In Matter of Bevill* can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company.

*Grand Jury Proceedings.* 156 F.3d at 1041. We adopt this interpretation and conclude that, theoretically, Lawyer could have represented Roe and Moe individually with respect to the grand jury investigation. Still, this attorney-client relationship would extend only to those communications which involved Roe's and Moe's individual rights and responsibilities arising out of their actions as officers of the corporation.

[14] **2. *The Corporation's Right to Waive the Attorney-Client Privilege.*** Having concluded that there are potentially some communications protected by the attorney-client privilege, we next consider the effect of Oldco's waiver of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

that privilege. The major difficulty--there are others, but we need not discuss them here--is that the individuals' allegedly protected communications with Lawyer do not appear to be distinguishable from discussions between the same parties in their capacities as corporate officers and corporate counsel, respectively, anent matters of corporate concern. The intervenors propose that such "dual" communications be treated as jointly privileged such that the consent of all parties would be required to waive the privilege. But they fail to cite authority supporting this position, and we ultimately decline to accept it: permitting a joint privilege of this type would unduly broaden the attorney-client privilege by allowing parties outside a given attorney-client relationship to prevent disclosure of statements made by the client.

[15][16][17] The reference to an alleged joint defense agreement does little to advance the intervenors' argument on this point. "The joint defense privilege protects communications between an individual and an attorney for another when the communications are 'part of an ongoing and joint effort to set up a common defense strategy.' " *Bay State Ambul.*, 874 F.2d at 28 (citation omitted). Because the privilege sometimes may apply outside the context of actual litigation, what the parties call a "joint defense" privilege is more aptly termed the "common interest" rule. *See United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989). Even when that rule applies, however, a party always remains free to disclose his own communications. *See In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 922 (8th Cir.1997). Thus, the existence of a joint defense agreement does not increase the number of parties whose consent is needed to waive the attorney-client privilege; it merely prevents disclosure of a communication made in the course of preparing a joint defense by the third party to whom it was made.

[18] In the clamor over the existence *vel non* of a joint defense agreement, the parties tend to overlook case law dealing directly with the circumstances under which statements made in a joint conference remain privileged.

Although these cases do not speak with one voice, they inform our resolution of the issue. They establish that joint communications with a single attorney are privileged with respect to the outside world because clients must be entitled to the full benefit of joint representation undiluted by fear of waiving the attorney-client privilege. *See Ogden*, 202 F.3d at 461. Nevertheless, the privilege does not apply in subsequent litigation between the joint clients, *see id.;* in that sort of situation, one client's interest in the privilege is counterbalanced by the other's interest in being able to waive it.

*7 The instance of a criminal investigation in which one former co-client is willing to aid in the prosecution of the other lies in the wasteland between these two doctrinal strands, and courts have split on whether the target of the prosecution may block disclosure in this context. *See McCormick on Evidence,* § 91 at 365 n.13 (John W. Strong ed., 5th ed. 1999) ("Whether the privilege is effective where one joint client is prosecuted and the other is willing to testify as to the joint consultations is a question which has divided the courts."); *see also Conn. v. Cascone,* 195 Conn. 183, 487 A.2d 186, 189-90 (1985) (collecting cases on both sides of the issue).

[19] Although the instant case arises as a motion to quash a subpoena, rather than as an attempt to block a former co-client's testimony, the issue of privilege is entirely congruent. But there is another difference here--a significant one that cuts against the intervenors. In this iteration, the former co-clients were not independent actors, but, rather, corporate officers who owed a fiduciary duty to the corporation. Faced with an analogous assertion of privilege by corporate managers, the Fifth Circuit has held that the managers' interest must yield to the shareholders' interest in disclosure of the privileged materials. *Garner* v. *Wolfinbarger,* 430 F.2d 1093, 1101-04 (5th Cir.1970). Taking a similar tack, we hold that a corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

individual attorney-client relationship between him and the corporation's counsel

The line we draw parallels the holding of *Bevill,* 805 F.2d at 124 (rejecting the contention that "because [corporate officers'] personal legal problems were inextricably intertwined with those of the corporation, disclosure of discussions of corporate matters would eviscerate their personal privileges"). In this regard, we think it significant that the fifth prong of the *Bevill* test is stated in the negative: communications may be individually privileged only when they "*[do] not* concern matters within the company or the general affairs of the company," rather than when they *do* concern an individual's rights. *Id.* at 123 (emphasis supplied).

On this view, it follows that Roe or Moe may only assert an individual privilege to the extent that communications regarding individual acts and liabilities are segregable from discussions about the corporation. When one bears in mind that a corporation is an incorporeal entity and must necessarily communicate with counsel through individuals, the necessity for such a rule becomes readily apparent. Holding otherwise would open the door to a claim of jointly held privilege in virtually every corporate communication with counsel.

*8 Here, neither Roe nor Moe have even attempted to make any showing of segregability. On the contrary, their main argument in the district court and on appeal appears to be that the documents at issue do not lend themselves to separation into individual and corporate categories. The intervenors' brief is replete with references to "joint privilege," but contains no allegation that any particular communication related solely to the representation of Roe or Moe. Given the absence of such an allegation and the allocation of the burden of proof (which, on this issue, rests with the intervenors), we perceive no error in the district court's explicit finding that "all communications in this case are corporate communications." That dooms the intervenors' claim of attorney-client privilege, *see Grand Jury Proceedings,* 156 F.3d

at 1042 (rejecting claim of individual privilege when "appellant has not produced for [the court's] review the particular documents at issue nor has he otherwise adequately demonstrated in the record that any of the documents ordered produced were limited to the topic of his *individual* legal rights and responsibilities"), and renders moot the question of whether Roe and Moe also possessed an attorney-client privilege in these documents.

[20][21] **3. *The Work Product Privilege.*** The claim of work product privilege raises a similar set of issues anent joint privilege. The work product rule protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party. *E.g., Sealed Case,* 29 F.3d at 718. The rule facilitates zealous advocacy in the context of an adversarial system of justice by ensuring that the sweat of an attorney's brow is not appropriated by the opposing party. *Hickman v. Taylor.* 329 U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed. 451 (1947). Although the record does not include an index of allegedly privileged documents--a shortcoming to which we shall return--it appears that at least two categories of files contemplated by the subpoena might qualify as work product: Lawyer's interviews of employees during Oldco's internal investigation into the rebate program, and his notes and mental impressions of the investigation.

[22] Roe, Moe, and Lawyer as their attorney may, at least in theory, invoke the work product privilege as to work done exclusively for Roe and Moe as individuals. Yet, their argument does not claim exclusivity, [FN2] but, rather, amounts to an insistence that they should have a veto over the disclosure of documents produced for the joint benefit of the individuals and the corporation. As in the case of the attorney-client privilege, however, the intervenors may not successfully assert the work product privilege with respect to such documents. Because they effectively conceded that the work was performed, at least in part, for the corporation, Oldco's waiver of all privileges negates their potential claim of privilege. In these circumstances, therefore,

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363, *8 (1st Cir.(Mass.)))

the work product privilege does not preclude disclosure of the documents sought by the subpoena.

[23] Undaunted, the intervenors argue that the presence of the oral joint defense agreement demands a different result. We do not agree. Although a valid joint defense agreement may protect work product, *see In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir.1990), one party to such an agreement may not preclude disclosure of work product by another party on whose behalf the work originally was performed. Nor can the parties, by agreement, broaden the scope of the privilege that the law allows. *See United States v. Lee*, 107 F. 702, 704 (C.C.E.D.N.Y.1901). Such an agreement would contravene public policy (and, hence, would be unenforceable). [FN3]

*9 [24][25] We add, moreover, that the type of joint defense agreement described in Lawyer's affidavit would be null and void. After all, a primary requirement of a joint defense agreement is that there be something against which to defend. *Bay State Ambul..* 874 F.2d at 28. In other words, a joint defense agreement may be formed only with respect to the subject of potential or actual litigation. *Polycast Tech. Corp. v. Uniroyal, Inc.,* 125 F.R.D. 47, 50 (S.D.N.Y.1989). Lawyer's affidavit avers that his three clients (Oldco, Roe, and Moe) entered into an oral joint defense agreement in 1990, at which time no particular litigation or investigation was in prospect. The agreement thereafter remained in effect, Lawyer says, attaching *ex proprio vigore* to all matters subsequently arising (including the current grand jury investigation). The law will not countenance a "rolling" joint defense agreement of this limitless breadth.

[26] The rationale for recognizing joint defense agreements is that they permit parties to share information pertinent to each others' defenses. *See Hunydee v. United States,* 355 F.2d 183, 185 (9th Cir.1965). In an adversarial proceeding, a party's entitlement to this enhanced veil of confidentiality can be justified on policy grounds. But outside the context of actual or prospective litigation,

there is more vice than virtue in such agreements. Indeed, were we to sanction the intervenors' view, we would create a judicially enforced code of silence, preventing attorneys from disclosing information obtained from other attorneys and other attorneys' clients. Common sense suggests that there can be no joint defense agreement when there is no joint defense to pursue. We so hold. [FN4]

**B. *Fed.R.Civ.P. 45(d)(2).***

[27][28][29] As an alternate ground for our decision, we note that the motion to quash was properly denied because the intervenors failed to present sufficient information with respect to the items to which their claim of privilege attaches. The Civil Rules specifically provide that:

When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications or things not produced that is sufficient to enable the demanding party to contest the claim.

Fed.R.Civ.P. 45(d)(2). The operative language is mandatory and, although the rule does not spell out the sufficiency requirement in detail, courts consistently have held that the rule requires a party resisting disclosure to produce a document index or privilege log. *See, e.g., Bregman v. Dist. of Columbia,* 182 F.R.D. 352, 363 (D.D.C.1998); *First American Corp. v. Al-Nahyan,* 2 F.Supp.2d 58, 63 n. 5 (D.D.C.1998); *see also Avery Dennison Corp. v. Four Pillars,* 190 F.R.D. 1, 1 (D.D.C.1999) (describing privilege logs as "the universally accepted means" of asserting privilege claims in the federal courts); *cf. Vaughn v. Rosen,* 484 F.2d 820 (D.C.Ct.App.1973) (articulating the justifications for requiring privilege logs in the context of the FOIA). A party that fails to submit a privilege log is deemed to waive the underlying privilege claim. *See Dorf & Stanton Communications, Inc. v. Molson Breweries,* 100 F.3d 919, 923 (Fed.Cir.1996) (holding that failing "to provide a complete privilege log demonstrating sufficient grounds for taking the privilege" waives the privilege). Although

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363, *9 (1st Cir.(Mass.)))

most of the reported cases arise in the context of a claim of attorney-client privilege, the "specify or waive" rule applies equally in the context of claims of work product privilege. *See, e.g., Smith v. Conway Org., Inc.,* 154 F.R.D. 73, 76 (S.D.N.Y.1994).

**\*10** In a somewhat indirect fashion, the intervenors suggest that they were hampered in their ability to present a list of privileged documents by the district court's refusal to hold an evidentiary hearing. This suggestion does not withstand scrutiny. After all, the intervenors were not without knowledge of the communications to which the subpoena pertained; Lawyer originally had possession of them and turned them over to Smith & Jones only when Newparent decided to change counsel. Despite this knowledge, the intervenors made no effort to prepare a privilege log. That omission is fatal.

[30] Privilege logs do not need to be precise to the point of pedantry. Thus, a party who possesses some knowledge of the nature of the materials to which a claim of privilege is addressed cannot shirk his obligation to file a privilege log merely because he lacks infinitely detailed information. To the contrary, we read Rule 45(d)(2) as requiring a party who asserts a claim of privilege to do the best that he reasonably can to describe the materials to which his claim adheres.

[31][32][33] At any rate, the district court did not err by failing to hold an evidentiary hearing. We test a trial court's decision on whether or not to convene an evidentiary hearing for abuse of discretion. *E.g., David v. United States,* 134 F.3d 470, 477 (1st Cir.1998). Our cases exhibit a strong preference for a "pragmatic approach" to the question of whether, in a given situation, an evidentiary hearing is required. The key determinant is whether, "given the nature and circumstances of the case ... the parties [had] a fair opportunity to present relevant facts and arguments to the court and to counter the opponent's submissions." *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 302 (1st Cir.1995) (quoting *Aoude v. Mobil Oil Corp.,*

862 F.2d 890, 893-94 (1st Cir.1988)). In this instance, the paper record is quite extensive, containing affidavits from Lawyer as well as from representatives of Newparent and Smith & Jones. Furthermore, the intervenors had ample opportunity to respond to the other side's arguments, and took advantage of this opportunity by submitting a lengthy offer of proof. Under the circumstances, the district court was not obliged to convene an evidentiary hearing to fill in gaps in the intervenors' privilege claims. *See Aoude,* 862 F.2d at 894 (observing that matters often can be "heard" adequately on the papers).

**\*11** [34] Next, the intervenors lament that the district court's failure to rule on their motion for immunity deprived them of the opportunity to supplement the record with further evidence. Even if the district court had denied the immunity motion, the intervenors reason, they would have had an opportunity to decide whether to submit affidavits at the risk of incriminating themselves. This lamentation does not strike a responsive chord.

For one thing, the intervenors' failure to furnish a privilege log cannot plausibly be said to have resulted from the lack of an explicit ruling on the motion for immunity. Roe and Moe could have submitted a privilege log by proffer or over an attorney's signature without in any way compromising their Fifth Amendment rights.

[35] For another thing, although it is plainly the better practice for a trial court to rule explicitly on every substantial motion, it has long been accepted that a trial court may implicitly deny a motion by entering judgment inconsistent with it. *Wimberly v. Clark Controller Co.,* 364 F.2d 225, 227 (6th Cir.1966). In this case, the district court's rejection of the motion to quash effectively denied the intervenors' motion for a grant of immunity. That ruling hardly can be questioned on the merits. The intervenors point to no case authorizing a grant of judicial immunity to a grand jury target in order to facilitate the presentation of a privilege claim, and they offer no persuasive reason why this case should be the first.

2001 WL 1356363
(Cite as: 2001 WL 1356363, *11 (1st Cir.(Mass.)))

What remains is the intervenors' unhappiness with what they characterize as the district court's rush to judgment. The facts are simple: the district court convened a status conference and then converted the status conference into a non-evidentiary hearing on the merits of the intervenors' privilege claims. The proper time to raise an objection to this procedure was directly after the court's announcement of its intention to proceed to the merits, but the intervenors stood mute. Having neither contemporaneously objected to the court's procedural ruling nor sought a continuance, the intervenors have waived any right to complain about the court's timing. *See In re United States (Franco)*, 158 F.3d 26, 32 n. 3 (1st Cir.1998); *United States v. Diaz- Villafane*, 874 F.2d 43, 47 (1st Cir.1989).

## IV. CONCLUSION

*12 We need go no further. We hold that the intervenors' claims of privilege fail because the oral joint defense agreement on which they rely cannot defeat Oldco's express waiver of privilege, and, alternatively, because the intervenors failed without justification to produce a privilege log (thereby waiving the underlying attorney-client and work product privileges). Similarly, the district court did not err either in refusing to convene an evidentiary hearing or in ruling simultaneously on the motion to quash and the motion for immunity. Accordingly, the order refusing to nullify the grand jury subpoena is unimpugnable.

*Affirmed.*

FN* Of the Eastern District of Virginia, sitting by designation.

FN1. The written joint defense agreement need not concern us as the grand jury has limited its request to documents predating the execution of that agreement.

FN2. For example, with respect to the employee interviews conducted by Lawyer, the intervenors argued to the lower court that the work product privilege does not belong exclusively to Oldco because the work was performed on behalf of all

three clients.

FN3. This same reasoning applies to defeat the intervenors' claim that the parties' understanding, at the time they entered into the oral joint defense agreement, somehow serves to trump the normal operation of the attorney-client privilege. *See Lee*, 107 F. at 704.

FN4. Given this holding, we need not address other potential problems with the purported joint defense agreement in this case (e.g., the absence of any indicium of corporate authority and the related question of whether corporate officers have the power to bind a corporation to such agreements when a conflict of interest plainly exists).

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works