## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**WORLD WRESTLING FEDERATION**
**ENTERTAINMENT, INC., a Delaware**
**corporation,**

|  |  |
|---|---|
| **Plaintiff,** | **CASE NO.  00-CIV-8616 (DC)**<br>**(Southern District of New York)** |

**vs.**

**L. BRENT BOZELL, III, an individual;**
**MEDIA RESEARCH CENTER, INC.,**
**a Virginia non-profit corporation,**
**d/b/a Parents Television Council;**
**PARENTS TELEVISION COUNCIL, INC.,**
**a Delaware non-profit corporation;**
**JAMES LEWIS, an individual; MARK**
**HONIG, an individual; CYNTHIA**
**DELORES TUCKER, an individual; and**
**Various John and Jane Does,**

**CASE NO.  01-7913-CIV-HURLEY**
**Magistrate Lynch**

D....
**FILED**

**MAR 2 5 2002**

·LERK, USDC / SDFL / W

**Defendants.**

_____/

## CONSOLIDATED RESPONSE TO DEFENDANT JAMES LEWIS' MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER (RE: SUBPOENA OF KATHLEEN GROSSETT-TATE) AND KATHLEEN GROSSETT-TATE'S MOTION TO QUASH SUBPOENA AND/OR FOR PROTECTIVE ORDER

World Wrestling Federation Entertainment, Inc. ("WWFE") files the following Consolidated Response to Defendant James Lewis' Motion to Quash and/or For Protective Order (re: Subpoena of Kathleen Grossett-Tate) and Kathleen Grossett-Tate's Motion to Quash Subpoena and/or For Protective Order.

### INTRODUCTION

Continuing the tact of obstructing discovery in this case at all costs and ignoring all rules of procedural and substantive law, Defendant Lewis and Mrs. Kathleen Grossett-Tate ("Mrs. Tate") have now filed frivolous Motions to Quash a subpoena duces tecum served on Mrs. Tate. The subpoena sought records in Mrs. Tate's possession by March 12, 2002 and her deposition on

**Kirkpatrick & Lockhart** LLP

March 19, 2002. By the motions, Mrs. Tate, one of only two known percipient witnesses to the murder at issue in the underlying case, seeks to be excused from producing documents or testifying.

The sheer frivolity of these most recent stalling tactics is best evidenced by the remarkable and incomprehensible request for relief made in Lewis' motion, and parroted in Mrs. Tate's motion. Thus, Lewis requests an Order precluding "WWFE from reviewing and examining documents and testimony of Kathleen Gossett[sic]-Tate, mother of Lionel Tate, in any proceeding in this matter." See Tab 1, p. 8. In essence, this desperate request would have this Court enter an Order prohibiting WWFE from reading any documents in Mrs. Tate's possession as well as the sworn testimony given previously by Mrs. Tate in open court and transmitted on the national airwaves on Court TV.

The sheer frivolity of the relief requested is compounded by the use of a deliberate, knowing and calculated misstatement designed to provide factual support for the specious argument behind the prayer for relief, that Mrs. Tate was a "vital agent" of Lionel Tate in dealing with Mr. Lewis and, therefore, immune from questioning about what her son told her he did to Tiffany Eunick. Thus, Mr. Lewis represents to the Court that:

> "[Mrs. Tate] was a vital agent in dealing with Mr. Lewis, as her son was denied bond during the litigation." (Id. at p. 4) (emphasis added)

Mrs. Tate's motion contains an almost identical allegation that:

> "[Mrs. Tate] was a vital agent in dealing with Mr. Lewis, as her son was denied bond during the criminal trial." (emphasis added)

See Mrs. Tate's Motion to Quash Subpoena, attached hereto as Tab 2, p. 5.

There simply is no excuse for these allegations. Lionel Tate was not denied bond prior to or at trial. He was arrested on August 11, 1999; released to his mother's cognizance on August 12, 1999, remained in her custody on pretrial release and stood trial from January 10,

2

**Kirkpatrick & Lockhart LLP**

2001 to January 25, 2001. <u>See</u> the various documents concerning Lionel Tate's pretrial release status attached hereto at Tab 3. Mr. Lewis personally handled the bond hearing and certainly knew the above statement was false. Mrs. Tate had custody of her son following his release after arrest and obviously knew the above statement was false.

WWFE respectfully submits the obstruction surrounding all attempts to obtain discovery from those involved in the Lionel Tate case, including Defendant Lewis, must stop, and that sanctions are appropriate here. Neither motion is grounded in fact, nor based on law, as will be demonstrated herein.

In other pleadings filed with this Court, Lionel Tate's appellate counsel judicially admitted, in a pleading explicitly said to be directed by <u>Mrs. Tate</u> that the so-called wrestling defense was "bogus." <u>See</u> Tab 4, n. 3 and n. 4. As a matter of law, this admission is binding on Lionel Tate and Mrs. Tate. <u>See</u> <u>Jones v. Jones</u>, 197 B.R. 949, 956 (M.D. Fla. 1996). WWFE has always maintained the defense was bogus. The trial judge who sentenced Lionel Tate wrote a blistering opinion repudiating the defense. The jury rejected it. And now, the party who asserted the defense admits it was bogus, yet refuses to be examined as to her knowledge of how and why this bogus defense was advanced. Proof of that fact is a central issue in this litigation. WWFE is entitled to prove that fact through the testimony of Mrs. Tate, <u>one of only two known witnesses</u> to the brutal murder of Tiffany Eunick and to inquire as to the basis of the judicial admission that the defense was bogus.[1]

## I.   **LACK OF GOOD FAITH EFFORTS TO RESOLVE ISSUES**

As a preliminary matter, both motions at issue contain certifications that counsel for Lewis and Mrs. Tate tried in good faith to resolve the issues raised in their respective motions. If

---

[1]     "Bogus" is defined to mean "counterfeit; fake". <u>See</u> The American Heritage Dictionary; Second College Edition, 1985, p. 193.

telling opposing counsel that a witness will not produce any document, not produce a privilege log, and will not appear for a deposition unless a Court orders it in good faith, then there was a good faith effort to resolve the matters.  A truly good faith effort to resolve these issues, however, requires more.  Rule 45(d)(2) and Local Rule 26.1.G.3(b) clearly require that a privilege log be delivered to opposing counsel.  No such log has ever been tendered to counsel for the WWFE or to this Court.  Instead of tendering a proper privilege log to counsel, and then discussing whether the claim of privilege is contested, both Lewis and Mrs. Tate ran to Court and asserted privilege in a vacuum without identifying to the Court, or counsel, a single document over which a privilege is claimed.  That action is not good faith.

In point of fact, counsel for WWFE told counsel for Mrs. Tate that claims of privilege must be asserted on the record.  See Tab 5.  None was given.  Likewise, counsel for WWFE advised counsel for Mrs. Tate that a claim of privilege, whether attorney-client, work product, or Fifth Amendment, had to be asserted, by clear law, on an evidentiary record, and requested Mrs. Tate to appear so that such a record could be made.  See Tab 6.  Mrs. Tate refused to appear.

## II.  CASE HISTORY

WWFE previously described the underlying case in other filings with this Court.  See Tabs 7 and 8.

For purposes of the motions sub judice, a few facts have special significance.  Mrs. Tate was, by her own admission, the adult in charge of Tiffany Eunick on the night she was brutally beaten to death in her house.  The only other person known to have been present was her son, Lionel Tate, who stands convicted of murder in the first degree.

Previously, Mrs. Tate, a police officer in her own right, gave a sworn statement to police on July 29, 1999.  See Tab 9.  Additionally, with Mr. Lewis present, it appears that Mrs. Tate testified at length on August 11, 1999 before a Grand Jury regarding the death.  Without

objection or a privilege instruction by Mr. Lewis, Mrs. Tate seemingly testified regarding conversations she had with her son <u>after</u> he had been charged with the crime. On January 23, 2001, she testified at the trial of her son and again answered questions about her role and the statements her son made to her after arrest. See Tab 11.

In her sworn statements, Mrs. Tate denied observing or being aware of any violence that night; claimed she was upstairs sleeping; heard certain noises coming from downstairs; and that she responded to these noises by telling Tiffany Eunick to be quiet or she would "spank her butt." <u>See</u> Tab 9 at p. 8. The consistent thrust of Mrs. Tate's sworn statements was that she did not know that Tiffany was being murdered a few feet below her in a savage and prolonged beating which, according to trial testimony, raged for five minutes. <u>See</u> Tabs 9, 11 and 12(a).

Despite her sworn statements that she did not know what happened, and overwhelming forensic evidence known to her and Mr. Lewis that Tiffany Eunick suffered numerous and multiple severe injuries as a result of the prolonged beating, Mrs. Tate joined Mr. Lewis in making public statements that Tiffany's death was an "accident" which occurred while Lionel was mimicking wrestling moves he saw on television. Indeed, on the day after the jury verdict rejected the wrestling defense, Mrs. Tate and Mr. Lewis jetted off to be on The Today Show to peddle that theme. See Tab 12(b).

Now, after Lionel Tate has been convicted and sentenced to life in prison, Mrs. Tate, Lionel Tate and new counsel for Lionel Tate judicially admitted that the wrestling defense was "bogus." Having done so, Lewis and Mrs. Tate now seek to prevent the development of the proof of what has now been admitted that the defense was bogus. These arguments are reviewed in the next section of this brief.

**Kirkpatrick & Lockhart** LLP

## III.  ARGUMENTS OF LEWIS AND MRS. TATE

The motions filed by Lewis and Mrs. Tate make largely the same arguments.  Most of Mrs. Tate's motion tracks the exact language of Lewis' previously filed motion.  Since Lionel Tate has separate counsel, as does Mrs. Tate, Mr. Lewis has no standing to raise any arguments on behalf of either Lionel Tate or his mother.  Nevertheless, since all his arguments are also made by Mrs. Tate, they are addressed herein.

In summary fashion, the arguments made by Mrs. Tate to quash the subpoena and avoid producing documents or testifying are as follows:

1. Lionel Tate had an attorney-client privilege with Mr. Lewis and Mrs. Tate was a "vital agent," since her son was supposedly denied bond.  Therefore, she doesn't have to testify, evidently about anything.

2. The attorney-client privilege of Mrs. Tate allows her not to testify or produce records;

3. The work-product privilege of Lionel Tate allows Mrs. Tate not to testify or produce records;

4. The work-product privilege of Mrs. Tate allows her not to testify or produce records;

5. Lionel Tate's Fifth Amendment rights would be violated if Mrs. Tate testified or produced records;

6. Mrs. Tate's Fifth Amendment rights would be violated if she testified or produced records;

7. The documents sought by subpoena are available from third parties;

8. Mrs. Tate's Grand Jury testimony is confidential;

9. The subpoena is overly broad and seeks irrelevant information; and

10. The Soldiers and Sailors Act somehow permits Mrs. Tate not to testify because she might be sent to war.

Mr. Lewis makes arguments 1, 2, 3, 4, 5, 8 and 9.  Although Mrs. Tate's motion indicated she would be advancing arguments 7 and 9 in the opening section of this motion, no argument

on those points is, in fact, made by her. Thus, there is no response to be made on those arguments. Moreover, the exact same arguments were all rejected by Magistrate Lynch in ruling on Rosenbaum's prior Motion to Quash. See Tab 13.

## IV.  ARGUMENT

### A.  THE ATTORNEY-CLIENT PRIVILEGE ARGUMENTS

#### 1.  The Attorney-Client Privilege in This Case is Governed by Federal Law

Neither Lewis nor Tate cited any federal authority in their Motions for the proposition that Mrs. Tate is an agent of her son for purposes of Lionel Tate's attorney-client privilege. Instead, both relied exclusively on a single decision of a Florida intermediate appellate court as the legal basis for their argument. See Gerheiser v. Stephens, 712 So. 2d 1242 (Fla. 4th DCA 1998). Claims of attorney-client privilege in this case are, however, governed by federal law, not state law. Rule 501 of the Federal Rules of Civil Procedure provides that a claim of privilege in federal court is resolved by federal common law unless the privilege is invoked with respect to a claim or defense as to which state law supplies the rule of decision. Rule 501 has been interpreted by the courts to mean that the federal common law of privilege applies when a claim is in federal court based on federal question jurisdiction. See Hancock v. Hobbs, 967 F.2d 462, 466-67 (11th Cir. 1992). Conversely, when a case is in federal court based solely on diversity jurisdiction, state law applies. Miller v. Transamerican Press, Inc., 621 F.2d 721, 724 (5th Cir. 1980). This case involves both federal and state law claims and defenses. See Tab 14. In such a case, the Eleventh Circuit has held that the federal law of privilege applies even when the evidence sought might be relevant to a pendent state law claim. Hancock, 967 F.2d at 466-67; Sirmans v City of South Miami, 86 F.R.D. 492, 494-95 (S.D. Fl. 1980). Thus, the Gerheiser case is not controlling in any event and is not the proper formulation of privilege governing this case.

**Kirkpatrick & Lockhart** LLP

## 2.    The Federal Law of Privilege Does Not Permit Mrs. Tate to Refuse to Testify About Her Knowledge of All Facts

A person attempting to invoke the attorney client privilege has the burden to prove that: (1) the asserted holder of the privilege is, or sought to become, a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *See* U.S. v. Noriega, 917 F.2d 1543, 1551 (11th Cir.), *cert. denied*, 498 U.S. 976 (1990).

It is a basic premise of the attorney-client privilege that the privilege protects only *communications* between attorney and client from disclosure.   Upjohn Company v. United States, 101 S.Ct. 677 (1981).   The privilege does not prevent the disclosure of underlying facts. Id.   A witness may not refuse to disclose any relevant facts within his or her knowledge simply because those facts were communicated to an attorney.   Id.   Accordingly, Mrs. Tate may not refuse to testify regarding any facts simply because she may have communicated those facts to Lewis.

Moreover, even if Gerheiser did control, there is no serious question that Mrs. Tate has waived the privilege to the extent she now claims it provides her with a basis not to testify about the statements made to her by Lionel Tate.   Without objection or instruction, she testified at length about such subjects before a Grand Jury and as a defense witness at trial, with Mr. Lewis present both times.   See Tabs 10 and 11.

Finally, the judicial admission made to this Court that the wrestling defense was "bogus", alone and in conjunction with other evidence set forth in ensuing sections in this Response establish that the crime-fraud exception negates <u>all</u> claims of privilege.

### 3.   Movants Have Not Demonstrated a Privilege on Any Document

It is root law in the Eleventh Circuit that "the attorney-client privilege may not be tossed as a blanket over an undifferentiated group of documents. The privilege must be asserted with respect to particular documents." <u>In re Grand Jury Subpoena</u>, 831 F.2d at 227 (district court erred in recognizing and permitting blanket assertion of attorney-client privilege to all subpoenaed documents).

In this case, movants have made no attempt to comply with the law governing privilege assertions. They simply assert that "the documents sought by way of subpoena are protected by attorney/client privilege." This is precisely the type of blanket assertion of privilege the Eleventh Circuit has rejected.

### 4.   Mrs. Tate Waived All Privileges by Failing to Produce a Privilege Log

To prevent naked assertions of privilege, the proponent of a privilege with regard to subpoenaed documents must provide a privilege log. <u>See</u> Fed. R. Civ. P. 45(d)(2); United States District Court for the Southern District of Florida Local Rule 26.1.G.3(b). Neither Lewis nor Mrs. Tate provided such a log or information. Under such circumstances, the privilege has been waived even if it otherwise might have applied. <u>See</u>, <u>e.g.</u>, <u>TIG Insurance Corporation of America v. Johnson</u>, 799 So.2d 339, 340 (Fla. Dist. Ct. App. 2001); <u>A.I.A. Holdings, S.A. v. Lehman Brothers, Inc. and Bear Stearns & Co., Inc.</u>, 2000 WL 1538003, at *3 (S.D.N.Y. Oct. 17, 2000) (holding that "[w]here a party has completely failed to provide an index of documents withheld on the ground of privilege, a finding of waiver is appropriate") (copy attached hereto as

Exhibit A); John Labatt Ltd. v. Molson Breweries, 93 Civ. 75004, 94 Civ. 71540 (RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995), aff'd, 100 F.3d 919 (Fed. Cir. 1996), cert. denied, 520 U.S. 1275 (1997) (copy attached hereto as Exhibit B).

There is no inequity involved in expecting compliance with the Local Rules. As the record before this Court establishes, every single person involved in filing the various motions relating to WWFE's discovery efforts have systematically not followed this simple and clear command of the Rules that govern privilege assertions. Indeed, Lewis is already under an Order to prepare a privilege log relating to the documents in Rosenbaum's possession, which he has not obeyed. There is simply no point in having rules if one party can violate them as they please, burden the Court with motions made after non-compliance with the rules, and get away with doing so.

### 5.     Lionel Tate's Attorney-Client Privilege Does Not Immunize Kathleen Grossett-Tate From Testimony

The movants ambiguously argue that the attorney-client privilege between Lewis and Lionel Tate somehow provides Mrs. Tate with the right not to testify at all, and/or that it protects communications made by Lionel Tate to Lewis in the presence of Mrs. Tate, and/or protects even communications made solely between Mrs. Tate and Lewis with no counsel present.[2] There is no known formulation of the attorney-client privilege under federal common law (or any law) that goes that far. At best, the privilege prevents only communication between client and counsel if all other criteria are met. The reasons for this concept are too well established to be reasonably debated. Privileges are not a favored evidentiary concept because they serve to obscure the truth. United States v. Suarez, 820 F.2d 1158, 1160 (11th Cir. 1987). As such, privileges are to be construed as narrowly as possible. Id. See also, United States v. Pipkins,

---

[2]     For reasons previously stated, the single case relied upon for this proposition, the Gerheiser case, does not control here.

528 F.2d 559, 563 (5th Cir. 1976) (holding that the attorney-client privilege is inconsistent with the goal of discovering the truth at trial and, therefore, "ought to be strictly confined within the narrowest possible limits consistent with the logic of its principle.") No reason exists to deviate from these precepts here.

First of all, no formulation of attorney-client privilege or work product shields Mrs. Tate from testifying as to everything she knows about that night and what happened. Her personal knowledge is simply not privileged.

Second, no formulation of either attorney-client privilege or work product shields Mrs. Tate from testifying about what her son told her about that night outside the presence of counsel. Indeed, as demonstrated, she has repeatedly testified about that very subject. Her inquiries of her son, and his responses, are clearly discoverable and do not involve communications with an attorney.

Third, the real thrust of the asserted privilege seems to be to prevent Mrs. Tate from disclosing what she discussed with Mr. Lewis about her son's statements to her, as well as discussions between her and Mr. Lewis when Lionel Tate was present.

The issue of whether the presence of friends or family members in a meeting between attorney and client waives the privilege has been addressed in only a few instances by both state and federal courts. Those courts have held that the presence of a friend or family member during a meeting between attorney and client waives the attorney-client privilege. The courts in those cases based their rulings on the premise that the third party is not reasonably necessary to the transmission of the communication. See Higgins v. Albert Einstein Medical Center, 1991 WL 236210 (E.D. Pa. 1991) (the attorney-client privilege does not apply to communications that are intended to be disclosed to third parties and that are, in fact, so disclosed); State v. Fingers, 564 S.W.2d 579 (Mo. 1978) (the court held that the attorney-client privilege had been waived by the

**Kirkpatrick & Lockhart** LLP

presence of the defendant's father at conferences between the defendant and his attorney); People v. Doss, 514 N.E.2d 502, (Ill. 1987) (holding that the presence of client's friend vitiated attorney-client privilege because she did not act as an agent or advisor to client and client needed no help in communicating with the attorney, despite the fact that client was of below average intelligence); United States v. Evans, 954 F.Supp. 165 (N.D. Ill. 1997) (concluding that attorney-client privilege was waived due to presence of third person attorney at conference between defendant and attorney because defendant would have been able to seek appropriate legal representation without third person).

These cases make it clear that the attendance of a family member or friend during an attorney-client communication will vitiate the attorney-client privilege when that third party is not reasonably necessary for the transmission of information to the attorney. This premise is actually supported by, and at the root of, the Gerheiser case cited as support for the argument that Mrs. Tate is covered by Lionel Tate's attorney-client privilege. In that case, Gerheiser's son, Ronald Knight, was arrested along with his friend, Sean Stephens. Gerheiser v. Stephens, 712 So.2d 1252, 1253 (Fl. 1998). As the Court pointed out, the son "was incarcerated in the jail and . . . asked her to find him an attorney." Id. at 1254. The mother then met with attorney V. Ted Brabham about representing her son. Id. Subsequently, the mother advised Brabham that she could not afford his fees and Brabham represented the friend of her son who pled guilty to various charges. The friend then filed a motion claiming that he was denied effective assistance of counsel because Brabham had a conflict of interest due to his discussion with Gerheiser prior to his representation of Stephens. Id. The mother had signed an affidavit supporting the motion to the effect she discussed his fee and other unspecified confidential matters. At an evidentiary hearing, Stephens sought to call Gerheiser to testify regarding her conversation with Brabham. Id. at 1254. Gerheiser objected on the basis that those discussions were covered by the attorney-

12

**Kirkpatrick & Lockhart** LLP

client privilege.  Gerheiser, 712 So.2d at 1253.  When the trial court concluded that Gerheiser was an agent of her son and that the communications were protected by the attorney-client privilege, the state requested an *in camera* examination of Gerheiser, which the trial court eventually granted.  Id.  Gerheiser then filed a petition for writ of certiorari.  Id.

On appeal, the Court agreed that Gerheiser's conversation with Brabham was protected by the attorney-client privilege <u>because</u> she was acting as an agent for her son <u>for the purpose</u> of <u>securing legal representation for him</u>.  Id.  The court based its ruling on the fact that Gerheiser had "essentially acted as a messenger for her son, who was incarcerated in the jail and who asked her to find him an attorney.  As such, she was reasonably necessary for the transmission of the communication.'"  Id.  Having done so, the appellate court nevertheless denied the Motion to Quash because her affidavit had supported the motion and she would not be permitted to use the privilege as sword and shield.

Gerheiser involved a single communication made to secure counsel at the request of an incarcerated child at the onset of the matter.  Evidently, realizing that a pretext had to be advanced to make Mrs. Tate a person "reasonably necessary for the transmission" of communications between Lionel Tate and Lewis, both movants decided to falsely tell the Court Lionel Tate was denied bond.  In truth, Lewis had unfettered access to Lionel Tate at all times and did not need the mother to transmit information of any kind.  There is no question Lewis had access to Lionel Tate individually, as he told the media that Lionel Tate played with Mr. Lewis' own children.  See Tab 15.

Thus, the movants' position amounts to an advocation of a parent-child privilege.  The Eleventh Circuit has specifically rejected the existence of the parent-child privilege.  In re Grand Jury Subpoena of Santarelli,  740 F.2d 816, 817 (11th Cir. 1984) (recognizing that every court of appeals that had addressed questions of family privilege outside the context of interspousal

communications had rejected such a privilege).  See also, In re Grand Jury Proceedings (Starr), 647 F.2d 511 (5th Cir. 1981) (noting that there was no federal judicial support or recognition of a parent-child privilege).

**B.      THE WORK PRODUCT DOCTRINE DOES NOT PROHIBIT THE DISCLOSURE OF THE REQUESTED DOCUMENTS OR TESTIMONY**

**1.      Movants Have Not Carried Their Burden of Proving the Applicability of the Work Product Doctrine to Any Document or Areas of Inquiry**

As with the attorney-client privilege, the party claiming work product protection has the burden of proof.  As such, movants must show, as to each document Mrs. Tate seeks to withhold: (1) that an attorney or his agent prepared a particular document; (2) that such person was acting on behalf of the client when he or she did so; and (3) that such person prepared the document in anticipation of litigation.  In re Grand Jury Proceedings, 601 F.2d 162, 171 (5th Cir. 1979), citing Hickman v. Taylor, 329 U.S. 495 (1947).

Again, in this case, movants made no attempt to meet this required burden.  Lewis simply asserts that "Ms. Grossett-Tate *may* be privy to Mr. Lewis' thoughts about particular strategy" and that "critical decisions based upon discovery and court rulings *could* be discussed with [her]."  See Tab 1, p. 6 and Tab 2, p. 6.  These equivocal statements do not even attempt to explain *how* this privilege applies to any document that WWFE requested in its subpoena and are not sufficient to satisfy the burden of proof with regard to the work product doctrine.

**2.      The Movants Waived the Work Product Privilege by Failing to Produce a Privilege Log**

As discussed above, the Federal Rules of Civil Procedure require a person asserting privilege to provide a log setting forth a description of the nature of the documents, communications or things not produced that is sufficient to enable the demanding party to contest the claim.  See Fed. R. Civ. P. 45(d)(2); United States District Court for the Southern

**Kirkpatrick & Lockhart** LLP

District of Florida Local Rule 26.1.G.3(b).  Neither movant did so.  Under these circumstances, the failure to identify any information regarding the documents claimed to be work product waives any privilege that might otherwise have applied.  See, e.g., TIG Insurance Corporation of America, supra, 799 So.2d at 340; A.I.A. Holdings, 2000 WL 1538003 at *3; John Labatt Ltd., supra, 1995 WL 23603 at *1.

### 3.   WWFE Has "Substantial Need" of the Requested Documents and Would Suffer "Undue Hardship" Without Them

Finally, even if the Court were to hold that the work product doctrine *applied* in this case *and* that it had not been waived, WWFE can still overcome the claim on the basis of "substantial need" and "undue hardship."  *See* Hickman v. Taylor, 329 U.S. 495, 511-12 (1947) (holding that a party seeking production of an opposing counsel's "work product" must show substantial need and undue hardship).  The claims in this case require proof of falsity and potentially also proof of malice.  WWFE is entitled to prove that the "bogus" wrestling defense was created and developed by Lewis with knowledge it was false.  Mrs. Tate was present at the initial police interviews with her son where no such claim was made and was involved in a later videotaped reenactment wherein a completely different fabricated tale implicating wrestling was told by her son.  She knows, and has to know, how, when and why the factual explanation for Tiffany Eunick's death came to be the bogus wrestling defense.  There is no question that Lewis made numerous out-of-court statements to the media and the other defendants in which he described what Lionel Tate did on the evening in question.  If Mrs. Tate's denial of knowledge was truthful, the factual basis for Mr. Lewis' statements, which mutated and evolved at all times, can only be based on information Lionel Tate told Lewis, which "facts" were then disclosed to the public.  The only other possibility is that the factual renditions were invented by Mr. Lewis, in which case no privilege will protect them.  Without access to said evidence and any documents in Mrs. Tate's possession, WWFE will be severely prejudiced in the presentation of its case.

**Kirkpatrick & Lockhart LLP**

Indeed, the whole point of the obstructionist tactics is to create a failure of proof due to lack of access to it.

### C. THE CRIME-FRAUD EXCEPTION APPLIES TO COMMUNICATIONS AND MATERIALS THAT MIGHT OTHERWISE BE PRIVILEGED

Mrs. Tate cannot avail herself of either the attorney-client privilege or the work product doctrine because, in addition to the reasons discussed above, any documents subpoenaed from Mrs. Tate relating to the "bogus" defense were in furtherance of a fraud.   Likewise, communications between Lewis and Mrs. Tate, individually or as alleged agent of Lionel Tate, in furtherance of that fraud are not privileged.   It is well established that an otherwise valid assertion of privilege, either attorney-client or work product, can be overcome by the crime-fraud exception.   Gutter v. E.l. DuPont De Nemours, 124 F.Supp.2d 1291, 1298 (S.D. Fla. 2000).   The crime-fraud exception requires disclosure of otherwise privileged communications or material obtained in the course of the attorney's duties on the client's behalf which are made or performed in furtherance of a crime, fraud or other misconduct fundamentally inconsistent with the basic premises of the adversary system.   Id.   The basic premise of the justice system is to arrive at the truth.   The presentation of bogus defenses is not, and should never be, a basic premise of our system.   The Eleventh Circuit has adopted a two-part test to be used in determining whether the crime-fraud exception applies:

> First, there must be a prima facie showing that the client was engaged in criminal or fraudulent conduct when he sought the advice of counsel, that he was planning such conduct when he sought the advice of counsel, or that he committed a crime or fraud subsequent to receiving the benefit of counsel's advice.   Second, there must be a showing that the attorney's assistance was obtained in furtherance of the criminal or fraudulent activity or was closely related to it.

In re Grand Jury, 845 F.2d 896, 897 (11th Cir. 1988).

**Kirkpatrick & Lockhart LLP**

In this case, the fraud that was committed upon the court, the public and the WWFE by Lewis, Tate and Mrs. Tate is unmistakable.  There was never any factual basis for a defense premised on a play-wrestling accident scenario between Lionel Tate and Tiffany Eunick.  In fact, wrestling was never once mentioned as a possible cause of Tiffany's murder until after Lewis was appointed as Tate's attorney, as the trial judge pointed out when he sentenced Tate.  See Tab 16.  At trial, even Tate's own expert admitted Tiffany's death was no accident but a homicide. See Tab 17, p. 1317.  The autopsy of Tiffany Eunick revealed that she had suffered over 35 separate injuries, including three brain contusions, a fractured skull, a broken rib and a lacerated liver.  When Tate and his mother spoke to the police two days after the death and before Lewis was retained as his attorney, Tate said that he had merely been playing tag with Tiffany and that he had given her a bear hug and accidentally bumped her head on a table while moving her from the floor to the couch while she slept.  See Tab 18.  Neither Tate nor his mother mentioned anything about wrestling in any of those statements.  When those statements became public, Dr. Perper announced that Tiffany's injuries were completely inconsistent with Tate's version of events and that the injuries she suffered could not have been the result of mere "roughhousing." See Tab 19.

After Tate's arrest and indictment, Lewis was appointed as his attorney.  It was only after Lewis became involved in the case that wrestling was seized upon as an "explanation" for Tiffany's death.  Up until that time, wrestling had never been mentioned by either Tate or his mother.  When Lewis developed the bogus wrestling defense, he took center stage in the media spotlight.  He appeared on numerous television and radio shows and worked with the PTC Defendants on the "Clean Up T.V. Now" fundraising video.  During each appearance, Lewis blamed professional wrestling for the death of Tiffany Eunick, claiming that Tate accidentally

killed Tiffany by simply copying moves he had seen on television wrestling shows.  As is the hallmark of "bogus" defenses, the story was constantly evolving.   When Lewis caused a subpoena to be served on WWFE talent The Rock, and leaked it to the media causing bold headlines linking The Rock to the murder of a child, Lewis told the media he had subpoenaed The Rock simply because he lived in South Florida.  See Tab 20.  He did not claim Lionel Tate was imitating The Rock.  By time of trial, Lewis told the jury Lionel Tate was imitating The Rock when he killed Tiffany Eunick.  See Tab 21.  At other points, Lewis told the media that Lionel Tate was mimicking the moves of a wrestler known as Sting which were on a Sprite commercial.  See Tab 22.  That claim disappeared by trial.

Lewis did more, much more, in assisting and furthering the fraudulent activity after he was retained.  A key piece of evidence in that regard was a supposed "reenactment" of what Lionel Tate did to Tiffany Eunick, done with a defense retained expert, Dr. Klaas.[3]  The tape of this "reenactment" has previously been provided to this Court in conjunction with Plaintiff's Motion for Clarification/Reconsideration of Order on Richard Rosenbaum's Motion to Quash and James Lewis' Motion to Quash dated February 22, 2002.  Mrs. Tate was present, as her voice can be heard late into the tape.  On the tape, made at the Tate house, Lionel Tate demonstrates punching Tiffany Eunick in the chest area 30-40 times and then accidentally whipping her into the iron pole by the stairs leading up to Mrs. Tate's bedroom.  The tape could not have been created in the hope of being offered by the defense at trial as it is rank hearsay if offered by the defense.  It was great for media consumption, however, and played over the nation's air waves, usually on split screen with Lionel Tate seen whipping Dr. Klaas into the iron

---

[3]     Dr. Klaas is in complete contempt of a subpoena served on him.  Motions relating to this refusal to do anything in response to this Court's subpoena also are before this Court. See Tab 24.

**Kirkpatrick & Lockhart LLP**

pole on one half of the screen and WWF personnel executing a similar move on the other half of the screen.

On its face, the tape was a demonstrable hoax.  Whereas the statements given by Lionel Tate to police had Tiffany going upstairs after the physical contact he described to police, the reenactment does not have her doing so.  The statements given by Lionel Tate to police have Tiffany repeatedly "touching" him while sleeping.  The "touching" described by Lionel Tate mysteriously disappears from all subsequent descriptions of what happened, including the reenactment.  In her sworn statements, Mrs. Tate has admitted to hearing noises and telling Tiffany to be quiet or she would "spank her butt."  That sequence is omitted completely from the reenactment.  These, and other omissions, caused the trial judge to criticize the reenactment tape both in pretrial matters and after trial in his sentencing opinion.  See Tab 16.  In fact, the tape was eventually introduced at trial—by the prosecution to prove it was a lie, which they did, convincingly.

When Tate went to trial, it was clear that the "wrestling defense" and the "reenactment" were wholly inconsistent with the many injuries suffered by Tiffany.  Recognizing this, the jury returned a guilty verdict against Tate after only three hours of deliberation and several jurors who were subsequently interviewed stated that wrestling had nothing to do with what happened to Tiffany and that it was not even an issue in the case.  See Tab 23.  Despite this complete rejection of the "wrestling defense," Lewis and Mrs. Tate appeared the following morning on the Today show to continue their perpetration of the fraud, during which Lewis incredibly stated that "everyone who saw the trial understood that this child was simply imitating what he saw on t.v." Evidently, the jurors did not so understand.

**Kirkpatrick & Lockhart** LLP

On March 9, 2001, Judge Lazarus sentenced Tate to life in prison in an order that contained a scathing review of the "wrestling defense." See Tab 16. The order was complete and emphatic in its utter rejection of the "defense":

> But the facts on which the jury relied are deceptively simple in **rejecting the involvement of professional wrestling replication;** thus by necessary implication, accident:
>
> 1. In the two statements to the police, Lionel Tate's own words failed to indicate that wrestling played any part in Tiffany's brutal murder. The statements did not come close to explaining what happened in that townhouse.
>
> 2. In statements made to EMS and the police by the defendant's mother, neither accident nor wrestling played any part in Tiffany's fatality.
>
> **Not until there was a defense-initiated reenactment did actions initiating professional wrestling start to emerge as a defense.** This reenactment totally failed to explain to the jury during trial, and to this judge sitting as a thirteenth juror in the motion for new trial/reduction of charge, the extent and severity of the injuries to Tiffany Eunick. Even though the reenactment depicted a connection to professional wrestling, the testimony of Dr. Brannon shows that Lionel Tate disbelieved the authenticity of what he saw on television. **The reenactment in all due respect, seemed to be trying to fit the facts, rather than a true depiction of the events.**
>
> Accordingly, the jury obviously then, and this court now, did not and does not accept that replicating what may or may not have been seen in various televised wrestling shows as a reason to call Lionel Tate's actions 'accidental.'

After listing the numerous injuries that Tiffany had suffered at Tate's hands, Judge Lazarus found that it was "inconceivable that such injuries could be caused by 'roughhousing,' 'horseplay,' or by replicating professional wrestling moves." (emphasis added).

These are but some of the facts that support WWFE's position that the "wrestling defense" was nothing more than a media hoax. These facts alone more than amount to a prima facie of both elements of the crime fraud exception. The development and creation of a criminal defense is done with the aid of the defendant's attorney. In this case, it is even more obvious that the defense was created and perpetrated, not only with Lewis' assistance, but, likely, at his suggestion, particularly given the fact that neither the defendant nor his mother ever claimed that

wrestling had anything to do with this tragedy until Lewis was appointed. Indeed, in the most recent and stunning verification that the "wrestling defense" was nothing but a ruse, *Tate's own appellate attorney*, Rosenbaum, stated in a pleading filed with this court that he *"has reason to believe that the 'wrestling defense' was bogus."* See Tab 4, n. 3.

### D.   DOCUMENTS IN GROSSETT-TATE'S POSSESSION AND TESTIMONY BY GROSSETT-TATE DO NOT IMPLICATE ANY FIFTH AMENDMENT PRIVILEGES OF LIONEL TATE

Movants next argue that Lionel Tate's Fifth Amendment privilege against self-incrimination protects Mrs. Tate from providing the documents requested in the subpoena and from testifying. In support of this proposition, movants state that the possession of documents by Mrs. Tate should be considered as if Tate's attorney possessed the documents. See Tabs 1 and 2. This argument is completely without merit.

In direct contrast to Lewis' assertion, the United States Supreme Court has held that, "a person inculpated by materials sought by a subpoena issued to a third party cannot seek shelter in the Self-Incrimination Clause of the Fifth Amendment." SEC v. Jerry T. O'Brien, Inc., 104 S.Ct. 2720, 2725 (1984). This is so because the Fifth Amendment proscribes only compelled *self*-incrimination, not the incrimination of others. Indeed, the very case cited by Lewis as support for his argument actually explicitly rejected his position and is frequently cited as support for the well-established rule to the contrary. Specifically, in Fisher v. United States, 96 S.Ct. 1569 (1976), the Court stated that rights of taxpayers were not violated by the enforcement of a documentary summons directed to their attorneys and requiring production of the taxpayers' own records in the possession of the attorneys. The Court based its ruling on the premise that, in such a case, "the ingredient of personal compulsion against an accused is lacking." Id. at 1574 (quoting Couch v. United States, 93 S.Ct. 611, 616 (1973)). The Court went on to say that the

fact that the attorneys are agents of the taxpayers does not change this result and reiterated its previous holdings that the privilege:

> was never intended to permit [a person] to plead the fact that some third person might be incriminated by his testimony, even though he were the agent of such person . . . . [T]he Amendment is limited to a person who shall be compelled in any criminal case to be a witness against Himself.

Id. Because "[I]t is extortion of information from the accused himself that offends our sense of justice,' the Fisher Court held that, "Agent or no, the lawyer is not the taxpayer. The taxpayer is the 'accused,' and nothing is being extorted from him." Fisher, 96 S.Ct. at 1574.

The same logic applies here. Agent or no, Mrs. Tate is not her son. Therefore, she is not permitted to ignore the subpoena or refuse to testify asserting Lionel Tate's Fifth Amendment privilege.

### E. ALL PRIVILEGES ASSERTED BY MRS. TATE MUST BE ASSERTED ON A QUESTION-BY-QUESTION BASIS OR A DOCUMENT-BY-DOCUMENT BASIS

Once again, it is root law that privileges cannot be made in a vacuum and that "blanket claims of privilege will not justify a wholesale refusal to testify or produce documents in response to a request." Hillsborough Holdings Corp. v. Celotex Corp., 18 Fed.R.Serv. 39 (Bank. Ct., M.D. Fla. 1990). Indeed, it has been the law of this Circuit for 15 years that blanket assertions of privilege "shall not expect . . . grace." In Re Grand Jury Subpoena, 831 F.2d 225 (11th Cir. 1987). Blanket privilege assertions are improper both with respect to the attorney-client privilege and the Fifth Amendment privilege. Id.; In Re Grand Jury, 694 F.2d 1256 (11th Cir. 1982); United States v. Goodwin, 625 F.2d 693 (5th Cir. 1980) ("a blanket assertion of the [Fifth Amendment] privilege without inquiry by the Court, is unacceptable"); State of Florida v. Southland Corp., 684 F. Supp. 292 (S.D. Fla. 1988) (the witness must assert any claim of privilege on a question-by-question basis rather than assert a blanket privilege as to all questions and the witness, not their attorney, must invoke it).

**Kirkpatrick & Lockhart LLP**

Insofar as Mrs. Tate suggests she may invoke her own Fifth Amendment rights, a curious tact in light of the fact she has repeatedly, until now, provided media interviews and sworn testimony about the death of Tiffany Eunick, the procedure for doing so is clear. She must assert the privilege specifically in response to particular questions. Thereafter, the claim is reviewed by a judicial officer who determines whether the information sought would tend to incriminate. This procedure exists because a witness is not the final arbiter of whether nor not the information sought would tend to incriminate. United States v. Booker, 641 F.2d 218, 220 (5th Cir. 1981); United States v. Johnson, 577 F.2d 1304, 1311 (5th Cir. 1978). Adherence to these principles is especially important here, since adverse inferences can be drawn from the invocation of the Fifth Amendment in civil cases even when the witness is not a party. See, e.g., LiButti v. United States, 107 F.3d 110 (2d Cir. 1997); Brinks, Inc. v. City of New York, 717 F.2d 200 (2d Cir. 1983); United States v. District Council, 832 F. Supp. 644 (S.D. N.Y. 1993).

**F.     THE SOLDIERS AND SAILORS CIVIL RELIEF ACT DOES NOT PROTECT GROSSETT-TATE FROM TESTIFYING AT A DEPOSITION OR PRODUCING DOCUMENTS**

In a final argument that illustrates Mrs. Tate's desperation to avoid producing documents and testifying in this case, Mrs. Tate claims that she is protected from complying with the subpoena by the Soldiers and Sailors Civil Relief Act (50 App. U.S.C.A. § 501 et seq.) ("the Act") because she is "an active member of the Army Reserve."

The Act states that:

> At any stage thereof any action or proceeding in any court in which a person in military service is involved, **either as a plaintiff or defendant**, during the period of such service or within sixty days thereafter may, in the discretion of the court in which it is pending, on its own motion, and shall, on application to it by such person or some person on his behalf, be stayed as provided in this Act [sections 501 to 591 of this Appendix] **unless in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service**.

50 App. U.S.C.A. § 521 (emphasis added). Under the Act, the term "military service" signifies Federal service **on active duty with any branch of service heretofore referred to or mentioned** as well as training or education under the supervision of the United States preliminary induction into the military service. Essentially, the Act protects those who are actively serving the United States military and whose ability to participate in their own defense or prosecution of civil actions is hampered by their service in the military. Mrs. Tate is not an active servicewoman. As she states in her Motion to Quash, she is a member of the Army Reserve.

Additionally, the Act specifically applies only to members in active service who are either **plaintiffs or defendants** in a civil case and whose ability to prosecute or defend the action is materially affected by reason of his or her military service. The United States Supreme Court has stated that the phrase "unless, in the opinion of the court, the ability of the plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service" is at the very heart of the policy of the Act. <u>Boone v. Lightner</u>, 63 S.Ct. 1223, 1226 (1943). The Eleventh Circuit has also stated that "[a] district court must, therefore, determine whether the ability of the party in military service to prosecute his case is materially affected by his service and may properly deny the stay if the party will not be materially prejudiced." <u>Comer v. City of Palm Bay, Florida</u>, 265 F.3d 1186, 1191 (11th Cir. 2001). This is so because the purpose of the Act is to "protect active military personnel from having their legal

**Kirkpatrick & Lockhart LLP**

remedies expire during that time in which they are unable to assert them due to the unique demands placed upon personnel by virtue of their military service" McMurty v. City of Largo, 837 F. Supp. 1155, 1157 (M.D. Fla. 1993) and "to protect, from harassment and injury in connection with their civil affairs, those who, usually in a state of current or impending military emergency, find themselves torn from their normal business activities back home, and, in military raiment, en route to some far off place such as Bastogna or Dak To or plain Hill 618 to so battle for their country." King v. Zagorski, 207 So.2d 61, 64-65 (Fla. 1968).

Mrs. Tate is neither a plaintiff nor a defendant in this case. She is a witness. The Soldiers and Sailor Civil Relief Act was never intended to apply to such a situation. Accordingly, Mrs. Tate is not shielded by the Act from producing documents or attending a deposition.

## CONCLUSION

Movants have raised no valid legal basis to prohibit the production of the requested documents and the appearance of Kathleen Grossett-Tate to give testimony at a deposition. To the extent that any of the requested documents might otherwise be privileged, the privilege has been waived, and, in any event, the crime/fraud exception to the "work product" and "attorney-client" privileges applies. Therefore, WWFE respectfully requests that the Court deny the Motions to Quash; Order the immediate production of all the requested documents; and Order Mrs. Tate to appear for testimony.

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP

Daniel A. Casey
**KIRKPATRICK & LOCKHART LLP**
Miami Center – 20th Floor
201 South Biscayne Boulevard
Miami, FL 33131
Tel: (305) 539-3300
Fax: (305) 358-7095
Attorneys for World Wrestling
Federation Entertainment, Inc.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served this 25th

day of March, 2002, via United States, mail on the following counsel:

**Thomas A. Leghorn, Esquire**
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, New York  10017-5639

**Michael J. Quarequio, Esquire**
500 Southeast 6th Street, Suite 100
Fort Lauderdale, Florida  33301

**Robert R. Sparks, Jr., Esquire**
Herge, Sparks & Christopher, LLP
6862 Elm Street, Suite 360
McLean, VA  22101

**Stephen Zukoff, Esquire**
19 West Flagler Street, Suite 510
Miami, Florida  33130

**Robert C. Buschel, Esquire**
Buschel, Carter, Schwartzreich & Yates
The West Wing
201 S.E. 8th Street
Ft. Lauderdale, FL 33316

**Michael Hursey, Esquire**
One Financial Plaza, Suite 1615
Fort Lauderdale, FL 33394

Daniel Casey

**Kirkpatrick & Lockhart** LLP