FILED

MAR 2 5 2002

LERK, USDC / SDFL / W.

# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

|  |  |
|---|---|
| WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., a Delaware corporation, | )<br>)<br>) |
|  | ) |
| Plaintiff, | )<br>) |
| vs. | )<br>) |
| L. BRENT BOZELL, III, an individual; MEDIA RESEARCH CENTER, INC., a Virginia non-profit corporation, d/b/a Parents Television Council; PARENTS TELEVISION COUNCIL, INC., a Delaware non-profit corporation; JAMES LEWIS, an individual; MARK HONIG, an individual; CYNTHIA DELORES TUCKER, an individual; and Various John and Jane Does, | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |

CASE NO. 00-CIV-8616 (DC)
(Southern District of New York)

CASE NO.: 01-7913 CIV Hurley
Magistrate Lynch

**APPENDIX TO CONSOLIDATED RESPONSE TO DEFENDANT JAMES LEWIS' MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER (RE: SUBPOENA OF KATHLEEN GROSSETT-TATE) AND KATHLEEN GROSSETT-TATE'S MOTION TO QUASH SUBPOENA AND/OR FOR PROTECTIVE ORDER**

APPENDIX TO CONSOLIDATED RESPONSE TO
DEFENDANT JAMES LEWIS' MOTION
TO QUASH AND/OR FOR PROTECTIVE ORDER (RE: SUBPOENA OF
KATHLEEN GROSSETT-TATE) AND KATHLEEN GROSSETT-TATE'S
MOTION TO QUASH SUBPOENA AND/OR FOR PROTECTIVE ORDER

## TAB NO.  DESCRIPTION

1.       James Lewis' Motion to Quash and/or for Protective Order

2.       Kathleen Grossett-Tate's Motion to Quash Subpoena and/or for Protective Order

3.       Order Denying State's Motion to Revoke Bond
         Arrest Info
         Release Information

4.       Richard Rosenbaum's Reply to Plaintiff's Memorandum in Opposition to the Motion
         for Sanctions

5        Letter dated 3/11/02 from Jerry McDevitt, Esq. to Michael Hursey, Esq.

6.       Letter dated 3/14/02 from Jerry McDevitt, Esq. to Michael Hursey, Esq.

7.       Plaintiff's Memorandum in Opposition to Richard Rosenbaum's Motion to Quash or,
         in the Alternative, for Protective Order

8.       Plaintiff's Response to Objections on Richard L. Rosenbaum's Motion to Quash or
         for a Protective Order and James Lewis' Motion to Quash and/or for Protective Order
         and Requests for *De Novo* Review

9.       Sworn statement of Kathleen Grossett-Tate dated 7/29/99

10.      Excerpt of Grand Jury Testimony of Kathleen Grossett-Tate dated 8/11/99, pp. 30,
         32, 33 and 41.

11.      Trial Transcript Vol. XIV of Kathleen Grossett-Tate's Testimony

12.      (a)  Transcript of Larry King Live dated 3/12/01
         (b)  Transcript of Today Show dated 1/26/01

13.      Order on Richard Rosenbaum's Motion to Quash or, for Protective Order

14.      Third Amended Complaint

15.       Article from latimes.com dated 1/26/01 entitled "Wrestling Defense Fails; Boy 13 Faces Life"

16.       Sentencing Order of Judge Lazarus dated 3/9/01

17.       Trial Transcript Vol. XI testimony of John Marachino, M.D. pp. 1317

18.       Statement of Lionel Tate taken on 7/30/99 at 7:13 p.m. and Statement of Lionel Tate taken on 7/30/99 at 8:28 p.m.

19.       Opinion of Joshua Perper, M.D. dated 8/5/99
          Autopsy Report

20.       March 4, 2000 Sun-Sentinel article entitled "Wrestler Ordered to Speak at Trial"

21.       Opening Statement of James Lewis, Vol. V of Trial Transcript

22.       1/28/00 Miami Herald article entitled "Boy's Claim:  Wrestling TV Shows to Blame"

23.       Sun-Sentinel article dated 1/26/01 entitled "Boy, 13, convicted of murder in beating death of young girl" and Miami Herald article dated 1/26/01 entitled "I wish there was another alternative.  It's horrible."

24.       Motion to Compel and Incorporated Memorandum of Law

Exhibit A

Exhibit B

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

```
----------------------------------------------------------------x
```

WORLD WRESTLING FEDERATION                  :
ENTERTAINMENT, INC., a Delaware             :        Case Number : 00-CIV8616 (DC)
corporation,                                :        SOUTHERN DISTRICT NEW YORK
                                            :
      Plaintiff,                     :
                                            :        CASE NO: 01-7913 CIV HURLEY
v.                                          :        MAGISTRATE LYNCH
                                            :                                    :
L. BRENT BOZELL, III, and individual,       :
MEDIA RESEARCH CENTER, INC.,                :
A Virginia non-profit corporation, d/b/a    :
PARENTS TELEVISION COUNCIL,                 :
JAMES LEWIS, and individual,                :
MARK HONIG, an individual and               :
VARIOUS JOHN AND JOHN DOES,                 :
                                            :
      Defendants.                    :
```
----------------------------------------------------------------x  :
```

## DEFENDANT JAMES LEWIS', MOTION TO QUASH
## AND/OR FOR PROTECTIVE ORDER
### (RE: SUBPOENA OF KATHLEEN GOSSETT-TATE)

COMES NOW, Defendant James Lewis, an attorney, by and through his

undersigned counsel, and respectfully requests this Court enter an order quashing a

third party subpoena duces tecum with deposition of KATHLEEN GOSSETT-TATE, the

mother of Lionel Tate.  And as grounds and in support there of states the following:

## I. BACKGROUND

The Plaintiff, WWFE, filed a notice of serving a subpoena on Kathleen Gossett-

Tate, a third party to the above entitled matter, and mother of Lionel Tate.

Lionel Tate was a criminal defendant represented by Defendant Lewis in a

murder trial.  WWFE alleged in its lawsuit that Defendant Lewis defamed the

1



**EXHIBIT** ___1___

organization by claiming that Lionel Tate was acting out wrestling moves on the decedent and therefore Lionel Tate did not intend to hurt the decedent. That is, the decedent died by accident.

Currently, Mr. Richard Rosenbaum is representing Mr. Tate in his direct appeal to the Fourth District Court of Appeal in Florida. Defendant Lewis, in order to aide Tate and Rosenbaum, provided his entire work product/attorney client file to Rosenbaum. The WWFE served a subpoena first upon Richard Rosenbaum and demanded production and inspection of documents obtained in the defense of Lionel Tate.

As of February 25, 2002, Magistrate Judge Lynch heard oral argument of the parties regarding the motion to quash the Rosenbaum subpoena, and has ruled on the privileges asserted by Rosenbaum on behalf of Tate, and by Mr. Lewis on behalf of Tate and himself.

Plaintiff seeks to obtain from Tate's mother, what it realizes it will not be able to get from Mr. Rosenbaum. (See Exhibit A).

## II. GROUNDS

As grounds and in support of this motion, Defendant Lewis states:

1.  Defendant Lewis asserts attorney/client privilege on behalf himself and Lionel Tate. As Tate's mother/guardian, Gossett-Tate was acting as an agent for her son, and her conversations with counsel are privileged. See Gerheiser v. Stephens, 712 So. 2d 1252 (Fla. 4th DCA 1998).

2.  Defendant Lewis asserts work product privilege on behalf of himself and Lionel Tate.

3.  Lionel Tate has not waived any privilege including his Fifth Amendment privilege.

4.    Documents sought by WWFE can be obtained through third party sources, for example the police or State Attorney's Office, without risking the inadvertent disclosure of privileged or protected material.

5.    As to request number 5 in the subpoena, complaints to the Department of Business and Professional Regulation, in the State of Florida are privileged until probable cause has been found by the Department. <u>Carvallo v. Stuller</u>, 777 So. 2d 1064 (Fla. 2d DCA 2001); Fla. Stat. §§ 455.621(10); 455.225(10).

6.    As to request number 6 in the subpoena, testimony in front of the grand jury in the State of Florida is presumptively confidential. Fla. Stat. §§ 905.24, 905.27(1); <u>State v. Reese</u>, 670 So. 2d 174 (Fla. 4th DCA 1996).

7.    Documents sought by WWFE is irrelevant and not likely to lead to discoverable material.

### III. ARGUMENT

A party may request a court to quash a subpoena pursuant to Federal Rule of Civil Procedure 45(C)(3)(A). The documents sought by way of subpoena are protected by attorney/client privilege, work product privilege, Fifth Amendment privilege, privileged by statute, and are irrelevant.

ATTORNEY/CLIENT PRIVILEGE

The attorney/client privilege exists far beyond the conclusion of the trial proceedings, because the Supreme Court has held that the client holds the privilege even beyond death. <u>Swidler & Berlin v. United States</u>, 524 U.S. 399, 409 (1998). "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." <u>Id.</u> at 403. (citations omitted). "In any event, a client may not know

3

at the time he discloses information to his attorney whether it will later be relevant to a

civil or criminal matter, let alone whether it will be of substantial importance." Id. at 409.

The Court rejected a balancing test in defining the "contours of the privilege," and

invoked a bright line rule. Id. (citations omitted). Any statements Lionel Tate made to

his lawyer, his lawyer's staff, confidential psychologists, including his mother, cannot be

disclosed to WWFE. His mother, through out the trial proceedings was her son's

guardian and agent. See Gerheiser v. Stephens, 712 So. 2d 1252 (Fla. 4th DCA 1998).

     In Gerheiser, the court stated that " . . . the attorney-client privilege 'extends to

the necessary intermediaries and agents through whom such communications are

made.'" citing, State v. Kciolek, 129 A.2d 417, 424 (1957); City and County San

Franscico v. Superior Court, 231 P.2d 26, 31 (1951) (en banc)). Ms. Gossett-Tate also

has standing to assert the privilege on behalf of her son. Id. at 1255.

     Ms. Gossett-Tate, offered her assistance to Mr. Lewis through out the litigation

including the trial of her son. She was a vital agent in dealing with Mr. Lewis, as her

son was denied bond during the litigation. Ms. Gossett-Tate was and remains a Florida

Highway Patrol Trooper, and she used her skills and shared her insights with her son's

attorney.[1]

     The fact that Gossett-Tate is Lionel Tate's mother is particularly significant. The

State of Florida recognizes and encourages parents to be a part of the criminal justice

process, to aide their child, when he is accused of a crime. T.T. v. State, 689 So. 2d

1209, 1211 (Fla. 3d DCA 1997). A parent must be given notice that her child is being

---

    [1] At best, an evidentiary hearing is required to determine if Tate himself waived
the attorney-client privilege. See Rogers v. State, 742 so. 2d 827 (Fla. 2d DCA 1999).

4

held in detention.  Fla. R. Juv. P. 8.010.  Whether a parent is present during questioning of a child, by police, is a significant factor in the assessment of admissibility of a child's statement.  Stokes v. State, 371 So. 2d 131 (Fla. 1st 1979); JES v. State, 366 So. 2d 538 (Fla. 1979).  Furthermore, the type of plan of treatment a juvenile court will impose upon a child is subject to the acceptance by the parent, to the exclusion of the government.  In re JRM, 340 So. 2d 937 (Fla. 1976).  A parent's input is also considered when the juvenile court is considering whether the child should be tried as an adult.  State v. Boatman, 329 So. 2d 307 (Fla. 1976).  A parent also has a right to review her child's pre-sentencing reports (which are confidential to all others), prior to sentencing.  JB v. State, 418 So. 2d 423 (Fla. 1st DCA 1982). Parents have standing to have their child's plea of guilty withdrawn, if the parent asserts a claim.  VSJ v. State, 793 So. 2d 104 (Fla. 2d DCA 2001).

The attorney/client privilege belongs to the client.  Swidler, 524 U.S. at 409. The lawyer has a duty to assert it.  Ms. Gossett-Tate also has a duty to assert the privilege and continue to protect her son.  In sum, the courts want parents to be involved at every stage of their children's proceedings.  It would be contrary to the rights established by the rules of juvenile procedure and the case law to first, encourage parental involvement, and then say that it is not privileged.

WORK PRODUCT  PRIVILEGE

There are two types of work product: 1) fact work product; and, 2) opinion work product.  State v. Rabin, 495 So. 2d 257, 260 (Fla. 3d DCA 1986).  Fact work product is "factual information which pertains to a client's case."  Id. at 262.  Opinion work product is the lawyer's mental impression of witness and assessment of the case.  Id.  A lawyer

has the right to independently assert such privilege, outside of even the hypothetical client waiver. Id. at 263. Regardless of any debatable split in authority about whether work product privilege extends beyond the case for which it was gathered, any view would preclude a lawyer or his agent from revealing the work product. See id. n. 5. This lawsuit is at worst "closely related" to the Tate case and should thus extend the privilege even if disclosure would lead to relevant information.

Ms. Gossett-Tate may be privy to Mr. Lewis' thoughts about particular strategy. Critical decisions based upon discovery and court rulings could be discussed with Tate's mother. For the very reason that WWFE wishes to have the documents and testimony of Gossett-Tate, to try and prove malice of Mr. Lewis by determining what their assessment of testimony and evidence had on Lionel's defense, is the very reason it should not be disclosed. Florida courts desire to have parents involved with the adjudicatory process of their children.

Defendant Lewis asserts his work product privilege independently in this case. Witness interviews, for example, would be intertwined with fact and opinions of Lewis. See id. n. 8. Any questions regarding whether Defendant Lewis actually reviewed a public record at a given point in time, can be explored in a deposition of Lewis or Gossett-Tate. This Court can still preserve the sanctity of several privileges, and at the same time WWFE can explore through other discovery methods.

The court should be cognizant of the real possibility that WWFE (multi-billion dollar corporation), versus Lewis, (a solo practitioner), is nothing more than an attempt to chill any lawyer who dares to criticize the WWFE, and punish the lawyer that comments about professional wrestling's influence on children. The WWFE can afford

to cast a wide net and care less about preserving privileges or the financial and time drain it has on the subjects of its subpoenas.[2] The court needs to reign in the plaintiffs and not allow discovery as if this were an anti-trust case.

FIFTH AMENDMENT PRIVILEGE

Lionel Tate may still assert his Fifth Amendment privilege. Although he has been convicted of a crime, the appellate court may reverse his case for a new trial, and he would still enjoy the privilege upon retrial. A client can assert a Fifth Amendment privilege even though his lawyer possesses the documents which may incriminate him. Fisher v. United States, 425 U.S. 391, 402 (1976). Possession of documents by Gossett-Tate, in an effort to help her son's defense, and perhaps his appeal, should be considered as if Tate's attorney possessed these documents.

OBJECTIONS TO BOURG-CARTER COMPLAINT & GRAND JURY TESTIMONY

Plaintiff is not entitled to Gossett-Tate's complaint to the Department of Business and Professional Regulation about Bourg-Carter. First, Bourg-Carter should be put on notice of this subpoena request because she may consider the allegations contained therein as defamatory, if disclosed to third parties. Secondly, the proceedings have not reached the level where disclosure is allowable. Carvallo v. Stuller, 777 So. 2d 1064 (Fla. 2d DCA 2001); Fla. Stat. §§ 455.621(10); 455.225(10) (DPR proceedings are confidential until finding of probable cause).

As to requests for grand jury testimony, the testimony is confidential. Fla. Stat.

---

[2] WWFE just served a subpoena against Glenn Roderman, Esq. and E. Ross Zimmerman, Esq. attorneys for the parents of the decedent, Tiffany Eunick. These lawyers also dared to agree that violence on television could negatively influence children, on a PTC video production.

§§ 905.24, 905.27(1); <u>State v. Reese</u>, 670 So. 2d 174 (Fla. 4th DCA 1996).

## CONCLUSION

For all the reasons setforth, James Lewis, requests this Court enter an order recognizing that Kathleen Gossett-Tate is an agent of her son in the defense Lionel Tate, and precluding Plaintiff, WWFE, from reviewing and examining documents and testimony of Kathleen Gossett-Tate, mother of Lionel Tate, in any proceeding in this matter.

Respectfully submitted,
BUSCHEL CARTER
SCHWARTZREICH & YATES
201 S.E. 8th Street
Fort Lauderdale, FL 33316
and Michael Quaraquio

By:

Robert C. Buschel, 63436

The undersigned counsel has conferred with counsel for Plaintiff WWFE, in a good faith effort to resolve the issues raise in this motion and has been unable to do so.

Robert C. Buschel

I HEREBY CERTIFY that a copy of the foregoing was sent via fax to the counsel listed on the attached certificate of service on this __5__ day of February, 2002.

Robert C. Buschel

8

Case No. 00-CIV8686 (DC)
 WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., V.
L. BRENT BOZEL, III, et al.

## CERTIFICATE OF SERVICE

**Attorneys for Plaintiff:**

Eugene R. Licker, Esq.
KIRKPATRICK & LOCKHART, LLP.
1251 Avenue of the Americas
New York, New York 10020-1104

Tel. (212) 536-3900
Fax (212) 536-3901

Jerry S. McDevitt, Esq.
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building          
535 Smithfield Street
Pittsburgh, Pennsylvania 15222

Tel. (412) 355-8608
Fax (412) 355-6501

**Attorneys for Defendants, L. Brent Bozell, III, Media Research Center, Inc.,
Parents Television Council, Inc., Mark Honig, and the John and Jane Doe
Defendants:**

Thomas A. Leghorn, Esq.
Wilson, Elser, Moskowitz, Edelman & Dicker, LLP     
150 East 42nd St.
New York, New York 10017-5639

Tel. 212-490-3000
Fax 212-490-3038

Robert Sparks, Jr., Esq.
Linda Stiles Shively, Esq.
Herge, Sparks & Christopher LLP
6862 Elm Street, Suite 360
McLean, Virginia 22101

Fax 703-893-7371

AO 88 (Rev. 1/94) Subpoena in a Civil Ca

### Issued by the
# UNITED STATES DISTRICT COURT

| SOUTHERN | DISTRICT OF | FLORIDA |
|---|---|---|

World Wrestling Federation Entertainment, Inc., a Delaware corporation

**Vs.**

L. Brent Bozell, III, an individual; Media Research Center, Inc., a Virginia non-profit corporation, d/b/a Parents Television Council; Parents Television Council, Inc., a Delaware non-profit corporation; James Lewis, an individual; Mark Honig, an individual; Cynthia Delores Tucker, an individual; and Various John and Jane Does

## SUBPOENA IN A CIVIL CASE

CASE NUMBER: 00 Civ. 8616
(Southern District of New York)

TO:   Kathleen Grossett Tate
      3900 Southwest 53rd Avenue
      Pembroke Park
      Ft. Lauderdale, FL 33319

☐ YOU ARE COMMANDED to appear in the United States District court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | |
|  | DATE AND TIME |
|  | |

☒ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor, Miami, Florida 33131-2399 | March 19, 2002 10:00 a.m. |

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  See ATTACHMENT "A"

| PLACE | DATE AND TIME |
|---|---|
| Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor, Miami, Florida 33131-2399, Attention:  Daniel A. Casey | March 12, 2002 10:00 a.m. |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
|  | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify.  Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Counsel for Plaintiff World Wrestling Federation Entertainment, Inc. | February 19, 2002 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Jason L. Richey, Esq., Kirkpatrick & Lockhart LLP, Henry W. Oliver Bldg., 535 Smithfield St., Pittsburgh, PA 15222-2312
Telephone:  (412) 355-6260

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

RECEIVED
FEB 2 2 2002
BY:

PI-812596 v1

# Exhibit A

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
| | Kathleen Grossett Tate<br>3900 Southwest 53rd Avenue<br>Pembroke Park<br>Ft. Lauderdale, FL  33319 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

**Rule 45, Federal Rules of Civil Procedure, Parts C & D:**

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i)   fails to allow reasonable time for compliance;

(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii)

of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held,

(iii)  requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv)  subjects a person to undue burden.

(B)  If a subpoena

(i)    requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii)  requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT "A"

The following definitions, instructions and document requests are a part and incorporated into the preceding subpoena as though the same were stated therein:

## DEFINITIONS

1.    The Uniform Definitions set forth in Southern District of New York Local Rule 26.3 shall be deemed incorporated by reference into these Requests.

2.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

3.    "Any" shall also mean "all" and vice versa.

4.    "Communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), whether in person, in writing, by telephone, electronically or any other method whereby knowledge, facts and/or information is imparted or transmitted from one person or entity to another or to a file.

5.    "Concerning" shall mean relating to, referring to, describing, evidencing or constituting.

6.    "Document" shall be defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic (E-mail) or computer compilations, videos and film (both edited and unedited). A draft or non-identical copy is a separate document within the meaning of this term.

7.    "Lewis" shall mean and refer to Defendant James Lewis, and any other person who is aware of or in the possession, custody or control of any information, document or thing for or on his behalf.

8.    "Person" shall mean any natural person or any business, legal or governmental entity or association.

9.    "Tate" shall mean and refer to Lionel Tate.

10.    "WWFE" shall mean and refer to Plaintiff World Wrestling Federation Entertainment, Inc., formerly known as Titan Sports, Inc., and any officer, director, employee, associate, agent or attorney thereof.

11.    "You" or "Your" shall refer to Kathleen Grossett Tate, and any other person or entity who is aware of or in the possession, custody or control of any information, document or thing for or on her behalf.

## INSTRUCTIONS

1.     You are requested to furnish all documents in Your possession and all documents available to You, not merely such documents as You know from Your own personal knowledge or from business records, but also information and knowledge that is available to You, Your attorneys, investigators, etc., by reasonable inquiry.

2.     Should You assert a privilege with respect to any document requested herein, You are requested to provide the following information per Rule 45(d)(2) as to each such document or item of information:

    (i)     The type of document or information (e.g., letter, notebook, telephone conversation, etc.);

    (ii)     The date of the document or transaction involving the information;

    (iii)     Identification of the author and/or all participants with respect to the information;

    (iv)     Identification of the signatory or signatories of the document, if any;

    (v)     Identification of the document's current custodian;

    (vi)     The present whereabouts of the document and/or the names of all persons with personal knowledge with respect to the information; and

    (vii)     A statement of the grounds on which the claim of privilege rests with respect to each such document or piece of information withheld.

3.     All documents shall be produced as they are kept in the usual course of business or the documents shall be organized and labeled to correspond with the categories in the Document Requests.

4.     Whenever a document request is framed in the conjunctive, it also shall be taken in the disjunctive and vice versa.

5.     Whenever a term is framed in the singular, it also shall be considered to be plural and vice versa.

6.     The use of any tense of any verb shall be considered to include within its meaning all other tenses of the verb.

7.     You are obligated to conduct a reasonable inquiry in order to answer each document request and if, thereafter, You still are unable to respond, state all efforts made by You to obtain the requested documents.

8.     To the extent not otherwise expressed, interpretation of these requests herein shall be consistent with the Local Civil Rules of the United States District Court for the Southern District of New York.

## DOCUMENT REQUESTS

1.      Produce all documents concerning <u>State v. Lionel Tate</u> ("Tate Case").

2.      Produce all documents concerning Lionel Tate's involvement in the death of Tiffany Eunick.

3.      Produce all documents concerning the injuries sustained by Tiffany Eunick on the date of her death.

4.      Produce all communications between You, James Lewis, Deweese Eunick and/or any other Person concerning:  (1) Lionel Tate; (2) the death of Tiffany Eunick; or (3) professional wrestling and/or WWFE.

5.      Produce all documents regarding any complaint You made against Dr. Sherrie Bourg Carter.

6.      Produce copies of Your sworn statement, deposition and grand jury testimony in the Tate Case.

7.      Produce all documents concerning Your alleged negligence and/or responsibility for the death of Tiffany Eunick.

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

WORLD WRESTLING FEDERATION                    :
ENTERTAINMENT, INC., a Delaware                   :        Case Number : 00-CIV8616 (DC)
corporation,                                                      :        SOUTHERN DISTRICT NEW YORK
                                                                      :
     Plaintiff,                                            :
                                                                      :        CASE NO: 01-7913-CIV-HURLEY
v.                                                                   :        MAGISTRATE LYNCH
                                                                      :                                                :
L. BRENT BOZELL, III, an individual,              :
MEDIA RESEARCH CENTER, INC.,                  :
A Virginia non-profit corporation, d/b/a          :
PARENTS TELEVISION COUNCIL,                    :
JAMES LEWIS, an individual,                         :
MARK HONIG, an individual and                     :
VARIOUS JOHN and JANE DOES,            :
                                                                      :
     Defendants                                       :
     :

## KATHLEEN GROSSETT-TATE'S MOTION TO QUASH SUBPOENA AND/OR FOR PROTECTIVE ORDER

COMES NOW, Kathleen Grossett-Tate ("Ms. Tate"), by and through her undersigned counsel, and respectfully requests this Court to enter its Order quashing a subpoena duces tecum with deposition served on Ms. Tate, and in support of this Motion states:

### I. BACKGROUND

Plaintiff World Wrestling Federation Entertainment, Inc. ("WWFE"), served a subpoena (copy attached) on Ms. Tate, a non-party in this case, the mother and legal guardian of Lionel Tate, a juvenile.

Lionel Tate was a criminal defendant represented by Attorney/Defendant James

1

EXHIBIT  2

Lewis ("Lewis") in a murder trial in Broward County, Fl. WWFE alleged in its lawsuit that Defendant Lewis defamed it by claiming that Lionel Tate was acting out wrestling moves on the decedent, and therefore Lionel Tate did not intend to hurt her and she died by accident.

Currently, Attorney Richard Rosenbaum is representing Lionel Tate in his direct appeal to the Fourth District Court of Appeal in Florida. Defendant Lewis, in order to aid Tate and Rosenbaum, provided his entire work product/attorney client file to Rosenbaum. The WWFE served a subpoena first upon Attorney Rosenbaum, and demanded production and inspection of documents obtained in the defense of Lionel Tate.

On or about February 25, 2002, U.S. Magistrate Judge Lynch heard oral argument of the parties regarding the motion to quash the Rosenbaum subpoena. The Court has ruled on the privileges asserted by Rosenbaum on behalf of Tate, and by Mr. Lewis on behalf of Tate and himself.

Plaintiff now seeks to obtain from Tate's mother, what it realizes the Court will not allow it to get from Mr. Rosenbaum.

## II. THERE ARE SEVERAL LEGAL GROUNDS THIS COURT CAN USE TO QUASH THE SUBPOENA

1. Ms. Tate asserts the attorney/client privilege on behalf of herself and her son, Lionel Tate. As Tate's mother/guardian, Ms. Tate was acting as an agent for her son, and her conversations with counsel are privileged. See Gerheiser v. Stephens, 712 So. 2d 1252 (Fla. 4th DCA 1998).

2. Ms. Tate asserts "work product" privilege on behalf of herself and Lionel Tate.

3.     Lionel Tate has not waived any privilege, including his Fifth Amendment privilege. Ms. Tate should not be compelled through this subpoena to waive any Fifth Amendment privilege of her son, or her own (discussed below).

4.     Documents sought by WWFE can be obtained through third party sources, (e.g. public records, the police, or State Attorney's Office, etc.), without risking the inadvertent disclosure of privileged or protected material.

5.     Regarding request number 5 in the subpoena, complaints to the Department of Business and Professional Regulation, in Florida are privileged until probable cause has been found by the Department. Carvallo v. Stuller, 777 So. 2d 1064 (Fla. 2d DCA 2001); Fla. Stat. §§ 455.621(10); 455.225(10).

6.     Regarding request number 6 in the subpoena, testimony before the Grand Jury in Florida is presumptively confidential. Fla. Stat. §§ 905.24, 905.27(1); State v. Reese, 670 So. 2d 174 (Fla. 4th DCA 1996).

7.     The documents sought by WWFE are irrelevant, and not likely to lead to discoverable material. Most of the document requests (especially Request nos. 1, 2, 3, and 7) are overly broad.

8.     Undersigned counsel is in the process of preparing a "privilege log" to aid the Court in determining what documents Ms. Tate has, and what privilege protects them from disclosure. If the Court so orders, counsel will file said log (under seal, under separate cover). Ms. Tate specifically reserves the right to file a privilege log. Time constraints have prevented her from doing so before now.

3

### III. ARGUMENT

A party may request a court to quash a subpoena pursuant to F. R. Civ. P. 45(C)(3)(A).  The documents sought by way of subpoena are protected by attorney/client privilege, work product privilege, Fifth Amendment privilege, privileged by statute, over broad, or are irrelevant.

**ATTORNEY/CLIENT PRIVILEGE**

The attorney/client privilege exists far beyond the conclusion of the trial proceedings.  The U.S. Supreme Court has held that the client holds the privilege even beyond death. Swidler & Berlin v. United States, 524 U.S. 399, 409 (1998). "The attorney-client privilege is one of the oldest recognized privileges for confidential communications." Id. at 403. (citations omitted). "In any event, a client may not know at the time he discloses information to his attorney whether it will later be relevant to a civil or criminal matter, let alone whether it will be of substantial importance." Id. at 409.  The Court rejected a balancing test in defining the "contours of the privilege," and invoked a bright line rule. Id. (citations omitted).

Any statements juvenile Lionel Tate made to his lawyer, his lawyer's staff, confidential psychologists  (including his mother, Ms. Tate),  cannot be disclosed to WWFE. His mother, throughout the trial proceedings (and even now) was her son's guardian and agent. See Gerheiser v. Stephens, 712 So. 2d 1252 (Fla. 4th DCA 1998).

In Gerheiser, the court stated that " . . . the attorney-client privilege 'extends to the necessary intermediaries and agents through whom such communications are made.'" citing, State v. Kociolek, 129 A.2d 417, 424 (1957); City and County San Franscico v.

4

Superior Court, 231 P.2d 26, 31 (1951) (en banc)). Ms. Tate also has standing to assert the privilege on behalf of her son. Id. at 1255.

Ms. Tate, offered her assistance to Mr. Lewis throughout the litigation, including the trial of her son. She was a vital agent in dealing with Mr. Lewis, as her son was denied bond during the criminal trial. Ms. Tate was and remains a Florida Highway Patrol Trooper, and she used her skills and shared her insights with her son's attorney.[1]

The fact that Ms. Tate is Lionel Tate's mother is particularly significant. The State of Florida recognizes and encourages parents to be a part of the criminal justice process, to aid their child, when he is accused of a crime. T.T. v. State, 689 So. 2d 1209, 1211 (Fla. 3d DCA 1997). A parent must be given notice that her child is being held in detention. Fla. R. Juv. P. 8.010.

Whether a parent is present during questioning of a child, by police, is a significant factor in the assessment of admissibility of a child's statement. Stokes v. State, 371 So. 2d 131 (Fla. 1st 1979); JES v. State, 366 So. 2d 538 (Fla. 1979). Furthermore, the type of plan of treatment a juvenile court will impose upon a child is subject to the acceptance by the parent, to the exclusion of the government. In re JRM, 340 So. 2d 937 (Fla. 1976).

A parent's input is also considered when the juvenile court is considering whether the child should be tried as an adult. State v. Boatman, 329 So. 2d 307 (Fla. 1976). A parent also has a right to review her child's pre-sentencing reports (which are confidential to all others), prior to sentencing. JB v. State, 418 So. 2d 423 (Fla. 1st DCA 1982). Parents have standing to have their child's plea of guilty withdrawn, if the parent asserts a claim.

---

[1] At most, an evidentiary hearing is required to determine if Tate himself waived the attorney-client privilege. See Rogers v. State, 742 So.2d 827 (Fla. 2d DCA 1999).

VSJ v. State, 793 So. 2d 104 (Fla. 2d DCA 2001).

The attorney/client privilege belongs to the client. Swidler, supra, 524 U.S. at 409. The lawyer has a duty to assert it. Ms. Tate also has a duty to assert the privilege and continue to protect her son. In sum, the courts want parents to be involved at every stage of their children's proceedings. It would be contrary to the rights established by the rules of juvenile procedure and case law to first encourage parental involvement, and then say that it is not privileged.

## WORK PRODUCT PRIVILEGE

There are two types of work product: (1) "fact" work product; and (2) "opinion" work product. State v. Rabin, 495 So. 2d 257, 260 (Fla. 3d DCA 1986). Fact work product is "factual information which pertains to a client's case." Id. at 262. Opinion work product is the lawyer's mental impression of witness and assessment of the case. Id. A lawyer has the right to independently assert such privilege, outside of even the hypothetical client waiver. Id. at 263. Regardless of any debatable split in authority about whether work product privilege extends beyond the case for which it was gathered, any view would preclude a lawyer or his agent from revealing the work product. Id n. 5. The instant lawsuit is at least "closely related" to the Tate murder case, and should thus extend the privilege even if disclosure would lead to relevant information.

Ms. Tate may have been privy to Mr. Lewis' thoughts about particular strategy. Critical decisions based upon discovery and court rulings could have been discussed with Tate's mother. For the very reason that WWFE wishes to have the documents and Ms. Tate's testimony (e.g. to try and prove malice by Mr. Lewis, by determining what their

6

assessment of testimony and evidence was on Lionel's defense), is the very reason it should <u>not</u> be disclosed.   Florida courts desire to have parents involved with the adjudicatory process of their children.

Defendant Lewis asserts his work product privilege by separate Motion in this case. Witness interviews, for example, would be intertwined with facts and opinions of Lewis. <u>Id</u> n. 8. Any questions regarding whether Defendant Lewis actually reviewed a public record at a given point in time, could be fair game if this Court allowed a deposition of Lewis or Ms. Tate.  This Court can still preserve the sanctity of several privileges, and at the same time WWFE can obtain evidence through other discovery methods.

The Court should be cognizant of the real possibility that WWFE (a multi-billion dollar corporation), versus Lewis and Ms. Tate, (a solo practitioner and a single mom), is nothing more than an attempt to (1) have a chilling effect on any lawyer and his client  who dare to criticize the WWFE,  and (2) punish the lawyer (and his client)  that comments about professional wrestling's influence on children.  The WWFE can afford to cast a wide net  and not care about preserving privileges, or the financial and time drain it has on the subjects of its subpoenas.[2]   The Court needs to reign in the Plaintiffs, and not allow discovery against a non-party like Ms. Tate as if this were a major document-intensive case.

---

[2] WWFE just served a subpoena against Glenn Roderman, Esq. and E. Ross Zimmerman, Esq., attorneys for the parents of the decedent, Tiffany Eunick.  These lawyers also dared to agree that violence on television could negatively influence children, on a PTC video production.

## FIFTH AMENDMENT PRIVILEGE

Lionel Tate may still assert his Fifth Amendment privilege.  Although he has been convicted of a crime, the appellate court may reverse his case for a new trial.  He would still possess the privilege upon retrial.  A client can assert a Fifth Amendment privilege even though his lawyer possesses the documents which may incriminate him.  Fisher v. United States, 425 U.S. 391, 402 (1976).  Possession of documents by Ms. Tate, in an effort to help her son's defense and his appeal, should be considered as if Lionel Tate's attorney possessed these documents.

Further, Ms. Tate is the target of a State of Florida criminal investigation stemming from the exact same acts that gave rise to her son's murder case.  Therefore, she can assert the 5th Amendment on her own behalf.  While the Special Prosecutor assigned to the case has recommended to Governor Bush that charges not be brought, the Governor has not rendered his final decision.  There is also the possibility of federal criminal charges being filed.

## OBJECTIONS TO DR. BOURG-CARTER COMPLAINT & GRAND JURY TESTIMONY

Plaintiff is not entitled to Tate's complaint to the Department of Business and Professional Regulation about Dr. Bourg-Carter.  First, Bourg-Carter should be put on notice of this subpoena request because she may consider the allegations contained therein as defamatory, if disclosed to third parties. Ms. Tate could become a defendant in such a defamation suit.  Secondly, the proceedings have not reached the level where disclosure is allowable.  Carvallo v. Stuller, 777 So. 2d 1064 (Fla. 2d DCA 2001); Fla. Stat.

8

§§ 455.621(10); 455.225(10) (DPR proceedings are confidential until finding of probable

cause).

As to requests for grand jury testimony, such testimony is confidential.  Fla. Stat.

§§ 905.24, 905.27(1); State v. Reese, 670 So. 2d 174 (Fla. 4th DCA 1996).


### PROTECTION AFFORDED TO MS. TATE BY THE SOLDIERS' & SAILORS' CIVIL RELIEF ACT

50 App. U.S.C.A. § 521 states the following:

> § 521. Stay of proceedings where military service affects conduct thereof:
>
> At any stage thereof any action or proceeding in any court in which a person in military service is involved, either as plaintiff or defendant, during the period of such service or within sixty days thereafter may, in the discretion of the court in which it is pending, on its own motion, and shall, on application to it by such person or some person on his behalf, be stayed as provided in this Act [sections 501 to 591 of this Appendix], unless, in the opinion of the court, the ability of plaintiff to prosecute the action or the defendant to conduct his defense is not materially affected by reason of his military service.


Ms. Tate is an active member of the Army Reserve.  She is now awaiting orders that

will cause her to have to leave Florida.  Because the United States is at war in Afghanistan

and the Middle East, Ms. Tate's services are needed to aid the U.S. military.

The Soldiers' & Sailors' Civil Relief Act ("Relief Act")(1940) at 50 App. U.S.C.A. §§

501, 521, et seq., should be considered by this Court in weighing whether Ms. Tate should

have to produce documents and give deposition testimony.  On such short notice

(subpoena served on March 4, 2002), and in light of her having to move to another

location, she should not be harassed by the WWFE while serving her country in time of war.

§ 501 et seq. of this Appendix must be read with an eye friendly to those who dropped their affairs to answer their country's call. LeMaistre v. Leffers, 333 U.S. 1 (1948).

§ 501 et seq. of this Appendix must be liberally construed to protect those who have been obliged to drop their own affairs to take up the burdens of the nation, and discretion vested in trial courts to that end is not to be withheld on nice calculations as to whether prejudice may result from absence, or absence result from the service. Boone v. Lightner, 63 S.Ct. 1223 (1943), reh'g den. 320 U.S. 809 (U.S.N.C. Oct. 11, 1943).  See also Engstrom v. First National Bank of Eagle Lake, 47 F.3d 1459 (5th Cir. 1995) cert. denied 516 U.S. 818.

The Court can now see that under the Relief Act, (and its predecessor Relief Act of 1918),  the law is clear that courts are to liberally construe the Act, and not let it be defeated by a narrow or technical construction.  A major thrust of the Relief Act is to relieve those in military service of defending lawsuits, and by analogy, depositions in which they are not even a party, such as here.

In the alternative, Ms. Tate would ask this Court to issue a stay of her deposition, until after she has completed her military service in this war.  The district court has broad discretion to stay proceedings as an incident to its power to control its own docket. Clinton v. Jones, 117 S.Ct. 1636, 1639 (1997).

## CONCLUSION

For all the reasons set out above, Ms. Tate requests this Court enter its Order (1) quashing said subpoena, recognizing that she was and is an agent of her son in his defense  and (2) precluding Plaintiff WWFE, from reviewing and examining documents, and taking the deposition or any other testimony of Ms. Tate, or (3) any other relief this Court may deem proper.

Respectfully submitted,

MICHAEL HURSEY, P.A.
One Financial Plaza
Suite 1615
Fort Lauderdale, FL 33394
Telephone: 954-779-1880
Facsimile: 954-779-1880
E-mail: mhpalaw@bellsouth.net

Undersigned counsel has conferred with counsel for Plaintiff WWFE, in a good faith effort to resolve the issues raise in this Motion, but has been unable to do so.

MICHAEL HURSEY
Fl. Bar No. 457698

I HEREBY CERTIFY that a copy of the foregoing was sent via U.S. mail to the counsel listed on the attached certificate of service on this 14th day of March, 2002.

MICHAEL HURSEY

11

Copies furnished to:

Honorable Daniel T.K. Hurley

Daniel a. Casey, Esq.
Miami Centre - 20th fl.
201 South Biscayne Blvd.
Miami, FL 33131
Stephen M. Zukoff, Esq.
19 west Flagler Street
Suite 510
Miami, FL 33130

Robert C. Buschel, Esq.
201 SE 8th Street
Fort Lauderdale, FL 33316

Thomas A. Leghorn, Esq.
150 East 42nd Street
New York, NY 10017-5839

Robert Sparks, Jr., Esq.
6882 Elm Street, Suite 360
McLean, VA 22101

Michael J. Quarequlo, Esq.
500 SE 6th Street, Suite 100
Fort Lauderdale, FL 33301

Jerry S. McDevitt, Esq.      (Sent also by fax)
Henry w. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Eugene R. Licker, Esq.
1251 Avenue of Americas
New York, NY 10020-1104

AO 88 (Rev. 1/94) Subpoena In a Civil C

## Issued by the
# UNITED STATES DISTRICT COURT

| **SOUTHERN** | **DISTRICT OF** | **FLORIDA** |

World Wrestling Federation Entertainment, Inc., a Delaware corporation

**Vs.**

L. Brent Bozell, III, an individual; Media Research Center, Inc., a Virginia non-profit corporation, d/b/a Parents Television Council; Parents Television Council, Inc., a Delaware non-profit corporation; James Lewis, an individual; Mark Honig, an individual; Cynthia Delores Tucker, an individual; and Various John and Jane Does

### SUBPOENA IN A CIVIL CASE

CASE NUMBER: 00 Civ. 8616
(Southern District of New York)

TO:  Kathleen Grossett Tate
3900 Southwest 52nd Avenue, Apt. 805
Pembroke Park
Ft. Lauderdale, FL 33319

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☒   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.  The deposition will be videotaped.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor, Miami, Florida 33131-2399 | March 19, 2002 10:00 a.m. |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):  See ATTACHMENT "A"

| PLACE | DATE AND TIME |
|---|---|
| Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor, Miami, Florida 33131-2399, Attention:  Daniel A. Casey | March 12, 2002 10:00 a.m. |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Counsel for Plaintiff World Wrestling Federation Entertainment, Inc. | February 26, 2002 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Daniel A. Casey, Esq., Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor, Miami, Florida 33131-2399, Telephone:  (305) 539-3324

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

PI-812596 v2

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|------|-------|
|      | Kathleen Grossett Tate |
|      | 3900 Southwest 52nd Avenue, Apt. 805 |
|      | Pembroke Park |
|      | Ft. Lauderdale, FL 33319 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|------------------------|-------------------|

| SERVED BY (PRINT NAME) | TITLE |
|------------------------|-------|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii)

of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held.

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT "A"

The following definitions, instructions and document requests are a part and incorporated into the preceding subpoena as though the same were stated therein:

### DEFINITIONS

1.      The Uniform Definitions set forth in Southern District of New York Local Rule 26.3 shall be deemed incorporated by reference into these Requests.

2.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

3.      "Any" shall also mean "all" and vice versa.

4.      "Communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), whether in person, in writing, by telephone, electronically or any other method whereby knowledge, facts and/or information is imparted or transmitted from one person or entity to another or to a file.

5.      "Concerning" shall mean relating to, referring to, describing, evidencing or constituting.

6.      "Document" shall be defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic (E-mail) or computer compilations, videos and film (both edited and unedited). A draft or non-identical copy is a separate document within the meaning of this term.

7.      "Lewis" shall mean and refer to Defendant James Lewis, and any other person who is aware of or in the possession, custody or control of any information, document or thing for or on his behalf.

8.      "Person" shall mean any natural person or any business, legal or governmental entity or association.

9.      "Tate" shall mean and refer to Lionel Tate.

10.     "WWFE" shall mean and refer to Plaintiff World Wrestling Federation Entertainment, Inc., formerly known as Titan Sports, Inc., and any officer, director, employee, associate, agent or attorney thereof.

11.     "You" or "Your" shall refer to Kathleen Grossett Tate, and any other person or entity who is aware of or in the possession, custody or control of any information, document or thing for or on her behalf.

## INSTRUCTIONS

1.      You are requested to furnish all documents in Your possession and all documents available to You, not merely such documents as You know from Your own personal knowledge or from business records, but also information and knowledge that is available to You, Your attorneys, investigators, etc., by reasonable inquiry.

2.      Should You assert a privilege with respect to any document requested herein, You are requested to provide the following information per Rule 45(d)(2) as to each such document or item of information:

(i)     The type of document or information (e.g., letter, notebook, telephone conversation, etc.);

(ii)    The date of the document or transaction involving the information;

(iii)   Identification of the author and/or all participants with respect to the information;

(iv)    Identification of the signatory or signatories of the document, if any;

(v)     Identification of the document's current custodian;

(vi)    The present whereabouts of the document and/or the names of all persons with personal knowledge with respect to the information; and

(vii)   A statement of the grounds on which the claim of privilege rests with respect to each such document or piece of information withheld.

3.      All documents shall be produced as they are kept in the usual course of business or the documents shall be organized and labeled to correspond with the categories in the Document Requests.

4.      Whenever a document request is framed in the conjunctive, it also shall be taken in the disjunctive and vice versa.

5.      Whenever a term is framed in the singular, it also shall be considered to be plural and vice versa.

6.      The use of any tense of any verb shall be considered to include within its meaning all other tenses of the verb.

7.      You are obligated to conduct a reasonable inquiry in order to answer each document request and if, thereafter, You still are unable to respond, state all efforts made by You to obtain the requested documents.

8.      To the extent not otherwise expressed, interpretation of these requests herein shall be consistent with the Local Civil Rules of the United States District Court for the Southern District of New York.

- 2 -

## DOCUMENT REQUESTS

1. Produce all documents concerning <u>State v. Lionel Tate</u> ("Tate Case").

2. Produce all documents concerning Lionel Tate's involvement in the death of Tiffany Eunick.

3. Produce all documents concerning the injuries sustained by Tiffany Eunick on the date of her death.

4. Produce all communications between You, James Lewis, Deweese Eunick and/or any other Person concerning:  (1) Lionel Tate; (2) the death of Tiffany Eunick; or (3) professional wrestling and/or WWFE.

5. Produce all documents regarding any complaint You made against Dr. Sherrie Bourg Carter.

6. Produce copies of Your sworn statement, deposition and grand jury testimony in the Tate Case.

7. Produce all documents concerning Your alleged negligence and/or responsibility for the death of Tiffany Eunick.



**roward County Sheriff's Off**

**Ken Jenne , Sheriff**

DATE ENTERED  8-16-99
BY _____

# Booking Report

| CIS # | **509919530** | BCCN # | | | Booking Sheet Control Date and Time |
|---|---|---|---|---|---|
| OBTS | 0 | Print Clearance | | Prints No | **08/11/1999     21:40:58** |

| Arrest # | BS 9919530 | Offense Report # | | Agency | BS |
|---|---|---|---|---|---|

| Last Name | | | | | SSN # |
| First | **TATE , LIONEL , A** | | | | |
| Middle | | | | | |

| | Race | Sex | Height | Weight | Eyes | Hair | Comp. | Age | DOB | Place of Birth | FDLE |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | BLACK | M | 505 | 160 | BRN | BLK | DRK | 13 | 01/30/1987 | IL | 0 |

| Permanent | | | | | | Months of Residence |
| Address | 3900 SW 52 AV | | PEMBROKE PARK | FL  33023 | | 72 |

| Arrest Date | 8/11/99 20:50:00 | Arresting Officer  AIBOLINO | Place of Arrest  555 S E 1 AVE |
|---|---|---|---|

| Booking_date 8/11/99 21:02:48 | Intake Officer ID | Badge Number 6109 |
|---|---|---|

Intake Comments WC99-13897,29/54-4549

| Date | Charge Section | | Charges | LevelMag. Code TypeBond Amount |
|---|---|---|---|---|
| | | Case Number | Charge Comments | |
| | Booking Off. ID | County | Judge | Date/Time Charge Entered |
| 08/11/1999 | WARR-FEL | | WARRANT - FEL | XF       N      NA        0 |
| 1 | | | MURDER- | |
| | bs08499 | REL PER J/ORDR | FOGAN | 08/11/1999 21:35:16 |

Nic
MaryAnn

ATIS ONLY

x BS 99 19530
500 50 99 19530

0 IMD

Rush    EXHIBIT ___3___

LEXIS®-NEXIS®

Copyright 1999 The New York Times Company: Abstracts
Information Bank Abstracts
MIAMI HERALD

August 12, 1999, Thursday

**SECTION:** Section A; Page 1, Column 4

**LENGTH:** 51 words

**HEADLINE:** BOY, 12, INDICTED IN DEATH OF YOUNG BROWARD GIRL

**BYLINE:** BY SABRINA L MILLER

**JOURNAL-CODE:** MH

**ABSTRACT:**

Grand jury, in rare decision, indicts **Lionel Tate,** 12, on first-degree murder charge in July 28 death of playmate, Tiffany Eunick, 6, Pembroke Park, Fla; boy, fitted with electronic ankle monitor, is released to custody of his mother, Florida Highway Patrol Trooper Kathleen Grossett-Tate; photo (M)

**GRAPHIC:** Photograph

**LANGUAGE:** ENGLISH

**LOAD-DATE:** September 22, 1999

 FOCUS™

Search: General News;Lionel Tate

To narrow this search, please enter a word or phrase:

| FOCUS |

*Example:* House of Representatives

About LEXIS-NEXIS  Terms & Conditions  What's New
Copyright (c) 1999 LEXIS-NEXIS, a division of Reed Elsevier Inc. All rights reserved.

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORIDA

STATE OF FLORIDA,       )
                        )
        Plaintiff,    )     CASE NO.: 99-14401CF10A
                        )
v.                  )     JUDGE: SUSAN LEBOW
                        )
LIONEL TATE,        )
                        )
        Defendant.   )
_____)

## ORDER DENYING STATE'S MOTION TO REVOKE BOND

**THIS CAUSE,** having come before the Court upon the State's Motion to Revoke Bond, the Court having considered said motion, having conducted an evidentiary hearing and otherwise being fully advised in the premises, finds as follows:

The Defendant is charged by Indictment with First Degree Murder. The offense is alleged to have occurred on July 28, 1999 and the Indictment was returned on August 11, 1999. The Defendant, a 12 year old child, was ordered released from custody, on electronic monitoring, by the Honorable Robert J. Fogan. Arraignment was held on August 13, 1999 at which time the State moved for the Court to reconsider the Defendant's conditions of release that had been imposed by Judge Fogan, another Circuit Court Judge. After consideration of the evidence and testimony, this Court exercised it's discretion to continue the Defendant's release on his own recognizance, pursuant to Florida Rule of Criminal Procedure 3.131(a) and State v. Arthur, 390 So.2d 717 (Fla. 1980). This Court ordered, that as a condition of release, the Defendant must remain on electronic monitoring and added additional conditions of release to include supervision by Pretrial Services, no unsupervised contact with any child under 12, no

State v. Tate
99-14401CF10

direct or indirect contact with victim's family or witnesses, remain at home except for going to church or the private school he is attending.

On September 21, 1999 the State filed a Motion to Revoke Bond based on doctors reports expressing the opinion that the Defendant has a high potential for violence and needed to be placed in a secure, behavioral management program. A hearing was held on this motion on September 24, 1999. The Defendant was present at the hearing along with his mother and attorney. The Court heard testimony from State witnesses Dr. Michael Brannon, Dr. Edward Connor, Dr. Sherrie Bourg-Carter and David Scharf. The Defendant called Dr. Joel Klass as a witness. The psychologists testifying for the State expressed their conclusions based upon interviews and projective tests that the Defendant posed a "high potential for violence." However, none of the State's witnesses expressed the opinion that the Defendant poses an imminent threat. Mr. Scharf, from Pretrial services testified that the Defendant, while under adult supervision, plays in his home with other neighborhood children and he has observed the children playing, what he describes as, violent video games. The defense psychiatrist, Joel Klass, M.D., testified that he does not believe the Defendant is a danger while living at home and concurred with Dr. Brannon that the Defendant does not pose an immediate threat for violent behavior.

This Court, having fully considered the State's motion, memorandum of law and the testimony presented at the hearing finds that there has been no breach of the conditions of release and that there is no legal basis for considering a revocation of

-2-

State v. Tate
99-14401CF10

bond pursuant to Florida Rule of Criminal Procedure 3.131(f) or pretrial detention

pursuant to Rule 3.132.  Having considered the additional information presented, the

Court finds that a change in Defendant's custody status is not warranted.   The

testimony regarding the Defendant's danger to the community was speculative, at best,

and was outweighed by testimony that he is not an imminent threat.   This Court is

unable to conclude that there is a substantial probability that the Defendant poses a

threat of harm to the community.  It appears that, at this time, the existing conditions of

release are adequate and should be continued.

It is therefore,

**ORDERED  AND  ADJUDGED** that  the  State's  Motion  to  Revoke  Bond  is

**DENIED**.

OPEN COURT                                    NOV 19 1999

**DONE AND ORDERED** in ~~Chambers~~, Fort Lauderdale, Florida, this ____ day of

November, 1999.

SUSAN LEBOW

_____

SUSAN LEBOW
CIRCUIT COURT JUDGE

Copies furnished to:

Assistant State Attorney Kenneth D. Padowitz

James S. Lewis, Esq.
Attorney for Defendant
500 SE 6 Street, Suite 100
Ft. Lauderdale, Florida 33301

-3-

*Casey*

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## CASE NO: 01-7913-CIV-HURLEY

*CASE NO. 00-8616-CIV
(SOUTHERN DISTRICT OF NEW YORK)*

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

        Plaintiff,

vs.

L. BRENT BOZELL, III, an individual;
MEDIA RESEARCH CENTER, INC., a
Virginia non-profit corporation, d/b/a PARENTS
TELEVISION COUNCIL; PARENTS TELEVISION
COUNCIL, INC., a Delaware non-profit corporation;
JAMES LEWIS, an individual; MARK HONIG, an
individual; CYNTHIA DELORES TUCKER, an
individual; and VARIOUS JOHN and JANE DOES,

        Defendants.

_____/

### RICHARD L. ROSENBAUM'S REPLY TO
### PLAINTIFF'S MEMORANDUM IN OPPOSITION
### TO THE MOTION FOR SANCTIONS

        COMES NOW the non-party deponent, Richard L. Rosenbaum, by and through

his undersigned counsel and files this Reply to Plaintiff's Memorandum in Opposition to

the Motion for Sanctions, and would respectfully show unto this Honorable Court the

following:

1.    The Plaintiff's Response mischaracterizes, misinterprets, and misrepresents

critical facts surrounding WWFE's and its counsels' wrongful disclosure of a

confidential document, Lionel Tate's Presentence Investigation Report; improper

1194R-00003 348148.1


EXHIBIT___4___

contact with the court in violation of Local Rule 7.7, Rules of Southern District of

Florida, prohibiting correspondence to the court; and improper inclusion of

correspondence between counsel in its Appendix.  However, rather than following the

WWFE's "red herrings" or relying upon its false representations, the non-party shall

restrict his reply to the primary considerations upon which the Motion for Sanctions was

based:

> A)   Why was Lionel Tate's confidential Presentence Investigation Report,
> prohibited by law from being distributed, included in the WWFE's
> Appendix and referred to in its Response in Opposition to Rosenbaum's
> Motion to Quash and/or for a Protective Order?
>
> B)   Why did out-of-State counsel fax correspondence to Judge Hurley after
> being notified by Richard Rosenbaum's counsel of the improper inclusion
> of confidential materials contrary to Rule 7.7, So.Dist.Fla.?
>
> C)   Why did the Plaintiff publish letters between counsel in its Appendix in
> violation of Rule 7.7, So.Dist.Fla.?

2.   The Plaintiff's factual representations in WWFE's response are false and

misleading.  As set forth in the non-party deponent's Response in

Opposition to Motion to Strike, the actual facts are as follows:

> a.   On Thursday, January 10, 2002, undersigned counsel provided Mr.
> Rosenbaum with a copy of the Appendix filed by the Plaintiff along with its
> Response in Opposition to Mr. Rosenbaum's Motion to Quash and/or for
> a protective Order;

b.    After reviewing the materials over the evening, Mr. Rosenbaum retained

the services of a licensed private investigator to ascertain where the

confidential materials had been obtained from and who had "leaked" the

privileged Presentence Investigation Report to the WWFE;

c.    Once Mr. Rosenbaum's investigator was able to obtain a copy of the

confidential Presentence Investigation Report late Friday afternoon from

the Broward County Clerk of Courts, undersigned counsel attempted to

speak to the Assistant State Attorney assigned to the Lionel Tate case in

an attempt to ascertain how the confidential document had mistakenly

been made public;

d.    On the morning of Friday January 11, 2002 the undersigned called and

inquired of Mr. Stitcher as to how the WWFE had obtained the

confidential Presentence Investigation Report and why the same was

submitted in the Appendix to his Response to Non-Party Richard

Rosenbaum's Motion to Quash;

e.    It was further indicated that the inclusion of the Presentence Investigation

Report in the Appendix to Plaintiff's response was improper for a variety

of reasons, the most notable being the fact that PSI reports are

confidential in nature and disclosure is <u>not</u> permitted to the general public

as recited therein;[1]

---

[1]This would put even an unsophisticated lay person on notice of the confidential
nature of the report, let alone experienced litigation counsel.  It is telling that Plaintiff
did not see the express warning of confidentiality when the report was examined or, in

f.    Mr. Stitcher advised the undersigned that he did not know the answer to undersigned counsel's questions, but he would look into the situation and advise;

g.    That the undersigned, as is his custom, left early on that Friday, due to religious reasons;

h.    That after 5:00 PM on that same day the undersigned's secretary called the undersigned at his residence to advise him that Mr. Stitcher needed to speak to him;

i.    That as a courtesy, the undersigned responded to Mr. Stitcher's call.  The undersigned told Mr. Stitcher that he had a very limited time to talk at that time;

j.    Mr. Stitcher advised Mr. Zukoff that he at that time had no answer to the earlier inquiries as to their source of the Report;

k.    Mr. Stitcher advised the undersigned that he would have no objection to the sealing the report, and wanted to know there and then what Mr. Rosenbaum's position was concerning the same;

l.    The undersigned advised Mr. Stitcher that he would consult with his client, the options available and would advise him on Monday (it should be noted that court was closed at the time of the call and in fact nothing could be done until the following Monday in any event);

m.    On Monday morning the undersigned made a call to Mr. Stitcher and

the alternative, apparently chose to ignore the same.

advised him as follows:

i.    That there was no question that the disclosure of tab no. 11 in the

    Appendix was totally inappropriate;

ii.    That the options available in response thereto were being

    considered and would be acted upon in a timely manner;

iii.    That Mr. Rosenbaum would not act in any way to obstruct whatever

    legitimate efforts the WWFE made in their attempt to seal the

    privileged document should counsel be able to formulate a plan to

    accomplish the same.  However, undersigned advised he was not

    quite sure how one is able to unring the bell; and

iv.    If the WWFE was in fact able to formulate a way of correcting this

    error Richard Rosenbaum would cooperate so long as the rights of

    his client were not further compromised as a result of the WWFE

    and its counsel's actions.

3.    Undersigned counsel believes it to be unethical conduct to become a

witness in a case in which he is also counsel, and to testify as to a

controverted fact.  Accordingly, the affidavits of attorneys Stitcher and

Casey should be stricken.[2]  Such a belief makes it difficult for this non-

party to respond to WWFE's counsels' sworn affidavits.  This non-party

---

[2] Such belief is predicated, inter alia, upon an appellate decision in which
Richard L. Rosenbaum obtained a reversal of a murder conviction following the
prosecutor becoming a witness and prosecuting the same crime.  See Holloway v.
State, 705 So. 2d 646 (Fla. 4th DCA 1998)[a conviction for murder was improper when
the prosecutor acted as both a witness and as prosecutor at appellant's criminal trial].

deponent reminds this Court that as appellate counsel, he is proceeding

pro bono presenting weighty State and Federal constitutional issues on

appeal and is ethically bound to assert privilege and to maintain said

assertion on appeal, if necessary. See Rule 4-1.6, Rules Regulating the

Florida Bar.

4. Mr. Rosenbaum obtained the file of Jim Lewis, a named defendant herein, and

thereafter, the files and notes of others which were confidential. As a result, when

subpoenaed, a Motion to Quash and/or for a Protective Order was filed. A Privilege

Log was subsequently filed with a Motion to File the Same Under Seal.

5. Mr. Rosenbaum has "no dog"[3] in the WWFE's fight with Jim Lewis and other

Defendants in this case, yet he has already been harassed and burdened by the

WWFE's efforts. Mr. Rosenbaum seeks only to represent Lionel Tate concerning

appellate and post-conviction matters, which he has a constitutional right to pursue

without undue interference. Richard Rosenbaum vehemently desires to stay out of

these civil proceedings, which are ancillary and burdensome.

6. Mr. Rosenbaum's objections have been based upon Lionel Tate's privilege.

Arguably, trial counsel and Defendant in the civil case, James Lewis should have

previously objected to the requested invasion into Lionel Tate's privileged and work

product materials, but his failure to so object is not crucial to preservation of the issue

---

[3]Richard Rosenbaum has reason to believe that the "wrestling defense" was
bogus and that in actuality Lionel Tate's contact with Tiffany Eunick was accidental and
unintentional and that this child, twelve years old at the time of the incident, was not
competent to be tried as an adult nor to assist in his defense.

herein.

7.    Even if Mr. Lewis should have objected to the requested discovery, it is Lionel

Tate's rights which shall be infringed by the unlawful release of confidential materials.

Accordingly, Lionel Tate is the only one who can waive his rights under the

attorney/client privilege and the work product doctrine.[4]

8.    The Rules Regulating The Florida Bar, specifically, Rule 4-1.6, states:

> (a) Consent Required to Reveal Information. A lawyer shall
> not reveal information relating to representation of a client
> except as stated in subdivisions (b), (c), and (d), unless the
> client consents after disclosure to the client.
> (b) When Lawyer Must Reveal Information. A lawyer shall
> reveal such information to the extent the lawyer reasonably
> believes necessary:
> (1) to prevent a client from committing a crime; or
> (2) to prevent a death or substantial bodily harm to another.
> (c) When Lawyer May Reveal Information. A lawyer may
> reveal such information to the extent the lawyer reasonably
> believes necessary:
> (1) to serve the client's interest unless it is information the
> client specifically requires not to be disclosed;
> (2) to establish a claim or defense on behalf of the lawyer in a
> controversy between the lawyer and client;
> (3) to establish a defense to a criminal charge or civil claim
> against the lawyer based upon conduct in which the client
> was involved;
> (4) to respond to allegations in any proceeding concerning the
> lawyer's representation of the client; or
> (5) to comply with the Rules of Professional Conduct.
> (d) Exhaustion of Appellate Remedies. When required by a
> tribunal to reveal such information, a lawyer may first exhaust all
> appellate remedies.
> (e) Limitation on Amount of Disclosure  When disclosure is

---

[4]Lionel Tate, a minor, Kathleen Tate, mother/custodial parent, and John Tate,
natural father have expressly advised Richard Rosenbaum to maintain and preserve
each and every one of Lionel Tate's privileges and immunities to the fullest extent of
the law.

mandated or permitted, the lawyer shall disclose no more information than is required to meet the requirements or accomplish the purposes of this rule.

9.    The WWFE and its counsel, by manufacturing and relying upon the non-existent

misdeeds of others, seek to divert this Court's attention from its own misconduct.

10.   Undisputedly, the Plaintiff and its counsel obtained and utilized in a public forum

confidential materials.

11.   The Plaintiff and its counsel published the same by filing the confidential and

privileged material in the public records of the Federal District Court in the Southern

District of Florida.

12.   In an attempt to "cover up the mistake," the WWFE sent via facsimile

correspondence to this Honorable Court, in violation of Local Rule 7.7, Southern

District of Florida.

13.   The WWFE and its counsel repeatedly refer to "Rosenbaum's refusal to comply

with the Subpoena Duces Tecum." See e.g., p. 1.[5] This is not a situation where the

non-party deponent has refused to comply with a court order. In fact, Richard L.

Rosenbaum is merely honoring his ethical obligation to assert the attorney/client

privilege and to maintain that confidential documents are work-product.

14.   Although the WWFE and its counsel refer to the confidential PSI as a "document

buried," any reasonable attorney in Florida knows that such a document is privileged

---

[5] One would think by such language that the WWFE had already secured an order compelling disclosure of each and everyone the items demanded in the Subpoena. However, no such relief has been afforded to the WWFE.

and confidential, regardless of what tab it is found in the WWFE;s Appendix.[6]  Richard

L. Rosenbaum suggests that the reason no case law exists in Florida surrounding the

wrongful inclusion of a confidential private PSI in public records is that in the past, no

party or counsel has so blatantly violated the law.

15.     Contrary to Mr. Stitcher's and Mr. Case's representations, the PSI had not been

prepared for the Record in State vs. Tate.  For some unknown reason, which is

presently being investigated, the confidential document was inserted into the trial court

clerk's file with the Clerk of Court, Seventeenth Judicial Circuit in and for Broward

County, Florida, without a clock-in date or time.  Importantly, the same was not

contained in the Record on Appeal in this case, and the only public filing of the

document was the WWFE's reference to the confidential PSI in its Response in

Opposition to Mr. Rosenbaum's Motion to Quash, and in its Appendix in support

thereof.

16.     Despite the WWFE and its counsels' assertions that the Motion for Sanctions "is

a protectural sham," the same was necessary in order for Mr. Rosenbaum, appellate

counsel for Lionel Tate, to fulfill his ethical responsibilities to Lionel Tate.  Clearly, even

though Lionel Tate was only 12 years of age at the time of the incident, he is entitled to

the United States and Florida constitutional protections of the attorney/client privilege

and the work-product doctrines.  See Fischer v. United States, 425 U.S. 391, 402, 96

S.Ct. 1569, 48 L.Ed.2d 39 (1976); United States v. Juarez, 573 F.2d 267, 276

---

[6]WWF and thier counsel's statement suggesting otherwise is disingenuous and is support by absolutely nothing.

(5th Cir.)(explaining <u>Fischer</u>), <u>cert denied</u>, 439 U.S. 915, 58 L.Ed.2d 262, 99 S.Ct. 289 (1978).

17.     Without publicly referring to the PSI, as the WWFE did, the non-party deponent respectfully suggests this Honorable Court review, in-camera, the now sealed Appendix filed by the WWFE, specifically, tab no. 11 to ascertain whether the WWFE and its counsels' assertions that its counsel was forced to "read through 19 pages of text to find a reference on the last page of the PSI indicating that the document is not a matter of public record" is a valid excuse for publicly filing a confidential document. <u>See</u> Memorandum and Plaintiff's Memorandum in Opposition, p. 4; Stitcher Affidavit, ¶ 12, Ex. B.

18.     Without quoting from the confidential document, this non-party deponent cannot do the privilege issue justice. Therefore, this Court should review the probation department's clear bold lettering, large font markings of privilege and confidentiality, and remember; reasonably prudent attorneys practicing law in Florida, or anywhere, have an obligation to know which matters are privileged; more so, any attorney providing competent counsel is required to read <u>every</u> page, <u>every</u> paragraph of a document attached in an Appendix and referred to in a pleading.

19.     While it is nice to learn, for the first time upon receipt of the Plaintiff's Memorandum in Opposition, that Mr. Stitcher "apologized to the court" after being informed that his facsimile correspondence to the court was improper, it is unavailing. See Page 7, Memorandum in Opposition. However, the same is an admission that the WWFE and its counsel violated the Local Rules of this Court. Surprisingly, Mr. Stitcher

cavalierly ignores his improper facsimile correspondence to the Federal District Court Judge in the Southern District of Florida, a locale and venue in which he was not permitted to practice.

20.     Interestingly, the WWFE and its counsel assert that "Rule 7.7 is designed to prevent counsel from routinely 'copying' the Court on letters that they exchange.........." See Memorandum, p. 12. Notably, neither the WWFE nor its counsel cite any authority for this proposition. To the contrary, the Plaintiff and its counsel totally ignore their improper contact with the Court, while candidly admitting its ex-parte apology.[7]

21.     The WWFE and its counsel repeatedly "bang the drum" that their unlawful disclosure of the PSI is not sanctionable. While this non-party deponent has been unable to cite any specific remedy provided for by statute, Florida law was clearly violated by the wrongful disclosure of confidential materials. See Section 945.10, Florida Statutes; Rules 3.172 and 3.173, Florida Rules of Criminal Procedure (2001).[8]

22.     The Plaintiff and its counsel's allegation that it did not publish or distribute the confidential document is laughable. Clearly, by filing the PSI as part of the Appendix with the Clerk of Court and failing to file the same under seal, the matters became public record. They were listed on the Pacer System. Although subsequently sealed by Order of the Court, the documents were nevertheless disclosed, albeit for less than

---

[7]Even the WWFE's sarcastic footnote concerning Blacks Law Dictionary's definition of ex parte was clearly violated as Mr. Stitcher's apology to the court was taken "without notice to, or contestation by, any person adversely interested." See p. 7, n. 7.

[8]This non-party offers that said unlawful disclosures constitutes indirect contempt of court or obstruction of justice.

a two week period. The extent of time the information was wrongly and unlawfully disclosed as a result of the WWFE and its counsels' acts. Sanctions are required because of the mere making of the confidential materials a public record.

23.    Contrary to the WWFE's insinuation in Footnote 9, Rosenbaum has not misused the Florida Bar Rules, but rather seeks to further Lionel Tate's exercise of his State and Federal constitutional rights. While the Florida Rules of Professional Conduct specifically state that the Rules are not designed to be a basis for civil liability, in this case, Lionel Tate seeks equitable relief. Richard Rosenbaum does not seek to establish WWFE's civil liability[9] at this time and in these proceedings.

I HEREBY CERTIFY that on this **12th day of FEBRUARY, 2002**, a true and correct copy of the foregoing was furnished by U.S. mail to: the attached service list.


Respectfully submitted,

LAW OFFICE OF STEPHEN ZUKOFF, ESQ.
COUNSEL FOR RICHARD L. ROSENBAUM
19 WEST FLAGLER STREET
SUITE 211
MIAMI, FL 33130
TELEPHONE: (305) 374-4331
FLA. BAR NO: 0177061

STEPHEN M. ZUKOFF

---

[9]In fact, Richard L. Rosenbaum, in all likelihood, has no basis to seek civil relief. Only Lionel Tate, because he is a minor child, his parents or guardian, can assert a cause of action on his behalf.

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

**CASE NO: 01-7913-CIV-HURLEY**

WWFE, etc.,

Plaintiff,

vs.

L. BRENT BOZELL, et al.,

Defendants.

_____/

**MAILING LIST**

DANIEL A. CASEY, ESQ.
KIRKPATRICK & LOCKHART LLP
Attorneys for Plaintiff
Miami Center, 20th Floor
201 South Biscayne Boulevard
Miami, FL 33131

KURT STITCHER, ESQ.
KIRKPATRICK & LOCKHART LLP
Attorneys for Plaintiff
535 Smithfield Street
Pittsburgh, PA 15222-2312

STEPHEN ZUKOFF, ESQ.
Attorney for Richard Rosenbaum
19 W. Flagler Street, #211
Miami, FL 33130

ROBERT BUSCHEL, ESQ.
Attorney for James Lewis
201 SE 8th Street
Ft. Laud., FL 33316

RICHARD L. ROSENBAUM, ESQ.
Attorney for Lionel Tate
350 E. Las Olas Blvd., #1700
Ft. Laud., FL 33301

1134R-00003 348148.1

13

# Kirkpatrick & Lockhart LLP

Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
412 355 6500
www.kl.com

March 11, 2002

Jerry S. McDevitt
412.355.8608
Fax: 412.355.6501
jmcdevitt@kl.com

**VIA FAX**

Michael Hursey, Esquire
One Financial Plaza, Suite 1615
Fort Lauderdale, FL 33394

        Re:     World Wrestling Federation Entertainment, Inc. v.
                  L. Brent Bozell, III, et al.

Dear Mr. Hursey:

      I wish to confirm certain aspects of our conversation today.

      During our conversation, you indicated you would be filing a protective order with respect to the subpoena served on Mrs. Tate.  Insofar as assertions of privilege or Fifth Amendment invocations are concerned, I believe the law is clear that those must be made in response to specific questions.  Thus, I want to make my position clear, and that is that unless the Court quashes her subpoena prior to March 19, 2002, I believe she must appear and assert her privileges on the record so that a proper record can be made for testing with the Court.

                  Very truly yours,

                  Jerry S. McDevitt

JSM/emw



**EXHIBIT** _____5_____

PI-822511 v1

# Kirkpatrick & Lockhart LLP

Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222-2312
412.355.6500
www.kl.com

March 14, 2002

Jerry S. McDevitt
412.355.8608
Fax: 412.355.6501
jmcdevitt@kl.com

**VIA FAX**

Michael Hursey, Esquire
One Financial Plaza, Suite 1615
Fort Lauderdale, FL 33394

Re:   World Wrestling Federation Entertainment, Inc. v.
      L. Brent Bozell, III, et al.

Dear Mr. Hursey:

This will confirm your oral advice today that you intend to file a motion with the Court today regarding the subpoena duces tecum served on Mrs. Tate.

It is a matter of record that Mrs. Tate is already in non-compliance with the document portion of the subpoena, and today you advised that she would not show up for the deposition. I believe the law is utterly clear that all privileges must be invoked in response to specific questions at a deposition and that there is no good faith basis for her refusal to appear and show up for these depositions. Accordingly, we will be moving the Court to hold Mrs. Tate in contempt of the Court for violation of the subpoena in a deliberate fashion.

Very truly yours,

Jerry S. McDevitt

JSM/emw

cc:   Robert C. Buschel, Esquire (via fax)
      Thomas A. Leghorn, Esquire (via fax)
      Stephen Zukoff, Esquire (via fax)

**EXHIBIT** 6

PI-824161 v1

BOSTON ▪ DALLAS ▪ HARRISBURG ▪ LOS ANGELES ▪ MIAMI ▪ NEWARK ▪ NEW YORK ▪ PITTSBURGH ▪ SAN FRANCISCO ▪ WASHINGTON

BOX
FILED

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA     JAN 0 7 2002

ERK, USDC / SDFL / WP-

| | |
|---|---|
| WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., a Delaware Corporation,     ) ) ) ) | |
|       Plaintiff,     ) ) | |

WORLD WRESTLING FEDERATION                )
ENTERTAINMENT, INC., a Delaware            )          ERK, USDC / SDFL / WP-
Corporation,                               )
                                           )
          Plaintiff,                       )
                                           )          CASE NO. 00-CIV-8616 (DC)
     vs.                                   )          (Southern District of New York)
                                           )
L. BRENT BOZELL, III, an individual;       )
MEDIA RESEARCH CENTER, INC.,               )          CASE NO.: 01-7913 CIV Hurley
a Virginia non-profit corporation,         )          Magistrate Lynch
d/b/a Parents Television Council;          )
PARENTS TELEVISION COUNCIL, INC.,          )
a Delaware non-profit Corporation;         )
JAMES LEWIS, an Individual; MARK           )
HONIG, an Individual; CYNTHIA DELORES      )
TUCKER, an individual; and Various John    )
and Jane Does,                             )
                                           )
                                           )
          Defendants.                      )
_____  )

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO RICHARD L. ROSENBAUM'S MOTION TO QUASH OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER

Plaintiff World Wrestling Federation Entertainment, Inc. ("WWFE") respectfully requests that the Court deny Richard L. Rosenbaum's ("Rosenbaum") Motion to Quash a Rule 45 document subpoena that WWFE served on him, because the grounds set forth in the motion are without factual or legal merit.

*First*, Rosenbaum's "undue burden" objection is unavailing, because (a) WWFE has already agreed to give Rosenbaum ample additional time to respond to the subpoena; (b) the documents requested come from a discrete set of files that Rosenbaum received directly from James Lewis, an attorney and a defendant in the underlying defamation case; and (c) WWFE has



**EXHIBIT 1**

**Kirkpatrick & Lockhart LLP**

offered to review and copy responsive, "non-privileged" documents from the Lewis file, thus sparing Rosenbaum the "burden" of reviewing and copying the same.[1]

**Second**, Rosenbaum's objection that certain requested documents are "publicly available" misses the point of the subpoena. WWFE is not interested in whether other persons might have had access to these documents, because, irrespective of what the *public* knew, in order to prove its defamation case against Lewis, WWFE must show what *Lewis* knew when he made his defamatory pronouncements about WWFE. Only Lewis's own files can tell us that.

**Third**, Rosenbaum's objection that "work product" protection prohibits disclosure of certain documents must fail, because (a) Rosenbaum has not carried his burden of proving any such protection on behalf of Lewis; (b) Lewis has waived the protection through disclosure of his purported work product to third parties; and (c) WWFE has substantial need of the materials and would suffer undue hardship without their production.

**Fourth**, Rosenbaum has not carried his burden of proving that any of the documents at issue is covered by the "attorney-client privilege." Moreover, any claim of "attorney-client privilege" that Rosenbaum might have asserted has been waived, because (a) both Lewis and Rosenbaum have failed to produce a log of the allegedly "privileged" documents; and (b) both Lewis and his client, Lionel Tate, waived any applicable privilege by disclosing the subject matter of Tate's communications in various public forums.[2]

---

[1]     In a pre-motion conversation between Rosenbaum's counsel and members of the undersigned's law firm counsel for Mr. Rosenbaum never so much as *mentioned* either the size of Rosenbaum's staff or Rosenbaum's briefing schedule on the Tate appeal as bases for his "inadequate time" and "undue burden" claims. WWFE learned of these "objections" only upon receipt of the Motion to Quash. These omissions are not in keeping with the "meet and confer" requirements of Local Rule 7.1(3).

[2]     Also included in Rosenbaum's litany of objections to the subpoena is a claim that "service" of the subpoena was "defective," because WWFE allegedly did not give prior notice to

**Kirkpatrick & Lockhart** LLP

In sum, Rosenbaum has no legally valid grounds for refusing to comply with the subpoena, and WWFE respectfully requests that the Court order full and immediate production in compliance therewith.

## FACTUAL BACKGROUND

### The Murder of Tiffany Eunick[3]

On the night of July 28, 1999, Lionel Tate murdered Tiffany Eunick. Prior to the murder, Deweese Eunick had left her daughter in the care of Tate's mother, Kathleen Grossett-Tate, a Florida Highway Patrol Trooper whom Ms. Eunick had recently met. That night, while Ms. Eunick went to work, Ms. Tate had agreed to watch Tiffany at Ms. Tate's townhouse in Pembroke Park, Florida, as she had done on a few prior occasions. With Ms. Tate at the townhouse that particular night was her son, Lionel, a 5 foot 4 inch, 166-pound, 12 year old boy. Tiffany was 6 years old, stood 4 feet 2 inches tall, and weighed 48 pounds.

After dinner that night, Ms. Tate went upstairs to her bedroom to sleep, leaving Lionel alone with Tiffany. At some point later in the evening, Ms. Tate heard a commotion downstairs. In response, she cracked her bedroom door and demanded to know what was happening. Lionel responded that Tiffany was making noise. Ms. Tate yelled down the stairs that she would spank Tiffany if Tiffany didn't keep quiet.

---

defense counsel. This assertion is false. As shown below, WWFE sent notice to all counsel, including Lewis's, the day after the subpoena was served and several days before the date for compliance. *See infra.* at 14. Furthermore, Rosenbaum's objection that the requests are vague as to time warrants no response, because the requests themselves prove otherwise. WWFE will not address these two less than convincing arguments in the body of this brief.

[3]  WWFE is reciting the facts of Tiffany Eunick's murder in order to give the Court an understanding of the evidence either known, or available, to defendant James Lewis at the time he attempted to blame WWFE and its SMACKDOWN! wrestling program for Tiffany's death during his many and varied appearances in the media.

**Kirkpatrick & Lockhart** LLP

Tiffany's noisemaking was understandable; Lionel was beating her to death at the time. After he finished beating Tiffany into unconsciousness, Lionel went upstairs to tell his mother that Tiffany was not breathing. Ms. Tate finally came down to investigate, then quickly called 9-1-1. When police and emergency personnel responded to Ms. Tate's townhouse, she told them that Tiffany had been ill that evening and suggested that she had choked on some regurgitated ox tail soup. Lionel, the only witness to Tiffany's death, said nothing to suggest that he had had any contact whatsoever with Tiffany.

### Tiffany Eunick's Autopsy and Lionel Tate's Arrest

Examination of Tiffany at the hospital and in an autopsy readily established that Tiffany had been violently killed. Indeed, far from choking on some soup, Tiffany had suffered over 35 separate injuries at the hands of Lionel Tate that night, including three brain contusions, a fractured skull, a broken rib, and a lacerated liver, a portion of which was left floating in her abdomen. Not surprisingly, her injuries quickly proved fatal. (Copy of Autopsy Report attached at **Appendix Tab 1**)

On July 30, as a result of the autopsy, two Broward County Sheriff's Office detectives took Lionel Tate into custody. In his initial statement to the detectives, Lionel claimed that he and Tiffany had been playing "tag," during which Lionel had given Tiffany a "bear hug." He also stated that he had accidentally bumped Tiffany's head on a table while trying to move her from the floor to the couch as she slept. At no time did Lionel ever mention *anything* about "wrestling." Indeed, Lionel told the detectives that, at the time of the murder, he had been watching "The Flintstones" and "Cow and Chicken," two Cartoon Network programs, on television. (Copy of 7/30/99 Statement of Lionel Tate attached at **Appendix Tab 2**)

After Ms. Grossett-Tate arrived at the police station, detectives re-interviewed Lionel in his mother's presence. Once again, Lionel told his "tag" story and denied any other contact with Tiffany. He did claim, however, that Tiffany had already injured her face earlier in the day when she accidentally hit herself with a videotape, a story his mother supported. Neither Lionel nor his mother ever mentioned *anything* about Lionel "wrestling" with Tiffany that night. (Copy of 7/30/99 Statement of Lionel Tate attached at **Appendix Tab 3**)

When Tate's statements about the events of July 28 became public, Dr. Joshua Perper, the Chief Medical Examiner of Broward County, flatly stated that Tiffany's injuries were totally inconsistent with Lionel's story and that these injuries were *not* the result of "roughhousing." (August 5, 1999, Report of Dr. Joshua Perper, attached at **Appendix Tab 4**)

### Defendant James Lewis and the "Wrestling Defense"

Shortly after Lionel Tate's arrest and indictment for First Degree Murder, his court-appointed attorney, James S. Lewis, began an aggressive and sustained public campaign to paint Tiffany Eunick's death as a "tragic accident," first as a result of childish "horseplay," then, later, as a result of Lionel's alleged imitation of "wrestling moves" he had learned by watching WWFE programs, including SMACKDOWN!. As part of this process, Lewis conspired with the other defendants to divert attention from his client's guilt and to defame WWFE by claiming that WWFE programming had inspired Lionel and several other children across the country to kill their "peers" by using "wrestling moves."[4]

Although a full description of Lewis's numerous public statements is beyond the scope of this Memorandum, his public media blitz included appearances on "Dateline NBC;" "Leeza;"

---

[4]    A sampling of public defamatory statements that Lewis made is set forth in Response 7 to WWFE's Response to Defendant Lewis's First Set of Interrogatories, attached at **Appendix Tab 5.**

MSNBC's "Today in America;" "Crier Today;" Court TV; Fox News's "The O'Reilly Factor;" Fox News's "The Edge with Paula Zahn;" WSVN-TV Miami; WTVJ-NBC TV Miami; WPLG-TV Miami; WWOR-TV Secaucus, New Jersey; the NBC "Today" Show; ABC's "The View;" The Queen Latifah talk show; and CNN's "Larry King Live." He also gave interviews to numerous other media outlets, including the Miami Herald; the Ft. Lauderdale Sun-Sentinel; the Associated Press; CBS Radio; APBNews.com; WFOR News Miami; and "wrestleboard.com."

The indisputable thrust of Lewis's public statements – conveyed through this dizzying variety of media – was to lay the blame for Tiffany Eunick's death squarely on WWFE and its wrestling programs, which were not even available on broadcast network television until *after* Lionel Tate murdered Tiffany Eunick.[5]

More importantly, in his public statements, Lewis repeatedly described his and Tate's version of the events that led to Tiffany's death on July 28, for which there are only *two* possible sources. *First*, because Lionel Tate was the only living witness to Tiffany's murder, Lewis's statements might reflect information that Tate had provided to him, either directly or through third parties. *Second*, to the extent that Tate never told Lewis what actually happened the night he killed Tiffany, Lewis's stories about that night were simply part of a hoax that sought to blame WWFE for a murder his client committed. Either way, the implications of these public disclosures for the "attorney-client privilege" are profound.

The most direct example of a public disclosure, however, was a videotape that Tate created with one Dr. Joel Klass, a psychiatrist whom Lewis had hired to help defend Lionel on numerous issues (*e.g.*, competence to waive his *Miranda* rights, intent to kill, and the "wrestling

---

[5] WWF SMACKDOWN! did not begin airing on network television until August 26, 1999, when UPN started carrying the program. No WWFE program was on the air the night Lionel Tate killed Tiffany Eunick.

defense").[6]  (Copy attached at **Appendix Tab 6**).  In this videotape, *Tate himself* purports to "recreate" what happened the night he killed Tiffany.  Among other things, the tape shows Tate exchanging a flurry of punches with Klass – who is playing the role of Tiffany – then describing how he had flung Tiffany head-first into an iron railing, supposedly the way a professional wrestler would throw his opponent into the ring ropes.  Tate also contends that his brutal beating of Tiffany was consensual, as Tiffany had agreed to "play wrestle" with Lionel that evening.[7]

### The Investigation into Tiffany Eunick's Murder

Long before Lionel Tate's murder case came to trial – and while Lewis was out peddling his "wrestling defense" to an unsuspecting public – the investigation into Tiffany Eunick's death was providing no support for Lewis's trial strategy.  Setting aside his own client's failure even to *mention* "wrestling" prior to Lewis's appointment, numerous pieces of evidence contradicted Lewis's public statements decrying WWFE's programs.  Samples include the following:[8]

### Witness Statements

In her deposition, **Deweese Eunick** testified that, in the few times that she had "babysat" Lionel for Ms. Tate, Lionel had not imitated, or even spoken about, wrestling, nor had he ever

---

[6]      This videotape, and all materials relating thereto, is one of the subjects of Request 14 from WWFE's subpoena to Rosenbaum.

[7]      This videotaped "reenactment" included numerous actions that Tate had never described to the police when he was questioned about the events of July 28.  The tape also managed to leave out several undisputed facts about those events, which is one of the reasons why the trial judge later blasted the tape as a defense concoction.  In fact, it was the prosecution that used the tape at trial, in order to show the jury that Lionel Tate was a liar.  Of course, Lewis knew that he could never have used the tape affirmatively, because it was rank hearsay.  The only purpose in creating the tape was to perpetuate Lewis's "wrestling defense" hoax by getting the tape into the public domain.  He succeeded.  Indeed, another defendant in the defamation case, C. Delores Tucker, relied on the tape to support her defamatory opinions about WWFE!

[8]      In the interests of time, WWFE will not burden the Court with a full recitation of all of the facts that prove the falsity of Lewis's "wrestling defense."  The evidence cited is merely a sample of the evidence disproving any actual connection between WWFE professional wrestling programs and the horrific murder of Tiffany Eunick.

**Kirkpatrick & Lockhart** LLP

played any type of physical game with Tiffany. Likewise, she testified that Tiffany had never watched professional wrestling. Finally, and perhaps most disturbingly, Ms. Eunick testified that during the short time she had known Lionel, he had repeatedly told her how "fine" she was and that he loved her. Following Tiffany's murder, Lionel had also asked Ms. Tate if he could have Tiffany's toys and if he could move in with Ms. Eunick and live in Tiffany's room. (November 2, 2000, Telephonic Deposition of Deweese Eunick, pp. 16, 17, 19, 44, 45, 55, 56, 57 (attached at **Appendix Tab 7**))

Likewise, Ms. Eunick's fiancé, **Bradley Henry**, testified in deposition that he had never seen Lionel "play wrestle" before and that, to his knowledge, Tiffany did not watch wrestling. (March 14, 2000, Statement of Bradley Henry (Via Telephone), p. 24; March 15, 2000, Statement of Bradley Henry (Via Telephone), pp. 6-8 (attached at **Appendix Tab 8**))

Before she was ever deposed in the case, Lionel's mother, **Kathleen Grossett-Tate**, told "Dateline NBC" that Lionel had watched only "an hour or two" of professional wrestling prior to July 28, 1999. She also stated that she "wouldn't say" that wrestling had anything to do with Tiffany's death, because "some people may say watching cops and robbers has a bad influence on children." When asked whether Lionel was "imitating" wrestling when he killed Tiffany, Ms. Tate responded that: "My son watches wrestling. My son watches cartoons. So I can't s y it's just wrestling." ("Dateline NBC" Transcript (attached at **Appendix Tab 9**))

At her deposition, **Ms. Tate** testified that she had never seen Lionel "play wrestle" with anyone before and that Lionel had lived with his father in Mississippi from mid-1998 until June of 1999, one month before the murder. (August 11, 1999, Excerpt of Testimony of Kathleen Grossett Tate, pp. 4, 46-47 (attached at **Appendix Tab 10**))

Lionel's father, **John Tate**, testified that while Lionel was living with him through *June of 1999*, Lionel could not have watched professional wrestling, because Mr. Tate did not have cable, and wrestling shows were not available on network television. Mr. Tate described Lionel as immature and a liar. He also noted that Lionel had a long history of disruptive and aggressive behavior at school, for which he was suspended on several occasions. (*See* March 2, 2001, Presentence Investigation Report, p. 10 (attached at **Appendix Tab 11**))

This testimony was in keeping with that of the **law enforcement officers and emergency medical personnel** who spoke with Lionel and/or his mother immediately after the murder. They testified that neither one said anything about Lionel "wrestling" with Tiffany that night. *See, e.g.,* Depositions of Deputy Arthur (Robert) Chouinard (no contact between Lionel and Tiffany); Deputy Kelly Baranyai (Lionel and Tiffany had been "playing" before the murder); John Casey (Ms. Tate told him she was alone in the house).

### Expert Evaluation

During the pre-trial process, Lewis, the prosecutor and the Court each retained its own expert to assess Lionel's mental capacity. During an August 19, 1999, examination by the Court-appointed psychologist, **Dr. Michael Brannon**, Dr. Brannon questioned Lionel in detail about the underpinnings of the "wrestling defense" theory. Lionel made it clear to Dr. Brannon that *he knew that wrestling was "fake"* and that it if the wrestlers were actually hitting each other as hard as it seemed, they would be seriously injured and could not come back to wrestle in subsequent matches. Tate told Dr. Brannon that he had even seen a documentary on television describing how professional wrestlers make their carefully choreographed matches look "real," but, despite repeated challenges by Dr. Brannon, Tate stuck to his position that wrestling was "fake" and that no one could take that kind of abuse and come back for more. **Dr. Sheri Bourg-**

Carter, the State's psychologist, witnessed the whole exchange. (February 29, 2000, Letter from Dr. Michael Brannon, and March 4, 2001, Letter from Dr. Sherie Bourg-Carter (attached at **Appendix Tab 12**))

### Third Party Observers

In various statements, several of Lionel Tate's **former teachers** stated that Lionel was "out of control," a constant disruption to class order, inattentive, aggressive, a "bully," a thief, disrespectful of others, and hostile toward authority. On one occasion, Lionel had even engaged in a schoolyard fight with a younger, smaller girl. (Presentence Investigation Report, pp. 15-17) **(Appendix Tab 11)**

### Lewis's Dogged Pursuit of the "Wrestling Defense"

In the face of the foregoing evidence, which was either known, or available, to Lewis, he continued his public defamatory attacks on WWFE throughout the course of pretrial proceedings in the Tate criminal case. He even continued his smear campaign after Judge Joel T. Lazarus, the trial judge in Tate's criminal case, barred Lewis from presenting expert testimony on the "wrestling defense," having found, after a lengthy *Frye* hearing, that there was no scientifically valid basis for any such defense. *See* October 23, 2000, Order, attached at **Appendix Tab 13**.

### The Tate Verdict and Judge Lazarus's Sentencing Opinion

So caught up was Lewis in his "wrestling defense" hoax that he, Tate, and Tate's mother even rejected a generous plea offer from the State, which would have sent Lionel to a juvenile facility for three years, followed by ten years of probation, during all of which Lionel would have received various forms of counseling. *See, e.g.,* January 23, 2001, Hearing Transcript, p. 115 (copy attached at **Appendix Tab 14**). Instead, Tate went to trial in January of 2001.

**Kirkpatrick & Lockhart** LLP

During the trial, the State's evidence conclusively proved that Tiffany Eunick's numerous and severe injuries were totally inconsistent with any version of events touted by Tate and Lewis. In fact, in stark contrast to Lewis's claim that Tiffany's death was a wrestling-related "accident" – made both in the media and in his opening statement – *Lewis's own hired expert* testified that Tiffany Eunick's death was no "accident;" it was a *homicide. See* March 9, 2001, Sentencing Order of Judge Joel T. Lazarus, p. 13 (attached at **Appendix Tab 15**).

On January 25, after deliberating for only about 3 hours, the jury found Lionel Tate Guilty of the First Degree Murder of Tiffany Eunick. During post-trial interviews, **several jurors** flatly rejected the "wrestling defense," stating that wrestling was not an issue in the case, because, among other things, (a) the injuries were so extensive that it could not have been "wrestling;" and (b) Tate could not have "done that kind of damage" to Tiffany and not realized what he was doing.[9]

Despite the verdict – and its total rejection of the "wrestling defense" – Lewis and Tate's mother jetted off to New York the very next day to appear on the "Today" show, where they continued to flog the fraudulent defense. During this appearance, Lewis maintained that Tiffany's death was an "accident" and that it was simply "child's play that went wrong." Continuing to beat the WWFE drum, Lewis went on to state that "[e]veryone who saw the trial understood that this child was simply imitating what he'd seen on TV" and that "everyone who was there knew that wrestling played a major part in Lionel's make-up and in what happened to Tiffany." (January 26, 2001, "Today" Show Transcript attached at **Appendix Tab 17**) Apparently, the Tate jurors were not among the "everyone" who had seen the trial.

---

[9] *See, e.g.,* 1/25/01 Ft. Lauderdale Sun-Sentinel; 1/26/01 Detroit News; 1/26/01 Miami Herald, attached at **Appendix Tab 16**.

**Kirkpatrick & Lockhart** LLP

Lewis's continuing attacks on WWFE, even in the face of the jury's rejection of his theory, did not sit well with the trial judge.  On March 9, 2001, Judge Lazarus sentenced Lionel Tate to life in prison on his First Degree Murder conviction.  In his Order, Judge Lazarus all but called Lewis's "wrestling defense" a sham and a hoax.  As Judge Lazarus put it:

> But the facts on which the jury relied are deceptively simple in *rejecting the involvement of professional wrestling replication*; thus by necessary implication, accident:
>
> 1.  In the two statements to the police, Lionel Tate's own words failed to indicate that wrestling played any part in Tiffany's brutal murder.  The statements did not come close to explaining what happened in that townhouse.
>
> 2.  In statements made to EMS and the police by the defendant's mother, neither accident nor wrestling played any part in Tiffany's fatality.
>
> *Not until there was a defense-initiated reenactment did actions initiating professional wrestling start to emerge as a defense.*  This reenactment totally failed to explain to the jury during trial, and to this judge sitting as a thirteenth juror in the motion for new trial/reduction of charge, the extent and severity of the injuries to Tiffany Eunick.  Even though the reenactment depicted a connection to professional wrestling, the testimony of Dr. Brannon shows that Lionel Tate disbelieved the authenticity of what he saw on television.  *The reenactment in all due respect, seemed to be trying to fit the facts, rather than a true depiction of the events.*
>
> Accordingly, the jury obviously then, and this court now, did not and does not accept that replicating what may or may not have been seen in various televised wrestling shows as a reason to call Lionel Tate's actions 'accidental.'

After listing the numerous injuries that Tiffany had suffered at Lionel Tate's hands, Judge Lazarus found that it was "inconceivable that such injuries could be caused by 'roughhousing,' 'horseplay,' or by replicating professional wrestling moves."  (Appendix Tab 15) (emphasis added).

## WWFE's Defamation Lawsuit Against Lewis and Others

As Lewis took the Tate case from indictment toward trial, his public defamatory comments about WWFE did not stand alone. Rather, Lewis conspired and cooperated with the other defendants in this case – including L. Brent Bozell and the Parents Television Council – in a concerted effort to damage WWFE in its business and to generate more notoriety and/or funding for themselves. As the facts of the Tate case – and of the other child death ca. es that Lewis and his co-conspirators cited in their attacks – developed, however, it became clear that *none* of these cases had any connection to WWFE or its wrestling programs.

Nevertheless, in an effort to grab headlines and to harm further the WWFE's image, Lewis served a subpoena on WWFE wrestler Dwayne Johnson, a/k/a "The Rock," who had absolutely no connection whatsoever to the Tate case, but who happened to reside in South Florida. When WWFE moved to quash the subpoena and warned Lewis about his public defamatory statements, Lewis ran to the media and proclaimed his defiance by daring WWFE to sue him. *See, e.g.*, 3/20/00 Sun-Sentinel, attached at **Appendix Tab 18**.

When all other efforts to halt the defendants' smear campaign failed, WWFE filed a defamation suit against the defendants in Federal Court in New York on November 9, 2000. In the lawsuit, WWFE seeks damages for false and defamatory statements that Lewis made *in the media*. Although Lewis's in-court statements are relevant to his *waiver* of "work product" and "attorney-client privilege" protections, WWFE in no way seeks to hold Lewis *liable* for statements that he made in the courtroom in defense of his client.

But WWFE's lawsuit was not the end of its effort to convince the defendants to repudiate their lies. Even after filing suit, WWFE continued to request that the defendants cease defaming it. Indeed, when the Tate verdict came down on January 25, 2001, counsel for WWFE twice wrote to the Bozell defendants to demand a public retraction of their defamatory statements, all

13

**Kirkpatrick & Lockhart** LLP

to no avail. (January 30, 2001, and March 13, 2001, Letters from Jerry McDevitt to Robert Sparks, attached at **Appendix Tab 19**).

WWFE is not alone in believing that it has valid claims against Lewis for his out-of-court statements defaming WWFE. When Lewis and his co-conspirators moved to dismiss WWFE's complaint, the Honorable Denny Chin, United States District Judge for the Southern District of New York, *denied* the motions in all respects. In doing so, Judge Chin noted that WWFE's allegations, if proved, suggested that Lewis – through his media blitz on the "wrestling defense" – was placing his own notoriety above the interests of his young client. *See* Transcript of April 26, 2001, Hearing on Defendants' Motion to Dismiss, pp. 6-7 (attached at **Appendix Tab 20**).

### Discovery in the Lawsuit Against Lewis, et al.

On November 15, 2000, WWFE served the defendants with its First Set of Interrogatories and First Request for Production of Documents. In response, Lewis provided virtually no information and absolutely *no documents that would be responsive to the current subpoena*. Instead, he repeatedly objected that the materials requested were "privileged as attorney/client and work product." *See* Lewis's Response to First Set of Interrogatories and Response to First Request for Production of Documents, dated May 10, 2001, attached at **Appendix Tab 21**. Despite the objection, however, Lewis never produced a log of purportedly "privileged" documents, as required by the Federal Rules of Civil Procedure and by the Local Rules of the United States District Court for the Southern District of New York. *See* Fed. R. Civ. P. 26(b)(5); SDNY Local Rule 26.2.

When the issue of Lewis's inadequate responses came before Judge Chin, Lewis defended his non-response by claiming that he no longer had custody or control over the files he had developed for the Tate case, including any and all documents responsive to WWFE's

discovery requests. Instead, Lewis said, he had turned over the entire file to Tate's appellate counsel, Richard Rosenbaum, Esq., who was purportedly denying Lewis access to his own files. Lewis even filed an Affidavit in the defamation case attesting to the foregoing facts. *See* June 1, 2001, Letter from James S. Lewis to Jerry McDevitt, and July 12, 2001, Affidavit of James S. Lewis, (attached at **Appendix Tab 22**). Thus, according to Lewis, and as Judge Chin found, in order for WWFE to obtain the responsive documents to which it was entitled, it would have to serve a Rule 45 subpoena *duces tecum* on Mr. Rosenbaum. That's just what WWFE did.

### WWFE's Rule 45 Subpoena *Duces Tecum*

On December 13, 2001, WWFE served a Rule 45 subpoena on Mr. Rosenbaum's wife at their Broward County home.[10] (Copy of Subpoena *Duces Tecum* attached at **Appendix Tab 23**) On December 14, counsel for the WWFE in the New York action sent a copy of the subpoena to all counsel of record in the case, including Michael J. Quarequio, Esq., counsel for Lewis. (Copy of 12/14/01 Letter attached at **Appendix Tab 24**) The subpoena – with a return date of December 21, 2001 – contained 14 requests, which may fairly be divided into the following groups of documents: (1) publicly available records (Requests 1-5 and 9, and parts of 8 and 12-14); (2) documents reflecting statements that Lewis made to third parties, including the media (Requests 10-13); and (3) documents reflecting the statements of any prospective witness, including Lionel Tate, however generated (Requests 6, 7, 14).

On December 19, Stephen M. Zukoff, Esq., counsel for Richard Rosenbaum, called counsel for the WWFE and stated that Mr. Rosenbaum would be moving to quash the subpoena and would not produce *any* documents until the Court had ruled on his objections. When pressed

---

[10]    This subpoena complied fully with all applicable Federal Rules and Local Rules, including those governing service and the timing of a response. Nowhere in Rosenbaum's motion is there any contrary suggestion.

for a reason for the motion, Mr. Zukoff simply stated that the documents requested were "privileged." Counsel for the WWFE then received a copy of the motion to quash via facsimile on Friday, December 21. The motion contained numerous grounds that Mr. Zukoff had never addressed with counsel for the WWFE during the December 19 telephone call.

On Wednesday, December 26, counsel for the WWFE spoke again with Mr. Zukoff, this time to address the "new" objections that Mr. Rosenbaum had first made in his motion. Specifically, counsel for the WWFE told Mr. Zukoff that (a) the return date on the subpoena was not an issue, because WWFE had already agreed to give Mr. Rosenbaum substantial additional time in which to comply; (b) WWFE could relieve any "burden" on Mr. Rosenbaum's staff by reviewing the Lewis files itself; (c) WWFE was entitled to any "publicly-available" records, as well as alleged work product, as part of its need for documents relevant to Lewis's state of mind when he made his various defamatory statements; and (d) Lewis had waived any "attorney-client privilege" by his repeated public disclosures of his conversations with his client. Counsel for the WWFE confirmed each of these points in a letter dated December 27, 2001. (Copy attached at **Appendix Tab 25**)

In response, Mr. Zukoff faxed a letter that (a) confirmed his client's steadfast refusal to produce *any* documents until this Court rules on the Motion to Quash and (b) contained several comments on Tate's criminal conviction. (Copy of 12/27/01 Letter attached at **Appendix Tab 26**). The following day, counsel for the WWFE replied to Mr. Zukoff's letter and clarified WWFE's position on the subpoena. (Copy of 12/28/01 Letter attached at **Appendix Tab 27**)

As it stands today, Mr. Rosenbaum has refused to produce *any* of the Lewis documents to WWFE in response to the subpoena.

**Kirkpatrick & Lockhart** LLP

## ARGUMENT

I.     **THE SUBPOENA IMPOSES NO "UNDUE BURDEN" ON ROSENBAUM.[11]**

In various places throughout his motion, Rosenbaum complains that the WWFE subpoena would impose an "undue burden" on him and his small staff, especially in light of his appellate brief in the Tate case, which was originally due on Friday, January 4, 2002.[12]   In making this claim, Rosenbaum bears the burden of proving "undue burden," with citation to specific facts regarding the nature or volume of production that makes compliance "unduly burdensome."  *See Flatlow v. Islamic Republic of Iran*, 196 F.R.D. 203, 206 (D.D.C. 2000) (bare assertions of a burden do not satisfy the specificity requirement of an undue burden objection; showing of burden must be specific).  *See also Northrop Corp. v. McDonnell Douglas Corp.*, 751 F.2d 395, 403 (D.C.Cir.1984); *Equal Employment Opportunity Commission, v. Roadway Express, Inc.*, 75 F. Supp. 2d 767, 772 (N.D. Ohio 1999); *Williams v. City of Dallas*, 178 F.R.D. 103, 109 (N.D. Tex. 1998); *Plant Genetic Systems v. Northrup King Co., Inc*, 6 F. Supp. 2d 859, 862 (E.D. Mo. 1998) (holding that bare assertion by a party that it would be burdensome for it to comply with subpoena is insufficient to grant motion to quash).   The vague assertions in Rosenbaum's motion are inadequate to meet this burden and, in fact, are contrary to the facts, as shown below.

---

[11]      Ironically, Rosenbaum's motion imposes an "undue burden" on WWFE, because nowhere in his motion does Rosenbaum specify which of his myriad objections applies to which of WWFE's requests.  Consequently, WWFE will simply have to assume that Rosenbaum's objection to producing "publicly available" documents applies to *any* such documents, but that his objections on "work product" and "privilege" grounds apply only to those requests that theoretically call for such materials.

[12]      Rosenbaum's lawyer, Stephen M. Zukoff, has since informed the undersigned that Rosenbaum has requested an extension of this date, further raising the specter that Rosenbaum's objections are simply calculated to deny WWFE the timely discovery to which it is entitled.

*First*, WWFE has already told Rosenbaum's counsel that WWFE has no objection to postponing until January 18 the date for compliance with the subpoena. This should allow Rosenbaum and his staff ample time to review the Lewis files and to produce all documents as to which no claim of privilege is properly made in writing.

*Second*, the Lewis files are a discrete set of documents, and it is highly likely that, in carrying out his duties as Tate's appellate counsel, Rosenbaum has carefully segregated and categorized all of these materials. It is also highly likely that Rosenbaum has compiled many of these documents into one or more appendices for his appellate brief. The time required to copy these documents should impose no *undue* burden on Rosenbaum.

*Third*, WWFE has offered to fly to Ft. Lauderdale to review and copy all of the Lewis documents as to which Rosenbaum makes no claim of privilege. Surely, this will eliminate *any* possible "burden" on Rosenbaum and his staff.

*Fourth*, whatever "burden" remains is attributable not to WWFE but to Lewis, who denied custody and control over the requested documents and who required WWFE to obtain them from Rosenbaum via subpoena. Rosenbaum's complaint, then, is not with WWFE.

Consequently, the Court should overrule Rosenbaum's blanket objection to the subpoena on the grounds of alleged "undue burden."

**Kirkpatrick & Lockhart** LLP

## II. WWFE IS ENTITLED TO "PUBLICLY AVAILABLE" DOCUMENTS.

Rosenbaum next complains that many of the documents requested are "publicly available" and that WWFE should seek them from "other more qualified records custodians." Motion to Quash at 5.[13]  Rosenbaum's objection misses the boat.

James Lewis, whose files Rosenbaum now controls, is a defendant in a defamation case pending in the Southern District of New York. In order to prevail in its defamation claim against Lewis, WWFE will have to prove, among other things, that Lewis's defamatory public statements about WWFE were false and, perhaps, that Lewis made them with actual malice, *i.e.*, with knowledge that the statements were false or with reckless disregard as to their falsity. *See* May 24, 2001, Opinion of the Honorable Denny Chin, p. 11 (attached at **Appendix Tab 28**). *See also New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964); *Celle v. Filipino Reporter Enterps.*, 209 F.3d 163, 182 (2nd Cir. 2000). "Malice," in turn, is defined as "spite, ill will, hatred, or the intent to inflict harm, or . . . a reckless disregard of the [defamed party's] rights." Chin Opinion at 19 (citation omitted). In other words, "malice" is a *state of mind*, proven by "objective facts," such as what the party making the defamatory statement knew and when he knew it. *E.g.*, Chin Opinion at 20, citing *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir. 1982).

In Requests 1, 2, 3, 4, 5, and 9, as well as in parts of 8, 12, 13, and 14, WWFE seeks publicly available evidence *that was actually in Lewis's possession* when he was making his defamatory public statements. By exploring the information that Lewis, himself, had, WWFE can adduce "objective facts" showing that Lewis either *knew* his public statements were false or

---

[13]      In support of this contention, Rosenbaum cites only Requests 1-5, though several other requests may call for documents that Lewis obtained from public sources or that found their way into the public forum through Lewis or others, *i.e.*, Requests 6, 7, 8, 9, 12, 13, and 14. WWFE's "public record" argument applies with equal force to any such documents.

**Kirkpatrick & Lockhart** LLP

had *no basis* on which to make them, both of which show malice.  Access to these documents is especially critical here, because Judge Chin has imposed a strict **15 deposition limit** on the parties, despite the complexity of the factual issues in this defamation case.  Because WWFE needs these documents to prove its case, and because Rosenbaum has no other conceivable objection to the production of documents covered by Requests 1, 2, 3, 4, 5, and 9, WWFE respectfully requests that the Court order their immediate production.[14]  *See, e.g., Williams v. City of Dallas,* 178 F.R.D. 103, 111 (N.D. Tex. 1998) (finding that "public availability" of the documents was no defense to production where the relevant issue was the movant's *possession* of the documents).

## III.   "WORK PRODUCT" PROTECTION DOES NOT PROHIBIT DISCLOSURE OF THE REQUESTED DOCUMENTS.

### A.   Rosenbaum Has Not Carried His Burden of Proving the Applicability of "Work Product" Protection to Any Documents at Issue.

As a threshold matter, the party claiming a "work product" protection with respect to requested materials bears the burden of proving each element of this defense to production.  *See, e.g., In re Air Crash Near Cali, Colombia on December 20, 1995,* 959 F. Supp. 1529, 1531 (S.D. Fla.1997) (finding that "[i]n order to preserve the liberal discovery contemplated by the Federal Rules, the burden falls on the party opposing discovery . . . to prove its entitlement to a privilege for otherwise relevant documents"); *In re Air Crash Disaster at Sioux City, Iowa,* 133 F.R.D. 515, 518 (N.D. Ill.1990) (reaffirming the well-settled proposition that "the party seeking the privilege has the burden of establishing all of its essential elements").

---

[14]     To the extent that Rosenbaum is claiming "work product" protection or "attorney-client privilege" for documents covered by Requests 8, 12, 13, and 14, WWFE will address such claims in the following sections.

**Kirkpatrick & Lockhart** LLP

Thus, as to each document that Rosenbaum seeks to withhold on grounds of "work product" protection, he must establish: (1) that an attorney or his agent prepared a particular document; (2) that such person was acting on behalf of the client when he or she did so; and (3) that such person prepared the document in anticipation of litigation. *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979), citing *Hickman v. Taylor*, 329 U.S. 495 (1947).

Although Rosenbaum makes a vague, sweeping claim to work product protection on Lewis's behalf, he has not even attempted to show how each document withheld on this basis meets these criteria."[15]  As such, Rosenbaum has not met his burden on this issue, and the Court should reject his blanket assertion of "work product" protection.

**B.      Both Lewis and Rosenbaum Waived Any "Work Product" Protection by Failing to Produce a Privilege Log.**

Assuming, *arguendo*, that Rosenbaum made his "work product" objection in good faith, and not for the purposes of obstruction or delay, he was still required to produce a "privilege log" that sets forth detailed information about every document as to which he is claiming such protection. *See* Fed. R. Civ. P. 45(d)(2); United States District Court for the Southern District of Florida, Local Rule 26.1(G)(3)(b).  As noted above, Lewis had the same obligation in response to WWFE's discovery requests in the underlying defamation case. *See supra* at 13.  Neither attorney has produced any such log.

Under these circumstances, this Court may find that Lewis and Rosenbaum have waived any "work product" protection that might otherwise have applied.  *See, e.g., TIG Insurance Corporation of America v. Johnson*, 799 So.2d 339, 340 (Fla. Dist. Ct. App. 2001); *A.I.A.*

---

[15]      Theoretically, Rosenbaum could raise work product objections on Lewis's behalf with respect to *certain* documents sought in Requests 6, 7, 8, 9, 10, 11, 12, 13, and 14. His failure to provide a privilege log, however, leaves WWFE *and this Court* guessing as to what requests – and what documents – Rosenbaum is even raising the "work product" objection.

**Kirkpatrick & Lockhart** LLP

*Holdings, S.A. v. Lehman Brothers, Inc. and Bear Stearns & Co., Inc.*, 2000 WL 1538003, at *3 (S.D.N.Y. Oct. 17, 2000) (holding that "[w]here a party has completely failed to provide an index of documents withheld on the ground of privilege, a finding of waiver is appropriate") (copy attached hereto as **Exhibit A**); *Hurst v. F.W. Woolworth Co.*, 95 Civ. 6584 (CSH), 1997 WL 61051 at *6 (S.D.N.Y. Feb 11, 1997) (copy attached hereto as **Exhibit B**); *John Labatt Ltd. v. Molson Breweries*, 93 Civ. 75004, 94 Civ. 71540 (RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995), *aff'd*, 100 F.3d 919 (Fed. Cir. 1996), *cert. denied*, 520 U.S. 1275 (1997) (copy attached hereto as **Exhibit C**).[16] WWFE would ask the Court to do just that.

C.   **Lewis Waived Any "Work Product" Protection Through Public Disclosure.**

Even if the Court were to excuse Rosenbaum and Lewis's failure to produce a privilege log, the Court should still reject Rosenbaum's claim, to the extent that Lewis disclosed the contents of any such documents to third parties. For example, any public use or disclosure of any witness statements sought in Requests 6, 7, and 8 would operate as a waiver of the "work product" protection, because "[t]he privilege derived from the work-product doctrine is not absolute. Like other qualified privileges, it may be waived." *United States v. Noble*, 422 U.S. 225, 239 (1975).

Likewise, there can be no claim of protection as to Request 9, because that Request seeks only documents that Lewis actually *used* as part of his defense of Lionel Tate. As the Supreme Court held in *Noble*, where an attorney disclosed the work product of his investigator through trial testimony, he waived "work product" protection with respect to the entire subject matter of such testimony. *Id.* at 240 (observing that "Respondent can no more advance the work-product

---

[16]   "Although most of the reported cases arise in the context of a claim of attorney-client privilege, the 'specify or waive' rule applies equally in the context of claims of work product privilege." *In re Grand Jury Subpoena*, 2001 WL 1356363 at *9 , __ F.3d___, (1st Cir. Nov. 8, 2001) (copy attached hereto as **Exhibit D**).

**Kirkpatrick & Lockhart** LLP

doctrine to sustain a unilateral testimonial use of the work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination").

Finally, Rosenbaum can claim no "work product" protection as to Requests 11, 12, and 13, because these Requests seek, among other things, materials that Lewis shared with persons or entities that were not parties to the State criminal case against Lionel Tate.  By sharing with third parties whatever facts, impressions, or conclusions such materials might contain, Lewis has waived any "protection" that might otherwise have attached to them.

### D.   WWFE Has "Substantial Need" of the Requested Documents and Would Suffer "Undue Hardship" Without Them.

Finally, even if the Court were to hold that the work product doctrine *applied* in this case *and* that Lewis had not *waived* it through third-party disclosures, WWFE can still overcome the claim on the basis of "substantial need" and "undue hardship."  *See Hickman v. Taylor*, 329 U.S. 495, 511-12 (1947) (holding that a party seeking production of an opposing counsel's "work product" must show substantial need and undue hardship).

As noted above, the defamation claim against Lewis will require proof of both falsity and malice.  In order to get inside Lewis's mind – and to understand what he knew or believed about his "wrestling defense" at the time he made his defamatory statements – WWFE needs access to Lewis's files.  Only those files can tell us whether Lewis (a) *knew* his defamatory statements to be false; (b) *believed* them to be false; or (c) had done an investigation inadequate to justify his statements, which would show reckless disregard for their falsity.  *There is no other source for documents evidencing Lewis's state of mind when he made his false, defamatory statements about WWFE.*

Moreover, without these documents, WWFE will be severely prejudiced in the presentation of its defamation case, because, while WWFE could certainly produce evidence to show the *falsity* of Lewis's statements, WWFE would be unable to show that Lewis *knew* the objective truth and was, therefore, acting with *malice* when he made his statements.

In light of the foregoing, WWFE respectfully requests that the Court overrule Rosenbaum's non-specific claims to "work product" protection and order production of the Lewis files.

## IV.   THE   "ATTORNEY-CLIENT   PRIVILEGE"   DOES   NOT   PROHIBIT DISCLOSURE OF THE REQUESTED DOCUMENTS.

### A.   Rosenbaum Has Not Carried His Burden of Proving the Applicability of the "Attorney-Client Privilege" to Any Document at Issue.

In order to invoke the attorney client privilege, the claimant must establish that: (1) the asserted holder of the privilege is, or sought to become, a client; (2) the person to whom the communication was made (a) is a member of a bar of a court, or his subordinate . . . (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client. *See U.S. v. Noriega*, 917 F.2d 1543, 1551 (11th Cir.), *cert. denied*, 498 U.S. 976 (1990), citing *United States v. Kelly*, 569 F.2d 928, 938 (5th Cir.), *cert. denied*, 439 U.S. 829 (1978). Once again, despite a lengthy exposition on the law of attorney-client privilege, Rosenbaum nowhere attempts to explain *how* this privilege applies to any document that WWFE requested in its subpoena, nor does he show how each purportedly "privileged" document meets each of the

criteria for application of attorney-client privilege.[17]   As such, the Court should deny Rosenbaum's motion on this ground.

**B.    Both Lewis and Rosenbaum Waived the Privilege by Failing to Produce a Privilege Log.**

As noted above, the Federal Rules of Civil Procedure and the Local Rules of this Court required Rosenbaum – and Lewis – to file a "privilege log" with respect to any documents withheld on the grounds of "attorney-client privilege." *See supra* at 20.  Having failed to file such a log – which would allow WWFE to contest the assertion of privilege and permit this Court to evaluate Rosenbaum's claims – Rosenbaum has waived any attorney-client privilege that might otherwise have attached to these documents. *See, e.g., TIG Insurance*, 799 So.2d at 340; *A.I.A. Holdings*, 2000 WL 1538003, at *3 (**Exhibit A**); *Hurst*, 1997 WL 61051 at *6 (**Exhibit B**); *John Labatt Ltd.*, 1995 WL 23603 at *1 (**Exhibit C**).

**C.    Tate and Lewis Waived the Privilege Through Public Disclosures.**

Setting aside the defective *manner* in which Lewis and Rosenbaum asserted a privilege on Tate's behalf, and *assuming*, for argument's sake, that Tate and Lewis actually had communications for the purpose of securing, or rendering, legal advice, Tate and Lewis waived any privilege by failing to keep such communications confidential, a key requirement for the assertion of the privilege. *See U.S. v. Suarez*, 820 F.2d 1158, 1160 (11th Cir. 1987) (holding that "at the point where the attorney-client communications are no longer confidential, i.e., where there has been a disclosure of a privileged communication, there is no justification for retaining the privilege"). *See also United States v. Gordon-Nikkar*, 518 F.2d 972, 975 (5th Cir.1975); *In re*

---

[17]    WWFE will assume, without conceding, that Requests 6 and 8-14 could *conceivably* call for "privileged" documents, though most of these requests are geared, in the main, toward documents surrounding Lewis's public defamation of WWFE through the media.

*Weiss*, 596 F.2d 1185, 1186 (4th Cir.1979); *United States v. Arnoff*, 466 F. Supp. 855, 862 (S.D.N.Y. 1979); *United States v. Mierzwicki*, 500 F. Supp. 1331, 1334 (D. Md. 1980).

In this case, the basis of WWFE's lawsuit against Lewis is his relentless public campaign to explain his client's actions by attacking WWFE. As part of this campaign, Lewis repeatedly described for a sensationalist media how Lionel Tate had "accidentally" killed Tiffany Eunick while "mimicking wrestling moves" he had supposedly learned from WWFE programming. For example, Lewis made the following statements to the national media:

- On October 22, 1999, Lewis trotted out his bogus "wrestling defense" on the "Leeza" show. During the taping, Lewis told Leeza Gibbons that "you have a child here [Tate] *basically who indicates that he was horsing around with her [Tiffany Eunick] . . . acting out wrestling moves . . . .*" He then told Leeza that Tate had "*told the child psychiatrist in this case* that that's exactly what happened. That he was throwing her . . . like they would whip her into a ring rope." ("Leeza" Transcript attached at **Appendix Tab 29**) (emphasis added)

- On January 28, 2000, Lewis told the Miami Herald that "*Lionel didn't mean to hurt this girl, he wasn't* angry and he didn't have any reason to hurt her. *He was just acting out what he'd seen on television* . . . ." (1/28/2000 Article attached at **Appendix Tab 30**) (emphasis added)

- On March 9, 2000, Lewis told the Miami Herald that "You have a young boy acting out a move he sees on television" and that it was a "Sprite Commercial featuring Sting [a professional wrestler] that was apparently what was being mimicked." (3/9/2000 Article attached at **Appendix Tab 31**)

- On March 22, 2000, Lewis appeared on a "Court TV" special with Catherine Crier, at which time Lewis volunteered that: "*My client basically said that they were playing wrestling and that he came up behind her and dropped her to the floor and she hit her head* . . . ." (Transcript attached at **Appendix Tab 32**) (emphasis added)

- On April 28, 2000, Lewis appeared on the Fox News program "The O'Reilly Factor" and repeated his story that Lionel and Tiffany "were acting out what they saw on television – the WWF and the WCW. He [Tate] had watched wrestling over a period of years and was basically playing with this little girl when he killed her." (Transcript attached at **Appendix Tab 33**)

- On January 16, 2001, Lewis told a national audience watching the Tate trial on "Court TV" that Tiffany Eunick died while she and Lionel Tate were "play wrestling." According to Lewis, Tiffany punched Lionel several times, and Lionel punched her back. When Lionel tried to swing Tiffany onto a couch, he caught his foot on a table and propelled her into an iron railing. *See* January 16, 2001, Transcript of Trial Proceedings, Volume 5, p. 554 (attached at **Appendix Tab 34**).

- In the Klass videotape, which aired on national television and which the prosecution introduced into evidence at trial, *Lionel Tate himself* purports to describe the events of July 28, 1999, including how his alleged "play wrestling" resulted in the violent death of Tiffany Eunick. (**Appendix Tab 6**)

At a minimum, unless Lewis's "wrestling defense" was *solely* his own concoction, all of these statements reveal the content of purportedly "confidential" communications between Tate and Lewis (or his agents) about *how* Tiffany Eunick died. Because Lewis and Tate chose to make public disclosure of the contents of such communications, they have waived any attorney-client privilege claim with regard to all communications on the same *subject matter*. *See, e.g., Urban Outfitters, Inc. v. DPIC Companies, Inc.*, 203 F.R.D. 376, 381 (N.D. Ill. 2001) (holding that "[v]oluntary disclosures, as opposed to inadvertent disclosures, waives the privilege as to remaining documents of the same subject matter"); *Golden Valley Microwave Foods, Inc, v. Weaver Popcorn Company, Inc.*, 132 F.R.D. 204, 207 (N.D. Ind. 1990); *Greene, Tweed of Delaware, Inc. v. Dupont Dow Elastomers, L.L.C.*, 202 F.R.D. 418, 420 (E.D. Pa. 2001) (holding that the voluntary disclosure of attorney-client communications waives the privilege to all other communications on the same subject).

Likewise, all of Lewis's public statements regarding Tate's personal history – including his alleged infatuation with professional wrestling– serve as a waiver of any purported attorney-client privilege regarding *that* subject. Because the documents that WWFE seeks through its subpoena address these two subjects, the Lewis and Tate disclosures waived any otherwise applicable privilege with respect to these documents, and they cannot reclaim it now. *See*

27

**Kirkpatrick & Lockhart** LLP

*Suarez*, 820 F.2d at 1160 (finding that "it has long been held that once waived, the attorney-client privilege cannot be reasserted").

Although Rosenbaum may argue that only Lionel Tate could have waived the privilege, *Tate's own disclosures* evidence this waiver. As noted above, it was Lionel Tate himself who appeared on the Klass videotape, purporting to recount how he had "accidentally" killed Tiffany Eunick on July 28, 1999. This tape – condemned as a sham by Judge Lazarus – was designed for public consumption and was, in fact, disclosed to the public. Clearly, then, the *subject matter* of how Tate killed Tiffany is no longer confidential, and the privilege is waived.

In addition, even *Lewis's* "solo" disclosures may fairly be attributed to Tate. **First**, as Rosenbaum himself points out in his motion, Lewis had a fiduciary duty to Tate and an ethical obligation not to make public statements about Tate's case without Tate's consent. *See* The Florida Bar, Rule of Professional Conduct 4-1.6 (stating that a lawyer "shall not reveal information relating to representation of a client . . . unless the client consents after disclosure to the client"). There is no record evidence that Lewis violated this Rule, nor has Rosenbaum contended that Lewis did.

**Second**, Tate and his mother never objected to any of Lewis's public pronouncements about the bogus "wrestling defense." Moreover, Tate and his mother both sat through his criminal trial, during which Lewis made statements, and put on evidence, in support of his concocted theory about how Tiffany Eunick met her untimely demise. And Tate's mother, his legal guardian, went on the "Today" show and on "Dateline NBC" to perpetuate the "wrestling defense" hoax and to put her "spin" on her child's case.

These facts provide compelling evidence that Tate was part and parcel of the hoax and that he agreed to waive the attorney-client privilege when he believed it would benefit his

**Kirkpatrick & Lockhart** LLP

defense, whether in the eyes of the public or at trial.[18]   *See Suarez*, 820 F.2d at 1160-61 (finding waiver where client allowed his attorney to disclose communications to third parties); *In Re Claus von Bulow*, 828 F.2d 94, 100-101 (2nd Cir. 1987) (holding that a client, by his actions, may impliedly waive the attorney-client privilege or consent to disclosure); *United States v. Bump*, 605 F.2d 548,551 (10th Cir. 1979) (finding waiver where client made no showing that attorney's disclosures were without his consent); *Griffith v. Davis*, 161 F.R.D. 687, 698 (C.D. Cal. 1995) (holding client's consent to disclosure waived the privilege, even in the absence of an explicit waiver); *Drimmer v. Appleton*, 628 F. Supp. 1249, 1252 (S.D.N.Y. 1986) (finding implied waiver).

In sum, Rosenbaum has not established the elements of the attorney-client privilege, and, to the extent he may try, Lewis and Tate have already waived any possible claim to the privilege. Therefore, any documents that Rosenbaum seeks to withhold on privilege grounds – including all documents responsive to Requests 6 and 14 – should be ordered produced.[19]

---

[18]   Rosenbaum suggests in his motion that Lionel Tate actually refused to waive his attorney-client privilege.  Rosenbaum's "Exhibit A" provides absolutely no support for this assertion and has nothing to do with the waiver at issue in this response.  Moreover, as Rosenbaum neglects to mention, Judge Lazarus *overruled* defense objections regarding Tate's competence to waive his rights.  *See* March 8, 2001, Order, attached at **Appendix Tab 35**.

[19]   Even if the Court holds that the privilege has not been waived, the Court should order Rosenbaum to produce all purportedly privileged documents for an *in camera* review under the crime/fraud exception to the attorney-client privilege.  The foregoing facts – including Judge Lazarus's sentencing order and Judge Chin's comments upon denying Lewis's motion to dismiss – strongly suggest that Lewis (possibly in concert with Tate and/or Tate's mother) concocted the "wrestling defense" as a fraud upon the court.  This showing should be sufficient to trigger an *in camera* review.  *See United States v. Zolin*, 109 S. Ct. 2619, 2631-32 (1989) (holding that an *in camera* review is appropriate where the moving party has presented sufficient evidence to support a reasonable belief that such review may yield evidence to establish the crime/fraud exception); *In Re Grand Jury Subpoena 92-1(SJ)*, 31 F.3d 826, 829-30 (9th Cir. 1994) (finding that the party opposing the privilege need only make a showing "sufficient to establish a reasonable belief that *in camera* review *may lead to evidence* that the exception applies" and that the court need consider only *that* party's presentation); *Gutter v. E.I. DuPont de Nemours & Co.*,

## CONCLUSION

WWFE's subpoena imposes no "undue burden" on Rosenbaum, and Rosenbaum has no factually or legally valid objection on grounds of "public availability" or "work product." To the extent that any of the requested documents might otherwise be privileged, Rosenbaum, Lewis, and Tate have all waived the privilege, and, in any event, the crime/fraud exception to the "work product" and "attorney-client" privileges may apply.   Therefore, WWFE respectfully requests that the Court deny Rosenbaum's Motion to Quash in its entirety and order the immediate production of all the requested documents.

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP

Daniel A. Casey
KIRKPATRICK & LOCKHART LLP
201 South Biscayne Boulevard, 20th Floor
Miami, FL  33131
(305) 539-3324 (phone)
(305) 358-7095 (fax)

Attorneys for World Wrestling
Federation Entertainment, Inc.

---

124 F. Supp. 2d 1291, 1299, 1306-07 (S.D. Fla. 2000) (holding that the party opposing the privilege need only make a "prima facie" showing that the client and the attorney were committing or about to commit some type of fraud upon the court), citing *In Re Grand Jury Investigation (Schroeder)*, 842 F.2d 1223, 1226 (11th Cir. 1987).   WWFE respectfully submits that the attached Appendix contains such a "prima facie" showing, which applies equally to Rosenbaum's "work product" objections. *See In Re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994).

**Kirkpatrick & Lockhart** LLP

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 7th day of

January, 2002, via United States, mail on the following counsel:

Thomas A. Leghorn, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, New York  10017-5639

Michael J. Quarequio, Esquire
500 Southeast 6th Street, Suite 100
Fort Lauderdale, Florida  33301

Robert R. Sparks, Jr., Esquire
Herge, Sparks & Christopher, LLP
6862 Elm Street, Suite 360
McLean, VA  22101

Stephen Zukoff, Esq.
19 West Flagler Street, Suite 510
Miami, Florida  33130

Daniel Casey

**Kirkpatrick & Lockhart** LLP

2000 WL 1538003
(Cite as: 2000 WL 1538003 (S.D.N.Y.))
<KeyCite Yellow Flag>

Page   1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

A.I.A. HOLDINGS, S.A., et al., Plaintiffs,
v.
LEHMAN BROTHERS, INC. and BEAR STEARNS & CO., INC., Defendants.

No. 97CIV4978(LMM)(HBP).

Oct. 17, 2000.

Peter N. Wang, Esq., Friedman, Wang & Bleiberg, P.C., New York.

K. Chris Todd, Esq., Kellogg Huber Hansen Todd & Evans P.L.L.C., Washington, D.C.

Jayant W. Tambe, Esq., Jones, Day, Reavis & Pogue, New York.

Robert W. Gaffey, Esq., Layton, Brooks & Hecht, New York.

Stephen L. Ratner, Esq., Rosenman & Colin, LLP, New York.

MEMORANDUM OPINION AND ORDER

PITMAN, Magistrate J.

*1 Currently pending are (1) plaintiffs' motion to compel defendants to produce (a) information concerning complaints against introducing brokers other than Daouk and his affiliated entities and (b) a May 17, 1995 audio tape that is being withheld on the basis of the work-product privilege and (2) Bear Stearns' motion for a protective order precluding the deposition of its chairman, Alan C. Greenberg. For the reasons set forth below, plaintiffs' motion is denied in part and granted in part. Bear Stearns' motion is denied.

A. Introducing Broker Information

Plaintiffs seek to compel defendants to answer the following interrogatory and document request concerning introducing brokers:

Identify any communication, whether oral or written, between [defendant] and any [self regulatory organization], state, or federal regulatory organization regarding any complaints or inquiries concerning, referring or relating to [your] introducing brokers or entities alleged to be [your] introducing brokers; and identify for each such communication, the person(s) involved, and the date, place and content of the communication.

* * *

[Produce] [a]ll documents concerning, referring or relating to any warnings, complaints, reprimands, questionnaires, requests, compliance inquiries, or citations issued by any [self regulatory organization], federal, or state regulatory authority to [you], concerning or regarding [your] introducing brokers, including [your] response thereto.

(Letter of Antonia Apps, Esq., dated June 9, 2000, tab 1 at 2 and 4, tab 2 at 2 and 4). Plaintiffs contend that the information sought may constitute relevant "similar act" evidence. Defendants contend that the information sought is irrelevant and that even if it does have some relevance, the burden of compiling and producing the information outweighs any potential relevance that it may have.

An introducing broker is a securities or commodities broker that uses the services of another broker, usually referred to as a clearing broker, to execute and process securities and/or commodities transactions. See generally *Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 29 (2d Cir.2000); *Gilman v. BHC Sec., Inc.,* 104 F.3d 1418, 1423 (2d Cir.1997); *Katz v. Financial Clearing & Servs. Corp.,* 794 F.Supp. 88, 90 (S.D.N.Y.1992); *Stander v. Financial Clearing & Servs. Corp.,* 730 F.Supp. 1282, 1285 (S.D.N.Y.1990). At oral argument, defendants represented that they have had relationships with several hundred introducing brokers and that complaints concerning introducing brokers are maintained only in the files of the complaining customer. Thus, in order to compile the complaints regarding introducing

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT __A__

2000 WL 1538003                                                      Page    2
(Cite as: 2000 WL 1538003, *1 (S.D.N.Y.))

brokers, a search would have to be made of the files of all the customers of all the introducing brokers.

Although defendants' handling of complaints concerning introducing brokers *may* have some probative value, I conclude that the burden and expense of retrieving complaints against clearing brokers other than Daouk and his affiliated entities outweighs the likely benefit of the information. Based on the representations of defendants' counsel, it appears that defendants have had relationships with a large number of introducing brokers in many parts of the world. Presumably, the relationships of each of these introducing brokers with their customers are subject to local regulation or local custom and practice. Given this variety, complaints about an introducing broker in one jurisdiction may have little to do with an introducing broker in another jurisdiction. The relevance of the information sought is further attenuated by the fact that the request is unlimited in time and seeks information concerning complaints made both before and after May 1995. Finally, the relevance of the information sought is still further attenuated by the fact that the discovery requests do not seek proven instances of misconduct by introducing brokers, but rather mere complaints which may or may not have merit. Although the scope of relevance is extremely broad for discovery purposes, *see generally Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991), the burden of recovering the information would be great and it appears that its potential probative value would be *de minimis.* Accordingly, I conclude that the potential relevance of the complaints concerning introducing brokers other than Daouk and his affiliated entities is substantially outweighed by the burden of compiling this information, and the motion to compel production of this information is denied. *See Food Lion, Inc. v. United Food & Commercial Workers Int'l Union,* 103 F.3d 1007, 10012-13 (D.C.Cir.1997); *Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602, 608 (S.D.N.Y.1989).

B. May 17, 1995 *Audio Tape*

*2 Plaintiffs next seek to compel production of an audio tape being withheld by Bear Stearns on the basis of the work-product doctrine. The only information provided by Bear Stearns concerning the tape is the date on which it was recorded, the claim that it is a "[c]onversation in anticipation of litigation" and that the work-product doctrine is being asserted (Letter of Antonia Apps, Esq ., dated June 9, 2000, tab 7).

Fed.R.Civ.P. 26(b)(5) provides:
When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.
Rule 26(b)(5) is supplemented by Local Civil Rule 26.2, which provides:
(a) Where a claim of privilege is asserted in objecting to any means of discovery or disclosure, ... and an answer is not provided on the basis of such assertion,
(1) the attorney asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed ...; and
(2) the following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:
(A) for documents: (i) the type of document; e.g., letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena *duces tecum,* including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other;
(B) for oral communications: (i) the name of the person making the communication and the names of persons present while the communication was made and, where not

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2000 WL 1538003
(Cite as: 2000 WL 1538003, *2 (S.D.N.Y.))

Page 3

apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of the communication; and (iii) the general subject matter of the communication.

In order to satisfy these requirements, an index of documents withheld on the ground of privilege must, "as to each document, ... set[ ] forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." *Golden Trade, S.r.L. v. Lee Apparel Co.,* 90 Civ. 6291(JMC), 1992 WL 367070 at *5 (S.D.N.Y. Nov. 20, 1992). *See also Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.,* 707 F.Supp. 1429, 1439 (D.Del.1989) ("[A] party asserting work product protection must 'identify the withheld documents with sufficient particularity that the opposing counsel can intelligently argue that the privilege ought not to apply." '), *quoting Petz v. Ethan Allen, Inc.,* 113 F.R.D. 494, 497 (D.Conn.1985).

**\*3** Judged by these standards, Bear Stearns' description of the basis for the assertion of work product protection is inadequate. Neither the parties to nor the subject matter of the conversation are identified in any way. Rather, in describing the subject matter of the recording, the index listing merely states the definition of work product with no elaboration whatsoever. Since the definition of work product is implicit in Bear Stearns' assertion of work product, the description of the audio tape offered by Bear Stearns effectively provides no information at all and seems to have been designed with an intent to obfuscate rather than to illuminate.

Having concluded that Bear Stearns' index listing of the tape recording is deficient, the next issue is what consequence should result. On the facts of this case, I find that it is appropriate to conclude that Bear Stearns has waived whatever claim of work product it may have otherwise had. This is not a case where the record suggests that a good faith attempt was made to assert work product and that the index approaches, but does not quite meet, the requisite standard. The dearth of information in the index listing is so complete that the

listing is the functional equivalent of no listing at all. *See Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc., supra,* 707 F.Supp. at 1440 ("Because defendant's responses claiming the privilege are evasive and incomplete, they are the equivalent of a failure to answer for the purposes of a motion to compel."). Where a party has completely failed to provide an index of documents withheld on the ground of privilege, a finding of waiver is appropriate. *Hurst v. F.W. Woolworth Co.,* 95 Civ. 6584(CSH), 1997 WL 61051 at *6 (S.D.N.Y. Feb. 11, 1997); *John Labatt Ltd. v. Molson Breweries,* 93 Civ. 75004, 94 Civ. 71540(RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995), *appeal transferred sub nom., Dorf & Stanton Communications, Inc. v. Molson Breweries,* 56 F.3d 13 (2d Cir.1995), *aff'd,* 100 F.3d 919 (Fed.Cir.1996); *Smith v. Conway Org., Inc.,* 154 F.R.D. 73, 76 (S.D.N.Y.1994); *Allstate Life Ins. Co. v. First Trust, N.A.,* 92 Civ. 4865 (SWK), 1993 WL 138844 at *3 (S.D.N.Y. Apr. 27, 1993); *Bank v. Manufacturers Hanover Trust Co.,* 89 Civ. 2946(MJL), 1990 WL 155591 at *2 (S.D.N.Y. Oct. 9, 1990); *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.,* 130 F.R.D. 28, 32 (S.D.N.Y.1990); *Jackson v. Edwards,* 99 Civ. 0982(JSR) (HBP), 2000 WL 782947 at *2 (S.D.N.Y. June 16, 2000); *Large v. Our Lady of Mercy Medical Center,* 94 Civ. 5986(JGK)(THK), 1998 WL 65995 at *4 (S.D.N.Y. Feb. 17, 1998); *PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp.,* 93 Civ. 5375(SAS)(HBP), 1996 WL 525862 at *3-*4 (S.D.N.Y. Sept. 17, 1996). [FN1] Since Bear Stearns' index listing concerning this audio tape is the equivalent of no listing at all, the consequence should be the same as if there had been a total failure to list the tape on the index of documents withheld on the ground of privilege.

FN1. Although there is authority reaching a contrary result and limiting the remedy to the belated preparation of the index of withheld documents, I do not find those cases persuasive. "Limiting the remedy to the belated preparation of a privilege log effectively tells practitioners they can flout the Court's Rules and incur no sanction other than an Order directing compliance with the rules." *PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp., supra,* 1996 WL 525862 at *4. *See* 2 Michael C.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Silberberg, *Civil Practice in the Southern District of New York* § 22.11 at 22-28 (2d ed. 2000) ("[T]he cases imposing waiver appear to express the better view of the appropriate remedy in the event a party fails to timely provide the privilege list.").

**\*4** Accordingly, within ten (10) days of the date of this Order, Bear Stearns shall produce a copy of the May 17, 1995 audio tape to counsel for plaintiffs.

### C. *Greenberg Deposition*

Finally, Bear Stearns seeks a protective order precluding the deposition of its chairman Alan C. Greenberg. At a conference on September 1, 2000, plaintiffs claimed that it was appropriate to take Greenberg's deposition because a May 1995 Memorandum by Ron Hersch, the director of Bear Stearns' futures department, indicates that Greenberg himself made inquiry of Hersch in 1995 concerning one of Daouk's affiliated entities. Plaintiffs also argued that it is appropriate to depose Greenberg because two of the plaintiffs (Debs and Baalbaki) claim to have had some direct contact with Greenberg concerning the subject matter of this action. Greenberg has submitted an affidavit in which he claims to have no recollection of any of the facts underlying this litigation, the subject matter of the Hersch memorandum and the alleged contacts with Debs and Baalbaki.

As I noted in *Holman v. ICN Pharmaceuticals, Inc.,* 98 Civ. 0674(AKH)(HBP), 1999 WL 1267459 at *1 (S.D.N.Y. Dec. 29, 1999): "[A]n order to vacate a notice of taking [a deposition] is generally regarded as both unusual and unfavorable ...." *Investment Properties Int'l, Ltd. v. IOS, Ltd.,* 459 F.2d 705, 708 (2d Cir.1972). *Accord Speadmark, Inc. v. Federated Dep't Stores, Inc.,* 176 F.R.D. 116, 118 (S.D.N.Y.1997); *Naftchi v. New York Univ. Med. Ctr.,* 172 F.R.D. 130, 132 (S.D.N.Y.1997) ; *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co.,* 90 Civ. 7811(KC), 1993 WL 34678 at *2 (S.D.N.Y. Feb. 4, 1993); *Polycast Tech. Corp. v. Uniroyal, Inc.,* 87 Civ. 3297(CSH), 1990 WL 138968 at *3 (S.D.N.Y. Sept. 20, 1990). Although there is serious reason to doubt (1) whether [conducting the deposition

in issue] will advance discovery on the case, and (2) whether taking [the deposition in issue] in California is the most prudent and economical way for an individual plaintiff to spend his litigation budget, I cannot conclude that [the witness in issue] is so completely without knowledge that his deposition should be precluded altogether .... In addition, the fact that [the witness] may have no personal knowledge of the [events in issue] and knows only what he was told by others does not affect the appropriateness of taking his deposition. *Naftchi v. New York Univ. Med. Ctr., supra,* 172 F.R.D. at 132-33. Even hearsay is fair ground in discovery. *See Litton Systems, Inc. v. Am. Tel. & Tel. Co.,* 700 F.2d 785, 827 (2d Cir.1983). Moreover, [the witness's] testimony concerning the statements made to him by [defendant's] employees may well be admissible against [defendant] as admission testimony. Fed.R.Evid. 801(d)(2).

Although I have no reason to doubt the veracity of Greenberg's Affidavit, the Hersch memo supports an inference that, at least in 1995, Greenberg had actually considered at least some of the allegations that gave rise to this action and participated in internal discussions of those alleged facts. Defendants have cited no authority demonstrating that plaintiffs are not entitled to an opportunity to refresh Greenberg's memory with respect to these events.

**\*5** Accordingly, no later than twenty (20) days from the date of this Order, Bear Stearns shall make Greenberg available for deposition by plaintiffs' counsel. It is, however, appropriate that guidelines be set to ensure that Greenberg's deposition is not used as an opportunity for harassment. Accordingly, unless Greenberg's testimony reveals that he has discoverable information relevant to this action, his deposition is limited to two (2) hours. In addition, unless Greenberg's testimony reveals that he has other discoverable information relevant to this action, the subject matter of the deposition shall be limited to the May 1995 Hersch memo and his putative contact with the plaintiffs Debs and Baalbaki. Plaintiffs shall start the deposition by questioning Greenberg

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2000 WL 1538003                                                Page   5
(Cite as: 2000 WL 1538003, *5 (S.D.N.Y.))

concerning these subjects. Plaintiffs are not to start the deposition with background questions since such information has no relevance if Greenberg currently has no knowledge concerning the subject matter of this action. If Greenberg has no recollection of the May 1995 Hersch memo and his putative contact with the plaintiffs Debs and Baalbaki, and reasonable attempts to refresh his recollection concerning these subjects are unsuccessful, the deposition shall terminate. Counsel are again reminded that I accept telephonic applications for both protective orders and orders to compel in the event the deposition does not proceed amicably.

D. *Summary*

Accordingly, for all the foregoing reasons, (1) plaintiffs' application to compel responses to interrogatories and document requests concerning introducing brokers is denied; (2) Bear Stearns is directed to produce the May 17, 1995 audio tape to counsel for plaintiffs within ten (10) days of the date of this Order, and (3) Bear Stearns is directed to produce Alan C. Greenberg for deposition within twenty (20) days of the date of this Order.

SO ORDERED

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

**James F. HURST, Plaintiff,**
**v.**
**F.W. WOOLWORTH CO. and Woolworth Corp., Defendants.**

**No. 95 CIV. 6584 CSH.**

Feb. 11, 1997.

*MEMORANDUM AND ORDER*

HAIGHT, Senior District Judge:

*1 This matter is currently before the Court for consideration of plaintiff's motion to compel the production of four documents which defendants F.W. Woolworth Co. and Woolworth Corp. (referred to collectively as "Woolworth") claim are privileged. For the reasons stated below, plaintiff's motion is granted.

*BACKGROUND*

Plaintiff was terminated from Woolworth in 1995, at the age of 58. Although Woolworth claims plaintiff's discharge was part of a reduction in force (RIF), plaintiff alleges that he was selected for termination because of his age. Shortly after his termination, plaintiff filed a charge of discrimination with the EEOC, and initiated the instant suit for age discrimination after receiving notice from the EEOC of his right to sue.

On August 18, 1995, plaintiff served Woolworth with his complaint and his First Set of Document Requests. In these requests, plaintiff asked for "[a]ll documents concerning Defendant's alleged decision to implement a reduction in force in 1995," "[a]ll documents concerning the factors that lead to Defendant's alleged decision to implement a reduction in force in 1995," and "[a]ll documents concerning the actual implementation of the alleged reduction in force in 1995." Included

in the instructions to these requests was a direction that "any objections to these document requests on the grounds of privilege (including work product) should be accompanied by a privilege log that complies with Local Civil Rule 46."

Woolworth responded to these requests on November 13, 1995 by producing some responsive documents and stating that additional documents would be produced after a confidentiality stipulation had been executed. In a letter to Woolworth's counsel dated December 7, 1995, plaintiff noted that Woolworth had also raised confidentiality objections in its response, but had not produced a privilege log:

You have raised many privilege objections without complying with Local Rule 46, which requires a detailed description of each document claimed as privileged. Your failure to comply with Local Rule 46 results in a waiver of any privilege claims. Please provide a privilege log promptly or risk waiver.

At a subsequent discovery conference between the parties, Woolworth represented that it had produced all documents related to the 1995 reduction in force, and agreed to forward any further documents that were located or list them on a privilege log.

In January 1996, the parties began to negotiate for a confidentiality agreement, pursuant to which Woolworth would produce additional documents. By March 29, 1996, both parties had executed an appropriate stipulation. However, additional documents were not forwarded to plaintiff until several months later, due to further negotiations over which party should bear the copying costs. After reviewing Woolworth's supplemental production, plaintiff again expressed concern over the absence of a privilege log and reminded Woolworth, in a letter dated May 23, 1996, that it was "required to [provide a privilege log] under the Local Rules to the extent you have withheld any documents on the basis of a privilege claim."

*2 In June 1996, Peter Clay was deposed. As

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___B___

1997 WL 61051                                                        Page  2
(Cite as: 1997 WL 61051, *2 (S.D.N.Y.))

Woolworth's vice-president for Human Resources, Clay was actively involved in implementing the 1995 RIF. At one point in the deposition, plaintiff's counsel asked whether Clay had sought legal advice regarding the RIF. Clay responded:

A: I approached corporate counsel that once I have a plan prepared, I would go to corporate counsel and ask them to review it to be sure that what I'm doing or what I plan to do is appropriate and to seek their counsel.
Q: To ensure that your plan complies with the law?
A: Yes.
Q: And did you relay that plan to [counsel] in writing?
A: Um, I - I honestly - I just don't recall specifically. I probably did prior to implementation.

Yet, when asked whether all documents relating to the 1995 RIF had been produced, Clay repeatedly assured plaintiff's counsel that all such documents in his files had been turned over.

In a letter dated July 11, 1996, counsel for plaintiff demanded production of the written plan to which Clay had referred in his deposition testimony. Anticipating a possible defense of attorney-client privilege, plaintiff asserted in this letter that "any claim of attorney-client privilege over the document has been waived under the circumstances pursuant to Fed. R. Civ. P. 26(b)(5) and Local Civil Rule 46 ...." In response, counsel for Woolworth sent plaintiff's counsel a letter dated July 22, 1996 which stated:

Defendant hereby provides a log of documents not produced during discovery because they are protected by the attorney-client privilege.
1. F.W. Woolworth Co. Master Employee List As Of 01/13/95, with handwritten notes, prepared by Peter Clay at the request of counsel (6 pages).
2. Handwritten list of Buying Department employees prepared by Peter Clay at the request of counsel (1 page).
3. January 26, 1995 chart of regional office employees and list of terminating or retiring buyers, with handwritten notes, prepared by Pete Clay at the request of counsel (1 page).

4. March 24, 1995 letter from Pete Clay to Christopher J. Hoey of Jackson, Lewis, Schnitzler & Krupman regarding EEOC charge filed by James F. Hurst (4 pages). [FN1]

> FN1. These documents were submitted to the Court for *in camera* review in connection with plaintiff's motion.

Clay's deposition was continued on October 18, 1996. At that time, plaintiff's counsel inquired about Clay's recollection of the documents listed in the July 22 privilege log. For example, the following exchange took place regarding the first document on Woolworth's list:

Q: Did you make notes on the master employee list in connection with the 1995 reduction in force?
A: I probably did, as I used it as a check sheet to make sure I had everybody in a spot either in or out.
Q: Is that the only reason that you worked with it?
A: Uh-huh.

When asked about the remaining documents, Clay had only a vague recollection or no recollection at all. Although plaintiff's counsel also attempted to inquire whether these documents were given to an attorney at the request of that attorney, Woolworth's counsel directed the witness not to answer each of these questions.

*3 However, in response to plaintiff's motion to compel, Clay submitted an affidavit alleging that his recollection of these documents had been refreshed after reviewing them carefully. According to Clay, these documents came exclusively from his confidential files. He now testifies that he made markings on the Master Employee List "[i]n response to meetings I had with counsel, and in preparation for future discussions with counsel regarding the 1995 terminations." In addition, Clay states that he met with counsel to seek legal advice before finalizing certain termination decisions, "after making numerous markings on the document."

With respect to the second document listed on

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the July 1996 privilege log, Clay states that he prepared this document "pursuant to a request from counsel at Woolworth to assist them in ... preparing a strategy and/or legal defense in an action brought by another former Buying Department employee, Lois Hunziker." Finally, Clay testified that he made several handwritten notations on the third document and reviewed the document with counsel on several occasions, "in response to a request from counsel at Woolworth to provide them with certain information necessary to give me legal advice with respect to implementing the 1995 terminations." Clay also notes in his affidavit that he placed the following stamp on documents one and three:

PRIVILEGED AND CONFIDENTIAL
PREPARED AT THE REQUEST OF
COUNSEL

The basis for the claim of privilege as to the fourth document is readily apparent from its description.

In his motion to compel production of these documents, plaintiff makes three arguments. First, plaintiff argues that defendant has failed to meet its burden of establishing the essential elements of privilege protection for the first three documents included in the July 1996 privilege log. Second, plaintiff urges the Court to reject Clay's affidavit in opposition to this motion, since defendant previously obstructed plaintiff's efforts to challenge the privilege assertion by directing Clay not to respond to certain questions during his deposition. Third, plaintiff argues that Woolworth has waived any privilege that might exist by its failure to produce a privilege log in a timely manner. Woolworth, of course, contests each of plaintiff's assertions.

*DISCUSSION*

Although plaintiff has objected to Woolworth's claim of privilege on the substantive grounds that an attorney-client privilege has not been proven with respect to the first three documents on the July 1996 privilege log, I need not reach this issue since I find plaintiff's last argument persuasive. It is clear from the facts presented on this motion that Woolworth has waived any privilege that might exist for the four documents at issue as a result of its unjustified failure to comply with the Federal Rules of Civil Procedure and Local Civil Rule 46(e).

Federal Rule of Civil Procedure 34(b) directs that:

the party upon whom the [document] request is served shall serve a written response within 30 days after the service of the request. A shorter or longer time may be directed by the court or, in the absence of such an order agreed to in writing by the parties ....

*4 If the responding party objects to a particular request, "the reasons for the objection shall be stated." Fed. R. Civ. P. 34(b) . When such an objection is based on a claim of privilege, the responding party must not only identify the nature of the privilege, but also provide specific information sufficient to identify the document. Fed. R. Civ. P. 26(b)(5); Local Civ. R. 46(e)(2). This information is often referred to as a "privilege log."

Failure to state a privilege objection, or provide the attendant privilege log, "within the time provided by the Federal Rules of Civil Procedure, or any extensions thereof" can result in a waiver of the privilege. Local Civ. R. 46(e)(1); *see also* Fed. R. Civ. P. 26(b)(5), Advisory Committee Notes ("To withhold materials without such notice is contrary to the rule ... and may be viewed as a waiver of the privilege or protection."); *Chase Manhattan Bank, N.A. v. Turner & Newall, PLC,* 964 F.2d 159, 166 (2d Cir. 1992) (noting that failure to comply with the privilege log requirement of Rule 46(e)(2) may result in a finding that the privilege has been waived); *Wilson v. New York City Housing Authority,* 1996 WL 524337, *2 (S.D.N.Y. 1996) ("To the extent that defendants attempt to assert privilege, their failure to serve an index of privilege documents in conformity with Local Civil Rule 46(e)(2) has resulted in waiver of any privilege they may have otherwise had.").

Plaintiff submitted his First Set of Document Requests to Woolworth in August 1995.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Pursuant to subsequent agreements between the parties, Woolworth's response to these requests was not due until November 13, 1995. As discussed above, Rule 46(e) mandates that a privilege log be produced within the time agreed to by the parties if any responsive documents are withheld on a claim of privilege. Yet, it is undisputed that Woolworth did not produce a Rule 46(e)(2) privilege log on November 13, 1995 when it responded to plaintiff's First Set of Document Requests, and there was no agreement between the parties giving Woolworth an extension of time in which to comply with this local rule.

In fact, plaintiff explicitly warned Woolworth on two separate occasions within a five month period that it had failed to comply with Local Rule 46 and was risking waiver of any privilege protecting documents which were still being withheld on that basis. After Clay indicated in his deposition that he had probably created a written plan for the implementation of the 1995 reduction in force, plaintiff again asserted that any privilege had been waived as a result of Woolworth's failure to comply with Rule 46(e), and demanded production of the document. Only then did Woolworth produce its privilege log in a letter dated July 22, 1996, eight months after the original due date of November 13, 1995.

There is no question that Woolworth did not comply with Local Rule 46(e), since it did not produce a privilege log "within the time provided by the Federal Rules of Civil Procedure or any extensions thereof." The question is whether the circumstances of this case warrant a finding of waiver on that basis. "Of relevance to such a determination is the nature of the violation, its willfulness or cavalier disregard for the rule's requirements, and the harm which results to other parties." *AFP Imaging Corp. v. Philips Medizin Systems,* 1993 WL 541194, *3 (S.D.N.Y. 1993).

**\*5** In its opposition to plaintiff's motion, Woolworth argues that its delayed production of the privilege log was not a serious violation of Rule 46(e). Woolworth points out that the parties were engaged in protracted negotiations over a confidentiality stipulation and the costs of copying between January and May of 1996. Based on this chronology, Woolworth asserts that its privilege log was not as untimely as plaintiff would like the Court to believe. While I accept Woolworth's version of the facts as accurate, the time spent in negotiations over a protective order and the cost of copying documents is totally irrelevant to Woolworth's obligation to produce a privilege log within the time agreed to by the parties, that is, November 13, 1995.

Woolworth does not claim, nor could it, that the entry of a confidentiality order, or the resolution of who would bear copying costs, had any bearing whatsoever on whether Woolworth would provide plaintiff with copies of documents that it claims are privileged. These issues affected the terms under which Woolworth would produce additional documents; but, Woolworth had no intention of producing these allegedly privileged documents to plaintiff under any circumstances. In any case, there is no evidence that Woolworth was holding its privilege log in abeyance until these issues were resolved. Woolworth never asked for an extension on this basis, or referred to the ongoing negotiations in response to plaintiff's repeated requests for a privilege log. As a result, these negotiations do not provide an excuse for Woolworth's failure to comply with Rule 46(e).

Nonetheless, Woolworth insists that "this is not a situation where Defendants stubbornly refused to identify these documents as privileged or where Defendants sought willfully to avoid compliance with the Local Rules." However, there is no evidence that Woolworth did anything but simply ignore the requirements of Rule 46(e). *Cf. AFP Imaging Corp.,* 1993 WL 541194 at *3 (finding no waiver because party did not simply ignore the requirements of Rule 46). Woolworth does not claim that it was unaware that these documents existed at the time its privilege log was due. *Cf. AFP Imaging Corp.,* 1993 WL 541194, at *3 (finding no waiver because the document at issue was "only recently identified and located."). There is also no evidence that Woolworth was mistaken about

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1997 WL 61051                                                          Page   5
(Cite as: 1997 WL 61051, *5 (S.D.N.Y.))

the rule's requirements. *Cf. D56, Inc. v. Zuckers Gifts, Inc.,* 1996 WL 280797, *1 (finding no waiver because party produced the privilege log as soon as it realized its error in interpreting the rule and the total delay was only five weeks). In fact, Woolworth gives no explanation at all for its failure to comply with the rule.

Finally, Woolworth argues that plaintiff has not suffered any prejudice as a result of receiving the privilege log in July 1996. I disagree with this conclusion considering that the plaintiff has been forced to spend substantial time and expense to compel Woolworth to comply with its discovery obligations. *Cf. D56,* 1996 WL 280797, at *1 (finding no prejudice because party requesting privilege log had not made Rule 37 motion or incurred any significant expense).

**\*6** In sum, this case is almost identical to the circumstances described in *Pfkinans Int'l Corp. v. IBJ Schroder Leasing Corp.,* 1996 WL 525862, *2 (S.D.N.Y. 1996), where Magistrate Judge Pitman found that the defendants had waived the protection of privilege by not producing the privilege log required by Local Civil Rule 46(e)(2) in a timely manner. In that case, the plaintiff first sought discovery of certain audit documents on September 9, 1993. *Id.* at * 2. Since no extensions had been agreed to between the parties, Magistrate Judge Pitman noted that timely production of a privilege log would have been thirty days after this first request for documents was served on the defendants. *Id.* at *3. However, no audit documents were produced by the defendants and no privilege log was prepared. *Id.* at *2. Despite plaintiff's repeated requests, and subsequent confirmation through depositions that the documents existed, defendant produced neither the documents nor a privilege log. *Id.* On these facts, the Court concluded that "a finding of waiver is clearly justified." *Id.* at *4. I conclude that the same result is warranted here. [FN2]

FN2. Woolworth's belated production of a privilege log on July 22, 1996, eight months after it was due, does not operate as a cure to the waiver of privilege protection. *Cf. Allstate Life Insurance Co. v. First*

*Trust National Assoc.,* 1993 WL 138844, *3 (S.D.N.Y. 1993) ("Having waived the documents' immunity [by failure to produce a privilege log], Oppenheimer cannot now resurrect their allegedly privileged status, by simply complying with the rules.").

Although waiver may be a serious sanction for such a violation, the importance of local rules "should not be diminished by skirting their application when the results prove harsh to a party." *Carte Blanche (Singapore) Pte., Ltd. v. Diners Club Int'l Inc.,* 130 F.R.D. 28, 32 (S.D.N.Y. 1990); *see also Pkfinans Int'l Corp.,* 1996 WL 525862, at * 4 (noting that reluctance to find waiver would only encourage disregard of the Court's Rules and encourage motion practice). Accordingly, I conclude that Woolworth has waived any privilege protection for the four documents listed in its letter to plaintiff dated July 22, 1996, by its failure to comply with Local Rule 46(e). *See Baron Philippe De Rothschild, S.A. v. Paramount Distillers, Inc.,* 1995 WL 86476, *1 (S.D.N.Y. 1995) ("Given the delay in producing a privilege log despite numerous requests, defendants have waived any possible privilege.").

### CONCLUSION

For the foregoing reasons, plaintiff's motion for an order compelling production of the four documents discussed above is granted. Defendant is directed to retrieve these four documents from the Court within five days of the date of this opinion. These documents must be produced to plaintiff no later than February 17, 1997.

It is SO ORDERED.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1995 WL 23603
(Cite as: 1995 WL 23603 (S.D.N.Y.))
< KeyCite History >

Page   1

Only the Westlaw citation is currently
available.

United States District Court, S.D. New York.

John LABATT LIMITED, Labatt Brewing
Company Limited, Labatt's USA Inc., and
Labatt Importers, Inc., Plaintiffs,
v.
MOLSON BREWERIES, Molson
Breweries U.S.A. Inc., Miller Brewing Co.,
Martlett
Importing Co., and Molson Breweries of
Canada, Ltd., Defendants.

Nos. 93 CV 75004, 94 CV 71540.

Jan. 20, 1995.

McDermott, Will & Emery by Roger W.
Wenthe, Chicago, IL, for plaintiffs.

Darby & Darby, P.C. by Amy J. Benjamin,
Ira Jay Levy, New York City, for defendants
and third party respondents.

OPINION & ORDER

ROBERT P. PATTERSON, District Judge.

*1 Motion for reargument denied.

At the original hearing on November 22,
1994 in this Part I motion to compel, third
party respondents Dorf & Stanton
Communications, Inc. and Hill, Holliday,
Connors, Cosmopulous, Inc. ("Third Parties"),
failed to comply with Local Civil Rule 46(e)
and Rules 45(d)(2) and 26(b)(5) of the Federal
Rules of Civil Procedure in their assertions of
privilege by failing to provide a complete
privilege log demonstrating sufficient grounds
for taking the privilege. Their counsel, who is
also counsel to Plaintiffs, also failed to bring
the documents demanded to the hearing on
Defendant's motion to compel, so that when
the Court requested review of the documents
in camera, they were not available.
Accordingly, Defendants' motion to compel
was granted from the bench at the hearing on
November 22, 1994.

On December 16, 1994, the Third Parties filed
a motion to modify the Court's order of
November 22, 1994 to preclude discovery of
one of the documents covered by that order
and two other documents which were not on
the privilege log and which had been withheld
from production to Defendants. [FN1]   On
December 28, 1994, Defendants cross-moved
for production of the additional documents and
for copies of the depositions of witnesses from
the two Third Parties in a related litigation
between Plaintiffs and Anheuser-Busch,
*Anheuser-Busch v. Labatt*, No. 93 Civ. 251 GFG
(E.D.Mo.), (the *"Anheuser- Busch* Litigation"),
based on a waiver it had received from
Anheuser-Busch. After initially objecting to
Defendants' late cross-motion, Plaintiffs
waived said late notice allowing the Court to
proceed to consider the cross-motion.

On its motion for modification, Plaintiffs' so-
called new evidence consists of material it had
a duty under the Federal Rules of Civil
Procedure to bring to the Court's attention in
order to carry its burden to establish its claims
of privilege. *See United States v. Schwimmer*, 892
F.2d 237, 244 (2d Cir.1989).   Having ignored
that obligation, Plaintiffs' counsel, who is also
appearing for the Third Parties, should not be
entitled to readdress the question here.   To
hold otherwise would make Local Civil Rule
46(e) and Rules 45(d) and 26(g) of the Federal
Rules of Civil Procedure meaningless.

Furthermore, the Third Parties still have not
established that the privilege ever existed as
to any of the documents sought to be
protected.   The documents are notes of
personnel of the independent advertising
agencies representing Plaintiffs made at a
meeting scheduled to assist them in
marketing and advertising Plaintiffs' product,
"Ice Beer";   Plaintiffs' attorneys were present
at this meeting.   There has been no showing
that the Third Parties were seeking legal
advice at the meeting.   Rather, it appears
that Plaintiffs were briefing the personnel of
the Third Parties so that the content of the
advertising placed by the agencies would not
undercut the theories expounded in the
litigation.   The documents themselves do not

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___C___

indicate either the seeking of legal advice or the confidentiality of their contents. Having explained these theories and, incidentally, the pending litigation to Third Parties rather than conducting such discussions in-house, Plaintiffs are not entitled to claim attorney-client privilege.

*2 Accordingly, the Court adheres to its original ruling, and the documents submitted under seal are ordered unsealed for production to Defendants by January 23, 1994.

With respect to Defendants' motion for copies of the depositions of the witnesses of the Third Parties taken pursuant to a confidential order issued by Judge Gunn in the *Anheuser-Busch* Litigation, although Defendants have shown that such depositions could lead to relevant evidence, they have not shown need for such depositions until after the testimony in the *Anheuser-Busch* trial is completed this spring. Accordingly, these depositions are ordered to be produced to Defendants by the Third Parties within ten days of the close of testimony in that litigation unless the Third Parties move from an order by Judge Gunn setting aside this order prior thereto.

Because there is no just reason for the delay of an appeal from this order, the Court directs that this order be entered as a final judgment under Fed.R.Civ.P. 54(b). The production of documents shall thereafter be stayed until further order of this Court if Dorf & Stanton files a Notice of Appeal from this order within 30 days after its entry. If no Notice of Appeal is filed within that period, this order shall become enforceable on the 31st day after its entry.

IT IS SO ORDERED.

FN1. Plaintiffs' motion for reargument is timely since it was brought within ten days of the docketing of the original order which was delayed due to the moving of the Clerk's Office.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363

--- F.3d ---

(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))

<KeyCite Citations>

Only the Westlaw citation is currently available.

United States Court of Appeals,
First Circuit.

**In re GRAND JURY SUBPOENA**
**(Custodian of Records, Newparent, Inc.),**
**A. Nameless Lawyer (A Pseudonym) et al.,**
**Intervenors, Appellants.**

**No. 01-1975.**

Heard Sept. 14, 2001.
Decided Nov. 8, 2001.

Former officers of subsidiary corporation, and attorney who had served as subsidiary's outside counsel and also represented officers in their personal capacities, moved to quash subpoena duces tecum in which federal grand jury sought to compel parent corporation to produce records pertaining to subsidiary's affairs. The United States District Court for the District Of Massachusetts, Reginald C. Lindsay, J., denied motion. Intervenors appealed. The Court of Appeals, Selya, Circuit Judge, held that: (1) officers and attorney had sufficient interest in proceedings to intervene in order to seek to quash subpoena; and (2) denial of motion to quash was appealable even though it was not a final judgment; but (3) subsidiary's waiver of attorney-client and work product privilege was effective as to any privilege protecting communications between officers and attorney, regardless of any joint defense agreement; (4) failure to present sufficient information regarding nature of materials withheld resulted in waiver of any privileges; and (5) district court did not abuse its discretion by declining to hold evidentiary hearing.

Affirmed.

West Headnotes

**[1] Grand Jury ⬤⟳ 36.4(1)**
193k36.4(1) Most Cited Cases

Former officers of subsidiary corporation, and attorney who had formerly represented subsidiary and officers, had sufficient interest in proceedings in which subpoena duces tecum had been issued by federal grand jury to subsidiary's parent corporation seeking records pertaining to subsidiary's affairs, based on their allegation that attorney-client privilege protected records of corporation from disclosure, to allow them to intervene as of right for purposes of pursuing quashal of subpoena. Fed.Rules Civ.Proc.Rule 24(a)(2), 28 U.S.C.A.

**[2] Federal Civil Procedure ⬤⟳ 315**
170Ak315 Most Cited Cases

Intervention is appropriate as of right when the disposition of an action may impair or impede the applicant's cognizable interest. Fed.Rules Civ.Proc.Rule 24(a)(2), 28 U.S.C.A.

**[3] Federal Civil Procedure ⬤⟳ 315**
170Ak315 Most Cited Cases

Colorable claims of attorney-client and work product privilege qualify as sufficient interests to ground intervention as of right. Fed.Rules Civ.Proc.Rule 24(a)(2), 28 U.S.C.A.

**[4] Federal Courts ⬤⟳ 594**
170Bk594 Most Cited Cases

Denial of a motion to quash a subpoena is not usually considered a final judgment and thus is not ordinarily an appealable event.

**[5] Federal Courts ⬤⟳ 576.1**
170Bk576.1 Most Cited Cases

Court of Appeals had jurisdiction to consider appeal from denial of motion by former officers of subsidiary corporation, and attorney who had formerly represented them, to quash subpoena duces tecum in which federal grand jury sought to compel subsidiary's parent corporation to produce records pertaining to subsidiary's affairs, even though denial of motion was not a final judgment, as absent an immediate appeal, records in question, which

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works



EXHIBIT _D_

2001 WL 1356363
(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))

officers and attorney claimed were protected by attorney-client privilege, would be disclosed.

**[6] Federal Courts ⚖ 574**
170Bk574 Most Cited Cases

An exception to the requirement of finality exists to allow appeal following denial of motion to quash a subpoena when a substantial privilege claim cannot effectively be tested by the privilege-holder through a contemptuous refusal to produce the documents.

**[7] Witnesses ⚖ 198(1)**
410k198(1) Most Cited Cases

Attorney-client privilege protects communications made in confidence by a client to his attorney.

**[8] Grand Jury ⚖ 36.3(2)**
193k36.3(2) Most Cited Cases

Because it stands in the way of a grand jury's right to every man's evidence, attorney-client privilege applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through open communication between lawyer and client.

**[9] Witnesses ⚖ 219(3)**
410k219(3) Most Cited Cases

A corporation's attorney-client privilege may be waived by current management.

**[10] Witnesses ⚖ 199(2)**
410k199(2) Most Cited Cases

**[10] Witnesses ⚖ 222**
410k222 Most Cited Cases

Default assumption is that a corporation's attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is burden of individuals claiming that their communications with corporation's attorney are protected by attorney-client privilege to dispel that presumption.

**[11] Witnesses ⚖ 199(2)**
410k199(2) Most Cited Cases

Corporate employees seeking to assert a personal claim of attorney-client privilege with respect to communications with corporation's attorney must meet five benchmarks: they must show they approached counsel for the purpose of seeking legal advice, must demonstrate that when they approached counsel they made it clear that they were seeking legal advice in their individual rather than in their representative capacities, must demonstrate that counsel saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise, must prove that their conversations with counsel were confidential, and must show that the substance of their conversations with counsel did not concern matters within the company or the general affairs of the company.

**[12] Grand Jury ⚖ 36.3(2)**
193k36.3(2) Most Cited Cases

Attorney who had served as principal outside counsel for subsidiary corporation, and who had also represented former officers of subsidiary in their personal capacities, could theoretically have represented officers individually with respect to grand jury investigation, so that their communications would be protected by attorney-client privilege; however, this attorney-client relationship would only extent to those communications which involved officers' individual rights and responsibilities arising out of their actions as officers of corporation.

**[13] Witnesses ⚖ 199(2)**
410k199(2) Most Cited Cases

Requirement that corporate officer who alleges that his communications with corporation's counsel are protected by attorney-client privilege must show that substance of his conversations with counsel did not concern matters within the company or the general affairs of the company only precludes an officer from asserting an individual attorney client privilege when the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

communication concerns the corporation's rights and responsibilities; however, if communication between a corporate officer and corporate counsel specifically focuses upon the individual officer's personal rights and liabilities, requirement can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company.

**[14] Grand Jury ⟜ 36.3(2)**
193k36.3(2) Most Cited Cases

All communications made between two officers of subsidiary corporation, and attorney who served as outside counsel for subsidiary and also represented officers in their personal capacities, were corporate communications, so that subsidiary's waiver of attorney-client privilege was effective to waive any privilege that protected communications between officers and attorney, for purposes of grand jury investigation into subsidiary's actions, where there was no indication that any particular communication related solely to attorney's representation of officers, apart from his representation of subsidiary.

**[15] Witnesses ⟜ 199(2)**
410k199(2) Most Cited Cases

"Joint defense privilege" protects communications between an individual and an attorney for another when the communications are part of an ongoing and joint effort to set up a common defense strategy.

**[16] Witnesses ⟜ 199(2)**
410k199(2) Most Cited Cases

Because so-called joint defense privilege sometimes may apply to protect communications between attorney and client outside the context of actual litigation, it is more aptly termed the common interest rule; even when this rule applies, however, a party always remains free to disclose his own communications.

**[17] Witnesses ⟜ 199(2)**
410k199(2) Most Cited Cases

**[17] Witnesses ⟜ 219(3)**
410k219(3) Most Cited Cases

Existence of a joint defense agreement does not increase the number of parties whose consent is needed to waive the attorney-client privilege; rather, it merely prevents disclosure of a communication made in the course of preparing a joint defense by the third party to whom it was made.

**[18] Witnesses ⟜ 199(2)**
410k199(2) Most Cited Cases

Joint communications with a single attorney are privileged with respect to the outside world because clients must be entitled to the full benefit of joint representation undiluted by fear of waiving the attorney-client privilege; nevertheless, privilege does not apply in subsequent litigation between the joint clients, as in that sort of situation, one client's interest in the privilege is counterbalanced by the other's interest in being able to waive it.

**[19] Witnesses ⟜ 219(3)**
410k219(3) Most Cited Cases

A corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an individual attorney-client relationship between him and the corporation's counsel.

**[20] Federal Civil Procedure ⟜ 1600(3)**
170Ak1600(3) Most Cited Cases

"Work product rule" protects work done by an attorney in anticipation of, or during, litigation from disclosure to the opposing party.

**[21] Federal Civil Procedure ⟜ 1600(3)**
170Ak1600(3) Most Cited Cases

Work product rule facilitates zealous advocacy in the context of an adversarial system of justice by ensuring that the sweat of an attorney's brow is not appropriated by the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

opposing party.

**[22] Grand Jury ⇐ 36.3(2)**
193k36.3(2) Most Cited Cases

Subsidiary corporation's waiver of work product privilege with respect to work that had been performed by attorney who served as corporation's outside counsel also waived privilege with respect to attorney's simultaneous representation of two officers of subsidiaries in their personal capacities, and thus, attorney and officers could not rely on privilege to preclude disclosure of attorney's interviews of subsidiary's employees during internal investigation, and his notes and mental impressions of investigation, during grand jury investigation into actions of subsidiary.

**[23] Federal Civil Procedure ⇐ 1600(3)**
170Ak1600(3) Most Cited Cases

While a valid joint defense agreement may protect work product, one party to such an agreement may not preclude disclosure of work product by another party on whose behalf the work originally was performed, nor can the parties, by agreement, broaden the scope of the privilege that the law allows, as such an agreement would contravene public policy.

**[24] Attorney and Client ⇐ 21.5(1)**
45k21.5(1) Most Cited Cases

A primary requirement of a joint defense agreement is that there be something against which to defend, and in other words, a joint defense agreement may be formed only with respect to the subject of potential or actual litigation.

**[25] Attorney and Client ⇐ 21.5(3)**
45k21.5(3) Most Cited Cases

Purported joint defense agreement entered by attorney who served as outside counsel for subsidiary corporation, in which attorney was also to represent two officers of subsidiary in their personal capacities, even though no particular litigation or investigation was in

prospect, and there thus was no joint defense to pursue, was null and void; the law does not countenance such a "rolling" joint defense agreement, which would undermine rationale for allowing such agreements.

**[26] Attorney and Client ⇐ 21.5(1)**
45k21.5(1) Most Cited Cases

Rationale for recognizing joint defense agreements is that they permit parties to share information pertinent to each others' defenses, and in an adversarial proceeding, a party's entitlement to this enhanced veil of confidentiality can be justified on policy grounds, but outside the context of actual or prospective litigation, there is more vice than virtue in such agreements.

**[27] Grand Jury ⇐ 36.3(2)**
193k36.3(2) Most Cited Cases

Former officers of subsidiary corporation, and attorney who had formerly represented officers, did not present sufficient information regarding nature of materials in possession of parent corporation for which grand jury subpoena had been issued, and as to which they asserted claims of attorney-client privilege and work-product privilege, and thus, privileges were waived and could not be basis to quash subpoena, where officers and attorney made no intervention to prepare a privilege log, even though they had knowledge of communications as to which subpoena pertained.   Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[28] Witnesses ⇐ 222**
410k222 Most Cited Cases

Operative language of rule under which party who withholds information subject to a subpoena on basis that it is protected by privilege must provide a description of nature of withheld information is mandatory. Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[29] Witnesses ⇐ 221**
410k221 Most Cited Cases

A party that fails to submit a privilege log

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

when withholding information subject to a subpoena on basis that it is protected by privilege is deemed to waive the underlying privilege claim, whether privilege asserted is attorney- client privilege, or work product privilege. Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[30] Witnesses ⬤= 222**
410k222 Most Cited Cases

Privilege logs do not need to be precise to the point of pedantry in order for party who withholds information subject to a subpoena on basis that it is protected by privilege to avoid waiver of privilege, and thus, a party who possesses some knowledge of the nature of the materials to which a claim of privilege is addressed cannot shirk his obligation to file a privilege log merely because he lacks infinitely detailed information; rather, rule requires a party who asserts a claim of privilege to do the best that he reasonably can to describe the materials to which his claim adheres. Fed.Rules Civ.Proc.Rule 45(d)(2), 28 U.S.C.A.

**[31] Federal Courts ⬤= 820**
170Bk820 Most Cited Cases

Court of Appeals tests a trial court's decision on whether or not to convene an evidentiary hearing in connection with motion to quash subpoena for abuse of discretion.

**[32] Witnesses ⬤= 16**
410k16 Most Cited Cases

Courts prefer use of a pragmatic approach in resolving question of whether, in a given situation, an evidentiary hearing is required in connection with motion to quash subpoena, and key determinant is whether, given the nature and circumstances of the case, the parties had a fair opportunity to present relevant facts and arguments to the court and to counter the opponent's submissions.

**[33] Grand Jury ⬤= 36.3(2)**
193k36.3(2) Most Cited Cases

District court did not abuse its discretion by

declining to hold an evidentiary hearing in connection with motion by former officers of subsidiary corporation, and attorney who had represented officers, to quash subpoena duces tecum in which federal grand jury sought to compel subsidiary's parent corporation to produce records pertaining to subsidiary's affairs, where paper record was quite extensive, and officers and attorney had ample opportunity to respond to arguments of other side.

**[34] Federal Courts ⬤= 625**
170Bk625 Most Cited Cases

Former officers of subsidiary corporation, and attorney who had represented officers, who had moved to quash subpoena duces tecum in which federal grand jury sought to compel subsidiary's parent corporation to produce records pertaining to subsidiary's affairs, waived any right to object to timing of district court in simultaneously entering adverse rulings on their motions to quash, and for immunity, where officers and attorney neither contemporaneously objected to procedural ruling, nor sought a continuance.

**[35] Federal Civil Procedure ⬤= 928**
170Ak928 Most Cited Cases

Although it is plainly the better practice for a district court to rule explicitly on every substantial motion, it has long been accepted that a court may implicitly deny a motion by entering judgment inconsistent with it.

Andrew Good, with whom Harvey A. Silverglate, Silverglate & Good, Norman Zalkind, David Duncan, Zalkind, Rodriguez, Lunt & Duncan, Martin G. Weinberg, Oteri, Weinberg & Lawson, Elizabeth B. Burnett, and Mintz Levin Cohn Ferris Glovsky & Popeo were on consolidated brief, for appellants.

John M. Hodgens, Jr., Assistant United States Attorney, with whom James B. Farmer, United States Attorney, and Stephen P. Heymann, Assistant United States Attorney, were on brief, for the United States.

Before Selya and Lipez, Circuit Judges, and

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363 (1st Cir.(Mass.)))

Doumar, [FN*] Senior District Judge.

SELYA, Circuit Judge.

*1 This appeal requires us to traverse largely unexplored terrain concerning the operation of the attorney-client and work product privileges. The underlying controversy arises out of a subpoena duces tecum issued by a federal grand jury to a corporation, seeking records pertaining to the affairs of a subsidiary. Although the corporation and the subsidiary waived all claims of privilege, the subsidiary's former attorney and two of its former officers intervened and moved to quash the subpoena. They claimed that the subsidiary had entered into a longstanding joint defense agreement with the former officers and contended that the subpoenaed materials were privileged (and, thus, not amenable to disclosure). The district court eschewed an evidentiary hearing and denied the motion to quash, but stayed production of the documents pending appeal.

We affirm the district court's order. We hold that an individual privilege may exist in these circumstances only to the extent that communications made in a corporate officer's personal capacity are separable from those made in his corporate capacity. Because the intervenors do not allege that any of the subpoenaed documents are solely privileged to them but rest instead on the theory that all the documents are jointly privileged, their claim, as a matter of law, does not survive the subsidiary's waiver. The joint defense agreement does not demand a different result: privileges are created, and their contours defined, by operation of law, and private agreements cannot enlarge their scope. Moreover, this particular joint defense agreement is unenforceable.

We have a second, independently sufficient ground for our decision. The denial of the motion to quash must be upheld in all events because the intervenors failed to generate a descriptive list of the documents alleged to be privileged.

## I. BACKGROUND

We start by recounting the events leading to this appeal. Consistent with the secrecy that typically attaches to grand jury matters, see, e.g., Fed.R.Crim.P. 6(e), this case has gone forward under an order sealing the proceedings, the briefs, and the parties' proffers. To preserve that confidentiality, we use fictitious names for all affected persons and corporations.

On March 26, 2001, Oldco--a Massachusetts corporation in the business of processing, packaging, and distributing food products--entered into a plea agreement with the United States Attorney for the District of Massachusetts. Under the agreement's terms, Oldco pled guilty to charges of conspiracy to defraud the Internal Revenue Service and agreed to cooperate with the government's ongoing investigation of certain present and former officers, employees, and customers. As part of this cooperation, Oldco expressly waived applicable attorney-client and work product privileges. Soon thereafter, a federal grand jury issued a subpoena duces tecum to Oldco's parent corporation, Newparent, Inc., demanding the production of documents relating to its "rebate program"--a program under which, according to the government, Oldco would charge certain complicit customers more than the going rate for its products, but would then refund the difference by payments made directly to principals of these customers.

*2 At the time the subpoena was served, Oldco was a wholly-owned subsidiary of Newparent. Its records were in the possession of Newparent's counsel, a law firm that we shall call Smith & Jones. Newparent had acquired Oldco in June of 1998, but the grand jury investigation focused on conduct that occurred prior to the acquisition date. During that earlier period, Oldco had operated as a closely held corporation, owned by a number of members of a single family; one family member (Richard Roe) served as its board chairman and chief executive officer, and another (Morris Moe) served on the board and as executive vice- president for sales and marketing. A Nameless Lawyer was Oldco's principal outside counsel. These three

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

individuals--Roe, Moe, and Lawyer--intervened in the proceedings and filed a motion to quash the subpoena.

The factual premise for the motion to quash is derived largely from Lawyer's affidavit. He states that while representing Oldco he also represented Roe and Moe in various individual matters. Moreover, he claims to have conducted this simultaneous representation of corporate and individual clients under a longstanding joint defense agreement. According to Lawyer, this agreement, although never committed to writing, provided that communications among the three clients were jointly privileged and could not be released without unanimous consent. Despite the absence of any reference to this agreement in the corporate records--there was no resolution or vote of the board of directors authorizing Oldco to participate in such an arrangement--the intervenors assert that Roe, as chief executive officer, had the authority to commit the corporation to it.

Pertinently, Lawyer claims to have represented Oldco and its officers in connection with the grand jury investigation from and after October 1997 (when the grand jury served Oldco with an earlier subpoena requesting the production of certain customer records). He says that the oral joint defense agreement applies to this multiple-party representation and that he told the government that he represented Oldco and "all of its executives."

There is, to be sure, a written joint defense agreement entered into by and between Lawyer, as counsel for Roe/Moe, and Smith & Jones, as counsel for Newparent/Oldco. [FN1] However, that agreement was not executed until the fall of 1999 (by which time Lawyer was no longer representing Oldco). There is no evidence in the voluminous record (apart from Lawyer's affidavit) that any joint defense agreement existed before that time. Moreover, the intervenors neglected to mention the existence of an oral joint defense agreement when Newparent acquired Oldco and likewise failed to incorporate any reference to such a pact into the subsequent written agreement.

*3 Notwithstanding these discrepancies, the intervenors solemnly maintain that the oral joint defense agreement existed from 1990 forward; that its terms apply to the grand jury investigation; and that it gives them a joint privilege--they mention both attorney-client and work product privileges--in the Oldco documents currently in the hands of Smith & Jones. But they do not identify any particular documents as privileged, nor do they specify the reasons why certain communications should be considered privileged. Thus, like soothsayers scrutinizing the entrails of a goat, we are left to scour the record for indications of what these documents might be and what they might contain. As best we can tell, some of the documents comprise transcripts of interviews with Oldco employees (including Roe and Moe); others comprise Lawyer's written summaries of Oldco's internal investigation into the rebate program.

Not surprisingly, the government and Oldco both filed oppositions to the intervenors' motion to quash. In response, the intervenors sought leave to present immunized evidence with respect to the privilege claims. They also filed a formal offer of proof and requested an evidentiary hearing. The district court denied the motion to quash at a non-evidentiary hearing held on July 2, 2001, thereby implicitly denying the intervenors' other requests. This expedited appeal ensued.

## II. JUSTICIABILITY

We turn first to a pair of threshold questions that implicate our authority to hear and determine this appeal. Neither question need occupy us for long.

[1][2][3] First, we are satisfied that Roe, Moe, and Lawyer were properly allowed to intervene in the proceedings below for the purpose of pursuing quashal of the subpoena. Intervention is appropriate as of right when the disposition of an action may impair or impede the applicant's cognizable interest. Fed.R.Civ.P. 24(a)(2). Colorable claims of attorney-client and work product privilege qualify as sufficient interests to ground intervention as of right. *See In re Grand Jury*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

*Proceedings (Diamante* ), 814 F.2d 61, 66 (1st Cir.1987) (implying that "the existence of a privileged relationship or of a legitimate property or privacy interest in the documents possessed by the third party" is sufficient to establish standing). Clearly, those interests would be forfeited if Newparent were to comply with the grand jury subpoena-- and, as matters now stand, Newparent has no incentive to protect the intervenors' interests. Consequently, this is a textbook example of an entitlement to intervention as of right.

[4][5][6] Second, although denial of a motion to quash a subpoena is not usually considered a final judgment and thus is not ordinarily an appealable event, we believe that we have appellate jurisdiction in this instance. An exception to the requirement of finality exists when "a substantial privilege claim ... cannot effectively be tested by the privilege- holder through a contemptuous refusal [to produce the documents]." *FDIC v. Ogden Corp.,* 202 F.3d 454, 459-60 (1st Cir.2000); *see also Perlman v. United States,* 247 U.S. 7, 12-13, 38 S.Ct. 417, 62 L.Ed. 950 (1918) (recognizing that, as a practical matter, denials of an intervenor's privilege-based motion to quash a subpoena must be immediately appealable because no effective post- judgment remedy otherwise would exist). Courts have invoked this exception when, as now, "a client (who is herself a party or a grand jury target) seeks to appeal an order compelling her attorney ... to produce allegedly privileged materials." *Ogden,* 202 F.3d at 459; *accord In re Grand Jury Subpoenas,* 123 F.3d 695, 697 (1st Cir.1997). Although in this case the documents are in the hands of Newparent's counsel rather than in the custody of the intervenors' counsel, this only reinforces the essential fact that, absent an immediate appeal, the allegedly privileged material will be disclosed. Accordingly, we have jurisdiction to hear and determine this appeal.

## III. THE MERITS

*4 This appeal presents a smorgasbord of legal issues, but we must forgo the temptation to sample them all. Instead, we masticate only those issues that are necessary to a principled

resolution of the matter.

We begin by discussing the ramifications of Roe's and Moe's claim that they were individual clients of Lawyer with respect to the grand jury investigation. We conclude that although such individual representation might have occurred in theory, no individual privilege exists as to documents in which Oldco also has a privilege. Because no independently enforceable privilege is alleged here, the corporation's waiver is effective for all communications covered by the subpoena, notwithstanding the existence *vel non* of the oral joint defense agreement. In all events, the intervenors failed adequately to inform the district court of the particular communications to which their claims of privilege allegedly attached. In the pages that follow, we proceed to discuss these issues one by one.

### A. Privilege Claims.

Because the attorney-client and work product privileges differ, we treat them separately.

[7][8] 1. *Individual Attorney-Client Privilege Claims.* The attorney- client privilege protects communications made in confidence by a client to his attorney. *See, e.g., United States* v. *Mass. Inst. of Tech.,* 129 F.3d 681, 684 (1st Cir.1997) (limning the scope of the privilege). Because it stands in the way of a grand jury's right to every man's evidence, the privilege applies only to the extent necessary to achieve its underlying goal of ensuring effective representation through open communication between lawyer and client. *See Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976).

[9] Roe and Moe can mount a claim of attorney-client privilege only if, and to the extent that, Lawyer represented them individually. If the only attorney- client privilege at stake is that of their corporate employer, then Oldco's waiver defeats the claim of privilege. After all, the law is settled that a corporation's attorney-client privilege may be waived by current management. *See CFTC v. Weintraub,* 471 U.S. 343, 349, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985) ("[W]hen

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

control of a corporation passes to new management, the authority to assert and waive the corporation's attorney client privilege passes as well.").

*5 [10] It is often difficult to determine whether a corporate officer or employee may claim an attorney-client privilege in communications with corporate counsel. The default assumption is that the attorney only represents the corporate entity, not the individuals within the corporate sphere, and it is the individuals' burden to dispel that presumption. See United States v. Bay State Ambul. & Hosp. Rental Serv., Inc., 874 F.2d 20, 28 (1st Cir.1989). This makes perfect sense because an employee has a duty to assist his employer's counsel in the investigation and defense of matters pertaining to the employer's business. See United States v. Sawyer, 878 F.Supp. 295, 296 (D.Mass.1995).

[11] To determine when this presumption bursts, several courts have adopted the test explicated in In re Bevill, Bresler & Schulman Asset Mgmt. Corp., 805 F.2d 120 (3d Cir.1986). That test enumerates five benchmarks that corporate employees seeking to assert a personal claim of attorney-client privilege must meet:
First, they must show they approached [counsel] for the purpose of seeking legal advice. Second, they must demonstrate that when they approached [counsel] they made it clear that they were seeking legal advice in their individual rather than in their representative capacities. Third, they must demonstrate that the [counsel] saw fit to communicate with them in their individual capacities, knowing that a possible conflict could arise. Fourth, they must prove that their conversations with [counsel] were confidential. And fifth, they must show that the substance of their conversations with [counsel] did not concern matters within the company or the general affairs of the company.
Id. at 123; accord Grand Jury Proceedings v. United States, 156 F.3d 1038, 1041 (10th Cir.1998); United States v. Int'l Bhd. of Teamsters, 119 F.3d 210, 215 (2d Cir.1997); In re Sealed Case, 29 F.3d 715, 719 n. 5 (D.C.Cir.1994).

We think that Bevill 's general framework is sound. Of course, the first four elements of its test are most relevant when an attorney disputes a corporate officer's claim of individual privilege. Here, however, Lawyer's affidavit makes it clear that he represented both Roe and Moe in their personal capacities. Thus, even though the intervenors' brief does not specifically address the Bevill factors, we assume for argument's sake that the first four prongs of the test are satisfied.

[12][13] With respect to the final prong, the government claims that all of Roe's and Moe's communications were within the orbit of Oldco's general affairs, and therefore could not be individually privileged. In the government's view, Bevill precludes a finding of individual representation with respect to matters--such as the grand jury investigation into the rebate program--that involve the corporation. We do not read Bevill so grudgingly. As the Tenth Circuit explained:
*6 The fifth prong of In Matter of Bevill, properly interpreted, only precludes an officer from asserting an individual attorney client privilege when the communication concerns the corporation's rights and responsibilities. However, if the communication between a corporate officer and corporate counsel specifically focuses upon the individual officer's personal rights and liabilities, then the fifth prong of In Matter of Bevill can be satisfied even though the general subject matter of the conversation pertains to matters within the general affairs of the company.
Grand Jury Proceedings, 156 F.3d at 1041. We adopt this interpretation and conclude that, theoretically, Lawyer could have represented Roe and Moe individually with respect to the grand jury investigation. Still, this attorney-client relationship would extend only to those communications which involved Roe's and Moe's individual rights and responsibilities arising out of their actions as officers of the corporation.

[14] 2. The Corporation's Right to Waive the Attorney-Client Privilege. Having concluded that there are potentially some communications protected by the attorney-client privilege, we next consider the effect of Oldco's waiver of

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

that privilege. The major difficulty--there are others, but we need not discuss them here--is that the individuals' allegedly protected communications with Lawyer do not appea to be distinguishable from discussions between the same parties in their capacities as corporate officers and corporate counsel, respectively, anent matters of corporate concern. The intervenors propose that such "dual" communications be treated as jointly privileged such that the consent of all parties would be required to waive the privilege. But they fail to cite authority supporting this position, and we ultimately decline to accept it: permitting a joint privilege of this type would unduly broaden the attorney-client privilege by allowing parties outside a given attorney-client relationship to prevent disclosure of statements made by the client.

[15][16][17] The reference to an alleged joint defense agreement does little to advance the intervenors' argument on this point. "The joint defense privilege protects communications between an individual and an attorney for another when the communications are 'part of an ongoing and joint effort to set up a common defense strategy.' " Bay State Ambul., 874 F.2d at 28 (citation omitted). Because the privilege sometimes may apply outside the context of actual litigation, what the parties call a "joint defense" privilege is more aptly termed the "common interest" rule. See United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir.1989). Even when that rule applies, however, a party always remains free to disclose his own communications. See In re Grand Jury Subpoena Duces Tecum, 112 F.3d 910, 922 (8th Cir.1997). Thus, the existence of a joint defense agreement does not increase the number of parties whose consent is needed to waive the attorney-client privilege; it merely prevents disclosure of a communication made in the course of preparing a joint defense by the third party to whom it was made.

[18] In the clamor over the existence vel non of a joint defense agreement, the parties tend to overlook case law dealing directly with the circumstances under which statements made in a joint conference remain privileged.

Although these cases do not speak with one voice, they inform our resolution of the issue. They establish that joint communications with a single attorney are privileged with respect to the outside world because clients must be entitled to the full benefit of joint representation undiluted by fear of waiving the attorney-client privilege. See Ogden, 202 F.3d at 461. Nevertheless, the privilege does not apply in subsequent litigation between the joint clients, see id.; in that sort of situation, one client's interest in the privilege is counterbalanced by the other's interest in being able to waive it.

*7 The instance of a criminal investigation in which one former co-client is willing to aid in the prosecution of the other lies in the wasteland between these two doctrinal strands, and courts have split on whether the target of the prosecution may block disclosure in this context. See McCormick on Evidence, § 91 at 365 n.13 (John W. Strong ed., 5th ed. 1999) ("Whether the privilege is effective where one joint client is prosecuted and the other is willing to testify as to the joint consultations is a question which has divided the courts."); see also Conn. v. Cascone, 195 Conn. 183, 487 A.2d 186, 189-90 (1985) (collecting cases on both sides of the issue).

[19] Although the instant case arises as a motion to quash a subpoena, rather than as an attempt to block a former co-client's testimony, the issue of privilege is entirely congruent. But there is another difference here--a significant one that cuts against the intervenors. In this iteration, the former co-clients were not independent actors, but, rather, corporate officers who owed a fiduciary duty to the corporation. Faced with an analogous assertion of privilege by corporate managers, the Fifth Circuit has held that the managers' interest must yield to the shareholders' interest in disclosure of the privileged materials. Garner v. Wolfinbarger, 430 F.2d 1093, 1101-04 (5th Cir.1970). Taking a similar tack, we hold that a corporation may unilaterally waive the attorney-client privilege with respect to any communications made by a corporate officer in his corporate capacity, notwithstanding the existence of an

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363                                                           Page  12
(Cite as: 2001 WL 1356363, *8 (1st Cir.(Mass.)))

the work product privilege does not preclude disclosure of the documents sought by the subpoena.

[23] Undaunted, the intervenors argue that the presence of the oral joint defense agreement demands a different result. We do not agree. Although a valid joint defense agreement may protect work product, *see In re Grand Jury Subpoenas,* 902 F.2d 244, 249 (4th Cir.1990), one party to such an agreement may not preclude disclosure of work product by another party on whose behalf the work originally was performed. Nor can the parties, by agreement, broaden the scope of the privilege that the law allows. *See United States v. Lee,* 107 F. 702, 704 (C.C.E.D.N.Y.1901). Such an agreement would contravene public policy (and, hence, would be unenforceable). [FN3]

*9 [24][25] We add, moreover, that the type of joint defense agreement described in Lawyer's affidavit would be null and void. After all, a primary requirement of a joint defense agreement is that there be something against which to defend. *Bay State Ambul.,* 874 F.2d at 28. In other words, a joint defense agreement may be formed only with respect to the subject of potential or actual litigation. *Polycast Tech. Corp. v. Uniroyal, Inc.,* 125 F.R.D. 47, 50 (S.D.N.Y.1989). Lawyer's affidavit avers that his three clients (Oldco, Roe, and Moe) entered into an oral joint defense agreement in 1990, at which time no particular litigation or investigation was in prospect. The agreement thereafter remained in effect, Lawyer says, attaching *ex proprio vigore* to all matters subsequently arising (including the current grand jury investigation). The law will not countenance a "rolling" joint defense agreement of this limitless breadth.

[26] The rationale for recognizing joint defense agreements is that they permit parties to share information pertinent to each others' defenses. *See Hunydee v. United States,* 355 F.2d 183, 185 (9th Cir.1965). In an adversarial proceeding, a party's entitlement to this enhanced veil of confidentiality can be justified on policy grounds. But outside the context of actual or prospective litigation,

there is more vice than virtue in such agreements. Indeed, were we to sanction the intervenors' view, we would create a judicially enforced code of silence, preventing attorneys from disclosing information obtained from other attorneys and other attorneys' clients. Common sense suggests that there can be no joint defense agreement when there is no joint defense to pursue. We so hold. [FN4]

### B. *Fed.R.Civ.P. 45(d)(2).*

[27][28][29] As an alternate ground for our decision, we note that the motion to quash was properly denied because the intervenors failed to present sufficient information with respect to the items to which their claim of privilege attaches. The Civil Rules specifically provide that:

> When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications or things not produced that is sufficient to enable the demanding party to contest the claim.

Fed.R.Civ.P. 45(d)(2). The operative language is mandatory and, although the rule does not spell out the sufficiency requirement in detail, courts consistently have held that the rule requires a party resisting disclosure to produce a document index or privilege log. *See, e.g., Bregman v. Dist. of Columbia,* 182 F.R.D. 352, 363 (D.D.C.1998); *First American Corp. v. Al-Nahyan,* 2 F.Supp.2d 58, 63 n. 5 (D.D.C.1998); *see also Avery Dennison Corp. v. Four Pillars,* 190 F.R.D. 1, 1 (D.D.C.1999) (describing privilege logs as "the universally accepted means" of asserting privilege claims in the federal courts); *cf. Vaughn v. Rosen,* 484 F.2d 820 (D.C.Ct.App.1973) (articulating the justifications for requiring privilege logs in the context of the FOIA). A party that fails to submit a privilege log is deemed to waive the underlying privilege claim. *See Dorf & Stanton Communications, Inc. v. Molson Breweries,* 100 F.3d 919, 923 (Fed.Cir.1996) (holding that failing "to provide a complete privilege log demonstrating sufficient grounds for taking the privilege" waives the privilege). Although

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363, *9 (1st Cir.(Mass.)))

most of the reported cases arise in the context of a claim of attorney-client privilege, the "specify or waive" rule applies equally in the context of claims of work product privilege. *See, e.g., Smith v. Conway Org., Inc.,* 154 F.R.D. 73, 76 (S.D.N.Y.1994).

*10 In a somewhat indirect fashion, the intervenors suggest that they were hampered in their ability to present a list of privileged documents by the district court's refusal to hold an evidentiary hearing. This suggestion does not withstand scrutiny. After all, the intervenors were not without knowledge of the communications to which the subpoena pertained; Lawyer originally had possession of them and turned them over to Smith & Jones only when Newparent decided to change counsel. Despite this knowledge, the intervenors made no effort to prepare a privilege log. That omission is fatal.

[30] Privilege logs do not need to be precise to the point of pedantry. Thus, a party who possesses some knowledge of the nature of the materials to which a claim of privilege is addressed cannot shirk his obligation to file a privilege log merely because he lacks infinitely detailed information. To the contrary, we read Rule 45(d)(2) as requiring a party who asserts a claim of privilege to do the best that he reasonably can to describe the materials to which his claim adheres.

[31][32][33] At any rate, the district court did not err by failing to hold an evidentiary hearing. We test a trial court's decision on whether or not to convene an evidentiary hearing for abuse of discretion. *E.g., David v. United States,* 134 F.3d 470, 477 (1st Cir.1998). Our cases exhibit a strong preference for a "pragmatic approach" to the question of whether, in a given situation, an evidentiary hearing is required. The key determinant is whether, "given the nature and circumstances of the case ... the parties [had] a fair opportunity to present relevant facts and arguments to the court and to counter the opponent's submissions." *In re Thirteen Appeals Arising Out of the San Juan Dupont Plaza Hotel Fire Litig.,* 56 F.3d 295, 302 (1st Cir.1995) (quoting *Aoude v. Mobil Oil Corp.,*

862 F.2d 890, 893-94 (1st Cir.1988)). In this instance, the paper record is quite extensive, containing affidavits from Lawyer as well as from representatives of Newparent and Smith & Jones. Furthermore, the intervenors had ample opportunity to respond to the other side's arguments, and took advantage of this opportunity by submitting a lengthy offer of proof. Under the circumstances, the district court was not obliged to convene an evidentiary hearing to fill in gaps in the intervenors' privilege claims. *See Aoude,* 862 F.2d at 894 (observing that matters often can be "heard" adequately on the papers).

*11 [34] Next, the intervenors lament that the district court's failure to rule on their motion for immunity deprived them of the opportunity to supplement the record with further evidence. Even if the district court had denied the immunity motion, the intervenors reason, they would have had an opportunity to decide whether to submit affidavits at the risk of incriminating themselves. This lamentation does not strike a responsive chord.

For one thing, the intervenors' failure to furnish a privilege log cannot plausibly be said to have resulted from the lack of an explicit ruling on the motion for immunity. Roe and Moe could have submitted a privilege log by proffer or over an attorney's signature without in any way compromising their Fifth Amendment rights.

[35] For another thing, although it is plainly the better practice for a trial court to rule explicitly on every substantial motion, it has long been accepted that a trial court may implicitly deny a motion by entering judgment inconsistent with it. *Wimberly v. Clark Controller Co.,* 364 F.2d 225, 227 (6th Cir.1966). In this case, the district court's rejection of the motion to quash effectively denied the intervenors' motion for a grant of immunity. That ruling hardly can be questioned on the merits. The intervenors point to no case authorizing a grant of judicial immunity to a grand jury target in order to facilitate the presentation of a privilege claim, and they offer no persuasive reason why this case should be the first.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

2001 WL 1356363
(Cite as: 2001 WL 1356363, *11 (1st Cir.(Mass.)))

Page  14

What remains is the intervenors' unhappiness with what they characterize as the district court's rush to judgment. The facts are simple: the district court convened a status conference and then converted the status conference into a non-evidentiary hearing on the merits of the intervenors' privilege claims. The proper time to raise an objection to this procedure was directly after the court's announcement of its intention to proceed to the merits, but the intervenors stood mute. Having neither contemporaneously objected to the court's procedural ruling nor sought a continuance, the intervenors have waived any right to complain about the court's timing. *See In re United States (Franco),* 158 F.3d 26, 32 n. 3 (1st Cir.1998); *United States v. Diaz- Villafane,* 874 F.2d 43, 47 (1st Cir.1989).

## IV. CONCLUSION

*12 We need go no further. We hold that the intervenors' claims of privilege fail because the oral joint defense agreement on which they rely cannot defeat Oldco's express waiver of privilege, and, alternatively, because the intervenors failed without justification to produce a privilege log (thereby waiving the underlying attorney-client and work product privileges). Similarly, the district court did not err either in refusing to convene an evidentiary hearing or in ruling simultaneously on the motion to quash and the motion for immunity. Accordingly, the order refusing to nullify the grand jury subpoena is unimpugnable.

*Affirmed.*

FN* Of the Eastern District of Virginia, sitting by designation.

FN1. The written joint defense agreement need not concern us as the grand jury has limited its request to documents predating the execution of that agreement.

FN2. For example, with respect to the employee interviews conducted by Lawyer, the intervenors argued to the lower court that the work product privilege does not belong exclusively to Oldco because the work was performed on behalf of all three clients.

FN3. This same reasoning applies to defeat the intervenors' claim that the parties' understanding, at the time they entered into the oral joint defense agreement, somehow serves to trump the normal operation of the attorney-client privilege. *See Lee,* 107 F. at 704.

FN4. Given this holding, we need not address other potential problems with the purported joint defense agreement in this case (e.g., the absence of any indicium of corporate authority and the related question of whether corporate officers have the power to bind a corporation to such agreements when a conflict of interest plainly exists).

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., a Delaware Corporation, | ) ) ) ) | AR 1 9 2002 |
| Plaintiff, | ) ) | SDK USDC / SDF |
| vs. | ) ) ) | CASE NO. 00-CIV-8616 (DC) (Southern District of New York) |
| L. BRENT BOZELL, III, an individual; MEDIA RESEARCH CENTER, INC., a Virginia non-profit corporation, d/b/a Parents Television Council; PARENTS TELEVISION COUNCIL, INC., a Delaware non-profit Corporation; JAMES LEWIS, an Individual; MARK HONIG, an Individual; CYNTHIA DELORES TUCKER, an individual; and Various John and Jane Does, | ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.: 01-7913 CIV Hurley Magistrate Lynch |
| Defendants. | ) ) | |

## PLAINTIFF'S RESPONSE TO OBJECTIONS ON RICHARD L. ROSENBAUM'S MOTION TO QUASH OR, FOR A PROTECTIVE ORDER AND JAMES LEWIS' MOTION TO QUASH AND/OR FOR A PROTECTIVE ORDER AND REQUEST FOR *DE NOVO* REVIEW

Plaintiff World Wrestling Federation Entertainment, Inc. ("WWFE") respectfully requests that the Court deny and/or overrule what was captioned as Richard L. Rosenbaum's ("Rosenbaum") Objections to the Magistrate's ruling on Rosenbaum's and James Lewis' ("Lewis") Motions to Quash the Rule 45 subpoena that WWFE served on Rosenbaum. ("Objections") These Objections, filed entirely by Rosenbaum, are utterly meritless and

EXHIBIT ___8___

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., a Delaware Corporation, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) ) | CASE NO. 00-CIV-8616 (DC) (Southern District of New York) |
| L. BRENT BOZELL, III, an individual; MEDIA RESEARCH CENTER, INC., a Virginia non-profit corporation, d/b/a Parents Television Council; PARENTS TELEVISION COUNCIL, INC., a Delaware non-profit Corporation; JAMES LEWIS, an Individual; MARK HONIG, an Individual; CYNTHIA DELORES TUCKER, an individual; and Various John and Jane Does, | ) ) ) ) ) ) ) ) ) ) ) ) ) | CASE NO.: 01-7913 CIV Hurley Magistrate Lynch |
| Defendants. | ) ) ) | |

**PLAINTIFF'S RESPONSE TO OBJECTIONS ON RICHARD L. ROSENBAUM'S
MOTION TO QUASH OR, FOR A PROTECTIVE ORDER AND
JAMES LEWIS' MOTION TO QUASH AND/OR FOR A
PROTECTIVE ORDER AND REQUEST FOR _DE NOVO_ REVIEW**

Plaintiff World Wrestling Federation Entertainment, Inc. ("WWFE") respectfully requests that the Court deny and/or overrule what was captioned as Richard L. Rosenbaum's ("Rosenbaum") Objections to the Magistrate's ruling on Rosenbaum's and James Lewis' ("Lewis") Motions to Quash the Rule 45 subpoena that WWFE served on Rosenbaum. ("Objections") These Objections, filed entirely by Rosenbaum, are utterly meritless and

constitute yet another dilatory tactic designed to delay even further the production of highly relevant documents in Rosenbaum's possession.[1]

## I.     FACTUAL BACKGROUND

This case involves numerous claims centered around false and defamatory statements made by the Defendants to the effect that the Plaintiff's television program named Smackdown! had caused children to kill other children. All Defendants, except Defendant James Lewis, are affiliated with an outfit called the Media Research Center ("MRC"). Brent Bozell is the head of that organization. MRC is an ultra-conservative political organization dedicated to exposing what it believes is a liberal or leftist bias of the media. During the time in question, MRC also did business under a fictitious name that enabled it to conceal its real identity and purpose when raising money from the public. The fictitious name was the "Parents Television Council" ("PTC"), which was presented to the fundraising public as a non-partisan group of "members" dedicated to cleaning up television. A central aspect of the scare tactics used by MRC to raise money under the PTC ruse was that WWFE's Smackdown! program was causing children to kill other children.

To raise money, MRC devised a specific fundraising campaign strongly centered on the Lionel Tate case in Florida, where a 12-year old, 170-pound manchild brutally beat to death a 6 year-old, 48-pound little girl. In this particular fundraising scheme called the National Campaign to Clean Up TV Now, MRC produced a videotape sent to prospective donors in which the WWFE program was blamed for Tiffany Eunick's death.

---

[1]     Lewis did not lodge any appeal from the Magistrate's rulings nor did he comply with them. As a result, WWFE will be independently moving to have Mr. Lewis held in contempt.

In reality, wrestling had nothing to do with the death of Tiffany Eunick. When Lionel Tate was arrested for the crime, he gave several statements to the police, at least two of which were transcribed. In the first statement, he identified the programs he was watching during the period he killed Tiffany Eunick. These programs were the Flintstones and another cartoon called Cow & Chicken. At no time did Lionel Tate state that he was wrestling with Tiffany. For that matter, he never mentioned the word "wrestling". Likewise, Lionel Tate did not claim he was wrestling with Tiffany in a second statement given to police in the presence of his mother. See July 30, 1999 Statements of Lionel Tate, attached hereto at Tab 1.

Mr. Lewis was trial counsel for Lionel Tate. Having no real defenses, Mr. Lewis constructed a "media" defense at odds with all known facts and all forensic evidence. The true purpose of the defense was to deflect attention away from not only the savage brutality of his client, but also the reasons why Lionel Tate killed Tiffany Eunick. The "defense" also gained Mr. Lewis quite a bit of national and local publicity. Thus, to an unsuspecting media, Mr. Lewis peddled the notion that Tiffany's death was an "accident" caused by horseplay gone awry. The horseplay was, of course, said to be mimicking what was seen on WWFE programs. The forensic evidence, however, all of which was known to Lewis, told a different story. That evidence demonstrated a multitude of injuries inflicted in a beating that raged for over five minutes according to eventual trial testimony. This rage killing occurred in a small townhouse with Lionel Tate's mother only a few feet away. Despite the obvious conflict inherent in representing the only two people present in the house on the night of Tiffany's death, Mr. Lewis represented both Lionel Tate and Mrs. Tate in the ensuing investigation. For media consumption, both Mr. Lewis and Mrs. Tate claimed in all forms of media that Lionel Tate was simply engaged in child's horseplay imitating what he saw on the WWFE's program. Both prior

to and after the trial, Mrs. Tate portrayed the death as an accident even though her consistent testimony has been she did not know what happened downstairs because, according to her, she was sleeping upstairs at the time.  To further this ruse, Mr. Lewis appeared on and in virtually every media outlet in his attempt to portray Tate as a victim and the WWF as being responsible. He harassed WWF talent, such as The Rock, with subpoenas and leaked doing so to the media. Lewis' actions resulted in headlines suggesting The Rock had something to do with the murder of Tiffany Eunick.  At evidentiary hearings, Lewis waved wrestling dolls around for media consumption and played videotapes blaming wrestling for children's deaths which featured Defendant Bozell.  Behind the scenes, he was also interacting with the MRC defendants to propagate the lie.  Evidence gathered in discovery shows that Lewis called Mr. Bozell during the pretrial phase of the Tate case; that Mr. Bozell directed his underlings to help locate an expert to testify for Lionel Tate to blame wrestling; and that PTC did consult with experts whose names were passed onto Mr. Lewis.  See Deposition of Lara Mahaney, pp. 31 - 38, attached hereto at Tab 2.  In return, Mr. Lewis participated in the fundraising video of PTC featuring the Tate case. On the fundraising video, Mr. Lewis stated there was "no other reason that anybody in this case can point to" to explain why Lionel Tate brutally killed Tiffany Eunick.  See Transcript of "Clean Up TV Now," attached hereto as Tab 3.  This, too, was a lie, and the files and records now in the possession of Mr. Rosenbaum will assist in proving those reasons.  Among other reasons advanced for Tiffany's death was the statement by her father, in the presence of Mr. Lewis, that Lionel Tate had attempted to sexually molest Tiffany and then killed her in a rage when she resisted.  See Transcript of The Leeza Show, 10/22/99, attached hereto at Tab 4.

Prior to trial, Mr. Lewis' client rejected a plea bargain that would have had Tate get help and would have required three years in juvenile custody. Instead, Mr. Lewis proceeded to trial on murder one charges, argued against charging the jury on lesser individual offenses, told the jury it was all an "accident" of kids at play, then put on an expert who admitted that Tiffany Eunick's death was no accident, but a homicide. The State's evidence was that Tiffany received dozens of injuries in a sustained beating that fractured her skull, broke her ribs and lacerated her liver to the point parts of it were found floating in her abdomen at autopsy. The State also offered a concocted "reenactment" of the night in question that had been fabricated as part of the defense effort to blame wrestling. On the "reenactment" tape, Lionel Tate purported to demonstrate what he did to Tiffany Eunick to kill her. The State offered the tape to prove Tate was still lying, as the tape was inconsistent with all other evidence. See March 9, 2001 Order by Judge Lazarus, attached hereto at Tab 5. In warp speed, the jury rejected the hoax and found Lionel Tate guilty of murder in the first degree.

Subsequently, in an opinion that excoriates the defense, and in judicial terms which denounced the so-called wrestling defense as a hoax, the trial judge sentenced Lionel Tate to life imprisonment without parole. See Tab 5. More recently, in papers filed with this Court, Mr. Rosenbaum himself flat out admitted that he himself had reason to believe the wrestling defense was, in his words, "bogus." See Richard L. Rosenbaum's Reply to Plaintiff's Memorandum in Opposition to the Motion for Sanctions, at Footnote 3, attached hereto at Tab 6.

Following the trial of Lionel Tate, WWFE sought document discovery from Mr. Lewis in the federal case in New York. Mr. Lewis responded by representing to the Court that he no longer had custody of any of the records, all of which were said to be in Mr. Rosenbaum's possession and control. See 6/1/01 Letter from Lewis to Jerry McDevitt, attached at Tab 7.

Given that representation, the federal court indicated that the WWFE should subpoena the records from Mr. Rosenbaum. See June 25, 2001 Order by Judge Denny Chin, attached at Tab 8. As set forth below, when WWFE did so, it began to encounter systematic obstruction from all persons affiliated with the representation and defense of Lionel Tate. For his part, despite his admission that the wrestling defense was "bogus", Mr. Rosenbaum has refused to turn over so much as a single record, choosing instead to make dilatory and frivolous motions. See Richard L. Rosenbaum's Motion to Quash or For a Protective Order, attached hereto at Tab 9. For his part, Mr. Lewis joined in the frivolous motions ultimately decided by the magistrate and then did not comply with, nor appeal, the magistrate's decision ordering him to turn over a privilege log. Dr. Klaas, a psychologist retained by the defense who participated in the fabricated "reenactment" of Lionel Tate killing Tiffany Eunick, has totally ignored this Court's subpoena and has filed no response to WWFE's Motion to Compel compliance. And, most recently, Mrs. Tate, a police officer and the only other person present in the house during the brutal killing, has ignored a subpoena for documents and for testimony and filed yet another dilatory Motion to Quash largely on grounds previously rejected by Magistrate Lynch. This latest stalling tactic from Mrs. Tate comes after she gave sworn statements to the police, grand jury testimony, trial testimony and unsworn statements on numerous television shows both before and after the verdict. WWFE respectfully requests this Court affirm the magistrate's ruling expeditiously in order that this case may proceed.

## II.    PROCEDURAL BACKGROUND

On December 13, 2001, and as directed by the Court in New York having jurisdiction over the case, WWFE served a subpoena *duces tecum* on Rosenbaum requesting various documents relating to the Lionel Tate case. See Subpoena, attached at Tab 10. Shortly

thereafter, on December 20, 2001, Rosenbaum filed a Motion to Quash the subpoena on the grounds that the requested documents were protected by the attorney-client privilege and/or the work product doctrine; the subpoena subjected Rosenbaum to undue burden and expense; and because the documents were available through other sources. See Tab 9. Rosenbaum's motion was entirely unsupported by affidavit or otherwise as to the alleged burden. Lewis also filed a Motion to Quash the subpoena citing essentially the same grounds as Rosenbaum. See James Lewis' Motion to Quash, attached hereto at Tab 11. Despite the claims of privilege, neither Lewis nor Rosenbaum tendered a privilege log, as required by Rule 45.

The Motions to Quash were assigned to Magistrate Frank Lynch, Jr. On February 22, 2002, Magistrate Lynch issued an order addressing each objection Rosenbaum and Lewis raised in their Motions. Magistrate Lynch ordered the documents to be produced within fifteen days and further ordered Lewis to supply a privilege log within 15 days regarding any document that Lewis contends otherwise supports the statements made by him at issue in this lawsuit.. This Order, having not been provided to the Court by Rosenbaum, is attached hereto at Tab 12.[2]

Thereafter, WWFE sought two clarifications regarding the magistrate's ruling regarding Rosenbaum's obligation to produce all non-privileged and responsive documents. On March 13, 2002, Magistrate Lynch issued a supplementary Order directing such production.

On March 6, 2002, Rosenbaum filed Objections to the Order and requested a *de novo* review of Magistrate Lynch's rulings. These Objections are nothing more than a deliberate attempt to further delay Rosenbaum's production of documents that clearly are not privileged and which he has no legal basis to withhold.

---

[2]     Lewis took no appeal from the magistrate's Order. He has not complied with the Order and produced a privilege log.

**Kirkpatrick & Lockhart** LLP

III.   **ARGUMENT**

A.   **The Standard for Review of Magistrate Lynch's Order is That the Findings Were Clearly Erroneous or Contrary to Law**

In his Objections, Rosenbaum requests a *de novo* review of Magistrate Lynch's ruling. He is not entitled to such a review.  Rule 4(a) of the Local Magistrate Rules for the Southern District of Florida states that when a party appeals from a non-dispositive order by a federal magistrate, "[t]he District Judge shall consider the appeal and shall set aside any portion of the Magistrate's Order found to be *clearly erroneous or contrary to law*."  Indeed, this standard applies not only to decisions overruling stock objections as to burden, relevancy and the like, but also to issues of privilege.  *See Ray v. Cutter Labs, Division of Miles, Inc.,* 746 F.Supp. 86 (M.D. Fl. 1990) (applying clearly erroneous standard to magistrate's order concerning waiver of the attorney-client privilege and rejecting claim that order should be reviewed *de novo*); *Joiner v. Hercules, Inc.,* 169 F.R.D. 695 (S.D. Ga. 1996) (applying clearly erroneous standard to privileges in discovery).   Accordingly, Rosenbaum has no right to a *de novo* review of Magistrate Lynch's order.

B.   **Magistrate Lynch's Findings Were Not Clearly Erroneous or Contrary to Law**

The clearly erroneous standard is the highest and most rigorous standard in the civil judicial system.  Under this standard, the Magistrate's findings should not be disturbed unless the Court is "left with the definite and firm conviction that a mistake has been committed." *Cole v. United States*, 861 F.2d 1261, 1263 (11th Cir.1988).  Rosenbaum is an appellate lawyer with presumptive knowledge of the standard of review, yet he has not even attempted to make such a showing here.  In fact, as noted later in this Response, two of the three grounds Rosenbaum set forth to support his request for a *de novo* review were not even raised in the original Motions to

Quash. Therefore, they were never addressed by Magistrate Lynch and they cannot now be considered by this Court in determining whether Magistrate Lynch's rulings were clearly erroneous. Further, Rosenbaum impliedly concedes that he cannot meet the clearly erroneous burden by arguing that Magistrate Lynch's decision should be reviewed, not pursuant to the clearly erroneous standard, but on a *de novo* basis. Rosenbaum does not even attempt to persuade this Court that Magistrate Lynch's ruling was clearly erroneous. Accordingly, his Objections must be overruled.

### 1.   Rosenbaum's Status as Pro Bono Attorney Does Not Insulate Him From the Subpoena Power of the Court

First, Rosenbaum takes issue with Magistrate Lynch's order that he produce certain public records in his possession. While Rosenbaum may disagree with this decision, it is not clearly erroneous or contrary to law. Rosenbaum, citing no authority, asserts that, as pro bono counsel for Lionel Tate, he should not be required to go through the effort of producing non-privileged records he has in his possession. There is no legal basis for this argument. An attorney is not impervious to the subpoena power of the Court simply because he is not being paid to comply. Moreover, WWFE offered to conduct the review of non-privileged records itself, an offer that was refused. Further, as WWFE previously stated in its Response to Rosenbaum's Motion to Quash, WWFE is not interested in whether other persons might have had access to these documents, because, in order to prove its defamation case against Lewis, WWFE must show what *Lewis* knew when he made his defamatory pronouncements about WWFE. Only Lewis' own files can tell us that. Indeed, at this juncture, one has to question the reasons for Rosenbaum's refusal to produce any records in light of his admission before this Court that the wrestling defense was "bogus." On the one hand, Rosenbaum admits that his own review of the evidence drives the very conclusion which WWFE seeks to prove in this case, yet

**Kirkpatrick & Lockhart** LLP

on the other hand resists disclosure of the same evidence when sought by the entity victimized by the "bogus" defense.

### 2. Suppression of Statements For Purposes of Criminal Trial Is Irrelevant for Purposes of Civil Action

Rosenbaum also argues that he should not be required to produce the first two statements of Lionel Tate because they were suppressed during his criminal trial. This argument was not even raised in either Lewis' or Rosenbaum's original Motion to Quash and should not be considered by the Court as a basis for an Objection to the Magistrate's Order ruling on those Motions. The suppression of Tate's statements for purposes of his criminal trial has no bearing on this civil case. The primary purpose of the exclusionary rule in the criminal context is to deter future unlawful police conduct. *United States v. Calandra,* 414 U.S. 338, 347 (1974). Therefore, in civil cases, application of the exclusionary rule is usually inappropriate. *United States v. Janis,* 428 U.S. 433, 447 (1976) (noting that "[i]n the complex and turbulent history of the rule, the Court never has applied it to exclude evidence from a civil proceeding, federal or state.") In determining whether a statement that has been suppressed in a criminal trial should be excluded in a civil trial, the court must weigh the likely social benefits of excluding the evidence against the likely costs. *Id.* at 454.

The main benefit of the exclusionary rule, as stated above, is the deterrence of unlawful police conduct. On the costs side of the balancing test, there is the loss of often probative evidence and all of the secondary costs that flow from the less accurate or more cumbersome adjudication that therefore occurs. *Immigration and Naturalization Service v. Lopez-Mendoza,* 468 U.S. 1032, 1041 (1984) (holding that the exclusionary rule should not be applied in deportation proceedings). Accordingly, when evidence that has been suppressed in a criminal

trial pursuant to the exclusionary rule is not shown to have a sufficient likelihood of deterring future unlawful police conduct if excluded in a civil case, the evidence should be allowed in the civil case. *See Janis*, 428 U.S. at 454.

In this case, the exclusion of Tate's statements in this case would have absolutely no deterrent effect on any unlawful police conduct. Any deterrent effect of excluding the evidence was already effective when the statements were suppressed in Tate's criminal trial. Further, the government is not a party to this case and the instant case bears no relation to the conduct by the police during the Tate investigation. Therefore, there is no basis to withhold Tate's statements from discovery in this case.[3]

### 3.    Rosenbaum is Required to Produce Documents With Notations of Third Party Witnesses

Finally, Rosenbaum's assertion that he should be permitted to redact any notations from any attorney-client privileged or work product source is also without merit. The magistrate's ruling clearly permits redactions of attorneys notes as work product and no more. In support of this argument, Rosenbaum simply states, without citation, that "this Court was previously advised that the requested documents included documents reviewed by other confidential defense retained witnesses." There is nothing in the papers before Judge Lynch that said any such thing. Apparently, Rosenbaum is now suggesting that certain witnesses made notes on documentary evidence and that such notes are protected. First, the Court was not advised in any pleading that has been provided to WWFE that some of the requested documents had been reviewed by so-called confidential defense retained witnesses who made notes on the documents.

---

[3]     In the interest of candor to the Court, two of Tate's statements are matters of public record and are in the possession of counsel for WWFE. See Tab 1. It is respectfully submitted that any issue of trial admissibility regarding those statements is best left to the discretion of the trial judge hearing the actual case.

This issue was simply never raised in opposition to the subpoena and cannot now be a basis for reversing Magistrate Lynch's decision. Further, the phrase "confidential defense retained witnesses" is unclear and does not provide any specific basis for applying work product protection to the documents. The only witnesses who can be "retained" are experts. Nowhere does Rosenbaum clearly state that the notes were made by non-testifying experts retained to assist the defense.

Second, Rosenbaum has asserted no reason why notes made by third party witnesses should be protected as work product. In order to withhold those documents from WWFE, Rosenbaum must establish: (1) that an attorney or his agent prepared a particular document; (2) that such person was acting on behalf of the client when he or she did so; and (3) that such person prepared the document in anticipation of litigation. *In re Grand Jury Proceedings*, 601 F.2d 162, 171 (5th Cir. 1979), citing *Hickman v. Taylor*, 329 U.S. 495 (1947). Rosenbaum himself implies that the notes he seeks to redact were made by witnesses, rather than by counsel or his agent. Therefore, any notations by those third parties are not protected by the work product doctrine and must be produced.

## IV.   CONCLUSION

Rosenbaum has asserted no grounds for this Court to reverse Magistrate Lynch's Order on the basis that it was clearly erroneous or contrary to law or for his argument that the order should be reviewed on a *de novo* basis. Therefore, WWFE respectfully requests that the Court overrule Rosenbaum's Objections to Magistrate Lynch's Order on the Motion to Quash in its entirety and order the immediate production of all the requested documents.

**Kirkpatrick & Lockhart** LLP

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP

_____ for

Daniel A. Casey    FBN - 735545
KIRKPATRICK & LOCKHART LLP
201 South Biscayne Boulevard, 20th Floor
Miami, FL 33131
(305) 539-3324 (phone)
(305) 358-7095 (fax)

Attorneys for World Wrestling
Federation Entertainment, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this _19th_ day of

March, 2002, via United States, mail on the following counsel:

Thomas A. Leghorn, Esquire
Wilson, Elser, Moskowitz, Edelman & Dicker LLP
150 East 42nd Street
New York, New York  10017-5639

Michael J. Quarequio, Esquire
500 Southeast 6th Street, Suite 100
Fort Lauderdale, Florida  33301

Robert R. Sparks, Jr., Esquire
Herge, Sparks & Christopher, LLP
6862 Flm Street, Suite 360
McLean, VA  22101

Stephen Zukoff, Esq.
19 West Flagler Street, Suite 510
Miami, Florida  33130

_____ for

Daniel Casey

13
**Kirkpatrick & Lockhart LLP**

# TAB 1

STATEMENT OF   **LIONEL TATE**                           CASE # PK99-07-921

The following will be a sworn taped statement in reference to Case Number PK99-07-921. It's gonna be in reference to a death investigation of Juvenile Tiffany Eunick. The incident occurred on 7/28/99 at 3900 S.W. 52nd Avenue, apartment 805, Pembroke Park, Florida. This statement is gonna be taken from a juvenile, Lionel Tate, whose address is 3900 S.W. 52nd Avenue, Apartment 805 in Pembroke Park, Florida. He's a black male. His date of birth is January 30th, 1987. Todays date is July 30th, 1999. The time is now 8:28 p.m. by my ah pager. This statement is gonna be taken by Detectives Berrena, CCN 6949 and Detective Kaminsky, CCN 6523. Also present is Lionel's mother, Kathleen, last name G-R-O-S-S-E-T-T   hyphen T-A-T-E.


Q     Okay Lionel, before we ah start, what I'd like for you to do is just answer my questions about if you know what right and wrong is and what's truthful and what's a lie, okay?

A     Yes


Q     Alright, if today was Christmas, would that be the truth or a lie?

A     Lie


Q     Okay, ahm, if I said my shirt was ah florescent green, what..what would that be?

A     A lie.


Q     Okay, what color is my shirt?

A     Blue and white stripes.


Q     Okay, ah if I told you ah I was a police officer, would that be truth or a lie?

A     Truth.


Q     Okay, Lionel what I'd like for you to do is just tell me in your own words...when Tiffany was at your house on Wednesday, ah you Mom had ah gone shopping with both of you, correct?

A     Yes


Q     You went to Publix?

A     Yes


Q     And then you got home about four o'clock?

A     Yes


Q     Alright.  Then your mom...

KK    .... where do you attend school?


Gan                          Page 1 of  18

STATEMENT OF   **LIONEL TATE**                    CASE # PK99-07-921

Q    Okay yeah, where do you go to school right now? (No answer) Okay, he don't..., he doesn't have a school right now?

MT   He just came back from Mississippi.

Q    Just came back from Mississippi.  Okay, what grade level is that?
A    I'm goin to six

Q    Okay.  Ah, then what I'd like for you to do is just...
KK   Let me..let me interrupt for just one second...also ahm, prior to the tape starting ah were you read ah from a form called Miranda Rights?  Did Detective Berrena read those things out loud to you?
A    Yes

KK   ...right here...
Q    Okay

KK   And did you also initial the form and sign the form?
A    Yes

KK   Is that your signature?
A    Yes

KK   And is that your...date and the time?
A    Yes

KK   Okay, also present in the room is ah Lionel's mother ah Kathleen ah did you also have a chance Kathleen to read this ah form?  Do you understand the form?
A    Yes

KK   Okay, and did you sign it down here as a witness?
A    (Unintelligible)

KK   I'm sorry, could you...
A    ...(unintelligible) as a witness

KK   Okay, and do you understand everything?  That ah..what this means...Miranda Rights?
A    Yes.

KK   Okay
A    You askin me, or...?

Gan                          Page 2 of  18

⊗

STATEMENT OF   **LIONEL TATE**                           CASE #  PK99-07-921

KK   Yeah. I was asking you.
A    Oh.

KK   Also ahm, anytime during this statement Lionel, if you do not understand something, please
     tell us that you do not understand whatever question that, that is posed to you.  Ah, if ah..if
     your not sure of something, say your not sure and please don't guess at anytime forward,
     okay?
A    Yes

KK   Do you understand everything I've just said?
A    Yes

Q    Alright.  Lionel ah, it's Wednesday, the 28th.  You've just returned home from shopping
     with your Mom and Tiffany.  Your Mom unpacks the groceries, then she's workin midnights,
     so she goes upstairs to get some rest.  Is that correct?
A    Yes

Q    Okay.  What..what..what do you and Tiffany do at that time?
A    Ah, at first when my Mom went upstairs, me and Tiffany went upstairs because she told my
     mom her stomach was hurtin and my mom toll her to go lay down.

Q    Okay
A    And Tiffany slep for about a hour...

Q    ...uh huh...
A    ...and she got up and she came downstairs with me.  Ah, bout a couple minutes later...bout
     thirty minutes later, my Mom came downstairs and fixed her somethin to eat.

Q    Okay.  After you ate, did you guys play?
A    We did, but we sat down about twenty minutes before we start playin.

Q    Uh huh
A    And we started to play after that twenty minutes.

Q    What'd you play?
A    Tag

Q    And what happened when you were playin tag?
A    Ah, she was taggin me and I tagged her back, and she had tagged me and I had grabbed her
     like dis...

Gan                          Page 3 of  18

⊗

STATEMENT OF   **LIONEL TATE**                    CASE # PK99-07-921

Q   Okay, when you say grabbed her like this, what do ya mean by that?
A   I grabbed her from behind.

Q   Okay, so is did she looking at you, or looking away from you?
A   She was like tryin to get away from me.

Q   Okay
A   Like lookin...

Q   ...the other way?
A   Yes

Q   So her back is facing you?
A   Yes

Q   Her back is to you?  Then whatta you do, reach out around her?
A   I got like..grabbed her like dis.

Q   In a bear hug?
A   Kinda...call it a bear hug.

Q   Okay Lionel, I..I don't need kind ofs and stuff.  All I wants the truth to explain the injury.
A   Yes

Q   Okay.  You got her in a bear hug.
A   Yes

Q   And what'd you do?
A   And I had grabbed her like dis and picked her up.

Q   Okay, when you say like this, you had both hands like by her stomach?
A   Yes

Q   Okay, and you picked her up that way?
A   Yes

Q   Okay, and what happened when you did that?
A   I put her down and she..she had said ouch and I said what's wrong, and she said it was her ..her like stomach and..and she..and I axed did I do it and she said yeah, kinda, but she said it was the food that was messin up her stomach, cause she wasn't fillin well.

Gan                          Page 4 of  18

STATEMENT OF     LIONEL TATE                         CASE # PK99-07-921

Q     Now did she just say "ouch", like..?
A     She was like, she was like, "ouch", like dat.

Q     It was loud?
A     Yes

Q     Okay
A     And..

KK    Did she do something with her hands when she said that?
A     She was like "ouch".

KK    Okay, your takin both your hands and your puttin to your..your right side of your stomach,
      is that what she did?
A     Yes

KK    Okay, so your imitating...
A     ...and...

KK    ...what she...
A     Yes.  And she...about five minutes later she went upstairs in my room...

Q     ...un huh...
A     ...into my bathroom and chuked in the ah toilet, because she said she wasn't feelin well and
      and five minutes had passed and I checked up on her and she said she was still throwin up,
      so I came...I went back downstairs and she had ke..a couple minutes had passed and she
      came downstairs with the pillow and she..she laid down and her head was like twisted..like
      she was movin around, like edgy...

Q     ...when you say she was movin around...
A     ...right...

Q     ...did she have her..her, was she holding her stomach moving around?
A     No, she was like movin.  Like a squenchin or somethin.

Q     Did she look like she was in pain?
A     No.  She was like move..ah, wigglin around and I had sought she was like ah off her pillow
      and over here on the stairs, so I just move..picked her up and moved her back over der where
      the pillow was.  And I was removin my hand and..and as I was removin my hand, her head
      hit, hit the thing...

Gan                         Page 5 of  18

⊗

STATEMENT OF    LIONEL TATE                    CASE # PK99-07-921

Q      ...what thing?
A      And...hit the table.

Q      Okay, about how high off the ground were you?  Just show me...
A      ...I'm not sure...

Q      ...my your (unintelligible) how far?
A      I picked her up and I was bout, bout right to my knees...

Q      ...you were, okay...
A      ...and I was holdin it and I put her down and I was movin my hands away and my hand had turned to hit the table and then she had her...then she had moved and her hand...she moved her hand onto her stomach and she was doin like dis and then she just made the sound...

Q      ...what sound?
A      Like yell, like Ow, like ow and my mom ca..ca..looked out the room and axed me what was that and I told her it was Tiffany, and she said, 'get her to stop'.  And I was like Tiffany, Tiffany, stop makin that noise, but she had stopped, and then I was standin..I had got back up, and sat down and started watchin TV again and then..and then when I looked back at her a couple minutes after I was watchin TV, her stomach wasn't movin up and down like it was suppose to, so I ran upstairs and got my mom and called her and toll her, her stomach wasn't movin up and down like it was suppose to.

Q      Lionel, how did she get the injury to her forehead?
A      She..that's when I had put her down and I moved my hand.

Q      Lionel, if she's facing up, she doesn't hit her forehead on the floor?
A      I tel..I was movin my hand away from her head...

Q      ,..right...
A      ...and it was like..it turned and hit the table, the side of the table.

Q      So, she hit her forehead on the table?
A      She was like dis and I moved my hand and just hit like she hit her head..on the side ah back of the table.

Q      Lionel, when you lift somebody up like this...
A      ...yes...

Q      ...okay and her head turns, and they hit the table, they get swung into the table.

STATEMENT OF   **LIONEL TATE**                                    CASE # PK99-07-921

A     No, I had her...I put her down and I was movin my hand, tryin to move her head...

Q     ...uh huh...
A     ...that's when her head just turnt and hit the table.

Q     Okay. How did she hit the back of her head?
A     I never seen her hit the back of her head.

Q     She hit the back of her head. She also hit the side of her head.
A     I never seen her hit the back or the side of her head.

Q     Was there any other time when you may have picked her up, or tried to move her, or she fell, or something, Lionel?
A     No, just the time she slipped when she was running, that was it.

Q     Yeah, yeah you can...
A     ...that may have been it. I don't
MT    ...when Tiffany..when I came into the house and I first picked up Tiffany...?
A     ..yes...

MT    And she said that Aunt Seca (?), I hit ahm, my face, or the side of my face..where did she hit wit the table?
A     She was like, she threw it up...

MT    ...uh huh...
A     ... and she landed, because you seen her holdin ah, ah ice..

MT    ...yeah cause she had ice...
A     ...she had the ice on the side...

Q     ... (everyone talking at the same time) Okay, alright..
MT    ...or somthing...

Q     ...that explains that injury, thank you.
Mt    I, I don't know the exact spot, but it was somewhere like that.

Q     Okay. Ahm, when..there was one point where you guys are..she's like teasing you by puttin her hand on you, what was that about?
A     Oh, she was..that's when she was asleep. She wasn't teasin me, she was asleep. I don't think she know what she was doin and she just kep movin her hand, cause my Mom heard

Gan                              Page 7 of 18

STATEMENT OF   LIONEL TATE                                   CASE # PK99-07-921

(Continued)  me ah sayin Tiffany get off me, get off me, stop doin at, because she was still sleepin and she just kep movin her hand back on me, and I kep sayin Tiffany stop and she just kep movin her hand back on. I stood there a...

MT   ...I heard dat too. I heard that because I, I, I said ahm, "what were you tellin Tiffany to ah move her hand off you", or somethin like that. I remember that too. Now I member that.

A   ...I was..I was der a couple of minutes tellin her..

MT   ...I was like shhh...

A   ...like move her hand off me, move her hand off..move your hand off me and she just kep..everytime I moved it off, she just put it back on.

Q   Okay

A   Like she wanted it in that position...

Q   ...when...

A   ...cause...that's when she was asleep.

Q   Okay.  Is there another time when you were pushing her or shaking her when she was on the ground?

A   Ah, when I was tellin her to stop makin the noise? That my Mom tol..that my Mom axed me to ah..to ax..tell her to stop. That's the only time I was pushin her. Like Tiffany, wake up...

Q   ...you were touching..

A   ...tellin her...

Q   ...that lightly, or was it stronger?

A   I was like Tiffany, stop mo...ah stop making all that sound. Stop yellin.

Q   Okay, where..what part of the body were you pushing?

A   Like right..like on her side like deep here.

Q   Okay. Cause, I just wanna tell ya it, it..she has an injury right where you pointed. So, were you pushing hard?

A   No, I was not pushing her hard, I was just like "Tiffany stop makin all that noise".

Q   Okay. When you were behind her and you gave her that bear hug and lifted her up?

A   Yes

Q   Did you do it more than once?

A   No, I only did it once.

Gan                          Page 8 of  18

⊕

STATEMENT OF   LIONEL TATE                           CASE #  PK99-07-921

Q     Did ya kinda bounce her when you had her like that?
A     No.  I just picked her up like dis and I had did like dis, had  put her down on her feet.

Q     Picked her up and moved her?
A     Yes

KK    Did you squeeze when you did that?
A     No, I just kinda like grabbed her...just like grabbed her and moved her..moved over, I didn't
      squeeze.

Q     Well, you had to squeeze...
MT    He probably squeezed because he tried to pick me up.

Q     Okay
MT    ...like that, and I'm sayin boy, I'm too heavy for you, you know.

KK    Umm, what, what area of the..the residence did this all occur?
Q     Where were you in the house?
A     In the livin room.

KK    When she was on the ah, on the ah floor...?
A     ...yes...
Q     (We'll have a (unintelligible)

KK    What floor ahm...
Q     Sorry bout that...
MT    ...that's the jacket (?)

KK    Oh sorry.  Ahm, on the floor when this happened, she was face up, and this is by the stairs
      that you (Unintelligible)?
A     Where she was?

KK    Yes sir.
A     I had moved her cause she was right by on the stepper thing.

KK    Okay
A     And I had just picked her up and put her back where she was..we were like, where she was
      layin at in the first place.

Gan                           Page 9 of  18

⊕

STATEMENT OF   LIONEL TATE                          CASE #  PK99-07-921

KK    Okay, now when you..when you moved her, you said you had both hands underneath?
A     Yes

KK    You had both hands underneath what?  One hand was under what?
A     I had one hand like...

KK    ...point to me on your body where your...
A     ..right here...

KK    ...like this here...
A     ..like right here..

KK    ...okay, so your going behind the shoulder blade...
A     ..so her neck...

KK    ..area, behind your neck?
A     Like right there.

KK    And where was your other hand?
A     And I had the other hand like..like right here on the legs.

KK    ...underneath her legs...
A     ...had her like dis...

KK    And how were your hands positioned...
A     ...der was just...

KK    ...when you...
A     ...day was just like dis.

KK    Okay, you're showin me palms up this time?
A     Yeah

KK    Now, when you lifted her, you said you got knee high, is that correct?
A     Yes

KK    How was her body positioned when you were holding her at that point...
A     ..she...

STATEMENT OF    LIONEL TATE                          CASE # PK99-07-921

KK    ...was she...?
A     ..she was, she was just like laying, laid out.

KK    Which way was her chest pointing when you were holding her at this position?
A     She was like pointing..like...

Q     ...straight up or down?
A     ..in like. It was kinda like bend in a little bit.   It was like bended in some and then I just laid her down.

KK    Okay.  When did she hit the table thought, prior to you layin her down?
A     Ah, when I moved my hand...when I was releasin my hand from her.

KK    Okay, and were you moving at the time?  Forward, or were you moving backward, or were you...?
A     ...I was moving backward.

KK    And..and when you released her as you said, what part of her head, can you point to me on your body, hit the table?
A     Like right up here...

KK    ...okay...
A     ...on my forehead.

Q     By your forehead?
A     Yes

KK    Alright, did any other part of her head hit the table?
A     Not that I know of.

KK    What do you know?
A     Just know that when she..when I was releasin my hand from right der, her head turned and hit the table.

KK    Okay, her head turned?  Which part of the...which part turned?
A     ..like she had her face up like dis and I was comin from..movin from this side, comin back, and her head ja..just hit it like dit.

Gan                          Page 11 of  18

STATEMENT OF   **LIONEL TATE**                                  CASE #  PK99-07-921

KK     The side of her head? (Unintelligible)

A      The tables comin like this way and when I I was comin from this way, backin up and I'm..and her head was like this kinda.

KK     Okay, your showin me your head bent over to the side is what your showin me. (Talking at the same time)...

A      ...no her head was kinda like straight up like dis and when I was removin my hands from right there, that's when her head just hit the table.

KK     Okay, can you...

A      ...sideways...

KK     Okay sideways.  Can you tell me if it was the left side, or the right side, or do you not know?

A      Do not know

KK     Okay, so..but you do know that the side of her head...

A      ...yes...

KK     Okay, hit what portion of the table ah that we're just talking about?

A      The..the ah side that they stand up.  Like the table like stands up.

KK     Okay, so the side.  Was it the corner, or was it ah the table, or was it the flat side?

A      It was kinda like ah..it was the flat..kinda like the corner was right there...

KK     ...okay...

A      ...and the flat side.

KK     It was the side of her head...

A      ...kinda like...

KK     ..where did it contact?

A      It contacted ah, ah like the corner a little bit?

KK     ..corner of the (unintelligible)?

A      Yes

KK     The side that goes down?

MT     The table is all solid, and there's no...

A      ...yeah...

MT     ...in between the...

Gan                                Page 12 of  18

STATEMENT OF   LIONEL TATE                    CASE # PK99-07-921


KK    ..ah, okay...
MT    ..side..

KK    Okay
MT    All solid just like a top...

Q     ...okay...
MT    ...with the..it's like a wall.

Q     Lionel when..when Tiffany..when you gave her that bear hug and and then put her down and
      was she other than the fact, that she then yelled and said her stomach hurt, was she tellin you
      throughout this that she didn't feel good, or that...
A     After I had put her down? That's when she said "Ouch", and she said...I said, "did I do that",
      and she said, 'yeah, you did somethin, but ah my stomach was hurtin from the food that I
      ate'. That's what she had toll me.

Q     How bout when she ah hit her head. What'd she tell you then?
A     She was sleepin when she..when she had hit her head.

Q     Let me ask you Lionel, the only problem I'm having here is how is Tiffany sleeping through
      all of this?
A     She..I'm talking about when I had picked her up. She was already on the ground sleepin.

Q     Was she sleeping or was she...?
A     ..she was sleepin...

Q     ...hurt?
A     She was sleepin.

Q     Why did you move her?
A     I was movin her from in front of the stairs, because the step master, or whatever...

Q     ...uh huh...
A     ...it's right by the stairs and that's where she was, so I just picked her up and moved her, so

Q     ...why, were you, were you, were you...
A     ...she wouldn't be in the way...

Q     ...were you gonna use the stair thing? Stair climber, or the stair master?
A     No sir

Gan                          Page 13 of 18

STATEMENT OF:   **LIONEL TATE**                    CASE # PK99-07-921

MT      (Unintelligible)

Q       Okay, correct.  Did...Lionel, anything else you may have done..any other time you picked
        her up, any other game you may have been playing during this time?  You been straight wit
        us on, on this..
A       Yes

Q       What else?
A       Dat was it.

Q       Well, she's got a couple more bruises.
A       Well, I don't know about anything else.  That's all I know.

Q       Okay.
KK      Ahm, when was the first time that you realized something was wrong with, with Tiffany?
A       When she first came...ah after she had ah ate the ox tail and rice...

Q       ...uh hum...
A       ...that's she, she went upstairs in my bathroom and puked and said her stomach was hurtin.

Q       Wa..wait a minute, was that before the bear hug, or after the bear hug?
A       That was after the bear hug.

Q       Okay, so she ate, and then that's when you guys were playing and you...
A       ...she sat down about twenty minutes before we start playin.

Q       Okay
A       Because she wanted to let her food digest a little bit.

Q       Uh huh
A       And we start playin and then after this..after I had picked her up...

Q       ...the bear hug?
A       Yes

Q       That's when she went upstairs to puke?
A       Yeah, she toll me her stomach was hurtin from the food and what I had did.  She said I did
        some of it.

Gan                        Page 14 of  18

⊕

STATEMENT OF   **LIONEL TATE**                    CASE # PK99-07-921

KK     Was anyone else present in the living room when this ah bear hug occurred?
A      No sir

KK     Was anyone else present in the living room when ah Tiffany's head hit the table?
A      No

KK     Okay. Who else was in the house at the time of all this?
A      Me and my mother.

KK     Okay, where was your Mom during this?
A      Upstairs

KK     Okay, what was she doing?
A      Sleeping

KK     Did you ah, when she came back down after ahm as you described, before puking ah, when
       her head hit the table did you realize that at that point that there was a problem?
A      Who me?

KK     Yes
A      She just hit her head and, and I know she had put her hand on her stomach.  She was at .when
       I had first picked her up...

KK     ...did you believe at that time there was a problem?
A      No

KK     When did you realize after that, that there was a problem?
A      When her stomach was not moving at all.

KK     Then, and as a result of that, what'd you do next?
A      I went upstairs and told my Mom

KK     Okay, and then what happened next?
A      My Mom came down...

YK     ...Let me ask you this. What'd you tell your Mom?
A      I toll my Mom that ah Tiffany stomach wasn't movin like it was suppose to...

STATEMENT OF   **LIONEL TATE**                    CASE # PK99-07-921

KK   ...okay...
A    ...and she, and she was like what and I said her stomach wasn't movin, and she came down stairs. She was runnin down stairs and started to give Tiffany CPR.

KK   Okay
A    And nothin was happening but vomit was comin up and she toll me go get the phone and, and she pressed 911 and called the police.

KK   Okay, now did you tell your Mom ahm during that incident, or anytime after, about that bear hug?
A    No

KK   Did you tell your Mom about Tiffany ah hitting the table?
A    (no response)

KK   Did you tell...
A    ...I toll her that she had hit herself on the table.

KK   Okay
A    But, I just didn't tell her how.

KK   Okay. And ah, was that when all the paramedics were there, or after, when, when did you tell her about it?
A    After.

KK   After
MT   Ah, he said when she was rollin around, she hit her head on the table.
A    Yes, she was rollin.

Q    Okay. Did ahm, well why didn't you tell your Mom what happened?
MT   Answer him.
A    I was scared

Q    Why were you scared?
A    She (?)

Q    Huh. (Mumbling) Huh. Why were you scared?
KK   Were you just scared of what the consequences could be?

Gan                          Page 16 of 18

STATEMENT OF:   **LIONEL TATE**                    CASE #: PK99-07-921

Q       Were you scared because of what happened?  Huh?  Your shaking your head yes.  Is that
        what you...because you thought of what happened?  Huh?
A       No

Q       What? (Unintelligible) Huh, how come you didn't tell your Mom?
A       (No answer)

Q       Huh?  Lionel, I want you to look at me, okay.  Why didn't you tell your Mom?
A       (no answer)

Q       How come?  Were you afraid of what you had done?
A       I was scared (unintelligible)

Q       You were scared?
KK      (Unintelligible)

KK      Okay.  Ahm, let me ask you this ahm, as far as ah tonight, being here and stuff like that, did
        you have opportunities to use the restroom this evening?
A       Yes

KK      Okay, how..did you use it, how many times?
A       Three

KK      Okay, and ah, did you have earlier..did you drink a Sprite?
A       Yes

KK      And did you eat some chips?
A       Yes

KK      And what were you doing just prior to us coming back here to this room?
A       Playing

KK      Okay, where were you playing at?
A       In your room, interview room, with the toys.

KK      Okay, so there's a room there and it has toys and stuff in it?
A       Yes

KK      Okay, have you been handcuffed tonight at all?
A       No

Gan                     Page 17 of  18

⊕

STATEMENT OF   **LIONEL TATE**                    CASE #  PK99-07-921

Q       Were you mistreated in any way?
A       No

Q       Did anybody yell at you?
A       No

KK      Okay, did anyone here tell you what to say?
A       No
MT      (unintelligible) I told him what to do.

Q       Yes, did you...
A       (unintelligible)

Q       Did your Mom tell you what to say?
A       No

Q       Okay.  No further questions Kathleen.  Detective?
KK      No more questions

Q       Okay, the time is now 8:52 by my pager and that will terminate the interview.



1

IN THE CIRCUIT COURT OF THE 17th
JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

- - - - - - - - - - - - - - -

STATE OF FLORIDA,

vs

ORIGINAL

                    No. 99-14401CF
                    Judge Joel T. Lazarus

LIONEL TATE,

     Defendant.

- - - - - - - - - - - - - - -

                    Fort Lauderdale, Florida
                    June 28, 2000
                    8:30 a.m.


      The above-entitled cause came on for hearing

before the Honorable JOEL T. LAZARUS, Presiding Judge,

at the Broward County Courthouse, 201 Southeast Sixth

Street, Fort Lauderdale, Florida, on the 28th day of

June, 2000.

APPEARANCES:

        MICHAEL J. SATZ, State Attorney
        By:  KENNETH PADOWITZ, ESQ.,
        Assistant State Attorney,
        appearing on behalf of the State of Florida

        By:  JAMES LEWIS, ESQ.,
        appearing on behalf of the defendant




                  DEFENSE MOTIONS

2

1                           I N D E X

2    June 28, 2000          Motion to Suppress      Pages (24-137)

3    WITNESS                                         PAGE
     DETECTIVE JOHN BERRENA
4    Direct Examination By Mr. Padowitz              23
     Cross Examination By Mr. Lewis                  109
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

45

1      Q.    I'm showing you what's marked State's Exhibit A

2  for identification and ask you to take a look at that.  Do

3  you recognize that?

4      A.    I recognize the case number and the name, yes.

5      Q.    What is that?

6      A.    It's the case number used for this investigation

7  PK99-07-291 dated 7/30 of '99.  Underneath it has Lionel

8  Tate and then the Roman numeral one.

9      Q.    Is this the taped confession that you just

10 testified you took of Lionel Tate?

11     A.    Yes.  I mean, I haven't heard this specific tape,

12 but it says Lionel Tate statement one.

13     Q.    You have heard the actual tape?

14     A.    Absolutely.

15     Q.    And it was in the same or similar condition as the

16 date you took the tape?

17     A.    Yes.

18          MR. PADOWITZ:  Your Honor, State is moving State's

19     A for identification into evidence.

20          MR. LEWIS:  Without objection.

21          THE COURT:  Okay.  That's State's 2 for purposes

22     of the hearing.

23          (Thereupon, State's Exhibit A for

24          identification was received into evidence

25          and marked as State's Exhibit 2.)

46

1        THE COURT:  You are not playing that are you?

2        MR. PADOWITZ:  I was.

3        THE COURT:  Do I need to hear the whole tape?

4        MR. LEWIS:  I would like you to hear the whole

5    tape.

6           (Thereupon, State's Exhibit 2 was published

7           to the Court.)

8        DETECTIVE BERRENA:  The following is a sworn taped

9    statement and a reference to case number PK99-07-921.

10   The statement is going to be in reference to an

11   unattended death of juvenile Tiffany Eunick,

12   E-U-N-I-C-K.  Date of occurrence is 7/28/99.  Incident

13   location is 3900 Southwest 52nd Avenue, Apartment 805,

14   Pembroke Park, Florida.  This statement is taken from

15   Lionel Tate, juvenile.  Date of birth of January 30th,

16   1987.  He lives at 3900 Southwest 52nd Avenue,

17   Apartment 805, Pembroke Park, Florida.  Phone number

18   964-8042.  Statement taken on 7/30/99, and it's now

19   approximately 7:13 p.m.  This statement is taken from

20   Detective Berrena, CCN 6949.  Also present Detective

21   Kaminsky, CCN of 6523.  Also present is Lionel's

22   cousin.

23        State your name.

24        MR. HENRY:  Bradley Henry.

25        DETECTIVE BERRENA:  And your date of birth?

47

1        MR. HENRY:  Twenty-three of twelve, '65.

2        DETECTIVE BERRENA:  Prior to going on tape,

3   Lionel, you read that Rights Waver Form?

4        THE DEFENDANT:  Yes.

5        DETECTIVE BERRENA:  Did you understand it?

6        THE DEFENDANT:  Yes.

7        DETECTIVE BERRENA:  Okay.  You said Bradley,

8   right?

9        MR. HENRY:  Yeah.

10       DETECTIVE BERRENA:  You signed and he understood

11   it okay?

12       MR. HENRY:  Yes.

13       DETECTIVE BERRENA:  Okay.  All I want you to do

14   with this --

15       DETECTIVE KAMINSKY:  Let me, let me just also --

16   This is Detective Kaminsky.  Before we continue I just

17   want to read these things over, also.  Before Detective

18   Berrena or I ask you any questions, I want to advise

19   you of your constitutional rights.  You have the right

20   to remain silent.  Anything you say can be used against

21   you in a court of law.  You have the right to talk to a

22   lawyer and have a lawyer present before any

23   questioning.  If you cannot afford a lawyer, one will

24   be appointed to represent you before any questioning if

25   you wish.  Do you understand each of these rights that

48

1    I have read to you, Lionel?

2            THE DEFENDANT:  Yes.

3            DETECTIVE KAMINSKY:  And do you also understand

4    these rights, Bradley?

5            MR. HENRY:  Yeah, I understand them.

6            DETECTIVE BERRENA:  Is that your signature there?

7            THE DEFENDANT:  Yes.

8            DETECTIVE KAMINSKY:  And Bradley, did you also

9    sign the form here at the bottom in the witness

10   section?

11           MR. HENRY:  As a witness, yes.

12           DETECTIVE BERRENA:  Lionel, what I want you to do

13   is tell me that Wednesday starting from the time at 4

14   p.m. when you were at your house.  Okay.  Prior to, all

15   right.  That's what the statement is going to be about.

16   Before we do that, I'm just going -- Do you know right

17   from wrong?

18           THE DEFENDANT:  Yes.

19           DETECTIVE BERRENA:  Do you know truth from a lie?

20           THE DEFENDANT:  Yes.

21           DETECTIVE BERRENA:  Would the truth be my shirt is

22   green?

23           THE DEFENDANT:  Lie.

24           DETECTIVE BERRENA:  Okay.  If I said today --

25           THE DEFENDANT:  Lie.

49

1          DETECTIVE KAMINSKY:  Hold on, Lionel.  We talked

2     earlier before we went on tape, we talked about truths

3     and lies and stuff like that.

4          THE DEFENDANT:  Yes.

5          DETECTIVE KAMINSKY:  I know some of the questions

6     you are answering from prior, but let me ask you some

7     new questions.

8          If I said -- If I said today was Christmas Day,

9     would that be a truth or would that be a lie?

10          THE DEFENDANT:  Lie.

11          DETECTIVE KAMINSKY:  If I said we were at a police

12     station now, would that be a truth or lie?

13          THE DEFENDANT:  Truth.

14          DETECTIVE KAMINSKY:  Okay.  Let me ask you this,

15     what grade are you in?

16          THE DEFENDANT:  Going into sixth.

17          DETECTIVE KAMINSKY:  Okay.  You're going to sixth

18     grade?

19          THE DEFENDANT:  Yes.

20          DETECTIVE KAMINSKY:  What's your favorite class

21     and subject?

22          THE DEFENDANT:  Math.

23          DETECTIVE KAMINSKY:  What kind of grades do you

24     get in math?

25          THE DEFENDANT:  Ninety-seven average.

50

1    DETECTIVE KAMINSKY:  Ninety-seven average?

2    THE DEFENDANT:  Yes.

3    DETECTIVE KAMINSKY:  So you're doing real well in

4    math?

5    THE DEFENDANT:  Yes.

6    DETECTIVE KAMINSKY:  Okay.  How about reading?

7    THE DEFENDANT:  I'm good in reading.

8    DETECTIVE KAMINSKY:  Okay.  Everything that we

9    talk about here, if you don't understand something as

10   we talk about it I want you to say I don't understand,

11   is that okay?

12   THE DEFENDANT:  Yes.

13   DETECTIVE KAMINSKY:  And if you are not sure of

14   something, do not guess.

15   THE DEFENDANT:  Okay.

16   DETECTIVE KAMINSKY:  And if you're -- If the

17   question requires a yes or no, you can answer that.

18   And if you have to say something else after that, it's

19   okay to say that.  Do you understand that?

20   THE DEFENDANT:  Yes.

21   DETECTIVE KAMINSKY:  And if you do not understand

22   something, please say that you do not understand and

23   we'll make sure that is clear.

24   THE DEFENDANT:  Okay.

25   DETECTIVE BERRENA:  Four p.m. you, Tiffany and

51

1    your mom are at your house?

2         THE DEFENDANT:  Yes.

3         DETECTIVE BERRENA:  You just came back from

4    Publix?

5         THE DEFENDANT:  Yes.

6         DETECTIVE BERRENA:  Okay.  Then all I want you to

7    do is tell me what happens from that point on.

8         THE DEFENDANT:  My mom puts away the groceries.

9    She goes upstairs and goes to sleep.  Wait, all right.

10   Tiffany goes upstairs with me and my mom comes up after

11   she puts up groceries.  Tiffany tells my mom that her

12   stomach is hurting.  My mom tells Tiffany to go take a

13   nap.  Tiffany sleeps for about a hour.  Me and Tiffany

14   go downstairs and we start playing tag in the house.

15   And we were running in the house, tagging, and I

16   grabbed her like playing tag and --

17        DETECTIVE BERRENA:  How did you grab her?

18        THE DEFENDANT:  Like -- Well, like how do you grab

19   somebody.

20        DETECTIVE BERRENA:  Well, show --

21        MR. HENRY:  Demonstrate.  Demonstrate for me.

22        THE DEFENDANT:  Like how you grab like this?

23        DETECTIVE BERRENA:  No, stand up and show us.

24        MR. HENRY:  Stand up.

25        THE DEFENDANT:  Like this.

52

1      DETECTIVE BERRENA:  Oh, easy son.

2      MR. HENRY:  Take it easy, man.

3      DETECTIVE BERRENA:  Were you behind her?

4      THE DEFENDANT:  She said the same thing.  Yes.

5      DETECTIVE BERRENA:  Were you behind her?

6      MR. HENRY:  Yeah (inaudible).

7      THE DEFENDANT:  Yes.

8      DETECTIVE BERRENA:  Right.  Was it with that kind

9  of force you picked her up with?

10      THE DEFENDANT:  I'm not too sure.

11      DETECTIVE KAMINSKY:  Okay.  When you are showing

12  us both, both Bradley and Lionel are standing up and

13  Lionel is behind Bradley.  Lionel is placing his hands

14  around the waist area.  And without using force go

15  ahead and show us the hold that you had.

16      DETECTIVE BERRENA:  Yeah, slowly.

17      THE DEFENDANT:  Like that?

18      DETECTIVE KAMINSKY:  Okay.  You're showing both

19  your hands.

20      THE DEFENDANT:  And I picked her up like that.

21      DETECTIVE KAMINSKY:  Okay.  Hold on.  You are

22  showing both of your hands clinched around the front

23  area of the waist.

24      THE DEFENDANT:  Yeah.

25      DETECTIVE KAMINSKY:  Now, is this how you were

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

53

1  holding Tiffany at that time?

2       THE DEFENDANT:  I was like picking her up like

3  this, yes.

4       DETECTIVE KAMINSKY:  When you did that, what did

5  you do?

6       THE DEFENDANT:  I picked her up.

7       DETECTIVE KAMINSKY:  Did you squeeze or not?

8       THE DEFENDANT:  I like -- Like this, and I tried

9  to pick her up.

10       DETECTIVE KAMINSKY:  Okay.  Were you squeezing

11  when you did that?

12       THE DEFENDANT:  Not -- I would like squeezing her

13  like this.

14       DETECTIVE BERRENA:  Did you pick her up off the

15  ground?

16       THE DEFENDANT:  Yes.

17       DETECTIVE BERRENA:  Did you like bounce her up and

18  down a couple of times?

19       THE DEFENDANT:  No, I grabbed her like this.

20       DETECTIVE BERRENA:  Uh-huh.

21       THE DEFENDANT:  And picked her up.

22       DETECTIVE KAMINSKY:  When you did that, what was

23  Tiffany's reaction?

24       THE DEFENDANT:  When I put her she said ouch.

25       DETECTIVE KAMINSKY:  Okay.  And what did she do?

54

1      DETECTIVE BERRENA:  That softly or --

2      DETECTIVE KAMINSKY:  When she said --

3      DETECTIVE BERRENA:  Or how did she --

4      THE DEFENDANT:  She was like ouch.

5      DETECTIVE KAMINSKY:  Okay.  You can go ahead and

6  sit down.  Now, when she went ouch, let me ask you what

7  did - what did she do at that point?

8      THE DEFENDANT:  She -- After I put her down she

9  tagged me back again and I start --

10      DETECTIVE KAMINSKY:  Before you did, did she do

11  anything with her hands?

12      THE DEFENDANT:  Like what?

13      DETECTIVE KAMINSKY:  I mean, when she said ouch,

14  did she do anything?

15      THE DEFENDANT:  She did like ouch.

16      DETECTIVE KAMINSKY:  Okay.  You're pointing to

17  your right side of your stomach area.  What happened

18  after that?

19      THE DEFENDANT:  I put her down and she tagged me

20  again and that's when I --

21      DETECTIVE KAMINSKY:  Go ahead.

22      THE DEFENDANT:  That when we start running back

23  around, and she ran upstairs about halfway and hit her

24  leg.

25      DETECTIVE KAMINSKY:  What did she hit her leg on?

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

55

1          THE DEFENDANT:  The -- The bar.  There like the

2     thick bar.

3          DETECTIVE KAMINSKY:  Which thick bar?

4          THE DEFENDANT:  Thick bar on the stair.

5          DETECTIVE KAMINSKY:  Is in front of the stair.

6     Okay.  What part of her body touched the stair?

7          THE DEFENDANT:  Like her leg.

8          DETECTIVE KAMINSKY:  Which leg, do you remember?

9          THE DEFENDANT:  No.

10         DETECTIVE KAMINSKY:  What happened after that?

11    What happened next?

12         THE DEFENDANT:  That's when she told me she wasn't

13    playing anymore because she had hit her leg.

14         DETECTIVE KAMINSKY:  Okay.  Where did she go?

15         THE DEFENDANT:  She went upstairs after that and

16    puked in my bathroom.  And she came and I went upstairs

17    and checked on her.  And she said she was still puking.

18    And I came back downstairs and she said she was tired.

19    So like -- And then after that she went to sleep and I

20    saw her head was twisted.  Like her head was off the

21    pillow and I pick her and moved it back on the pillow.

22    And when I was moving my hands she had hit her head.

23         DETECTIVE KAMINSKY:  Okay.  Let me ask you.  When

24    you moved, she was on the ground.  Where was she at on

25    the ground?

56

1      THE DEFENDANT:  Yup.

2      DETECTIVE KAMINSKY:  Was she on the floor or on

3   the couch?

4      THE DEFENDANT:  On the floor.

5      DETECTIVE KAMINSKY:  In what room of the house?

6      THE DEFENDANT:  In the living room.

7      DETECTIVE KAMINSKY:  Where was she by on the

8   floor?

9      THE DEFENDANT:  Can't describe like -- We have the

10   stairs this way.

11      DETECTIVE KAMINSKY:  What kind of furniture?

12      THE DEFENDANT:  We have a sofa, stairs.  We have

13   the -- What's the thing that my mom got in the corner

14   that she got a tread mill.

15      MR. HENRY:  Stair stepper.

16      THE DEFENDANT:  The step, yeah, stair stepper.

17      DETECTIVE KAMINSKY:  Okay.

18      THE DEFENDANT:  Like that.  She was kind of by

19   that.

20      DETECTIVE KAMINSKY:  Okay.

21      THE DEFENDANT:  That's when I picked her up.

22      DETECTIVE KAMINSKY:  Okay.

23      THE DEFENDANT:  And moved her on the pillow.

24      DETECTIVE KAMINSKY:  When you went to pick her up,

25   where did you place your hands?

57

1    THE DEFENDANT:  I had my, my hand right here.  One

2    right here.

3    DETECTIVE KAMINSKY:  Would you show me?  You poke

4    both hands out with palms up?

5    MR. HENRY:  -- so he can demonstrate.

6    DETECTIVE KAMINSKY:  Well.

7    THE DEFENDANT:  Can I pick you up?  I was like --

8    DETECTIVE KAMINSKY:  No, no, that's all right.

9    THE DEFENDANT:  I had one hand like right here.

10   DETECTIVE BERRENA:  By your head?

11   DETECTIVE KAMINSKY:  One --

12   THE DEFENDANT:  Like right here.

13   DETECTIVE BERRENA:  Okay.

14   THE DEFENDANT:  And one leg right here.  My hand

15   right here.

16   DETECTIVE BERRENA:  When you picked her up was she

17   like, you know how you pick somebody up and you have

18   them like level, or did you pick her up where she's

19   hanging from one side?

20   THE DEFENDANT:  No, she was like, kind of like

21   level, but her head was hanging down.

22   DETECTIVE BERRENA:  Okay.

23   THE DEFENDANT:  Like that.

24   DETECTIVE BERRENA:  What happened?

25   THE DEFENDANT:  And I put her down on the pillow

58

1      and I was moving my hand right there and she hit it.

2              DETECTIVE BERRENA:  She -- That's when she hit her

3      head.

4              THE DEFENDANT:  She hit her head.

5              DETECTIVE BERRENA:  I didn't hear, I'm sorry.

6              THE DEFENDANT:  And she hit her head.  And --

7              DETECTIVE BERRENA:  All right.  Did she hit her

8      head on the floor, or where did she hit her head?

9              THE DEFENDANT:  No, she hit her head on like the -

10     what you call it.  The side of the table.

11             DETECTIVE BERRENA:  What?

12             THE DEFENDANT:  What you call it, thick thing

13     right here.  I can't --

14             DETECTIVE KAMINSKY:  This leg of the table?

15             THE DEFENDANT:  It's -- We don't have legs.

16             DETECTIVE KAMINSKY:  The side of the table?

17             THE DEFENDANT:  Side of the table, something like

18     that.  That's when I got up, sat down on the chair, and

19     I didn't see her stomach going up like this was

20     supposed to and I ran upstairs and got my mom.

21             DETECTIVE BERRENA:  All right.  Did at any time

22     when she was on the ground --

23             THE DEFENDANT:  Yes.

24             DETECTIVE BERRENA:  On the rig laying down, did

25     she hit her head any other time than that?

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

59

1       THE DEFENDANT:  Not that I know of.

2       DETECTIVE BERRENA:  Just the one time when you

3    picked her up?

4       THE DEFENDANT:  Yes, and put her down.

5       DETECTIVE BERRENA:  There wasn't a time when she

6    rolled around?

7       THE DEFENDANT:  She was like moving like that.

8       DETECTIVE BERRENA:  Okay.  And what happened?  I'm

9    sorry.  Okay, Detective.

10      DETECTIVE KAMINSKY:  When she was on the floor and

11   you went to move her, why did you move her?

12      THE DEFENDANT:  I was moving her body getting it

13   where the pillow was.  Just like putting her over

14   there.

15      DETECTIVE KAMINSKY:  When you lifted her, how high

16   up off the ground did you lift her?

17      THE DEFENDANT:  I don't really -- I lift her like

18   right up.

19      DETECTIVE KAMINSKY:  Can you show me from the

20   floor here?

21      THE DEFENDANT:  All right.

22      DETECTIVE KAMINSKY:  Can you show me in your

23   hands?

24      THE DEFENDANT:  It's like this.

25      DETECTIVE KAMINSKY:  How high up.

60

1        THE DEFENDANT:  I picked her up like this.  About

2    right here.

3        DETECTIVE KAMINSKY:  Okay.  So you're showing this

4    is approximately three feet of distance from the floor

5    to your hand?

6        THE DEFENDANT:  I guess so.

7        DETECTIVE KAMINSKY:  Is that --

8        THE DEFENDANT:  I don't know.

9        DETECTIVE KAMINSKY:  Approximately correct.

10       MR. HENRY:  That's approximately correct.

11       DETECTIVE KAMINSKY:  Is that what -- That's what

12   Lionel is showing me.

13       When you moved her, how far did you move her that

14   she --

15       THE DEFENDANT:  I just like --

16       DETECTIVE KAMINSKY:  Hit the table.

17       THE DEFENDANT:  I just like moved her where the

18   pillow was.  It really wasn't that far from where I

19   was.  I got up and moved her right there.

20       DETECTIVE KAMINSKY:  What side of her head hit the

21   table?

22       THE DEFENDANT:  It was like right up here.

23       DETECTIVE KAMINSKY:  What part where?

24       THE DEFENDANT:  Her head just turned.

25       DETECTIVE BERRENA:  Point.

61

1      DETECTIVE KAMINSKY:  Yeah, point to your head and

2    show me.

3      THE DEFENDANT:  Like right here I guess.

4      DETECTIVE BERRENA:  Well, you're pointing to your

5    whole face.  Pick a spot where you think.

6      THE DEFENDANT:  Right here I guess.

7      DETECTIVE BERRENA:  Okay.  Right here.

8      THE DEFENDANT:  I'm not sure.  She just turned.

9      MR. HENRY:  You're pointing between your eyes, up

10   above your forehead.

11     THE DEFENDANT:  Well, yes.

12     DETECTIVE BERRENA:  Your forehead, right here in

13   front?

14     THE DEFENDANT:  Guess so.

15     DETECTIVE BERRENA:  Of your forehead?

16     THE DEFENDANT:  Yes.  And She moved.  Like when I

17   moved my hand she went like this and that's when she

18   made this sound.  And my mom heard it, and she asked me

19   what was it.  And I said Tiffany and she said tell her

20   to stop.  And I said, Tiffany, stop, and she just

21   stopped and her stomach is not moving.  And she said

22   like that and nothing came out.  When she did stop

23   breathing and her heart, I mean her stomach wasn't

24   moving I went upstairs to get my mom.  And my mom was

25   doing C.P.R on her and throw up came out of her mouth.

62

1    A lot just came out her mouth.

2         DETECTIVE KAMINSKY:  Let me ask you, when you went

3    to move her, how many times did her head hit the table?

4         THE DEFENDANT:  I saw her head hit once like when

5    I moved her over there and I lifted my hand from back

6    there, that's when her head hit the table.

7         DETECTIVE KAMINSKY:  What was the distance from

8    the floor to the side of the table when that happened?

9         THE DEFENDANT:  I'm not for sure.

10        DETECTIVE KAMINSKY:  Was it --

11        THE DEFENDANT:  Distance.

12        DETECTIVE KAMINSKY:  Yeah.  Can you show me from

13   the ground up with your hand how far up from the table

14   did her head hit the table?

15        THE DEFENDANT:  The table was about the table was

16   about five -- I think it was about this high.  The

17   table is -- The table is about that high or something.

18        DETECTIVE KAMINSKY:  What I'm asking you is this,

19   when her head hit the side of the table, was she

20   falling out of your hands, or did --

21        THE DEFENDANT:  No.

22        DETECTIVE KAMINSKY:  Okay.

23        THE DEFENDANT:  That's when I had already had --

24   it was like she was kind of like this off the ground

25   and I had put her down.  That's when I had removed my

63

1    hand from right there and that's when her head turned

2    and hit the table.

3         DETECTIVE KAMINSKY:  Were you turning her body

4    when this happened?

5         THE DEFENDANT:  No.

6         DETECTIVE KAMINSKY:  When she made these sounds,

7    let me ask you this, what sound did your mother hear?

8         THE DEFENDANT:  She heard like an ow, something

9    like that like she was in pain.

10         DETECTIVE KAMINSKY:  What time -- At what point

11    during the process did she go ow?  When did Tiffany go

12    ow?

13         THE DEFENDANT:  That's why --

14         DETECTIVE KAMINSKY:  After what?

15         THE DEFENDANT:  After I had put her down and it

16    was she had --

17         DETECTIVE KAMINSKY:  Was this after the hug that

18    you demonstrated before or is this after being hit in

19    the table?

20         THE DEFENDANT:  No, she was sleeping after I put

21    her down and then she had hit her head and she never

22    said nothing.  And then about two, three minutes later

23    that's when she said ow.  She just like yelled and then

24    she went after that.  My mom came out and asked me what

25    was that.  And I said it was Tiffany.  And she told me

64

1    to tell her to stop.  And that's when I went moved

2    Tiffany telling her to stop.  She's like moving her

3    hand, like move her, like that, kind of like pressing.

4    And she went like she was throwing up but nothing came

5    out.

6        DETECTIVE KAMINSKY:  What did you do at that

7    point?  What did you do at that point?

8        THE DEFENDANT:  What?

9        DETECTIVE KAMINSKY:  When she did that, what did

10   you do next?

11       THE DEFENDANT:  I had just moved away from her and

12   sat back down and watched T.V again.

13       DETECTIVE KAMINSKY:  What were you watching on

14   T.V?

15       THE DEFENDANT:  Cow and Chicken.

16       DETECTIVE KAMINSKY:  What time was this about, do

17   you know?

18       THE DEFENDANT:  I think 10:30 or something.  It

19   was right after the Flintstones came on.

20       DETECTIVE KAMINSKY:  Okay.  You were watching T.V,

21   and what happened next?

22       THE DEFENDANT:  I looked back at Tiffany a couple

23   minutes later and her stomach wasn't moving, like going

24   up and down.  That's when I ran up there and told my

25   mom that here stomach wasn't moving.

65

1    DETECTIVE KAMINSKY:  Okay.  When you went up there --

2    you told your mom the stomach wasn't moving, what else

3    did you tell your mom?

4        THE DEFENDANT:  I just said her stomach wasn't

5    moving like it was supposed to and you need to come do

6    something.  And that's when she came downstairs and was

7    doing C.P.R on Tiffany.  And she still wasn't breathing

8    and my mom called the police.

9        DETECTIVE KAMINSKY:  Did you tell your mom what

10   happened?

11       THE DEFENDANT:  What?

12       DETECTIVE KAMINSKY:  Like you described to us?

13       THE DEFENDANT:  No.

14       DETECTIVE KAMINSKY:  Did you tell her the day it

15   happened?

16       THE DEFENDANT:  What?

17       DETECTIVE KAMINSKY:  The thing you just described

18   to us.  The process that you just described to us.  The

19   incident with Tiffany.  Did you tell her that day she

20   did C.P.R, Mom, this is what happened?

21       THE DEFENDANT:  I told her what happened except

22   for the one --

23       DETECTIVE KAMINSKY:  What did you tell your mom?

24       THE DEFENDANT:  I told her everything except when

25   I picked her up and moved her like that and when we

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

66

1   playing.

2       DETECTIVE KAMINSKY:  So what you are telling me is

3   tnat you didn't tell your mom about when you were

4   moving her with your hands and her head hit the table?

5       THE DEFENDANT:  No.

6       DETECTIVE KAMINSKY:  Okay.  Tell me, clarify, make

7   that clear so I understand.  What did you tell your mom

8   about what happened?

9       THE DEFENDANT:  I told her everything at like,

10  like when she wasn't breathing.  I told her like that

11  and --

12      DETECTIVE KAMINSKY:  Did you tell your mom that

13  her head hit the table?

14      THE DEFENDANT:  No.

15      DETECTIVE KAMINSKY:  Tiffany's head.

16      THE DEFENDANT:  No, I meant -- No.

17      DETECTIVE KAMINSKY:  Yes or no?

18      THE DEFENDANT:  No.

19      DETECTIVE KAMINSKY:  Okay.  Did you tell your mom

20  about the bear hug?

21      THE DEFENDANT:  No.  When we were playing?

22      DETECTIVE KAMINSKY:  Yes.

23      THE DEFENDANT:  No.

24      DETECTIVE KAMINSKY:  Is there anything other than

25  you didn't tell her -- What did you tell her?

67

1    THE DEFENDANT:  I told her like I just ran

2    upstairs and told my mom that Tiffany wasn't breathing.

3    And then after that I told her she went upstairs and

4    puked in bathroom and she came downstairs and told me

5    she was tired and she laid down on the floor and she

6    was like moving right and made that big sound.  And my

7    mom asked me what was it and I told her it was Tiffany.

8    And she said tell her to stop, that's because she said

9    she heard me to telling her to stop and Tiffany was

10   like moving her hand and my mom heard me from upstairs

11   telling her like move your hand off me, stuff like

12   that.  She kept moving her hand back up, and I kept

13   telling her to move off.  And my mom heard that and

14   that was it.

15        DETECTIVE BERRENA:  Okay.

16        THE DEFENDANT:  And I told her when her stomach

17   wasn't moving.

18        DETECTIVE KAMINSKY:  Now, that was Wednesday

19   night?

20        THE DEFENDANT:  Yes.

21        DETECTIVE KAMINSKY:  After Tiffany went to the

22   hospital, did you tell your mom any different story?

23        THE DEFENDANT:  My mom was really -- No, I didn't

24   tell her anything.

25        DETECTIVE KAMINSKY:  Thursday the following day,

68

1    did you tell your mom the story that you told us this

2    evening?

3          THE DEFENDANT:  No.

4          DETECTIVE KAMINSKY:  Any time since have you told

5    her, yes or no?

6          THE DEFENDANT:  No.

7          DETECTIVE KAMINSKY:  Okay.  So at this point, you

8    are telling me your mom does not know what you have

9    told us?

10         THE DEFENDANT:  When I moved her, no.  And played

11   with her, no.

12         DETECTIVE KAMINSKY:  What about the bear hug?

13         THE DEFENDANT:  When I was playing with her, no.

14         DETECTIVE KAMINSKY:  Detective Berrena?

15         DETECTIVE BERRENA:  I don't have any questions.

16         DETECTIVE KAMINSKY:  Okay.  Let me ask you,

17   everything we discussed here, has that been the truth

18   or has that been a lie?

19         THE DEFENDANT:  The truth.

20         DETECTIVE KAMINSKY:  Did Detective Berrena or

21   myself, did we tell you to say anything?

22         THE DEFENDANT:  No.

23         DETECTIVE KAMINSKY:  Did we force you to say

24   anything?

25         THE DEFENDANT:  No.

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

69

1       DETECTIVE KAMINSKY:  Has everything you said to us

2   been of your own free will?

3       THE DEFENDANT:  Yes.

4       DETECTIVE KAMINSKY:  Okay.  And while you are here

5   did you have an opportunity to use the restroom?

6       THE DEFENDANT:  Yes.

7       DETECTIVE KAMINSKY:  Did you also have an

8   opportunity to drink Sprite or eat chips that we have

9   here?

10      THE DEFENDANT:  Yes.

11      DETECTIVE KAMINSKY:  I have no more questions.

12      DETECTIVE BERRENA:  I have nothing further

13  Bradley.  This will then conclude the statement at 7:31

14  one p.m.

15      (Thereupon, the taped statement was

16      concluded.)

17      MR. PADOWITZ:  Would the Court like me to

18  continue?

19      THE COURT:  Sure.  I'm waiting for you.

20      Q.   (BY MR. PADOWITZ) Detective, prior to going on

21  tape when every one was assembled in the room, you and

22  Detective Kaminsky, Bradley Henry and the defendant, at

23  that point going on tape was the defendant under arrest?

24      A.   No, sir.

25      Q.   Was he being detained at all, at that point?

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

# TAB 2

Depo of Lara Mahaney (World Wrestling vs. L. Brent Bozell, III) 1-15-2002

## ACE-FEDERAL REPORTERS, INC.

**Page 1 to Page 385**

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**ACE-FEDERAL REPORTERS, INC.**
**1120 G Street, N.W.**
**Suite 500**
**Washington, DC    20005**
**Phone:    800-336-6646**
**FAX:    202-737-3638**

Page 1

[1]   UNITED STATES DISTRICT COURT
[2]   FOR THE DISTRICT OF NEW YORK
[3]
[4]   - - - - - - - - - - - - -x
[5]        WORLD WRESTLING FEDERATION :
[6]   ENTERTAINMENT, INC., a :
[7]   Delaware corporation, :
[8]   Plaintiff, : Case Number
[9]   vs. : 00CIV8616 (DC)
[10]  L. BRENT BOZELL, III, ET :
[11]  AL. :
[12]  Defendants. :
[13]  - - - - - - - - - - - - -x
[14]
[15]  DEPOSITION OF LARA MAHANEY
[16]
[17]  Washington, D.C.
[18]  Tuesday, January 15, 2002
[19]
[20]       REPORTED BY:
[21]  PATTY ARTRIP GELS
[22]

Page 2

[1]   Video Deposition of LARA MAHANEY, called for
[2]   examination pursuant to notice of deposition, on
[3]   Tuesday, January 15, 2002, in Washington, D.C. at the
[4]   law offices of Kirkpatrick & Lockhart, 1800
[5]   Massachusetts Avenue, NW, at 9:30 a.m. before PATTY
[6]   ARTRIP GELS, a Notary Public within and for the
[7]   District of Columbia, when were present on behalf of
[8]   the respective parties:
[9]
[10]  JERRY S. McDEVITT, ESQ.
[11]  Kirkpatrick & Lockhart, LLP
[12]  535 Smithfield Street
[13]  Pittsburgh, Pennsylvania 15222
[14]  413-355-6500
[15]  On behalf of Plaintiff
[16]
[17]  THOMAS A. LEGHORN, ESQ.
[18]  Wilson, Elser, Moskowitz, Edelman & Dicker
[19]  150 East 42nd Street
[20]  New York, New York 10017-5639
[21]  202-490-3000
[22]  On behalf of Defendant

Page 3

[1]   APPEARANCES (Continued)
[2]
[3]   and
[4]
[5]   ROBERT R. SPARKS, JR., ESQ.
[6]   Herge, Sparks & Christopher
[7]   6862 Elm Street, Suite 360
[8]   McLean, Virginia 22101
[9]   On behalf of the Defendant
[10]
[11]

Page 4

[1]   Whereupon,
[2]   LARA MAHANEY
[3]   was called as a witness and, having first been duly
[4]   sworn, was examined and testified as follows:
[5]   CROSS-EXAMINATION
[6]        BY MR. McDEVITT:
[7]        Q    Miss Mahaney, my name is Jerry McDevitt. I
[8]   will be asking you some questions over the next
[9]   several hours and, if at any time I ask you one
[10]  that's vague or incomprehensible which I sometimes
[11]  do, just tell me; and I will be glad to rephrase it.
[12]       A    Okay.
[13]       Q    If you get uncomfortable, need to take a to
[14]  break, same thing, just let us know; and we will take
[15]  a break for you.
[16]  Would you state your name and address the
[17]  record, please?
[18]       A    Laura Mahaney, 306 East Glendale, Number 3,
[19]  Alexandria, Virginia.
[20]       Q    And by whom are you employed, ma'am?
[21]       A    The Parents Television Council.
[22]       Q    And when you say Parents Television

Page 5

[1]   Council, do you mean the PTC, Inc.?
[2]        A    Yes.
[3]        Q    All right. And how long have you been
[4]   employed by PTC, Inc.?
[5]        A    About two-and-a-half years.
[6]        Q    All right. It is my understanding that
[7]   PTC, Inc. became a separate nonprofit corporation
[8]   from MRC in around February of last year. Is that
[9]   your understanding?
[10]       A    Yes.
[11]       Q    Prior to February 2001, who was technically
[12]  your employer?
[13]       A    Media Research Center.
[14]       Q    So that prior to February of 2001, were
[15]  your paychecks from Media Research Center?
[16]       A    Yes.
[17]       Q    Since February of 2001, who issues your
[18]  paycheck?
[19]       A    Parents Television Council.
[20]       Q    Is there an Inc. on the check?
[21]       A    I don't remember.
[22]       Q    You don't know either way?

Page 6

## Page 31

[1]   Q   And I take it it would be correct to state
[2] that you never went, for example, to the courthouse
[3] where those cases were pending to look to see what
[4] documents were publicly available?
[5]   A   No
[6]   Q   As far as you know, nobody else did?
[7]   A   As far as I know.
[8]   Q   And neither you nor anybody else to your
[9] knowledge ever interviewed any of the people that
[10] were actually involved in those cases, did you?
[11]   A   I didn't. For the Clean Up TV Now video, I
[12] guess somebody had to interview him.
[13]   Q   You are talking about the appearances of
[14] Mr. Lewis on the tape?
[15]   A   Mr. Lewis and also the attorneys for
[16] Tiffany Eunick.
[17]   Q   Is that your understanding who those
[18] attorneys were is that they were the attorneys for
[19] Tiffany Eunick?
[20]   A   That's my understanding. I don't know if
[21] that's – I mean that's who I thought they were.
[22]   Q   Did you ever speak to Mr. Lewis?

## Page 32

[1]   A   I did.
[2]   Q   How many times?
[3]   A   One that I recall.
[4]   Q   And how did that come about?
[5]   A   My understanding is that Mr. Lewis had
[6] called Brent I think looking for information or
[7] researching information on experts with the media and
[8] violence or wondering if we had any studies.
[9] And I spoke – Mr. Bozell spoke to me and I
[10] was looking – I pulled up some of our studies and
[11] some of the contacts that I knew for media and
[12] violence, and then I called Mr. Lewis to let him know
[13] that I would be sending it to him.
[14]   Q   All right. So if I understand what you are
[15] saying, your understanding is Lewis called Mr. Bozell
[16] asking for help and Mr. Bozell told you to help him?
[17]   A   Yes.
[18]   Q   And that help consisted of trying to line
[19] up experts for Mr. Lewis?
[20]   A   No, not trying to line up. Just provide
[21] names.
[22]   Q   Didn't you correspond and e-mail to various

## Page 33

[1] experts?
[2]   A   Yes, I did.
[3]   Q   Didn't you tell those experts that what you
[4] were doing was trying to find somebody to testify?
[5]   A   I may have. I don't recall what I wrote in
[6] the e-mail, but I wouldn't say I was trying to line
[7] them up.
[8] I was trying to see who was – I wasn't –
[9] I wouldn't be responsible for contacting them and
[10] saying – setting up where they would go testify.
[11]   Q   What did Mr. Bozell tell you specifically

[12] you were prepared to do?
[13]   A   Simply research people who are experts and
[14] provide studies.
[15]   Q   All right. And did he tell you to call Mr.
[16] Lewis?
[17]   A   No. I did that on my own.
[18]   Q   All right. And do you know why PTC was
[19] assisting with the defense of a kid charged with
[20] murder?
[21]   MR. LEGHORN:   Objection.
[22]   A   Well, we provide research materials often.

## Page 34

[1] That's not an uncommon request for people to call and
[2] ask for information.
[3] So I don't think it was out of the process
[4] of –
[5]   Q   How many charged murderers has PTC helped
[6] in the past?
[7]   A   I wouldn't be able to answer that.
[8]   Q   Can you name for me one other than Lionel
[9] Tate that you are aware of?
[10]   A   No, but again the way I look at it is the
[11] way I always get research people asking for
[12] information and materials so it was not really
[13] outside the scope of what we do for a lot of people.
[14]   Q   But in the entire time you have been at MRC
[15] and PTC, did Mr. Bozell ever ask you to do any work
[16] on behalf of any other attorneys representing people
[17] charged with murder?
[18]   A   No.
[19]   Q   That's the only time?
[20]   A   Yes.
[21]   Q   All right. When did this conversation with
[22] Mr. Bozell take place in which he revealed that Mr.

## Page 35

[1] Lewis had called asking for help?
[2]   A   Really I don't know the specific time
[3] frame.
[4]   Q   All right.
[5]   A   I don't have any clue.
[6]   Q   And shortly after that, would that have
[7] been when you had the dialogue with various experts?
[8]   A   Um-hmm.
[9]   Q   So we can date that?
[10]   A   Yes.
[11]   Q   We can date that roughly by your e-mails?
[12]   A   Yes.
[13]   Q   Do you recall when you called Mr. Lewis?
[14]   A   It would have been shortly after I had the
[15] information gathered so –
[16]   Q   Did you make any notes of that call?
[17]   A   No.
[18]   Q   All right. And with as much detail as you
[19] can remember, tell us what was said during the phone
[20] call you had with Mr. Lewis. There was a phone call
[21] I take it?
[22]   A   Yes.

Page 36

[1] Q  All right.

[2] A  I believe I just said that I would be
[3] sending him a list of experts and the research
[4] material. It was – that's it.

[5] Q  Sending him a list of experts and the
[6] research material. Did you in fact do that?

[7] A  Yes.

[8] Q  Did you send him a letter?

[9] A  I think it may have just been on a note pad
[10] type of thing. I didn't type out a letter to him.

[11] Q  So you have no document or report that you
[12] sent to him?

[13] A  No.

[14] Q  Who was on the list of experts?

[15] A  Dr. Rahusman I believe and I think David
[16] Myer. Those are who I believe were on the list.

[17] Q  What materials did you send him?

[18] A  I sent to him the Senate Judiciary
[19] Committee Report on Children, Media and Violence and
[20] then some of the studies that correlated with that
[21] report.

[22] Q  Did Mr. Lewis make any statements to you

Page 37

[1] during the phone call about what he was contending
[2] had occurred to Tiffany Eunick?

[3] A  No. I don't remember him saying that. I
[4] don't remember him saying that.

[5] Q  Did PTC ever do any background
[6] investigation of Mr. Lewis before it decided to help
[7] his defense?

[8] A  Well, you know, I don't know. I was
[9] providing research material to him just like I would
[10] anybody else.

[11] It wasn't – I don't do research
[12] investigative background on anybody I send research
[13] to. That's just the extent of it. I collect
[14] different information and send it to him.

[15] Q  At the time you were asked to do this, were
[16] you aware that Mr. Lewis was contending that Lionel
[17] Tate was simply mimicking and playing with Tiffany
[18] Eunick with what he had seen on TV and wrestling
[19] programs?

[20] A  Yes.

[21] Q  And that, of course, was exactly what PTC
[22] was running around the country telling everybody,

Page 38

[1] wasn't it?

[2] A  That PTC was telling –

[3] Q  That Lionel Tate killed Tiffany Eunick
[4] while he was mimicking wrestling moves?

[5] A  I don't know that we had. I don't know the
[6] sequence of dates. I am not sure that we had.

[7] Q  You think that MRC had a bias, in other
[8] words, wanting Mr. Lewis to succeed in that defense
[9] because it would prove what PTC had been trying to
[10] tell people that television causes people to act
[11] violently?

[12] A  I don't believe the PTC is biased. I
[13] believe we look at plenty of evidence that shows that
[14] there is no correlation between media and violence
[15] and the way kids act out. So I don't think it is a
[16] bias.

[17] Q  I take it it is PTC's belief that there is
[18] other programs that are more appropriate for children
[19] to watch than, for example, professional wrestling
[20] programs on the WWF?

[21] A  Well, I think the PTC recognizes that
[22] people can decide what their kids want to watch.

Page 39

[1] I don't think they are trying to tell
[2] people what they should watch as far as what their
[3] kids are watching. I just think that there is an –
[4] that they shouldn't be marketing to kids and it
[5] should be moved back at a later time.

[6] Q  Hasn't Mr. Bozell expressed disdain for
[7] parents who allow children to watch, for example,
[8] professional wrestling programs?

[9] A  I don't know that he has expressed
[10] disdain.

[11] I think he would – well, I am not going to
[12] speculate to what he would think. You would have to
[13] ask him that.

[14] Q  My question was, ma'am: It is part of
[15] PTC's belief that there is more appropriate
[16] programming for children to watch –

[17] A  No, our position is that we would like to
[18] see responsibility brought back to the entertainment
[19] industry.

[20] We have never said to my knowledge don't
[21] let your kid watch WWF; instead put in a Barney
[22] tape. I mean we haven't.

Page 40

[1] Q  Doesn't PTC put out a list of programs that
[2] it gives a red light and a green light for that?

[3] A  We weight programs for parents.

[4] Q  And that's supposedly telling parents
[5] what's suitable for children to watch, isn't it?

[6] A  I don't know that it tells them what's
[7] suitable. I think it gives them an idea of the
[8] contents of the programs and let's them make that
[9] decision.

[10] Q  What's a red light supposed to indicate,
[11] that it is not suitable for children to watch?

[12] A  No, I think it would be a warning to
[13] parents. I don't know that it would say it is not
[14] suitable.

[15] I am not sure that we are saying this is
[16] inappropriate. Actually I can't speak to that. I
[17] just know that my perception of the family guide is
[18] just that it is a guide to parents.

[19] Q  And does PTC hold the belief that certain
[20] television programming, violent programing they
[21] characterize it, can cause children to act violently?

[22] A  PTC's belief? I think our belief is that

Page 41

# TAB 3

**TRANSCRIPT OF PTC PROMOTIONAL VIDEOTAPE: "CLEAN UP TV NOW!"**

**Steve Allen**: Hello, I'm Steve Allen. Thanks for letting me talk with you about something that concerns all of us, the corruption of this nation, especially our children. Brent Bozell, President of the Parent's Television Council or PTC, has asked me to tell you about our national effort, the Clean Up TV Now campaign. Vulgarity and general garbage on TV is dragging an entire young generation down a moral sewer. Prepare yourself for what you are about to see and hear and then please watch to find out what you and I can do to stop it.

**Announcer**: Not long ago, parents could trust television with their kids. [Clips of Leave it to Beaver, Bugs Bunny Looney Toons, Andy Griffith, I Love Lucy, The Waltons] But in recent years, Hollywood has violated that trust. [Clips of modern TV shows: Buffy the Vampire Slayer, Sports Illustrated Swimsuit 2000, WWF, WCW, HBO feature If these Walls Could Talk, The Daily Show].

**Brent Bozell**: Hollywood is teaching children the exact opposite of what parents are trying to teach children. So, Hollywood, television becomes an enemy of the family.

**Steve Allen**: People spend more time, even as children, watching television, then they spend in the company of their parents or their teachers or any church influence or anything of the sort. Number one, at the head of the list, is television.

**Dean Jones**: We produce inappropriate remarks and behavior, on television and in films, and we show it to our entire culture.

**Pat Boone**: Daytime soap operas, nighttime, primetime, familytime, anything goes, language, behavior, nudity and we're just letting it happen to us.

**Announcer**: Children watch an average of 28 hours of TV per week. By age 18, they will witness 16,000 murders; 200,000 acts of violence; and countless sexual acts and foul words. The results, an epidemic of teen sexual disease, 1.5 million unwed teenagers pregnant each year, an explosion of juvenile crime.

**Brent Bozell**: Go to a mall and listen to the obscenities, turn on television and watch the latest school shooting. Look at the statistics, of all the unwed teenage girls who are walking the streets pregnant. There's something going on with America's youth. It's being poisoned.

**Pat Boone**: Television is like a drug.

**Dean Jones**: Seven hours a day the set is on in the average American home.

**Pat Boone**: It's more and more filth and depravity and depression and immorality and it is getting a nation hooked on it.

**Dean Jones**: When three to five years old were asked, do you like TV better or your daddy better, they said TV.

**Announcer**: Two out of three kids name celebrities as their role models, their heroes. What lessons do these heroes teach? Unfortunately, the only way is to show you actual disgusting examples of current TV shows. [Clips from Dawson's Creek and Nash Bridges]

**Senator Sam Brownback**: Television and the media is the nation's storyteller and whoever tells the story defines the nation.

**Dean Jones**: Film is a teaching medium, if it's not why are our schools and our universities full of it? You look at the history, in the past of why the church was so was involved in paintings and frequency in liturgy and in song is because it helps shape the soul.

**Brent Bozell**: I think historically, Hollywood, had the power, and exercised the power, to do good things. It showed positive images, it showed the world the way we'd like it to be. It gave a good wholesome entertainment to the family.

**Steve Allen**: You can no longer just sit down with the kids and grandma and watch TV in an evening. If you do, you'd better keep the clicker in your hand, because every few seconds there's going to be something, and I know this from personal experience, about which you say to the kids, "sorry gang, this is not for you" and you click to another channel where you might find something worse.

**Brent Bozell**: My wife and I have five children of our own and constantly we have to constantly protect them from what they're watching on television. And that's just not right.

**Announcer**: Last year, during the so-called "Family Hour", on primetime network TV, foul language was up 58%. [TV show clips: The Drew Carey Show, Melrose Place, King of the Hill, NYPD Blue, ER, Simpson's, News Radio] Sex references were up 77% [TV show clips: Cupid, Friends] and violence was up 86%. [TV show clips including WWF] According to the American Psychiatric Association, television affects children by making them less concerned about the suffering of others, more afraid of the world and more aggressive toward others.

**Steve Allen**: The change in TV has made a big change in our children, especially in our schools. Once our biggest worries were chewing gum, running in the halls, shooting spitballs. Now, we have unthinkable tragedies like Paduca, Jonesboro, and Columbine high school. Today's violent programming does incite the minds of our impressionable youth. The following segment will tell the

heart-wrenching story of the tragic death of a sweet little six-year-old girl. Hear how one twelve-year-old boy's steady diet of today's disturbing displays, loosely referred to as wrestling, came to a horrifying end.

**Deweesee Eunich**: Sometimes, she would skate and I would walk and I would try and catch up with her. It was fun. She tries to be ahead of me and I would try to run and catch her up or whatever. Tiffany was only six years old by age but in maturity she was a little woman.

**E. Ross Zimmerman** (Eunich family attorney): What apparently happened was, that Lionel, had been watching the WWF, something that he did virtually on a daily basis, for hours and hours a day. When he wasn't watching it on television, he was watching the WWF home movies and what he did is he treated little Tiffany like a ragdoll and performed a series of wrestling moves on her that killed her.

**Glenn R. Roderman** (Eunich family attorney): He was emulating his hero. And he started pummeling this little girl to the point where eventually that night she had sustained some thirty blunt trauma injuries to her body. I mean the autopsy is unbelievable that's why it took two medical examiners to go through this autopsy and to determine how many injuries this girl sustained, internally and externally.

**Jim Lewis**: There is absolutely no other reason that anybody in this case can point to other than simply a child acting out the fantasies that he sees on television and not really understanding the ramifications of that type of physical contact.

**Deweesee Eunich**: I just wanted to be able to hold her again, you know, to feel her body that I'm used to against my body but from whatever they had seen I wasn't able to do that, they didn't allow me to. I didn't have a chance to go while she was laid on the bed. it really hurt to see tubes. Six years old, forty eight pounds with tubes running from every part of her body, that hurts.

**Dean Jones**: We are all responsible for what happens in this nation. And the people that produce the entertainment, which is so influential, which shapes our young people, there's a special level of responsibility that they have. And the fact that they don't accept it has to be changed.

**Pat Boone**: If there was a drug dealer at the door we wouldn't let him stand there and do his sales pitch to our kids. We'd call the police, we'd dial 911, we'd do something.

**Brent Bozell**: I am really convinced that our children are being poisioned by destructive messages coming out of Hollywood. I launched the PTC simply

because it was time that somebody stand up to Hollywood and say enough is enough, clean up your acts.

**Announcer**: The Parents' Television Council, or PTC, was formed in 1995 by Brent Bozell, its mission was to bring decency back to TV. The PTC records and analyzes every minute of every primetime show on every network. With over 70,000 hours of programming in their archives so far. But the real power behind PTC is its members, over 450,000 concerned families across America with thousands more joining every month.

**Brent Bozell**: We're learned that numbers talk. When hundreds of thousands of people come together, from all over the country, and go to the sponsors and say enough is enough, the sponsors listen.

**Pat Boone**: If they find that there are hundreds of thousands, or even several million consumers, potential consumers saying if you cram anymore of that stuff down my throat I'll not watch your network, I'll not watch that show, I'll not buy any of those products, the numbers add up quickly and it strikes terror into their hearts and into their cash registers.

**Announcer**: That's exactly what the PTC is doing, focusing on the sponsors that are bankrolling this sewage. Without sponsors, Hollywood can't produce the garbage that's poisoning our children. The PTC solution is simple. One, expose the sponsors whose advertising dollars pay for TV and film and two, demand they pull their ads until the foul programs are cleaned up or cancelled.

**Brent Bozell**: With some of the most offensive shows on television, we've taken those shows directly to the sponsors, we've shown them to the sponsors, we've explained to the sponsors that they are responsible for this poison and I tell you time and again these sponsors look at this, they don't want to have anything to do with it and they pull their ads in a New York second.

**Announcer**: For example, PTC launched a campaign against Smackdown because millions of children are virtually addicted to this sick show. Vince McMahon, head of the WWF, sent a sarcastic and foul letter to PTC Chairman Bozell. He bragged that the PTC would never be able to stop him. Well, Bozell shared it with PTC's entire membership; they mobilized and literally overwhelmed Smackdown sponsors with complaints. One sponsor, Ford, actually had to shut down their consumer complaint line. Then they yanked their ads, so did General Motors, Mars Candy, Wendy's, AT&T, Coca Cola along with the US Army, Navy and AirForce. These and many others pledged not to advertise on Smackdown. Within a few weeks a humbled Vince McMahon publicly announced that Smackdown would clean up its act.

**Pat Boone**: I see Brent Bozell and The Parent's Television Council like Gary Cooper in High Noon, somebody has to do something, somebody as to stand up

and say enough, you'll not flood our homes and our families with filth anymore if we can do anything about it. So I applaud and am part of the Parent's Television Council because somebody's got to do something.

**Brent Bozell**: The biggest threat to our culture is coming from Hollywood. We have the campaign to change that, we know it works, the only thing, the only thing that is preventing us from succeeding is the funding we need.

**Announcer**: The Clean Up TV Now campaign will require PTC to increase its efforts, its resources, and its membership.

**Brent Bozell**: We'll be blanketing the country with hundreds of full page ads, bringing hundreds of thousands more people into our campaign. We're going to be working directly with the top 200 sponsors, letting them know that we're watching everything they're doing and their days of unchecked sponsorship are over. Our celebrity spokesmen, like Pat Boone and Dean Jones and Steve Allen will be all over the country speaking out in newspaper interviews, on television, on radio shows. And finally, we're going to let our membership know through our monthly newsletter, exactly what we're doing and how hundreds of thousands of people also can participate to put an end to the sponsorship that is ruining television.

**Dean Jones**: Unless there is a very big stick over the head of Hollywood nothing is going to change.

**Pat Boone**: We've got to keep waking up the public and also shaming the sponsors, they're the ones who are paying for it.

**Steve Allen**: We can have great influence provided by our numbers but you must exercise your rights and you must be in the number of the virtuous in this regard.

**Brent Bozell**: Our Clean Up TV Now campaign is the biggest such effort in history. But, I need your help to succeed to blanket the country with Steve Allen's ad, grown to a million members and demanded advertisers stop sponsoring the garbage poisoning our children. Our campaign budget is 2.7 million dollars, a lot of money I know. The good news is that our board of directors has authorized a half million dollar matching grant to launch the campaign. But only if we can raise an equal amount from key supporters like you by June 30. So every dollar you give before the deadline will be doubled up to $500,000. Now is our time to act. Return your agreement of support to me with the most generous tax deductible gift you can. Please respond soon. Help me cut off the money supply for the Hollywood garbage and Clean Up TV Now!

**Steve Allen**: I hope you'll stand with the Parent's Television Council in our national Clean Up TV Now campaign because together we can stop Hollywood

from dragging our children deeper into a moral sewer.  It's never been more important than it is right now.  Thank you.

# TAB 4

**Transcript of The Leeza Show**
**10/22/99**

**"Do Kids Repeat violence seen on television and in the movies?"**

Leeza:    Thanks so much for making time for us today. Audience there is no question we live in a violent culture, do we not?

Audience:   Yes

Leeza:    And we need to look at; we want to look today at and ask you to take a stand on the question of what impact that has on our kids. There's this new movie out, you know the Brad Pitt, Edward Norton film "Fight Club." So I'm going to ask you to take a stand on it. Look at one of the scenes from the movie and tell me what difference does it make to our kids? Watch. [Scene from the "Fight Club"] Do scenes like those entice your kids to do things like? [Scenes of young men fighting]

The question for you audience then, take a stand. Does televised wrestling and movies like the "Fight Club" glamorize and encourage youth violence? Stand up if you say yes. Alright. Wow! That's a lot of you. Thank you so much. More on this later on. You are going to meet some teens who are part of what you could call real life fight clubs that are popping up all over the country, taking fighting to a whole new level. And you know, little kids as young as like 6 years old are watching this pro-wrestling. Can they understand that it is fantasy violence? That it is fake? Do they know the consequences of it? They know all the moves. They know Stone Cold Steve Austin. They know the Undertaker. They know the pile driver, the drop kick and all these wrestling moves they can tell you. This 12-year-old named Lionel Tate was an avid, is an avid wrestling fan. Well, he is facing life in a Florida prison for the murder of a little girl, Tiffany Eunick, 6 years old. Was wrestling responsible? You be the judge.

[Leeza voice over – showing photos and newspaper clippings from the case] It happened one night in late July. Deweese Eunick dropped her 6-year-old daughter Tiffany off at the home of Kathleen Tate, a friend with whom she would sometimes share babysitting duties while working an evening shift. But later, Deweese had a strange feeling something was wrong. She called to check on her only child. It was Kathleen's 12-year-old son Lionel who answered the phone. He said he was watching TV and Tiffany was lying down, but it was too late. The next phone call Deweese would receive was news no mother ever wants to hear. There had been an accident, Tiffany was in cardiac arrest. Tiffany was dead.

But what happened? An autopsy report showed that Tiffany's death was caused by blunt trauma. She suffered 30 blows to her 48 pound body, including 2 to her brain. She had a fractured rib, a lacerated liver and hemorrhaging to the skull. Prosecutors say she was a thrown around like a rag doll by a 166 pound child, Lionel Tate. Was Lionel imitating the body slamming moves carried out by the pro wrestlers on TV or was it just child's horseplay that got out of hand?

[Back to live show]

This is Tiffany's mom. This is Deweese Eunick. Her dad Mark James is also here. They are here with their attorneys, but on stage with me now is Jim Lewis who is the attorney for Lionel Tate. How do you mom and dad even make sense of what happened with your little girl that day?

| | |
|---|---|
| Deweese Eunick: | You can't, you can't, you can't. |
| Mark James: | Nothing really makes sense. |
| Eunick: | Because nothing adds up. There are different stories and everything's so… |
| James: | The mother has been interrogated on several occasions. |
| Leeza: | Well the story we know is true is what the autopsy showed. |
| James: | Exactly. |
| Leeza: | Which is a lot of injuries, cracked ribs and an injured…. |
| James: | Flattened out her brain. She had a liver split with a piece of her liver fell off in her abdomen. Her adrenal gland that sat on top of her kidney was also damaged. |
| Leeza: | But why would a 12-year-old boy beat up on a little girl? |
| James: | That is the thing that we are asking is that there are more questions than answers. And quite frankly I think he tried to rape my daughter and she refused him and he felt rejected and that is the reason why she sustained so many injuries. The reason for my argument is that if someone is just on someone you get like 1 or 2 or 3 injuries. When someone sustains more than 30 injuries like that it is something that happened right there on the spot. It was triggered. |
| Eunick: | That's from rage. |

James:              Rage, exactly!

Leeza:              Well, Lionel is saying and his attorney in fact, Jim Lewis has said that maybe he was acting out some wrestling moves.

Jim Lewis:          Leeza, if I could just interject a few things here. First of all, you are talking about a 12-year-old boy who has no prior criminal history. No acts of violence from a very normal mother, who is a Florida state trooper, a Desert Storm veteran. And you have a child here basically who indicating that he was horsing around with her. They were playing together acting out wrestling moves apparently they both watch.

James:              Jim Lewis you are a lawyer, you have been to law school for like 6 years. Where is the intentions. I know you have to come in and talk like this because you are a defense attorney. I don't expect you to say anything else.

Lewis:              Sir, I share your pain. I have children too and I understand what you are going through.

James:              But if a child has 30+ injuries where do you get horse playing at?

Leeza:              Let me ask you Deweese, it was reported that at one point Tiffany was lying down when you called to check on her. Lionel answered the phone and told you she's lying down and you knew something wasn't right about that. It was reported that she was crying out and that Kathleen said something to the effect of tell her to settle down or be quiet.

Eunick:             Well, Kathleen told me that she heard noise downstairs and she got up and came to the door or something and shouted downstairs, why are you making so much noise down there. And she said Lionel said, it wasn't me mom, it was Tiffany. And then she said she went back to lay down and the noise started again. And she heard the noise and she came out and she said, tell Tiffany to stop that noise or if she doesn't I'm going to beat her butt. I said to her, when you heard the noise the second time why didn't you look. She said the sound that Tiffany was making was not a normal noise. So I said you know how Tiffany is why didn't you look to see what was going on.

James:              Another thing, Jim Lewis I have nothing personal against him because he's just making money as a defense lawyer. He lied on several occasions so we have three perpetual liars. We have the mother, the son and not the lawyer, who has joined the liar pack. The next thing Leeze is that the family did not want to prosecute the little boy. We see that as a family matter. I don't know what mother or father could say their child

|          | had 30+ injuries and do not want to see the culperate behind bars. |
|----------|---|

Leeza:      So what would justice be in this case for you?

James·      Well frankly I think justice would be either seeing his mother or the son in a box.

Leeza:      Lionel is 12-years-old. He has been charged as an adult with First Degree murder.

Lewis:      Yes, Leeza but what we forget is that he has the intellect of a 12-year-old child. Yes, he is big for his age.

Leeza:      Yes, but does a 12-year-old child not know right from wrong?

Eunick:     Exactly, I was just going to say that because Tiffany was only 6-years-old but Tiffany was exceptionally smart.

Leeza:      Even if we said they were horsing around and Tiffany got hurt or he accidentally put her in to hard of a hold or he dropper her or whatever. As soon as he saw she was hurt and cried out, wouldn't he go get his mother?

Eunick:     Exactly, that's another question to.

Lewis:      It's easy for us to say as adults what we would do in a particular situation. But there's no malice that any can say that this child had against Tiffany. They'd played together several times before. It appeared that he loved this little girl. There's no anger.

Eunick:     The thing that bothered me was you see her there. She's lying there and she's not moving or anything and you're scared to the point where you can't scream and say mom, mom, I need help or something. She laid there, she died. You came to my house Wednesday night after the baby died. You were there Thursday morning, Thursday night. You ate. We were there Friday all day. And you're scared to the point that all this time you couldn't find time to say something. If it was an accident, I'm asking why didn't he call for help or tell somebody something?

Leeza:      Do you think that this kid could have been acting out TV violence, wrestling moves that he'd seen? That he just got carried away. He thought it was fake. That he didn't know she was going to die?

Lewis:      The child has told the child psychiatrist in this case, that that's exactly what happened. That he was throwing her, first they were punching at each other and then he grabbed her arms and then whipped her, like they would whip her into a ring rope. But instead of hitting a ring rope, she

hit an iron staircase.

| | |
|---|---|
| Leeza: | So alright, members of the think tank, this is the challenge for you and for all of us today. Do kids act out this kind of violence? Are they mature enough to understand right from wrong? Do they think it's fantasy and that a kid will pop back up and she's not really dead. So what then do we make of movies like the "Fight Club" and World Wrestling and World Championship Wrestling? Does it produce just entertainment you know and when you see these backyard brawls, these home videos you'll see throughout our who today. Are they innocent? Do they help channel a kid's aggression. Or are these real life fight clubs and could there be other deaths like Tiffany's? |
| Veda Coleman-Wright: | [Taped comments – Ms. Wright works for the Broward County Sheriff's Department] At one point he remembers coming up behind her. Putting her into a bear hug, dropping her several times. Even though he offered no explanation for his actions we do know that the moments before her death were quite violent. |
| Michael Noreiga | [Taped comments – Lionel Tate's neighbor] I don't think he would ever do something like that, not intentionally. It could have been that they were playing around and he squeezed her and that was it. |
| Leeza: | Well, if he squeezed her it produced an awful lot of injuries. So we have a 12-year-old boy who's now facing life in prison charged with First Degree murder. We have a 6-year-old girl who is dead. Let me hear from the think tank where are you so far? |

[Audience comments: one person comments no Tate's being released from jail/juvenile hall]

| | |
|---|---|
| Lewis: | First of all this child was attacked by another inmate when he was in the juvenile facility is one of the reasons that the judge let him out. You're talking again a 12-year-old child who doesn't have the same accountability as we do as adults. [Audience comment] We're not saying that he has a bad childhood. We're saying that his was a very horrible tragic horrific accident that occurred over a period of time. |
| Leeza: | There are two attorneys here representing the Eunick Family. We have Mr. Zimmerman and Mr. Roderman. And one is involved in the criminal side and one is involved in the civil side. I know you're both anxious to get in here. |
| Roderman: | My big question is where is the remorse, Jim. You and I both know in criminal cases, particularly if they were friends for so many years mom and his mom are friends. Not a card, not a phone call, not an apology. |

not a sorrow.  And I just can't understand how cold this kid can be.

Lewis:          Well I understand that he that Lionel after it happened asked you Deweese if he could have Tiffany's toys?

Deweese:        He was at home with us and he was going through the room, he was in Tiffany's room and then was saying to me, me and my mom was inside, and he said can I get some of the stuff that we use to play with.  And you know at first we didn't know what happened.

Leeza:          This is before you knew he might be responsible?

Deweese:        Right.

Lewis:          But that just goes to show you how a 12-year-old doesn't understand the gravity of the situation.  How he doesn't understand that this little girl isn't going to come back tomorrow or the next day.  12-year-old children or 10-year old children, where he's tested at, don't see life and death like we do.

Leeza:          Audience, can anyone see that perspective on it?

[Audience member says they're only hearing one side of the story]

Lewis:          He's not allowed to be here because he is on house arrest and his mom's home with him and they're not allowed to present their side of the story and this is not the forum to present all of the facts of the case and he is presumed innocent at this point and I hope that everyone here would believe that.

Leeza:          Our focus here today is really to look at what kind of a defense.  Would you buy it as a defense, that this kid was a wrestling fan, that he's seen these moves.

Zimmerman:      I do think it was an issue and let me explain why.  Of course, I'm representing Mark and Deweese and I feel very strongly about what happened here.  What we're talking about is the difference between criminal responsibility and civil responsibility.  Criminal responsibility of course is if someone puts instructions over the internet of how to build an atomic bomb that person is negligent but that no way excuses the criminal responsibility of the person foolish enough to build that bomb and plant it in Time Square.  But what we're talking about here is civil liability, Kathleen Tate, complete irresponsibility in watching these children.

Leeza:          Well, then why did the judge release the son charged with First Degree Murder to the mother.

Murder to the mother.

Lewis:       I disagree with that.  Is it negligent that someone would lay down and take a nap in their own home upstairs while their children are downstairs watching television?  Who here hasn't done that?

Roderman:    What about the prepensely for violence on the part of that child?  That mother knows that child had behavioral problems and she knows about how the family's been passing this kid around for months and months and months before she came to Florida.

Lewis:       He was with his father while she was in Desert Storm.  I don't consider that to be passing him around.

Roderman:    Well, she could not handle him.

Lewis:       He's a good kid.  He is a good kid who has found himself in a very horrific situation.

Zimmerman:   Jim, with all due respect to your client's mother, your client's mother indicated in her first version of the events that when she went to pick up Tiffany, Tiffany had an ice pack on her head because she was injured from a tape that had hit her in the head.

Lewis:       The children were playing at the mother's home.

Zimmerman:   Then she said that little Tiffany had a stomachache and threw up and Tiffany had to go upstairs and throw up in her bathroom.  And how does this woman watch out for this allegedly sick child, she goes to sleep.  When the child screams out in pain from the first floor, what does she do?  She screams down tell Tiffany to be quiet or I'll beat her butt.  And that's from her own statement and from Lionel's statement.

Lewis:       We're taking little bits and pieces here and trying to link them together and lynch this child and that's not right.  This is different from a case where a child picks up a gun or a knife and goes out and robs somebody or slits somebody's throat.  It is different.

Leeza        But you would have to admit that you are going to have a challenge in trying this case.

Lewis:       This is the most trying case I've had in 20 years of practice.  And I feel very sadly for this family and for everybody involved but by throwing this child in jail for the rest of his life isn't going to make things any better.

[Audience comments]

Lewis:       All I can tell you is that the other people in his neighborhood indicate that this child is not a danger. This kid has never attacked anyone before. The problem here that we have here is that we have a child who fixated and watched wrestling night after night on television. If you go to one of these wrestling matches or Monday Night Nitro things and you see how they market this violence to our children. Give me these little dolls, these Goldberg dolls that talk or the little T-shirts or the little Sting masks that they wear. These children are being introduced to this type of violent behavior and it's okay because they see their gladiator buddies get out there and beat each other up and when it's all over they walk off the stage and it's great fun. And 12-year-old children can't understand it.

Leeza:       So that is what we want to keep our focus on today. The specifics of this case sad as they are and we'll keep you posted on what happens. But Mr. Lewis brings up our point, which is what impact if any does it have if any if kids are exposed repeatedly to this violence and at what age can they figure it out that it's fantasy. At what age can they tell somebody if they beat them and they did they're not going to get back up.

[Introduction to the Backyard wrestling segment]

Leeza:       ...These are teenagers, backyard brawls. The parents are there; sometimes cheering them on, saying all right this is helping them deal with their aggressions. Those kids watch the WWF you can guarantee it. The President and Chief Executive Officer of the WWF is aware of your daughter's death and aware that his 12-year-old is mounting a defense saying that this happened because he was repeating wrestling moves. They say, While saddened by this story there is nothing to indicate or suggest that there is a connection between television viewing habit and senseless acts of violence such as this. This is a disturbing lack of parental supervision in similar instances. The focus of the community, parents, family and friends should be on proper parental supervision. The bottom line is where are the parent. That from Linda McMahon. (Leeza read from a letter written to her by Linda McMahon)

[Backyard wrestling segment]

Lewis        ...I believe in Lionel Tate, that this is a little boy who had some influence that was negative and that basically didn't mean to harm this girl, didn't mean to hurt her and this is what happened.

Leeza:       You know what though, if I were Lionel Tate's mother, if I were this mom I would be very very concerned about my child, if I thought something suddenly caused my kid to snap and he could be capable of

|            | that kind of behavior. I would say put that child in counseling. Let's get intense therapy. Let's get psychiatric evaluations. |
|------------|---|
| Lewis:     | There was nothing prior, Leeza, to this to indicate that this child had any problems. |
| Leeza:     | All the more reason to say what has happened to my little Lionel. |
| Lewis:     | Believe me, she doesn't know. She would like the answers just like all of us. But this is a good person and to sit here and to try and defame her, I think is unfair. |

[More backyard wrestling]

| Zimmerman: | [To Lee Reherman]  But you cannot say to some extent that he is not influenced by the WWF (referring to the young man who participates in backyard wrestling) and what he's seeing on TV. |
|------------|---|
| Reherman:  | I would say he is potentionally influenced. But let me ask you a question, if that young man Lionel Tate, who killed that poor young girl, had had a Denver Bronco's football jersey on and was running down the street after watching the Super Bowl and hit her 30 times as fast as he could, would you be suing the NFL? |
| Zimmerman: | They are purposefully marketing to children and regardless of what Mr. McMahon wrote about in his letter he will tell you and has told you on talk shows that he is marketing to children. It's the business. |
| Reherman:  | The reason I made the football reference is because the argument with Lionel Tate was that he could not tell the difference between what was real and what was fiction. And you're making the argument that a person watches football knowing that it's real and watches wrestling and can not disseminate whether its real, might think it's real. So you're saying they know the difference between a Jesse "the Body" Ventura and a John Elway, but they don't know the difference between me and a 6-year-old girl? But with your argument, you'd sue the NFL tomorrow. |

[Real life fight clubs segment]

| Leeza:     | That takes me back to you Mark and Deweese; you didn't see it happening either. We focused a lot on television, the movies and the WWF. You think it's a partial culprit? |
|------------|---|
| James:     | We're not totally blaming the Wrestling Federation. You know, you are the ones who are responsible. A parent has a responsibility of course but what we are getting at is that had it not been for the Wrestling Federation, |

I think my daughter would have been alive today.  We learned that this guy was very dangerous after the fact and he would have hurt her.  But we have linked many of her blows to the wrestling type blows so we know she would have been injured and we blame the mother yeah, while we blame the Wrestling Federation for teaching him the method of how to kill someone.

# TAB 5

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD, COUNTY

STATE OF FLORIDA

       Plaintiff

vs.

**LIONEL TATE**

       Defendant.

_____/

CASE NO: 99-14401CF10A

JUDGE JOEL T. LAZARUS

### O R D E R

Within sixteen hours of the verdict, opening statements were being made in a new forum: the court of public opinion. Starting with the Today show on that date and continuing unabated, there has been a barrage of appearances on talk shows, radio programs, pulpits in our houses of worship, and in any and every other forum imaginable. This was not the media doing their job of reporting; this was a calculated effort to try this case for a second time in a court not governed by its laws of the state of Florida but by the feelings of sympathy and compassion for a fourteen year old convicted of the highest offense known to mankind.

And the effect was virtually immediate. Letters arrived from the north and south, east and west of this country. And these letters were almost universal in their tenor: have mercy on Lionel Tate, have compassion on this fourteen year old. The letters contained phrases such as "horsing around," "boys will be boys," "playing" and "accident." As recently as last Thursday, one of the counsel was on television stating no punishment was warranted for this "accident."

It is a truism that not one single letter writer or call maker was privy to the horrific facts brought out during the trial; not one person sat through the pathetic testimony of the results of Lionel Tate's deeds upon the body of Tiffany Eunick. The emphasis since January the 25th has been on the defendant and how to bypass what the law apparently requires, with hopes and prayers and requests for mercy and leniency for this child. Voices cry out for "justice",

State of Florida v. Lionel Tate
Sentencing Order
Page 2 of 18


but not for justice for *Tiffany Eunick.* Most letters and calls refer to this victim only as an afterthought. In the court of public opinion, Lionel Tate has turned into the victim.

It is obvious what the purpose of these appearances in the studios and on the pulpits by participants in the trial has been, and to this very day continues to be. If the purpose is to pressure this court to proceed with its heart rather than its mind, with all due respect, I decline. The jury has defined the future of Lionel Tate; the jury has spoken, loudly, clearly, and unanimously.

Regardless of my rulings here this day, I assure all it will be based on my perception of the law, a perception that I might add I am thoroughly convinced to be correct. If I based my ruling on what the overwhelming majority of the public is requesting, I would be, perhaps, a hero to those who want me to act out of sympathy, but I would be disavowing the oath I have taken to uphold the laws of the state of Florida and our constitution. Above all, we are a nation of laws The very last thing a jury is told is, "none of us have the right to violate rules we all share."

In the final analysis, the court of public opinion cannot be the body ruling on these motions and sentence; it must be by this judge following the laws of this land. Justice Blackmun stated in his dissent in **Furman v. Georgia**, 408 US at 411:

> We should not allow our personal preferences as to the wisdom of legislative and congressional actions, or our distaste for such action, to guide our judicial decision in cases such as these. The temptations to cross that policy line are very great.

State of Florida v. Lionel Tate
Sentencing Order
Page 3 of 13

## I. Motion For a New Trial

The indictment handed down by the Grand Jury has caused much criticism, and is also an integral part of the grounds in the Motion for a New Trial. The ability to indict is present within the laws of Florida, and there can be no challenge to the impaneling of this Grand Jury. The issue, though, is one of the applicability of the Felony Murder statute, F.S. 782.04(2)(h), in the instant case.

This court is being asked to grant a new trial, on the grounds that F.S. 827.03, Aggravated Child Abuse, was unconstitutionally applied at bar.

> *Aggravated child abuse*, F.S. 827.03(2) occurs when a person:
>
> (a) *commits aggravated battery on a child, or*
>
> (c) knowingly or willfully abuses a child and in doing so causes great bodily harm, permanent disability, or permanent disfigurement to the child.

Aggravated Battery is defined as:   Intentionally or knowingly causing great bodily harm, permanent disability, or permanent disfigurement.

Child Abuse means:  intentional infliction of physical...injury upon a child or an intentional act that could reasonably be expected to result in physical...injury to a child.

The defense alleges that the Aggravated Child Abuse statute was never meant to apply to situations of one child hurting another. No cases are cited to support this position and a review of the legislative history of F.S. 827.03 does not support this contention. See, **Kama v. State**, 507 So.2d 154 (1 DCA 1987).

There have been cases in Florida that deal with child-upon-child Aggravated Child Abuse. See, for example: **KBS v. State**, 725 So.2d 448 (2 DCA 1999). **AJ v. State**, 721 So.2d 761

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 4 of 18

(2 DCA 1998).  This court finds no case wherein Aggravated Child Abuse, juvenile upon juvenile, was the underlying felony in a Murder in the First Degree prosecution.  While most Aggravated Child Abuse cases are concerned with familial or custodial situations, the mere fact that a defendant is not within that group does not preclude the charge from being prosecuted.  In the absence of case law to the contrary, the court is not in a position to grant a new trial because of an allegation of inapplicability.

In the case from a sister district, KBS, supra, the court asked for guidance on this very issue, but none was forthcoming.  In a *per curiam* decision affirming Judge Ramsberger, the Second District Court of Appeal questioned the prosecutorial decision of one juvenile being charged with Aggravated Child Abuse on another.  It said "...the legislature may well wish to review this issue."  Now this court also requests guidance in the future as to the intent of the statute which undisputedly permits a prosecution of a juvenile under F.S. 827.03.

Should the state have sought what they are legally empowered to do is not an issue for the court.  The policies of the State Attorney of the 17th Judicial Circuit should not and will not be praised or criticized, at least by this court.  But public opinion sends a message to what it believes is the appropriateness or lack of appropriateness of indicting a twelve year old for Aggravated Child Abuse resulting in death, the necessary elements of a Felony Murder in the First Degree charge.

Once the state chooses to seek an indictment for a crime punishable by death or life imprisonment, upon the return of the indictment, the child must be tried and handled in every respect as an adult.  Florida Statute 985.225 requires such action against..."a child of any age."  For crimes other than capital, the prosecutor can proceed in juvenile court, or, if permitted by F.S. 985.227, direct filing of an information.

Other cases similar in many respects to that of Lionel Tate's will appear in the future, unfortunately and without a doubt.  And the prosecuting authorities will be wise to heed the

State of Florida v. Lionel Tate
Sentencing Order
Page 5 of 18

voices being raised, and examine their criteria in prosecuting twelve year old boys and girls. Make no mistake:  this judge does consider a twelve year old  a boy or girl, regardless of the crime he or she commits.  But it is not the court's consideration which dictates how a prosecutor proceeds.

This court was provided with a recent letter written on behalf of the international organization, Amnesty International, as well as taking testimony from its representative in attendance.  The letter and the testimony details the organization's concerns with the treatment of children who are convicted of serious criminal offenses.   There is a realization, though, that there is "severity and inflexibility of the sentence which the youngster now faces.......the relevant authorities' response 'shall always be in proportion not only to the circumstances and the gravity of the offences  but also to the circumstances and the needs of the juvenile as well as to the needs of society.' "

The recognition of the "relevant authorities' response" is present:   these are legislative decisions that must be addressed, and not judicial decision.  Judges cannot and should not legislate from the bench.

The court has been implored to recognize the plea offer made in February, 2000, which was rejected by silence, in that there was no response from the defense.  Prior to commencement of trial, this court on its own, made inquiry as to the possibility of a negotiated plea.  At that time, there was no plea offer "on the table" but nevertheless inquiry was made to see if there could be a resolution without a trial.  Obviously, there was none.  Specifically, the defendant himself stated his desire to go to trial.

The prosecutor said that the defense merely had to approach him for the negotiations to commence; with no one approaching him, the prosecutor did not make any effort to initiate a resolution.   And even if he had, subsequent comments from the defense clearly show that a plea was unacceptable as a resolution.  There has not been any acknowledgment that  Lionel

State of Florida v. Lionel Tate
Sentencing Order
Page 6 of 18

Tate did anything wrong at any anytime, and he would never plea to what was, in his mind, an accident.

Should the government have taken the initiative?  If it had, perhaps, the result might have been different and we would not be here now.  The defense, it is reported, was interested in a resolution, but was steadfast in its insistence that no admission of guilt or incarceration would result.  Should the defense have been more realistic in its expectations?  If it had, perhaps the results would have been different and we might not be here now.

Testimony was received on March 2, 2001, and again today from Mrs. Grossett-Tate.  She testified that she never knew or made inquiry as to the penalty for Murder in the First Degree. As a law enforcement officer, for her to say she did not know the penalty for Murder in the First Degree, a capital offense, is beyond credibility.  For her to state she did not ask, when a First Degree Murder charge subjects most defendants to the possibility of execution (not in this case, though), if Lionel Tate would be facing that potentially, is unbelievable.

To state that not one person, attorney, lay person or mental health specialist, ever mentioned a life sentence, casts doubts on her testimony, and as a basis for a new trial, is rejected.  In her own words, she stated that she could not tell her son he was facing life in prison, she never felt "it would go this far", implies she well knew.

Of course, the issue is whether her son, the defendant knew.  The court is satisfied that from early on, including his comments on the competency evaluation, he knew what he was facing. But to bring this issue up after the verdict was received is irrelevant to the business at hand.

Additionally, these statements made to the world by Mrs. Grossett-Tate as recently as a week ago states that no plea would ever be accepted, even now, for, in her words, this was an accident.

<u>State of Florida v. Lionel Tate</u>
*Sentencing Order*
Page 7 of 18

This court does not know whether any deals were cut, or were not, as to post-conviction actions by the prosecutor in joining in with the trial attorney. Such has been repeated by the media and is a part of the motions filed in the case. It is totally immaterial at this point. Once the jury has spoken, the opportunity for negotiations has ceased. And whatever actions the attorney's choose to take here or in Tallahassee in the future, is their business and not the courts. If such becomes relevant in subsequent litigation, the courts will address it at that time.

If the state was surprised at the verdict, they should reread their arguments after the state's case was concluded, and again after the defense rested. And if the state now believes that a Murder in the First Degree verdict was inappropriate, I need not remind them that they had well over 500 days, from date of indictment to date of jury selection, to *nolle pros* their case and refile as Murder in the Second Degree or Manslaughter, the latter charge apparently the basis for the final plea negotiations. They got what they wanted; they now have to take responsibility for their actions in seeking it in the first instance.

The state chose not to deviate from what they sought in August, 1999. To talk about travel to the governor to seek a reduction in charge or sentence, if accurate, is of tremendous concern to this court. It not only casts the prosecutor in a light totally inconsistent with his role in the criminal justice system, but it makes the whole court process seem like a game where, if the results are unfavorable, they'll run to a higher source to seek a different result. A trial is not a test balloon, sent up to see what may happen. And if the results displease both sides, so be it: this is what our jury system is about.

This court has no authority to impose a plea that was rejected. The court had no obligation to accept a negotiation, if one had even been proposed, post verdict, to concoct a way outside of the jury's actions. This type of fiction is unacceptable, and quite possibly is violative of Florida laws. I add that this denigrates the very difficult and diligent job the twelve jurors did in this case, and, I am sure, make some question the jury system at all.

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 8 of 18

The defense has filed a motion requesting a **Cottle** hearing, based on **Cottle v. State**, 733 So.2d 963 (Fla. 1999). As stated previously, this court declines holding a **Cottle** hearing, not on the merits, but on the timing. Such a hearing might well be heard in the future; to do so now, as was stated, is untimely.

It has been suggested that if the jury had been informed of the potential punishment that accompanied a Murder in the First Degree conviction, the jury's deliberations might have concluded in a different result. The jury was not informed, correctly, that a guilty verdict would require a life sentence. The jurors are instructed they must disregard the consequences of their verdict. Since the mid-1980's, the law has not permitted the jury to be informed except in those cases where the jurors participate in the sentencing. See, F.Rule of Crim. Procedure 3.390(a). See, **Knight v. State**, 668 So.2d 596 (FLA 1996).

The jury's role is to be the trier of the facts; for a jury to exercise pardon power would fly in the face of our whole judicial system. There cannot be any acceptance of the concept of jury nullification, where a jury does not like a law, or like how it is to be applied. See, **Legette v. State**, 718 So.2d 878 (4 DCA 1998).

In a supplemental motion for a new trial, the defense claims error in the admission of certain statements by Dr. Michael Brannon. A full hearing was held on this issue, with Dr. Brannon testifying. At issue was whether the doctor violated the terms of both his employ and the agreement between the state and defense. It is in general agreement that Dr. Brannon would not talk about any admissions as to the events on the specific day.

It is this court's opinion that Dr. Brannon did not violate the agreement, in part or in whole. Specifically, the most damaging testimony from the doctor at trial concerned Lionel Tate's perception that professional wrestling was not real, the statement did not violate the agreement. A defense witness at the Motion for New Trial, Dr. John Spencer, while expressing consternation at Dr. Brannon's testimony, did not feel that Dr. Brannon violated

State of Florida v. Lionel Tate
Sentencing Order
Page 3 of 18

any of the ethical considerations all psychologists are subject to. Dr. Spencer admitted that he did not report Dr. Brannon to the appropriate governing body, and, that if he felt a violation occurred, he would have. Accordingly, the introduction of Dr. Brannon's testimony is not grounds for a new trial.

In its Second Supplemental Motion for New Trial, it is alleged that the actions of Dr. Sherri Bourg-Carter were egregious requiring a new trial. The court heard sufficient testimony from Dr. Bourg-Carter to find if any improprieties by the psychologist were present, they certainly did not approach a level of prejudice to the defendant which should result in a new trial. Additionally, the facts of the instant case are sufficiently dissimilar as to negate the relevancy of Holland v. State, 636 So.2d 1289 (Fla. 1994). Taking into consideration her actions at Dr. Spencer's office, her trial testimony, and her testimony at the motion on March 2, 2001, Dr. Carter's activities do not create a ground to reverse the jury.

It has been argued that sentencing a fourteen year old to life in prison is cruel and/or unusual punishment, violative of the Eighth Amendment of the U.S. Constitution or Art. 1 §17 of the Declaration of Rights of the Florida Constitution. In effect, the defense argues that such a sentence is disproportionate to the crime committed, specifically child abuse causing death. Also, it is argued that such a sentence in Eighth Amendment analysis does not reflect current standards.

Perhaps the leading case in Eighth Amendment analysis is Trop v. Dulles, 356 US 86 (1958)

> While the State has the power to punish, the Amendment stands to assume that this power be exercised within the limits of civilized standards.

It is not the court's role to act as a legislator or to reflect public opinion. While the court should look to objective indications of societal current values, the U.S. Supreme Court in Gregg v. Georgia, 428 U.S 153 (1976) stated:

> Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

While the Eighth Amendment prohibits the infliction of cruel and unusual punishment, recognizing the evolving standards of decency that mark the progress of a maturing society, prevailing state and federal case law hold that life imprisonment for Murder in the First Degree, even where the convicted is barely into his teens, is neither cruel nor unusual. See, **Penry v. Lynaugh**, 492 U.S. 302 (1989).

The defense argued that the child abuse perpetrated by Lionel Tate merged with the killing of Tiffany Eunick, and constitutes a single offense. In other words, there can be no crime of Felony Murder in the First Degree with the predicate act of Aggravated Child Abuse. This court notices the conflict with **Kansas v. Lucas**, 759 P.2d 90 (Kansas 1998). Florida law, on the other hand, it is quite clear that Aggravated Child Abuse may sustain a Felony Murder First Degree charge. Accordingly, the court denies the request to dismiss the charge of Felony Murder in the First Degree. See, **Robles v. State**, 188 So.2d 789 (Fla. 1966), **Lukehart v. State**, 762 So.2d 482 (Fla. 2000) and **Mapps v. State**, 520 So.2d 92, 93-94 (Fla. 4th DCA 1988).

The other issues raised by the defense in their motions and supplemental motions for new trial are without legal basis. All of these grounds were addressed during the pre-trial motions or during the trial itself. These include: impeachment of Mrs. Grossett-Tate, the State's photographs admissions, the state's computer animation, the results of the **Frye** hearing which limited "expert" testimony concerning professional wrestling, the inclusion of the third

statement of Lionel Tate to law enforcement after suppression of the first two, and, the disallowing of professional wrestlers to testify as either fact witnesses or reluctant expert witnesses.

Thus the Motion for New Trial as well as those Supplemental Motions on the grounds of the inapplicability of the felony murder laws, on the grounds of the inapplicability of the Aggravated Child Abuse statute and on the grounds reviewed above are **DENIED**.

## II. Reduction of the Charge

There is a provision in Florida law that permits courts to reduce the jury verdict to the lesser charge of Murder in the Second Degree or Manslaughter. Rule 3.620, F.R.Crim.Proc. states:

> When the offense is divided into degrees or necessarily includes lesser offenses, and the court, on a motion for new trial, is of the opinion that the *evidence does not sustain the verdict* but is sufficient to sustain a finding of guilt of a lesser degree or of a lesser offense necessarily included in the one charged, the court shall not grant a new trial but shall find or adjudge the defendant guilty of the lesser degree or lesser offense necessarily included in the charge, unless a new trial is granted by reason of some other prejudicial error. (emphasis added)

It should be noted that this opportunity to reduce the verdict was rejected by the jury. Over defense objection, this court instructed the jury on both lessers.

In analyzing the sufficiency of the evidence to sustain the verdict, the court reviewed the testimony and physical evidence introduced at trial. I cannot be any more direct than this: the evidence of guilt was overwhelming. The jury's verdict was totally consistent with the evidence.

State of Florida v. Lionel Tate
Sentencing Order
Page 12 of 18

Much talk has been made using the term of "accident". "Accident" is defined in Florida Statute 782 within the definition of Excusable Homicide:

> The killing of a human being is excusable, and therefore lawful, under any one of the following three circumstances:
>
> 1. When the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent

The defense states that the "accident" was simply Lionel Tate replicating what he saw being done by Sting, Hulk Hogan or The Rock, familiar names to professional wrestling aficionados. But this court is unaware of any wrestler plummeting an adversary that is half the size and one third the weight, let alone half the age. The argument is rejected that the thirty plus injuries discussed herein could have been inflicted by any "means with usual ordinary caution."

It has been suggested, and rejected by the jury listening intently to the testimony, that Lionel Tate could not appreciate what he was doing, that, in so many words, he could not and did not realize he was inflicting pain severe enough to result in death. But when a child years younger than Lionel Tate, accidentally hurts another, the child is cognizant enough of his or her actions to say "I'm sorry" and stop the offensive behavior.

Tiffany Eunick either had to cry out in major pain, a crying out that fell on Lionel Tate's deaf ears, or Tiffany Eunick was mercifully unconscious, a situation belied by Lionel Tate's reenactment. If the child was crying out, then further acts of Lionel Tate could not have been done with usual ordinary caution; the same can be said if Tiffany Eunick was unconscious.

Perhaps, and only perhaps, the first or second or even the third blow was inflicted, "by accident and misfortune in doing (a) lawful act by lawful means with usual ordinary caution," but that cannot explain the remaining number of significant and fatal injuries.

State of Florida v. Lionel Tate
Sentencing Order
Page 13 of 18

It was shown, without dispute, that Lionel Tate was a fan of professional wrestling. Perhaps, even zealous in his love for this type of "entertainment". But the facts of which the jury relied are deceptively simple in rejecting the involvement of professional wrestling replication; thus, by necessary implication, accident:

> 1. In the two statements to the police, Lionel Tate's own words failed to indicate that wrestling played any part in Tiffany's brutal murder. The statements did not come close to explaining what happened in that townhouse.

> 2. In statements made to EMS and the police by the defendant's mother, neither accident nor wrestling played any part in Tiffany's fatality.

Not until there was a defense-initiated reenactment did actions initiating professional wrestling start to emerge as a defense. This reenactment totally failed to explain to the jury during trial, and to this judge sitting as a thirteenth juror in the motion for new trial/reduction of charge, the extent and severity of the injuries to Tiffany Eunick. Even though the reenactment depicted a connection to professional wrestling, the testimony of Dr. Brannon shows that Lionel Tate disbelieved the authenticity of what he saw on television. The reenactment in all due respect, seemed to be trying to fit the facts, rather than a true depiction of the events.

Accordingly, the jury obviously then, and this court now, did not and does not accept that replicating what may or may not have been seen in various televised wrestling shows as a reason to call Lionel Tate's actions "accidental."

It should be noted that not only did the state's witnesses eliminate the possibility of accident, but the defense's own expert, Dr. John Marraccini, negated the argument of accident. Dr. Marraccini, in response to Mr. Padowitz's question affirmatively and reluctantly dispelled the notion of accident.

In analyzing the sufficiency of the evidence, I must reflect upon the in excess of thirty separate injuries, and determining whether they could have been inflicted accidentally: If the court finds that they were inflicted accidentally, then the court would be clearly bound to hold that Excusable Homicide as defined above was proven, and dismiss the charge or reduce it. These injuries were shown in vivid detail to the twelve jurors. They included:

- extensive and multiple lacerations of the liver
- a piece of the liver floating in the abdomen having been severed by extraordinary force
- a rib fracture
- a fracture to the skull
- brain swelling
- internal injuries, including a neck hemorrhage

And, tragically, many more.

It is inconceivable that such injuries, could be caused by "roughhousing," "horseplay" or by replicating professional wrestling moves. The number and seriousness of many of the injuries prove the state's case. This was not a death that should be classified as Excusable Homicide. It matters not which injury occurred in what order as to the ultimate culpability of Lionel Tate. But what is important, as to the timing of the injuries, is the severity of the two major injuries according to Dr. Flannagan and Dr. Kirschner. If one was to assume that the initial injury to Tiffany Eunick was the blow to the head, as depicted in the Klass reenactment, then the abdominal injuries which followed had to be a horrific stomping by foot or knee, or both on an unconscious little girl. And because of the nature of the injuries to the abdomen, Tiffany Eunick had either to be prone on the ground, or held up in a vertical position. If one assumes the blows to the abdomen preceded the others, then the injuries to the head and brain had to be caused in a way similar to swinging a limp object like a rag doll into the stair rails. Either way, the injuries could not be considered "accidental". In this court's opinion, an accidental infliction of the injuries is totally inconsistent with the testimony and with logic. Those not present in court who defend the actions of Lionel Tate as accidental simply did not see or hear the evidence of guilt.

State of Florida v. Lionel Tate
Sentencing Order
Page 15 of 18

With the concept of accident being rejected, the court must decide whether these injuries sustain the elements of Aggravated Child Abuse.

Aggravated Child Abuse occurs when the defendant commits Aggravated Battery, and death results; or commits Child Abuse, and death results. The difference between the two is that in the Aggravated Battery component, the defendant must have acted *intentionally* and *intended* to cause great bodily harm, permanent disability or permanent disfigurement (and if death results, felony murder by Aggravated Child Abuse). In the case of Child Abuse, *the* defendant must *knowingly* or *willfully* inflict physical injury which results in great bodily harm, permanent disability or permanent disfigurement **or** do an act *intentionally* that could reasonably be expected to result in physical injury to a child.

There is an element of intent in both subsections. Whether or not Lionel Tate had the requisite intent to commit Aggravated Battery or knowingly or willfully commit Child Abuse was presented to the jury, and the jury so found that he did. Lay and expert testimony as to the issue of Lionel Tate's maturity and by implication his ability to intend an act was admitted over the state's objection. A special jury instruction as to maturity level was given, over state's objection. The jury, through its verdict, has stated its findings as the trier of the facts.

The government relied more heavily on the Child Abuse component rather than the Aggravated Battery section. To say that Lionel Tate did not commit Child Abuse would be stating that he did not knowingly **or** willfully inflict physical injury. Note that the statue does not require that Lionel Tate knowingly **and** willfully inflict physical injury; either would suffice. Lionel Tate, even if one believes he may not have willfully inflicted physical injury, had to knowingly do so.

Additionally, the child abuse statute in the alternative states that Lionel Tate did an act intentionally. This is not in issue, in this court's mind. If that act or acts could reasonably be

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 16 of 18

expected to result in physical injury, then the charge is proved. Once again, the numbers and severity of the injuries prove these elements.

This judge has been asked to follow the example set by the Honorable Hiller B. Zobel, in the so-called "British Nanny" case: **Massachusetts v. Woodward.** It is unnecessary to state the facts of that case, other than what is necessary to further our analysis. On February, 1997, eight month old Matthew Eappen died of severe head injury; on March 5, 1997, a grand jury indicted nanny Louise Woodward for Murder in the First Degree. On October 30, 1997, the jury returned a guilty verdict of Murder in the Second Degree; the judge imposed a mandatory life sentence on Ms. Woodward.  On November 10, 1997, Judge Zobel reduced the jury verdict from Murder in the Second Degree to Involuntary Manslaughter.

Judge Zobel rejected the granting of a new trial.  To quote his words, applicable in all respects to this case;

> Thus a verdict of Guilty could not properly result from the jury's merely rejecting the defense's physiological explanation as inadequate or Defendant's version of the events as implausible. The jury could return a Guilty verdict only, if, in addition to an adverse assessment of the defense position, the jurors concluded, on all the evidence, that the prosecution's version was true, beyond a reasonable doubt.

In denying a new trial, Judge Zobel chose to reduce the charge. He did so by invoking a rule in the Commonwealth that does not have a corollary in Florida. Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979) reads:

> If a verdict of guilty is returned, the judge may on motion...order the entry of a finding of guilty of any offense included in the offense charged in the indictment.

In short, under Massachusetts law, the court may reduce the level of the conviction for any reason that justice may require.

If the Florida legislature in the future chooses to incorporate such a procedure in the Rules of Criminal Procedure, then, and only then, can the court embrace its concept. But until that time arrives, if ever, the singular and only ground for reduction has been discussed above.

It is requested by the defense for this court to find that the jury's verdict was contrary to the manifest weight of the evidence. This I decline to do. The evidence of Lionel Tate's guilt is clear, obvious and indisputable. And that evidence supports the jury's verdict. To find otherwise would be to invalidate each juror's decision in unanimously finding for a verdict of guilt.

### III. Ruling and Sentence

In the proceeding pages, the court has rejected the defendant's Motions for a New Trial. There are no grounds which exist permitting the court to so act.

In the proceeding pages, the court has rejected the defendant's motion to reduce the charge to Murder in the Second Degree or Manslaughter. There are no grounds which exist permitting the court to so act.

I am moved by the outpouring of concern for Lionel Tate. At the same time I am dismayed by the lack of concern for the child victimized by Lionel Tate. It is obvious that Tiffany Eunick will never have a second chance at life, and there are so many who plead for a second chance for the defendant.

Only those who sat through the days of testimony can appreciate the nature of the acts of Lionel Tate.

State of Florida v. Lionel Tate
Sentencing Order
Page 18 of 18

Only those who viewed the physical evidence can appreciate the gravity of the offense. To embrace the concept of accident one would have to ignore in its totality what was presented and accepted by the jurors.

The acts of Lionel Tate were not the playful acts of a child. The acts of Lionel Tate were not the acts borne out of immaturity. The acts of Lionel Tate were cold, callous and indescribably cruel.

It is therefore the sentence of the court, in accordance with the laws of the State of Florida, that you, Lionel Tate, having been found guilty of Murder in the First Degree in the death of Tiffany Eunick, be sentenced to incarceration for your natural life.

DONE AND ORDERED this _____ day of **March, 2001**, in Open Court, Fort Lauderdale, Broward County, Florida.

JUDGE JOEL T. LAZARUS

Copies furnished:

Ken Padowitz, Esquire
Assistant State Attorney

James S. Lewis, Esquire
Attorney for Defendant

Richard L. Rosenbaum, Esquire
Attorney for Defendant

# TAB 6

Casey

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

## CASE NO: 01-7913-CIV-HURLEY

CASE NO. 00-8616-CIV
(SOUTHERN DISTRICT OF NEW YORK)

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

        Plaintiff,

vs.

L. BRENT BOZELL, III, an individual;
MEDIA RESEARCH CENTER, INC., a
Virginia non-profit corporation, d/b/a PARENTS
TELEVISION COUNCIL; PARENTS TELEVISION
COUNCIL, INC., a Delaware non-profit corporation;
JAMES LEWIS, an individual; MARK HONIG, an
individual; CYNTHIA DELORES TUCKER, an
individual; and VARIOUS JOHN and JANE DOES,

        Defendants.

_____/

## RICHARD L. ROSENBAUM'S REPLY TO
## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO THE MOTION FOR SANCTIONS

COMES NOW the non-party deponent, Richard L. Rosenbaum, by and through

his undersigned counsel and files this Reply to Plaintiff's Memorandum in Opposition to

the Motion for Sanctions, and would respectfully show unto this Honorable Court the

following.

1.    The Plaintiff's Response mischaracterizes, misinterprets, and misrepresents

critical facts surrounding WWFE's and its counsels' wrongful disclosure of a

confidential document, Lionel Tate's Presentence Investigation Report; improper

contact with the court in violation of Local Rule 7.7, Rules of Southern District of Florida, prohibiting correspondence to the court; and improper inclusion of correspondence between counsel in its Appendix. However, rather than following the WWFE's "red herrings" or relying upon its false representations, the non-party shall restrict his reply to the primary considerations upon which the Motion for Sanctions was based:

A) Why was Lionel Tate's confidential Presentence Investigation Report, prohibited by law from being distributed, included in the WWFE's Appendix and referred to in its Response in Opposition to Rosenbaum's Motion to Quash and/or for a Protective Order?

B) Why did out-of-State counsel fax correspondence to Judge Hurley after being notified by Richard Rosenbaum's counsel of the improper inclusion of confidential materials contrary to Rule 7.7, So.Dist.Fla.?

C) Why did the Plaintiff publish letters between counsel in its Appendix in violation of Rule 7.7, So.Dist.Fla.?

2. The Plaintiff's factual representations in WWFE's response are false and misleading. As set forth in the non-party deponent's Response in Opposition to Motion to Strike, the actual facts are as follows:

a. On Thursday, January 10, 2002, undersigned counsel provided Mr. Rosenbaum with a copy of the Appendix filed by the Plaintiff along with its Response in Opposition to Mr. Rosenbaum's Motion to Quash and/or for a protective Order;

2

b.     After reviewing the materials over the evening, Mr. Rosenbaum retained
       the services of a licensed private investigator to ascertain where the
       confidential materials had been obtained from and who had "leaked" the
       privileged Presentence Investigation Report to the WWFE;

c.     Once Mr. Rosenbaum's investigator was able to obtain a copy of the
       confidential Presentence Investigation Report late Friday afternoon from
       the Broward County Clerk of Courts, undersigned counsel attempted to
       speak to the Assistant State Attorney assigned to the Lionel Tate case in
       an attempt to ascertain how the confidential document had mistakenly
       been made public;

d.     On the morning of Friday January 11, 2002 the undersigned called and
       inquired of Mr. Stitcher as to how the WWFE had obtained the
       confidential Presentence Investigation Report and why the same was
       submitted in the Appendix to his Response to Non-Party Richard
       Rosenbaum's Motion to Quash;

e.     It was further indicated that the inclusion of the Presentence Investigation
       Report in the Appendix to Plaintiff's response was improper for a variety
       of reasons, the most notable being the fact that PSI reports are
       confidential in nature and disclosure is not permitted to the general public
       as recited therein;[1]

_____

[1]This would put even an unsophisticated lay person on notice of the confidential
nature of the report, let alone experienced litigation counsel. It is telling that Plaintiff
did not see the express warning of confidentiality when the report was examined or, in

f.      Mr. Stitcher advised the undersigned that he did not know the answer to
undersigned counsel's questions, but he would look into the situation and
advise;

g       That the undersigned, as is his custom, left early on that Friday, due to
religious reasons;

h.      That after 5:00 PM on that same day the undersigned's secretary called
the undersigned at his residence to advise him that Mr. Stitcher needed to
speak to him;

i.      That as a courtesy, the undersigned responded to Mr. Stitcher's call. The
undersigned told Mr. Stitcher that he had a very limited time to talk at that
time;

j.      Mr. Stitcher advised Mr. Zukoff that he at that time had no answer to the
earlier inquiries as to their source of the Report;

k.      Mr. Stitcher advised the undersigned that he would have no objection to
the sealing the report, and wanted to know there and then what Mr.
Rosenbaum's position was concerning the same;

l.      The undersigned advised Mr. Stitcher that he would consult with his
client, the options available and would advise him on Monday (it should
be noted that court was closed at the time of the call and in fact nothing
could be done until the following Monday in any event);

m.      On Monday morning the undersigned made a call to Mr. Stitcher and

the alternative, apparently chose to ignore the same.

advised him as follows:

i.      That there was no question that the disclosure of tab no. 11 in the

        Appendix was totally inappropriate;

ii.     That the options available in response thereto were being

        considered and would be acted upon in a timely manner;

iii.    That Mr. Rosenbaum would not act in any way to obstruct whatever

        legitimate efforts the WWFE made in their attempt to seal the

        privileged document should counsel be able to formulate a plan to

        accomplish the same.  However, undersigned advised he was not

        quite sure how one is able to unring the bell; and

iv.     If the WWFE was in fact able to formulate a way of correcting this

        error Richard Rosenbaum would cooperate so long as the rights of

        his client were not further compromised as a result of the WWFE

        and its counsel's actions.

3.      Undersigned counsel believes it to be unethical conduct to become a

witness in a case in which he is also counsel, and to testify as to a

controverted fact.  Accordingly, the affidavits of attorneys Stitcher and

Casey should be stricken.[2]  Such a belief makes it difficult for this non-

party to respond to WWFE's counsels' sworn affidavits.  This non-party

_____

[2] Such belief is predicated, inter alia, upon an appellate decision in which
Richard L. Rosenbaum obtained a reversal of a murder conviction following the
prosecutor becoming a witness and prosecuting the same crime.  See Holloway v.
State, 705 So. 2d 646 (Fla. 4th DCA 1998)[a conviction for murder was improper when
the prosecutor acted as both a witness and as prosecutor at appellant's criminal trial].

1194R-00003 346146.1                              5

deponent reminds this Court that as appellate counsel, he is proceeding

pro bono presenting weighty State and Federal constitutional issues on

appeal and is ethically bound to assert privilege and to maintain said

assertion on appeal, if necessary.  See Rule 4-1.6, Rules Regulating the

Florida Bar.

4.    Mr. Rosenbaum obtained the file of Jim Lewis, a named defendant herein, and

thereafter, the files and notes of others which were confidential.  As a result, when

subpoenaed, a Motion to Quash and/or for a Protective Order was filed.  A Privilege

Log was subsequently filed with a Motion to File the Same Under Seal.

5.    Mr. Rosenbaum has "no dog"[3] in the WWFE's fight with Jim Lewis and other

Defendants in this case, yet he has already been harassed and burdened by the

WWFE's efforts.  Mr. Rosenbaum seeks only to represent Lionel Tate concerning

appellate and post-conviction matters, which he has a constitutional right to pursue

without undue interference.  Richard Rosenbaum vehemently desires to stay out of

these civil proceedings, which are ancillary and burdensome.

6.    Mr. Rosenbaum's objections have been based upon Lionel Tate's privilege.

Arguably, trial counsel and Defendant in the civil case, James Lewis should have

previously objected to the requested invasion into Lionel Tate's privileged and work

product materials, but his failure to so object is not crucial to preservation of the issue

---

[3]Richard Rosenbaum has reason to believe that the "wrestling defense" was bogus and that in actuality Lionel Tate's contact with Tiffany Eunick was accidental and unintentional and that this child, twelve years old at the time of the incident, was not competent to be tried as an adult nor to assist in his defense.

herein.

7.   Even if Mr. Lewis should have objected to the requested discovery, it is Lionel

Tate's rights which shall be infringed by the unlawful release of confidential materials.

Accordingly, Lionel Tate is the only one who can waive his rights under the

attorney/client privilege and the work product doctrine.[4]

8.   The Rules Regulating The Florida Bar, specifically, Rule 4-1.6, states:

> (a) Consent Required to Reveal Information. A lawyer shall
> not reveal information relating to representation of a client
> except as stated in subdivisions (b), (c), and (d), unless the
> client consents after disclosure to the client.
> (b) When Lawyer Must Reveal Information. A lawyer shall
> reveal such information to the extent the lawyer reasonably
> believes necessary:
> (1) to prevent a client from committing a crime; or
> (2) to prevent a death or substantial bodily harm to another.
> (c) When Lawyer May Reveal Information. A lawyer may
> reveal such information to the extent the lawyer reasonably
> believes necessary:
> (1) to serve the client's interest unless it is information the
> client specifically requires not to be disclosed;
> (2) to establish a claim or defense on behalf of the lawyer in a
> controversy between the lawyer and client;
> (3) to establish a defense to a criminal charge or civil claim
> against the lawyer based upon conduct in which the client
> was involved;
> (4) to respond to allegations in any proceeding concerning the
> lawyer's representation of the client; or
> (5) to comply with the Rules of Professional Conduct.
> (d) Exhaustion of Appellate Remedies. When required by a
> tribunal to reveal such information, a lawyer may first exhaust all
> appellate remedies.
> (e) Limitation on Amount of Disclosure  When disclosure is

---

[4]Lionel Tate, a minor, Kathleen Tate, mother/custodial parent, and John Tate,
natural father have expressly advised Richard Rosenbaum to maintain and preserve
each and every one of Lionel Tate's privileges and immunities to the fullest extent of
the law.

7

> mandated or permitted, the lawyer shall disclose no more
> information than is required to meet the requirements or
> accomplish the purposes of this rule.

9. The WWFE and its counsel, by manufacturing and relying upon the non-existent misdeeds of others, seek to divert this Court's attention from its own misconduct.

10. Undisputedly, the Plaintiff and its counsel obtained and utilized in a public forum confidential materials.

11. The Plaintiff and its counsel published the same by filing the confidential and privileged material in the public records of the Federal District Court in the Southern District of Florida.

12. In an attempt to "cover up the mistake," the WWFE sent via facsimile correspondence to this Honorable Court, in violation of Local Rule 7.7, Southern District of Florida.

13. The WWFE and its counsel repeatedly refer to "Rosenbaum's refusal to comply with the Subpoena Duces Tecum." See e.g., p. 1.[5] This is not a situation where the non-party deponent has refused to comply with a court order. In fact, Richard L. Rosenbaum is merely honoring his ethical obligation to assert the attorney/client privilege and to maintain that confidential documents are work-product.

14. Although the WWFE and its counsel refer to the confidential PSI as a "document buried," any reasonable attorney in Florida knows that such a document is privileged

---

[5] One would think by such language that the WWFE had already secured an order compelling disclosure of each and everyone the items demanded in the Subpoena. However, no such relief has been afforded to the WWFE.

1194R-00003 348148.1                                    8

and confidential, regardless of what tab it is found in the WWFE;s Appendix.[6]  Richard L. Rosenbaum suggests that the reason no case law exists in Florida surrounding the wrongful inclusion of a confidential private PSI in public records is that in the past, no party or counsel has so blatantly violated the law.

15.     Contrary to Mr. Stitcher's and Mr. Case's representations, the PSI had not been prepared for the Record in State vs. Tate.  For some unknown reason, which is presently being investigated, the confidential document was inserted into the trial court clerk's file with the Clerk of Court, Seventeenth Judicial Circuit in and for Broward County, Florida, without a clock-in date or time.  Importantly, the same was not contained in the Record on Appeal in this case, and the only public filing of the document was the WWFE's reference to the confidential PSI in its Response in Opposition to Mr. Rosenbaum's Motion to Quash, and in its Appendix in support thereof.

16.     Despite the WWFE and its counsels' assertions that the Motion for Sanctions "is a protectural sham," the same was necessary in order for Mr. Rosenbaum, appellate counsel for Lionel Tate, to fulfill his ethical responsibilities to Lionel Tate.  Clearly, even though Lionel Tate was only 12 years of age at the time of the incident, he is entitled to the United States and Florida constitutional protections of the attorney/client privilege and the work-product doctrines.  See Fischer v. United States, 425 U.S. 391, 402, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); United States v. Juarez, 573 F.2d 267, 276

---

[6]WWF and thier counsel's statement suggesting otherwise is disingenuous and is support by absolutely nothing.

(5ᵗʰ Cir.)(explaining <u>Fischer</u>), <u>cert denied</u>, 439 U.S. 915, 58 L.Ed.2d 262, 99 S.Ct. 289 (1978).

17.     Without publicly referring to the PSI, as the WWFE did, the non-party deponent respectfully suggests this Honorable Court review, in-camera, the now sealed Appendix filed by the WWFE, specifically, tab no. 11 to ascertain whether the WWFE and its counsels' assertions that its counsel was forced to "read through 19 pages of text to find a reference on the last page of the PSI indicating that the document is not a matter of public record" is a valid excuse for publicly filing a confidential document.  <u>See</u> Memorandum and Plaintiff's Memorandum in Opposition, p. 4; Stitcher Affidavit, ¶ 12, Ex. B.

18.     Without quoting from the confidential document, this non-party deponent cannot do the privilege issue justice.  Therefore, this Court should review the probation department's clear bold lettering, large font markings of privilege and confidentiality, and remember; reasonably prudent attorneys practicing law in Florida, or anywhere, have an obligation to know which matters are privileged; more so, any attorney providing competent counsel is required to read <u>every</u> page, <u>every</u> paragraph of a document attached in an Appendix and referred to in a pleading.

19.     While it is nice to learn, for the first time upon receipt of the Plaintiff's Memorandum in Opposition, that Mr. Stitcher "apologized to the court" after being informed that his facsimile correspondence to the court was improper, it is unavailing. See Page 7, Memorandum in Opposition.  However, the same is an admission that the WWFE and its counsel violated the Local Rules of this Court.  Surprisingly, Mr. Stitcher

cavalierly ignores his improper facsimile correspondence to the Federal District Court Judge in the Southern District of Florida, a locale and venue in which he was not permitted to practice.

20.    Interestingly, the WWFE and its counsel assert that "Rule 7.7 is designed to prevent counsel from routinely 'copying' the Court on letters that they exchange.........." See Memorandum, p. 12. Notably, neither the WWFE nor its counsel cite any authority for this proposition. To the contrary, the Plaintiff and its counsel totally ignore their improper contact with the Court, while candidly admitting its ex-parte apology.[7]

21.    The WWFE and its counsel repeatedly "bang the drum" that their unlawful disclosure of the PSI is not sanctionable. While this non-party deponent has been unable to cite any specific remedy provided for by statute, Florida law was clearly violated by the wrongful disclosure of confidential materials. See Section 945.10, Florida Statutes; Rules 3.172 and 3.173, Florida Rules of Criminal Procedure (2001).[8]

22.    The Plaintiff and its counsel's allegation that it did not publish or distribute the confidential document is laughable. Clearly, by filing the PSI as part of the Appendix with the Clerk of Court and failing to file the same under seal, the matters became public record. They were listed on the Pacer System. Although subsequently sealed by Order of the Court, the documents were nevertheless disclosed, albeit for less than

---

[7]Even the WWFE's sarcastic footnote concerning Blacks Law Dictionary's definition of ex parte was clearly violated as Mr. Stitcher's apology to the court was taken "without notice to, or contestation by, any person adversely interested." See p. 7, n. 7.

[8]This non-party offers that said unlawful disclosures constitutes indirect contempt of court or obstruction of justice.

1194R-00003 345148.1                                    11

a two week period. The extent of time the information was wrongly and unlawfully

disclosed as a result of the WWFE and its counsels' acts. Sanctions are required

because of the mere making of the confidential materials a public record.

23.    Contrary to the WWFE's insinuation in Footnote 9, Rosenbaum has not misused

the Florida Bar Rules, but rather seeks to further Lionel Tate's exercise of his State and

Federal constitutional rights. While the Florida Rules of Professional Conduct

specifically state that the Rules are not designed to be a basis for civil liability, in this

case, Lionel Tate seeks equitable relief. Richard Rosenbaum does not seek to

establish WWFE's civil liability[9] at this time and in these proceedings.

I HEREBY CERTIFY that on this **12ᵗʰ day of FEBRUARY, 2002**, a true and

correct copy of the foregoing was furnished by U.S. mail to: the attached service list.

Respectfully submitted,

LAW OFFICE OF STEPHEN ZUKOFF, ESQ.
COUNSEL FOR RICHARD L. ROSENBAUM
19 WEST FLAGLER STREET
SUITE 211
MIAMI, FL 33130
TELEPHONE: (305) 374-4331
FLA. BAR NO: 0177061

STEPHEN M. ZUKOFF

---

[9]In fact, Richard L. Rosenbaum, in all likelihood, has no basis to seek civil relief
Only Lionel Tate, because he is a minor child, his parents or guardian, can assert a
cause of action on his behalf.

1194R-00003 348148.1                    12

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO: 01-7913-CIV-HURLEY

WWFE, etc.,

　　　　Plaintiff,

vs.

L. BRENT BOZELL, et al.,

　　　　Defendants.

_____/

## MAILING LIST

DANIEL A. CASEY, ESQ.
KIRKPATRICK & LOCKHART LLP
Attorneys for Plaintiff
Miami Center, 20th Floor
201 South Biscayne Boulevard
Miami, FL 33131

KURT STITCHER, ESQ.
KIRKPATRICK & LOCKHART LLP
Attorneys for Plaintiff
535 Smithfield Street
Pittsburgh, PA 15222-2312

STEPHEN ZUKOFF, ESQ.
Attorney for Richard Rosenbaum
19 W. Flagler Street, #211
Miami, FL 33130

ROBERT BUSCHEL, ESQ.
Attorney for James Lewis
201 SE 8th Street
Ft. Laud., FL 33316

RICHARD L. ROSENBAUM, ESQ.
Attorney for Lionel Tate
350 E. Las Olas Blvd., #1700
Ft. Laud., FL 33301

1194R-00003 348148.1                                    15

# TAB 7



# JAMES S. LEWIS
### ATTORNEY AT LAW

SUITE 100
500 SOUTHEAST 6TH STREET
FORT LAUDERDALE, FLORIDA 33301

TELEPHONE (954) 523 7948
TELEFFAX (954) 779-1767

June 1, 2001

By U. S. Mail and Facsimile (412) 355-6461

Jerry S. McDevitt
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Re:     **World Wrestling Federation Entertainment, Inc. v. L. Brent Bozell, III, et. al.**
        **Case No.: 00 Civ. 8616**

Dear Mr. McDevitt:

You may consider this letter a supplemental response to your Request for Production and Interrogatories.

In follow up to your letter of May 24, 2001 concerning my responses to your Request for Production and interrogatories, please be advised that my entire criminal file concerning the State of Florida vs. Lionel Tate was transferred in March of 2001 to Lionel Tate's appellate lawyer:

Richard Rosenbaum
350 East Las Olas Boulevard
Suite 1220, Fort Lauderdale, FL 33301
Telephone (954) 522-7007

I have not retained any copies from the file with the exception of newspaper clippings.

I will respond by corresponding paragraph the issues you raise in your May 24, 2001 letter to Mr. Quarequio

1

## Production of Documents

Request no. 2: I do not have the ability to prepare a privilege log as I no longer possess any documents from the Lionel Tate file. These documents if any exits relevant to your inquiry are in the possession of Attorney Richard Rosenbaum.

I do not possess any copies of the videotape reenactment.

Assistant State Attorney, Ken Padowitz does have a copy, and a public record's request from you directed to the State Attorney's office would enable you to obtain a copy.

Request no. 5: I did retain a clip file of newspaper articles in connection with the Lionel Tate case and I am sending you a copy of every newspaper article I have in my possession.

Request no. 9: I did not record or know the dates of these videotapes but have Mr. Casey come by my office, I will give him a copy of the tapes with the understanding he will return them. I have located additional tapes that contain Court TV, O'Reilley Factor, and various local news footage.

Request no. 22: I do not possess these documents. A public record's request directed to the State Attorney's Office could result in obtaining the autopsy report, Lionel Tate's statements, etc.

Request nos. 23, 24: I stand by my prior objections.

Request no. 31: I have no professional liability insurance. I seriously doubt my homeowner's policy applies but here it is:

Clarendon Insurance,                    Policy No. HI-031-6228
Post Office Box 141150                  Contact: Phil Budervic
Gainsville, FL 32614
Telephone (352) 332-8800

Request no. 40: I currently do not possess any documents that are the subject of your request. I will of course notify you if and when that changes. I am requesting that Dr. Wiley Mittenberg provide me with a copy of his report and Test Results. I will provide those to you upon receipt. Dr. Joel Klass and Dr. John Spencer authorized no written reports that I am aware of but they will be witnesses.

Request no. 43: To clarify my response I am not aware of any specific documents that exist which support that statement with the exception of witness statements and depositions taken in connection with the Lionel Tate case that I presume you already have in your possession. The witnesses that come to mind include, Dewessee Eunick, Bradley Henry, Kathleen Grossett-Tate, Dr. John Marraccini, Dr. Joel Klass and Dr. Wiley Mittenberg  I will also seek to call psychologists Dr. Frank Farley of Temple University, Dr. Ron Slaby of Harvard University and Dr. Lori Butts. These

2

psychologists gave depositions and testified in a pre-trial hearing. I do not possess any of these depositions or statements at the present time.

### Answers to Interrogatories

Interrogatory no. 7: I, James S. Lewis, possess the videotapes. Other than my secretary, Renee Piedra, no other individuals have assisted me in providing documents. Again, attorney Richard Rosenbaum now possesses my criminal file.

Interrogatory no. 8: I stand by my previous objections.

In the spirit of cooperation please contact me directly by phone or correspondence in a continuing effort to facilitate discovery.

Sincerely,

JAMES S. LEWIS, ESQ.

JSL:rp

cc:    Thomas A. Leghorn, Esq.
       Robert R. Sparks, Esq.

3

.

# TAB 8

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -x
                     :

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC.,           :

            Plaintiff,    :

     - against -       :    <u>ORDER</u>

L. BRENT BOZELL, III, MEDIA    :    00 Civ. 8616 (DC)
RESEARCH CENTER, INC., d/b/a
PARENTS TELEVISION COUNCIL,   :
PARENTS TELEVISION COUNCIL,
JAMES LEWIS, MARK HONIG, and  :
VARIOUS JOHN AND JANE DOES,

               :

          Defendants.
               :
- - - - - - - - - - - - - - - - - - -x

**CHIN, D.J.**

      IT IS HEREBY ORDERED THAT

      1.  As to defendants L. Brent Bozell, III, Media

Research Center, Inc., Parents Television Council, Mark Honig,

and various John and Jane Does (collectively, the "PTC

Defendants"):

          a.  They shall produce any and all documents, as

to which there are no disagreements, that are responsive to

plaintiff's First Set of Document Requests and Interrogatories,

served on the PTC Defendants on November 15, 2000, on or before

<u>July 13, 2001</u>;

          b.  Plaintiff shall bring to the Court's

attention, in the form of a letter brief not to exceed 10 pages,

any remaining disagreements relating to its First Set of Document

Requests and Interrogatories on or before <u>July 20, 2001</u>, and the

PTC Defendants shall respond, in the form of a letter brief not to exceed 10 pages, on or before <u>July 27, 2001</u>.

     2.  As to defendant James Lewis:

       a.  He is ordered to produce any and all documents in his possession, custody, or control that are responsive to plaintiff's First Set of Document Requests and Interrogatories, or to provide a proper privilege log for any documents that he withholds, on or before <u>July 13, 2001</u>.  In addition, on or before <u>July 13, 2001</u>, he shall provide an affidavit attesting to the fact, if true, that he no longer has possession, custody, control, or access to any responsive documents that he transferred to appellate counsel; he shall state when the files were transferred and to whom (providing name(s) and address(es));

       b.  Plaintiff is directed to subpoena the Florida appellate attorney for Lionel Tate if it wants the appellate attorney's files relating to the Tate case.

     3.  The stay of discovery imposed by the Court on January 5, 2001, is lifted.  All fact and expert discovery is to be completed by <u>January 25, 2002</u>.

     SO ORDERED.

Dated:    New York, New York
           June 25, 2001

                        DENNY CHIN
                      United States District Judge

- 2 -

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 00-8616-CIV

(SOUTHERN DISTRICT OF NEW YORK)

## 01-7913
## CIV - HURLEY

MAGISTRATE JUDGE
LYNCH

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

        Plaintiff,

vs.

L. BRENT BOZELL, III, an individual;
MEDIA RESEARCH CENTER, INC., a
Virginia non-profit corporation, d/b/a PARENTS
TELEVISION COUNCIL; PARENTS TELEVISION
COUNCIL, INC., a Delaware non-profit corporation;
JAMES LEWIS, an individual; MARK HONIG, an
individual; CYNTHIA DELORES TUCKER, an
individual; and VARIOUS JOHN and JANE DOES,

        Defendants.

NIGHT BOX
FILED

DEC 2 9 2001

_____/

### RICHARD L. ROSENBAUM, ESQ.'S MOTION TO
### QUASH OR, IN THE ALTERNATIVE, FOR PROTECTIVE ORDER

COMES now a non-party deponent, RICHARD L. ROSENBAUM, ESQ. by and

through his undersigned counsel, and respectfully requests this Court enter a Protective

Order precluding the Plaintiff, WORLD WRESTLING FEDERATION ENTERTAINMENT,

INC., from obtaining documents pursuant to the Subpoena Duces Tecum issued to a non-

party witness, RICHARD L. ROSENBAUM, ESQ. and as grounds and in support thereof

states as follows:

PERS-GMB 341962.1



## I.  BACKGROUND

The Plaintiff, WORLD WRESTLING FEDERATION ENTERTAINMENT, INC.,

served a Subpoena on RICHARD L. ROSENBAUM, ESQ. on December 13, 2001.

RICHARD L. ROSENBAUM, ESQ. is one of the appellate attorneys for Lionel

Tate, a child convicted of first degree murder for an act which occurred when Lionel

Tate was 12 years of age.

Lionel Tate was represented at trial by Defendant, James Lewis, Esquire.  After

Lionel Tate's conviction, RICHARD L. ROSENBAUM, ESQ. first appeared as appellate

counsel.

Lionel Tate's direct appeal to the Fourth District Court of Appeal, State of

Florida, is pending.  His Initial Brief is presently due to be filed on or before January 4,

2002.

The Subpoena issued "commanded" the production, inspection and copying of a

multitude of documents obtained or compiled in the defense of Lionel Tate.

## II.  GROUNDS

As grounds and in support of this Motion, The non-party deponent states as

follows:

    1)     The Subpoena issued should be quashed and/or modified as it:

          a.     Requires disclosure of privileged or other protected matter and no

                 exception or waiver applies;

          b.     Subjects RICHARD L. ROSENBAUM, ESQ. to undue burden;

    c.    Requests production of items that are readily available from other sources;

    d.    Fails to allow a reasonable time for compliance.

2)    The materials sought by the Plaintiff are confidential and protected by the attorney/client privilege. The same were acquired by Lionel Tate's trial counsel during the course and scope of representation, and production thereof cannot be compelled at this juncture.

3)    The materials sought by the Plaintiff are the work product of Lionel Tate's defense counsel.

4)    Lionel Tate has not waived his rights under the attorney/client privilege.[1]

5)    RICHARD L. ROSENBAUM. ESQ. is presently unable to provide the information set forth in Instruction No: 2, which demands compilation of information from all privileged documents including information concerning:

    "a.    The type of document or information (e.g., letter, notebook, telephone conversation, etc.);

    b.    The date of the document or transaction involving the information;

    c.    Identification of the author and/or all participants with respect to the information;

---

[1]An in-court discussion was held prior to sentencing as to whether Lionel Tate was even competent to waive his rights to the attorney/client privilege. A copy of the Colloquy which ensued, and the Proffer by defense counsel and experts that Lionel Tate was not competent to proceed are attached hereto as Exhibit "A" and incorporated herein by reference.

d.   Identification of the signatory or signatories of the document, if any;

e.   Identification of the document's current custodian;

f.   The present whereabouts of the document and/or the names of all persons with personal knowledge with respect to the information; and

g.   A statement of the grounds on which the claim of privilege rests with respect to each such document or piece of information withheld."

6)   The vast majority of documents sought to be produced are documents equally available to the Plaintiff from other sources. Most, if not all of those sources, are the person or entities that originated the same. For example, the Plaintiff improperly seeks from this non-party:

"1.   .....any and all documents generated by <u>any law enforcement agency</u> concerning ......Tiffany Eunick;

2   .....any and all documents generated by <u>any emergency medical services</u> agency concerning..... Tiffany Eunick;

3.   .....any and all documents generated by <u>any fire department</u> concerning .....Tiffany Eunick;

4.   .....any and all documents generated by <u>any hospital or other medical facility</u> concerning .....Tiffany Eunick;

5.   .....any and all documents generated by <u>any medical examiner's office or coroner's office</u> concerning.....Tiffany Eunick."

7)   Further, the Plaintiff seeks production of any and all written or recorded statements of any witnesses in this matter. Clearly, any such statements would have

either been forwarded by the State pursuant to its obligations under Rule 3.220, Florida Rules of Criminal Procedure, or would have been obtained by the defense and would thus be "work product."

8)      Good cause exists to warrant quashing or modifying the Subpoena, or for entry of a Protective Order.

9)      The instant Subpoena subjects RICHARD L. ROSENBAUM, ESQ. to undue burden and expense.  The LAW OFFICES OF RICHARD L. ROSENBAUM is a small, two-person firm, with RICHARD L. ROSENBAUM and a young associate, as well as secretarial staff.  Although RICHARD L. ROSENBAUM is "of counsel" to a larger firm, RICHARD L. ROSENBAUM, ESQ. has been expending substantial pro bono time, efforts and energies on Lionel Tate's Application for Clemency to the Governor of the State of Florida, as well as preparing Lionel Tate's Initial Brief on Appeal.  The due date for the filing of Lionel Tate's Initial Brief quickly approaches.  To require RICHARD L. ROSENBAUM, ESQ. to review and categorize for the Plaintiff in this civil case documents which are easily obtainable from other more qualified record custodians, shall require RICHARD L. ROSENBAUM, ESQ. to disclose privileged materials of his client, Lionel Tate, and shall unduly burden, hampering Lionel Tate's appeal.

10)     Time is of the essence for Lionel Tate.  His "date in appellate court" is quickly approaching.  The instant Subpoena shall only serve to muzzle Lionel Tate's evidence of innocence - in no way related to the Plaintiff, WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., or the issues raised in this civil case.

JAN-22-02 TUE 05:54 PM          FAX NO.                    P. 32

11)    RICHARD L. ROSENBAUM, ESQ. is unable to comply with the Subpoena issued based upon a previously scheduled irreconcilable conflict. Specifically, RICHARD L. ROSENBAUM, ESQ.'S attendance is required in Federal District Court in West Palm Beach, Florida at the same time the instant Subpoena is returnable, December 21, 2001, at 10:00 A.M. As Sentencing is in West Palm Beach, and the deposition in this case is scheduled at the same time in Miami, Florida, RICHARD L. ROSENBAUM, ESQ. is unable to "be in two places at once," requiring issuance of a Protective Order.

12)    Even if RICHARD L. ROSENBAUM, ESQ. were available to attend the instant deposition, RICHARD L. ROSENBAUM, ESQ. as a non-party to these proceedings, he is entitled to have the Subpoena quashed or a Protective Order entered based upon a plethora of reasons set forth herein.

13)    In the event this Honorable Court denies RICHARD L. ROSENBAUM, ESQ.'S Motion to Quash or, in the Alternative, for Protective Order, RICHARD L. ROSENBAUM, ESQ. requests that he be given a reasonable time period in which to have the requested materials assembled. Further, he requests that the Plaintiff reimburse costs expended and that a reasonable sum be paid to reimburse RICHARD L. ROSENBAUM, ESQ. for the utilization of office personnel to comply with the request, in whole or in part.

## ARGUMENT

A party may request a court to quash a subpoena pursuant to Federal Rule of Civil Procedure 45(C) (3)(A), which provides in pertinent part:

PERS-GMB 341962.1                          6

(A)    On timely motion, the court by which a subpoena was issued shall quash
       or modify the subpoena if it ...

    (i)    fails to allow reasonable time for compliance

                         * * *

    (iii)   requires disclosure of privileged or other protected
       matter and no exception or waiver applies, or

    (iv)    subjects a person to undue burden.

Furthermore, a party may seek a protective order pursuant to Federal Rule of Civil

Procedure 26(c), which provides in pertinent part:

> Upon motion by a party . . . the court in which the action is pending . . . may
> make any order which justice requires to protect a party or person from
> annoyance, embarrassment, oppression, or undue burden or expense,
> including one or more of the following:

                         * * *

    (1)    that the disclosure or discovery not be had;

                         * * *

    (4)    that matters not be inquired into, or that the scope of the disclosure or
       discovery be limited to certain matters;

The documents sought by way of the instant Subpoena are protected pursuant to

attorney/client privilege.

An attorney/client privilege may be invoked by a lawyer on behalf of his client. See

Fischer v. United States, 425 U.S. 391, 402, 96 S.Ct. 1569, 48 L Ed.2d 39 (1976); United

States v. Juarez, 573 F.2d 267, 276 (5th Cir.)(explaining Fischer), cert denied, 439 U.S.

915, 58 L.Ed.2d 262, 99 S.Ct. 289 (1978)  Confidential disclosures by a client to an

attorney made in order to obtain legal assistance are privileged. Thus, when the client

himself would be privileged from production of the document, either as a party at common

law or as exempt from self-incrimination, the attorney having possession of the document

is not bound to produce. See Fischer at 391. The reasoning behind attorney/client

privilege is so that the relation between a lawyer and client is comfortable and, thus, the

client feels absolutely free to divulge everything connected with this case to his lawyer to

assist the latter in preparing for the representation. Clearly, the relationship would be

seriously weakened if a client had to fear that his lawyer could disclose to a party the

identity of the client's records that he has used or is using to build his case. See United

States v. Henkins, 631 F.2d 360 (5th Cir.1980).

The attorney/client privilege would be undermined if people were required to confide

in lawyers at the peril of compulsory disclosure every time an opposing party decided to

subpoena the attorney. Id. at 360. Additionally, to obtain discovery of work products,

there must be an unusually strong showing of good cause to justify discovery of such

writings. See Campbell v. Eastland, 307 F.2d 478 (U.S. Ct. of App. 5th Cir. 1962). The

work product privilege applies to materials prepared to aid an anticipated or pending

litigation. It protects the ideas, legal theories, opinions and mental impressions of

attorneys formulated in connection with preparation for trial. See Gutter v. E.I.Dupont DDE

Nemours & Co., 1998 U.S. Dist. LEXIS 23207; Hickman v. Taylor, 329 U.S. 495, 67 S.Ct.

385, 91 L.Ed.2d 451 (1947). Additionally, the concept of subject matter waiver does not

apply to work product privilege. See Cox v. Administrator, 17 F.3d 1386 (11th Cir. 1994);

In Re Martin Marietta Corp., F.2d 619 (4th Cir. 1988). If a document in questions clearly

requests or gives legal advice, or contains traditional work product information, it is protected from disclosure.  See Great Plains Mut. Ins. Co., Inc. v. Mutual Reinsurance Bureau, 150 F.R.D. 193 (U.S.D.C. Kan. 1993).

If a client transfers documents to his attorney for purposes of obtaining legal advice, the document cannot be obtained by Subpoena by reason of attorney/client privilege.  See Heddon v. State, 786 So.2d 1262 (Fla. 2nd DCA 2001); Fisher v. United States, 425 U.S. 391, 402-405, 48 L.Ed.2d 39, 96 S.Ct. 1569 (1976).  The attorney/client privilege is possessed by the client.  See, e.g., Sec. 90.502(2), Fla. Stat. (1997).  The attorney/client privilege protects a defendant's constitutional right to legal representation.  See Rogers v. State, 742 So.2d 827 (Fla. 2nd DCA 1999).

Furthermore, opinion work product involves a lawyer's impressions, conclusions, opinion and theories of a client's case.  Opinion work product is an absolute privilege.  See Horning-Keating v. State, 777 So.2d 438 (Fla. 5th DCA 2001).  Bare assertions of need and undue hardship are insufficient to require the production of work product.  A showing of need and undue hardship must include specific explanations and reasons; unsworn assertions of counsel are insufficient.  The burden is on the party seeking discovery to demonstrate need and undue hardship.  See Horning-Keating at 438.

The attorney-client privilege protects communications between attorney and client from disclosure where:

> (1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is [the] member of a bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence

of strangers (c) for the purpose of securing primarily either (i) an opinion on law (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

United States v. Jones, 517 F.2d 666, 670 (5th Cir. 1975); (quoting United States v. United

Shoe Machinery Corp., 89 F. Supp. 357, 358-59 (D.Mass. 1950)). See also 4 J. Moore,

Moore's Federal Practice §  26.60[2], at 26-193 (1989).

Additionally, the rules regulating The Florida Bar, Chapter 4, Rules of Professional

Conduct, make clear the professional responsibilities of an attorney to a client.

Specifically, Rule 4-1.6 states:

> "A lawyer shall not reveal information relating to representation of a client....unless the client consents after disclosure to the client."

The comment to Rule 4-1.6 also states:

> "The observance of the ethical obligation of the lawyer to hold inviolate confidential information of the client....encourages people to seek early legal assistance....a fundamental principle and the client-lawyer relationship is that the lawyer maintain the confidentiality of information relating to the representation...the attorney-client privilege applies in judicial and other proceedings in which a lawyer may be called as a witness or otherwise required to produce evidence concerning a client....The confidentiality rule applies not merely to matters communicated in confidence by the client but also to all information relating to the representation, whatever its source. A lawyer may not disclose such information...."

The work product rule protects work done by an attorney in anticipation of or during

litigation from disclosure to any party. See In Re Grand Jury Subpoena, _____ F.3d _____

(1st Cir. November 8, 2001) [2001 U.S. App. LEXIS 24064]. The rule facilitates zealous

advocacy in the context of an adversarial system of justice by ensuring that "the sweat of

an attorney's brow is not appreciated by the opposing party." Hickman vs. Taylor, 329

U.S. 495, 511, 67 S.Ct. 385, 91 L.Ed.2d 451 (1947).

Clearly, RICHARD L. ROSENBAUM, ESQ. has an ethical and legal obligation to

Lionel Tate not to disclose or reveal privileged material. That material includes all "work

product" turned over to RICHARD L. ROSENBAUM, ESQ. from Lionel Tate's trial counsel,

JAMES LEWIS. Accordingly, the Subpoena issued should be quashed and/or a Protective

Order entered.

Moreover, a party must serve subpoenas pursuant to Rule 45 (b)(1), which provides

in pertinent part:

> (1)   A subpoena may be served by any person who is not a party and is not less
> than 18 years of age. Service of a subpoena upon a person named therein
> shall be made by delivering a copy thereof to such person ... Prior notice of
> any commanded production of documents and things or inspection of
> premises before trial shall be served on each party in the manner prescribed
> by Rule 5(b).

> [Emphasis added]

Rule 5(b) specifically provides in pertinent part:

> (b)   Whenever under these rules service is required or permitted to be made
> upon a party represented by an attorney the service shall be made upon the
> attorney unless service upon the party is ordered by the court.

> [Emphasis added]

Accordingly, the Federal Rules of Civil Procedure mandate that prior notice of the

service of a subpoena duces tecum must be served on each party, even if the subpoena

duces tecum is directed towards a non-party witness. Such procedure was ignored at bar,

as the Plaintiff failed to notify the Defendants of the instant subpoena prior to issuance thereof.

It is well settled that a party may be subject to a protective order if it issues a subpoena that neither limits the scope of the demand to a reasonable time period nor specifies the documents requested with reasonable particularity. See also State Theatre Co. v. Tri-States Theater Corp., 11 F.R.D. 381 (D. Neb. 1951)(quashing subpoena duces tecum since documents failed to be reasonably designated). Additionally, to determine whether a subpoena imposes upon a witness an undue burden, a court must determine the relevance of the documents requested, the need of the party requesting the documents, the breadth of the demand, and the specificity of the time period the documents requested. Concord Boat Corporation v. Brunswick Corp., 169 F.R.D. 44, 50 (S.D. NY 1996).

The Subpoena served on RICHARD L. ROSENBAUM, ESQ. violates the Federal Rules of Civil Procedure, particularly the notice requirements contained in Rule 45. WORLD WRESTLING FEDERATION ENTERTAINMENT, INC. failed to serve a notice of the Subpoena upon the parties or upon their counsel, thereby causing the Subpoena to be fatally defective.

Notwithstanding the failure of the Subpoena to reasonably designate the documents demanded, such as by specific category, the Subpoena fails to include any reference or indication of a time period for which the documents are to be produced. Moreover, the over broad nature of the Subpoena will ultimately allow production of documents that will fail to even meet the standard of relevancy. See Concord Boat Corporation v. Brunswick

Corp., 169 F.R.D. at 50 (finding that the subpoena issued to financial services company was over broad, since the requests would guarantee "to produce information that would not even meet the broad standard of relevancy [underlying the discovery rules]." citing U.S. v. Int'l Bus. Ach. Corp., 72 F.R.D. 78, 83 (S.D.N.Y. 1976)).

Likewise, the Subpoena shall result in the disclosure of documents that are protected attorney/client privileged documents. To the extent that WORLD WRESTLING FEDERATION ENTERTAINMENT, INC. seeks the production of documents which would not otherwise be discoverable based upon privilege and work product, discovery should not be permitted.

The undersigned counsel has conferred with counsel for the Plaintiff, WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., in a good faith effort to resolve the issues raised in this Motion and has been unable to do so. In addition, the undersigned has contacted the counsel for Party, JAMES LEWIS, who has no objection to the relief requested in the instant-Motion.

## CONCLUSION

For all the reasons set forth herein, non-party witness, RICHARD L. ROSENBAUM, ESQ. respectfully requests that this Court enter an Order precluding Plaintiff, WORLD WRESTLING FEDERATION ENTERTAINMENT, INC., from having any access to Party JAMES LEWIS' documents, together with such other and further relief as this Court may deem just and proper.

JAN-22-02 TUE 05:56 PM                          FAX NO.                      P. 40

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 20th day of December, 2001, a true and correct

copy of the foregoing was furnished by facsimile to DANIEL A. CASEY, ESQUIRE,

KIRKPATRICK & LOCKHART LLP, Miami Center, 201 South Biscayne Boulevard, 20th

Floor, Miami, FL 33131.

LAW OFFICE OF STEPHEN ZUKOFF, ESQ.
COUNSEL FOR RICHARD ROSENBAUM
19 WEST FLAGLER STREET
SUITE 510
MIAMI, FL 33130
TELEPHONE: (305) 374-4331
FLA. BAR NO: 0177061

_____
STEPHEN M. ZUKOFF

PERS-GMB 341962 1                        14

# TAB 10

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

| SOUTHERN | DISTRICT OF | FLORIDA |
|---|---|---|

World Wrestling Federation Entertainment, Inc., a Delaware corporation

vs.

**L. Brent Bozell, III, an individual; Media Research Center, Inc., a Virginia non-profit corporation, d/b/a Parents Television Council; Parents Television Council, Inc., a Delaware non-profit corporation; James Lewis, an individual; Mark Honig, an individual; Cynthia Delores Tucker, an individual; and Various John and Jane Does**

### SUBPOENA IN A CIVIL CASE

CASE NUMBER: 00 Civ. 8616

(Southern District of New York)

TO:   Richard L. Rosenbaum, Esq.
      350 East Las Olas Boulevard
      Suite 1720 – Las Olas Centre
      Fort Lauderdale, Florida 33301

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | |
| | DATE AND TIME |
| | |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|
| | |

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See Attachment "A"

| PLACE | DATE AND TIME |
|---|---|
| **Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor, Miami Florida 33131; Attention: Daniel A. Casey, Esq.** | **December 21, 2001** **10:00 a.m.** |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|
| | |

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| Counsel for Defendant World Wrestling Federation Entertainment, Inc. | December 12, 2001 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
**Daniel A. Casey, Esq., Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor Miami, Florida 33131, Telephone: (305) 539-3324**

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

PI-777076 v1

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|---|---|
| | Richard Rosenbaum, Esq. |
| | 350 East Las Olas Boulevard |
| | Suite 1720 - Las Olas Centre |
| | Fort Lauderdale, Florida 33301 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____

DATE                                                    SIGNATURE OF SERVER

ADDRESS OF SERVER

---

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(B) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written      objection to inspection or copying of any or all of the designated      materials or of the premises.  If objection is made, the party serving      the subpoena shall not be entitled to inspect and copy materials or   inspect the premises except pursuant to an order of the court by      which the subpoena was issued.  If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production.     Such an order to compel production shall protect any person who is     not a party or an officer of a party from significant expense resulting   from the inspection and copying commanded.

(3) (A)  On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it
(i)   fails to allow reasonable time for compliance;
(ii)  requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where      that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii)      of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held,
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv)  subjects a person to undue burden.
(B)  If a subpoena
(i)   requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii)  requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute    and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to   attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d)  DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation    materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or  things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT "A"

## DEFINITIONS

The following document demands are to be answered with reference to the definitions set forth below, each of which shall be deemed to be a material part of each request for production of documents pursuant to this Subpoena:

1.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

2.      "Any" shall also mean "all," and vice versa.

3.      "Communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), whether in person, in writing, by telephone, electronically, or by any other method whereby knowledge, facts, and/or information is imparted or transmitted from one person or entity to another, or to a file.

4.      "Document" shall be defined to be synonymous in meaning, and equal in scope, to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic or computer compilations.  A draft or non-identical copy is a separate "document" within the meaning of this term.

5.      "Lewis" shall mean and refer to James Lewis, a named defendant in the case of World Wrestling Federation Entertainment, Inc. v. L. Brent Bozell III, et al., Case No. 00 Civ. 8616, United States District Court, Southern District of New York, and any other person who is aware of, or in the possession, custody, or control of, any information, document, or thing for or on his behalf.

6.      "Person" shall mean any natural person or any business, legal, or governmental entity or association.

7.      The term "concerning" shall mean relating to, referring to, describing, evidencing, or constituting.  "Reflecting" shall mean embodying, containing, recording, noting, referring to, relating to, describing, or mentioning.

## INSTRUCTIONS

1.     You are required to furnish all documents in your possession and all documents available to you, not merely such documents of which you are personally aware or from business records, but also information and knowledge that is available to you, your employees, officers, and agents, attorneys, investigators, etc., by reason of inquiry, including inquiry of your employees, officers, agents, representatives, etc.

2.     *Should you assert a privilege with respect to any document requested herein*, you are requested to provide the following as to each such document or item of information:

     a.     The type of document or information (e.g., letter, notebook, telephone conversation, etc.);

     b.     The date of the document or transaction involving the information;

     c.     Identification of the author and/or all participants with respect to the information;

     d.     Identification of the signatory or signatories of the document, if any;

     e.     Identification of the document's current custodian;

     f.     The present whereabouts of the document and/or the names of all persons with personal knowledge with respect to the information; and

     g.     A statement of the grounds on which the claim of privilege rests with respect to each such document or piece of information withheld.

3.     This subpoena shall be deemed continuing in nature so as to require further and supplemental responses to any document requests in the event that any information comes to your

attention subsequent to the filing of your responses. Thus, supplemental production of any documents is required if you obtain any documents falling within the scope of a request.

4.     All documents produced shall be segregated and identified according to the request to which they are primarily responsive

5.     If a document is no longer in your possession, custody, or control, you must state whether such document is missing or lost, has been destroyed, has been transferred, whether voluntarily or involuntarily, to others, or otherwise has been disposed of, and in each instance, explain in detail the circumstances surrounding any authorization to make such disposition of the document and the date thereof.

6.     Whenever a document request is framed in the conjunctive, it also shall be taken in the disjunctive, and vice versa

7.     Whenever a term is framed in the singular, it also shall be considered to be plural, and vice versa.

8.     The use of any tense of any verb shall be considered to include within its meaning all other tenses of the verb.

9.     You are obligated to conduct a reasonable inquiry in order to answer each document request and if, thereafter, you still are unable to respond, state all efforts made by you to obtain the requested documents.

## DOCUMENT REQUESTS

1.     Produce any and all documents generated by any law enforcement agency concerning or reflecting any response by such agency to the location where Tiffany Eunick was injured on July 28, 1999, and/or any investigation into the death of Tiffany Eunick on July 28, 1999, and/or the

criminal case against Lionel Tate arising therefrom, including, but not limited to, Incident Reports, Reports of Investigation (ROI's), Arrest Reports ("A Form"), Complaints, and Affidavits

2.　　Produce any and all documents generated by any emergency medical services agency concerning or reflecting any response by such agency or agencies to the location where Tiffany Eunick was injured on July 28, 1999, including, but not limited to, run sheets, invoices for services, and treatment notes and reports.

3.　　Produce any and all documents generated by any fire department concerning or reflecting any response by such department(s) to the location where Tiffany Eunick was injured on July 28, 1999.

4.　　Produce any and all documents generated by any hospital or other medical facility concerning or reflecting any services rendered to Tiffany Eunick on or about July 28, 1999.

5.　　Produce any and all documents generated by any medical examiner's office or coroner's office concerning or reflecting any response by such agency to the location where Tiffany Eunick was injured on July 28, 1999, and/or any investigation into the death of Tiffany Eunick on July 28, 1999, and/or the criminal case against Lionel Tate arising therefrom, including, but not limited to, autopsy reports.

6.　　Produce any and all written or recorded statements of any witness concerning or reflecting the death of Tiffany Eunick on July 28, 1999; the investigation thereof; and/or the criminal case against Lionel Tate, including, but not limited to, oral, written, and/or transcribed statements of any law enforcement officers; fire department personnel; emergency medical services personnel; hospital personnel; medical examiner's office personnel; coroner's office personnel; percipient witnesses; expert

witnesses; or other persons involved in any investigation into the death of Tiffany Eunick, including, but not limited to, Kathleen Grossett-Tate, Bradley Henry, Deweese Eunick, Lionel Tate, and Mark James.

7.      Produce any and all oral, written, and/or transcribed statements of any person with any knowledge of, or contact with, Lionel Tate prior to July 28, 1999, including, but not limited to: physicians and other medical personnel; teachers; social workers; daycare personnel and/or babysitters; friends and/or playmates; and relatives.

8.      Produce any and all documents concerning or reflecting statements made by Lionel Tate to any law enforcement agent or agency, including, but not limited to, recorded and/or videotaped versions of any such statements.

9.      Produce any and all documents that were identified, marked, introduced into evidence, argued, referred to, or otherwise used by Lewis on behalf of his client, Lionel Tate, during any pretrial proceeding and/or trial session in the case of the State of Florida v. Lionel Tate, Case # 99-14401 CF10A, in the Circuit Court of the Seventeenth Judicial Circuit in and for Broward County, Florida.

10.     Produce any and all documents concerning or reflecting any communications between Lewis and the other Defendants in the case of World Wrestling Federation Entertainment, Inc. v. L. Brent Bozell III, et al., Case No. 00 Civ. 8616, United States District Court, Southern District of New York.

11.     Produce any and all documents concerning or reflecting any communications between Lewis and attorneys Glenn Roderman and E. Ross Zimmerman, including, but not limited to, any communications concerning or reflecting the death of Tiffany Eunick; the investigation thereof; the

criminal case against Lionel Tate; and the public statements of Lewis, Roderman, and Zimmerman concerning the same.

12.     Produce any and all documents concerning or reflecting any communications between Lewis and any member of the media, including, but not limited to, any communications concerning or reflecting the death of Tiffany Eunick; the investigation thereof; the criminal case against Lionel Tate; Tate's trial defense; and WWFE, its programming, its officers and directors, its employees, its contracted talent (i.e., professional wrestlers); and professional wrestling in general.

13.     Produce any and all documents concerning or reflecting any public statements of Lewis, whether through the media, on the telephone, or over the Internet, concerning or reflecting the death of Tiffany Eunick; the investigation thereof; the criminal case against Lionel Tate; Tate's trial defense; and WWFE, its programming, its officers and directors, its employees, its contracted talent (i.e., professional wrestlers); and professional wrestling in general.

14.     Produce any and all videotapes that Lewis in any way assisted or participated in developing, producing, editing, and/or packaging, including, but not limited to, videotapes concerning or reflecting the death of Tiffany Eunick; the investigation thereof; any alleged reenactment of the events that lead to Tiffany Eunick's death; the criminal case against Lionel Tate; Tate's trial defense; and WWFE, its programming, its officers and directors, its employees, its contracted talent (i.e., professional wrestlers); and professional wrestling in general.

# TAB 11

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

```
----------------------------------------x
WORLD WRESTLING FEDERATION            :
ENTERTAINMENT, INC., a Delaware       :
corporation,                          :

        Plaintiff,                    :

v.                                    :

L. BRENT BOZELL, III, and individual, :
MEDIA RESEARCH CENTER, INC.,          :
A Virginia non-profit corporation, d/b/a :
PARENTS TELEVISION COUNCIL,           :
JAMES LEWIS, and individual,          :
MARK HONIG, an individual and         :
VARIOUS JOHN AND JOHN DOES,           :

        Defendants.                   :
----------------------------------------x  :
```

Case Number : 00-CIV8616 (DC)
SOUTHERN DISTRICT NEW YORK

CASE NO: 01-7913 CIV HURLEY
MAGISTRATE LYNCH

## DEFENDANT JAMES LEWIS', MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER

COMES now, Defendant James Lewis, an attorney, by and through his

undersigned counsel, and respectfully requests this Court enter an order quashing a

third party subpoena duces tecum of Richard L. Rosenbaum, Esq., the appellate

attorney and present custodian of Lewis' attorney/client file of Lionel Tate. And as

grounds and in support there of states the following:

### I. BACKGROUND

The Plaintiff, WWFE, served a subpoena on Richard L. Rosenbaum, a third

party to the above entitled matter. Counsel for Defendant James Lewis did not receive

notice of the subpoena at all. Through a filing of a motion to quash/protective order, by

Rosenbaum's attorney did Defendant Lewis learn of the demand by WWFE of Lewis'/

1

attorney/client file of Lionel Tate.

Lionel Tate was a criminal defendant represented by Defendant Lewis in a murder trial. WWFE alleged in its lawsuit that Defendant Lewis defamed the organization by claiming that Lionel Tate was acting out wrestling moves on the decedent and therefore Lionel Tate did not intend to hurt the decedent.

Currently, Mr. Rosenbaum is representing Mr. Tate in his direct appeal to the Fourth District Court of Appeal. Defendant Lewis, in order to aide Tate and Rosenbaum, provided his entire work product/attorney client file to Rosenbaum. The subpoena issued demanded production and inspection of documents obtained in the defense of Lionel Tate.

## II. GROUNDS

As grounds and in support of this motion, Defendant Lewis states:

1.  Defendant Lewis adopts the arguments of Richard Rosenbaum in his motion to quash, to the extent that Defendant Lewis can assert those arguments and privileges.

2.  Defendant Lewis asserts attorney/client privilege on behalf himself and Lionel Tate.

3.  Defendant Lewis asserts work product privilege on behalf of himself and Lionel Tate.

4.  Lionel Tate has not waived any privilege including his Fifth Amendment privilege.[1]

---

[1] Defendant Lewis specifically adopts footnote 1 of Rosenbaum's motion to quash, which explained that Lionel Tate's competence to waive a privilege, due to his

2

5.   Documents sought by WWFE can ' obtained through third party sources, for

example police or State Attorney's  ffice, without risking the inadvertent

disclosure of privileged or protected material.

6.   Documents sought by WWFE is irrelevant and not likely to lead to discoverable

material.

### III. ARGUMENT

A party may request a court to quash a subpoena pursuant to Federal Rule of

Civil Procedure 45(C)(3)(A). The documents sought by way of subpoena are protected

by attorney/client privilege, work product privilege, Fifth Amendment privilege, and are

irrelevant.

Any documents which WWFE hopes to be able to present as evidence against

Defendant Lewis, must be related to statements made outside of a courtroom.  This is

because all statements made in a judicial proceeding are absolutely privileged.

Fridovich v. Fridovich, 598 So. 2d 65, 66 (Fla. 1992).  WWFE's search for statements

or questions by Defendant Lewis in depositions, court hearing, pleadings, are not only

available from a source outside of the client file, but ultimately will be inadmissible

based upon an absolute privilege.  See id.

ATTORNEY/CLIENT PRIVILEGE

The attorney/client privilege exists far beyond the conclusion of the trial

proceedings, because the Supreme Court has held that the client holds the privilege

even beyond death. Swidler & Berlin v. United States, 524 U.S. 399, 409 (1998). The

---

age and mental state, is not tenable.

3

attorney-client privilege is one of the oldes recognized privileges for confidential communications." Id. at 403, (citations omitted). "In any event, a client may not know at the time he discloses information to his attorney whether it will later be relevant to a civil or criminal matter, let alone whether it will be of substantial importance." Id. at 409. Let alone that the information may be sought in a defamation lawsuit, against his lawyer post-trial. For that reason, the Court rejected a balancing test in defining the "contours of the privilege," and invoked a bright line rule. Id. (citations omitted). Any statements Lionel Tate made to his lawyer, his lawyer's staff, confidential psychologists, cannot be disclosed to WWFE. Any other document would be better obtained by a public records request to the police or the State Attorney's Office.

The attorney/client privilege belongs to the client. Id. The lawyer has a duty to assert it. Comments made by Lewis during media interviews about his theory of the case is not a waiver of attorney/client privilege in its entirety or in perpetuity. See Georgetown Manor, Inc. v. Ethan Allen, Inc., 753 F. Supp. 936, 939 (S.D. Fla. 1991).

WORK PRODUCT  PRIVILEGE

There are two types of work product: 1) fact work product; and, 2) opinion work product. State v. Rabin, 495 So. 2d 257, 260 (Fla. 3d DCA 1986). Fact work product is "factual information which pertains to a client's case." Id. at 262. Opinion work product is the lawyer's mental impression of witness and assessment of the case. Id. A lawyer has the right to independently assert such privilege, outside of even the hypothetical client waiver. Id. at 263. Regardless of any debatable split in authority about whether work product privilege extends beyond the case for which it was gathered, any view would preclude Defendant Lewis from revealing the work product. See id. n. 5, (this

4

lawsuit is at worst "closely related" to the T  e case and should thus extend the privilege even if disclosure would lead to relevant information). Defendant Lewis asserts his work product privilege independently in this case. Witness interviews, for example, would be intertwined with fact and opinions of Lewis.  See id. n. 8 Any questions regarding whether Defendant Lewis actually reviewed a public record at a given point in time, can be explored in a deposition.  This Court can still preserve the sanctity of several privileges and WWFE can explore through other discovery methods.

FIFTH AMENDMENT PRIVILEGE

Lionel Tate may still assert his Fifth Amendment privilege.  Although he has been convicted of a crime, the appellate court may reverse his case for a new trial, and he would still enjoy the privilege upon retrial.  A client can assert a Fifth Amendment privilege even though his lawyer possesses the documents which may incriminate him.  Fisher v. United States, 425 U.S. 391, 402 (1976).

## CONCLUSION

For all the reasons set forth and adopted by reference, James Lewis; requests

this Court enter an order precluding Plaintiff, WWFE, from having any access to the

client file of Lionel Tate which is currently in possession of Richard Rosenbaum, Esq.

Respectfully submitted,
BUSCHEL CARTER
SCHWARTZREICH & YATES
2  S.E. 8th Street
Fort Lauderdale, FL 33316


and Michael Quaraguio


By: _____

Robert C. Buschel, 63436


The undersigned counsel has conferred with counsel for Plaintiff WWFE, in a

good faith effort to resolve the issues raised in this motion and has been unable to do so.

_____

Robert C. Buschel


I HEREBY CERTIFY that a copy of the foregoing was sent via fax to the counsel

listed on the attached certificate of service on this 3 day of January 2002.

_____

Robert C. Buschel

6

# TAB 12

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-7913-CIV-HURLEY/LYNCH

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

        Plaintiff,

v.

L. BRENT BOZELL, III, an individual;
MEDIA RESEARCH CENTER, INC., a
Virginia non-profit corporation, d/b/a
PARENTS TELEVISION COUNCIL;
PARENTS TELEVISION COUNCIL, INC.,
a Delaware non-profit corporation;
JAMES LEWIS, an individual; MARK HONIG,
an individual; CYNTHIA DELORES TUCKER,
an individual; and VARIOUS JOHN and
JANE DOES,

        Defendants.

_____/



FILED by _____ D.C.

FEB 2 2 2002

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S. D. OF FLA.

### ORDER ON RICHARD L. ROSENBAUM'S MOTION TO QUASH OR, FOR PROTECTIVE ORDER [DE #1] AND JAMES LEWIS' MOTION TO QUASH AND/OR PROTECTIVE ORDER [DE #8]

**THIS CAUSE** having come on to be heard upon the aforementioned motions and this Court having reviewed the motions and the responses, thereto, makes the following findings of fact and conclusions of law.

Both of these motions result from a subpoena served upon Richard L. Rosenbaum, Esquire by the Plaintiff on or about December 13, 2001. A copy of this subpoena referred to is listed under Tab 23 to the Plaintiff's response to motion to quash subpoena of Richard L. Rosenbaum (Rosenbaum).

This case emanates out of discovery disputes concerning documents the Plaintiff seeks to have produced for use in pending litigation in the United States District Court for the Southern District of New York involving these parties.  In that litigation, the Plaintiff has apparently sued the Defendants for defamation and other relief.  In this particular issue, the Defendant, James Lewis (Lewis), has allegedly made certain out of court statements which the Plaintiff alleges are defamatory.  These statements revolve around Lewis' representation of Lionel Tate (Tate) in a criminal proceeding in the State of Florida which involved the death of Tiffany Eunick.

Lewis represented Tate, who is not a named defendant in this proceeding.  Tate was convicted after a jury trial and has been sentenced by the Circuit Court in Broward County, Florida.  There is an appeal of that criminal case pending in the state courts.

Richard Rosenbaum is the attorney who has been retained to handle and represent Lionel Tate on his appeal.  All of the files that Lewis had in his possession concerning this case have apparently been turned over to Rosenbaum.  Lewis' responses indicate that Rosenbaum now represents Lionel Tate on appeal and that Lewis does not have within his possession any documents requested.

Mr. Rosenbaum and Mr. Lewis both assert essentially the same objections concerning the production of the documents sought.  Those objections relate to attorney-client privilege, work product privilege, Fifth Amendment privilege and that the requests are unduly burdensome.  This Court will go through each of the fourteen requests for production and state its reasons why the request should be granted or denied.

The first request seeks all documents generated by any law enforcement agency concerning the investigation of the Tate criminal case. The second request seeks all such documents from any emergency medical services agency relating to that case. The third request seeks all documents generated by any fire department concerning its involvement in that case. The fourth request seeks all documents generated by any hospital/medical facility concerning that investigation and the death of Tiffany Eunick. Finally, request number five asks for all records of the medical examiner's/coroner's office reflecting its work involving that criminal case.

While this Court understands that these are public records which are not privileged and which would be available by way of third party subpoena by the Plaintiff, this Court does not see any reason why copies of these documents should not be produced by Lewis and Rosenbaum. The pending litigation in the District Court in the State of New York surrounds alleged statements made by Lewis which the Plaintiff argues are defamatory. The Plaintiff should be able to obtain copies of these public records from Rosenbaum and Lewis to determine if there is any basis in those documents for the statements and positions taken by Lewis in his public pronouncements concerning the Plaintiff. The key issue is not what the public records state in this situation as much as it is whether or not there is any information contained within those records which would support or contradict the statements/conduct by Lewis as alleged in the pleadings filed in the District Court in the Southern District of New York. Therefore, all of the records requested in requests 1, 2, 3, 4, and 5 shall be produced by Rosenbaum and/or Lewis within 15 days of the date of this Order  Any notations or other handwritten marks which either Lewis and/or Rosenbaum

3

have placed on those documents shall be redacted prior to copying and production to the Plaintiff.

Request number 6 seeks all written or recorded statements of any witnesses involved in the Tate/Eunick case. Likewise, request number 7 asks for any and all statements by any person with knowledge of or contact with Tate. These two categories could clearly involve work product information. As mentioned previously by this Court, the criminal case is on appeal. This Court is not convinced by the Plaintiff's argument that Lionel Tate has waived his attorney-client privilege in this matter simply by Lewis making out of court statements concerning the Plaintiff. There needs to be more of an affirmative, specific, intelligent and knowing waiver by Tate of his attorney-client privilege. This is especially so since there is a criminal appeal pending which could result in a re-trial of all or part of the criminal case.

Out of an abundance of caution, this Court must consider the fact that statements made, whether they be oral or written by "any witness" or "any person," may involve witness interviews. Certainly these are work product of Lewis and/or Rosenbaum. On the other hand, this Court is not going to permit Lewis to make out of court statements which serve as a basis for the Plaintiff's complaint against him in the Southern District of New York and to hide behind the criminal case. For that reason, if there are any statements allegedly made and which are the basis of the Plaintiff's lawsuit in the Southern District of New York which Lewis bases upon anything contained within the items requested in requests numbers 6 and 7, then Lewis is to file a privilege log within 15 days of the date of this Order in strict compliance with Local Rule 26.1(G)(3).

In the event that Lewis does not file any such privilege log pursuant to the terms of this Order, then he shall be deemed to have admitted that any of the statements or actions which he is being sued for did not emanate from any of the items requested in numbers 6 and 7.

Request number 8 seeks all documents reflecting statements made by Tate to any law enforcement agency whether they be recorded or videotaped. If these statements were made to law enforcement agencies, they cannot be considered work product nor privileged information. Certainly, they would fall within the records this Court has ordered to be produced under request number 1 as well. Therefore, any such statements by Tate to law enforcement shall be provided within 15 days of the date of this Order.

Request number 9 seeks all documents which were "identified, marked, introduced into evidence, argued, referred to, or otherwise used by Lewis" during any pretrial/trial proceeding in the state criminal case. This Court views this request the same as 6 and 7. The fact that something was identified, marked, introduced into evidence or referred to is overly broad. This could be interpreted to mean that any statement made by counsel during opening, closing arguments or even cross-examination could fall within the purview of this request. If it is impossible for this Court to determine what document would be sought, certainly such a request would seem to be overly broad and unreasonable.

Secondly, this Court has no problem with any documents which were marked, introduced into evidence or shown to prosecution during the criminal case. Certainly there can be no privilege claimed as to those documents. However, documents which were "argued" or "referred to" is overly broad and shall not be produced. Therefore, as to request number 9, all documents which were marked for identification in open court,

5

and/or introduced into evidence during the criminal case shall be produced within 15 days of the date of this Order. The remaining requested documents in number 9 are **DENIED**.

Request number 10, seeks all documents concerning or reflecting any communications between Lewis and the other defendants in the civil case pending in the Southern District of New York. Mr. Rosenbaum does not raise any objection and this Court cannot see how he could anyway. This Court does not see any valid objection raised by Mr. Lewis either. There is no assertion of a joint defense or any other reference to why these documents should not be produced.

Likewise, in respect to request number 11 which asks for all documents concerning any communications between Lewis and attorneys Roderman and Zimmerman, there does not appear to be any valid objections raised. Certainly, there does not seem to be any reference to the Tate criminal case which Mr. Rosenbaum could raise as an objection. Also, there does not appear to be any valid objection raised by Lewis. Therefore, the documents sought in request numbers 10 and 11 shall be produced within 15 days of the date of this Order.

Request number 12 seeks production of all documents reflecting any communications between Lewis and any member of the media relating to the death of Tiffany Eunick, the investigation thereof or any reference to the Plaintiff. Again, if these are documents which were communications to third parties such as the media, there can be no attorney-client privilege nor any work product privilege raised. These documents shall be produced within 15 days of the date of this Order.

6

Request number 13 seeks all documents reflecting any public statements by Lewis, whether they be through the media or otherwise, involving the Tate case.  Just as in request number 12, these items shall be produced within 15 days of the date of this Order.

Request number 14 seeks all videotapes that Lewis in any way assisted or participated in concerning the Tate criminal case.  This Court again believes that this request is over broad as it is worded.  If any videotapes were utilized and published to third parties, whether they be in court or to any media, then those items would be addressed and contained within requests number 9, 12 or 13.  This Court is reading request number 14 to be seeking videotapes that may not have been publicly disseminated, introduced into evidence or otherwise produced to third parties and which Lewis utilized in preparing his defense of the criminal case.

This would be a classic definition of attorney work product and shall not be disclosed unless there is something on those videotapes which serves as the basis for the statements and/or conduct of Lewis as alleged in the lawsuit pending against him in the Southern District of New York.  In that event, Lewis shall comply with this Court's directives concerning Local Rule 26.1(G)(3), just as this Court ordered in respect to requests number 6 and 7.  If he does not file any such privilege log in respect to request number 14, then the same presumption is applicable as stated by this Court herein above in regards to requests number 6 and 7, *i.e.*, that Lewis is admitting that there is nothing on any videotape which serves as a basis for his statements and/or conduct.

It is therefore

**ORDERED AND ADJUDGED** that the motion to quash [DE #1] and motion to quash

[D.E. #8] are hereby **GRANTED** in part and **DENIED** in part as specifically set forth herein.

**DONE AND ORDERED** this _2nd_ day of February, 2002, at Fort Pierce,

Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:

Honorable Daniel T.K. Hurley

Daniel A. Casey, Esq.
Miami Centre - 20th FL
201 South Biscayne Blvd.
Miami, FL 33131

Stephen M. Zukoff, Esq.
19 West Flagler Street
Suite 510
Miami, FL 33130

Robert C. Buschel, Esq.
201 SE 8th Street
Fort Lauderdale, FL 33316

Thomas A. Leghorn, Esq.
150 East 42nd Street
New York, NY 10017-5639

Robert Sparks, Jr., Esq.
6862 Elm Street, Suite 360
McLean, VA 22101

Michael J. Quarequio, Esq.
500 SE 6th Street, Suite 100
Fort Lauderdale, FL 33301

8

Jerry S. McDevitt, Esq.
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Eugene R. Licker, Esq.
1251 Avenue of the Americas
New York, NY 10020-1104

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

Be a sworn taped statement in reference to case number PK99-07-921.
It's going to be in reference to a DEATH INVESTIGATION reference
Tiffany E U N I C K.  Statement is going to be taken from Kathleen,
last name is G R O S S E T T - T A T E, black female, date of birth
of 11/16/62. Her address is 3900 S.W. 52nd Avenue, Apartment 805,
Pembroke Park, Phone number of 964-8062.  Today's date is July
29th, 1999.  The time is now 9:46 P.M.  Statement's going to be
taken by Detective Berrena and Detective Kaminsky.


Q     Okay, Kathleen, being a trooper you know that ah, in the State
      of Florida, ah, as deputy sheriffs, we can place people under
      oath, is that correct?
A     Correct.

Q     Okay, please raise your right hand. Let the record reflect,
      how do you pronounce your last name?
A     Grossett-Tate.

Q     That Kathleen Grossett-Tate does have her right hand raised.
      Do you solemnly swear or affirm that the statement you're
      about to give will be the truth, the whole truth, and nothing
      but the truth, so help you God?
A     Yeah.

Q     Please lower your hand. Kathleen as far as the information in
      your name, date of birth and address and phone number, is that
      correct?
A     Ah, phone number is 8042.

Q     Okay, all right, ah,
Q2    8042?



JUVENILE
CONFIDENTIAL

/jo                          1  of 17

EXHIBIT ___9___

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

A    Correct.

Q    Kathleen, what I'd like for you to do is just tell me in your
     own words, ah, what happened say about ten days prior to
     Tiffany going to camp, and then leading up until yesterday's
     events.

A    Okay, ah, I saw her, what I can remember, what sticks out in
     my mind was the movie theater. I was working the movie
     theater, and ah, my boyfriend brought her and my son to the
     movie theater and they were all excited because I work a
     detail there and I kept telling them about the movie. So he
     brought them there and they got to watch separate movies, so
     she was all excited plus she had gotten her hair braided and
     the butterflies and I took her to the store and bought her
     some outfits because she was all excited about going to camp.
     Then ah, she went to camp. I'm not sure what day it was. But
     they came back on Friday of last week, the 23rd, at night, and
     ah, she was supposed to go to the Grand Prix with my son that
     night because I had gotten them some tokens. And she got back
     late so I told my son to wait until Saturday and both of them
     could go to the Grand Prix. However, when Bradley came, he
     said that Tiffany was sick. She came back from camp and she
     was vomiting and she was weak so he didn't want to take her
     out and her grandmother had to stay with her. Ah, I spoke to
     Suzette later on and she said that Tiffany was weak and she
     gave her some ginger tea and she felt a little bit better. Ah,
     late Saturday night, Suzette brought her to the house because
     I had came back from the military and I saw Tiffany and I was
     laying on the bed cause I was tired. Both her and her mom came
     upstairs and her mom stood at the foot of the bed and Tiffany
     came in and she was like, Hi, Auntie Kay, and I was like,
     what's wrong with you. That's not you. Tell me about camp.
     What did you do at camp? Did you meet anybody? What did you
     eat or did you go swimming or whatever? You know, I said, why

/jo                              2  of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

CONTINUED:

you just come back, Hi, Auntie Kay. You know, she said ah,
well, I went swimming and I met this girl and then she went
with her friends and ah, that was basically it.  She didn't
say much more about that and I saw her again Wednesday,
yesterday. Her mom called me and I said I'd pick them up
because she wanted to take my, she wanted to take my son to
the library with Tiffany yesterday morning.  So she came and
she got Lionel and ah, Tiffany was with her but I didn't
really get up out of the bed so they just left.  So I came
yesterday when I came in, Tiffany said ah, she had some ice in
a paper towel. She said, ah, I hit the side of my face with
the tapes and I said okay, put the ice on it so the swelling
can go down if there's any swelling and then when we get to
the house, I'll get you some more.

Q2   What time of day was that?
A    This was in the evening. This was about 3:00.

Q2   Okay.
A    Yeah, because my mom left had just left for work and it was
like between ten minutes that I would pick them up.  So I came
and then they got ready and they came with me and we stopped
in Publix and then in Publix, she met one of the ladies from
the church and she spoke to the lady, but she wasn't talkative
when she was in the car.  Come to think of it. She wasn't
talkative as like usual. Cause she got in the back, I told
them to sit in the back and she climbed in first and she sat
back there and she didn't say anything.  And ah, we went to
Publix. She spoke to the lady and we got back in the car.  And
we got home and as soon as we got out the car, she said Auntie
Kay, I don't feel too good. My stomach don't feel too good.
Can I go lay down?  I said, Okay, go ahead and lay down and I

/jo                        3  of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

CONTINUED:

     got in the house and I said what's wrong with your stomach.
She said, I don't know, but my neck hurts. I said, what's
wrong with your neck? You don't do anything with your neck.
Why is the neck hurting? She said, I don't know. But my
stomach don't feel good and she went upstairs.

Q2    What time did you get back to your house?
A     This is after 4:00 because I, as a matter of fact, I checked
the receipt last night to see what time I was in Publix and it
was stamped for 4:02.

Q2    Okay, so 4:02 at Publix?
A     This was before 5:00.

Q2    Which Publix is that?
A     The Publix at Palm and Miramar Parkway.

Q2    So then you guys?
A     Then we drove.

Q2    Your son Lionel,
A     And Tiffany.

Q2    Tiffany,
A     Right.

Q2    You went from Publix to your house?
A     To my house.

Q2    To your house?
A     And we went straight to the house.

Q2    In Pembroke Park?
A     Uh-huh. And ah, she went up and then later on after I got
through putting up the groceries.

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

Q2   I'm sorry, when you got to the house, you told me she was
     complaining of neck pain and?
A    She said ah, my neck hurt.  I said what's wrong with your
     neck?

Q2   And also her stomach?
A    And she said my stomach don't feel good. Can she go lay down.

Q2   From the time that you picked her up until back to the house,
     did was there any accidents or anything that could have caused
     her?
A    What accident?

Q2   I don't know, I'm asking you.
A    There was no accident. We went to Publix, we got out of Publix
     because as a matter of fact, she had the ice and the paper
     towel and two pieces of it fell on the floor and I told her,
     I said someone may slip and fall on the ice, so I picked up
     the two pieces and I took the one from her and I said, I'll
     put it in the garbage here. If you need some when we get home,
     then I'll give you some more.  And she said okay, so there was
     no accident.  There was no bump or anything.

Q2   Okay, so now you're..
A    We went home and she went straight upstairs to lay down. After
     she went upstairs to lay down, I finished pack, unpacking the
     bags and I went upstairs and lay down.  I got back up later on
     after 7:.00.

Q2   Let me ask you now, when you went to lay down, were you in the
     same room with her?
A    No.

Q2   So she's?

/jo                              5  of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

A    See, there's a day bed in my son's room that she sleeps in
     whenever she comes over.

Q2   Okay, so she's in that room?
A    She's in that room.  I'm in my room.

Q2   And you guys both go into the rooms at about what time?
A    She went up just before I did. So it was either 5:00 or just
     before 5:00.

Q2   Okay, and your son, Lionel, was?
A    Lionel was downstairs because we had gotten some tapes.

Q2   Okay,
A    And he had started watching T.V.

Q2   And you go into your room,
A    Uh-huh.

Q2   You lay down and you get back up at what time did you say?
A    I got back up it had to be like after 7:00.

Q2   Okay, when you get back up, where's Tiffany at?
A    Tiffany was downstairs.

Q2   So at that time?
A    Her and Lionel is downstairs and ah, they were telling me.
     They were watching T.V.  They were telling me that who called,
     the people who had called and she was telling me Bradley had
     called and she wanted something to drink, but Lionel said no,
     and they wanted to wake me up and I was like that's stupid.
     Just go get something to drink. That's why I took you guys to
     Publix.  Anyways ah, I fixed them something to eat and I gave
     them their plates to take to the table, and Lionel put his in
     the microwave.

/jo                              6  of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

Q    What did you fix her?
A    Oxtail, rice and peas and plantains.

Q    Okay, what time was this?
A    Ah, this was after 7:00.

Q2   Oh, okay, just after 7:00, (inaudible)
A    Uh-huh.

Q2   Okay.
A    Ah,

Q2   How, did she describe anything to you when she got up about
     how she's feeling?
A    No. She didn't say anything else.

Q2   Did she seem active, normal?
A    She seemed, she wasn't vibrant as usual, but she came and I
     said do you want something to eat. You want me to fix you some
     oxtail and she said yeah.  And I gave the kids the oxtail and
     I gave her the plate and she took it to the table. As a matter
     of fact, there wasn't much conversation after that because she
     had told me about the soda and I told them that's why I went
     and bought the soda for you guys to drink and you didn't have
     to call Bradley or wake me up for that. And then ah,

Q2   Did she, did she eat all her food or?
A    Well, she had just put the food down on the table and then the
     phone rang. And on my way up the stairs, she ah, my son
     answered the phone and then he said it was Bradley and he gave
     the phone to Tiffany cause I was telling don't tell Bradley
     I'm awake because then he's going to tell me something or
     whatever, and I'm going to have to stay up. So she said Daddy,
     Auntie is up.  Auntie Kay is up. And I said, Okay, Tiffany.

/jo                           7  of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

CONTINUED:

    Give me the phone. So I took the phone from her and I continue
    up the stairs. And she sat down at the table. Ah, this was
    probably like, I think it was like 8:16 or so by then and ah,
    I spoke to Bradley for a little bit. Then I said Tiffany, can
    you come and get this phone for me, please. And she came up
    and that's when I asked her about the water. I said, you think
    you could take the cup of water downstairs and she said, yes,
    I can take it. And ah, she took the cup of water downstairs
    and she went back downstairs with the phone. And ah, after
    that, after a little while, I still went back and lay down.
    After a while I heard her downstairs making a noise.  So I
    stood at the top of the stairs and I said Lionel, why is
    Tiffany making that noise.  So Tiffany stopped making that
    noise. And ah, he said she's sleeping and making a noise like
    a baby. I said, Tiffany, stop making that noise or else I'm
    going to spank your butt.  And she didn't say nothing, and I
    said Tiffany, stop making that noise and the noise stopped. So
    I went back and laid down.

Q2   What time is this about?
A    I didn't even look at the time.  But it it had to be close to
     10:00 or probably just after 10:00.

Q2   Okay,
A    And ah, a little after that, my son came up and this was after
     10:00 he came up. Probably almost 11:00, something to 11:00
     and he said, Mommy, Tiffany's laying on the floor and her
     stomach is not moving. I don't think she's breathing.  That's
     when I ran downstairs and grabbed her and checked her pulse
     and started doing C.P.R. and called 9-1-1 for them to send
     someone.

Q    Do you remember how long you did C.P.R. for her?

/jo                            8  of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                PK99-07-921

A    It may have been ten minutes, I don't know, but I didn't check
     to see how long.

Q    While you were doing C.P.R., ah, was anything in her airway or
     in her mouth?
A    Not that, when I tilt her head back and ah, blow inside of
     her, it's like blowing inside a bag of water. And ah, every
     time I'd breath into her, the vomit was coming through her
     mouth and her nose. So I turned her head and cleaned that out
     and continued.

Q2   Ah, let me just ask you this. When you got up, ah, before you
     went back upstairs at 8:00, you spoke with Bradley at 8:13,
     something like that?
A    Uh-huh.

Q2   What were the kids actually doing at this time?
A    They were watching T.V. before I came, when I came downstairs.

Q2   Do you remember what they were watching?
A    I have no idea.

Q2   They were just..
A    They were watching T.V. and then I got up and when they saw me
     coming down, they got up, Auntie Kay, so and so call, and
     whatever, start telling me who had call and what had happened.

Q2   Okay, so after you got off the phone, ah, you fell asleep?
A    Yeah, I went back and ...

Q2   Fell asleep?
A    Yeah.

Q2   Okay, and how, what made you wake up?

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

A    I heard Tiffany making a noise.

Q2   Okay, so you heard a noise that woke you up?
A    Uh-huh, right.

Q2   Ah, now you went up from the, you looked down from the stairway you said you saw her?
A    I didn't see her because when I, when I, if I opened my door?

Q2   Uh-huh.
A    If I stand right there by the door, I can't see everything downstairs. So I just opened the door, stood at the door, and I said, Lionel, what is Tiffany making that noise for.  And ah, at one point.

Q2   So you were doing this verbally?
A    Right.

Q2   Okay.
A    At one point ah, I heard the door slam. Nicole had came in the house cause I heard like she called me one time, Miss Kay, and then the door slammed.

Q2   I'm sorry, who's Nicole?
A    She's a neighbor across the way.

Q2   All right,
Q    Ah, when you were doing C.P.R. ah, did you try the Heimlich Maneuver, thinking maybe something lodged in her throat?
A    No, I didn't think anything was lodged in her throat.

Q    Okay, and ah, you had training in C.P.R. so you are proficient.  You know what you're doing in C.P.R.?
A    Right.

/jo                          10 of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

Q    Okay, ah, when she complained of her neck, did she tell you
     like that she felt, I mean, what kind of pain it was or?
A    No, because I was asking her, what's your neck doing hurting,
     you don't do any work or anything with your neck or anything.

Q    Right.  Ah, did ah, did you think that her stomach pain
     was ah, you know, from something she ate, or do you think
     it's something that she came back from camp with or what?
A    Well, when she said her stomach, her stomach didn't feel good,
     I remember her momma said about her stomach when she came
     back. So I told her to go lay down and you know, if maybe when
     she get up, it will feel better. I'd make her some tea or
     something but when I got up, she didn't say anything else
     about her stomach.

Q2   Did you know if she ever finished eating that food (inaudible)
A    No, she wasn't finishing it. Kelly took the rest to the
     (unintelligible)

Q2   Okay, so she ate a portion?
A    Right.

Q2   And let me just back up too, also. Ah, I was asking you before
     about that you woke up because you heard the noise. Can you
     describe the noise?  Was your door closed?
A    I can't even remember the noise. I just know that she was
     making a kind of noise. It wasn't like she was crying
     probably, huh?

Q2   Like a wheezing noise, a crying?  How would you describe it?
A    Ah...it wasn't a wheezing noise.

Q2   Was ah, was your door closed?
A    Yeah.

/jo                          11 of 17

STATEMENT OF:  KA__LEEN GROSSETT-TATE                    PK99-07-921

Q2    And the, is there any way to try to ah, I guess what I'm
      getting at is the relationship as to what type of noise you
      heard?
A     It wasn't like she was crying, I know that much, but I cannot
      describe the noise.

Q2    Okay.
A     Because if she was crying, then I would have gotten up and
      thinking something, they're down there fighting or maybe, you
      know.

Q2    So then, right.
A     But it wasn't a noise like that.

Q2    When you opened the door, I remember you told me that you said
      it verbally you know, for her to stop and stuff. Finally, I
      guess at one point you came down the stairway or something,
      you looked over and you saw her?
A     No. I didn't say that.

Q2    No, that was my assumption. Can you clarify that?
A     No, I can't, when I, when I heard the noise and I opened the
      door, I didn't look downstairs because I just opened my door
      and stood inside the door.

Q2    Okay.
A     And I spoke to Lionel and I was speaking to Tiffany also. And
      then later on when he came and got me, that's when I ran
      downstairs.

Q2    Okay, so that was the first time you saw her. I'm sorry, now
      I understand. Ah, when you ran downstairs, where was she at?
A     She was laying on the, on the ground.

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

Q2    Okay, and which way was she facing?
A     Her head was towards, you haven't seen my house.

Q2    Right.
A     But you know where the red chair is?

Q     Yes.
A     At the corner at the rug like that, at the corner, her head
      was facing towards the foot of the chair or this corner of the
      chair, the left corner of the chair.

Q     Where's the stairwell in relationship?
A     The stairwell is here.

Q     Okay.
A     And her legs probably would have been like halfway or by the
      stairs.

Q2    Was he chest facing up or facing down?
A     Her chest was up.

Q2    Okay.
A     She was laying like this.

Q2    Okay, and when you saw her ah, describe to me how she looked
      at that point? What, what did you (    )?
A     Ah, her eyes were half open and I checked her pulse, ah,

Q2    Was she breathing when you came down there?
A     No, she didn't look like she was breathing.

Q2    And when you checked her pulse, was there a pulse?
A     I didn't get a pulse in no hand, or no arm, and I didn't get
      a pulse in her neck. So then I started the C.P.R. or I grabbed
      the phone, one of the two, but...

/jo                          13  of 17

STATEMENT OF:  KATHLEEN GROSSETT-TATE                    PK99-07-921

Q2  Okay,
A   I started C.P.R. and then grabbed the phone and started
    calling 9-1-1.

Q2  Was anyone else at your residence that evening?
A   Just my son.

Q2  And Nicole came by?
A   And Nicole came by.

Q2  And I guess that was during the, between the phone call?
A   Nicole came by. She had came by the house after, after 8:15,
    after I spoke, it was after I spoke to Bradley, she came by.

Q2  You were upstairs and you just heard her?
A   Right.

Q2  What's Nicole's last name?
A   Ah, Anderson.

Q2  Anderson?  Do you know her phone number?
A   No, not off hand.

Q2  And she lives in which apartment?
A   She lives in Park, Park Place, I think. The one directly
    across from us.

Q   Okay, (inaudible)
A   Right. Cause I spoke to her today and she said when she came
    down there, she saw Tiffany, she couldn't believe it.

Q2  She said that she came by and opened the door, did she say
    what she observed at that time?
A   No, she just said, I just saw her when I came over there.

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

Q2    Everything was fine?
A     I can't believe it.

Q     All right, I understand now. She said to you today, I can't
      believe it?
A     Right.

Q     Okay.
A     Cause I called her this morning and told her because I had her
      braid Tiffany's hair for me when she have to go to the movie
      theater.

Q     Did ah, did ah, did Tiffany, I know her doctor is Dr.
      (unintelligible) but do you think the symptoms were bad enough
      or did she ever say, you know, I think I have appendicitis,
      did she ever think of that, or?
A     I didn't even think of that and I was thinking maybe, maybe it
      was the food, you know.

Q     Okay.
A     That got her sick or whatever, but then I start thinking. She
      came back and the food she ate there, and then I asked my son,
      did Tiffany tell you what kind of food they ate at camp and he
      said, she said they had cake and they had corned beef and the
      corned beef was half cooked and they didn't get any bread with
      the corned beef and I'm like, why they didn't tell someone
      about this.

Q     Did you notice any bruises on Tiffany?
A     No.

Q     When she came back from camp?
A     Cause like I said, I hadn't seen her but that night, the late
      night when I brought my son over, Saturday night.

/jo                              15 of 17

STATEMENT OF:  KATHLEEN GROSSETT-TATE                    PK99-07-921

Q    Uh-huh.
A    And then when I picked her up yesterday, and I didn't notice any bruises.

Q    All right, and ah, did you, did you give Tiffany any medication for her stomach?
A    No, because I thought about giving her half a Tylenol, but I said no, just lay down. It makes you feel better if ah, she get up and she didn't feel good, I was just ah, make her some tea and call her mom. But I didn't want to give her any medication because I didn't know what kind of reaction she would have to the medication.

Q    And how did you get along with Tiffany?
A    Fine, I just met her ah, a couple of weeks ago and she was great.

Q    How about Bradley?  How about his relationship with her?
A    Fine.

Q    Okay, good,
A    That's like, she's she's like that's my dad, you know.

Q    And Lionel and Tiffany?
A    Great, that's like his little sister that he never had but ...

Q    Okay.
A    The two of them got along fine.

Q2   I'm sorry, you said you've only known her a couple of weeks?
A    Yeah.

Q2   Also that night when you called 9-1-1, did you call anybody else to let them know (inaudible)

/jo                          16 of 17

STATEMENT OF:   KATHLEEN GROSSETT-TATE                    PK99-07-921

A     After ah, after the paramedics relieved me, then I called ah,
      I called Bradley back but he had already left because he
      called to tell me he was on his way and ah, I called her mom
      and I called my friend from ah the station to come over cause
      I was going to go to the hospital and I wanted them to come
      and get my son or...

Q2    Ah, so I guess Bradley called you at 8:15 and he called you
      just prior to coming over (unintelligible)
A     Right, because he was supposed to pick them up because I had
      my shift started at 12:00 last night.

Q2    Last night?
A     So he was picking them up for me.

Q2    Was he going to watch both of the kids?
A     Yeah.

Q2    To bring them (inaudible)
A     Right.

Q2    I have no more questions.
Q     Okay.


      THIS WILL THEN CONCLUDE THIS STATEMENT AND THE TIME IS NOW
      10:07 P.M.

1                               IN THE CIRCUIT COURT OF THE
                                SEVENTEENTH JUDICIAL CIRCUIT IN
2                               AND FOR BROWARD COUNTY, FLORIDA
3                               CRIMINAL JUSTICE DIVISION
4                               CASE NO. 99-14401 CF
5
6     State of Florida,
7            Plaintiff,
8     vs.
9     Lionel Tate,
10           Defendant.
      _____/
11
12
      APPEARANCE
13
              Kenneth Padowitz, Esquire
14            Assistant State Attorney
              State Attorney's Office
15            Fort Lauderdale, Florida
              On behalf of the plaintiff
16
              James Lewis, Esquire
17            Special Assistant Public Defender
              Fort Lauderdale, Florida
18            On behalf of the Defendant
19
20                      VOLUME XIV
21
22            Transcript of Trial had before the Honorable
23    Joel T. Lazarus, as Judge of the above-styled Court, at
24    the Broward County Courthouse, Fort Lauderdale, Florida,
25    held on the 23rd day of January, 2001.

- - - - -

I N D E X

Defendant's Witnesses          Direct    Cross

Ms. Tate ...................... 1654    1718

1      (Thereupon, the following proceedings were had:)

2          THE COURT:   Okay.  Let the record reflect the

3      defendant is present with counsel.  The State is

4      present.

5          Okay, Peg.

6          The Bailiff:  We have fourteen.

7          Mr. Lewis:  Judge, may I go ahead and seat the

8      witness?

9          THE COURT:   Well either way.  Six of one, half

10     dozen for the other half.  Have a seat.  It doesn't

11     make any difference to me.

12         Mr. Padowitz:  Why are we seating them outside

13     the presence of the jury?

14         THE COURT:   I have no idea why, but we did it

15     with Dr. Klass.  Instead of calling your next witness,

16     they come in from outside, they're already here.

17         The Bailiff:  Jury coming in.

18         (Thereupon, the jury entered the courtroom at

19         3:40 p.m.)

20         THE COURT:   All jurors are present, the defendant

21     is present with counsel, State's present.

22         You may swear the witness.

23  Thereupon,

24              Kathleen Grossett-Tate,

25         having first been duly sworn to tell the truth,

```
 1        the whole truth, and nothing but the truth, was

 2        examined and testified as follows:

 3                        DIRECT EXAMINATION

 4            The Clerk:  Thank you.  Please be seated.  Would

 5        you speak into the microphone.  State your name for

 6        the record and spell your last name.

 7            THE WITNESS:  Kathleen Angela Grossett-Tate, last

 8        name G-R-O-S-S-E-T-T, hypen, T-A-T-E.

 9            Mr. Lewis:  May it please the Court.

10        Q    (By Mr. Lewis)  Ms. Tate, what is your

11   relationship to the defendant in this case Lionel Tate?

12        A    He's my son.

13        Q    And how many children do you have?

14        A    Just one.

15        Q    And that's Lionel?

16        A    Yes, sir.

17        Q    Where were you born?

18        A    In St. Thomas, Jamaica.

19        Q    And how old were you when you came to the United

20   States?

21        A    Thirteen years old.

22        Q    And where did you come and live?

23        A    Chicago, Illinois.

24        Q    And where did you go to school?

25        A    In Chicago.
```

1    Q    And what's your level of education, how much

2    schooling did you have?

3    A    I have two years of college.

4    Q    Where did you graduate high school?

5    A    Chicago, Illinois.

6    Q    And after you graduated high school, what did you

7    do?

8    A    I went into the military, the Army.

9    Q    And how long were you in the United States Army?

10   A    I was on active duty for ten and a half years,

11   then I came out and I'm still in the reserves 'til the

12   present date.

13   Q    All right.  Now you entered the Army.  Can you

14   give me a year, about when you were?

15   A    I enlisted the same year I graduated high school

16   in 1981, but I was in the delayed entry program in '82.

17   Q    Where did you go when you were in the Army; where

18   you were station?

19   A    For basic training I went to Fort Jackson, South

20   Carolina, for A-I-C.  I went to Indianapolis, Indiana and

21   then I went to Germany for two years.

22   Q    What type of job did you have in the United

23   States Army?

24   A    Personnel management.

25   Q    And when did you leave of the armed services?

```
 1     A     July of '92.

 2     Q     Now when was Lionel born?

 3     A     January of '87.

 4     Q     And where and when did you meet Lionel father?

 5     A     June of '82 in Germany.

 6     Q     And was he in the service as well?

 7     A     Yes, sir.

 8     Q     And what was his name?

 9     A     John Tate.

10     Q     Now when - Lionel was born in '92, right?

11     A     Eighty-seven.

12     Q     I'm sorry.  '87.  When Lionel was born in '87,

13   did he live with you?

14     A     Lionel?

15     Q     Yes.

16     A     Yes, sir.

17     Q     And how long did Lionel's father, John Tate, live

18   with you?

19     A     Lionel was born in January.  We split up in

20   November the same year.

21     Q     So Lionel was still an infant when you and

22   Mr. Tate basically went your separate ways?

23     A     Yes, sir.

24     Q     Then who did Lionel live with was he was growing

25   up?
```

1    A    He lived with me for a while, but on several

2  occasions -- I used to play basketball in military, so on

3  those occasions he would say with his grandmother or when

4  I was in Saudi Arabia.

5    Q    Why?

6    A    For the military.

7    Q    For any particular event?

8    A    For Desert Storm, Desert Shield.

9    Q    The war with Iraq?

10   A    Yes, sir.

11   Q    And how long were you in Saudi Arabia during that

12  conflict?

13   A    For almost a year.

14   Q    And where did Lionel stay during that period of

15  time?

16   A    With his grandmother in Mississippi.

17   Q    Where did she live?

18   A    Mississippi.

19   Q    This is his paternal grandmother?

20   A    Yes, sir.

21   Q    Now did he live in the same house as his father,

22  John Tate?

23   A    No, sir.  His father was living in Chicago.

24   Q    Okay.  So during that period of time he lived

25  with his grandmother in Mississippi, how old would he have

1   been during that period of time?

2       A    Probably about four.

3       Q    Other than that period of time, has Lionel

4   primarily lived with you over the years?

5       A    Yes, sir.

6       Q    Have there ever been periods of time when he

7   lived with his father?

8       A    He stayed with his father probably about six

9   months, but he was down in Mississippi for about a year.

10  He stayed with his grandmother and aunts.

11      Q    And when was this?

12      A    This was the early part of '99.

13      Q    Okay.

14      A    He started living with his father, but he was

15  there from the middle of '98.

16      Q    Okay.  And he came home, came home to you in Fort

17  Lauderdale when?

18      A    July '99.

19      Q    Okay.  And do you remember about when in July of

20  '99?

21      A    The third.

22      Q    July 3rd, that's when he actually flew in from

23  Mississippi?

24      A    Yes.

25      Q    Why had he been with his grandmother and father

```
 1    for a period of time in Mississippi - for that period of

 2    time, was it about a year?

 3        A    That was about a year, because of my present job.

 4    I worked two to ten at night so - because -- so our family

 5    is in Jamaica.  I didn't have anyone to look after him and

 6    my neighbor who looked after him, she had another job so

 7    she was unable to care for him while I was at work.  And I

 8    didn't want him to stay by himself, so I asked him to

 9    watch him for a couple of years until he is old enough,

10    for two or three years, and he said okay.

11        Q    Didn't work out though?

12        A    No, sir.

13        Q    Why not?

14        A    He was just getting himself together and he had

15    just started to get back with his girlfriend and they were

16    going to get married, and he said whenever you get another

17    house and Lionel is a handful for him.

18        Q    His father wasn't really able to take care of him

19    is why he came back early?

20        A    Right.

21        Q    Now what job do you have where you had to work

22    this two to ten shift?

23        A    State Trooper Florida Highway Patrol.

24        Q    How long have you held that position?

25        A    Four years.
```

1    Q    And are you currently still on active assignment?

2    A    I'm on leave right now, but I'm still --

3    Q    You took some time off for this trial?

4    A    Yes.

5    Q    But up until this trial and before, were you

6    actually working on the Florida Highway Patrol?

7    A    Yes, sir.

8    Q    Do you have any job or employment other than

9    Florida Highway Patrol?

10   A    I'm still in the reserves.

11   Q    US Army Reserves?

12   A    Yes.

13   Q    What does that require under terms of time?

14   A    One weekend every month and two weeks each

15   summer, sometimes I go an extra two weeks.

16   Q    Going back when Lionel started school - five, six

17   years old, where did he go to school; where did he

18   actually start formal school, kindergarten?

19   A    He started school in Texas because I was

20   stationed in Texas, and then we moved -- after I got out,

21   I was in school in St. Petersburg.  He went to Gulf

22   Beaches Elementary, then he went to A.C. Perry and then I

23   took him out of A.C. Perry and sent him to Aquilla

24   (phonetic) which is a private school.  And then after

25   Aquilla he went to Watkins Elementary, and then from there

```
 1    he went to Mississippi.

 2         Q     Has Lionel had disciplinary problems in school?

 3         A     Such as?

 4         Q     Has he been accused of stealing petty items?

 5         A     Lionel's problem is his mouth, not stealing.  He

 6    will talk all day in school; but as far as stealing, I

 7    don't remember him stealing anything.

 8         Q     Okay.  Nothing significant?

 9         A     No, sir.

10         Q     In terms of needing to get more attention than

11    other children, did you ever experience that?

12         A     All the time.

13         Q     And what kind of things would he do in order to

14    try to get that attention?

15         A     He played a lot.

16         Q     Did Lionel ever watch wrestling on television?

17         A     Yes, sir.  He's been watching wrestling since he

18    was small.

19         Q     How old would Lionel have been when he started

20    watching wrestling?

21         A     Two.  I think we were still in Germany, because I

22    used to try to pin him.

23         Q     They have professional - American professional

24    wrestling on in Germany?

25         A     This was older guys.  It had come, I think, on a
```

1    military TV channel.

2        Q    Uh-huh.  And did you indicate that you and Lionel

3    would wrestle from time to time?

4        A    I used to pin him or do the choke hold.  That's

5    about it.  Or if he's on the bed, I'd jump down on him

6    but.

7        Q    And did you do that to punish him or hurt him?

8        Mr. Padowitz:  I'm going to object to leading the

9        witness on direct examination.

10       Mr. Lewis:  I'm sorry.  And I want -- judge, I

11       apologize.

12       Q    (By Mr. Lewis)  What was the intent of that

13   play-wrestling that you did?

14       A    Just playing with him.  He's a boy and my

15   mentality was with boys you're rough, with girls you're

16   gentle with them, you know, whatever.  But I was - I

17   always tried to be rough with him.

18       Q    Didn't have any brothers?

19       A    No, sir.

20       Q    Didn't you ever think there was anything wrong

21   with him watching wrestling like that?

22       A    No, sir.

23       Mr. Padowitz:  I object.  It's not relevant, her

24       opinion about that.

25       THE COURT:  She already answered.  Move on.

1    Q    (By Mr. Lewis)  Does he wrestle with other kids

2  his age?

3    A    Yes, sir.

4    Q    And would he ever sit and watch television with

5  other kids in the neighborhood and watch professional

6  wrestling?

7    A    Yes, sir.

8    Q    Did he do that with Cedrick?

9    A    He did it with Cedrick, Kashief's (phonetic)

10  brother.  I don't know if he did it with Cliff, but --

11  it's a little boy.  There was a little boy that used to

12  live across the street.  I don't remember him doing it

13  with him, but I know he did it with Kashief and Kashief's

14  brother and Cedrick.

15    Q    Now in terms of watching this wrestling, would

16  you ever see Lionel and other little boys trying to act

17  out any of the things that they saw on television?

18    A    I never sat there watching them act it out but I

19  know they're playing, running in the living room or

20  running upstairs and I tell them to quiet down or

21  whatever.  But most of the time when they hear me coming,

22  they'd quiet down.

23    Q    Did you see anything wrong with him tussling with

24  other boys doing wrestling stuff?

25    A    That's what boys do.

```
 1      Q     When you're in the room, does that activity -
 2  does that put a little dampening effect in terms of what
 3  he and his playmates do?
 4      A     Yes, sir.
 5      Q     Like how?
 6      A     If they're being loud or rowdy, and if I come in
 7  there: shhh, my mom is coming or Ms. Kaye is coming or
 8  whatever, you know?
 9      Q     Bradley Henry.  How do you know Bradley Henry?
10      A     Bradley is my cousin.
11      Q     And do you know the same family back in Jamaica?
12      A     Bradley's grandmother and my grandmother are
13  sisters.
14      Q     Okay.  Daweese Eunick, did you know any of her
15  family back in Jamaica?
16      A     After I met them I realized I knew her mom.  Her
17  mom is related to --
18      Q     Okay.  Did you know much of Bradley Henry back
19  when you were thirteen, I guess, when you lived in
20  Jamaica?
21      A     I knew of Bradley but we connected in 1984.  When
22  I came back from Germany, I went to Jamaica, so we hangout
23  with Bradley and another cousin of mine who is in
24  Kentucky.
25      Q     Now did there come a period of time in 1999 where
```

1   you reestablished contact with Bradley?

2       A     In June Bradley called me up because my cousin in

3   Connecticut, she gave him my number and he said he was

4   going down here.  And we started communicating, and

5   through him I met Daweese.

6       Q     Had Lionel come back from Mississippi yet when

7   you first met Bradley and Daweese?

8       A     No, sir.

9       Q     How long was it after you met Bradley and Daweese

10  that you met - that Lionel came back?

11      A     About a week or so.

12      Q     And how did you get along with Bradley and

13  Daweese?

14      A     Great.

15      Q     Did you meet Tiffany?

16      A     Yes, sir.

17      Q     How did you get along with Tiffany?

18      A     She was great.

19      Q     How did she refer to you?

20      A     Auntie Kaye.

21      Q     Did there come a time where Lionel flew in from

22  Mississippi and you took Lionel or they brought Bradley

23  over, I guess, first and met Lionel?  Do you remember how

24  that all happened?

25      A     The 4th of July we went over - Lionel came back

```
 1   the 3rd and we went over the 4th of July to hangout.

 2        Q    Who is "we" now?

 3        A    Lionel and I.

 4        Q    And where did you go to?

 5        A    Daweese's house.

 6        Q    And who was there?

 7        A    Tiffany and Bradley.

 8        Q    And was Daweese there too?

 9        A    Yes, sir.

10        Q    And what did you all do?

11        A    We talked; talked about Jamaica, talked about our

12   families and try to see how we're related because my

13   sister and brother on my mother's side is related to

14   Daweese's mother.

15        Q    And how did Lionel and Tiffany get along?

16        A    Great.  They were excited about each other

17   because they were like, oh, my cousin, you know, so.

18        Q    Referring to each other as cousin?

19        A    Right.

20        Q    Tiffany was an only child as well?

21        A    Yes, sir.

22        Q    Did you ever observe in this first meeting now,

23   were they talking with each other; what were they doing?

24        A    It was nonstop.

25        Q    What were they doing?
```

1    A    They were talking and playing.  Tiffany was

2  showing Lionel her room and later on they were watching

3  TV.

4    Q    Did you think there was anything strange or

5  abnormal at the time, the fact a six-year-old little girl

6  and twelve-year-old little boy hit it off in terms of such

7  a good relationship so fast?

8    A    No, sir.  Both of them were excited because they

9  were like, okay, this is my new cousin.  And that's the

10  way they were acting.  I was excited about meeting Daweese

11  and finally get a connection with Bradley.  I guess it

12  didn't seem strange at all.

13    Q    Did there come a time when you met again?

14    A    After the first meeting we kept in contact.  We

15  were over each others' house.

16    Q    All right.  So they would come over your house,

17  you would go over their's?

18    A    Yes, sir.

19    Q    What type of things would Tiffany and Lionel do

20  when the families got together?

21    A    They would watch TV.  Maybe if they were hungry

22  Lionel would probably fix something because he's supposed

23  to be the chef.  But they just played.

24    Q    Okay.  What kind of things would they play?

25    A    I know one time they were playing basketball and

1    watched TV.  They watched TV and they would get on the

2    computer.  Tiffany liked the computer.  She was quieted

3    about the computer.  So they would be on the computer with

4    the TV on.  So when they're doing that upstairs --

5        Q    Do you have a memory of any kind of other kinds

6    of games or kids things that they were doing?

7        A    Not really.

8        Q    Did you ever see any fight break out between the

9    two of them, I mean even verbal arguments?

10       A    No, sir.

11       Q    Any arguments over toys or give me that or

12   anything, that got to the point of -- that you had to calm

13   somebody down or tell somebody, hey, straighten up?

14       A    Not that I remember.

15       Q    How many times before July 28, 1999, do you think

16   Tiffany and Lionel were in the same place while you all

17   were interacting?

18       A    Several times Tiffany slept over the house.  She

19   slept in Lionel's room.  They went to the movies because I

20   had detail at the movie theater too.  I couldn't take them

21   because I couldn't take anyone in my patrol car, so I

22   would have someone drop them off so they could see the

23   movie.

24            And at one time Tiffany was afraid to be in a

25   movie by herself.  I think it was Will Smith's movie.  But

1   Lionel had seen the move twice and Tiffany was scared to

2   stay in the theater by herself, so Lionel went in with her

3   and stayed while the movie was over.

4       Q    Wild Wild West?

5       A    I think so.  I think that was the movie.  When

6   they're at her house, they're in the other side of the

7   house by themselves playing.

8       Q    Did Lionel ever go over to Tiffany's house, for

9   lack of a better term, baby-sit by Daweese or Bradley?

10      A    When I worked, Bradley would take my car.  I gave

11  him a set of my keys so he would pick up Lionel and go and

12  get Tiffany or bring Tiffany and they would go back to the

13  house or stay at my house a little bit or wherever they

14  went.

15      Q    Okay.  During all these interactions, did you

16  ever hear or see any problems between the two children?

17      A    No, sir.

18      Q    How would you describe their relationship with

19  each other?

20      A    Great.  When Tiffany first came over to the house

21  he took - he asked, may - can I go outside?  And I was

22  like, what are you going outside for?  I just got to go

23  outside.  And I didn't find out until later that he took

24  Tiffany to a neighbor's and was introducing her as his new

25  cousin.  So I -- somebody told me that later on.  But they

1   were great.

2       Q     July 28, 1999.  I believe a Wednesday; is that

3   your recollection?

4       A     I think so.

5       Q     And can you tell me that morning when you got up,

6   I mean did you have to work?  What's going on with you and

7   Lionel; what are you all doing?

8       A     I was on military duty.  And I came back the

9   night before and Daweese had called me.  She wanted to

10  pick up Lionel so that she could take Lionel and Tiffany

11  to the library.  And I said okay, because we were planning

12  - we had came back so we could see them and to do - wash

13  clothes and go back down that night.

14          And so I said, okay, come and get them.  So she

15  came and picked up Lionel.  They left, went to the

16  library.  Later on that day she called and said she was

17  getting ready for work, if I could come and pick up the

18  kids.  And I said okay, I have to stop and get some food

19  and then I'll be over there shortly.  After that I went to

20  the house to pick them up.

21      Q     And was Daweese there when you picked them up?

22      A     No.  She was already gone.

23      Q     It's just Lionel and Tiffany waiting for you to

24  come pick them up?

25      A     Right.

1    Q    Did you have a problem with that, that the two

2   kids were left alone?

3    A    Not really.

4    Q    What were the kids doing when you got over there?

5    A    They were playing.

6    Q    What were they playing?

7    A    I don't know.  They opened the door, so -- by the

8   time I got there they had stopped watching the tapes

9   because the tapes were on the floor.

10    Q    Okay.  What was -- what else was going on?  Well

11   they were playing.  All right.  You told me there were

12   video tapes they got from the library or something?

13    A    Correct.

14    Q    Was there ever any discussion or something in

15   throwing one of the tapes back or forth that Tiffany might

16   have got hit in the face or something with one of the

17   tapes?

18    A    When I first got to the door Tiffany said Auntie

19   Kaye - she had ice in a paper towel and she said -- well

20   first I came in the door.  I went to the fridge and I said

21   you guys get your stuff together so we could go.  And she

22   said, "Auntie Kaye, I hit myself with a tape."  And I

23   glanced at her like that and I said, "What tapes?"  And

24   she said, "the tapes on the floor."  And I looked and

25   tapes were on the floor.  And I'm like, okay.  But I

```
 1    couldn't understand how she hit herself with the tape

 2    because the tapes are all scattered on the floor.

 3        Q    Okay.  Did she get some ice or had something or

 4    do something?

 5        A    She had ice in a paper towel that she was putting

 6    on her face.

 7        Q    Could you see any mark?

 8        A    I didn't see anything.

 9        Q    But you didn't get her the ice in the paper

10    towel.  She got it herself?

11        A    No.  She had it before I got there.

12        Q    All right.  Did you question the children about

13    what's going on here, you know?

14        A    There was no reason to.

15        Q    All right.  Was she upset, was Tiffany upset?

16             Mr. Padowitz:  I object to leading the witness on

17        direct examination.

18             THE COURT:  Try to not to lead.

19             Mr. Lewis:  I'll try to do better.

20        Q    (By Mr. Lewis)  Did you sense that there was any

21    tension or hostility between the children?

22        A    Not at all.

23        Q    And what did you, the three of you do then?

24        A    After we left the house we went to Publix to get

25    some sodas and chips for the kids.
```

```
 1      Q     And what happened while you were at the store?

 2      A     When we first went in the store they were trying

 3 to weigh themselves on the scale.  And Tiffany had dropped

 4 some of the ice and I told her to pick up the ice and

 5 throw it in the trash by the register.  And I told her,

 6 when I get to the house I'll give them more.

 7            And they started to pick out whatever soda that

 8 they wanted.  And then we walked around and she met a lady

 9 from church.  And after that we cashed out and left.

10      Q     And this lady from the church, were you always in

11 a position where you could see Tiffany and lady from the

12 church?

13      A     I was pushing the cart.  Tiffany was closer to me

14 and Lionel was on the other side of me.  When Tiffany saw

15 her, she said the lady's name as if she was surprised and

16 she ran towards the lady.  When she ran towards the lady,

17 I stood there and watched her.  I don't remember if I

18 walked passed the lady, but I went across.  But at all

19 times I was looking at her talk to the lady because I

20 didn't know who she was.  I just new her by name the she

21 yelled out.  And when she came back she said, "you don't

22 know who that is."  I said, "I guess it's someone from

23 your mom's church."  And she said, "yes, Auntie Kaye" and

24 that was the extent of it.

25      Q     You didn't sense any danger there with this
```

1    woman?

2        A    Not at all.

3        Q    Tiffany knew Ms. Isabel, the church secretary,

4    right?

5        A    I don't think she was a church secretary.  It was

6    the pastor's wife.

7        Q    You're right, pastor's wife.  But it looked

8    pretty innocent?

9        A    I was watching her --

10           Mr. Padowitz:  I apologize to Mr. Lewis.  I

11       object to him testifying and leading on direct.

12           THE COURT:  Sustained.

13       Q    (By Mr. Lewis)  All right.  What happened after

14    you left the grocery store?

15       A    After we left the grocery store, we went to the

16    house.

17       Q    Who's house?

18       A    My house.

19       Q    Now where is your house located?

20       A    In Pembrook Park.

21       Q    And for the purpose of those who don't know where

22    Pembroke Park is, where is that in relation to what major

23    streets?

24       A    It's south of Hallendale on 52nd Avenue, just

25    north of Broward-Dade county line.

```
1      Q    Okay.  Somewhere around Hallendale Beach Blvd.

2   right, and between 35 and 441?

3      A    Right.

4      Q    Is that fair?

5      A    Yes.

6      Q    And what kind of house did you have there?

7      A    Just a townhouse.

8      Q    And it was a one-story or two-stories?

9      A    Two-story.

10     Q    Now what was on the first floor of the townhouse?

11     A    What do you mean?

12     Q    Well what rooms were on the first floor of the

13  townhouse?

14     A    Had living room, kitchen, dinning area and

15  bathroom and laundry room.

16     Q    Okay.  And then what's up on the second floor?

17     A    The bedrooms and two other bathrooms.

18     Q    How many bedrooms did you have up there?

19     A    Two bedrooms.

20     Q    Can you tell me what this picture, which I

21  believe is State's 1, does that look familiar to you?

22     A    That's part of the living room.

23     Q    Okay.  And how is it that you can get up to your

24  bedroom and two bathrooms that are upstairs?

25     A    Through the spiral staircase.
```

```
 1     Q      Is that the only way you get up there?

 2     A      If you climb over the balcony.

 3     Q      From the outside?  Okay.  From inside it's the

 4  only way to get up there?

 5     A      Yes, sir.

 6     Q      Now what is this material made of, this

 7  bannister?

 8     A      It's a metal staircase.

 9     Q      Okay.  Is it a hard surface?

10     A      Yes, sir.

11     Q      The tile - this is tile?

12     A      Yes, sir.

13     Q      That is a hard surface?

14     A      Yes.

15     Q      This rug, how - like how -- I don't know.

16     A      The rug is soft.  That's the only thing soft on

17  the floor.

18     Q      How thick is it?

19     A      Oh, about a quarter inch.

20     Q      Did it have padding or anything underneath it?

21     A      No, sir.

22     Q      And this table here, what is this table made of?

23     A      That's hard wood, like hard Formica.

24     Q      Okay.  Thank you.  So you get home, about what

25  time is it?
```

1     A    It was just after four because we had left the

2  store - well close to 4:00.

3     Q    You weren't working your trooper job that day?

4     A    I was on military leave.

5     Q    Okay.  Did you have any military responsibilities

6  that you were going to have to start?

7     A    I was supposed to be back on duty that night.

8     Q    At what time?

9     A    At 12:00 in Miami.

10     Q    Miami, where?

11     A    It was - we had a conference going on in a hotel

12  down in Miami.  I don't remember the exact hotel.

13     Q    Is this your two-week duty you're doing now?

14     A    It's an extra additional two-weeks I had done.

15     Q    Okay.  So you weren't working the trooper job.

16  And later that night you had responsibilities with U.S.

17  Army National Guard, right?

18     A    Army Reserve.

19     Q    Army Reserve.  Okay.  You said it's about 4:00

20  when the three of you walk in the door?

21     A    It was a little after four.

22     Q    Was anybody else home?

23     A    Just me, Lionel and Tiffany.

24     Q    Okay.  What happened when you come in; what do

25  you do?

 1       A    We started taking the groceries out of the car,

 2  and Tiffany asked if she could go upstairs and lie down

 3  because her stomach wasn't feel well and I said okay.

 4       Q    Did you ask her why she wasn't feeling well or do

 5  you have an idea why?

 6       A    I didn't ask her that.  When she told me her neck

 7  was hurt and I said, you've been working your neck all

 8  day, have you; and she smiled and said no.  And she went

 9  up and laid down.

10       Q    What do you mean, "neck was hurting"?

11       A    She said her neck was hurt.  And I joked with her

12  and I said I twist my neck sometimes - you see - and

13  you've been working your neck all day, have you; and she

14  laughed and said, no.  And I said, okay, go ahead and lay

15  down.  If you come back down I'll give you tea if you feel

16  better.

17       Q    Where did she go up and lie down?

18       A    In Lionel's room.  There's a bed in Lionel's room

19  for her.

20       Q    A separate bed?

21       A    Correct.

22       Q    And what did Lionel do as she went up and laid

23  down?

24       A    He was helping me unpack groceries.

25       Q    Okay.  And then what happened next that you can

Troiano, Laws & Associates
954-763-1582

```
 1   remember?

 2      A    I went upstairs to lay down after unpacking the

 3   groceries.

 4      Q    What time would that have been?

 5      A    Probably close to five.

 6      Q    Is Tiffany still upstairs laying down?

 7      A    Yes.

 8      Q    Was she asleep or awake?

 9      A    I don't think she was asleep that quick, but she

10   was laying down.

11      Q    Did you have any conversation with her?

12      A    Not then, no.

13      Q    You don't remember anything that was said or what

14   was Lionel doing when you went upstairs to lie down and

15   Tiffany was still upstairs?

16      A    I believe he was supposed to finish unpacking the

17   rest of the groceries that he had in his bag and mop the

18   floor.

19      Q    Okay.  Do you know if he did any of that?

20      A    I think he did.  The floor was clean.

21      Q    What was the next thing that you remember

22   happening?

23      A    Later on I came down to give them some dinner,

24   and this is like close to 7:00.  And I asked if they were

25   okay; both of them said yes.
```

1    Q    Was Tiffany downstairs at that point?

2    A    Yes.  They were watching TV.

3    Q    Do you know what they were watching?

4    A    No.

5    Q    What were they having for dinner?

6    A    I'd got some oxtails and rice and peas and I

7  think plantans or something like that.

8    Q    And when you came down, did you notice was

9  Tiffany tense or did you notice any problem between the

10  two children?

11    A    No.  They just told me -- I think Tiffany said

12  she wanted some soda.  And Bradley had called and Bradley

13  was telling her to wake me up to get soda.  And she said

14  you don't need to wake me up to get the soda drink if you

15  want it.  But other than that, no.

16    Q    So they ate.  You fed them, right?

17    A    Correct.

18    Q    What else happened then after -- when you were

19  feeding them, what did you do?

20    A    After I fixed the plates, I was going back

21  upstairs and the phone rang and it was Bradley.  And he

22  was telling Tiffany, let me talk to -- because he was

23  going to keep me on the phone, so she said Auntie Kaye is

24  going upstairs.  And I took the phone and I talked to

25  Bradley for a little bit and I said, you don't need to

```
 1    tell the kids to wake me up if they want something.
 2    That's why we went to the store.  They can get what they
 3    want to get.  And I talked to Bradley for a minute.
 4        Q    What did you and Bradley talk about, do you know?
 5        A    I don't remember, probably about the time that he
 6    was supposed to pick her up.  I'm not sure about the
 7    conversation, but something to do with he was coming over
 8    there to pick them up.
 9        Q    I need you to keep your voice up.
10        A    I'm sorry.
11        Q    Did Tiffany talk to Bradley at all?
12        A    I think Lionel got the phone and then gave it to
13    Tiffany, but somehow I ended up with the phone.  I don't
14    remember if they had a conversation, but I think she
15    talked and - because she told him that I was up or
16    something.
17        Q    And you needed to be sleeping right now.  Why did
18    you need to be sleeping?
19        A    Because I needed to be in military at 12:00 that
20    night.
21        Q    All right.  At some point you get off the phone
22    with Bradley?
23        A    Right.
24        Q    Then what did you do?
25        A    Asked him to take the phone back downstairs for
```

1    me.  And also I had a cup that I had water with and I

2    said, Tiffany, do you think you can take the phone and cup

3    down?

4        Q    I'm having trouble.  Keep your voice up.

5        A    I said, Tiffany, can you take the phone and cup

6    at the same time down?  And she was like, yes, I can take

7    both.

8        Q    Did she ultimately take the phone and cup down

9    for you?

10       A    Yes.

11       Q    And then what happened then?

12       A    After that I went to sleep.

13       Q    And what was the next thing that you remember?

14       A    At one point they were downstairs making noise

15   and I yelled at them to stop making noise on the stairs.

16   And then later on I heard another noise.  I was sleeping.

17   I don't remember if it was before or after the first one.

18       Q    What was the first noise that you heard?

19       A    I thought they were running on the stairs and I

20   was telling them don't run on the stairs because you can

21   slip on the rug.  If you slip on the rug you're going to

22   hit the metal staircase.

23       Q    What was the second noise that you heard?

24       A    And then I heard another noise.  I was sleeping

25   and I got up and stood on the top - inside my room and I

1    opened the door and I said, "what is that; what was the

2    noise?"  And Lionel said that's Tiffany.  So then I heard

3    Tiffany made a sound.

4        Q    What kind of sound was it?

5        A    It probably, you know, like when you're sleeping

6    and some people they have nightmares or even if you're

7    probably in pain or whatever you make like a moaning sound

8    or uhm-uhm.

9        Q    I'm going to ask you to replicate the sound as

10   best as you can in terms of the - how loud it was and what

11   it sounds like?

12       A    It sounds like if you were having a nightmare or

13   it could have been somebody - if you're in pain or

14   something like that.

15       Q    Replicate the sound?

16       A    Like uhm.

17       Q    Uhm?

18       A    Something like that.

19       Q    Something like that?

20       A    Something like that.

21       Q    What did you take from that; what you did you

22   think?

23       A    Well I think -- Lionel said she was in her sleep,

24   rolling like a baby, so I'm thinking maybe she's having a

25   nightmare, so I said okay and I went back and laid down.

```
 1            After I laid back down, after a while, Lionel

 2   ran upstairs and knocked on the door and said Tiffany or

 3   -- I think he said her chest was wasn't moving or her -

 4   she wasn't breathing or something.

 5      Q    Now before that, did you ever remember yelling

 6   downstairs?

 7            Mr. Padowitz:  Your Honor, I object leading the

 8        witness in direct examination.

 9            THE COURT:  Sustained.

10      Q    (By Mr. Lewis)  Do you remember the exact words

11   that you used when you hollered downstairs or talked

12   downstairs either time; do you remember what you would

13   have said?

14            Let me back you up a little bit.  Like what had

15   - when they were running on the steps or heard --

16      A    I probably told them stop running on the stairs.

17   I'm going to beat your butt.

18      Q    Okay.  And the second time when you hear the uhm?

19      A    Uh-huh?

20      Q    Did you make any -- say anything at that point or

21   do you just go with what Lionel told you or what?

22      A    I think I said something to Tiffany about stop

23   making that noise.

24      Q    Okay.  But you were under the impression that

25   Tiffany was sleeping, dreaming or something?
```

1    A    Well before he said that -- he said that Tiffany

2  was in her sleep rolling around like a baby, so I thought

3  she was probably having a nightmare.

4    Q    Okay.  Do you know what time this would have

5  been?

6    A    Then I didn't know because I didn't have the

7  lights on or anything in the room.

8    Q    Do you remember any other phone calls where

9  Daweese had called or Bradley called again, anything like

10  that?

11    A    I think Bradley called just before Lionel came

12  upstairs the last time, when he came up and said that

13  Tiffany wasn't breathing.

14    Q    Okay.  And when Lionel came upstairs and told you

15  that Tiffany wasn't breathing, did he have to wake you up?

16    A    He knocked on the door real hard and said, "mom,

17  mom, Tiffany is not breathing," or something to that

18  effect.  And I was like, turn on the light and I ran

19  downstairs.

20    Q    And what did you see when you got there?

21    A    I saw Tiffany laying on the ground.

22    Q    And what was she doing?

23    A    She was just laying there.  And I grabbed her,

24  like, Tiffany.  And I was checking her pulse and she

25  didn't have a pulse.

```
1      Q     I need you to keep your voice up now.  You

2   checked her pulse.  Did she have one?

3      A     No.  So I grabbed the phone and called 911 and

4   started doing CPR.

5      Q     Now have you been trained in how to do CPR?

6      A     Yes, sir.

7      Q     And trained in how to do pediatric CPR in

8   children?

9      A     Yes, sir.

10     Q     In your career have you ever done CPR, not just

11  practice for school, but actually have to do it on

12  somebody out in the field?

13     A     No, sir, not on a live person.

14     Q     Not either in the military or on in the Florida

15  Highway Patrol?  Have you ever actually done CPR on a real

16  person?

17     A     No, sir.

18     Q     What was your emotional situation at that time?

19     A     Probably in shock.

20     Q     Did you know what had caused Tiffany to stop

21  breathing or to not have a pulse?

22     A     No.

23     Q     What were you doing with the child?

24     A     What do you mean what I was doing?

25     Q     Well tell me your efforts to do the CPR.  I want
```

```
 1   you to specifically tell me what you did from the

 2   beginning up until the paramedics get there.

 3       A    I checked her pulse and there was no pulse.  And

 4   then I tried to give her the quick breath.

 5       Q    I'm sorry.  I'm sorry, Kathleen.  But you're

 6   going to have to keep your voice up for us.  What was the

 7   last thing that you said?

 8       A    I checked her pulse and checked her air way and

 9   tried to give her the breath.

10       Q    How did you try to give her breath, Kathleen?

11       A    Tilt her head back and cover her mouth with my

12   mouth.

13       Q    Did you ever touch her nose with your hand?

14       A    Yes, to pinch her nose to get her the breath.

15       Q    Was there any vomit that you saw during your CPR

16   efforts?

17       A    Every time I blow in her mouth the vomit would

18   come out, and I'd take my hand and scoop it out.  And I

19   had Lionel running back and forth to get paper towels to

20   help take it out.

21       Q    To clear the vomit out of her mouth with paper

22   towels.  And how long did that go on for?  Well, all

23   right.  You covered her nose and blew into her mouth.  Did

24   you ever do anything in terms of touching her abdomen or

25   stomach area?
```

```
 1      A    Yes, I did.

 2      Q    What specifically did you do?

 3           Mr. Padowitz:  Judge, I object to the leading

 4      form of the question and what area of the body.

 5           Mr. Lewis:  Oh, c'mon.

 6           THE COURT:  Overruled.

 7      Q    (By Mr. Lewis)  What did you do in terms of any

 8  type of compressions on the child while you're doing CPR?

 9      A    I had to give her five compressions for each

10  breath.

11      Q    And how would you do these compressions?

12      A    For small children you have to use your one hand

13  and press at the bottom of the rib cage.

14      Q    How many times did you do that?

15      A    I don't know, until the paramedics got there and

16  then they took over.

17      Q    Could you tell whether or not Tiffany was

18  responding in terms of did she regain breath as a result

19  of either your mouth-to-mouth or compressions that you

20  were doing?

21      A    No.

22      Q    Were you either increasing or decreasing the

23  amount of force that you were applying on the child's

24  abdomen as it continued and you got no results that the

25  child did not start breathing?
```

1    A    I think the force probably increased because I

2  was hysterical and I was trying to tell the 911 operator,

3  get the paramedics here quick; there's one down the street

4  from the house; get them here quick.  So I was hysterical.

5  So more than likely it would have been increased.

6    Q    How long it did take, from the time that you

7  first called, for the paramedics to get there?

8    A    I don't know.  I don't know.

9    Q    From the time that you called and were you

10 constantly working on Tiffany in terms of applying CPR

11 until the actual paramedics arrived?

12   A    Yes, I was.

13   Q    And where was Lionel during this period of time?

14   A    Lionel was getting me - going back and forth

15 getting me paper towels.  I had to clean the vomit out of

16 her mouth.  He was standing on the other side.

17   Q    Now during this period of time are you ever

18 asking Lionel what happened or?

19   A    I was busy with the CPR.

20   Q    Do you remember the first paramedic coming

21 through the door?

22   A    I don't remember, because Lionel opened the door

23 for them.  I was still down on the floor when they came

24 in.

25   Q    It was actually Lionel who opened the door for

1    the paramedics to come in?

2        A    Yes, sir.

3        Q    And when the paramedics got there, what did you

4    do?

5        A    They took over and I think I was calling Bradley

6    to make sure that he had left or something.  And I

7    remember Raymond was there.  He was there on the ground

8    too, trying to help her breathe.  And --

9        Q    What are you and Lionel doing when the paramedics

10   -- I know you were on the phone with Bradley.  What is

11   Lionel doing?

12       A    I wasn't paying attention to what Lionel was

13   doing.  I was paying attention to what they were doing

14   with Tiffany.

15       Q    Now what's going on in your mind in terms of what

16   has caused Tiffany to have this - stop breathing?

17       A    Well from the vomit, I was thinking maybe it had

18   something to do with the food I had given her.  Because

19   she came back sick from camp a couple of days before, so I

20   was thinking maybe it had something to do with the food.

21       Q    Okay.

22       A    Tiffany had complained about some stomach problem

23   earlier in the afternoon, right, and then she was sick.

24   She came back from camp that night and vomiting in her

25   sleep that night, so I was thinking maybe from that and

```
 1    from the food that I had given her.
 2        Q    Did you -- when she was still there in the home,
 3    did you recognize any bruises or scratches or anything on
 4    the exterior of Tiffany to indicate anything?
 5        A    No, sir.
 6        Q    How long was Tiffany in the house before the
 7    paramedics actually took her out?
 8        A    They were there for a while.
 9        Q    Can you put a time on it the best that you can?
10        A    It could have been a half hour or less.  I don't
11    know.
12        Q    Were they using any kind of machinery?
13        A    They had all kinds of machines on her.  They had
14    something on her nose, the mask on her nose.  They had
15    everything on her.
16        Q    When I say incubate, do you know what - when I
17    say when you incubate someone with a tube, was that going
18    on?
19        A    They were putting tubes in her and giving her
20    shots.
21        Q    Now can you tell, as you're there watching the
22    paramedics, whether or not they were having any success in
23    reviving Tiffany?
24        A    At first I couldn't tell.  And at one point I
25    looked at Raymond and he was like, I don't know, sis -
```

1    something to that effect.  So, I don't know.

2        Q    But you didn't know basically whether she was

3    coming back or not; is that a fair statement?

4        A    No.

5        Q    At some point the paramedic ambulance comes and

6    they actually remove Tiffany from your townhouse?

7        A    Yes, they did.

8        Q    What do you do?

9        A    I had to wait for another friend of mine, a

10   trooper, to come by the house to -- he was working, so I

11   called the station to see if he could come by the house,

12   to stay at the house for a little bit until I go to the

13   hospital so he can watch Lionel.

14       Q    What was that trooper's name.

15       A    Trooper Slater.

16       Q    And how long did it take for Trooper Slater to

17   get there?

18       A    He didn't get there -- he met us at the hospital,

19   because my neighbor said he would watched Lionel for me

20   until I came back.

21       Q    Okay.  And were there Broward Sheriff's Office

22   people there at this point?

23       A    Yes.

24       Q    And where was Lionel as you're -- after Tiffany

25   leaves in the ambulance, where is Lionel physically; is he

```
 1    inside the townhouse or outside?

 2         A    I believe he was inside the townhouse.

 3         Q    Was he downstairs with you?

 4         A    He was downstairs.

 5         Q    He wasn't upstairs in his bedroom?

 6         A    No, not at that time.

 7         Q    How long before you leave to go to the hospital,

 8    from the time they load Tiffany up and transport her?

 9         A    It was probably about a half hour, because I had

10    to change phones.  And when the deputy took me, a female

11    deputy took me.

12         Q    A Broward Sheriff's deputy?

13         A    Yes, sir.

14         Q    And did you have any conversation with Daweese

15    during this period of time?

16         A    I didn't talk to Daweese until I got to the

17    hospital.

18         Q    Do you know who did, if anybody called Daweese?

19         A    When Bradley got to the house I gave Bradley my

20    car to go and pick up Daweese and tell her - to tell them

21    to meet us at the hospital because we were on the way to

22    the hospital.

23         Q    Did you know what hospital they were going to?

24         A    Memorial East.

25         Q    And do you know if Bradley called Daweese or how
```

1    Daweese was contacted that there was a problem?

2        A    I don't remember.  I don't remember.  I think

3    Bradley must have called her from the house or something.

4        Q    Did you know whether or not Daweese had been

5    contacted?

6        A    I think Bradley called her because he took the

7    car to go pick her up at work and then bring her to the

8    hospital.  But I know at one point I called and left a

9    message on Daweese's machine, after I spoke with the

10   paramedics.

11       Q    And did Bradley call Daweese from your house or

12   do you know?

13       A    I think he did.

14       Q    So you load up and went down with another female

15   deputy?

16       A    Correct.

17       Q    Barrena (phonetic) does that sound right?

18       A    I don't remember her name.

19       Q    What did she look like?

20       A    She's about 5'7" blond.

21       Q    Kelley.  Does that sound right?

22       A    I think it was Kelley.

23       Q    And she takes you down to the hospital.  Again,

24   what was the name?

25       A    Memorial East.

1     Q     And where did you go when you got to the

2  hospital?

3     A     I believe Daweese was there before I got there,

4  and we went into the waiting room.  I think it was

5  pediatrics.

6     Q     And who did you talk to and what did you find out

7  when you got there?

8     A     I think when I first got there Daweese was

9  crying.  Because she wanted to see -- Kaye, please tell

10  them I want to see my baby; tell them to let me see

11  Tiffany.

12     Q     Did you know what Tiffany's condition was at that

13  point?

14     A     I don't think then we knew, because I think the

15  doctor came in later on and spoke to us.

16     Q     Were you there with Daweese when she was told

17  that Tiffany had passed away?

18     A     I think so.

19     Q     Keep your voice up.  I'm sorry?

20     A     I think so, yes.

21     Q     And what happened at that point and what was -

22  what were you all doing?

23     A     Everybody was in there crying.

24     Q     Now were there ever any questions about how -

25  what had caused this with Tiffany, what caused her to stop

```
 1   breathing; were you all talking about that at all?

 2       A    I don't think so, not then.

 3       Q    Bradley, Daweese is at the hospital, you're

 4   there; who else is around at that point?

 5       A    I think two friends of Daweese's from work.

 6       Q    What did you do after you found out that Tiffany

 7   had passed away?

 8       A    I think - I think at one point we went - we had

 9   to look -- we wanted to look at Tiffany because Daweese

10   wanted to see Tiffany.  She wanted to look at Tiffany.

11       Q    You went in?

12       A    And Chaplain Razlo (phonetic) came by.

13       Q    Okay.  And where did you go then, after that had

14   occurred?

15       A    I stayed at the hospital for a little bit, and

16   afterwards I went back home.

17       Q    How did you get back home?

18       A    Slater picked me up from the hospital.

19       Q    Trooper Slater?

20       A    Yes, sir.

21       Q    And took you back to your house?

22       A    Yes, sir.

23       Q    And who was there at your house when you got

24   back?

25       A    When I got to the house, that other deputy was
```

```
 1    inside the house with Lionel.

 2        Q    Shennard?

 3        A    Yes.

 4        Q    And how did Lionel - did he ask any questions or

 5    did you tell him what happened?

 6        A    Well before we left he had said --

 7             Mr. Padowitz:  Judge, I object to hearsay.

 8             THE COURT:  Sustained.  Sustained.

 9        Q    (By Mr. Lewis)  When you got back to the house,

10    did you tell him that Tiffany had passed away?

11        A    Yes, sir.

12        Q    And how did he react to that?

13             Mr. Padowitz:  Judge, same objection as to

14    hearsay, out-of-court statement.

15             THE COURT:  I'm going to allow it.

16        Q    (By Mr. Lewis)  You can respond to that question.

17        A    When I told him, I said Tiffany had died, and it

18    was like - like he just shut down.

19        Q    When you say "just shut down," what do you mean?

20        A    It was like he looked at me and like he was

21    shocked, and he didn't say anything for a long time.

22        Q    He didn't talk for a long time; is that a fair

23    statement?

24        A    Yes.

25        Q    And did you see anything abnormal about that
```

1    reaction at the time, that he was just shut down about it?

2        A    No.

3        Q    Who else was there at the house?  Well, let me

4    ask this.  When you got back there was Deputy Shennard,

5    Lionel are in the house.  Anybody else in the house?

6        A    No.

7        Q    When you got back, what did you do, other than

8    talk with Lionel.

9        A    I talked to Lionel for a little bit and I talked

10   to the deputy - well he wasn't really talking any way, so

11   I told him to go up and go to his bed.  And then after

12   that, after the deputy left, I think Brenna came by.

13       Q    Uh-huh?

14       A    And after that I wanted to clean up my house.

15   There was plastic and paper from the paramedics and the

16   front area of living room was scratched up, so I mopped up

17   the front area and then I went to bed.

18       Q    Was there any vomit on the floor?

19       A    It was on the rug.  I cleaned that up.

20       Q    Okay.  And did you see any blood?

21       A    When I was -- there was like a streak, just one

22   little streak and that was it.

23       Q    Was the blood mixed with vomit or blood separate

24   from the vomit?

25       A    I believe it was separate.

```
 1      Q    And do you know where that blood came from or how

 2   it got there?

 3      A    No, sir.

 4      Q    What did you use to clean up the house, the floor

 5   area or carpet?

 6      A    What I always use - bleach, water and then

 7   vinegar.

 8      Q    Now did anybody come by the house then that

 9   night; specifically did Daweese come by?

10      A    Daweese came by after she left the hospital, her

11   and Bradley.

12      Q    And about what time did they come by?

13      A    I don't remember what time it was.  I don't know

14   if it was even before I had mopped, but I know they came

15   by after they left the hospital.

16      Q    And do you recall Daweese going upstairs and

17   talking to Lionel?

18      A    I don't remember if she went upstairs.  Uh-uh.

19      Q    Do you remember having any more conversation with

20   Lionel that evening?

21      A    No, sir.

22      Q    And where --

23      A    It was late.

24      Q    Where was Lionel pretty much the rest of that

25   evening?
```

1      A     In his room.

2      Q     Did you and Daweese or Bradley talk any; do you

3   remember what you said to each other when she and Bradley

4   came by?  How long did they stay?

5      A     Not long, not long, maybe a half hour or

6   forty-five minutes if that.

7      Q     And what did you all talk about?

8           Mr. Padowitz:  Objection to hearsay.

9           THE COURT:  Sustained.

10      Q     (By Mr. Lewis)   Was anybody mad at you or

11   Bradley or Daweese, anybody angry at you; did they say

12   anything to you to indicate they're mad?

13           Mr. Padowitz:  I object to relevance.

14           THE COURT:  It is also hearsay.  Sustained.

15      Q     (By Mr. Lewis)   Was there any discussion in terms

16   of what caused the death or how -- what happened?

17           Mr. Padowitz:  Same objection.

18           THE COURT:  Sustained.

19      Q     (By Mr. Lewis)   Daweese and Bradley leave about -

20   what time did they leave?

21      A     It was probably after one or later than that.

22      Q     What happens the next day when you and Lionel get

23   up?

24      A     We went to Daweese's house, and on the way there

25   -- well when I got to Daweese's house, that same lady that

1   I saw at the supermarket, she was dressed up as if she was

2   going to work.  Her makeup was freshly done.

3       Q    Let me ask you.  On that Wednesday night, did you

4   get any more visitors, like any troopers or anything, come

5   by your house on Wednesday night?

6       A    Captain Brighton (phonetic) and Lieutenant Farton

7   (phonetic) came by.

8       Q    And it was coming by checking on you and see how

9   you were doing or what?

10      A    Well I had called because - Sergeant Collins is

11  my supervisor at the time and I called to let him know

12  that a child had died at my house.  And told him -- to

13  tell him what happened because I didn't want him to know

14  second hand that something happened and nobody told us.

15  But - so I called as a courtesy.

16      Q    Is that standard procedure in the department that

17  when something like this happens, an accident or death in

18  your home, that you report it to your employer?

19      A    Well it will be as courtesy, yes.  And that's

20  even with military.  Something happens, you let them know

21  before somebody else lets them know.

22      Q    These troopers, do you remember what time they

23  would have come by your house?

24      A    It was probably like 3:00 in the morning or after

25  that.

```
 1      Q    Woke you up?

 2      A    Yes, sir.

 3      Q    Was Lionel awake or asleep?

 4      A    He was sleeping.

 5      Q    And --

 6      A    I think he was sleeping.  He was in his room.

 7      Q    Do you know what you and the troopers talk about?

 8      A    I believe Lieutenant Farrell came by first and

 9  Captain Brighton.  And they came and asked me what

10  happened.

11           Mr. Padowitz:  Judge, I object to hearsay.

12           Mr. Lewis:  I'll move on, judge.

13      Q    (By Mr. Lewis)  Okay.  Next morning you go over

14  to Daweese's house, right?

15      A    Correct.

16      Q    And it's safe to say that it's a pretty sad time

17  for everybody?

18      A    Yes, sir; it was.

19      Q    And did Lionel go with you?

20      A    Yes, sir.

21      Q    And was there interaction between Daweese and

22  Lionel?

23      A    I think Daweese wanted to hug Lionel or

24  something.  She was hugging Lionel.

25      Q    Did you see, were there any bad feelings or
```

```
 1   anything causing anybody or anything?

 2      A    No, sir.  I was upset.

 3           Mr. Padowitz:  Objection to hearsay.

 4           THE COURT:  Move on.  Sustain the objection.

 5      Q    (By Mr. Lewis)  At this time did anybody know

 6   what the cause of death to Tiffany was?

 7      A    No.  I was upset because I thought it was the

 8   food.

 9      Q    Food that you had given her?

10      A    Yes, sir, when she came back from camp.

11      Q    I need you to keep your voice up.

12           You were still over there pretty much all that

13   day at Daweese's house.

14      A    Yes.

15      Q    A lot of people coming and going?

16      A    Yes, sir.

17      Q    Do you recall Detective Cominski and Brenna

18   coming over to the house?

19      A    Yes, sir.

20      Q    And do you recall them taking a sworn statement

21   from Daweese?

22      A    I don't remember if it was that day, but they had

23   taken statements from Daweese and Bradley.  And then I

24   think --

25      Q    This was Thursday.  Well this was Thursday.
```

```
 1    Wednesday night it happened and then Thursday night?
 2        A    Okay.  They took statements from Bradley and
 3    Daweese.
 4        Q    Did they get a statement from you?
 5        A    Yes.  Then they got a statement from me.
 6        Q    Now during this period of time, did you ever ask
 7    Lionel, you know, did he know anything; do you know what
 8    happened?
 9        A    I don't remember asking him.
10        Q    Was there any suspicion in your mind that he had
11    some involvement in her death?
12        A    No.  Because I thought it was from the stuff I
13    had given her.  So I was upset with myself because I had
14    -- I didn't know how am I going to tell Daweese Tiffany is
15    gone; I don't have Tiffany to give back to Daweese.  So I
16    was upset about myself.  I didn't think anything about
17    Lionel having anything to do with it.
18        Q    You had no suspicion whatsoever he had anything
19    or any involvement or anything to do with her death?
20        A    No, sir.
21        Q    Was Lionel with you when the detective came over
22    on that Thursday night and took statements?
23        A    I believe at some point I left and went to the
24    store or went somewhere to get something.  Because when
25    they were doing Bradley's and Daweese's, I wasn't there.
```

```
 1    I was going back and forth getting food or something,

 2    getting something to bring back to the house.  And then

 3    they told me I need to come to get my statement.

 4         Q    And did you give this there in the apartment?

 5         A    I gave it there in Daweese's bedroom.

 6         Q    And Lionel was there then?

 7         A    He was at the house, but he went in the room.

 8         Q    Now going on to Friday.  Apparently at some time

 9    you and Lionel are again at Daweese's residence, right?

10         A    Yes, sir.

11         Q    And what are you doing over there?

12         A    We went over there -- I think Daweese wanted to

13    see Lionel.  I was going over, but she wanted me to bring

14    Lionel.  And we went over there at three o'clock.  Daweese

15    had to go to the funeral home to make arrangements and I

16    had to go to the credit union to get some money to help

17    with the arrangements.  So there was a friend of Daweese's

18    at the house and Daweese asked her if Lionel could stay

19    with her until we got back.

20         Q    Okay.  Where was your credit union that you were

21    going to get some money to help?

22         A    Commercial and 34th.

23         Q    How far away is that from Daweese's house?  Where

24    was Daweese's house?

25         A    In Miramar, Palm Avenue and Pembroke Road.
```

```
 1      Q     And how long of a run is that by car, say one

 2   way, to get up there?

 3      A     About twenty minutes.

 4      Q     And when you left, did you take Lionel with you

 5   to go up to the credit union?

 6      A     I left Lionel at the house with Daweese.  It was

 7   a girlfriend of her's that was there.

 8      Q     Why did you do that as opposed to taking him in

 9   the car with you?

10      A     I was going to take him but - since my girlfriend

11   is going to be here, you can leave him, since he was

12   watching TV when we got ready to leave.  Anyway, so I said

13   okay.  She said she didn't mind.

14      Q     Now about what time did you get back to Daweese's

15   apartment?

16      A     I didn't go back there.

17      Q     What happened that you didn't go back there?

18      A     After I left the credit union I went to --

19   there's a fish market that I go to over on Griffin and

20   43rd, I think.  And I went to get fish because I knew a

21   lot of people would be coming to the house and just to

22   help with stuff.  So I went there to get some fish, but it

23   took longer because to clean a whole cooler of fish, it

24   took a little while.

25            So someone paged me from Daweese's house while I
```

```
 1    was there.  And since I saw it was Daweese's number, I

 2    borrowed the phone and called them back.  When I called

 3    back, Daweese's mom was there.

 4        Q    Right?

 5        A    And she said that they had left to went to B.S.O.

 6    headquarters to discuss the autopsy report.  And I said,

 7    "discuss the autopsy report at BSO headquarters?  Why did

 8    they take Daweese down there"?  And she said she didn't

 9    know; they took - all three of them went.  And I said,

10    "okay.  I have to go by the house for a little bit and

11    I'll be over there."

12        Q    Okay.  Where did you go at that point when you

13    found out Lionel was on the way to B.S.O. headquarters?

14        A    Well I had to go to my house because I had the

15    military radio.  And there was another lady that was going

16    to come to pick up the radio.  And they said to be there

17    by no later than 5:30, so I had to meet her back at the

18    house.

19        Q    Now did you think they were taking Lionel down to

20    the police station to interrogate him?

21             Mr. Padowitz:  I object to leading the witness.

22             THE COURT:  Sustained.

23             Mr. Lewis:  Sorry.

24        Q    (By Mr. Lewis)  So you went and dropped off the

25    army radio to the lady and then what did you do?
```

Troiano, Laws & Associates
954-763-1582

```
 1      A      On the way there Detective Brenna and Cominski,

 2  they beeped me.  When I got to my house I tried calling

 3  them back several times and no one answered.

 4          So I called Daweese's house again and I spoke to

 5  her mom and I told her that -- I said, "did they call you

 6  back," and she said, "no, they went to B.S.O.

 7  headquarters."  And I said, "what for?"  And she said, "to

 8  discuss the autopsy report."  And I said, okay, sounds

 9  strange, but whatever.  So I called --

10      Q      Did you ultimately -- okay.  You tried calling?

11      A      I called again.  They never answered the phone.

12      Q      What number are you calling?

13      A      The number for Detective Brennan's cell phone.

14  And I finally couldn't get in touch with them, so I called

15  Captain Brazel (phonetic) and I said they've been paging

16  me.  And I kept calling back, but whenever I call them

17  back --

18      Q      Captain Brazel.  He's still with Broward

19  Sheriff's Office?

20      A      F-H-P.

21      Q      Did there come a time when you ultimately arrive

22  down to the Broward Sheriff's Office?

23      A      After I called Captain Brazel -- Captain Brazel

24  called them and I called the number back and finally they

25  answered the phone.  And I said okay, I'm on my way.
```

1    Somebody is here to pick up the radio.  They should be

2    here shortly.  I'm on my way here.  And I said, "why do

3    you have to take them down to headquarters to discuss the

4    autopsy report?"

5            Mr. Padowitz:  I object to this hearsay.

6            THE COURT:  Sustained.

7            Mr. Lewis:  May we approach briefly sidebar?

8            (Thereupon, the following sidebar discussion was

9       had:)

10           Mr. Padowitz:  Judge, I object to hearsay and

11      also I hope counsel is already informed the witness

12      not to go into areas of first statements, because

13      we're going to get into --

14           Mr. Lewis:  That just dawned on me.  I didn't

15      caution her like she needs to be cautioned.  So I

16      don't know if we want to recess for the day?

17           THE COURT:  No.

18           Mr. Lewis:  We want to finish the testimony?  Can

19      we send the jury out for five minutes?

20           Mr. Padowitz:  Well, judge, I have a suggestion.

21      I don't know.  I don't have a problem leading her to

22      that spot.  I don't have an objection.

23           Mr. Lewis:  I don't want to cause a problem.

24           THE COURT:  Two minutes.

25           (Thereupon, the sidebar discussion was concluded

```
 1   and the following proceedings were had:)
 2       THE COURT:  While doing that, just to discuss
 3   logistics.
 4       (Thereupon the jury left the courtroom.)
 5       (Thereupon, a short break was taken; afterwhich
 6   the following proceedings were had outside the
 7   presence of the jury.)
 8       THE COURT:  Let the record reflect the defendant
 9   is present with counsel, State's present.
10       We're outside the presence of the jury.
11       Mr. Lewis:  We're going to caution you.  We're
12   now getting into statements made by Lionel down at the
13   police station.
14       Now the court has suppressed both - any
15   statements Lionel made when he was alone in the room
16   with Brenna, before you got there; suppressed the
17   statement with Bradley Henry before you got there.
18       So now we're going to go into -- basically only
19   things you can testify about is when you - what
20   happened when you got there and we can't make
21   reference to any of the two prior statements Lionel
22   already made.  Do you understand?
23       You get there and then they take you in and you
24   do the statement with Lionel, okay?
25       THE WITNESS:  Okay.
```

1            Mr. Lewis:  That's pretty much it.

2            THE COURT:  That's fine.  Thanks.

3            THE COURT:  Are we all set?

4            Okay.  Let the record reflect the defendant is

5       present with counsel, State's present.

6            Bring the jury back in, please.

7            (Thereupon, the jury reentered the courtroom at

8       5:03 p.m.)

9            THE COURT:  Okay.  You may continue, Mr. Lewis.

10           Mr. Lewis:  Thank you, judge.

11      Q    (By Mr. Lewis)  Now, Kathleen, at some point you

12 get down to the Broward Sheriff's Office and you see

13 Lionel again, right?  He's down there?

14      A    Later on.

15      Q    And at some point you go in with detectives into

16 a room and they turn on a tape recorder and take a

17 statement from Lionel, right?

18      A    When I got there I was trying to get the guy at

19 the desk.  He said he didn't know who I was talking about,

20 so I stayed down there for about forty-five minutes.

21      Q    Where were you sitting at?

22      A    I was downstairs in the lobby trying to call -

23 there was a house phone that they had.  I was calling to

24 see, whoever picked up on phone, to see if I can get in

25 touch with them.  Because I was calling their cell number

```
 1    and no one was answering them.

 2        Q    But at some point you come in contact with

 3    Detective Brennan and Cominski who, you know, because they

 4    interviewed you that night before, you gave them a

 5    statement?

 6        A    Yes, sir.

 7        Q    And at some point they tell you we want you to

 8    come in and take a statement with Lionel, right?

 9        A    No.  When I first got upstairs they took my gun

10    from me.

11        Q    Okay.

12        A    They told me that in this area we have to take

13    your weapon from you.  And I'm thinking --

14        Q    You knew something was wrong?

15        A    Right.

16        Q    Okay.  Now just follow my questions, okay?  At

17    some point you do go into a room and they take a statement

18    with Lionel, right?

19        A    Yes, sir.

20        Q    Now you say that when you learned that Lionel had

21    some contact with Tiffany that may have caused her

22    injuries?

23        A    Yes, sir.

24        Q    And actually in that statement you start asking

25    questions of Lionel, don't you?
```

```
 1      A    Yes, sir.

 2      Q    And at some point Lionel says why - question to

 3   Lionel:  Why -- okay.  This is on page 16 of 18, okay?

 4           "Did you mean -- well why didn't you tell your

 5      mom what happened"?

 6           And you say:  "Answer him."

 7      A    Correct.

 8      Q    And Lionel says, "I was scared"?

 9      A    Yes, sir.

10      Q    Now it's your testimony that before that

11   statement is given, Lionel never shared with you that he

12   had swung Tiffany or played rough with Tiffany?

13      A    I didn't know anything about it.

14      Q    Do you remember the question from one of the

15   officers:  "Lionel, I want you to look at me, okay?  Why

16   didn't you tell your mom?"

17           And there was no answer.

18           And then there is another question:  "How come,

19      were you afraid of what you'd done?"

20           Lionel answered again:  "I was scared."

21      A    I believe so.

22      Q    Are you surprised at what you heard in this

23   statement?

24      A    Yes, sir, I was.

25      Q    When Lionel said that he was scared and afraid to
```

1    tell you; how did you react, what did you think about

2    that?

3           Mr. Padowitz:   Judge, I object to what she

4       thought about that.

5           THE COURT:   I'm not sure what the relevance is

6       about on that.   Sustained.

7           Mr. Lewis:   I'll move on, judge.

8     Q    (By Mr. Lewis)  All right.   At some point you

9    leave the Broward Sheriff's Office and Lionel does not go

10   home with you, right?

11    A    Correct.

12    Q    And you go home.   And at some point another

13   trooper comes to your house?

14    A    No.   Sergeant Collins -- both Collins brothers

15   were at the Broward Sheriff's Office because they gave

16   them my gun.

17    Q    Okay.

18    A    And they told Trooper Slater to go home and

19   change and meet us at the house.   Before I left the

20   sheriff's office I gave the keys to my sergeant because

21   the detective -- the crime scene technicians were going to

22   the house prior to us to take pictures.

23    Q    And you knew that and you consented to this,

24   coming to the house?

25    A    Correct.   They had a set of my keys.

1      Q      And is it standard procedure when something

2   traumatic happens with a police officer that for a limited

3   period of time, basically, the agency takes whatever guns?

4          Mr. Padowitz:   Objection as to leading the

5      witness on direct examination.

6          THE COURT:   It's - go ahead.   Answer the

7      question.

8          THE WITNESS:   Yes.

9      Q     (By Mr. Lewis)   So that you won't harm yourself

10   or do anything crazy?

11     A      Correct.

12     Q      How do you get back to your house?

13     A      Sergeant Collins took me, my sergeant.   Bobby

14   Collins.

15     Q      Okay.   And you get back to the house.   What

16   happens?

17     A      We had to stay outside for a little while because

18   they were still in there taking pictures and whatever they

19   were doing inside the house.

20     Q      The crime scene people actually came in before

21   you got back?

22     A      Correct.   They told me -- I didn't want to go

23   back.   They told me to get something to eat, but I didn't

24   want anything and we sat outside.

25     Q      And as a police officer you understand the reason

1    for that, right?

2        A    Correct.

3        Q    Now at some point did you make a decision that

4    you weren't going to sleep in that house that night?

5        A    I did.  At first I wanted to go and get clothes

6    when they were finished.

7        Q    All right.  And you went upstairs and you did get

8    some clothes to come back out?

9        A    Sergeant Collins took me in the house.  And I had

10   some more guns in the house, so I got the guns from

11   upstairs.  So I went to get the gun, and the one out in my

12   patrol car and get some clothes to leave.

13       Q    Now at some point when you were there, there was

14   a pillow that --

15           Mr. Padowitz:  Judge, I object to leading form of

16       questions on direct examination and telling this

17       witness how to testify.

18           Mr. Lewis:  Well...

19           THE COURT:  Excuse me, it's not.  A pillow is not

20       a leading question.  But what about it?

21           Mr. Lewis:  I knew I'd get one right.

22       Q    (By Mr. Lewis)  This is State's Exhibit 26 for

23   Evidence.  Does this look familiar to you?

24       A    That was the pillow that was on the sofa that was

25   - apparently Tiffany was using that pillow that night.

```
 1      Q     Okay.  And this - and this is two days later,
 2  right?
 3      A     Correct.
 4      Q     And there is some blood on that pillow?
 5      A     Yes.
 6      Q     And where is this pillow located when you came
 7  back into the house?
 8      A     It was still on the sofa.
 9      Q     You hadn't washed the pillow case or done
10  anything to try to --
11      A     Not at all.  I hadn't washed earlier that day
12  when they came back by.
13      Q     Now when you get to the house, did you believe
14  the crime scene people were finished or still going on?
15      A     They were almost finished.  They were talking to
16  the other Collins brother, because he knew the people.  So
17  they were having a conversation and said something about
18  the pillow.  And I picked up the pillow and he said leave
19  that pillow, so I put the pillow back on the sofa and I
20  said okay.
21      Q     Were you trying to hide this pillow from the
22  crime scene detectives or?
23      A     You couldn't hide the pillow.  They had been in
24  my house for over an hour taking pictures.
25      Q     Okay.  So you didn't try to keep people from
```

```
 1   seeing the blood on this pillow?

 2       A    No, sir.

 3       Q    You all don't live in this residence any more, do

 4   you?

 5       A    No, sir.

 6            Mr. Lewis:  Your witness.

 7            THE COURT:  Cross examination?

 8            Mr. Padowitz:  Thank you, judge.

 9                         CROSS-EXAMINATION

10       Q    (By Mr. Padowitz)   I'm going to ask you some

11   questions.  If I talk to fast or you don't understand one

12   of my questions, please stop me and I'll repeat it for

13   you, okay?

14       A    Okay, sir.

15       Q    Now you are presently a Florida Highway Patrol

16   trooper, correct?

17       A    Yes, I am.

18       Q    And as Florida Highway Patrol trooper you have

19   testified in courtroom such as this hundreds of times,

20   haven't you?

21       A    Never in front of a jury, no.

22       Q    But in court you've testified hundreds of times,

23   haven't you?

24       A    I wouldn't say hundreds, quite a few.

25       Q    Well over a hundred?
```

1    A    I wouldn't say up to a hundred, quite a few - not

2   quite.

3    Q    Basically as a prosecution witness you've been

4   here many, many times?

5        Mr. Lewis:  Judge, I'm going to object to that

6       characterization.

7        THE COURT:  Sustained.

8    Q    (By Mr. Padowitz)  Well you get paid - as a

9   trooper, one of your duties is to come in and testify on

10   cases that you handle; right?

11    A    Yes, sir.

12    Q    Now on July 29th, the next day after Tiffany had

13   died, it's true that at that point you had just met

14   Tiffany Eunick a couple of weeks prior; correct?

15    A    Correct.

16    Q    And if you had just met Tiffany a couple of weeks

17   prior, obviously your son Lionel Tate had met Tiffany a

18   couple of weeks prior to that date; correct?

19    A    Yes, sir.

20    Q    Now on the date that Tiffany died, Lionel Tate

21   your son, weighed 166 pounds and 5'4" tall; correct?

22    A    I wasn't aware of his weight at that time, but I

23   guess so.

24    Q    That's what you've been told, right?

25    A    Yes.

```
 1      Q    And prior to that date there had been times when

 2   for instance a specific time that Lionel Tate became too

 3   much for you to handle and manage and that you actually

 4   picked up the phone and told his father, without notice to

 5   him prior to that, I'm putting him on a plane and sending

 6   Lionel Tate to you in Mississippi.  Pick him up tomorrow.

 7   Isn't that true?

 8      A    What do you mean "too much to handle"?

 9      Q    You picked up the phone and told, without any

10   notice to his father, I'm sending him to you.  I'm sending

11   Lionel Tate to you tomorrow.

12      A    No, that wasn't.

13      Q    That didn't happen?

14      A    That wasn't the situation.

15      Q    Lionel Tate was sent to Mississippi on two

16   occasions to live there, approximately one year each time;

17   right?

18      A    I believe so.

19      Q    And at one point when Lionel Tate came back to

20   you from Mississippi, that was because his father had told

21   you that he had difficulty?

22           Mr. Lewis:  Objection, judge, as to his father

23      told him.

24           THE COURT:  Sustained.

25      Q    (By Mr. Padowitz)  Well at some point you learned
```

1  that he had problems handling the defendant because of his

2  behavior and that's why he sent him to you?

3          Mr. Lewis:  Same objection.  It is a good try.

4          THE COURT:  Sustained.

5      Q    (By Mr. Padowitz)  Now the day that this occurred

6  that you've just testified to the jury about, you picked

7  up Tiffany from her mother's house; correct?

8      A    Correct.

9      Q    And Lionel was with you?

10     A    Yes, sir.

11     Q    And you indicate to the jury that Tiffany Eunick

12 had prior to your arrival had injured herself with VCR

13 tape and she had some ice for that injury, correct?

14     A    Yes, sir.

15     Q    And to use that ice to place it on her face

16 because of that injury, right?

17     A    Correct.

18     Q    And you got in the car with your son and Tiffany

19 and you drove to Publix and Tiffany had that ice with her

20 on the driver over to Publix?

21     A    Correct.

22     Q    And when you got to Publix, you agree that you

23 walked through Publix with Tiffany and she had that ice in

24 a paper towel in her hand; correct?

25     A    When we first got there she had the ice in a

1  paper towel.

2      Q    Well she actually had that ice in her hand,

3  wrapped in a paper towel all the way until you got close

4  to the register; right?

5      A    The register is right up front when you walk in

6  Publix.

7      Q    Well have you ever said anything different as to

8  when you threw the ice away on a prior occasion?

9      A    I don't remember.  But I know I said that I threw

10  - she through it in the register or I threw it in the

11  register.

12     Q    Do you remember on August 11th, 1999, at a

13  hearing, you were placed under oath by myself, correct?

14  You raised your right hand and swore to tell the truth,

15  right?

16     A    Okay.

17     Q    And page 13 lines 14 through 22.

18         Your Honor, may I approach of the witness?

19         THE COURT:  Yes.

20     Q    (By Mr. Padowitz)  If you could just read this to

21  yourself.  Okay?

22         Didn't I ask you these series of questions and

23  you give this answer.

24         Question, line fourteen:  "At what point did you

25     throw the ice away?

```
 1              Answer:  There was a piece that fell on the
 2      ground.
 3              Question:  Where was that?
 4              Answer:  We got close to the register.
 5              Question:  When you got close to the register,
 6      from what point of shopping through Publix?
 7              Answer:  From shopping?"
 8              That's what you had stated before, right?
 9              Mr. Lewis:  Judge, I object.  There's no
10      inconsistency in her statement now or then.
11              THE COURT:  All right.  Jury can make that
12      determination.
13      Q    (By Mr. Padowitz)  Now, in fact, as you walked
14      through Publix she had the ice still in her hands, didn't
15      she?
16      A    When I got through the door there was a scale, I
17      think, towards the left.  Then from there also on that
18      same side there was a register there, and then down
19      further were the sodas and chips and whatever else is
20      there.  They were jumping and playing on the scale, and I
21      was looking at the chips and stuff, shopping still.
22      Q    Ms. Grossett-Tate, are you telling the jury that
23      you did not walk through Publix with Tiffany with her
24      holding the ice?
25      A    I don't remember saying that I walked through
```

1   Publix with her holding ice.

2       Q    I'm not saying if you remember saying it.  I'm

3   asking you.  Did not in fact Tiffany walk through Publix,

4   while you shopped, holding the ice in her hands?

5       A    When we first got through Publix, she came

6   through the door, through Publix, inside Publix with the

7   ice.  A piece fell on the floor and I told her to pick it

8   up and throw it in the garbage; when we got home, I would

9   give her more ice if she needed it.  We were still in

10  Publix.

11      Q    Let me show you page 14, lines 5 through 15.  If

12  you could just read this to yourself, starting there.

13          Remember me asking you this question and you

14  giving this answer:  Question - line 5, page 14.

15          "When you entered into Publix from the car, she

16      still had the ice?

17          Answer:  No.  She had it in her hand.

18          Question:  As you walked through Publix she had

19      the ice where?

20          Answer:  We walked through she still had it in

21      her hands.  When we got to the register a piece fell.

22      I picked it up and threw it - the rest away.

23          Question:  There was no ice falling to the ground

24      walking through Publix?  Did she intermittently put

25      the ice to her head?

1          Answer:  Not that I remember."

2          Mr. Lewis:  Judge, I object.  There's not a

3     single thing --

4          THE COURT:  Okay, sir.  No speaking objections.

5          Mr. Padowitz:  Absolutely.

6          THE COURT:  Okay.  Fine.  The jury will make that

7     determination.

8     Q    (By Mr. Padowitz)   Now at the time that Tiffany

9     came up to the minister's wife in Publix, she would still

10    be holding the ice in her hands, right?

11    A    I don't recall that.

12    Q    Okay.

13         Your Honor, may I approach of the witness?

14    Q    (By Mr. Padowitz)  If you can just read this to

15    yourself.  Do you remember me asking you this question,

16    Ms. Grossett-Tate, and you giving this answer under oath?

17         "Question:  At the time Tiffany came in contact

18    with the woman from the church, she would still be

19    holding the ice in her hands?

20         Answer:  Yes, sir."

21         Now, Ms. Grossett-Tate, after - well at the time

22    that Tiffany was talking to the woman from the church,

23    she would still have the paper towel as well; correct?

24    A    I don't remember her with the paper towel.

25    Q    What I said -- just read to the jury immediately

1    after the question:

2            "You could have observed she was holding ice in

3        her hands?

4            Answer:  From what I can see.

5            Question:  She had the paper towel as well?

6            Answer:  Right."

7            Ms. Grossett-Tate, at some point you leave Publix

8        with Tiffany?

9        A    Yes, sir.

10       Q    Now you never went over and took a look at

11   Tiffany's head to see whether she needed medical

12   attention, right?

13       A    When she first told me about it I turned and

14   glanced at her and I didn't know notice anything.  And

15   then I looked at the tapes and I looked back at her and I

16   was still puzzled because the tapes were laying on the

17   ground.  And I was thinking how could tapes hit you when

18   they're laying on the ground.

19       Q    But my question to you, Ms. Tate.  You never get

20   like right on top of Tiffany and inspect her face or head

21   to see if she needed medical attention, right?

22       A    No, I didn't.  When she said that, she was closer

23   to me than you are now.

24       Q    Now at some point as you're leaving Publix,

25   Tiffany - according to you - says that her stomach doesn't

```
 1   feel good; right?

 2       A    That's when we got to my house.

 3       Q    At some point she tells you that?

 4       A    Correct.

 5       Q    And you never take her temperature or call the

 6   doctor or call her mother about her head or her stomach,

 7   right?

 8       A    No.

 9       Q    Now there comes a point when you're indicating

10   that Tiffany complained about her neck, right?

11       A    Correct.

12       Q    So she's indicated to you now that her head has

13   been injured, her neck hurts, and her stomach hurts.  You

14   never called a doctor, right?

15       A    No, I didn't.

16       Q    You never pick up the phone and call her mother

17   at work?

18       A    I couldn't call her mom.  Her mom would have to

19   call me.

20       Q    Okay.  Well we'll talk about that in a minute.

21   But you never called Bradley or anyone about this?

22       A    Bradley wasn't home yet.

23       Q    You never called a doctor about stomach

24   complaints, neck complaints or that her head had somehow

25   been injured?
```

1    A    Bradley wasn't home.  Daweese was at work and she

2  would have to call me because there is an extension that

3  goes to her and I didn't have it.

4    Q    What I'm asking, you didn't go take - make close

5  inspection of her face or stomach, but she had made

6  complaints to you?

7    A    She asked me if she could go lay down and I told

8  her to go lay down.

9    Q    You're telling this jury that you didn't have the

10  phone number for Tiffany's mother at work, right?

11    A    Her number was on the caller ID, but when you

12  call that number, there's a recording.  You have to have a

13  specific extension for Daweese.

14    Q    Well did you ever indicate that you did not have

15  the phone number of Tiffany's mother at work in a sworn

16  statement before?

17    A    I don't remember if I did, but I don't have a

18  direct number for her.

19    Q    If you could just take a look at this and read it

20  to yourself.  Page 17 line 15.

21    A    Okay.

22    Q    In fact you were asked this question on a prior

23  occasion.

24         "Question:  Did you have a phone number of the

25    mother at work?"

```
 1              And you answered:  "No, sir."

 2      A    That's correct.  I don't have a direct number for

 3  her.  The phone number is on the caller ID because she had

 4  called earlier.  But there's no direct number for her that

 5  you could pick up the phone and reach Daweese.  You'd have

 6  to go through – there's a recording that if you have the

 7  extension number or whatever you have to go through that.

 8      Q    On August 11th, 1999, you didn't volunteer that

 9  additional information; did you?

10      A    I don't remember if I told you that.  I don't

11  think so.

12      Q    Now as you indicated a moment ago, you don't

13  remember whether you told me.  You in fact had one prior

14  occasion prior to today actually --

15          Mr. Lewis:  Objection, judge.  Can we approach,

16      please?

17          THE COURT:  Sidebar.

18          (Thereupon, the following sidebar discussion was

19      had:)

20          Mr. Lewis:  He's about to tell this jury that –

21      elicit testimony in front of the grand jury.

22          Mr. Padowitz:  Absolutely not.

23          Mr. Lewis:  He's going to elicit it.

24          Mr. Padowitz:  It was a formal prior hearing.  I

25      never used grand jury once.
```

```
 1            THE COURT:  Do you have sworn statements from
 2      grand jury?
 3            Mr. Padowitz:  Absolutely.
 4            THE COURT:  To impeach?
 5            Mr. Padowitz:  I've never used it and I don't
 6      intend to.  It would be improper on my part.
 7            THE COURT:  Okay.  Move on.
 8            (Thereupon, the sidebar discussion was concluded
 9      and the following proceedings were had:)
10      Q     (By Mr. Padowitz)  Now there had been one prior
11      occasion, on a prior hearing that you actually answered
12      the question that I posed to you concerning facts that
13      happened about the death of Tiffany, right?
14      A     I believe so.
15      Q     Now as you had indicated to the jury you are a
16      trooper, so you've been trained in the art of CPR; right?
17      A     Yes, sir.
18      Q     And you've in fact been trained in the art
19      specifically of pediatric CPR?
20      A     CPR for everyone, correct.
21      Q     And you also have special training as an officer
22      having gone to the police academy in crime scene
23      preservation?
24      A     Correct.
25      Q     Now at some point you testified to the jury that
```

1  when you got home and after all these complaints from

2  Tiffany about her stomach and neck and her head, you even

3  in fact would say that she wasn't vibrant as usual, right?

4      A    She was after I came back down to give her

5  dinner.  I asked her if she was okay, and she said yes.

6      Q    Well at some point that evening you would

7  describe her - that she wasn't vibrant as usual, right?

8      A    I don't remember saying that.

9      Q    Your sworn statement to detectives on page 7.

10 Just read that, middle of the page.

11         Did you have enough time to read that?

12     A    Yes.

13     Q    So I would be correct.  Those would be your

14 words.  She complained about her neck - head, neck and

15 stomach and at some point you would say she wasn't as

16 vibrant as usual, right?

17     A    According to that statement.

18     Q    Well that statement is your words, isn't it?

19     A    According to that statement.

20     Q    You're not saying this statement is incorrect,

21 are you?

22     A    I don't know.  I'm not saying that.  I'm saying

23 that statement says that I said that she wasn't vibrant.

24     Q    At some point you leave your son, an obviously

25 166 pound boy, approximately fourteen inches taller than

1  Tiffany, who weighed 48 pounds and who was a first grader.

2  You leave them downstairs and walk upstairs and go in your

3  room and close the door and go to sleep, right?

4      A    Correct.

5      Q    And as you had testify to the jury before on your

6  direct you knew that your presence around the defendant

7  had a dampening effect on him when he was with other

8  people?

9      A    That's not what I said.

10     Q    You didn't use the words dampening effect?

11     A    That's not what I said.

12     Q    Okay.  Well you go upstairs to go to sleep.  And

13  when you did that, Tiffany - other than her complaints

14  about her stomach and her neck and her head and

15  indications that she wasn't vibrant as usual, she

16  basically though didn't have any injuries that you could

17  observe - any black and blue marks, right?

18     A    None at all.

19     Q    And there was no one else in the house for part

20  of that evening, other than a stop over by a neighbor who

21  used to live across the street.  The three of you were the

22  only people in the house?

23     A    Other than Nicole, correct.

24     Q    And when you went to sleep and took a nap, what

25  were you wearing?

1    A    I was wearing shorts and t-shirt.

2    Q    Now at some point you heard a noise from

3  downstairs, right?

4    A    Correct.

5    Q    And that noise was loud enough, obviously, to go

6  from downstairs to upstairs through your door and enough

7  to wake you up; right?

8    A    Correct.

9    Q    And you knew the noise was not from your son.

10  You knew it was from a girl, right?

11    A    The second time I knew it was from Tiffany

12  because I was standing at the door.

13    Q    You heard one noise and immediately you heard

14  another noise?

15    A    After I woke up and was standing at the door I

16  heard -- that's the sound I heard, like a moaning sound or

17  groaning sound.

18    Q    Okay.  You said a moaning sound like if you're in

19  pain is one way you described it?

20    A    Or having a nightmare.

21    Q    So here was this six year old that you're

22  supervising, right?  That she complained of a stomach

23  problem, neck problem, her head had hit something, she

24  wasn't as vibrant, you hear a sound that could have been

25  like if you're in pain and --

```
 1      A    Or having a nightmare.

 2      Q    Or having a nightmare.  And you don't go

 3  downstairs, right?

 4      A    No.

 5      Q    You yelled down, "who is making that noise,"

 6  right?

 7      A    Yes.

 8      Q    And Lionel Tate told you Tiffany, correct?

 9      A    I believe, yes.

10      Q    And then you yelled down, stop making that noise

11  or I'm going to spank your butt, quote, unquote, right?

12      A    I probably did.

13      Q    And you again said "Tiffany, stop making that

14  noise," and that's when the noise stopped?

15      A    Correct.

16      Q    The noise that you would describe as a kind of

17  like groaning in your sleep, right?

18      A    Correct.

19      Q    And then after you yelled that downstairs, you

20  went back into your room, closed door and went back to

21  sleep; right?

22      A    Correct.

23      Q    At some point you learn later on from your son

24  that he tells you that Tiffany wasn't feeling well and

25  asked him to keep an eye on her; isn't that what your son
```

```
 1    had told you?

 2         A     That was later on.

 3         Q     Right, later on.

 4         A     Like couple days later or something when we found

 5    out he had something to do with it.

 6         Q     Exactly.  That's my question.  My question is at

 7    some point later, not that night.  When you have a

 8    conversation with your son Lionel Tate, he tells you that

 9    Tiffany Eunick had asked your son to keep an eye on her

10    because she wasn't feeling well.  That's what he said to

11    you at some point, right?

12         A     I think he said, Tiffany asked him to watch her

13    while she's slept or something to that effect.

14         Q     Well actually page 33, line 4.  If you could just

15    read that to yourself.

16              In fact the words you used were - page 33, line

17    3.  He said Tiffany went to sleep.  She asked him to keep

18    an eye on her.

19              Right?  That's what you said before?

20         A     I think so.

21         Q     Now it's true, Ms. Tate, that from your doorway,

22    if you take just a few steps, you actually come to the top

23    of the stairs and you can look down without taking one

24    step and see a portion of the downstairs; right?

25         A     Yes.
```

1    Q    You didn't do that, right?

2    A    No.

3    Q    Now you were still dressed in shorts and T-shirt?

4    A    I think that's what I had on.

5    Q    Definitely had clothes on?

6    A    I had clothes on.

7    Q    And you're telling the jury that at some point

8  Lionel Tate bangs on your door and wakes you up and tells

9  you that Tiffany is not breathing, right?

10    A    Yes, sir.

11    Q    Ms. Tate, isn't it true that in fact you heard a

12  noise and that Lionel Tate never banged on your door and

13  that you woke up and went down stairs to find Tiffany

14  laying on the floor?

15    A    That's incorrect.  Lionel banged on the door.

16    Q    In fact when you were on the phone being recorded

17  to 911, don't you tell the operator on 911 that you heard

18  a noise and that you woke up and went out your door and

19  went downstairs to find Tiffany laying on the floor.  You

20  don't mention anything about Lionel Tate on that

21  conversation to the operate on 911, right?

22    A    I don't remember telling the operate that.  I

23  told them that the child wasn't breathing.

24    Q    Before that.  At some point don't you tell the

25  911 operator that you heard a noise and you don't say

```
 1   anything about your son and that you got up and went

 2   downstairs to find Tiffany lying on the floor?

 3       A    You'd have to play the tape.

 4       Q    Well?

 5       A    I don't remember.

 6       Q    You told the jury that you were hysterical?

 7       A    Yes, I was.

 8       Q    Isn't it true that on the 911 tape you're very,

 9   very calm, cool and collected?

10       A    I don't know.  I never listened to the 911 tape.

11       Q    In fact when you got downstairs, Tiffany's body

12   was cold; wasn't it?

13       A    I don't recall that.

14       Q    Page 14 line 11.  Please just read this to

15   yourself.

16            Do you remember giving sworn testimony on line

17       11?

18            "Question:  You checked her pulse?

19            Answer:  I checked her pulse.  I checked to see

20       if her stomach was moving.  Nothing.

21            Question:  Was she cold at the time?

22            Answer:  I think she was cold."

23            Do you remember that testimony?

24       A    Now that you read it.

25       Q    When you got downstairs she was cold because she
```

1    was already dead, wasn't she?

2        A    I don't know that.

3        Q    At no time prior to the time that you went to the

4    sheriff did your son ever tell you that he had anything to

5    do with Tiffany's death, right?

6        A    No.

7        Q    That would be correct, right?

8        A    That's correct.

9        Q    Besides dealing the detective in your statement

10   that Tiffany complained about her stomach and her neck and

11   her head, you also told the officer that at some point

12   that she had choked - Tiffany choked on an oxtail bone,

13   right?

14       A    I don't remember telling them that she choked on

15   an oxtail bone because I was not down there.

16       Q    Is it possible that you told someone that she

17   choked on an oxtail bone?

18       A    On an oxtail bone?  I don't think I could have

19   said that.

20       Q    At some point you tell Daweese Eunick that you

21   made some phone calls and found out that thirty people at

22   the camp - at the church camp had come down with a virus,

23   right?

24       A    I called the lady who took the children to camp

25   to find out if anything was wrong with the other children

1    because children had came back sick.

2        Q    I'm sorry.  I don't think that was clear, my

3    question.  Isn't it true at some point that you told

4    Tiffany's mother Daweese, that you told her that you had

5    in fact done some investigation, made some calls and that

6    there had been thirty people, approximately, that got sick

7    from a virus at the church camp?

8        A    After Tiffany's death, the next morning I talked

9    to Daweese to find out what the lady's - who was the lady

10   who took the children to camp.  She told me who it was and

11   I called the church to speak to the lady.  And I asked her

12   what happened with the children at camp and she told me --

13   what she told me I related to Daweese.

14       Q    And what you related to Daweese Eunick was that

15   thirty people at the church camp came down with a virus?

16       A    Correct.  The children.

17       Q    Now you would agree with me that you are

18   proficient in CPR, correct?

19       A    I've done CPR.  On a dummy they train you on, but

20   I've never actually done CPR on a human being.

21       Q    Right.  I understand that.  Would you agree with

22   me that you are proficient in CPR, that you know what

23   you're doing?

24       A    I believe so.

25       Q    Now at some point after getting beeped and

1  calling people and you're getting more people -- on the

2  day you end up going to the sheriff's department, at some

3  point you go down to B.S.O. Headquarters?

4      A    Correct.

5      Q    And down at headquarters at some point you get to

6  see your son, Lionel Tate; right?

7      A    Yes, sir.

8      Q    And being a trained officer and having gone to a

9  police academy you know what Miranda rights are, right?

10     A    Correct.

11     Q    And actually as a police officer you would know

12 more about Miranda warnings than the average person, other

13 than a lawyer?

14     A    Correct.

15     Q    And when you go into the room and you're with

16 your son, Miranda warnings are read to your son in your

17 presence; right?

18     A    Correct.

19     Q    And in fact they use a form which you know isn't

20 even required, but they use that form that has all the

21 Miranda warnings on it?

22     A    They have a form with Miranda warnings, yes.

23     Q    And you go through the academy, it's not required

24 that a form be used when Miranda warnings are read to a

25 person?

```
 1      A    Correct.

 2      Q    And at that point, at some point Lionel Tate

 3  signs the Miranda rights form and you sign it as a

 4  witness, right?

 5      A    Yes.

 6      Q    And you never objected or said stop or I want to

 7  speak to someone; you never did that, correct?

 8      A    I didn't do that because I didn't know what they

 9  were talking about, what they were going to tell me.  At

10  that point I didn't know what was going on.

11      Q    Right.  That's the purpose of asking questions is

12  to get answers, right?

13      A    Uh-huh.

14      Q    And they never appeared to be intimidating in any

15  manner or raise their voices to your son, correct?

16      A    Not in front of me, no.

17      Q    You consent to allow a statement to be taken from

18  him at that time, right?

19      A    Yes, sir.

20      Q    Now when the defense attorney asked you some

21  questions about your son's prior history, he asked you

22  about stealing and you said nothing significant; right?

23      A    Okay.

24      Q    But isn't it true that in regards to the question

25  about theft, isn't it true that in fact your son had
```

```
 1  burglarized the house next door, had actually gone in,

 2  broken in without consent and stolen an item from their

 3  house?

 4      A    He did not break into the house.  There was a

 5  house that our friends lived in.  Each morning -- the door

 6  is left unlocked.  Each morning he would meet the other

 7  boys down there and they would walk to school.  One of the

 8  boys had taken money from something he was selling or the

 9  school.  When he went in the house, he took the something

10  from the house and give it to some other kid or something

11  to that effect.

12      Q    The police were called?

13      A    Correct.

14      Q    And there was an investigation which, as you know

15  from the police academy, when someone goes into a home and

16  takes something that's not theirs, there is a burglary

17  investigation?

18      A    The police were called because they didn't know

19  who had taken it.

20      Q    You don't consider that significant, right?

21      A    It could be; it could not.

22      Q    Okay.  Now when you came downstairs you found

23  Tiffany's chest lying up with her back to the floor,

24  right?

25      A    Correct.
```

1    Q    Now you told this jury that you were wearing

2  shorts and T-shirt?

3    A    I think that's what I had on.

4    Q    But definitely clothes?

5    A    Yes, sir.

6    Q    Isn't it true that on the 911 tape that you told

7  the operator - actually you didn't tell the operator.  You

8  said, while it was being recorded, to your son, "get me my

9  clothes"?

10   A    I don't think I said that.

11   Q    No?

12   A    I don't think there was any reason for me to say

13  that.  I was already in clothes.

14   Q    That wouldn't be on the 911 tape?

15   A    I don't think so.

16   Q    You don't think so or you're not sure?

17   A    I had clothes on so there was no reason for me to

18  say get me my clothes.

19   Q    But you're not sure?

20   A    I had him get paper towels.

21   Q    But what I'm asking you is, did you say that or

22  you're not sure if you said that?

23   A    I couldn't have said that.  I was already in

24  clothes.

25   Q    You talked about Trooper Slater coming to the

1    house at some point?

2       A    Correct.

3       Q    Isn't it in fact true that Trooper Slater arrived

4    at the house while the paramedics were still there working

5    on Tiffany?

6       A    Trooper Slater met me at the hospital.  That's

7    who picked me up at the hospital.

8       Q    No.  Trooper arrived at the house while

9    paramedics were there?

10      A    I don't think so.  Not that I can remember them

11   being there or seen them.

12      Q    You might not recollect, but it's possible?

13      A    There were two deputies there.

14      Q    Well I'm not talking about deputies.

15      A    But I don't remember any trooper being at my

16   house at that time, no.

17      Q    In fact you told the jury about how hysterical

18   you were, but you made a phone call to a fellow trooper

19   who actually arrived at the house and was present during

20   CPR; isn't that true?

21      A    No.

22      Q    Now in response defense attorney's questions, you

23   indicated that you had seen streaks of blood on the floor

24   that were separate from the vomit on the floor?

25      A    I saw one little streak of blood.

```
 1      Q    And at this point you said you didn't know what

 2  happened to Tiffany, right?

 3      A    I didn't know where it came from.

 4      Q    I mean what you feared, you said, was that the

 5  oxtails had somehow poisoned or done something to Tiffany,

 6  right?

 7      A    I said I thought maybe it's the food that I gave

 8  to her.

 9      Q    Right.

10      A    That probably caused this.  I didn't know what

11  was wrong.  We were -- nobody knew.  We had to wait until

12  autopsy report.

13      Q    And that's my point.  You didn't know exactly

14  what happened, but your fear was --

15      A    The food had something to do with it, plus she

16  came back from camp sick.

17      Q    Right.  This oxtail that Tiffany ate may have

18  been the cause as to why she died, right?

19      A    I don't remember saying the oxtail, just the food

20  that she had - rice and peas and oxtail and probably

21  plantans and whatever vegetable, but just the food.  I

22  didn't say the oxtail.

23      Q    Right.  The oxtail food or peas or beans, the

24  food you feared may have made her sick and in fact killed

25  her?
```

```
1      A      Right.

2      Q      The same food that your son Lionel Tate had?

3      A      Correct.

4      Q      Right?

5             Ms. Tate, I know it's upsetting for you to be

6      here, isn't it?

7      A      Yes, it is.

8      Q      You were supervising a first grader, someone not

9      your child, who complained of having a stomach ache.  You

10     said at a sworn statement after her death, a neck injury,

11     had hurt her head; and mentioned something in your

12     testimony about a pillow that you turned over; about

13     cleaning up with Clorox, blood on the floor; about ice

14     being pressed on her head in Publix or not being pressed;

15     about hearing a scream or cry that could have been someone

16     in pain --

17            Mr. Lewis:  Judge, I'm going to object.  This is

18         not closing argument.  This is not a question, that's

19         for sure.

20            Mr. Padowitz:  Actually it is a question.

21            Mr. Lewis:  It's the most compound question I've

22         ever heard.

23            THE COURT:  Go ahead.

24     Q      (By Mr. Padowitz)  That you heard a cry that

25     could have been someone in pain and you didn't go down
```

```
 1    stairs.

 2            Isn't it true that you love your son and that

 3    you'll say anything that you have to and testify any way

 4    that you have to, to protect Lionel Tate?

 5       A    I never said that I turned the pillow over.  I

 6    said I picked up the pillow, and the person that was there

 7    said put that down and I put the pillow back.

 8            Tiffany said that she was okay when I came down

 9    to get them something to eat.  She was eating.

10            I could not protect my son.  I love my son, but

11    I cannot protect my son and I would never try to

12    jeopardize my career or anyone else to protect my son.  If

13    my son is wrong for anything, he is wrong.  But I'm not

14    going to come up here or go anywhere and just make up

15    stories to protect my son or anyone else.

16       Q    You indicated that you've testified perhaps as

17    many as a hundred times before, right?

18       A    I never said a hundred times.

19       Q    Well at one point --

20       A    I said maybe less.

21       Q    Actually you said, I think almost a hundred

22    times.  I am in the ballpark, right?

23       A    What does it say in there?

24       Q    I'll find it if you want to know what the exact

25    words were?
```

```
 1      A     Less than a hundred.

 2      Q     Little less than a hundred?

 3            THE COURT:  Ask your next question.

 4            Mr. Padowitz:  Okay.

 5      Q     (By Mr. Padowitz)  The prior hearing when you had

 6   gone through all testimony about what happened to Tiffany,

 7   that was August 11th, a few days after Tiffany had died,

 8   right, basically?

 9      A     Okay.

10      Q     Isn't it true that in that testimony that you did

11   not shed one tear during the entire hour and a half?

12            THE COURT:  Sustained.

13            Mr. Padowitz:  Judge, may I have a sidebar?

14            THE COURT:  Anything further?

15            Mr. Padowitz:  May I have a sidebar?

16            THE COURT:  For that question, no.

17      Q     (By Mr. Padowitz)  When the troopers came by at

18   3:00, they knocked on the door; correct?

19      A     Correct.

20      Q     And you peered out from the window above and you

21   were on the phone, and you went like that to tell them

22   you'll be there in a minute, right?

23      A     I don't remember if I was on the phone.  But most

24   of the time when someone knocks on my door if I'm upstairs

25   I always look out the window or look out the blinds.
```

```
 1      Q    Ms. Grossett-Tate, isn't it true that three

 2  troopers waited outside your door for approximately five

 3  minutes after you appeared in the window until you came

 4  downstairs and unlocked that door?

 5      A    They had to wait for me to come downstairs, but

 6  there was only two people there.

 7      Q    Didn't they wait approximately five minutes

 8  before you came downstairs and unlocked the door?

 9      A    It doesn't take five minutes to walk downstairs.

10      Q    When they finally had an opportunity to walk into

11  your house, wasn't the washing machine going at 3:00 in

12  the morning and there was a strong smell of Clorox which

13  you've indicated that you used?

14      A    There may have been a strong smell of Clorox but

15  my washing machine was not going.  You cannot wash paper

16  towels in the washing machine, and that's what was used to

17  clean up the vomit.

18           Mr. Padowitz:  Judge, if I can have just one

19      moment?

20      Q    (By Mr. Padowitz)   Isn't it true, Ms. Tate, that

21  the reason that you told the detectives in a sworn

22  statement that Tiffany's stomach hurt and neck hurt and

23  that she had been hit with something was in an attempt to

24  protect your son because you knew that in fact based on

25  what his prior history was he had beaten Tiffany to death?
```

```
 1        A    Why would I tell them that when I thought Tiffany

 2   had -- it had something to do with food or from her coming

 3   back from camp.

 4        Q    Oh?

 5             Mr. Padowitz:  No further questions.

 6             Mr. Lewis:  May we approach, please?

 7             (Thereupon, the following sidebar discussion was

 8        had:)

 9             Mr. Lewis:  I never got the 911 tape.  I need to

10        listen to see if I'm going to play it in redirect.

11             Mr. Padowitz:  It's incorrect.  I provided the

12        911 tape in discovery one year ago, and counsel had

13        all tapes.  And in fact I had discussions ten months

14        ago --

15             THE COURT:  Well?

16             Mr. Lewis:  I just have to listen to it.  I may

17        or may not play it.

18             THE COURT:  Okay.  Are you going to be long on

19        redirect?

20             Mr. Lewis:  Not long.

21             THE COURT:  Take the jury out for a minute.

22             (Thereupon, the jury left the courtroom at

23        6:00 p.m.)

24             Mr. Lewis:  I'm going to have Ms. Grossett-Tate

25        listen to it as well.
```

```
 1        Mr. Padowitz:  Judge, can we have the witness

 2   excluded?

 3        THE COURT:  He wants to have her listen to it the

 4   911 tape.

 5        (Thereupon, a recess was taken; afterwhich the

 6   following proceedings were had outside the presence of

 7   the jury.)

 8        THE COURT:  Let the record reflect the defendant

 9   is present with counsel outside the presence of the

10   jury

11        THE COURT:   Ma'am, you're in the middle of

12   testimony.

13        Mr. Lewis:   Judge, I'm not going to have any

14   more questions.

15        THE COURT:   Okay.  You're still in the middle of

16   testimony.  But on this next --

17        Mr. Lewis:  Can she go had ahead on --

18        THE COURT:   Excuse me one second.  You're done

19   with direct?

20        Mr. Lewis:  Yes.  No questions

21        THE COURT:   That's fine because I'm going to go

22   to other things we discussed.  And now that she's

23   going to be off the witness stand on this particular

24   matter, I will allow it.

25        Mr. Lewis:  I would like her advice.
```

```
 1        THE COURT:  I said I will allow it.

 2        Okay, Lionel, I'm sure that your attorney told

 3   you, you have the absolutely right to testify if you

 4   take the witness stand, if you want to; do you

 5   understand that?

 6        The Defendant:  Yes, sir.

 7        THE COURT:  You also have a right not to take the

 8   witness stand if you don't want to; do you understand

 9   that?

10        The Defendant:  Yes, sir

11        THE COURT:  Okay.  If you do take the witness

12   stand, not only would your attorney have the right to

13   question you but so would Mr. Padowitz.  Do you

14   understand that?

15        The Defendant:  Yes, sir.

16        THE COURT:  If you don't take the witness stand

17   I'll be telling the jury that they can't hold that

18   against you in any way; do you understand that?

19        The Defendant:  Yes, sir.

20        THE COURT:  Do you need any more time to talk to

21   your attorney, your mother or anybody else whether you

22   want to testify or you don't want to testify?

23        The Defendant:  I don't.  No, sir.

24        THE COURT:  Have you made a decision?

25        The Defendant:  Yes, sir.
```

```
 1        THE COURT:  And what is that decision?

 2        The Defendant:  I don't want to testify.

 3        THE COURT:   Mr. Lewis, can you assure the court

 4   that you've talked thoroughly, completely with your

 5   client as far as the advise that he gets to take the

 6   stand or not?

 7        Mr. Lewis:  I've spoken to him on the subject and

 8   also his mother who assisted in making these

 9   decisions.  And it is my advise to the child as well

10   as his desire and I believe his mother's desire, that

11   he not take the witness stand.

12        THE COURT:   Well the bottom line though, it's

13   your decision.  Do you understand that you can say to

14   Mr. Lewis, I don't care what advise you give me.  I

15   want to take the witness stand.

16        And you can tell your mom:  I don't care what you

17   say, I want to take the witness stand.

18        You can turn to Dr. Butts and say:  I don't care

19   what you have to say.  I want to take the witness

20   stand.  Do you understand that?

21        The Defendant:  Yes, sir

22        THE COURT:   Is there anymore need to talk with

23   Jim, Dr. Butts or your mother or anybody else?

24        The Defendant:  No, sir.

25        THE COURT:  You're set in your decision?
```

```
 1        The Defendant:  Yes, sir.

 2        THE COURT:  Okay.  All right.

 3        Defense rests?

 4        Mr. Lewis:  Yes, sir.  I'll do it in front of the

 5   jury.

 6        THE COURT:  Yes, you will, but what I want to do

 7   is have you rest.  Then I'm going to send them home

 8   and bring rebuttal witness first thing tomorrow

 9   morning.

10        But we'll have our meeting afterwards, so if you

11   would, Ms. Tate, if you just take the witness stand

12   just for formality of having no further questions and

13   I'll ask to you step down.

14        You can stay seated.

15        THE COURT:  Bring in the jury 9:00 tomorrow,

16   guys.

17        The Bailiff:   Jury entering the courtroom.

18   (Thereupon, the jury reentered the courtroom at

19        6:13 p.m.)

20        THE COURT:   Let the record reflect the jury are

21   present.  The defendant is present with counsel.

22   State is present.

23        Any redirect examination of your witness?

24        Mr. Lewis:  No, judge.  No further questions.

25        THE COURT:  All right.
```

APR AS LOW AS
2.99% Intro or   9.99% Ongoing   nextcard.com   Apply Now!

Click Here

# CNN.com. transcripts

Editions | myCNN | Video | Audio | Headline News Brief | Free E-mail | Feedback

MAINPAGE
WORLD
U.S.
WEATHER
BUSINESS
SPORTS
TECHNOLOGY
SPACE
HEALTH
ENTERTAINMENT
POLITICS
LAW
CAREER
TRAVEL
FOOD
ARTS & STYLE
BOOKS
NATURE
IN-DEPTH
ANALYSIS
LOCAL

EDITIONS:
CNN.com Europe

change default edition

MULTIMEDIA:
video
video archive
audio
multimedia showcase
more services

E-MAIL:
Subscribe to one of our
news e-mail lists.
Enter your address:
[        ] go

DISCUSSION:
message boards
chat
feedback

## Larry King Live

### Should the People Who Raised Matthew Propp Go to Jail for Kidnapping Him?

Aired March 12, 2001 - 9:00 p.m. ET

THIS IS A RUSH TRANSCRIPT. THIS COPY MAY NOT BE IN ITS FINAL FORM AND MAY BE UPDATED.

(BEGIN VIDEO CLIP)

MATTHEW PROPP: My parents are the people I have known for 22 years, people who have loved me, cared about me, have always taken care of me, have always made sure I had everything I wanted and needed.

(END VIDEO CLIP)

LARRY KING, HOST: Tonight, Matthew Propp calls a New Mexico couple mom and dad. His biological parents call them kidnappers. We'll get opposing legal views from attorney Raymond Colon. He represents Barry Smiley, the man accused of abducting Matt two decades ago. And also in New York, attorney Fred Magovern. He's representing Matt's biological parents in their long effort to recover a son.

And then, this Florida 14-year-old has been sentenced to life behind bars for beating a 6-year-old girl to death. We'll hear from the boy's mother -- mother rather, Kathleen Grossett-Tate. From New York, the victim's mother, Deweese Eunick. She's trying to forgive her daughter's killer. From Florida, young Tiffany's father, Mark James. He thinks Lionel Tate is getting the punishment he deserves.

Plus Navy Commander Scott Waddle could face court-martial for the fatal collision of his sub with a Japanese ship. His wife, Jill, will talk about the ordeal. She'll come to us from Pearl Harbor, Hawaii.

All next on LARRY KING LIVE.

Let me begin by saying that Matthew Propp, the young man involved in all of this, was due to be on this show but canceled late this afternoon. We welcome to our program, both in New York, Raymond Colon, the attorney

What are
Business
Travel Nea
Home & Ga
Electronic
Sporting G
Toys & Gai
Flowers
Jewelry
Camera

CNN Site

Search
CNN.com
[        ]
Find

CNN.com
TOP STORI

Bush signs
'faith-based'
business

Rescues co
devastating

DaimlerChry
join rapidly s
laid-off U.S.

Disney's GC
(MORE)

CNNfn
Wall St. mixe

U.S. retail sa

Motorola cut
(MORE)

MARKETS
DJIA    + 4
NAS     + 1
S&P     + 5

SI's Grant W
bracket brea

Blues clue?
physical in S

Report: Mich
Ellerbe, purs
(MORE)

**EXHIBIT**  03/13/2001

Case 0:01-cv-07913-DTKH   Document 46   Entered on FLSD Docket 03/26/2002   Page 397 of 677

...: Should the People Who Rais.   Matthew Propp Go to Jail for Kidnapp.  Him? - March Page 2 of 19

CNN WEB SITES:

myCNN.com CNNSI

allpolitics CNNfn.

CNNfyi.com

CNN.com Europe

AsiaNow

Spanish

Portuguese

German

Italian

Swedish

Norwegian

Danish

Japanese

Chinese Headlines

Korean Headlines

TIME INC. SITES:

Go To ...

CNN NETWORKS:

CNN

CNN INTERNATIONAL

CNN Headline NEWS

CNN RADIO

CNN AIRPORT NETWORK

CNN anchors

transcripts

Turner distribution

SITE INFO:

help

contents

search

ad info

jobs

WEB SERVICES:

for Barry Smiley, and Fred Magovern, the attorney for Matthew's biological parents.

What, Raymond, has your client been charged with?

RAYMOND COLON, ATTORNEY FOR BARRY SMILEY: He's been charged with kidnapping in the second degree, which is a class b felony in the state of New York.

KING: And where does he -- is he on bail now today to get bail?

COLON: Yes, he was released this -- late this morning, early this afternoon, and he is out on a $25,000 secured bond.

KING: And any trial date set?

COLON: The next court date will be April 25th. That's not for trial. That's a control date of sorts.

KING: Fred, are your clients, the biological parents, involved in this in any way, in the criminal action?

FRED MAGOVERN, ATTORNEY FOR BIOLOGICAL PARENTS: Well, good evening, Larry, and thank you very much for having us.

KING: Thank you.

MAGOVERN: Appreciate the opportunity to speak to you about this case. It's a very important case, it's a very distressing case for my clients.

By way of background, Larry, I've been in the field of adoption law for 30 years. In answer to your question, yes, my clients are very much involved in the case. They're the victims of -- in the case, as is Matthew, the young man who was taken from them 22 years ago.

KING: What would a -- can you quickly tell us the circumstances under which he was taken?

MAGOVERN: Well, I'll do my best. I don't know if time actually will permit a full relation of it.

But essentially, Matthew was conceived out of wedlock. My client Anthony as well as my client Debbie Russini subsequently married. But during the pregnancy, they met with -- the Russini family met with the -- Deborah's family. Deborah's family refused to allow Anthony to assert his claim and wish to raise the child. They deferred and told him, we'll get back to you.

And what happened from that point on is a terrible tale of a young woman who was used and who was led to place her child -- actually, she never placed her child. It was her father who placed her child, turned the child over to an attorney who was representing the Smileys at the time...

→ All Scoret

WEATHER

US Zip

WORLD

Quake help
says Indian

U.S.

Bush: No he
Washington
power crunc

POLITICS

Bush signs c
based' chari
business

LAW

Prosecutor s
rap star shoc

TECHNOLO

Napster to la
service

ENTERTAIN

Can the sec
up to the firs

HEALTH

Heart doctor
testing super

TRAVEL

Nurses to ai
passengers

FOOD

Texas cattle
violation of n

ARTS & ST

Ceramist Ad
his creations

KING: Now, the Smileys did get the baby, right?

🔊 (MORE H

MAGOVERN: The Smileys got the baby, correct. but when they took -- when they got the baby, they had no legal right to have the baby. Deborah, when she signed a document in the hospital, actually signed for her own circumcision. She didn't exactly know what she was -- what was being put before her. She had no access to counsel.

(CROSSTALK)

KING: And were the Smileys -- the Smileys ordered to return the child by a court when eventually she got together with her husband, with her then now soon-to-be husband? MAGOVERN: Well, no. They were subsequently married, Larry. But yes...

KING: That's what I meant, but then.

MAGOVERN: We went to court -- I'm sorry. We went to court in July of 1979, and we had a trial. We had an eight-day trial in family court before Judge Kevin Fogerty (ph). He unanimously -- he ruled in our favor that the consent, the documents that Debbie signed were fraudulent, a product of coercion. He ruled further that Anthony was precluded from being involved, and it was a (UNINTELLIGIBLE) fraud.

KING: And what the couple then did was run away with the child rather than give him back?

MAGOVERN: Well, they -- first, they exhausted all their legal remedies, which resulted in an additional delay. My client got two visits before the -- they were able to have that prevented during their appellate efforts, all of which were rebuked unanimously. Five judges who looked at this case...

KING: All right. I want -- I don't mean to -- but they took the baby away?

MAGOVERN: They did, they fled, Larry.

KING: OK. And that -- and been missing, nothing heard from for all these years.

MAGOVERN: That's correct. There were various rumors. My clients went around looking, but without success.

KING: Raymond, what is your defense?

COLON: Well, at this point, this is obviously a case which has a lot of historical background to it. And Fred is obviously going to be more insightful in terms of the history of this case.

It's very difficult except I would say at this point that our clients have, my client, Mr. Smiley, has pled not guilty. And I will have to defer right now to what our defenses would be in the courtroom.

KING: But there will be a vigorous defense, you're saying, right? It's not...

COLON: Well, absolutely, I mean certainly. This is a -- this is a couple that loves this child very, very much. This is an individual -- I'm speaking on behalf of my client, obviously -- who has such a significant strong relationship with this young man, who is a very thoughtful and insightful young man. And it's a tragic situation, because obviously the biological parents have been made to suffer as a result of what occurred. But thankfully, Matthew was raised in a proper manner, and he's a -- he's a very intelligent young man who loves his father, who loves Mr. Smiley, and Mr. Smiley loves him, obviously. KING: And he also today, as I understand it, in court hugged his biological parents. Is that correct? Biological father.

COLON: That -- that might be the case. And I think what I can say with a tremendous amount of self-assurance is that this young man has a tremendous amount of love in his heart for both Mr. Smiley, Mrs. Smiley, and the Russinis. I mean, that's something that's a fact that's not going to go away.

He has so much love to give to these individuals that have cared for him and who do in fact care for him today.

KING: Fred, since he is over the age now of being a child, can we just call it a wash? Can the state take a plea of a lesser charge and say turn it over to time served? You know, I mean, why can't we just end this in a Solomon-like manner?

MAGOVERN: Well, Larry, I suppose the state could. But if the state did, it would be an utter outrage -- an utter outrage. My clients have been victimized for 22 years by the Smileys. What they did was wrong.

And make no mistake about it: They knew what they were doing. It was calculated. They fled. And the fact that this young man has grown to maturity and appears to be by all accounts very, very happy and contented, misses the point.

They stole someone else's child. They've already been found contemptuous of the judge's order. So, you know, I don't really think there's much to discuss as to whether or not they took -- took...

KING: So you're saying they deserve punishment of some kind?

MAGOVERN: Larry, there has to be accountability for their actions. You cannot take somebody else's child, do a good job raising them, and then say, "reward me for the good job we've done raising him." It's an outrage.

KING: Could it -- could it be settled civilly, financially?

MAGOVERN: I, you know -- that's -- money -- monetary concerns have not motivated my client, although they've expended over $100,000 in the quest to find this young man,

This isn't the first adoption or situation, because it wasn't an adoption. We had one not too long ago, and it was the Steinberg case that turned out far differently, where someone else lied to birth parents and took their child, and that had a very, very different ending.

We're grateful that Matthew's alive and appears to be well, but the manner in which he's come to that point is just a terrible injustice to my client.

KING: All right. Let me get a break and come back with more of Raymond Colon and Fred Magovern on this edition of LARRY KING LIVE. Lots of subjects to cover tonight. Don't go away.

(BEGIN VIDEO CLIP)

PROPP: But what I want to clarify is the fact that the man I know as my father is in a New York state prison right now, actually in a county jail, you know, for something that legally may have put him there but morally I don't think he should be there for. And in the end, I hope, you know, all this can be resolved in a peaceful manner, something that can give both families a little bit of closure and maybe put it behind us at that time, maybe start new.

(END VIDEO CLIP)

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

ANTHONY RUSSINI, BIOLOGICAL FATHER: I thought about him every day. Every day. There's not a day that goes by that I didn't think about him. I would see somebody, look at my younger son, and see a young man, you know, blonde hair, blue eyes, and that's what I would look for. If I saw somebody walking down the street, with blonde hair and blue eyes that was maybe a little bigger, I would look.

(END VIDEO CLIP)

KING: That's the biological father. Now, Raymond, you have to admit that if there -- if what your client did was take this baby away, and even though they raised him very well, it would set a bad example if he got -- if nothing happened to him, then a lot of people in similar cases with adoptions that are questionable, would run off with the children, saying I'll cite this case as example, nothing should happen to me.

COLON: Well, Larry, of course, there are a lot of public policy implications here. But quite frankly, let me just say one thing and get this on the table: my client, Mr. Smiley, is very remorseful in terms of what the pain and the suffering that the Russinis have gone through.

But yes, there has to be a balance here of sorts, between meeting our justice for something of this nature, crime of this nature, which is serious crime -- the kidnapping, that is the allegation or in the indictment -- but you have to

weigh that against what has happened, what transpired over 20 years, the upbringing that this child had, the fact that he is a good solid citizen, the fact that society has to ask, and the people of state of New York have to ask themselves, what would be gained by prosecuting the Smileys after such an extensive period of time, when no harm came to this child.

I'm not saying that if you stay away from justice long enough that you should be rewarded, but certainly society has to balance -- in terms of justice, equity, and retribution, or deterrence -- what are factors here. I don't think society would gain anything by putting Mr. Smiley in jail. I don't think that is the way go in this case. KING: Do you think there is a civil ending? I mean, certainly the biological parents, you would think, deserve the money back they have spent trying to find their son.

COLON: Well, I'm not representing the Smileys in any civil matter, I just want to put that out, make that clear to you. I'm representing him in the criminal matter, that is my foremost concern at this point.

And I would say that if there is a possibility of remedying this in a civil arena, then that's to be for civil attorneys, but my client does face a significant amount of exposure. He could get up to 8 1/3 to 25 years in prison as a result of this charge, were he to be convicted. I do think that there are some problems substantively and procedurally with the case, however, it is our intention to try to reach an amicable disposition, if that is possible.

KING: Now, Fred, do you want that, or do you want -- for want of better term -- a pound of flesh here?

MAGOVERN: We don't want a pound of flesh, Larry. We wanted -- my client wanted an infant. My client has been deprived of sharing the childhood and giving guidance to his son for 22 years. We're not looking for a pound of flesh.

But there has to be accountability. This is not -- there are always instances of women who have walked onto nurseries and stolen babies out of hospitals, this isn't that much different. This was a legal theft that they carried out. There must be accountability. They can't just be swept away. The ends don't justify the means.

KING: All right, do you have a solution? I mean, do you say to yourself, this would be fair?

MAGOVERN: At this point in time, I don't have a solution, perhaps we need the wisdom of Solomon. I can only tell you that the things that we are hearing -- my clients are hearing -- the Smileys have yet to take accountability and take responsibility for what they have done.

We heard tonight that there is apology. I don't think that is what has really been extended, they're simply putting a spin on this to -- and they are using their -- my client's son to engineer a better position for their criminal charges. They have kidnapped a child! He is now an adult. It is a kidnapping, plain and simple. If it was my child who was kidnapped, I can tell you that I wouldn't be willing to shake hands and say, have a good day.

KING: All right, gentlemen, we will be doing lots more on this, and I appreciate your coming over, and we expect to call on you again. Raymond Colon and Fred Magovern, Colon the attorney for the Smiley family, Magovern the attorney for Matthew's biological parents.

When we come back, another intriguing story out of Florida: 14- year-old says he was aping wrestling matches and kills a 6-year-old. He did it when he was 12, when he is 14, he gets scheduled -- he gets sentenced to life in prison as an adult. We'll have lots of principals involved in that, don't go away.

(COMMERCIAL BREAK)

KING: All right, last week a Florida judge sentenced 14-year-old Lionel Tate to life in prison without the possibility of parole for the first-degree murder of 6-year-old Tiffany Eunick.

Joining us in New York is Deweese Eunick, the mother of the victim; and in Fort Lauderdale, Florida, Ken Padowitz, the assistant state attorney and the prosecutor in the Lionel Tate murder case. Also in Fort Lauderdale is Mark James, the father of the victim, Tiffany Eunick. And as well, Glenn Roderman, sitting right there with Mark. Glenn is the attorney for Mark James.

Also in Fort Lauderdale is Jim Lewis. He is the defense attorney for Lionel Tate. And in New York is William Schulz, executive director of Amnesty International, USA. We also expect to be joined shortly by Kathleen Grossett-Tate, the mother of Lionel Tate.

Deweese, no one could bring your daughter back, and there's nothing worse than losing a child.

DEWEESE EUNICK, MOTHER OF TIFFANY EUNICK: Right.

KING: What do you think should happen to Lionel?

EUNICK: OK, Larry, what we -- what I actually wanted to happen to Lionel, his mom and Jim Lewis obviously did not want the same thing. So, right now, I haven't given it any thought. We knew exactly where we were heading, and that we were heading for first- degree murder. They knew I knew, so it comes as no surprise to any of us.

KING: All right, do you want him to serve life in prison?

EUNICK: That would not be my ultimate goal. I would have preferred to see him rehabilitated. At least, they would try to get -- let him spend some time in a juvenile system where he -- they could try to rehabilitate him. That would be my wish.

KING: And Mark James, you are the father of this boy. Are you and Deweese divorced?

MARK JAMES, TIFFANY EUNICK'S FATHER: Well, we were never married to begin with, you know.

KING: I see, so -- but you're the father of the boy -- father of the girl that was killed?

JAMES: Right. Yes, I was, Larry.

KING: How do you feel about the sentence?

JAMES: Well, I'm really happy with the sentence, you know. I mean, nothing can really bring back my daughter. But at least I know that the system works and there's some justice after all, because my daughter suffered, you know, more than 30-plus injuries, and the people need to know that this was not just an accident, as was claimed before.

This was a vicious murder. This was a slaughter of my daughter, who suffered more than 30-plus injuries. She had her skull fractured, her liver lacerated. She could have died from any of those complications, and to think that she must have suffered majority of those blows while she was unconscious on the floor, that even pains me more. So I think that justice has served.

KING: Ken Padowitz, as the assistant state attorney and the prosecutor in this case, was this a difficult prosecution, to prosecute a 14-year-old boy in an adult setting?

KEN PADOWITZ, TATE CASE PROSECUTOR: Yes, it was very, very difficult. This was a vicious and brutal murder, Larry, and there is no other way to describe it. He beat this little girl. She was 48 pounds, 6 years old and a first-grader. He was 170 pounds, and five grade levels ahead of her, 14 inches taller than her. And he beat her with his hands and fists and kicked her over the course of five minutes with such forces that experts testify were equal to falling out of a second- or third-story building.

This was a brutal murder, and it was a first-degree murder. There is no question about it. Prosecuting Lionel Tate in the juvenile court system here in Florida, he was looking at six to nine months in juvenile detention. That was not justice.

I decided to present this case through a Broward County grand jury and they indicted him for first-degree murder as an adult.

KING: And I know you agreed with -- naturally, you fought for the decision and you got it. But we have heard that you do not agree with a life sentence.

PADOWITZ: I think that I offered a very fair plea offer: three years in a juvenile facility and 10 years of probation with psychological counseling. They turned that down repeatedly. We went to trial. He's been convicted. The law says life in prison.

The judge followed the law, but I think that there is a more appropriate
sentence for this horrible murder, yet taking into consider Lionel Tate's age at
the time he committed it. So...

KING: The judge had no discretion at all, Ken?

PADOWITZ: No, he had absolutely no discretion. He was a very fair judge,
and just followed the law when it came to sentencing. That's the only thing he
could do. He followed his oath, as I did following my oath in prosecuting
Lionel Tate.

KING: All right, we'll take a break. When we come back, we'll get Jim Lewis'
thoughts as to why he didn't take that. We'll check with William Schulz of
Amnesty International where they deal with how these kinds of things are
handled not only in the United States, but in other countries. This is LARRY
KING LIVE. Don't go away.

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE: Therefore, the sentence of this court in accordance
with the laws of state of Florida that you, Lionel Tate, having been found
guilty of murder in the first degree in the death of Tiffany Eunick, be
sentenced to incarceration for your natural life ordered this 9th day of March,
2001. You have 30 days in which to appeal. If you cannot afford an attorney,
one will be appointed for you. This court will stand in recess.

(END VIDEO CLIP)

(COMMERCIAL BREAK)

(BEGIN VIDEO CLIP)

GOV. JEB BUSH (R), FLORIDA: I am troubled by this. I mean, it's hard to
say a 14-year-old child, then 13, that committed a crime, this is an easy thing.
That is a tragic case. A young girl lost her life. This child's life has been
altered forever. So we will accept the clemency request should it come up.

(END VIDEO CLIP)

KING: Jim Lewis, that's encouraging for your client. The question,
obviously, is why didn't you take the plea bargain?

JIM LEWIS, LIONEL TATE'S DEFENSE ATTORNEY: Well. Larry, this
little boy was 12 years old at the time of this crime, and all of us in the
defense did not believe that he intentionally meant to hurt or to kill this little
girl. I think even the jurors have said that, that they didn't think that he
intended to kill her.

This little boy was playing. He was wrestling with this little girl. We tried to
show that to the court. But the judge in this case prevented us from showing
much of our evidence and some of the psychological data and studies that

show children often mimic what they see in terms of media violence.

KING: So, you thought you could win it, and so you turned down the plea because you thought the judge would rule in your favor and that you could convince a jury?

LEWIS: That's right. You know, it's very hard to tell a 3-year- old little boy that you're going to have go to juvenile prison for three years when everything he tells you and everything that you believe is that he did not intentionally mean to hurt this little girl.

KING: Are you encouraged by the statements of Governor Jeb Bush?

LEWIS: We're encouraged by those statements, and we're encouraged by the statements of Mr. Padowitz that he, too, will be seeking a clemency in this matter. But were going to appeal this because we believe, in fact, that Lionel should get another trial, a fair trial this time.

KING: Glenn Roderman, as the attorney for Mark James, why does Mark James need a lawyer in all of this? Tragically, his daughter is gone.

(CROSSTALK)

GLENN RODERMAN, MARK JAMES' ATTORNEY: Right, well, Mark originally wanted to make sure that justice did prevail in this case. I have been involved in the criminal justice system for 30 years here in Fort Lauderdale, and he came to me and asked me to make sure that all the evidence was presented, and, of course, the public was aware of what happened. We were able to do that.

The case was prosecuted perfectly. Mr. Padowitz is an excellent prosecutor, presented evidence as he knew it and saw it and there was a conviction. Just about predictable.

KING: Do you also agree with the idea of some sort of clemency here?

RODERMAN: Well, Larry, I think what's got to be done, we've got to alter system of justice as it relates to juveniles here in Florida and maybe in other states as well. I mean, Ken had no alternative but to present this case as he saw it. It was brutal murder, and there's just no other way to pursue it.

KING: We'll take a break, and when we come back, we'll get William Schulz of Amnesty International's thoughts on this and then more from Deweese and our panel, like to include some of your phone calls as well. This is LARRY KING LIVE. Stay there.

(BEGIN VIDEO CLIP)

UNIDENTIFIED MALE: The defense states that the accident was simply Lionel Tate replicating what he saw being done by Sting, Hulk Hogan, the Rock, the professional wrestling aficionados, but this court is unaware of any wrestling plummeting an adversary that's half the size and one-third the

weight, let alone half the age.

The argument is rejected that the 30-plus injuries discussed herein could have been inflicted by any, quote "means with usual, ordinary caution."

(END VIDEO CLIP)

(COMMERCIAL BREAK)

KING: Before we check in with William Schulz of Amnesty, we have with us on the phone Kathleen Grossett-Tate, the mother of Lionel Tate, who has been sentenced to life in prison.

Kathleen, have you been encouraged by the statements of Governor Bush about clemency?

KATHLEEN GROSSETT-TATE, MOTHER OF LIONEL TATE: Hello?
KING: Yes, are you encouraged by the statements by Governor Bush about clemency?

GROSSETT-TATE: Yes, Mr. King. Any help is acceptable at this time.

(CROSSTALK)

GROSSETT-TATE: ... the governor to say that he will consider the offer. Then, yes. It is something consider.

KING: Were you were shocked at the verdict?

GROSSETT-TATE: Not at all.

KING: You expected your son to be found guilty and to go to prison -- be sentenced to prison for life?

GROSSETT-TATE: No, I did not. I expected the verdict that -- of not guilty, but the sentencing, I expected that from the judge, because of the action, because of everything that went on during the trial, because of everything that went on during the hearing.

KING: Have you been able to see your boy since the trial?

GROSSETT-TATE: I saw him at the sentencing.

KING: But you haven't seen him since?

GROSSETT-TATE: No, sir.

KING: All right, Kathleen, I thank you. You hold right there. Let's go to New York. William Schulz, executive director of Amnesty International, what's the viewpoint of your organization on all of this?

WILLIAM SCHULZ, DIRECTOR, AMNESTY INTERNATIONAL: Well,

Larry, Amnesty International has immense sympathy for Tiffany and her
family. We take no position on the guilt or innocence here. Our concern is
simply not to multiply the tragedy.

The fact is that the Florida statutes are a violation of international law, they're
a violation of biological law, and they're a violation of common sense.
International law requires that the aim of incarceration, especially for
children, is rehabilitation. And in fact, it outlaws life imprisonment without
parole for those who commit crimes under the age of 12. This ruins the
United States' reputation in the eyes if the international community, similarly
to the fact that we are one of only six countries in the world that execute
those who commit crimes under the age of 18, and those include such human-
rights-despising countries as Iran, and Pakistan, Yemen. So, that's the first
problem.

The second problem is that the statutes violate biological law. As a clinician
wrote in "The New York Times" this Saturday in an op- ed, the fact is that
the prefrontal cortex of the brain, which is the part of the brain that controls
inhibition of action, is simply not fully developed in a 12-year-old, in a child.

And that's why -- that's why my last point is that it violates common sense.
There are reasons why we have movie ratings of PG-13, there are reasons
why 12-year-olds cannot be employed by McDonald's. And those are that
they are not fully-developed persons, so this simply multiplies the tragedy.

KING: Mark James, can you understand that?

JAMES: No, I think what he says there is totally irrelevant at this point. I
don't know where he come off on that tangent. I don't know where he came
from. If he is seeking popularity, or to boost his career or what, but the
frontal lobe of a child that age is certainly developed, of course, because I'm a
nurse, and I can tell you that.

Secondly is that I have lost my daughter, and I have felt it -- I felt it firsthand,
and he is telling me, here what I'm listening, if I -- if I am not hearing
correctly -- is that a child under 18, it's OK for them to kill and not be
punished, you know, as an adult, for a savage murder. You know, something
is wrong in the system then, if he does not see that. They should be punished.
You know, severely punished.

KING: Well, he's not saying he shouldn't be punished. He's saying they
shouldn't go to life in prison or be executed, and other countries don't do that
to people under 18.

JAMES: Right. But -- but you have to be careful at the message that we are
sending, because remember that there are other kids that are listening here,
and if they want to kill someone, and if we tell them that it is going to be OK
because they won't be sent to prison for the rest of their life, there will be
some leniency there, then they might consider killing. But when they see that
someone at 12 years old can be sent to prison for life, then they will think
twice.

KING: Yeah. All right.

Ken, how should the law be? How would you write this law?

PADOWITZ: Well, Larry, I think that I was in an untenable position when I looked at a juvenile system in Florida and all you would do is 6 to 9 months in a juvenile detention facility. I was in a position to seek justice for Tiffany. I had to present the case to a grand jury and have them decide whether to indict, or not to indict.

So, I would, as a citizen of Florida, not as a state attorney -- but as citizen, I think that the law should be changed to give more discretion to judges when kids are prosecuted as adults. There should definitely be discretion at sentencing, and I think that the juvenile justice system needs to be beefed-up. It was designed for petty theft cases, and it should be designed, now, to handle defendants who commit horrible murder.

And that is what Lionel Tate did here. This was not child's play. This was not an accident. KING: We'll get some thoughts from each of the members of our panel and then we'll hear from our friends in Pearl Harbor about what's going on there with that submarine investigation.

This is LARRY KING LIVE. We'll be right back with our group right after this.

(COMMERCIAL BREAK)

KING: Welcome back. We've just learned that the Naval court of inquiry, looking into the accident involving the nuclear submarine USS Greeneville, is still in session at this time, so we may not be able to have Jill Waddle or her attorney with us. If that occurs, of course, we'll just continue with our panel until the top of the hour.

Let's take some phone calls; Gulfport, Mississippi, hello.

CALLER: Hi, Larry. My question is for the defense attorney -- I think it's for James Smith.

KING: Jim Lewis.

CALLER: Jim Lewis. The little girl sustained over 30 injuries; my question is to him, is how could you defend -- it's not like the young kid Tate broke her neck accidentally in one supposed wrestling move; there are multiple injuries, how can -- she had to have been some type pain and agony; how can he defend that, as far as what was his defense? It wasn't just one accident that hurt her; there were multiple injuries that Tiffany incurred by this Tate kid.

KING: What was the defense, Jim?

LEWIS: Well, we actually tried to demonstrate that; we produced a videotape where Lionel basically acted out the wrestling moves that he did that injured the little girl. You know, these -- obviously this little girl died and that is a horrible tragedy, but, the 30 or so injuries that figure is grossly inflated. Some

of those injuries; there was a liver and a head that caused her death.

But you are talking about very small sized bruises, many of which could have been actually caused by the paramedics or the mother of my client, who was trying to save the little girl by doing resuscitation efforts.

KING: Deweese, you know the mother -- the mother has left us, by,the way, on the phone. You know Mrs. Tate, do you not.

EUNICK: For three weeks. Prior to my daughter's death.

KING: Are you sympathetic to her?

EUNICK: Um, I wouldn't say sympathetic with her, because, I am very disappointed with what went on, like just like she said she heard my daughter crying and she rendered no help to my daughter. So, I am disappointed in that fact that Lionel himself also heard my daughter crying, they did nothing to help my daughter. He just beat my daughter mercilessly, keep beating her. He had no heart.

KING: Yuba City, California. Hello.

CALLER: I have a question. I'd like to know if these children are to be tried as adults, why do we not allow them to drive, buy cigarettes, vote, every privilege that an adult has, why do we not let these children do that, if their adults? They become adults overnight because they made a mistake...

KING: All right, William, is it arbitrary?

SCHULZ: Well, I think that is a very good point, the fact is that in virtually all other aspects of our life, in relationship to children, we recognize that they are children, that they are not finished products. Unfortunately, when it comes to a crime, we somehow think that all the rules change, the reality is that 200,000 kids are being prosecuted as adults today in this country and 11,000 of them are convicted and being housed with adult criminals, where they are 500 percent more likely to be raped and it's inevitable that they will be taught the finer arts of criminality; that is self defeating.

KING: Now, Glen, Ken Padowitz said; wouldn't you say, as a veteran of 30 years of being around the criminal system in south Florida, something just doesn't ring right here?

RODERMAN: Larry, obviously, you always want the punishment to fit the crime. And apparently that is the big issue here in this case. I mean, you have a brutal beating -- no doubt -- that resulted in a death and there is punishment. Now people are very, very concerned about Lionel Tate.

I don't know how people have let go of the real thing here and that is the child's death. The system is crying out for change, and obviously there is a lot of violence in America, particularly among youths. You see these shootings in schools, and things that we never saw when we were kids. Obviously the system is pretty much the same system we had back then.

The legislature has to do something about juvenile crimes, particularly the violent ones. That is why Mr. Padowitz had no alternative, but to present this case to the grand jury, which came back -- I think it was unanimous -- obviously, should be tried as an adult for first-degree murder and trial jury came back unanimous in a very short period of time that he committed first-degree murder; what else are you supposed to do in our system?

KING: Were you in agreement when you learned of Ken's offer of a plea?

RODERMAN: I thought it was very liberal, Larry. I'm a criminal defense attorney for many, many years and I felt that Ken was obviously more than fair. I would have snatched that up in a heartbeat.

KING: Miami, hello. CALLER: My question for the panel is, why wasn't Tate's mother held responsible or charged in this crime since the little girl was left in her care?

KING: Jim do you know?

LEWIS: Well, you would have to ask Mr. Padowitz that. They certainly threatened to charge her on numerous occasions, but I think you have to look at the discretion that the prosecutor used in this particular case. You can't blame the grand jury for this child to be prosecuted as an adult. The jurors that tried the case -- the ones that have come forward -- have said they don't think Lionel should have been tried as adult, they don't think he should be in an adult jail.

And quite frankly, I don't think the decision to prosecute someone as an adult should be left to a prosecutor, it should be left to a judge, as it was previously here in this state.

KING: Ken?

PADOWITZ: Well, the problem is that you had a vicious murder by Lionel Tate who has been a behavior problem since kindergarten; he was expelled from school 15 times over his life, and in the two weeks prior to his sentencing after he is convicted of murder, and awaiting sentencing, he is trying to stab other inmates in the jail with a pencil. And...

LEWIS: Larry, that's just not true.

PADOWITZ: And he is stuffing paper towels in the sink and flooding out his jail cell.

LEWIS: This boy is fighting for his life in that jail.

KING: One at a time.

PADOWITZ: We have a defendant -- we have a defendant, who has been convicted of a vicious murder. But I think that has to be balanced and that is why we have a legal system set up to go to the governor have a clemency

hearing, to have Governor Bush and two members of the Cabinet hear all of the evidence, and for them to make a wise and just decision as to what an appropriate sentence would be for Lionel Tate.

But Lionel Tate, he is a murderer, that is what he did here, he committed a murder. And he still misbehaving and acting up while he's in the Broward County jail, so we have a defendant who needs to be punished, yet someone has to take into consideration Lionel Tate's age.

The juvenile justice system in Florida was not prepared to handle a murder such as this, when he's looking at six months in juvenile detention; that is not justice for Tiffany.

KING: We will break; I'll have Jim respond. I got to get a break and then Jim can respond to Ken's charges about what happened post-sentencing. This is LARRY KING LIVE; stay right there.

(COMMERCIAL BREAK)

KING: Before Jim responds, Ken, the question -- and I neglected to follow up with this -- why didn't you prosecute the mother?

PADOWITZ: Well, my focus was making sure that justice was done for Tiffany Eunick. I mean, too often, people forget that she is the focus in this, not Lionel Tate -- not the murderer, so my focus in prosecution was to ensure that I got justice for Tiffany Eunick by prosecuting the person who killed her. That was my focus. And it is just recently ended with Judge Lazarus sentencing Lionel Tate to the legal term.

KING: Jim, you want to respond to what Ken said about your client, post-sentencing?

LEWIS: Well, Lionel is not a vicious, bad kid; he's never hurt another person in his entire life. While he was in the jail, he is basically a very immature 12-year-old, some psychologists said he has the mind of a 9-year-old and a 10-year-old. He is basically not equipped to be in an adult jail. Tonight, he is sitting in an adult prison out in the Everglades. He's had his head shaved, he's in the blue uniforms, he's in solitary confinement, this is no place for a child to be; I don't care what he has done.

KING: Haleyville, Alabama, hello.

CALLER: Hi, Larry. I was wondering if the Wrestling Federation was willing to accept any responsibility for this crime?

KING: Anybody want to comment...

LEWIS: I can say they are not -- they haven't taken any responsibility. In fact they have sued me in New York for libel and slander because that was one of the defenses that was raised in this case.

PADOWITZ: Larry, I'll tell you why they are not going to take responsibility,

because wrestling had nothing do with this murder. When Lionel Tate gave his confession to the police. He said nothing about wrestling. He said he was playing tag. It only became professional wrestling defense months after this whole thing began, when Lionel Tate was indicted for murder. And then he does this recreation video, which couldn't have possibly happened, because there were boxes and an exercise machine, where he shows himself throwing himself...

KING: So...

LEWIS: Let me correct you. That is not true again. The child was actually watching wrestling when they came and picked him up to take him to the police station to get a confession out of him. And the sheriff's own public information's man indicated that wrestling had been involved. KING: Deweese, do you think that young Mr. Tate is a -- just a -- bad boy inherently, do you think he is just -- there is no way to help him?

EUNICK: Larry, honestly, I'm not sure about that, because when he was given that chance for us to see whether he could be rehabilitated or not, they did not take that chance. They are the ones who actually gave up on Lionel, not the judge. He was given a chance, a second chance, to life, and they chose not to take that. So, I really don't know.

KING: Let me break, and we'll be back with some more moments and some more phone calls as well. Don't go away.

(COMMERCIAL BREAK)

KING: Bayside, New York, hello.

CALLER: Hi, my question is for the defense attorney. Who made the decision for the kid to take that plea bargain, was it him or was it his mother? Because if it was his mother, then why -- if he was charged as an adult, then he should have made that decision for himself.

KING: Yeah, who made the decision, Jim?

LEWIS: How does a 12-year-old child make that decision about what is going to happen to him for the rest of his life? Obviously, that's a decision that his mother made with the advice and assistance of counsel. Quite frankly, we did not believe this child was going to be convicted of first-degree murder, and that's why we didn't just basically throw in and accept the deal.

Three years in prison was a fair deal, a fair outcome of the case before the trial, why isn't it a fair deal and outcome to the case now?

KING: Does anyone on the panel believe there is such a thing as a bad kid, just a kid who was, like, born sociopathically?

JAMES: I'm the one who would agree to that. I think that Lionel Tate is one of the coldest kid in America today, and that's why he is charge with first-degree murder. And my daughter paid a sacrifice with her life already to let

us know that he is a murderer and one of the coldest ones, because even shortly after killing my daughter, Lionel Tate was walking around as if nothing ever happened.

The only time I ever saw any emotions from Lionel Tate was when he was sentenced to life imprisonment or incarceration, you know, he would not be going home to mother. So, I mean, how would you feel at this point if we let him out on the street three years from now, and then he goes and kills another child, or maybe kill another adult, and we said, oh, my God, he should have been in jail, and we are sorry. But then, that would have been too late.

KING: William Schulz, I know -- you look at this all over, do you believe there's such a thing as a bad child, inherently bad?

SCHULZ: No, I don't. We have just heard here that there certainly are children who have deep disturbances, there is no question about that, and they may be physiological, emotional, sociopathic, of course, but the reality is we have just heard in this case that Lionel has had problems since he was in kindergarten. In order to believe that he was inherently bad, we have to believe that at five years old, he was some kind of a bad seed.

I'm not going to second-guess the lawyers here, but I am going to say that there is common recognition that children are finished products, and that they can change. They can be rehabilitated, and that really has to be the goal here.

KING: Certainly, Ken, he is not going to be rehabilitated in a cell, 24 hours a day, light coming into the cell, and under -- you know, he's -- that sound awful cruel, doesn't it?

PADOWITZ: Larry, if I can tell you that I work with 200 other assistant state attorneys here in Broward county and Fort Lauderdale, and not only do we see convictions, but as the American Bar Association says, we are the ministers of justice.

And that is why I offered a plea offer that I did, and that is why this time, even though he's been convicted of first-degree murder for this brutal murder, I think that we need to take into consideration Lionel Tate's age at the time he committed it, and that is why I'm willing to join the defense and go to the governor and have him hold a clemency hearing to take into consideration all these factors.

KING: How quick can that happen?

PADOWITZ: I think it's going to happen as fast as the governor and the cabinet want it to happen. It's up to them right now, and I'll willing to aid them in any way they need to get all the information at their disposal.

JAMES: But, Larry, I would like to say that I do not understand at this point why would Mr. Padowitz, with no hard feelings against him, but if the mother said she does not like him on national television, and the boy obviously does not like him, why would he leave Florida -- I mean, down here, take a trip up to see the governor for clemency for him? I mean, these people are -- I mean they are very, very evil as people. And I don't think he should really take that

position at this point.

KING: Well, Ken, we only got about 20 seconds, do you want respond?

PADOWITZ: Well, basically, I really -- my heart goes out to the father and the mother of Tiffany Eunick. I mean, nothing can ever replace their daughter, and there is nothing that I can say that can make them feel better, other than the fact that I'm going to try to seek justice for Tiffany, and I think I accomplished that, and I going to ensure that the right thing is done on this entire case, as a representative of the people of the state of Florida.

KING: Thank you all have much. We have not heard the last, obviously, of this one. We appreciate your being with us, and we apologize we couldn't do the admiral's story, because the Navy court of inquiry is still in session in Hawaii.

You heard from us, now we want to hear from you. What did you think of the show? Log on to our Web site, e-mail us your questions and comments at cnn.com/larryking.

Thanks for joining us, stay tuned for "CNN TONIGHT," and good night.

TO ORDER A VIDEO OF THIS TRANSCRIPT, PLEASE CALL 800-CNN-NEWS OR USE OUR SECURE ONLINE ORDER FORM LOCATED AT www.fdch.com

Search [CNN.com ▼]                    [_____] Find

Back to the top      © 2001 Cable News Network. All Rights Reserved.
Terms under which this service is provided to you.
Read our privacy guidelines.

**Today Show w/ Katie Couric**
**Guests: Jim Lewis & Kathleen Grossett-Tate**
**1/26/01**

| | |
|---|---|
| **Couric:** | Kathleen Grossett-Tate is Lionel Tate's mother and Jim Lewis is his attorney. Good morning to both of you and thanks so much for being here. |
| **Lewis and Grossett-Tate:** | Good morning. |
| **Couric:** | I can only imagine how stunned you were or were you stunned when you heard the verdict? |
| **Grossett-Tate:** | I thought she made a mistake. I was waiting for her to say I'm sorry, I made a mistake. It's not guilty. |
| **Couric:** | You obviously looked at your son's face, I'm sure, when this was going on. What was his reaction? |
| **Grossett-Tate:** | He was in shock. He was in shock. |
| **Couric:** | And I know as he left the courtroom it was reported that tears were streaming down his face. |
| **Grossett-Tate:** | Yes. |
| **Couric:** | Do you think he understands what this means? |
| **Grossett-Tate:** | All I know that I can say and understand it, he's going to be in jail for the rest of his life. That's about the extent. |
| **Couric:** | He could get 25 years to life without parole, is that correct? |
| **Lewis:** | That's right. What happened here Katie is basically we took a child abuse law that was meant to protect children and now we used it to convict one of them. I think it's a horrible misapplication of the law and hopefully the judge in Fort Lauderdale will see that and reduce the verdict that, that jury came up with. |
| **Couric:** | We heard one of the jurors say that their hands were basically tied because he had already been indicted, for murder and that was the case they were seeing and he was tried in adult court and that was. |
| **Lewis:** | This never should have been in an adult court. That's the decision that was made that we've all had to live with, but we can still undo this with the |

**EXHIBIT**  $\mathcal{B}$

cooperation of the judge of the appellate court or the system and treat this child fairly.

**Couric:**   At the same time though, Mr. Lewis, you rejected a plea offer last year that would have limited Lionel's sentence to three years in a juvenile detention center and ten years of probation.  Why not accept that offer then?

**Lewis:**   Because we believed that it was an accident as we still do now.  This was child's play that went wrong.  Everyone who saw the trial understood that this child simply was imitating what he'd seen on tv when he hurt this little girl.  The consequences of his conduct are horrible, but he did not intend to harm this girl.

**Couric:**   How did you come up with this defense, which some people have said, in fact, well not surprisingly, the World Wrestling Federation issued a statement saying your strategy linking the case to professional wrestling was a contrived hoax and that the jury fell through it.

**Lewis:**   That must not be the issue at all.  Everyone who was there knew that wrestling played a major part in Lionel's makeup and in what happened to Tiffany.  There was absolutely no other reason that he would harm this girl other than to simply be playing with her.  People can second guess and look, and look behind and say that we would try to do something other than help Lionel, but that was the truth.  That's the defense we went with and we believe ultimately this case will be seen for what it is, which is a very horrible accident.

**Couric:**   You are the boy's mother, Ms. Grossett-Tate.  So tell me, how could wrestling play such an important role in his life.  Did he watch it non-stop and did you see him trying to imitate the moves on other occasions?

**Grossett-Tate:**   He watched wrestling since he was young and when he played with the boys, they're always downstairs running around, jumping on each other, upstairs they're throwing each other on the beds, so it's, it's since he was young he's been doing this.

**Couric:**   You heard prosecutors talk about the extent of Tiffany's injuries, 35 injuries, fractured skull, torn liver, among other things and internal hemorrhaging, cuts, bruises, broken rib(s).  You know, how can that really be consistent with Lionel's story that it was just horseplay, that he put her under a table at one point and that she hit the banister or the railing of the steps at another point?

**Lewis:**   Things like this can happen in seconds.  Children love to try to defy gravity to throw each other around.  When she hit a pole and hit the floor,

um, you know, there was a medical testimony which consistent that wrestling moves were consistent with how the child died.  There's no other reason that this child would have done this and with all the testimony in the case, that anyone can determine that this child was simply acting out what he'd seen on television.

**Couric:**  I understand the Governor could commute his sentence after hearing from prosecutors.  Do you have any sense that that might happen…

**Lewis:**  We haven't had contact with the governor's office.  At this point we're asking the judge, Judge Lazarus, in this case, to reduce the jury's verdict and we'll seek appellate help and help from everyone in the community.  Hundreds of people, thousands of people have called us from all over this country telling us that similar things have happened with their children.

**Couric:**  What would you say to the governor if you had the chance?

**Grossett-Tate:**  I want my son out.  I want my son out.

**Couric:**  He's demonstrated violent behavior before, has he?

**Grossett-Tate:**  No.  He should not be there.

**Couric:**  What would you say to the family of Tiffany Eunick?

**Grossett-Tate:**  To Deweese, if there was anything that I could've done to bring Tiffany back to her, I would've done it.  If it includes my life, I would've done it.  I still sympathize with her because she lost her daughter.

**Lewis:**  Two tragedies aren't better than one.

**Couric:**  Kathleen Grossett-Tate and Jim Lewis, thank you both for coming by and talking with us this morning.  I know it's a very difficult time for you, so we appreciate it.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 01-7913-CIV-HURLEY/LYNCH

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

      Plaintiff,

v.

L. BRENT BOZELL, III, an individual;
MEDIA RESEARCH CENTER, INC., a
Virginia non-profit corporation, d/b/a
PARENTS TELEVISION COUNCIL;
PARENTS TELEVISION COUNCIL, INC.,
a Delaware non-profit corporation;
JAMES LEWIS, an individual; MARK HONIG,
an individual; CYNTHIA DELORES TUCKER,
an individual; and VARIOUS JOHN and
JANE DOES,

      Defendants.

_____/

FILED by ____ D.C.

FEB 2 2 2002

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA.

### ORDER ON RICHARD L. ROSENBAUM'S MOTION TO QUASH OR, FOR PROTECTIVE ORDER [DE #1] AND JAMES LEWIS' MOTION TO QUASH AND/OR PROTECTIVE ORDER [DE #8]

**THIS CAUSE** having come on to be heard upon the aforementioned motions and this Court having reviewed the motions and the responses, thereto, makes the following findings of fact and conclusions of law.

Both of these motions result from a subpoena served upon Richard L. Rosenbaum, Esquire by the Plaintiff on or about December 13, 2001. A copy of this subpoena referred to is listed under Tab 23 to the Plaintiff's response to motion to quash subpoena of Richard L. Rosenbaum (Rosenbaum).

EXHIBIT 13

This case emanates out of discovery disputes concerning documents the Plaintiff seeks to have produced for use in pending litigation in the United States District Court for the Southern District of New York involving these parties. In that litigation, the Plaintiff has apparently sued the Defendants for defamation and other relief. In this particular issue, the Defendant, James Lewis (Lewis), has allegedly made certain out of court statements which the Plaintiff alleges are defamatory. These statements revolve around Lewis' representation of Lionel Tate (Tate) in a criminal proceeding in the State of Florida which involved the death of Tiffany Eunick.

Lewis represented Tate, who is not a named defendant in this proceeding. Tate was convicted after a jury trial and has been sentenced by the Circuit Court in Broward County, Florida. There is an appeal of that criminal case pending in the state courts.

Richard Rosenbaum is the attorney who has been retained to handle and represent Lionel Tate on his appeal. All of the files that Lewis had in his possession concerning this case have apparently been turned over to Rosenbaum. Lewis' responses indicate that Rosenbaum now represents Lionel Tate on appeal and that Lewis does not have within his possession any documents requested.

Mr. Rosenbaum and Mr. Lewis both assert essentially the same objections concerning the production of the documents sought. Those objections relate to attorney-client privilege, work product privilege, Fifth Amendment privilege and that the requests are unduly burdensome. This Court will go through each of the fourteen requests for production and state its reasons why the request should be granted or denied.

The first request seeks all documents generated by any law enforcement agency concerning the investigation of the Tate criminal case. The second request seeks all such documents from any emergency medical services agency relating to that case. The third request seeks all documents generated by any fire department concerning its involvement in that case. The fourth request seeks all documents generated by any hospital/medical facility concerning that investigation and the death of Tiffany Eunick. Finally, request number five asks for all records of the medical examiner's/coroner's office reflecting its work involving that criminal case.

While this Court understands that these are public records which are not privileged and which would be available by way of third party subpoena by the Plaintiff, this Court does not see any reason why copies of these documents should not be produced by Lewis and Rosenbaum. The pending litigation in the District Court in the State of New York surrounds alleged statements made by Lewis which the Plaintiff argues are defamatory. The Plaintiff should be able to obtain copies of these public records from Rosenbaum and Lewis to determine if there is any basis in those documents for the statements and positions taken by Lewis in his public pronouncements concerning the Plaintiff. The key issue is not what the public records state in this situation as much as it is whether or not there is any information contained within those records which would support or contradict the statements/conduct by Lewis as alleged in the pleadings filed in the District Court in the Southern District of New York. Therefore, all of the records requested in requests 1, 2, 3, 4, and 5 shall be produced by Rosenbaum and/or Lewis within 15 days of the date of this Order. Any notations or other handwritten marks which either Lewis and/or Rosenbaum

3

have placed on those documents shall be redacted prior to copying and production to the Plaintiff.

Request number 6 seeks all written or recorded statements of any witnesses involved in the Tate/Eunick case.  Likewise, request number 7 asks for any and all statements by any person with knowledge of or contact with Tate.  These two categories could clearly involve work product information.  As mentioned previously by this Court, the criminal case is on appeal.  This Court is not convinced by the Plaintiff's argument that Lionel Tate has waived his attorney-client privilege in this matter simply by Lewis making out of court statements concerning the Plaintiff.  There needs to be more of an affirmative, specific, intelligent and knowing waiver by Tate of his attorney-client privilege.  This is especially so  since there is a criminal appeal pending which could result in a re-trial of all or part of the criminal case.

Out of an abundance of caution, this Court must consider the fact that statements made, whether they be oral or written by "any witness" or "any person," may involve witness interviews.  Certainly these are work product of Lewis and/or Rosenbaum.  On the other hand, this Court is not going to permit Lewis to make out of court statements which serve as a basis for the Plaintiff's complaint against him in the Southern District of New York and to hide behind the criminal case.  For that reason, if there are any statements allegedly made and which are the basis of the Plaintiff's lawsuit in the Southern District of New York which Lewis bases upon anything contained within the items requested in requests numbers 6 and 7, then Lewis is to file a privilege log within 15 days of the date of this Order in strict compliance with Local Rule 26.1(G)(3).

In the event that Lewis does not file any such privilege log pursuant to the terms of this Order, then he shall be deemed to have admitted that any of the statements or actions which he is being sued for did not emanate from any of the items requested in numbers 6 and 7.

Request number 8 seeks all documents reflecting statements made by Tate to any law enforcement agency whether they be recorded or videotaped. If these statements were made to law enforcement agencies, they cannot be considered work product nor privileged information. Certainly, they would fall within the records this Court has ordered to be produced under request number 1 as well. Therefore, any such statements by Tate to law enforcement shall be provided within 15 days of the date of this Order.

Request number 9 seeks all documents which were "identified, marked, introduced into evidence, argued, referred to, or otherwise used by Lewis" during any pretrial/trial proceeding in the state criminal case. This Court views this request the same as 6 and 7. The fact that something was identified, marked, introduced into evidence or referred to is overly broad. This could be interpreted to mean that any statement made by counsel during opening, closing arguments or even cross-examination could fall within the purview of this request. If it is impossible for this Court to determine what document would be sought, certainly such a request would seem to be overly broad and unreasonable.

Secondly, this Court has no problem with any documents which were marked, introduced into evidence or shown to prosecution during the criminal case. Certainly there can be no privilege claimed as to those documents. However, documents which were "argued" or "referred to" is overly broad and shall not be produced. Therefore, as to request number 9, all documents which were marked for identification in open court,

5

and/or introduced into evidence during the criminal case shall be produced within 15 days of the date of this Order.  The remaining requested documents in number 9 are **DENIED**.

Request number 10, seeks all documents concerning or reflecting any communications between Lewis and the other defendants in the civil case pending in the Southern District of New York.  Mr. Rosenbaum does not raise any objection and this Court cannot see how he could anyway.  This Court does not see any valid objection raised by Mr. Lewis either.  There is no assertion of a joint defense or any other reference to why these documents should not be produced.

Likewise, in respect to request number 11 which asks for all documents concerning any communications between Lewis and attorneys Roderman and Zimmerman, there does not appear to be any valid objections raised.  Certainly, there does not seem to be any reference to the Tate criminal case which Mr. Rosenbaum could raise as an objection.  Also, there does not appear to be any valid objection raised by Lewis.  Therefore, the documents sought in request numbers 10 and 11 shall be produced within 15 days of the date of this Order.

Request number 12 seeks production of all documents reflecting any communications between Lewis and any member of the media relating to the death of Tiffany Eunick, the investigation thereof or any reference to the Plaintiff.  Again, if these are documents which were communications to third parties such as the media, there can be no attorney-client privilege nor any work product privilege raised.  These documents shall be produced within 15 days of the date of this Order.

Request number 13 seeks all documents reflecting any public statements by Lewis, whether they be through the media or otherwise, involving the Tate case. Just as in request number 12, these items shall be produced within 15 days of the date of this Order.

Request number 14 seeks all videotapes that Lewis in any way assisted or participated in concerning the Tate criminal case. This Court again believes that this request is over broad as it is worded. If any videotapes were utilized and published to third parties, whether they be in court or to any media, then those items would be addressed and contained within requests number 9, 12 or 13. This Court is reading request number 14 to be seeking videotapes that may not have been publicly disseminated, introduced into evidence or otherwise produced to third parties and which Lewis utilized in preparing his defense of the criminal case.

This would be a classic definition of attorney work product and shall not be disclosed unless there is something on those videotapes which serves as the basis for the statements and/or conduct of Lewis as alleged in the lawsuit pending against him in the Southern District of New York. In that event, Lewis shall comply with this Court's directives concerning Local Rule 26.1(G)(3), just as this Court ordered in respect to requests number 6 and 7. If he does not file any such privilege log in respect to request number 14, then the same presumption is applicable as stated by this Court herein above in regards to requests number 6 and 7, *i.e.*, that Lewis is admitting that there is nothing on any videotape which serves as a basis for his statements and/or conduct.

It is therefore

7

**ORDERED AND ADJUDGED** that the motion to quash [DE #1] and motion to quash

[D.E. #8] are hereby **GRANTED** in part and **DENIED** in part as specifically set forth herein.

**DONE AND ORDERED** this _____ day of February, 2002, at Fort Pierce,

Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

Copies furnished:

Honorable Daniel T.K. Hurley

Daniel A. Casey, Esq.
Miami Centre - 20th FL
201 South Biscayne Blvd.
Miami, FL 33131

Stephen M. Zukoff, Esq.
19 West Flagler Street
Suite 510
Miami, FL 33130

Robert C. Buschel, Esq.
201 SE 8th Street
Fort Lauderdale, FL 33316

Thomas A. Leghorn, Esq.
150 East 42nd Street
New York, NY 10017-5639

Robert Sparks, Jr., Esq.
6862 Elm Street, Suite 360
McLean, VA  22101

Michael J. Quarequio, Esq.
500 SE 6th Street, Suite 100
Fort Lauderdale, FL 33301

Jerry S. McDevitt, Esq.
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222

Eugene R. Licker, Esq.
1251 Avenue of the Americas
New York, NY 10020-1104

Eugene R. Licker (EL 0334)
KIRKPATRICK & LOCKHART LLP
1251 Avenue of the Americas
New York, New York 10020-1104
phone: (212) 536-3900
fax: (212) 536-3901

Jerry S. McDevitt
Terry Budd
Jason L. Richey
Curtis B. Krasik
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania  15222
phone: (412) 355-8608
fax: (412) 355-6501



Attorneys for Plaintiff, World Wrestling Federation Entertainment, Inc.

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
WORLD WRESTLING FEDERATION             :
ENTERTAINMENT, INC., a Delaware        :
corporation,                           :
                                       :
          Plaintiff,                    :
                                       :   **CASE NUMBER:  00CIV8616 (DC)**
                                       :
    vs.                              :
                                       :
                                       :   **THIRD AMENDED COMPLAINT**
L. BRENT BOZELL, III, an individual,   :
MEDIA RESEARCH CENTER, INC.,           :
a Virginia non-profit corporation,  d/b/a :
PARENTS TELEVISION COUNCIL,            :
PARENTS TELEVISION COUNCIL,            :
INC., a Delaware non-profit corporation, :
JAMES LEWIS, an individual, MARK       :
HONIG, an individual, CYNTHIA          :
DELORES TUCKER, an individual and      :
VARIOUS JOHN AND JANE DOES,            :
                                       :
        Defendants.                    :
-------------------------------------------------------X

**EXHIBIT** __14__

## THIRD AMENDED COMPLAINT

World Wrestling Federation Entertainment, Inc. ("WWFE") files this Third Amended Complaint ("Complaint") against Defendants L. Brent Bozell, III, Media Research Center, Inc., d/b/a Parents Television Council, Parents Television Council, Inc., James Lewis, Mark Honig, Cynthia Delores Tucker and various John and Jane Does, (collectively referred to as the "Defendants") averring as follows:

## THE PARTIES

1.       Plaintiff WWFE is a Delaware corporation having its principal place of business at 1241 East Main Street, Stamford, Connecticut 06902. WWFE is an integrated media and entertainment company principally engaged in the development, promotion and marketing of television programming, pay-per-view programming and live arena events, and the licensing and sale of branded consumer products featuring the highly successful WORLD WRESTLING FEDERATION ("WWF") brand. Vince McMahon is the WWFE Chairman of the Board and is the creative force that has made the WWF one of the most popular brands in the United States today.

2.       Defendant Media Research Center, Inc. (hereinafter referred to as "MRC" and/or "PTC") holds itself out as a non-profit corporation organized and existing under the laws of the Commonwealth of Virginia and having its principal place of business at 325 South Patrick Street, Alexandria, Virginia 22314. The MRC is registered with the New York State Attorney Generals Office Charities Bureau (registration #63579). Bozell founded the MRC in or around the fall of 1987 as a successor to the National Conservative Political Action Committee ("NCPAC") after he resigned from the NCPAC amidst financial chaos. MRC annually files fundraising statements with the Charities Bureau. MRC has raised millions of dollars annually, including money from residents of New York. MRC has raised money from the public operating under the fictitious name of the "Parents Television Council" ("PTC"). The corporation's stated

2

purpose is "to bring political balance to the nation's news media and responsibility to the entertainment media." However, when raising money for the MRC through the PTC, Bozell has presented the PTC as a "non-partisan, non-profit, grassroots organization."

3.      Defendant Parents Television Council, Inc. holds itself out as a non-profit corporation organized and existing under the laws of Delaware and having its principle place of business at 701 Wilshire Boulevard, Suite 1950, Los Angeles, California 90017. Upon information and belief, Parents Television Council, Inc. was incorporated on October 13, 2000 in anticipation of this lawsuit. At some unknown point in time after October 13, 2000, the PTC split from the MRC and became a separate legal entity. The Parents Television Council, Inc. has continued the same activities as it performed under the MRC. For purposes of clarity, whether or not the PTC was operating under the MRC or was its own separate entity, it shall be referred to as "PTC" throughout this Complaint.

4.      Defendant L. Brent Bozell, III ("Bozell") is an individual resident of the Commonwealth of Virginia. Bozell, operates, controls, and manages a variety of supposedly "non-profit" corporations, including MRC and PTC. In fact, Bozell is the Chairman of both MRC and PTC. Bozell makes his living by fundraising schemes which utilize fraudulent techniques and which consistently victimize, disparage, defame and/or tarnish companies, like WWFE, as a central part of the scheme. Bozell contrives such schemes to provide substantial monies and support to himself. Upon information and belief, Bozell is paid in excess of two hundred thousand dollars each year by MRC and/or PTC.

5.      Defendant Mark Honig ("Honig") is an individual resident of the State of California. Honig is the Executive Director of the PTC.

6.      Defendant James Lewis ("Lewis") is an individual resident of the State of Florida. Lewis was defense counsel for Lionel Tate who has been convicted of first degree murder for the 1999 murder of Tiffany Eunick. Lewis has intentionally utilized the New York media to help him carry out tortious and otherwise unlawful activity which is the subject matter

3

of this lawsuit. He has appeared on numerous media programs which are both produced and broadcast from New York to defame the WWFE and tarnish the WWF mark as part of his conspiracy with the other Defendants. Lewis also has voluntarily published numerous defamatory statements through the media and through the PTC to New York residents and New York advertisers. Lewis has assisted the other Defendants in their fundraising efforts in New York from New York residents.

7.     Defendant Cynthia Delores Tucker ("Tucker") is an individual resident of the Commonwealth of Pennsylvania. Tucker is a member of the PTC Advisory Board. Tucker has published defamatory statements through the PTC to the New York Secretary of State and has affirmatively participated in the conspiracy with the other Defendants to defame WWFE and tarnish the WWF mark. Tucker has also assisted the other Defendants in fundraising activities in New York directed towards, *inter* alia, New York residents.

8.     Defendants John and Jane Does are any and all individual members of the PTC Advisory Board who had knowledge of, consented to, and/or participated in the unlawful conduct complained of herein.

### JURISDICTION AND VENUE

9.     This Complaint sets forth claims for, *inter alia*, trademark dilution, false description and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, and copyright infringement under the federal Copyright Act, 17 U.S.C. § 101 *et seq.* This Court has jurisdiction over the subject matter of these claims pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1121 (action arising under the Lanham Act) and 28 U.S.C. § 1338(a) and (b) (action arising under an Act of Congress relating to copyrights, trademarks and related unfair competition claims).

10.     This Court has supplemental jurisdiction over the subject matter of the remaining claims of this action pursuant to 28 U.S.C. § 1367.

4

11.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to WWFE's claims occurred in this District, including but not limited to the Defendants: (i) intentionally publishing through mailings, newspapers, television, radio and the internet defamatory statements regarding WWFE into this District; (ii) tortiously interfering or attempting to interfere with the contractual and business relations of existing and prospective advertisers of the WWFE, including, *inter alia*, Pfizer, Colgate-Palmolive Co. and Viacom, Inc., that reside in this District; (iii) causing a decrease in sales at WWFE's principal advertising sales office which is located in this District; (iv) tortiously interfering with the WWFE's contractual relations with F.A.O. Schwartz, a major toy retailer, that resides in this District; (v) unlawfully copying WWFE copyrighted programming and unlawfully using the programming in this District; (vi) causing the dilution and tarnishment of the WWF mark in this District; and (vii) raising significant sums of money in New York as part of their plan and scheme to hurt WWFE.

12.     Events involved in the litigation have occurred in numerous jurisdictions throughout the United States.  New York and specifically this District are directly involved in this suit as the Defendants' actionable conduct has either been produced, taped and/or broadcast from New York through the New York media and/or has been knowingly published by one or all of the Defendants into New York.  Moreover, most of the impact of the Defendants' actionable conduct has been felt by the WWFE in its principal advertising sales office that is located in this District.

## OVERVIEW

13.     Defendants have conspired to, and have joined together into an illegal agreement to, intentionally injure the business and goodwill of WWFE by a variety of tortious and other unlawful acts.  Each member of the illegal conspiracy has economic incentives for their actions, all of which are at the expense of the WWFE.

## FACTUAL BACKGROUND

**A.     Historical Background of the PTC, Bozell and Their Interest In the WWF**

14.     Bozell has never held elected office.  He has never been appointed by any duly authorized body to enforce "morality" standards in the entertainment industry or the television industry.  He has never been a member of any "council," elected or otherwise, and he has never been an elected member of any representative body of parents in this country.

15.     Nevertheless, in 1995 Bozell established the PTC as a Hollywood project of the Media Research Center.  Bozell's use of the words "Parents Television Council" and the manner in which the PTC presents itself to the public and to WWFE's advertisers is false and misleading.  No council in fact or law exists as the name falsely and explicitly states.

16.     Bozell claims to have established the PTC to force the entertainment industry to recognize, and to assume responsibility for, the role television programming purportedly has in shaping and influencing America's children and culture.

17.     By January 1999, the PTC had launched numerous special projects and campaigns, including the National Campaign to Improve the Quality of Prime Time Television. The stated purpose of the projects and campaigns was to educate television sponsors that television programming supposedly can be harmful to children.  In fact, the principal purpose was to raise money for the MRC's and PTC's conservative political agenda.  Each of the PTC's projects and campaigns had limited success and most ended in failure.

18.     Upon information and belief, between 1995 and 1999 Bozell became increasingly frustrated due to the PTC's lack of success, respect and validity and he became especially frustrated with his inability to raise large sums of money for himself and his conservative political agenda.  This lack of respect for his organization severely affected the morale of MRC and PTC employees and led to high turnover rates.

6

19.     In or around, July 1, 1999, Bozell became aware of a newspaper article in the Dallas Morning News reporting that a three year old child was accidentally killed by his older brother using a wrestling move he had seen on television. Bozell and PTC sent information regarding this newspaper article to its members through a PTC July 7, 1999 "E-Alert" (an "E-Alert is a message sent by the PTC through E-mail).

20.     At or around this same time, Bozell learned that WWFE would soon be producing a television show entitled WWF SMACKDOWN! which would be broadcast on UPN.

21.     After Bozell learned of WWFE's program, he developed a new strategy which he believed would turn around the fortunes of his organization. Bozell and the PTC chose to directly target WWF SMACKDOWN! due to the WWF's immense popularity and recognition throughout the United States. Bozell hoped a campaign against WWFE would give him and the PTC the needed press coverage, credibility and increased financial gain; something his prior efforts failed to accomplish.

22.     Moreover, Bozell believed that instead of just abstractly discussing television programming's alleged adverse effects on children, his organization could have more of an impact in generating revenue and receiving notoriety by a campaign designed to convince advertising sponsors that the WWF SMACKDOWN! program was actually causing children to kill children.

23.     Soon after July 1, 1999, the Bozell and PTC began a concentrated effort and strategy to focus almost all of its efforts and resources on WWF SMACKDOWN! in hopes of creating a well publicized fight, with Bozell appearing to be the good guy and Vince McMahon appearing to be the bad guy. Thus, a PTC fundraising video refers to Bozell as Gary Cooper and in a Wrestling Observer newsletter, Bozell calls Mr. McMahon "worse than Larry Flynt."

24.     Pursuant to this scheme, MRC, PTC, Bozell, Honig and Tucker (hereinafter referred to collectively as "PTC Defendants") undertook numerous tortious acts and other unlawful conduct in their efforts to "educate" the public and advertisers that WWFE, in general, and SMACKDOWN!, in particular, caused and/or is responsible for the deaths of four particular children. PTC Defendants do not have, and never had, any factual basis to support such claims and knew such claims were false.

**B.     The PTC's WWF SMACKDOWN! Campaign**

25.     To implement the plan, PTC Defendants began a pattern of systematically interfering with WWFE's business through a calculated and deliberate attempt to coerce sponsors and advertisers not to advertise their product on WWF SMACKDOWN!, all with the specific intent of injuring WWFE.

26.     PTC Defendants coerced WWFE's current and potential sponsors and advertisers of WWF SMACKDOWN! by besieging them with blatant misrepresentations and flat-out lies to disparage and tarnish WWFE, the millions of fans who watch WWFE programs, and the products and services provided under its WWF brand.

27.     For example, on July 26, 2000, PTC Defendants sent a letter from Bozell enclosing a PTC video to the CEO of Subway and, upon information and belief, to forty-four other CEOs of major corporations (seven of which reside in New York) for the purpose of inducing them to stop advertising on WWF SMACKDOWN!. In these letters, Bozell again implicates WWFE in the deaths of four children, including Tiffany Eunick, stating:

> For instance, you may not know that in the past year and a half, four children have been murdered by other children who were mimicking moves they learned by watching wrestling. Here are the startling and sad facts surrounding these four instances:
>
> - In Dallas, TX a 7 year-old boy killed his 3 year-old brother by performing a wrestling move he was mimicking known as a "clothesline." The 3 year old suffers brain swelling and dies of injuries to the head. According to police reports he'd been mimicking wrestling.

8

- In Hudson County Georgia, Earl Rose who is babysitting for a friend, left his home to buy some cigarettes. He puts on a WWF video to entertain the kids in his absence. While he is gone, a 4 year old jumps up and down on 15-month-old Ramone King. Ramone dies of massive injuries to the head and chest. The prosecutors believe the 4 year old was mimicking what he saw on the WWF wrestling video, which is used as evidence in the felony charges brought against Mr. Rose.

- In Florida, 12 year-old Lionel Tate killed six year-old Tiffany Eunick by performing several wrestling moves on her. Tiffany suffers 30 contusions and part of her liver is detached. Newspaper articles describe her as being battered like a "rag doll." Lionel has been charged with first degree murder. Attorneys for both families are pointing the finger of blame at the WWF, which this child was watching regularly.

- In Yakima, WA 12 year-old Jason Whala, while babysitting his 19 month-old cousin William Sweet, becomes upset when the toddler would not stop crying. Jason lifts the toddler over his head, turns the baby facing towards him, and "slams" him to the ground. This is a move known as the Jack Knife Power Bomb. He performs this move until William stops breathing and there is blood coming from William's nose and mouth.

28.    PTC Defendants knew or should have known through reasonable investigation that there is no evidence that WWFE and/or WWF SMACKDOWN! caused the death of any of the four children. PTC Defendants willfully made these defamatory statements to WWFE's sponsors and advertisers to cause financial harm to WWFE, while at the same time to increase PTC fundraising and PTC notoriety.

29.    PTC Defendants at all times knew that WWF SMACKDOWN!, like other television programs, depends upon, in part, the ability to sell advertising during commercial time and that WWFE's advertising income is a principal source of income for the corporation.

30.    An essential part of PTC Defendants' scheme against WWFE's sponsors and advertisers included misrepresenting the number of alleged PTC members generally, as well

9

as consistently misrepresenting the number of members who knew of and supported the plan to systematically interfere with sponsors of WWF SMACKDOWN!.

31.    PTC Defendants fraudulently use the term "PTC members" (hereinafter "PTC Members" or "Members") to make it appear that a number of parents are "members" of the non-existent "council." PTC Defendants typically include a representation regarding the number of PTC Members in communications to Members and advertisers of WWF SMACKDOWN! Upon information and belief, the PTC Defendants deliberately and fraudulently inflate and exaggerate the membership of PTC in order to appear to be growing in popularity and in order to coerce advertisers not to sponsor WWF SMACKDOWN! and to specifically injure WWFE.

32.    As part of their fundraising schemes, the PTC has from time to time sought the specific approval and/or authorization of PTC "members" to threaten companies with boycotts and the like if they continue to advertise their products on WWF SMACKDOWN!.

33.    PTC also has sent letters to Members enclosing a form for the Member to fill out authorizing PTC to use the Member's name as a co-signer on letters to WWF SMACKDOWN! advertisers and sponsors.

34.    On or around October 15, 1999, PTC mailed 154,474 letters to PTC Members criticizing General Motors, Ford, AT&T and Wendy's for spending their advertising dollars on SMACKDOWN!. The letters requested that the Members sign and return an enclosed "Warning to Sponsors Reply Form," which, when signed, authorized the PTC to list the Member's name as a cosigner of letters PTC planned to send to General Motors, Ford, AT&T and Wendy's. In response, the PTC received 7,692 signed forms.

35.    On or around March 31, 2000, PTC sent 3,188,492 letters to members of the public requesting that they sign the "Warning to Sponsors." 123,584 people signed and returned the forms.

10

36.     On May 5, 2000, PTC sent 206,690 letters to Members again requesting that they sign a "Warning." This warning was particularly aimed at WWF SMACKDOWN! and stated:

> I have authorized the Parents Television Council to inform you that I am one of millions of decent, responsible Americans who are totally disgusted by the ultra-violence and moral depravity depicted in so many TV shows – especially those like "WWF Smackdown!" which deliberately target children. Please consider yourself warned:
>
> IF CBS BROADCASTS "SMACKDOWN!", AND YOUR COMPANY BUYS COMMERCIALS ON THE SHOW, I WILL NOT BUY YOUR PRODUCTS!
>
> It's as simple as that.

PTC received 30,603 signed forms in response to this mailing.

37.     Based on the responses to PTC's (i) "Warning to Sponsors Reply Form"; (ii) "Warning to Sponsors"; and (iii) "Warning," the PTC, at the absolute most, spoke on behalf of the 161,879 people who had, at any time, returned a "Warning to Sponsors" form (disregarding the possibility that multiple forms were returned by the same person). PTC Defendants deliberately misrepresented the number of people who had authorized PTC Defendants to speak on their behalf against WWF SMACKDOWN! in numerous written and oral statements, including, *inter alia:*

(i)     In a December 1, 1999 letter to Admiral James Loy, Commandant of the U.S. Coast Guard, Bozell derided the Coast Guard for advertising on WWF SMACKDOWN! and stated, "On behalf of the 300,000 members of the PTC, we demand that the Coast Guard immediately stop sponsoring the worst of television." At the time of this letter, PTC Defendants had only mailed 154,474 letters containing the "Warning to Sponsors" to PTC Members and only 7,692 of those had been signed and returned.

11

(ii)     In a letter to Secretary Rodney Slater of the Department of Transportation, Bozell stated, "On behalf of the 300,000 members of the PTC, we demand that the Coast Guard immediately stop sponsoring the worst of television." At the time of this letter, PTC Defendants had only mailed 154,474 letters containing the "Warning to Sponsors" to PTC Members and only 7,692 of those had been signed and returned.

(iii)    In a letter to the public in March, 2000, PTC, via Bozell, stated that "over 400,000 Americans have joined me in the PTC by signing the Warning to Sponsors." At the time of this letter, PTC Defendants had mailed 154,474 letters containing the "Warning to Sponsors" to PTC Members and only 7,692 of those had been signed and returned by people authorizing PTC Defendants to speak on their behalf against WWF and WWF SMACKDOWN!.

(iv)     At the MCI shareholders meeting on June 1, 2000, Tucker, on behalf of PTC, addressed the MCI Shareholders, stating:

> I come here as a voice for the 500,000 members of the Parents Television Council who are outraged by MCI's loyal and frequent sponsorship of one of the most violent, sexually graphic, racist, sexist and foul-mouthed programs to air on prime time television, WWF Smackdown!"

At the time Tucker made this statement, PTC had received, at the most, 161,879 signed forms from people authorizing them to speak on their behalf against WWF and WWF SMACKDOWN!.

(v)     Steve Allen also spoke on behalf of PTC at the June 1, 2000

meeting and stated:

> The PTC would like your response to this
> question [regarding whether MCI would
> continue to sponsor SMACKDOWN!] by the 8[th]
> of June so that we may let our half-million
> members know whether or not MCI will still be
> one of Smackdown!'s loyal sponsors. The PTC
> has run the largest advocacy ad campaign in
> history, reaching over 215 million people,
> decrying the trashy programming coming from
> Hollywood and calling for corporate America to
> act responsibly with its advertising dollars.

At the time Steve Allen made this statement, PTC had received, at

the most, 161,879 signed forms from people authorizing them to

speak on their behalf against WWF and WWF SMACKDOWN!.

(vi)    In a July 26, 2000 letter mailed to the CEO of Subway and forty-

four other CEOs of major corporate sponsors and advertisers,

Bozell stated:

> As Chairman of the Parents Television Council,
> I am writing you on behalf of our 500,000
> members to ask you to exercise responsible
> advertising practices and stop sponsoring WWF
> Smackdown! with Subway's advertising dollars.

At the time of this letter, PTC had received, at the most, 161,879

signed forms from people authorizing them to speak on their behalf

against WWF and WWF SMACKDOWN!.

(vii)   In letters mailed to several toy retailers, including Target, Wal-

Mart, FAO Schwartz, Kmart and Toys 'R Us in October 2000,

Bozell stated:

13

> As Chairman of the Parents Television Council,
> I am writing to you on behalf of our 625,000
> members to ask you to stop selling World
> Wrestling Federation action figures to children.

At the time of these letters, PTC Defendants had received, at the

most, 161,879 signed forms from people authorizing them to speak

on their behalf against WWF and WWF SMACKDOWN!.

(viii)   In Mark Honig's address at the ConAgra Shareholders Meeting,
Honig stated:

> I am here representing our nearly 600,000
> members nationwide who are outraged at
> ConAgra's frequent and loyal support of the
> one of the most violent, sexually graphic, and
> foul-mouthed prime time programs to air on
> commercial broadcast television, WWF
> Smackdown!

At the time Honig made this statement, PTC Defendants had

received, at the most, 161,879 signed forms from people

authorizing them to speak on their behalf against WWF and WWF

SMACKDOWN!.

38.   Each time PTC Defendants made the foregoing statements falsely

misrepresenting the number of people authorizing Defendants to speak on their behalf against

WWF SMACKDOWN!, they knew or should have known that their statements were false and

that they in fact had not received authority to speak for the overwhelming majority of people

from whom they requested such authority.  PTC Defendants willfully, systematically and

maliciously used all of these inflated numbers to create a false impression, directly and/or by

inference, that the PTC had a large contingency of Members who specifically disapproved of

WWF programming; who were outraged at the particular advertiser's support of WWF

SMACKDOWN!, and who were prepared to boycott that sponsor's products if they continued to

14

advertise on WWF SMACKDOWN!. PTC Defendants exploited this false impression to induce companies to discontinue advertising on WWF SMACKDOWN!.

39.     As another essential part of the scheme, PTC Defendants consistently misrepresented the success of their interference by inflating the number of advertisers who had supposedly "pulled" or "withdrawn" their support of WWF SMACKDOWN!. This pattern of activity continues to date.

40.     PTC Defendants began their WWF SMACKDOWN! Campaign on or around August 1999, before WWF SMACKDOWN! ever began to regularly air on UPN. The PTC Defendants sent letters and video tapes to potential advertisers throughout the United States, including in New York, to "educate" the advertisers why they should not place advertisements on WWF SMACKDOWN!. Upon information and belief, PTC Defendants copied portions of WWFE's copyrighted programming which they included in the tapes sent to sponsors.

41.     In response to the PTC Defendants "education program," the PTC Defendants were surprised and delighted that they got a number of responses from major corporations, before WWF SMACKDOWN! even aired, stating that they would not advertise on the program. Upon information and belief, these responses strengthened PTC Defendants' belief that they should continue to focus most of their efforts on harming the WWFE in order to raise more money for MRC and PTC.

42.     On August 26, 1999, WWF SMACKDOWN! began airing regularly on UPN.

43.     The next day, the PTC began the process of educating "PTC members" about how WWFE and WWF SMACKDOWN! allegedly caused the death of children. On August 27, 1999, the PTC sent an "Action Alert" through the internet to PTC Members. The "Action Alert" described the first WWF SMACKDOWN! episode as featuring "extreme violence." PTC then told PTC Members "[b]ear in mind an earlier incident recounted in the July

15

7 PTC E-Alert, where a seven year old boy killed his three year old brother using a simple

clothesline move he'd seen on a wrestling show." After linking WWFE with the Dallas child's

death, PTC then urged PTC Members to send money to PTC and to voice their concerns with the

sponsors of the show. PTC provided its Members with WWF SMACKDOWN!'s sponsors'

names and addresses.

      44.    On or around September 1, 1999, PTC sent a letter to PTC Members

urging them to send more money to PTC and to co-sign a letter to WWF SMACKDOWN!'s

sponsors threatening to boycott the sponsor's products if the sponsors continued their contractual

relationship with WWFE. PTC intended to specifically harm the sponsors if their advertising

continued on WWF SMACKDOWN!. PTC further intended to specifically harm WWFE by

threatening WWFE's sponsors with harm if they did not cede to their demand to pull their

support from SMACKDOWN!. PTC represented in their letter that PTC Members should act

because 1.2 million children between the ages of 2 and 11 viewed the first WWF

SMACKDOWN! episode. PTC then continued linking WWFE to alleged murderous acts of

children by referencing the "Columbine massacre" and stating:

> **Will [the WWF] never learn?** Recently a 7 year old boy in Dallas, Texas
> decided to copycat one of the moves he'd seen on TV wrestling show...He tried it
> on his 3 year old brother...and **killed** him.

      45.    On September 10, 1999, PTC continued to reinforce the notion that there

was a connection between the Dallas death and WWFE. PTC Defendants sent a PTC Action

Alert through the Internet to Members describing the most recent episode of WWF

SMACKDOWN! by stating: "The violence continues with plenty of 'legitimate' wrestling

moves including the clothesline move that a young boy in Texas used on his baby brother and

killed him."

      46.    On or around October 1, 1999, PTC stepped up their WWF

SMACKDOWN! Campaign by sending "Urgent Grams" to Members attaching a letter from

Vince McMahon regarding Bozell's activities. In this Urgent Gram, PTC requested that Members send more money to PTC immediately and then implicated the WWFE and WWF SMACKDOWN! as the cause of the death of a child in Dallas and another child in Florida, Tiffany Eunick. PTC stated to its Members that the WWFE was engaged in "criminal" activities in producing and marketing its television programming. On behalf of PTC, Bozell wrote:

> 'We sell fun', McMahon says. Really? Tell that to the parents of the 3 year old boy in North Dallas who on May 27 died from brain swelling after sustaining massive trauma to the head. According to the Dallas Morning News, 'police initially suspected that an adult had to have been responsible until they interviewed the boy's 7 year old brother. He revealed that the had struck his brother with a clothes line move – running and hitting him in the neck with an outstretched arm – that he had seen his wrestling heroes perform on TV."
>
> Or tell it to the parents of 12 year old Lionel Tate, who was charged with first degree murder after the death of a 6-year old girl on July 28. Testimony showed that the boy was copying wrestling moves he'd seen on TV, including whipping the little girl, Tiffany, into an iron stairway railing. The coroner's report said that little Tiffany suffered such a brutal beating that her liver was actually severed.
>
> Targeting children with this garbage is no "prank" – its criminal!
>
> I am determined to make a major national issue of this criminally irresponsible program, and I need your help to do it.
>
> ...Believe me once these companies realize that the PTC's 350,000 supporters are the crest of a tidal wave of outrage over criminally irresponsible programming like "Smackdown!", they WILL pull their ads.

47.     PTC Defendants knew or should have known that WWFE's programming and marketing were not criminal activities. Moreover, PTC Defendants knew or should have known through reasonable investigation that WWFE and/or WWF SMACKDOWN! did not cause the death of the child in North Dallas or the murder of child in Florida.

48.     On November 19, 1999, Bozell, in addressing a Conservative Leadership Conference, reiterated that WWF SMACKDOWN! was responsible for the deaths of the two children. He stated:

Still, the same apologists for [WWF Smackdown's] nauseating violence will continue to snicker, "Come now. The audience, the children know it's only make believe.

Really? Tell that to the parents of the 3 year old boy in North Dallas who on May 27 died from brain swelling after sustaining massive trauma to the head. According to the *Dallas Morning News*, the trauma was so vicious that Dallas police initially suspected that an adult had to have been responsible until they interviewed the boy's 7 year old brother. He revealed that he had struck his brother with a 'clothesline' move – running and hitting him in the neck with an outstretched arm – that he has seen his wrestling heroes perform on TV.

Or tell the parents of 12 year old Lionel Tate, who was charged with first degree murder shortly after the death of a 6-year-old girl on July 28th. A Court psychiatrist testified that the boy said he was copying moves he watched on television, including whipping the little girl Tiffany into an iron stairway railing. According to the coroner's report, little 6-year old Tiffany suffered such a sustained and brutal beating that it severed her liver while causing a host of serious injuries.

Yes, tell Tiffany's parents her death was make believe, too. When I tell you that so-called "entertainment" television has become dangerous and destructive for the family, I'm not exaggerating, am I?

49.     Two weeks later, Bozell through his Nationally Syndicated column, which is published in New York, told a much larger audience about the WWFE's and WWF SMACKDOWN!'s alleged responsibility for "real life" deaths and injuries when he wrote:

Defending the WWF, McMahon crows that it's just "fun". Not quite. [T]here's a seven year old boy who killed his three year old brother by knocking him to the floor with, in the words of the Dallas Morning News, "a 'clothesline' move – running at him and hitting him in the neck with an outstretched arm – that he had seen his wrestling heroes perform on TV." And in south Florida, a 166 pound, twelve year-old boy killed a six year old, forty eight pound girl by whipping her into an iron stairway railing. A psychiatrist testified that the boy told him that what he did to the girl was "similar to throwing someone into the ring ropes, like they do in wrestling." It's not all "make believe," either.

50.     On March 9, 2000, Bozell wrote another Nationally Syndicated column entitled "Bad Karmazin: Mel Woos the WWF." In the column, which again was published throughout the United States, including New York, Bozell directly blamed the WWF for Tiffany Eunick's murder in Florida. He wrote that "[f]amily groups have long expressed outrage over the WWF, but now an actual south Florida family isn't just outraged, it's devastated. Last

summer, six year old Tiffany Eunick died at the hands of a twelve-year old boy, a wrestling buff like so many boys his age. And the family is pointing the finger of blame directly at the WWF." He then quotes a statement from Glenn Roderman – a statement which Bozell knew was false when he quoted it -- "The WWF 'has definitely played a role in this case...Anyone that knows this case, who knows this boy...know[s] that [he] was heavily influenced by wrestling."

51.    On May 5, 2000, PTC continued the campaign against WWFE and WWF SMACKDOWN! by sending an Action Alert to Members attaching an "Urgent Warning to the Top 100 T.V. Sponsors." In this Action Alert, PTC attacked Mel Karmazin for the rumored possibility of WWF SMACKDOWN! airing on CBS by stating, directly and by contextual inference, that WWF SMACKDOWN! had trained Lionel Tate in homicide. Thus, Bozell stated:

> ... and soon we may have Karmazin to thank for saturating the nation's airwaves with a program that in at least one instance has provided training in homicide for a pre-adolescent boy . . .
>
> Maybe we should ask the Eunick family in South Florida how they feel about the lessons taught by World Wrestling Federation.
>
> Last summer their six-year-old daughter died at the hands of a 12-year-old boy, a wrestling buff like so many boys his age. And attorneys for both families – the victim's and the perpetrator's – are pointing the finger of blame directly at the WWF.

52.    In point of fact, neither parent of Tiffany Eunick believes professional wrestling has anything to do with the murder of their daughter by Lionel Tate, and have so stated publicly. Indeed, Tiffany's father has stated publicly that he believes Lionel Tate murdered Tiffany Eunick after she rejected sexual advances.

53.    Again, in both of the Nationally Syndicated articles and in the May 5, 2000 letter, PTC Defendants by implication and/or direct statement conveys to the public and current and potential WWF advertisers that WWF SMACKDOWN! is responsible for the death of the child in North Dallas and for the murder of Tiffany Eunick. PTC Defendants knew or should have known through reasonable investigation that there is no evidence that WWFE and/or

WWF SMACKDOWN! caused the deaths of either the child in North Dallas or the child in Florida. PTC Defendants willfully made these defamatory statements to financially hurt the WWFE and to increase PTC fundraising and PTC notoriety.

54.     In or around mid-2000, the PTC then took their hoax to another level in claiming that WWF SMACKDOWN! caused the deaths of not only the children in Florida and Texas, but also two other children. Indeed, in the "PTC Insider," the PTC newsletter sent to Members and which was reprinted on the PTC Internet website, there is a feature entitled "Children, Wrestling and Murder" in which PTC Defendants claim that WWF wrestling had a "harmful influence" on children by causing the four children's deaths. This claim is factually false and Defendants knew so.

55.     In May, 2000, PTC sent a letter to Scott Sassa, the President of NBC West Coast, addressing NBC's plans to broadcast the XFL football games in 2001. Bozell and PTC threatened that Members would contact advertisers who had already "pledged not to advertise on WWF Smackdown!" and encourage them not to place advertising during XFL games. Bozell and PTC also attacked WWF SMACKDOWN! and connected WWFE to four child murders, stating, "Moreover, four children have been killed by other children performing wrestling moves on them that they had seen on wrestling programs."

56.     On the "About the PTC" page of the PTC Internet website, PTC Defendants falsely referred to the four children's deaths as "[t]he recent WWF tragedies." The link then allows the browser to learn about the supposedly "terrible effects" wrestling is having on children.

57.     On June 1, 2000, PTC published on the PTC website a statement from Steve Allen ("Allen"), that "[f]our children, from 14 months to six years old, had their lives cut tragically short because of the effect wrestling had on their peers. Police reports, attorneys from the Defendants, autopsy reports and victims' families point the finger of blame at the wrestling industry that purposely targets children as audience." PTC held out Allen, now deceased, at all

20

times relevant hereto as National Honorary Chairman of PTC.  As an agent of the MRC and

PTC, Allen served largely as a spokesman for PTC Defendants' schemes and campaigns,

including those set forth in this Complaint.

58.   On August 4, 2000, Bozell was interviewed on WrestlingObserver.com –

a popular web site disseminated throughout the world – and continued the theme that the WWF

SMACKDOWN! was responsible for four children deaths.  Bozell stated:  **"The sheer**

**arrogance and irresponsibility of the WWF while they line their pockets is frightening,**

**especially when you have news reports of four children having killed four children copy-**

**catting what they watched on television.  The finger is pointing directly to Smackdown!**

**and they still don't care.  You start flirting with the word evil at that point."**

59.   On or around September 28, 2000, PTC next posted a statement on its

Internet which was disseminated throughout the world from Honig that "four children aged 4

months to six years old, have had their lives tragically cut short by peers who were emulating

wrestling moves they learned by watching programs like WWF SMACKDOWN!.  Police

reports, autopsy reports, attorneys for the defendants point the finger of blame at the wrestling

industry that purposely targets children as an audience."

60.   PTC Defendants all knew or should have known through reasonable

investigation that there is no evidence that WWFE and/or WWF SMACKDOWN! caused the

death of any of the four children.  PTC, Bozell and Honig willfully made these defamatory

statements to financially hurt the WWFE and increase PTC fundraising and PTC notoriety.

61.   In or around January 2001, the PTC sent the PTC Insider newsletter to its

Members purporting to respond to this lawsuit.  They then falsely accused WWFE and its

employees of directing and/or orchestrating numerous incidents of criminal conduct which he

alleged had been directed at PTC.  Bozell wrote: "The WWF Community was doing everything

it could to disrupt our work.  They spread malicious rumors about me all over the internet…PTC

staff were harassed with hundreds of obscene emails, some containing viruses that wound up

21

destroying more than one computer system. There were threats of violence and even death threats against the PTC staff in general and me personally. One such death threat recently was aimed at Senator Joseph Lieberman...."

62.     PTC Defendants knew or should have known that WWFE was not involved in or behind any of the above referenced conduct. Bozell's statement imputed such conduct to WWFE.

63.     The PTC Defendants have published all of the above statements either while raising funds from the public for the PTC or while interfering with WWFE's advertisers. As will be shown below, the PTC Defendants developed other schemes and lies to further harm the WWFE and its mark.

**C.     The Conspiracy Between the PTC, Bozell, Honig, Tucker and Lewis**

64.     By mid to late 1999, Bozell realized that the PTC's WWF SMACKDOWN! Campaign had been more successful than his past fundraising schemes. He boasted that the PTC's WWF SMACKDOWN! Campaign: (1) caused the WWFE to lose significant sponsors; (2) decreased WWF's overall revenues; (3) increased dramatically PTC's fundraising revenue and "membership"; and (4) gave himself and his organization increased notoriety and respect with the media.

65.     However, as Bozell stated in his October "Urgent Gram" to Members, the PTC's WWF Campaign had not yet achieved its ultimate goal: "Major national sponsors who have already informed the PTC that their ads will no longer appear on 'Smackdown!' include Coca-Cola, General Motors, Ford, AT&T and Wendy's. **WE'RE WINNING THIS BATTLE! But we must not let up until Smackdown! can't get ANY sponsors at 8 p.m., and the UPN Network is forced to pull the show or relegate it to late night obscurity."** Bozell made these specific remarks to publicly affirm his specific intent to harm WWFE.

66.     Upon information and belief, PTC Defendants believed PTC's WWF SMACKDOWN! Campaign would be even more persuasive to sponsors and the public if someone directly involved in one of the child death cases blamed the WWF for the death of a specific child.

67.     PTC Defendants, through its agents, went to Florida and met with Lewis "for interviews and other events" and formed an illegal conspiracy. Lewis is the attorney for Lionel Tate ("Tate") who was charged with the brutal first degree murder of Tiffany Eunick ("Eunick").

68.     PTC Defendants formed a conspiracy with agents for Tate, including Lewis, to perpetuate the hoax that Tate's murder of Eunick had something to do with WWFE.

69.     Tate, who, as shown below, had no real defense to the charge of murder, was in obvious need of somebody to factually support the pretextual thesis that television somehow caused him to think it was all right to beat a little girl to death. PTC Defendants agreed to that role. Thus, Bozell appeared on at least one videotape used by Lewis in the Florida murder case in unsuccessful attempts to blame the WWFE and/or to permit Lewis to harass WWFE talent in an attempt to divert attention from his client's actions. This videotape contained appearances by Bozell designed to blame the WWFE for causing Tate to murder his victim. In turn, Lewis agreed to be filmed and/or included in MRC/PTC fundraising videotapes claiming that WWFE programming was responsible for Tate's murderous acts.

70.     The PTC also supplied Lewis with various so-called studies regarding the effect of television on children to encourage him in his efforts to blame television for the murder of a child.

71.     Moreover, Lewis further agreed to participate in the PTC's media hoax and conspired with PTC Defendants to go on various media programs, outside of the judicial

arena, to depict WWFE as being responsible for the death of Eunick in order to create "news" which PTC Defendants would then repeat to PTC Members.

72.     Tate is a 170-pound juvenile with a history of behavioral problems who, in a sustained beating of a 46-pound little girl, inflicted over 35 separate injuries, including three contusions to the brain, a fractured skull, a broken rib and a lacerated liver. Tate's vicious beatings undisputedly resulted in Eunick's death.

73.     During the incident, Tate's mother was home negligently supervising the two children from the upstairs of the house. Tate's mother, allegedly trying to take a nap, yelled down to Tiffany during this brutal murder to stop making noises or else she would "beat your butt."

74.     In fact, Lionel Tate initially did not admit to any touching of Tiffany Eunick.

75.     After Tate was arrested, he initially told police in a sworn statement that he was playing "tag". He also described a bear hug and placing his hand under Tiffany Eunick's head and bumping it into a table. It is a matter of public record that Tate never made any mention of wrestling with Eunick or of wrestling generally in his initial account of the death of Eunick.

76.     The only connection to wrestling involved in the Tate case was the unremarkable allegation that Tate was watching wrestling on television when the police came to arrest him several days after the death.

77.     Two weeks after his arrest, Tate was interviewed by a Court-appointed psychologist and a State psychologist, with Lewis's consent, regarding his knowledge of professional wrestling. At that time, on August 19, 1999, Tate told both experts that he understood wrestling was not real but fake, and even that he had watched a documentary showing how certain maneuvers were executed so as to avoid injury. He stated that if the

24

wrestlers were actually hitting each other as hard as they make it look, they would be too badly injured to get up and come back for another match. Even when one of the experts said several times that he thought wrestling was for real (in testing Tate), Tate repeatedly stated it was fake because no one could get hit like that and not get hurt.

78.     Despite these and other fatal admissions by Tate disavowing any wrestling connection, Lewis decided to aid the PTC's WWF Campaign, and to increase his own notoriety in the hope of personal gains, by appearing on numerous media shows and granting numerous newspaper interviews to point "the finger of blame" at WWFE.

79.     On September 20, 1999, Lewis voluntarily appeared in a story on Dateline NBC. Dateline NBC is produced and broadcast out of New York and to New York residents and to WWFE's New York advertising sponsors. In the NBC story, Lewis falsely stated that "[Tate] could believe that [pro wrestling] activity is O.K., to power drive each other and to body slam each other. That when it's all over, it's over. Everybody gets up, and it's just good fun." Lewis knew at the time he made these statements that Tate did not believe that, as evidenced by Tate's own previous statement.

80.     On October 22, 1999, Lewis appeared on a day time television program called *Leeza*, which was televised in New York, together with the parents of Tiffany Eunick. When Lewis attempted to trot out his theory that pro wrestling, not Tate, was to blame for the murder of Tiffany, and that the injuries were the result of horseplay accidentally gone awry, Tiffany's father responded by calling Lewis a liar, and stated that Lionel had attempted to rape his little girl, then beat her to death in a rage; a position entirely consistent with the nature of her injuries. Lewis did not deny, or even attempt to refute, the father's accusations.

81.     On March 4, 2000, Lewis increased his efforts to link the WWFE to the Tate incident. First, he served several invalid subpoenas on WWF character, the Rock, to testify in the Tate case at or around the time the Rock was to host Saturday Night Live so that Lewis would be guaranteed to create newspaper headlines such as "Pro wrestler subpoenaed in child

25

murder case." He intentionally did this to give the public the impression that pro wrestling was involved in a child's murder. Having done so, Lewis deliberately leaked the fact that the Rock had been served so as to generate adverse publicity in the Sunday paper, which, in fact, occurred. When asked by reporters why Lewis subpoenaed the Rock, Lewis could only respond "because he lives in South Florida."

82.     One month later, Lewis told Judge Joel Lazarus that he needed to take the Rock's deposition. In support of his argument, Lewis argued that he needed testimony about wrestling in general for his client's defense and he then played a video containing Bozell speaking about how wrestling supposedly affects children. Judge Lazarus quashed the subpoenas.

83.     On May 25, 2000, Judge Lazarus also ruled that Lewis had provided no expert testimony on the supposed effects of wrestling which could be admissible at trial. The court found that there is no scientific evidence which is generally accepted in the relevant scientific community as both accurate and reliable regarding the supposed impact of professional wrestling on children. The court later held a Frye hearing on the issue and found as follows:

> This court finds that there is no reliable methodology in reaching a conclusion about the effect of television wrestling on the infancy and maturity level of a preteen. There is no generally accepted scientific standards. Accordingly, the defense has failed to meet the Frye standard, which could allow the court to receive evidence from experts on the issue of the effect of wrestling on the maturity level and infancy of preteens.

84.     On the same day (March 4, 2000) as Lewis tried to drag WWFE and the Rock into court, he also reengaged his attack on the WWFE outside the courtroom. Lewis voluntarily appeared on a story for WWOR-TV in Secaucus, New Jersey which broadcasts for the "New York Designated Market Area" (the number 1 television market in the nation). Lewis knowingly misrepresented the truth of the Tate matter to direct the blame to WWFE. Lewis stated "I think the evidence is clear that what they were doing is mock wrestling, play fighting

what they saw on television. And yes, he was a lot bigger than her, and – and unfortunately it appears that him acting out these--these wrestling moves is how the young girl got killed."

      85.     On March 21, 2000, Lewis appeared on MSNBC which is produced and broadcast out of New York and is received by New York residents. He again pointed the finger at WWFE and professional wrestling for causing the death of Tiffany Eunick. He stated that laceration to her liver could have been caused by simply one knee drop or one punch to the abdomen. He said the other injuries "are things that, quite frankly, probably happened when they were trying to revive the girl." Lewis again knew these statements were false when he made them and he knew his client never even claimed to do a "knee drop" or "one punch to the abdomen."

      86.     On March 22, 2000, Lewis appeared on Crier Today, a show on Court TV which is produced and cablecast in New York and shown to New York residents and advertisers. On that show, he falsely stated during his interview regarding the WWFE's alleged effects on children "[t]he facts are that there are four other cases (other than Tate) where children have been killed where other children are acting out wrestling moves on them." By at least the time of this interview, Lewis was echoing the PTC falsehood that WWFE was responsible for four children's deaths. Lewis knew or should have known this statement was false when he made it.

      87.     Lewis has also appeared on many other national media forum that are broadcast from and into New York, including CBS Radio (March 23, 2000), which is headquartered in New York, The O'Reilly Factor (April 28, 2000), a show produced in New York, The Edge with Paula Zahn (May 8, 2000), the Today Show , produced in New York, (January 29, 2001), and The View, produced in New York (January 29, 2001) to again falsely "point the finger of blame" at the WWFE for children's deaths, including the death of Eunick.

      88.     Lewis's numerous personal appearances on TV shows and radio were designed to, and, in fact, did, achieve a certain degree of celebrity status for Lewis himself. Further, all of Lewis's media appearances and his attempts to bring the WWFE into the Tate case

were all a part of Lewis's conspiracy with the PTC Defendants to willfully harm the WWFE and the WWF mark.

89.     On information and belief, Lewis has stated that he was able to charge new clients twice what he had been able to charge prior to the publicity surrounding the <u>Tate</u> case.

90.     In addition to the media appearances, as mentioned above, Lewis also voluntarily appeared in a PTC video specifically made by PTC Defendants for fundraising entitled "Clean Up TV Now" which the PTC Defendants distributed to PTC Members including persons who reside in New York.

91.     Lewis knew when he appeared in PTC's fundraising video that the video with his defamatory statements on it would be sent into New York.

92.     In the video produced by PTC Defendants for fundraising purposes, there is a discussion that Tate allegedly watched WWF wrestling, virtually on a daily basis, for hours and hours a day.  According to the PTC video, Lionel Tate then treated Tiffany like a rag doll and performed a series of wrestling moves on her that killed her.  After these defamatory statements, Lewis then falsely adds "[t]here is absolutely no other reason that anybody in this case can point to other than simply a child acting out the [WWF wrestling] fantasies that he sees on television and not really understanding the ramifications of that type of physical contact."  At the time Lewis made these statements, he knew them to be false and to be contradicted by his client's own admissions.

93.     Through carefully sequenced and edited images and narration by Steve Allen, the PTC fundraising video also directly suggests and implies that WWFE and professional wrestling is responsible for other acts of juvenile violence, including the shootings at Columbine High School and in Jonesboro, Arkansas.

94.    PTC's implication on the video that Tiffany died as a result of Tate watching WWF wrestling on television is false and PTC Defendants knew it was false when they published this tape. Furthermore, Lewis knew that his statement was defamatory. Lewis knew that Tiffany's father on The Leeza Show pointed to Tate trying to rape Tiffany. Further, Lewis also knew that the State of Florida had, and would prove, other reasons for Tate's actions – specifically, a desire to kill Tiffany and then live with her mother with whom he was infatuated.

95.    PTC Defendants made the fundraising tape with the willful intent to harm WWFE.

96.    The other three death cases used by PTC Defendants to systematically defame WWFE did not involve WWF SMACKDOWN! in any way.

97.    Bozell specifically knew that three of the child deaths predated WWF SMACKDOWN! being on the air.

98.    Bozell specifically knew that the death in the fourth case, the one involved in the Georgia case, occurred only days after WWF SMACKDOWN! debuted.

99.    Bozell did not have any factual basis to assert that any child present in the house the day the child was killed in Georgia had watched the debut show of WWF SMACKDOWN!

100.    The case in Yakima, Washington involved a 12-year old juvenile put in charge of babysitting a very young boy. It is a matter of record that the 12-year old, while watching the Brady Bunch on television, deliberately and intentionally killed the young boy because he was sick of babysitting the child, the child was playing with his video games, and the child would not stop crying. The killer was charged with and convicted of second degree murder. No charges of any kind were brought or investigated against WWFE.

101.    Another case falsely cited by PTC Defendants and Lewis involved essentially an unlicensed day care facility in a Georgia home. The adult in charge, Earl Rose,

29

had been previously charged in the year prior to the death for physical abuse of the children he was watching. Mr. Rose was also a habitual criminal. Following the death, conflicting reports were made as to who had struck the dead baby and one of the children reported to have struck the dead child stated he was trying to "knock the cockroaches off the baby." Other reports had Earl Rose striking the dead child. Earl Rose was criminally charged and convicted for the neglect. No charges of any kind were brought or investigated against WWFE.

102.    The third death in North Dallas cited by PTC Defendants and Lewis involved a three year old who, while rough-housing with his seven-year-old brother, reportedly struck his head on a hard surface and accidentally died. No charges of any kind were brought or investigated against anyone, including the WWFE.

**D.    The PTC and Bozell Institute "Plan B"**

103.    As part of the PTC's WWF SMACKDOWN campaign, PTC Defendants organized a "blizzard of press releases" and "media appearances all over the country." They sent letters and videos to WWF SMACKDOWN!'s current and potential sponsors and urged its Members to contact WWF's Sponsors. PTC Defendants stated to Members that they were "getting the job done" and were forcing WWF SMACKDOWN!'s sponsors to "pull out."

104.    However, PTC Defendants' plan and/or scheme to destroy the revenues of WWF SMACKDOWN! had not been joined by large corporations such as MCI Worldcom and ConAgra which continued to advertise WWF SMACKDOWN! on a regular basis.

105.    In particular, although PTC Defendants repeatedly notified MCI of WWF SMACKDOWN!'s content, their efforts were ignored by MCI and their calls and letters went unanswered. Eventually, a MCI public relations representative contacted the PTC and said "**We don't advertise on particular shows or endorse particular shows, we purchase advertising on a network and our goal is to reach a target audience. I apologize on behalf of the company if that offends you.**"

30

106.    As a result of these setbacks, PTC Defendants moved on to what they called "Plan B."

107.    Under "Plan B," PTC Defendants told these advertisers that they would be held "personally responsible" for other children who died if they continued to advertise their products on WWF SMACKDOWN!.

108.    The PTC purchased stock in MCI Worldcom ("MCI") and then made arrangements for PTC's honorary chairmen, Allen, and PTC board member, Tucker, to speak at the MCI Worldcom shareholders meeting regarding WWF SMACKDOWN!.

109.    On June 1, 2000, Allen and Tucker went to the shareholders' meeting at PTC's expense and at all times acted as agents of the PTC.  The PTC never notified WWFE that they were going to speak about WWF SMACKDOWN! at the MCI shareholders' meeting.

110.    At the meeting, both Allen and Tucker demanded that the corporation stop advertising on WWF! SMACKDOWN.  Allen, on behalf of the PTC, stated to the shareholders present at the meeting and to MCI officers and directors who were also present "[a]gain I must stress to you stockholders that wrestling shows are having a deadly impact on our children.  Four children have been killed by peers who were emulating wrestling moves they learned by watching programs such as WWF Smackdown!.  Four children, from 14 months to six years old, had their live cut tragically short because of the effect wrestling had on their peers.  Police reports, attorneys for the defendants, autopsy reports and victims' families point the finger of blame at a wrestling industry that purposely targets children as an audience."

111.    Allen then gave MCI "7 days" to make a decision whether it would continue to advertise on WWF SMACKDOWN!.  On this same day, however, the PTC Defendants also issued a press release regarding the speeches which included Allen's statements about the WWFE's responsibility for the deaths of children in an attempt to put further pressure on MCI.

31

112.    Soon after the shareholders' meeting, MCI pulled their advertising from WWF SMACKDOWN! as a direct result of Allen's statements made at the meeting and included in the PTC press release.

113.    PTC Defendants knew or should have known that four children have not been killed by peers who were emulating wrestling moves they learned on shows such as WWF SMACKDOWN!. Moreover, PTC Defendants should have known that the victim's families have not directly pointed the finger of blame at the wrestling industry.

114.    Likewise, PTC Defendants resorted to "Plan B" when ConAgra refused to stop advertising on WWF SMACKDOWN! despite PTC Defendants' specific efforts to interfere with ConAgra's advertising contracts with the WWFE.

115.    The PTC purchased stock in ConAgra and made arrangements for PTC's Executive Director, Honig, and Advisory Board member, Tucker, to speak at the ConAgra shareholders' meeting regarding WWF SMACKDOWN!.

116.    On September 28, 2000, Honig and Tucker went to the shareholders meeting at PTC's expense and at all times acted as agents of the PTC.  The PTC never notified WWFE that they were going to speak about WWF SMACKDOWN! at the ConAgra shareholders' meeting.

117.    At the meeting, Honig and Tucker demanded that the corporation pull its ad dollars from WWF SMACKDOWN!.  Specifically, Honig, on behalf of the PTC, made false statements, almost identical to Allen's false statements, at the MCI meeting.  Honig stated: "In fact, four children aged four month to six years old, have had their lives tragically cut short by peers who were emulating wrestling moves they learned by watching programs like WWF Smackdown!.  Police reports, autopsy reports, attorneys for the defendants point the finger of blame at the wrestling industry that purposely targets children as an audience."

32

118.    Soon after the shareholders' meeting, ConAgra announced that it would terminate its relationship with WWFE at the expiration of its current contract and otherwise change its current advertising on WWF SMACKDOWN! as a direct result of Honig's statements made at the meeting.  PTC Defendants knew or should have known that the WWF was not responsible for the death of the four children and that the police reports, autopsy reports and attorneys for the defendants (other than co-conspirator Lewis) did not point the finger at the wrestling industry.

**E.    The PTC's "Tidal Wave" Attack on WWF SMACKDOWN!**

119.    To create the false impression that advertisers were leaving WWFE *en masse* as a result of its efforts, PTC also deliberately and fraudulently misrepresented the identity and number of companies that allegedly had stopped advertising on WWFE programming.  This was done in a specific attempt to further coerce companies not to advertise on WWF SMACKDOWN! and to specifically injure WWFE.  The "Tidal Wave" attack was also used to deceive Members into believing the PTC's efforts were more successful than they were in reality so the Members would keep financially supporting a "successful" organization.

120.    On August 1, 2000, PTC sprung their "Tidal Wave" attack into action with a series of PTC Press Releases which were published throughout the United States, including in New York, and with a letter which was sent to Speaker of the House, Dennis Hastert, in Washington D.C. and later placed on the PTC Internet Site.

121.    First, PTC issued a Press Release deploring GOP plans to showcase WWF star, the Rock, at the Republican National Convention.  In the press release, PTC intentionally misrepresented the names and number of companies that "withdrew their support" of WWF SMACKDOWN during the PTC's WWF SMACKDOWN! campaign.  The PTC Press Release states in pertinent part:

> When the PTC alerted the **Army, Navy, Air Force and Coast Guard** to the
> content on Smackdown!, they all **pulled** their sponsorship, stating that the show

33

did not reflect their core values.  To date, more than thirty corporations contacted by PTC have withdrawn their support of WWF Smackdown!, including corporate giants like **Wendy's, Ford, General Motors, Coca-Cola, AT&T, M&M Mars, Clorox, State Farm, Office Depot, Walgreens, Saks, Inc., Delta Airlines, Southwest Airlines, Allstate Insurance, Gap, Proctor & Gamble, Hershey's, McDonalds, SBC Enterprises, Maytag, Colgate-Palmolive, Kellogg's, Pfizer, Domino's, Federated Department Stores, Best Foods, Wrigley's, Bank of America, Johnson & Johnson, Dr. Pepper/Seven-Up and MCI WorldCom.**

122.    Second, PTC issued a similar Press Release calling on George W. Bush to withdraw the invitation to the Rock to address the GOP Convention.  In this press release, the PTC again intentionally misrepresented the names and number of companies that "withdrew" their support of WWF SMACKDOWN! during the PTC's WWF SMACKDOWN Campaign. The PTC Press Release states in pertinent part:

> When the PTC alerted the **Army, Navy, Air Force and Coast Guard** to the content on Smackdown!, they all **pulled** their sponsorship, stating that the show did not reflect their core values.  To date, more than thirty corporations contacted by PTC have withdrawn their support of WWF Smackdown!, including corporate giants like **Wendy's, Ford, General Motors, Coca-Cola, AT&T, M&M Mars, Clorox, State Farm, Office Depot, Walgreens, Saks Inc., Delta Airlines, Southwest Airlines, Allstate Insurance, Gap, Proctor & Gamble, Hershey's, McDonalds, SBC Enterprises, Maytag, Colgate-Palmolive, Kellogg's, Pfizer, Domino's, Federated Department Stores, Best Foods, Wrigley's, Bank of America, Johnson & Johnson, Dr. Pepper/Seven-Up and MCI WorldCom.**

> George Bush should do what corporate America is doing in droves – disassociating itself with the vulgarity and violence the WWF weekly markets to over 3 million children.  Over thirty corporate CEO's have pulled their sponsorship of WWF Smackdown!.  As the de facto CEO of the GOP, George Bush should make the responsible decision and do the same thing," said Bozell.

123.    PTC also sent the Speaker of the House of Representatives, Dennis Hastert, a letter from Bozell along with a PTC video tape regarding WWF SMACKDOWN!.

124.    Upon information and belief, PTC copied portions of WWFE's copyrighted programming which they included in the tape.

125.    At no time has PTC and/or MRC sought or obtained WWFE's permission to use copyrighted works owned by WWFE for any purpose.

34

126.   The letter sent to Dennis Hastert also contained defamatory statements similar to those in the PTC Press Releases. The letter states, in pertinent part:

> When the PTC alerted the Army, Navy, Air Force and Coast Guard to the content on Smackdown!, they all **pulled** their sponsorship, stating that the show did not reflect their core values. To date, more than thirty corporations contacted by PTC have **withdrawn** their support of WWF Smackdown!, including corporate giants like Wendy's, Ford, General Motors, Coca-Cola, AT&T, M&M Mars, Clorox, State Farm, Office Depot, Walgreens, Saks, Inc., Delta Airlines, Southwest Airlines, Allstate Insurance, Gap, Proctor & Gamble, Hershey's, McDonalds, SBC Enterprises, Maytag, Colgate, Palmolive, Kellogg's, Pfizer, Domino's, Federated Department Stores, Best Foods, Wrigley's, Bank of America, Johnson & Johnson, Dr. Pepper/Seven-Up and MCI WorldCom.

127.   On or before August 1, 2000, PTC knew or should have known that at that time more than thirty corporations had not "withdrawn their support of WWF Smackdown!" or "pulled" their ads. Many of the companies listed in the PTC Press Releases and the Hastert letter never advertised on WWF SMACKDOWN!, a fact PTC Defendants knew. PTC falsely listed the names of corporations in a manner designed to suggest support of PTC's activities and/or disapproval of WWF SMACKDOWN! programming.

128.   On August 2, 2000, Bozell continued the "Tidal Wave" attack by telling a nationwide audience, while debating "the Rock" on CNN Crossfire, that: "the reality is, that in the last several months, over 30 major sponsors, including Coca-Cola, MCI, the Armed Forces, Army, Navy, Coast Guard, a whole bevy of national sponsors, have seen what [the WWF is] doing. They're so disgusted by what you are doing they've all **pulled** their advertising which makes a [sic] remarkable that now the Republican Party is adopting you." Bozell knew at the time of this statement that it was false because 30 majors sponsors had not "pulled their advertising" from the WWF in the last several months.

129.   On September 28, 2000, Mark Honig in his speech to ConAgra shareholders also interjected the "tidal wave" approach by misrepresenting to the shareholders the number of major U.S. companies that had stopped sponsoring WWF SMACKDOWN!. Honig stated "[t]herefore, I am here to ask you: Does ConAgra plan to continue sponsoring

WWF Smackdown! Or, will you decide, as have nearly 40 other major U.S. corporations, to make what is a socially and corporately responsible decision and stop sponsoring this trash?" Honig knew at the time of this speech that 40 major U.S. corporations had not stopped sponsoring WWF SMACKDOWN!.

130.    Upon information and belief, in or around mid to late-2000, the PTC advertised in newspapers across the country, including newspapers in New York, stating that "[r]ecent, appeals from viewers of one particularly loathsome 'wrestling' program got 35 sponsors to **cancel** their ads." This advertisement directly implicates WWF SMACKDOWN!. At the time, the PTC published this advertisement, it knew that viewers of WWF SMACKDOWN! did not get 35 sponsors to cancel their ads.

131.    The PTC Defendants have also used this same tactic by misrepresenting in an October 2000 fundraising letter sent to Members that the PTC has "wreaked havoc on the vile World Wrestling Federation's atrocious 'Smackdown!' television show, convincing some 40 major advertisers to drop their support." This claim is false and PTC Defendants knew so at the time it was made.

132.    Finally, in or around mid to late-2000, the PTC website listed "Sponsors Who Pulled Their Support" from WWF SMACKDOWN! as part of the PTC's WWF SMACKDOWN! campaign. Specifically, the PTC website listed the following companies as having "**pulled their support**" from WWF SMACKDOWN! as a result of the PTC: "Allstate, American Dairy Farmers, AT&T, Bank of America, Best Foods, Campbell Soup Company, Clorox, Coca-Cola, Colgate-Palmolive, Domino's, Dr. Pepper, Federated Department Stores, Ford, Gap, General Motors, The Gillette Company, Hershey Foods, Kellogg's, MCI Worldcom, M&M Mars, Maytag, Levi's, Pfizer, Procter & Gamble, SBC Communications, Southwest Airlines, Tricon Global, U.S. Air Force, U.S. Army, U.S. Navy, U.S. Coast Guard, Wendy's and William Wrigley Jr., Corp."

133.     This list, like the lists on the above mentioned Press Releases and the letter to Dennis Hastert, is factually false as various of these companies listed never nationally advertised on WWF SMACKDOWN!. Moreover, the number of companies referenced in the newspaper advertisement, the Honig speech, the Press Releases, the Rock debate and the Hastert letter never reached the level stated in the publication. PTC statements regarding the foregoing "tidal wave" tactic were known by PTC to be false.

134.     PTC willfully, systematically and maliciously used all of these falsely inflated lists of "pulled sponsors" to create a false impression, directly and/or by inference, that the PTC has induced a "tidal wave" of companies to abandon WWF SMACKDOWN! in a show of support for PTC's assertions and/or to show their disapproval of WWF programming. PTC in turn exploited the false impression of the "tidal wave" they had contrived to induce additional WWF SMACKDOWN! sponsors to join the PTC's fictitious "bandwagon."

**F.     PTC Tortiously Interferes With WWF's Contracts With Toy Retailers**

135.     In October, 2000, PTC sent letters from Bozell and more PTC videos to WWF toy retailers including Wal-Mart, K-Mart, Target, Kay-Bees Toys, Toys "R" Us, and FAO Schwarz (which resides in New York).

136.     The letters defamed the WWF by implying that the WWF was responsible for the deaths of children in Texas, Florida, Georgia and Washington. The letter sent to each aforementioned toy retailer stated:

> In the past year and a half, four children have been killed by other children who were mimicking moves they learned by watching wrestling. Here are the startling and sad facts surrounding these four instances:
>
> - In Dallas Texas, a seven year-old boy kills his 3 year-old brother by performing a wrestling move he was mimicking known as a "clothesline." The three year old suffers brain swelling and dies of injuries do the head.
>
> - In Hudson County, Georgia, Earl Rose, leaves his [sic] the home to buy some cigarettes. He puts on a wrestling video

37

to entertain the kids in his absence. While he was gone, a 4-year-old jumps up and down on 15 month-old Ramone King. Ramone dies of massive injuries to the head and chest. The prosecutors believe a 4-year-old was mimicking what he saw on WWF wrestling video, which is used as evidenced in the felony charges brought against Mr. Rose.

- In Florida, 12 year-old Lionel Tate kills six-year-old Tiffany Eunick by performing several wrestling moves on her. Tiffany suffers 30 contusions and part of her liver is detached. Newspaper articles describe her as being battered like a "rag doll." Lionel has been charged with first-degree murder.

- In Yakima, Washington, 12-year-old Jason Whala, while babysitting his 19 month-old cousin William Sweet, becomes upset when the toddler does not stop crying. Jason lifts the toddler over his head, turns the baby facing towards him, and slams him to the ground. This is a move known as the Jack Knife Power Bomb. He performs this move until William stops breathing and there is blood coming from William's nose and mouth.

137.   The PTC also copied portions of WWFE's copyrighted programming which they included in the tape sent to the toy retailers. PTC did not seek or obtain WWFE permission to do so.

138.   After receipt of the PTC's letter and video, the toy seller FAO Schwarz agreed to stop selling WWF merchandise. In an attempt to further tarnish the WWF mark, the PTC issued a Press Release regarding this announcement claiming that FAO Schwarz's announcement was the direct result of ceding to PTC's pressure .

139.   The tortious and other unlawful activity by PTC in sending the defamatory letters and the videos to toy retailers has caused the WWFE to suffer losses in toy revenues and has tarnished the WWF mark.

**G.   Defendants' Malice and Bad Faith is Demonstrated By the Willful Continuation of Their Unlawful Conduct Subsequent to the Tate Verdict and Sentencing and WWFE's Demands for Retraction**

140.   On January 25, 2001, the Lionel Tate jury returned a verdict finding Lionel Tate guilty of first degree murder. The evidence at the Tate trial proved that:

(1) Lionel Tate at no time claimed he was wrestling with Tiffany Eunick during his interview with police;

(2) Lionel Tate claimed he was playing tag with Tiffany Eunick;

(3) The nature and extent of Tiffany Eunick's injuries were not consistent with the version of the facts told by Tate or Lewis;

(4) Tiffany Eunick's death was not an accident and was admitted by Tate's own expert at trial to have been a homicide; and

(5) Lionel Tate told a court-appointed expert he knew wrestling was fake and that you could not perform the moves seen on television without seriously injuring someone.

141.   After the verdict, several jurors spoke out about the rejection of the "wrestling defense." In the January 25, 2001 Sun-Sentinel, juror Mr. William Stevenson was quoted as follows:

> The injuries were so extensive we all felt that it wasn't an accident.
> We had to abide by the law and the law spelled it out. . . . It just
> wasn't wrestling.

In the following day's Miami Herald, juror Steve Danker was also quoted as follows:

> The whole wrestling thing just wasn't a big issue in this case. I
> just don't believe you can do that kind of damage to someone and
> not understand what you were doing.

Likewise, on January 26, 2001, juror Kathleen Pow-Sang appeared on CNN's "Burden of Proof" along with prosecutor Ken Padowitz. Ms. Pow-Sang stated that the jury unanimously agreed that wrestling was not a consideration in the Tate case.

142.   On January 30, 2001, WWFE, through its attorneys, sent a letter to the attorneys for PTC Defendants, detailing the evidence revealed during the Tate trial and the jury's unanimous and definitive denunciation of Tate's "wrestling defense" and demanding that they retract the defamatory statements they had made to date. The retraction demand clearly set forth

39

the defamatory statements that were to be retracted and illustrated unequivocally why those statements were defamatory. Specifically, the letter demanded the retraction of all statements that Lionel Tate killed Tiffany Eunick as a result of mimicking wrestling moves he saw on television, specifically SMACKDOWN!.

143.   Despite the overwhelming evidence that PTC Defendants' statements concerning WWFE and WWF SMACKDOWN!'s responsibility for Tiffany Eunick's death were false, they failed and refused to retract these statements after receiving the January 30, 2001 letter.

144.   Not only did the PTC Defendants fail to retract prior false statements following the Tate verdict, they maliciously continued to republish their false and defamatory statements accusing WWFE of being responsible for the deaths of four children, including Tiffany Eunick. After receipt of the January 30, 2001 letter from the WWFE demanding retractions, PTC sent a letter signed by Bozell to Members reiterating their siren call that WWFE caused the deaths of four children. Bozell stated, "According to numerous press reports there have been at least four cases where children have killed other children by mimicking what they saw on television."

145.   In the same letter, Bozell accused WWFE and Vince McMahon of making death threats. In that regard, Bozell, for PTC, stated:

> I need your most generous Membership gift to help me show
> Vince McMahon and the WWF . . . the Howard Sterns and
> everyone else out there in sleaze-land . . . that we've not been
> slowed, not one bit. And we're going to continue stronger than
> ever before. That all their lawsuits, all their detectives, all their
> smear campaigns, all their death threats – they're not going to stop
> us.

146. At no time has Vince McMahon made a death threat to or about Bozell or any person employed by or affiliated with PTC. Bozell knew such statement to be false when he made it.

147. At no time has WWFE made a death threat to or about Bozell or any person employed by or affiliated with PTC. Bozell knew such statement to be false when he made it.

148. On March 9, 2001, the Honorable Judge Joel T. Lazarus issued an Order in the Lionel Tate case sentencing Lionel Tate to life imprisonment. Judge Lazarus echoed the statements of the individual jurors who had been interviewed regarding the so-called "wrestling defense," all of whom stated that wrestling had nothing to do with the death of Tiffany Eunick. Judge Lazarus directly and explicitly rejected the notion that Lionel Tate accidentally killed Tiffany Eunick by mimicking wrestling and alluded to the possibility that the "wrestling defense" was nothing but a sham:

> But the facts on which the jury relied are deceptively simple in rejecting the involvement of professional wrestling replication; thus by necessary implication, accident:
>
> 1. In the two statements to the police, Lionel Tate's own words failed to indicate that wrestling played any part in Tiffany's brutal murder. The statements did not come close to explaining what happened in that townhouse.
>
> 2. In statements made to EMS and the police by the defendant's mother, neither accident nor wrestling played any part in Tiffany's fatality.
>
> Not until there was a defense-initiated reenactment did actions initiating professional wrestling start to emerge as a defense. This reenactment totally failed to explain to the jury during trial, and to this judge sitting as a thirteenth juror in the motion for new trial/reduction of charge, the extent and severity of the injuries to Tiffany Eunick. Even though the reenactment depicted a connection to professional wrestling, the testimony of Dr. Brannon shows that Lionel Tate disbelieved the authenticity of what he saw

41

on television. The reenactment in all due respect, seemed to be trying to fit the facts, rather than a true depiction of the events.

Accordingly, the jury obviously then, and this court now, did not and does not accept that replicating what may or may not have been seen in various televised wrestling shows as a reason to call Lionel Tate's actions 'accidental.'

Judge Lazarus, after listing the numerous injuries suffered by Tiffany Eunick, also stated that, "[I]t is inconceivable that such injuries, could be caused by 'roughhousing,' 'horseplay' or by replicating professional wrestling moves."

149.    Following the issuance of the Lionel Tate sentencing Order, and still having received no response whatsoever to its previous demand for a retraction, WWFE sent another letter, enclosing Judge Lazarus' Order and making a second demand for a retraction. Again, the PTC Defendants failed and refused to retract the statements, which had now been judicially recognized as false.

150.    On April 4, 2001, less than one month after Judge Lazarus issued his sentencing Order and two weeks after receiving WWFE's second demand for a retraction, PTC Defendants sent a letter from Tucker to the Director of Communications and Marketing for the National Association of Secretaries of State (NASS) and, upon information and belief, to each of the Secretaries of State of all fifty states, denouncing NASS' alliance with WWFE in the *Smackdown Your Vote!* initiative, which, in coalition with the Youth Vote Coalition, Project Vote Smart and MTV's Choose or Loose, resulted in more than 150,000 new voters in little more than two months. This letter contains the same defamatory statements that have been previously made by PTC that WWFE is responsible for the deaths of four children. Tucker writes:

If that were not enough, wrestling programs are having a deadly impact on our children. In the past two years, there have been press reports of instances in which children have been killed by other children who were mimicking moves they learned by

42

watching wrestling. Enclosed in this packet are the chilling details of the children who have lost their lives.

151.   PTC Defendants enclosed with the letter a PTC article entitled, "When Children Kill Children, How Much Influence Does TV Have?" Despite the recent denunciation of Tate's "wrestling defense," the PTC in this article again falsely accused WWFE of being responsible for the murders of four children, including Tiffany Eunick, and disingenuously reported only that Lionel Tate had been charged with first degree murder in Tiffany Eunick's death. No mention was made of his conviction, the juror's rejection of the wrestling defense, or Judge Lazarus' rejection of the assertion that Tate was just mimicking moves he had seen on television. The article stated:

> On January 16, 1999, in Yakima, Washington, 12-year-old Jason Whala, an avid wrestling fan, killed his 19-month-old cousin William Sweet with a "Jackknife Power Bomb" when he wouldn't stop crying. The move involved Jason picking William up over his head, turning the child toward him, and slamming him to the ground. Jason was convicted of second-degree felony murder.
>
> On May 27, 1999, a seven-year-old boy killed his three-year-old brother by performing a "clothesline." According to the Dallas Morning News, this was a move "that he had seen his wrestling heroes perform on TV."
>
> \* \* \*
>
> In Broward County, Florida, 12-year-old Lionel Tate was charged with first-degree murder in the July 28 death of a playmate, six-year-old Tiffany Eunick. According to the Fort Lauderdale Sun-Sentinel, Tate told psychiatrist Joel Klass that he had been copying wrestling moves he had seen on television.
>
> In Hudson County, Georgia, a four-year-old child jumped up and down on a 15-month-old baby and killed him after their babysitter left the house to buy cigarettes. The babysitter put on a WWF video to entertain the children while he was gone. According to Court TV, the prosecutor believes the four-year-old was mimicking what he saw on the wrestling video and also believes the child thought he could do what he was doing without permanently damaging the baby.

43

152.   PTC and Tucker also enclosed with the letter an Appendix entitled "Children Killing Children," a report by PTC which reinforces the notion that there was a connection between the four deaths and WWFE.  This report also contains false and misleadingly stale information, particularly with respect to the status of the Tiffany Eunick murder investigation:

> In the past two years, four children have been killed by other children mimicking wrestling moves they learned by watching wrestling programs.  Here are the startling facts:
>
> - In Dallas, Texas a 7 year-old boy kills his 3 year-old brother by performing a wrestling move he was mimicking known as a "clothesline." The 3 year old suffers brain swelling and dies of injuries to the head.
>
> - In Hudson County, Georgia, Earl Rose, leaves his the [sic] home to buy some cigarettes.  He puts on a wrestling video to entertain the kids in his absence.  While he is gone, a 4-year-old jumps up and down on 15-month-old Ramone King.  Ramone dies of massive injuries to the head and chest.  The prosecutors believe the 4-year-old was mimicking what he saw on the WWF wrestling video, which is used as evidence in the felony charges brought against Mr. Rose.
>
> - In Florida, 12-year-old Lionel Tate kills six-year-old Tiffany Eunick by performing several wrestling moves on her.  Tiffany suffers 30 contusions and part of her liver is detached.  Newspaper articles describe her as being battered like a "rag doll." Lionel has been charged with first-degree murder.
>
> - In Yakima, Washington, 12-year-old Jason Whala, while babysitting his 19 month-old cousin William Sweet, becomes upset when the toddler does not stop crying.  Jason lifts the toddler over his head, turns the baby facing towards him, and slams him to the ground.  This move is known as the Jack Knife Power Bomb.  He performs this move until William stops breathing and there is blood coming from William's nose and mouth.

44

153.    Also enclosed with the Secretaries of State letters was a copy of the PTC 1999 Annual Report in which PTC Defendants misrepresented the companies who had pulled their ads from WWF SMACKDOWN! and falsely implied that WWF had orchestrated death threats against the PTC, stating:

> By December, the PTC had convinced many of the sponsors to pull their ads, including Ford, M&M Mars, Wendy's, General Motors, AT&T, Coca-Cola, and the U.S. Army, Navy, Air Force, and Coast Guard. Following the advertisers' rapid defection, the WWF publicly pledged to clean up its act. WWF supporters then bombarded the PTC with e-mails, phone calls, hate mail – *and even death threats.*

154.    In addition to the defamatory PTC materials, PTC Defendants enclosed with the Secretary of State letters a video containing clips of WWFE's copyrighted programming. PTC Defendants copied portions of WWFE's copyrighted programming without authority or privilege.

155.    At the time PTC Defendants made the above statements they knew that Lionel Tate had not only been charged with first degree murder, but had been convicted and sentenced to life imprisonment because of Judge Lazarus' and the Tate jury's unambiguous rejection of Tate's "wrestling defense."

156.    PTC's statements that Lionel Tate killed Tiffany Eunick mimicking wrestling moves, after being provided with the trial judges opinion emphatically disregarding that claim and other materials sent with the retraction letters, were especially malicious.

## H.    Defendants' Tortious and Unlawful Activity Has Caused WWFE Harm

157.    In actual fact, as is known to PTC Defendants and Lewis, neither the Tate case nor any of the other three death cases has anything to do with WWFE or WWF SMACKDOWN!.

158.    For his part, even after the verdict, Lewis continued to make public statements that the death was an accident, even though his own expert admitted at trial it was a homicide, not an accident.

159.    Moreover, PTC Defendants and Lewis knew that all of their tortious activity and other unlawful conduct detailed above would likely cause financial harm to the WWFE and harm to the WWF mark. The Defendants willfully and maliciously caused such harm to the WWFE as particularly evidenced by their continuation to publish the defamatory statements even after a judicial rejection of the notion that Lionel Tate accidentally killed Tiffany Eunick using wrestling moves and two demands for retraction of the statements by WWFE.

160.    The above-mentioned tortious and unlawful conduct was the direct and proximate cause of damage to the WWFE, including, *inter alia,* loss in revenues, and tarnishment of the WWF mark and WWFE reputation.

## COUNT I

### Defamation (Libel and Slander)

### (Against All Defendants)

161.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

162.    Defendants have made both oral and written statements regarding WWFE and WWFE's television programming.

163.    Specifically, Defendants have made orally and/or in writing, *inter alia,* the following statements regarding the deaths of four children, including the murder of Tiffany Eunick.

164.    At ConAgra's shareholder meeting on or around September 28, 2000, and as reprinted on the PTC Internet website, Defendant Honig stated:

46

> In fact, four children, aged 4 months to six years old, have had their lives cut tragically short by peers who were emulating wrestling moves they learned by watching programs like WWF Smackdown! Police reports, autopsy reports, attorneys for the defendants point the finger of blame at the wrestling industry that purposely targets children as an audience.

165.   At MCI's shareholder meeting on or around June 1, 2000, and as reprinted on the PTC Internet website, Steve Allen, in his capacity as national honorary chairman of PTC, stated:

> Again I must stress to you stock-holders that wrestling shows are having a deadly impact on our children. Four children have been killed by peers who were emulating wrestling moves they learned by watching programs such as WWF Smackdown!
>
> Four children, from 14 months to six years old, had their lives cut tragically short because of the effect wrestling had on their peers. Police reports, attorneys for the defendants, autopsy reports, and victims' families point the finger of blame at a wrestling industry that purposely targets children as an audience.

166.   On PTC Defendants' "About the PTC" page of the PTC Internet website, PTC Defendants falsely associated WWF SMACKDOWN! with the deaths of four children as follows:

(A) Referring on the website to the four children's deaths as "[t]he recent WWF tragedies."

(B) Featuring an article regarding the four children's deaths on the WWF SMACKDOWN page of the PTC website under the heading "Children, Wrestling, and Murder."

(C) Stating that in murdering Tiffany Eunick, Lionel Tate "had been copying wrestling moves he had seen on TV."

(D) Stating that "Jason Whala, an avid wrestling fan, killed his 19-month old

cousin William Sweet with a 'Jackknife Power Bomb' (what the move is

now referred to by the WWF) when he wouldn't stop crying."

(E) Stating with regard to the murder of a 15-month old baby in Hudson

County, Georgia, "the prosecutor believes the four-year-old was

mimicking what he saw on the wrestling video and also believes the child

thought he could do what he was doing without permanently harming the

baby."

167.    In an August 4, 2000 press release of an interview of Defendant Bozell on

the WrestlingObserver.com Internet website, Defendant Bozell stated:

> The sheer arrogance and irresponsibility of the WWF while
> they line their pockets is frightening, especially when you
> have news reports of four children having killed four
> children copy-catting what they watched on television. The
> finger is pointing directly to Smackdown! and they still
> don't care. You start flirting with the word evil at that
> point.

168.    In a letter to the President of NBC, West Coast, regarding the content of

WWF SMACKDOWN! and NBC's plan to broadcast the XFL football games in 2001,

Defendant Bozell stated, "Moreover, four children have been killed by other children performing

wrestling moves on them that they had seen on wrestling programs."

169.    In letters to the CEO of Subway and, upon information and belief, to the

CEOs of forty-four other major corporations, Defendant Bozell accused WWFE of causing the

deaths of four children by stating:

> For instance, you may not know that in the past year and a
> half, four children have been murdered by other children
> who were mimicking moves they learned by watching
> wrestling. Here are the startling and sad facts surrounding
> these four instances:

- In Dallas, TX a 7 year-old boy killed his 3 year-old brother by performing a wrestling move he was mimicking know as a "clothesline." The 3 year old suffers brain swelling and dies of injuries to the head. According to police reports he'd been mimicking wrestling.

- In Hudson County Georgia, Earl Rose who is babysitting for a friend, left his home to buy some cigarettes. He puts on a WWF video to entertain the kids in his absence. While he is gone, a 4 year old jumps up and down on 15-month-old Ramone King. Ramone dies of massive injuries to the head and chest. The prosecutors believe the 4 year old was mimicking what he saw on the WWF wrestling video, which is used as evidence in the felony charges brought against Mr. Rose.

- In Florida, 12 year-old Lionel Tate killed six year-old Tiffany Eunick by performing several wrestling moves on her. Tiffany suffers 30 contusions and part of her liver is detached. Newspaper articles describe her as being battered like a "rag doll." Lionel has been charged with first degree murder. Attorneys for both families are pointing the finger of blame at the WWF, which this child was watching regularly.

- In Yakima, WA 12 year-old Jason Whala, while babysitting his 19 month-old cousin William Sweet, becomes upset when the toddler would not stop crying. Jason lifts the toddler over his head, turns the baby facing towards him, and "slams" him to the ground. This is a move known as the Jack Knife Power Bomb. He performs this move until William stops breathing and there is blood coming from William's nose and mouth.

170.    In letters to the CEOs of Toys 'R Us, FAO Schwartz, K-B Toys, Wal-Mart, Kmart, and Target, Defendant Bozell accused WWFE of causing the four children's deaths by stating:

> In the past year and a half, four children have been killed by other children who were mimicking moves they learned by watching wrestling. Here are the startling and sad facts surrounding these four instances:

- In Dallas, Texas as 7 year-old boy kills his 3 year-old brother by performing a wrestling move he was mimicking known as a 'clothesline.' The 3 year-old suffers brain swelling and dies of injuries to the head.

- In Hudson County, Georgia, Earl Rose, leaves his [sic] the home to buy some cigarettes. He puts on a wrestling video to entertain the kids in his absence. While he is gone, a 4-year-old jumps up and down on 15-month-old Ramone King. Ramone dies of massive injuries to the head and chest. The prosecutors believe the 4-year-old was mimicking what he saw on the WWF wrestling video, which is used as evidence in the felony charges brought against Mr. Rose.

- In Florida, 12-year-old Lionel Tate kills six-year-old Tiffany Eunick by performing several wrestling moves on her. Tiffany suffers 30 contusions and part of her liver is detached. Newspaper articles describe her as being battered like a 'rag doll.' Lionel has been charged with first-degree murder.

- In Yakima, Washington, 12-year-old Jason Whala, while babysitting his 19 month-old cousin William Sweet, becomes upset when the toddler does not stop crying. Jason lifts the toddler over his head, turns the baby facing towards him, and slams him to the ground. This is a move know as the Jack Knife Power Bomb. He performs this move until William stops breathing and there is blood coming from William's nose and mouth.

171.    In a PTC fund raising video entitled "Clean Up TV Now," sent to, among others, PTC "members," Defendants accuse WWFE and professional wrestling of causing Tiffany Eunick's murder through, *inter alia*, the following statements:

(A) Steve Allen introducing a segment on Tiffany Eunick's murder by stating, "how a twelve-year old boy's steady diet of today's disturbing display, loosely referred to as wrestling, came to a horrifying end."

(B) Defendant Lewis stating in reference to whether WWFE and professional wrestling caused Tiffany Eunick's murder, "there is absolutely no other reason that anyone in this case can point to other than a child acting out

50

fantasies he sees on television and not really understanding the
ramifications of that type of physical contact."

(C) E. Ross Zimmerman, identified as attorney for the family of Tiffany
Eunick, stating, "What apparently happened was, that Lionel had been
watching the WWF, something he did virtually on a daily basis for hours
and hours a day. When he wasn't watching it on television, he was
watching the WWF home movies and what he did is he treated little
Tiffany like a rag doll and performed a series of wrestling moves on her
that killed her."

(D) Explaining that Lionel Tate was "emulating his [WWF] heroes."

172.   In a letter to PTC Members on or around September 1, 1999, Defendant
Bozell accused WWFE of causing the death of the Dallas boy by stating, "**Will they [the WWF]
never learn?**! Recently a 7 year-old boy in Dallas, Texas decided to copycat one of the moves
he'd seen on a TV wrestling show . . . He tried it on his 3 year old brother . . . and **killed** him."

173.   In a PTC "Urgent Gram," published in or around October 1999, PTC
accused WWFE in the death of the Dallas boy and the murder of Tiffany Eunick by stating:

'We sell fun,' McMahon says. 'Really?'

Tell that to the parents of the 3-year old boy in North Dallas who on May
27 died from brain swelling after sustaining massive trauma to the head.
According to the Dallas Morning News, 'police initially suspected that an
adult had to have been responsible until they interviewed the boy's 7 year
old brother. He revealed that he had struck his brother with a 'clothesline'
move—running and hitting him in the neck with an outstretched arm—that
he had seen his wrestling heroes perform on TV.'

Or tell it to the parents of the 12-year old Lionel Tate, who was charged
with first degree murder after the death of a 6-year old girl on July 28.
Testimony showed that the boy was copying wrestling moves he'd seen on
TV, including whipping the little girl, Tiffany, into an iron stairway

railing. The coroner's report said that little Tiffany suffered such a brutal beating that her liver was actually severed.

Targeting children with this garbage is no 'prank'—its criminal! I am determined to make a national issue of this criminally irresponsible program . . . ."

174.   In Defendant Bozell's syndicated column dated March 9, 2000, Defendant Bozell accused WWFE in the murder of Tiffany Eunick by stating:

> (A) "Last summer, six-year old Tiffany Eunick died at the hands of a twelve-year old boy , a wrestling buff like so many boys his age. And the family is pointing the finger of blame directly at the WWF."

> (B) Republishing statements attributed to Glen Rodermann, identified as an attorney for Tiffany Eunick's family, "The WWF 'has definitely played a role in this case . . . Anyone that knows this case, who knows this boy . . . know[s] that [he] was heavily influenced by wrestling."

> (C) Republishing statements attributed to E. Ross Zimmerman, identified as Roderman's co-counsel, "'This little girl's head was crushed. Her brain was damaged severely by things that are . . . extremely consistent with the Stone Cold Stunner move,' the signature move of WWF wrestler Stone Cold Steve Austin."

175.   In a May 5, 2000 Action Alert letter to Members, Defendant Bozell accused WWFE in the death of Tiffany Eunick by stating:

> . . . and soon we may have Karmazin to thank for saturating the nation's airwaves with a program that in at least one instance has provided training in homicide for a pre-adolescent boy . . .
>
> Maybe we should ask the Eunick family in South Florida how they feel about the lessons taught by World Wrestling Federation.

52

> Last summer their six-year-old daughter died at the hands
> of a 12-year-old boy, a wrestling buff like so many boys his
> age. And attorneys for both families – the victim's and the
> perpetrator's – are pointing the finger of blame directly at
> the WWF.

176.    In a speech by Defendant Bozell at the Conservative Leadership Conference on November 19, 1999, Defendant Bozell accused WWFE in the death of the Dallas boy and the murder of Tiffany Eunick by stating:

> Still, the same apologists for [WWF Smackdown's] nauseating violence
> will continue to snicker, "Come now. The audience, the children know
> it's only make believe."
>
> Really? Tell that to the parents of the 3 year old boy in North Dallas who
> on May 27 died from brain swelling after sustaining massive trauma to the
> head. According to the Dallas Morning News, the trauma was so vicious
> that Dallas police initially suspected that an adult had to have been
> responsible until they interviewed the boy's 7 year old brother. He
> revealed that he had struck his brother with a 'clothesline' move – running
> and hitting him in the neck with an outstretched arm – that he has seen his
> wrestling heroes perform on TV.
>
> Or tell the parents of 12 year old Lionel Tate, who was charged with first
> degree murder shortly after the death of a 6-year-old girl on July 28[th]. A
> Court psychiatrist testified that the boy said he was copying moves he
> watched on television, including whipping the little girl Tiffany into an
> iron stairway railing. According to the coroner's report, little 6-year old
> Tiffany suffered such a sustained and brutal beating that it severed her
> liver while causing a host of serious injuries.
>
> Yes, tell Tiffany's parents her death was make believe, too.
>
> When I tell you that so-called "entertainment" television has become
> dangerous and destructive for the family, I'm not exaggerating, am I?

177.    In Defendant Bozell's nationally syndicated column dated December 1, 1999, Bozell accused WWFE in multiple deaths, including the deaths of the Dallas boy and the murder of Tiffany Eunick by stating:

> Then there's a seven-year-old boy who killed his three year old brother by
> knocking him to the floor with, in the words of the Dallas Morning News, 'a
> 'clothesline' move—running at him and hitting him in the neck with an
> outstretched arm—that he had seen his wrestling heroes perform on TV.'

And in South Florida, a 166 pound, twelve year-old boy killed a six year old, forty eight pound girl by whipping her into an iron stairway railing. A psychiatrist testified that the boy told him that what he did to the girl was 'similar to throwing someone into the ring ropes, like they do in wrestling.' Its not all 'make believe,' either.

178.    On the O'Reilly Factor television program on April 28, 2000, Defendant Lewis stated, "They [Tate and Eunick] were acting out what they saw on television. The WWF and the WCW. He had watched wrestling over a period of years and was basically playing with this little girl when he killed her."

179.    In the November 15, 2000 Miami Herald article entitled "Pro Wrestling Group Sues Boy's Attorney," Defendant Lewis stated, "There's no explanation any person has given to explain why a little boy would do what he did if it wasn't for watching wrestling shows."

180.    On the Leeza Gibbons television program on October 22, 1999, Defendant Lewis stated, "They [Tate and Eunick] were playing together, acting out wrestling moves apparently they both watch."

181.    In the March 9, 2000 Miami Herald article entitled "Bowdren Speaks With Boy's Attorney," Defendant Lewis stated, "You have a young boy acting out a move he sees on television."

182.    On the Crier TV television program on March 22, 2000, Defendant Lewis stated, "My client basically said that they were playing wrestling and that he came up behind her and dropped her to the floor and she hit her head and what he said is consistent with what a child perceives wrestling on television and acting it out on a playmate, and unfortunately a playmate much smaller than him, its very conceivable that what he [sic] when acting out this wrestling caused her death."

54

183.   In the April 7, 2000 article on the apbnews.com Internet website entitled "Wrestlers Fight to Skip Child's Murder Trial," Defendant Lewis stated, "Unfortunately . . . when children watch professional wrestling, sometimes child play turns into lethal play."

184.   The foregoing statements were false and defamatory.

185.   Defendants have also made the following statements regarding advertisers that allegedly had "pulled" and/or "withdrawn" their support for WWF SMACKDOWN!.

186.   In a PTC press release dated August 1, 2000, PTC stated:

> When the PTC alerted the **Army, Navy, Air Force and Coast Guard** to the content on Smackdown!, they all pulled their sponsorship, stating that the show did not reflect their core values.  To date, more than thirty corporations contacted by PTC have withdrawn their support of WWF Smackdown!, including corporate giants like **Wendy's, Ford, General Motors, Coca Cola, AT&T, M&M Mars, Clorox, State Farm, Office Depot, Walgreens, Saks, Inc., Delta Airlines, Southwest Airlines, Allstate Insurance, Gap, Proctor & Gamble, Hershey's, McDonalds, SBC Enterprises, Maytag, Colgate, Palmolive, Kellogg's, Pfizer, Domino's, Federated Department Stores, Best Foods, Wrigley's Bank of America, Johnson & Johnson, Dr. Pepper/Seven-Up and MCI WorldCom.**

187.   In a letter to Dennis Hastert, Speaker of the United States House of Representatives, dated August 1, 2000, Defendant Bozell stated:

> When the PTC alerted the Army, Navy, Air Force and Coast Guard to the content on Smackdown!, they all pulled their sponsorship, stating that the show did not reflect their core values.  To date, more than thirty corporations contacted by PTC have withdrawn their support of WWF Smackdown!, including corporate giants like Wendy's, Ford, General Motors, Coca Cola, AT&T, M&M Mars, Clorox, State Farm, Office Depot, Walgreens, Saks Inc., Delta Airlines, Southwest Airlines, Allstate Insurance, Gap, Proctor & Gamble, Hershey's, McDonalds, SBC Enterprises, Maytag, Colgate-Palmolive, Kellogg's, Pfizer, Domino's, Federated Department Stores, Best Foods, Wrigley's Bank of America, Johnson & Johnson, Dr. Pepper/Seven-Up and MCI WorldCom.

188.   In a PTC press release dated August 1, 2000, PTC stated:

When the PTC alerted the **Army, Navy, Air Force and Coast Guard** to the content on Smackdown!, they all pulled their sponsorship, stating that the show did not reflect their core values. To date, more than thirty corporations contacted by PTC have withdrawn their support of WWF Smackdown!, including corporate giants like **Wendy's, Ford, General Motors, Coca Cola, AT&T, M&M Mars, Clorox, State Farm, Office Depot, Walgreens, Saks Inc., Delta Airlines, Southwest Airlines, Allstate Insurance, Gap, Proctor & Gamble, Hershey's, McDonalds, SBC Enterprises, Maytag, Colgate-Palmolive, Kellogg's, Pfizer, Domino's, Federated Department Stores, Best Foods, Wrigley's Bank of America, Johnson & Johnson, Dr. Pepper/Seven-Up and MCI WorldCom.**

George Bush should do what corporate America is doing in droves— disassociating itself with the vulgarity and violence the WWF weekly markets to over 3 million children. Over thirty corporate CEO's have pulled their sponsorship of WWF Smackdown!. As the de facto CEO of the GOP, George Bush should make the responsible decision and do the same thing.

189.    On the August 2, 2000 CNN Crossfire television program in an appearance with WWF's THE ROCK character, Defendant Bozell stated, "the reality is, that in the last several months, over 30 major sponsors, including Coca-Cola, MCI, the Armed Forces, Army, Navy, Coast Guard, a bevy of national sponsors, have seen what [the WWF] is doing. They're so disgusted by what you are doing they've all pulled advertising which makes a [sic] remarkable that now the Republican Party is adopting you."

190.    In or around November 2000, PTC ran an advertisement in newspapers across the country, including the Chicago Tribune, that stated, "Recently, appeals from viewers of on particularly loathsome 'wrestling' program got 35 sponsors to cancel their ads."

191.    At ConAgra's shareholder meeting on September 28, 2000, and as reprinted on the PTC Internet website, Defendant Honig stated:

Therefore I am here to ask you: Does ConAgra plan to continue sponsoring WWF Smackdown! Or will you decide, as have nearly 40 other major U.S. corporations, to make what is a socially and corporately responsible decision and stop sponsoring this trash.

56

192.    In the PTC 1999 Annual Report which PTC Defendants enclosed with an April 12, 2001 letter sent to each of the fifty Secretaries of State, the PTC stated, "By December, the PTC had convinced many of the sponsors to pull their ads, including Ford, M&M Mars, Wendy's, General Motors, AT&T, Coca-Cola, and the U.S. Army, Navy, Air Force, and Coast Guard."

193.    On the PTC Internet website, PTC purported to list "Sponsors Who Pulled Their Support" from WWF SMACKDOWN!. The PTC identified the following companies as having "pulled their support" from WWF SMACKDOWN! as a result of the PTC: Allstate, American Dairy Farmers, AT&T, Bank of America, Best Foods, Campbell Soup Company, Clorox, Coca-Cola, Colgate-Palmolive, Domino's, Dr. Pepper, Federated Department Stores, Ford, Gap, General Motors, The Gillette Company, Hershey Foods, Kellogg's, MCI Worldcom, M&M Mars, Maytag, Levi's, Pfizer, Procter & Gamble, SBC Communications, Southwest Airlines, Tricon Global, U.S. Air Force, U.S. Army, U.S. Navy, U.S. Coast Guard, Wendy's and William Wrigley Jr., Corp. In other public statements, the PTC has claimed that McDonalds, Delta Airlines, Johnson & Johnson and Burger King have pulled their sponsorship from WWF SMACKDOWN! as a result of the PTC.

194.    Each of the foregoing statements regarding advertisers are false and defamatory.

195.    PTC has also made the following statements regarding the number of people authorizing PTC to speak on their behalf against WWF SMACKDOWN!:

196.    In a letter to Admiral James Loy, Commandant of the U.S. Coast Guard, Defendant Bozell derided the Coast Guard for advertising on WWF SMACKDOWN! and stated,

57

"On behalf of the 300,000 members of the PTC, we demand that the Coast Guard immediately stop sponsoring the worst of television."

197.    In a letter to Secretary Rodney Slater of the Department of Transportation, Defendant Bozell again stated, "On behalf of the 300,000 members of the PTC, we demand that the Coast Guard immediately stop sponsoring the worst of television."

198.    In a letter to the public in March, 2000, Defendant Bozell stated that "over 400,000 Americans have joined me in the PTC by signing the Warning to Sponsors."

199.    In a letter to Scott Sassa, President of NBC West Coast, Defendant Bozell stated, "I am writing you to express my concern – as well as that of the 500,000 members of the Parents Television Council – over the recently announced partnership between NBC and World Wrestling Federation Entertainment, Inc. (WWFE), to broadcast the new XFL next season."

200.    At the MCI shareholders meeting on June 1, 2001, Defendant Tucker, on behalf of PTC, addressed the MCI Shareholders, stating:

> I come here as a voice for the 500,000 members of the Parents Television Council who are outraged by MCI's loyal and frequent sponsorship of one of the most violent, sexually graphic, racist, sexist and foul-mouthed programs to air on prime time television, WWF Smackdown!"

201.    Steve Allen also spoke on behalf of PTC at the June 1, 2000 meeting and stated:

> The PTC would like your response to this question [regarding whether MCI would continue to sponsor SMACKDOWN!] by the 8[th] of June so that we may let our half-million members know whether or not MCI will still be one of Smackdown!'s loyal sponsors.  The PTC has run the largest advocacy ad campaign in history, reaching over 215 million people, decrying the trashy programming coming from

Hollywood and calling for corporate America to
act responsibly with its advertising dollars.

202.    In a July 26, 2000 letter mailed to the CEO of Subway and forty-four other

CEOs of major corporate sponsors and advertisers, Defendant Bozell stated:

> As Chairman of the Parents Television Council,
> I am writing you on behalf of our 500,000
> members to ask you to exercise responsible
> advertising practices and stop sponsoring WWF
> Smackdown! with Subway's advertising dollars.

203.    In letters mailed to several toy retailers, including Target, Wal-Mart, FAO

Schwartz, Kmart and Toys 'R Us in October 2000, Defendant Bozell stated:

> As Chairman of the Parents Television Council,
> I am writing to you on behalf of our 625,000
> members to ask you to stop selling World
> Wrestling Federation action figures to children.

204.    In Mark Honig's address at the ConAgra Shareholders Meeting,

Defendant Honig stated:

> I am here representing our nearly 600,000
> members nationwide who are outraged at
> ConAgra's frequent and loyal support of the
> one of the most violent, sexually graphic, and
> foul-mouthed prime time programs to air on
> commercial broadcast television, WWF
> Smackdown!

205.    Each of the foregoing statements regarding  membership, and action by

PTC in a representative capacity, are false, misleading and defamatory.

206.    PTC and Bozell have accused WWFE and its Chairman of orchestrating

unlawful threats and conduct towards PTC Defendants:

207.    In the January 2001 PTC Insider, it is stated that:

> the WWF community was doing everything it could to disrupt our work.
> They spread malicious rumors about me all over the Internet. . . . PTC

staff were harassed with hundreds of obscene e-mails, some containing viruses that would up destroying more than one computer system. There were threats of violence and even death threats against the PTC staff in general and me personally. One such death threat recently was aimed at Senator Joseph Lieberman, was turned over to the FBI and taken seriously enough that the Secret Service is investigating.

208.   In a letter to Members sent after the Tate verdict and after the WWFE's first demand for a retraction, Defendant Bozell again accused WWFE of being responsible for the deaths of four children, including Tiffany Eunick, and accused WWFE and Vince McMahon of death threats:

> According to numerous press reports there have been at least four cases where children have killed other children by mimicking what they saw on television.
>
> * * *
>
> I need your most generous membership gift to help me show Vince McMahon and the WWF . . . the Howard Sterns and everyone else out there in sleaze-land . . . that we've not been slowed, not one bit . . . That all their lawsuits, all their detectives, all their smear campaigns, all their death threats, they're not going to stop us.

209.   On April 12, 2001, and after receiving two retraction demands from WWFE, PTC sent letters from Defendant Tucker to the National Association of Secretaries of State ("the NASS letter") and, upon information and belief, to each of the fifty Secretaries of State continuing to accuse WWFE of being responsible for the deaths of children, including Tiffany Eunick. Specifically, in those letters and the materials enclosed therein, PTC and Tucker made the following defamatory statements.

210.   In the body of the NASS letter, PTC and Tucker accused WWFE of being responsible for the deaths of several children, stating:

> If that were not enough, wrestling programs are having a deadly impact on our children. In the past two years, there have been press reports of instances in which children have been killed by

60

other children who were mimicking moves they learned by watching wrestling. Enclosed in this packet are the chilling details of the children who have lost their lives.

211.   In an enclosure to the NASS letter entitled "When Children Kill Children, How   Much Influence Does Television Have?" PTC and Tucker made the following statements:

On January 16, 1999, in Yakima, Washington, 12-year-old Jason Whala, an avid wrestling fan, killed his 19-month-old cousin William Sweet with a "Jackknife Power Bomb" when he wouldn't stop crying. The move involved Jason picking William up over his head, turning the child toward him, and slamming him to the ground. Jason was convicted of second-degree felony murder.

On May 27, 1999, a seven-year-old boy killed his three-year-old brother by performing a "clothesline." According to the Dallas Morning News, this was a move "that he had seen his wrestling heroes perform on TV."

* * *

In Broward County, Florida, 12-year-old Lionel Tate was charged with first-degree murder in the July 28 death of a playmate, six-year-old Tiffany Eunick. According to the Fort Lauderdale Sun-Sentinel, Tate told psychiatrist Joel Klass that he had been copying wrestling moves he had seen on television.

In Hudson County, Georgia, a four-year-old child jumped up and down on a 15-month-old baby and killed him after their babysitter left the house to buy cigarettes. The babysitter put on a WWF video to entertain the children while he was gone. According to Court TV, the prosecutor believes the four-year-old was mimicking what he saw on the wrestling video and also believes the child thought he could do what he was doing without permanently damaging the baby.

212.   In an enclosure to the NASS letter entitled, "Children Killing Children," the PTC and Tucker made the following false and misleadingly outdated statements:

In the past two years, four children have been killed by other children mimicking wrestling moves they learned by watching wrestling programs. Here are the startling facts:

61

- In Dallas, Texas a 7 year-old boy kills his 3 year-old brother by performing a wrestling move he was mimicking known as a "clothesline." The 3 year old suffers brain swelling and dies of injuries to the head.

- In Hudson County, Georgia, Earl Rose, leaves his the [sic] home to buy some cigarettes. He puts on a wrestling video to entertain the kids in his absence. While he is gone, a 4-year-old jumps up and down on 15-month-old Ramone King. Ramone dies of massive injuries to the head and chest. The prosecutors believe the 4-year-old was mimicking what he saw on the WWF wrestling video, which is used as evidence in the felony charges brought against Mr. Rose.

- In Florida, 12-year-old Lionel Tate kills six-year-old Tiffany Eunick by performing several wrestling moves on her. Tiffany suffers 30 contusions and part of her liver is detached. Newspaper articles describe her as being battered like a "rag doll." Lionel has been charged with first-degree murder.

- In Yakima, Washington, 12-year-old Jason Whala, while babysitting his 19 month-old cousin William Sweet, becomes upset when the toddler does not stop crying. Jason lifts the toddler over his head, turns the baby facing towards him, and slams him to the ground. This move is known as the Jack Knife Power Bomb. He performs this move until William stops breathing and there is blood coming from William's nose and mouth.

213. In the 1999 Annual Report enclosed in the NASS letter, PTC and Tucker implied that WWFE was responsible for death threats against the PTC, stating, "WWF supporters then bombarded the PTC with e-mails, phone calls, hate mail – *and even death threats.*"

214. Each of the foregoing statements are false.

215. Each of the foregoing statements was published by Defendants with actual malice and/or reckless disregard for the truth. Each of the foregoing statements was published with ill will and hatred towards WWFE.

216. Each of the foregoing statements are defamatory.

217.   Each of the foregoing statements are defamatory *per se*.

218.   The foregoing defamatory statements were published by Defendants to numerous third parties, including WWFE sponsors, WWFE potential sponsors, WWFE vendors, public officials, and the public, through the Internet, direct mailings, the media and personal appearances.

219.   The foregoing defamatory statements explicitly or implicitly were applied to and intended to be applied to WWFE and WWF SMACKDOWN!.

220.   The recipients of Defendants' defamatory statements described herein understood both their defamatory meaning and that they were intended to apply to WWFE and WWF SMACKDOWN!.

221.   Defendants' defamatory statements described herein are, both individually and in the aggregate, defamatory in character, in that among other things, they (i) blackened the WWFE's reputation by charging WWFE with criminal conduct involving moral turpitude; (ii) exposed WWFE to public contempt, ridicule or hatred; (iii) injured WWFE in its businesses; (iv) so harmed WWFE's reputation in the estimation of the community so as to deter third parties from associating or dealing with WWFE; and (v) ascribed to WWFE conduct, character or a condition that would adversely affect the fitness of WWFE for the proper conduct of its business, trade or profession.

222.   In connection with Defendants' defamatory statements described herein, Defendants have no privilege or justification or have abused the same.

223.   As a direct and proximate result of the publication of Defendants' defamatory statements described herein, WWFE has suffered both general and special damages, including, *inter alia*, loss of advertising revenue and damage to WWFE's reputation.  Because the

63

foregoing defamatory statements were published with malice and/or were wantonly published in willful disregard for WWFE's rights. WWFE is entitled to and requests punitive damages.

## COUNT II

### Tortious Interference with Contractual Relations

### (Against All Defendants)

224.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

225.    WWFE maintained valid contracts with various third parties, including, *inter alia*, Clorox, Coca-Cola, Dr. Pepper/Seven-Up, and the U.S. Army, Navy and Air Force, to sponsor and/or advertise on the WWF SMACKDOWN! television program.

226.    Defendants had knowledge of WWFE's valid contracts with various third parties, including, *inter alia*, Clorox, Coca-Cola, Dr. Pepper/Seven-Up, and the U.S. Army, Navy and Air Force, to sponsor and/or advertise on the WWF SMACKDOWN! television program.

227.    Defendants intentionally sought to induce such third parties, including, *inter alia*, Clorox, Coca-Cola, Dr. Pepper/Seven-Up, and the U.S. Army, Navy and Air Force, to terminate their contracts with WWFE.

228.    In seeking to induce such third parties, including, *inter alia*, Clorox, Coca-Cola, Dr. Pepper/Seven-Up and the U.S. Army, Navy and Air Force, to terminate their contracts with WWFE, Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm WWFE.

229.    In seeking to induce such third parties, including, *inter alia*, Clorox, Coca-Cola, Dr. Pepper/Seven-Up and the U.S. Army, Navy and Air Force, to terminate their contracts

with WWFE, Defendants used, *inter alia*, the tortious conduct and false representations alleged herein.

230.    PTC has represented that as a direct result of their conduct, various third parties, including, *inter alia*, Clorox, Coca-Cola, Dr. Pepper/Seven-Up and the U.S. Army, Navy and Air Force, terminated their contracts with WWFE.

231.    As a direct and proximate result of Defendants' unlawful conduct, WWFE has been injured.

## COUNT III

### Tortious Interference with Contractual Relations

### (Against All Defendants)

232.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

233.    WWFE maintained valid contracts with various third parties, including, *inter alia*, ConAgra Corp. and MCI Worldcom, to sponsor and/or advertise on the WWF SMACKDOWN! television program.

234.    Defendants had knowledge of WWFE's valid contracts with various third parties, including, *inter alia*, ConAgra Corp. and MCI Worldcom, to sponsor and/or advertise on the WWF SMACKDOWN! television program.

235.    Defendants intentionally sought to induce such third parties, including, *inter alia*, ConAgra Corp. and MCI Worldcom, to terminate their contracts with WWFE to advertise on the WWF SMACKDOWN! television program.

65

236.     In seeking to induce such third parties, including, *inter alia,* ConAgra Corp. and MCI Worldcom, to terminate their contracts with WWFE, Defendants acted with malicious purpose and/or dishonest, unfair or improper means to harm WWFE.

237.     In seeking to induce such third parties, including, *inter alia,* ConAgra Corp. and MCI Worldcom, to terminate their contracts with WWFE, Defendants used, *inter alia,* the tortious conduct and false representations alleged herein.

238.     PTC has represented that as a direct result of their conduct, various third parties, including, *inter alia,* ConAgra Corp. and MCI Worldcom, terminated their contracts with WWFE to advertise on the WWF SMACKDOWN! television program.

239.     As a direct and proximate result of Defendants' unlawful conduct, WWFE has been injured.

## COUNT IV

### Tortious Interference with Prospective Business Relations

### (Against All Defendants)

240.     Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

241.     WWFE maintained business relations with various third parties, including, *inter alia,* Burger King, M&M Mars, Milk, Dr. Pepper/Seven-Up, and Nestle, to sponsor and/or advertise on the WWF SMACKDOWN! television program.

242.     Defendants had knowledge of WWFE's business relations with various third parties, including, *inter alia,* Burger King, M&M Mars, Milk, Dr. Pepper/Seven-Up, and Nestle, to sponsor and/or advertise on the WWF SMACKDOWN! television program and their likely continuation of such relationships in the future.

243. With knowledge of WWFE's business relations with such third parties, Defendants intentionally interfered with those business relations by attempting to induce such third parties not to sponsor and/or advertise on the WWF SMACKDOWN! television program both at present and in the future.

244. Defendants interfered with WWFE's business relations with such third parties with malicious purpose and/or using dishonest, unfair or improper means to harm WWFE.

245. In interfering with WWFE's business relations with such third parties, Defendants used, *inter alia,* the tortious conduct and false representations alleged herein.

246. PTC has represented that as a direct result of their conduct, various third parties, including, *inter alia,* Burger King, M&M Mars, Milk, Dr. Pepper/Seven-Up, and Nestle, would not sponsor and/or advertise on the WWF SMACKDOWN! television program both at present and in the future.

247. But for Defendants' tortious conduct alleged herein, such third parties would have continued to sponsor and/or advertise on the WWF SMACKDOWN! television program both at present and in the future.

248. As a direct and proximate result of Defendants' unlawful conduct, WWFE has been injured.

## COUNT V

### Product Disparagement and Trade Libel

**(Against All Defendants)**

67

249. Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

250. Defendants have disparaged WWFE's products and services provided pursuant to its WWF brand by, *inter alia*, accusing WWFE and the WWF SMACKDOWN! television program of causing the deaths of four young children, including the murder of Tiffany Eunick.

251. Such disparaging statements included specifically, *inter alia*, those statements alleged in Count I above, which allegations are specifically incorporated herein by reference and made a part hereof.

252. These disparaging statements are false.

253. Defendants' disparaging statements falsely accusing WWFE and the WWF SMACKDOWN! television program of causing the deaths of four children, including the murder of Tiffany Eunick, were made with actual malice and/or knowledge of the falsity of such statements to harm WWFE.

254. Defendants' disparaging statements falsely accusing WWFE and the WWF SMACKDOWN! television program of causing the deaths of four children, including the murder of Tiffany Eunick, were published to third parties.

255. As a direct and proximate result of the publication of Defendants' defamatory statements described herein, WWFE has suffered commercial injury to its business, reputation and goodwill, including, *inter alia*, special damages in the form of loss of advertising revenue resulting from various third parties terminating their advertising and/or sponsorship of the WWF SMACKDOWN! television program. Because the foregoing defamatory statements were published with malice and/or were wantonly published in willful disregard for WWFE's rights, WWFE is entitled to and requests punitive damages.

## COUNT VI

## Product Disparagement and Trade Libel

### (Against Defendants Bozell, MRC, PTC, Honig and Tucker)

256.   Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

257.   PTC Defendants have disparaged WWFE's products and services provided pursuant to its WWF brand by, *inter alia*, falsely misrepresenting that certain companies had "pulled their support" from sponsoring the WWF SMACKDOWN! television program when such companies had never sponsored the WWF SMACKDOWN! television program in the first instance.

258.   On or around October 26, 2000, PTC's Internet website purported to identify "Sponsors Who Pulled Their Support" from the WWF SMACKDOWN! television program.

259.   PTC Defendants' statements purporting to identify companies that "pulled their support" from the WWF SMACKDOWN! television program were factually false because they purported to identify companies that had never sponsored the WWF SMACKDOWN! television program and, therefore, could not possibly have "pulled their support" from the WWF SMACKDOWN! television program.

260.   PTC Defendants' statements falsely misrepresenting those companies that have "pulled their support" from the WWF SMACKDOWN! television program were published to third parties.

261.   PTC Defendants' statements falsely misrepresenting those companies that have "pulled their support" from the WWF SMACKDOWN! television program were made by

69

Defendants with actual malice and/or knowledge of the falsity of such statements to harm WWFE.

262.    As a direct and proximate result of the publication of PTC Defendants' defamatory statements described herein, WWFE has suffered commercial injury to its business, reputation and goodwill, including, *inter alia*, special damages in the form of loss of advertising revenue resulting from various third parties terminating their advertising and/or sponsorship of the WWF SMACKDOWN! television program. Because the foregoing defamatory statements were published with malice and/or were wantonly published in willful disregard for WWFE's rights, WWFE is entitled to and requests punitive damages.

## COUNT VII

### Product Disparagement and Trade Libel

### (Against Defendants Bozell, MRC, PTC, Honig and Tucker)

263.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

264.    PTC Defendants have disparaged WWFE's products and services provided pursuant to its WWF brand by, *inter alia*, falsely misrepresenting the identities and number of companies that allegedly have "pulled their support" from WWF SMACKDOWN! as a result of the PTC's disparagement and censorship campaign, falsely inferring that these companies agree with the PTC's statements and/or disapprove of WWF programming, and falsely misrepresenting the number of people authorizing PTC Defendants to speak on their behalf against WWF SMACKDOWN!.

265.    In various public statements described herein, including, *inter alia,* the statements alleged in Count I above, PTC Defendants have purported to identify the number and

identity of companies that allegedly have "pulled" or "withdrawn" their advertising or sponsorship from the WWF SMACKDOWN! television program.

266.    PTC Defendants' statements are factually false as: (i) various of these companies had not, in fact, stopped supporting the WWF SMACKDOWN! television program; (ii) various of these companies never nationally advertised on the WWF SMACKDOWN! television program; (iii) various of these companies stopped sponsoring the WWF SMACKDOWN! television program for reasons wholly unrelated to the PTC's disparagement and censorship campaign; (iv) not all of these companies disapprove of WWF programming; and/or (v) not all of these companies have manifested their agreement with the PTC.

267.    In various public statements described herein, PTC Defendants' have falsely misrepresented the number of people authorizing PTC Defendants to speak on their behalf against WWF SMACKDOWN!.

268.    PTC Defendants' statements are factually false as (i) upon information and belief, PTC Defendants "double count" PTC Members in an effort to inflate its membership count and exaggerate its size and influence; (ii) PTC Defendants make inconsistent statements regarding what it takes to be a PTC Member; and (iii) although PTC Defendants sent out forms to Members and the public asking for authorization to speak on their behalf, only a small fraction of the number of people on whose behalf they claim to be speaking actually signed and returned the forms giving PTC Defendants such authorization.

269.    PTC Defendants' statements described herein were published to third parties.

270.    PTC Defendants' statements described herein were made by Defendants with actual malice and/or knowledge of the falsity of such statements to harm WWFE.

71

271.   As a direct and proximate result of the publication of PTC Defendants' defamatory statements described herein, WWFE has suffered commercial injury to its business, reputation and goodwill, including, *inter alia*, special damages in the form of loss of advertising revenue resulting from various third parties terminating their advertising and/or sponsorship of the WWF SMACKDOWN! television program. Because the foregoing defamatory statements were published with malice and/or were wantonly published in willful disregard for WWFE's rights, WWFE is entitled to and requests punitive damages.

## COUNT VIII

### Trademark Dilution Under Section 43(c) of the Lanham Act

### (Against All Defendants)

272.   Each of the foregoing allegations is incorporated herein by reference as though fully set forth at length.

273.   WWFE's WWF and WWF SMACKDOWN! marks are famous and distinctive marks under Section 43(c) of the Lanham Act.

274.   Defendants' willful, systematic and malicious disparagement of WWFE and WWF SMACKDOWN! and the products and services provided pursuant to WWFE's WWF and WWF SMACKDOWN! marks has caused the dilution and tarnishment of the distinctive quality of the WWF and WWF SMACKDOWN! marks.

275.   Defendants' willful, systematic and malicious disparagement of WWFE and the products and services provided pursuant to its WWF and WWF SMACKDOWN! marks has caused the dilution and tarnishment of the distinctive quality of the WWF and WWF SMACKDOWN! marks in violation of Section 43(c) of the Lanham Act.

72

276.     Defendants' willfully intended to cause the dilution and tarnishment of the distinctive quality of the WWF and WWF SMACKDOWN! marks so as to constitute willful trademark dilution in violation of Section 43(c) of the Lanham Act.

277.     As a direct and proximate result of Defendants' acts described herein, WWFE has been injured.

## COUNT IX

### Trademark Dilution Under Section 43(c) of the Lanham Act

### (Against Defendants Bozell, MRC, PTC, Honig and Tucker)

278.     Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

279.     WWFE's WWF and WWF SMACKDOWN! marks are famous and distinctive marks under Section 43(c) of the Lanham Act.

280.     PTC Defendants' willfully, systematically and maliciously disparaged WWFE and WWF SMACKDOWN! and the products and services provided pursuant to WWFE's WWF and WWF SMACKDOWN! marks in connection with their fundraising activities.

281.     PTC Defendants' willful and systematic disparagement of WWFE and WWF SMACKDOWN!, in connection with PTC Defendants' fundraising activities has caused the dilution and tarnishment of the distinctive quality of the WWF and WWF SMACKDOWN marks.

282.     PTC Defendants' willful, systematic and malicious disparagement of WWFE and, specifically, the WWF and WWF SMACKDOWN! marks in connection with PTC

73

Defendants' fundraising activities has caused the dilution and tarnishment of the distinctive quality of the WWF and WWF SMACKDOWN! marks in violation of Section 43(c) of the Lanham Act.

283.   PTC Defendants' willfully intended to cause the dilution and tarnishment of the distinctive quality of the WWF and WWF SMACKDOWN! marks so as to constitute willful trademark dilution in violation of Section 43(c) of the Lanham Act.

284.   As a direct and proximate result of PTC Defendants' acts described herein, WWFE has been injured.

## COUNT X

### False Description and Unfair Competition Under Section 43(a) of the Lanham Act

### (Against Defendants Bozell, MRC, PTC, Honig and Tucker)

285.   Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

286.   PTC Defendants' descriptions of fact and representations of fact alleged herein, including, *inter alia,* the statements alleged in Count I above, are factually false.

287.   PTC Defendants' use of such false and/or misleading descriptions of fact and false and/or misleading representations of fact in commercial advertising and/or promotion misrepresented the nature, characteristics and/or quality of WWFE's commercial activities and the goods and services provided pursuant to the WWF brand.

288.   PTC Defendants' use of such false and/or misleading descriptions of fact and false and/or misleading representations of fact in commercial advertising and/or promotion are in violation of Section 43(a) of the Lanham Act.

289.    As a direct and proximate result of PTC Defendants' acts described herein. WWFE has suffered commercial injury to its business, reputation and goodwill.

## COUNT XI

## False Description and Unfair Competition Under Section 43(a) of the Lanham Act

### (Against Defendants Bozell, MRC, PTC, Honig and Tucker)

290.    PTC Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

291.    PTC Defendants' statements described herein falsely misrepresenting those companies that allegedly had "pulled" or "withdrawn" their advertising or sponsorship from the WWF SMACKDOWN! television program are factually false.

292.    PTC Defendants' use of such false and/or misleading descriptions of fact and false and/or misleading representations of fact are likely to, and did, cause confusion or mistake, and/or deceive third parties, including, *inter alia,* other sponsors of and/or advertisers on WWF programming, that the companies on PTC Defendants' purported list of "Sponsors Who Pulled Their Support" from WWF SMACKDOWN! approved of and/or sponsored the PTC Defendants' commercial activities, including, *inter alia,* its unlawful conspiracy and boycott against WWFE.

293.    PTC Defendants' use of such false and/or misleading descriptions of fact and false and/or misleading representations of fact are in violation of Section 43(a) of the Lanham Act.

294.    As a direct and proximate result of PTC Defendants' acts described herein. WWFE has suffered commercial injury to its business, reputation and goodwill.

## COUNT XII

### False Description and Unfair Competition Under Section 43(a) of the Lanham Act

### (Against Defendants Bozell, MRC, PTC, Honig and Tucker)

295.    Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

296.    PTC Defendants' statements described herein falsely misrepresenting the number of PTC Members and the number of people authorizing PTC Defendants to speak on their behalf are factually false.

297.    PTC Defendants' use of such false and/or misleading descriptions of fact and false and/or misleading representations of fact are likely to, and did, cause confusion or mistake, and/or deceive third parties, including, *inter alia,* other sponsors of and/or advertisers on WWF programming, that a number of people supported PTC Defendants and their campaign against WWFE, when only a small fraction of that number in fact supported PTC Defendants and its campaign against WWFE.

298.    PTC Defendants' use of such false and/or misleading descriptions of fact and false and/or misleading representations of fact are in violation of Section 43(a) of the Lanham Act.

299.    As a direct and proximate result of PTC Defendants' acts described herein, WWFE has suffered commercial injury to its business, reputation and goodwill.

### COUNT XIII

### Copyright Infringement

### (Against Defendants Bozell, MRC, PTC, Honig and Tucker)

76

300.     Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

301.     WWFE is the owner of registered copyrighted works in the broadcast and/or cablecast of each and every WWF television program, including, *inter alia,* WWF SMACKDOWN!, RAW, WAR ZONE, SUPERSTARS, LIVE WIRE and HEAT.  WWFE is also the owner of registered copyrighted works in the broadcast of each of its pay-per-view events.

302.     WWFE has complied in all respects with the Copyright Act of 1976, as amended, and all other laws governing copyright, and secured the exclusive right and privilege in and to the copyright of each such work.

303.     PTC copied portions of WWFE's copyrighted programming in PTC Defendants' fund raising videos without authority or privilege.

304.     PTC Defendants had personal involvement in the production of Defendants' infringing videos, including, *inter alia,* orchestrating and directing their content, production, and distribution.

305.     PTC Defendants had access to WWFE's copyrighted works, including WWFE's works in the broadcast and/or cablecast of the SMACKDOWN!, RAW, WAR ZONE, SUPERSTARS, LIVE WIRE and HEAT television programs, and WWF pay-per-views.

306.     PTC Defendants' acts of copying WWFE's copyrighted programming on PTC Defendants' fund raising videos constitute copyright infringement in violation of the Copyright Act of 1976.

307.     PTC Defendants' acts of copying WWFE's copyrighted programming on PTC fund raising videos constitute willful copyright infringement.

308.   PTC Defendants' acts of copying WWFE's copyrighted programming on PTC fund raising videos have caused and, unless restrained, will continue to cause WWFE actual damages and irreparable harm.

## COUNT XIV

### Conspiracy to Commit Product Disparagement and Trade Libel; Libel and Slander; and Tortious Interference

### (Against All Defendants)

309.   Each of the foregoing allegations is incorporated herein by reference and reasserted as though fully set forth at length.

310.   Defendants entered into an agreement to unlawfully harm WWFE, by, *inter alia*, (i) willfully, systematically and maliciously disparaging and/or defaming WWFE and the products and services provided pursuant to WWFE's WWF mark; (ii) mutually supporting the false representation that WWFE and, specifically, the WWF SMACKDOWN! television program, caused the deaths of four children, including the murder of Tiffany Eunick; (iii) diluting and/or tarnishing the value and goodwill of the WWF mark; (iv) interfering with WWFE's current and prospective contracts; and (v) otherwise harming WWFE through the unlawful conduct alleged herein.

311.   Each of the Defendants committed one or more overt acts pursuant to and in furtherance of Defendants' conspiracy to unlawfully harm WWFE, including, *inter alia*, (i) willfully, systematically and maliciously disparaging and/or defaming WWFE and the products and services provided pursuant to WWFE's WWF mark as described herein; (ii) creating and/or appearing in videocassettes used by each member of the conspiracy to support the illegal and tortious acts alleged herein; (iii) making public appearances on various media outlets to publicize

78

the false and defamatory statements alleged herein; and (iv) meeting among all Defendants to discuss the unlawful conduct alleged herein.

312.    Pursuant to and in furtherance of Defendants' conspiracy, Defendants have disparaged WWFE's products and services provided pursuant to its WWF brand.

313.    Defendants have disparaged WWFE's products and services provided pursuant to its WWF brand by, *inter alia*, the tortious conduct complained of herein, including, *inter alia*, the tortious conduct alleged in Counts V, VI, and VII above.

314.    Such tortious conduct, included specifically, *inter alia*, the defamatory and disparaging statements alleged Count I above, which allegations are specifically incorporated herein by reference and made a part hereof.

315.    These defamatory and disparaging statements are false.

316.    These defamatory and disparaging statements were published to third parties.

317.    These defamatory and disparaging statements were made with actual malice and/or knowledge of the falsity of such statements to harm WWFE. Each of these statements was published with ill will and hatred towards WWFE.

318.    Pursuant to and in furtherance of the conspiracy, Defendants have interfered with WWFE's current and prospective contracts.

319.    As a direct and proximate result of the publication of Defendants' defamatory statements described herein, trade libels, and contractual interferences, WWFE has suffered commercial injury to its business, reputation and goodwill, including, *inter alia*, general and special damages in the form of loss of advertising revenue resulting from various third parties

terminating their advertising and/or sponsorship of the WWF SMACKDOWN! television program and loss of goodwill and reputation.

## **PRAYER FOR RELIEF**

WHEREFORE, WWFE respectfully requests that this Honorable Court enter judgment in favor of WWFE and award WWFE the following relief:

(1)    actual damages suffered by WWFE as a result of the unlawful conduct complained of herein;

(2)    disgorgement of all monies, including, but not limited to, all monies obtained by fundraising schemes which diluted WWF's mark as a necessary part of the scheme, raised by Defendants as a result of the unlawful conduct complained of herein;

(3)    statutory damages, as permitted by the Lanham Act and Copyright Act, augmented as a result of Defendants' willful and unlawful conduct complaint of herein;

(4)    punitive damages, as permitted by law, as a result of Defendants' willful and malicious conduct complained of herein;

(5)    a permanent injunction enjoining Defendants' further unlawful conduct;

(6)    attorneys' fees;

(7)    costs; and

(8)    such other and further relief as this Court deems just and appropriate.

**JURY TRIAL DEMANDED**

Respectfully submitted,

KIRKPATRICK & LOCKHART LLP

Jerry S. McDevitt
Terry Budd
Jason L. Richey
Curtis B. Krasik
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA 15222
(412) 355-8608 (phone)
(412) 355-6501 (fax)


By: Eugene R. Licker (EL 0334)
1251 Avenue of the Americas
New York, New York 10020
(212) 536-3900 (phone)
(212) 536-3901 (fax)

Dated:  July 26, 2001          Attorneys for Plaintiff, World Wrestling
                               Federation Entertainment, Inc.

Wrestling Defense Fails; Boy, 13, Faces Life

4 tickets, 4 hot dogs, 4 sodas, and a newspaper. Just $79

## latimes.com

SEARCH:

**News**
Politics
Entertainment
music, movies, art, TV, restaurants

**Business**
Travel
Classifieds
jobs, homes, cars, rentals

**Sports**
Commentary
Shopping

## NEWS

## Nation & World

MORE

**BREAKING NEWS**
- AP Top Entertainment Headlines at 11:28 a.m. EST
- AP Top Technology Headlines at 11:28 a.m. EST
- AP Top Business Headlines at 11:28 a.m. EST

**TOP TIMES STORIES**
- Sharon, Arafat Envoys Meet Secretly as Election Nears
- Scandals Reach New Lows With Japanese Public
- Wrestling Defense Fails; Boy, 13, Faces Life

MORE

**Breaking News**
Nation & World
State & Local
Politics

**Health**
Highway 1
Science

**Orange County**
Valley
Ventura County

**Classifieds** Find a home, car, rental, job, pet, merchandise, auction, boat, plane or RV **Place an Ad**

**L.A. Times Subscription Services** Subscribe, Change of Address, Vacation Stops, Suspend Delivery, College Discount, Gift Subscriptions, Mail Subscriptions, FAQ

**Print Edition Advertisements** See this week's ads

MORE SECTIONS
Books
Columnists
Crossword
Education

Lottery
Magazine
Obituaries
Reading by 9

Special Reports
Sunday Opinion
Tech Times
Times Poll

---

Home | Site Map | Archives | Print Edition | Discussions | Advertise | Feedback | Help

🖨 **Print this story**

Friday, January 26, 2001

## Wrestling Defense Fails; Boy, 13, Faces Life

■ **Crime:** He's convicted of first-degree murder despite claim that he was imitating TV fights when he killed girl.

By MIKE CLARY, Times Staff Writer

MIAMI--Rejecting a "blame pro wrestling" defense, a jury Thursday found a 13-year-old guilty of murder in the beating death of his young playmate.

Lionel Tate is believed to be the youngest person in Florida history--and one of the youngest in the nation--ever convicted of homicide in an adult court. He could face life behind bars.

The defense had contended the boy simply was imitating the violent moves he had seen his wrestling heroes perform on television and had not intended to hurt anyone. But a jury of 10 women and two men took just longer than three hours to reject second-degree murder or manslaughter verdicts and come back with the first-degree murder conviction.

When the verdict was read, Lionel said nothing. He cried quietly as he was led from the courtroom by a bailiff.

"It was horrible, really horrible," juror Kathleen Pow-Sang said. "If there was any way that we could have gone with a lesser offense, justified it in any way, and we all wanted to . . . ."

Although precise numbers are not available, experts say there is a national trend to try juveniles as adults in certain violent crimes. For instance, a Milwaukee girl convicted of committing murder during a carjacking at



Lionel Tate, 13, is led out of the Broward County courthouse where a jury found him guilty of first-degree murder in Tiffany Eunick's death.
*AP*

http://www.latimes.com/news/nation/updates2/lat_wrestle010126.htm

**EXHIBIT** 15

Wrestling Defense Fails; Boy, 13, Faces Life

Food          Real Estate     Traffic
Health        Religion        Weather
Highway 1     Science         Workplace
Horoscope     So.Cal. Living  SITE MAP

LATE NEWS !!

SHOP 'TIL YOUR LAPTOP DROPS

shopping on
latimes.com

Search [        ] GO

○ Products  ○ Stores

VISA

nextCard

SAVE ON:
Hotels | Airfares
AirHotel | Packages

travelscape.com

age 13 received an automatic life sentence.

"This is the reactionary response to an increase in juvenile crime that began in the early 1990s," said Laurence Steinberg, a psychologist at Temple University in Philadelphia.

Lionel was 12 in July 1999 when he admitted flinging 6-year-old Tiffany Eunick around the living room of his suburban townhouse west of Fort Lauderdale after asking her if she wanted to "play wrestling." Lionel's mother, a Florida Highway Patrol trooper, was asleep upstairs.

Prosecutor Ken Padowitz said Lionel killed Tiffany during "a brutal, savage beating" that left her with a fractured skull, lacerated liver, a broken rib, internal hemorrhaging and multiple cuts and bruises.

Lionel was 5 feet, 4 inches and 166 pounds at the time. Tiffany, a first-grader, weighed 48 pounds.

Defense attorney Jim Lewis contended that Lionel lacked the maturity to understand the consequences of his actions.

The defense tried to force several wrestling stars, including Dwayne "The Rock" Johnson and Steve "Sting" Borden, to testify during the trial. But Broward County Judge Joel T. Lazarus quashed the subpoenas, and the World Wrestling Federation later sued Lewis for libel.

Jurors clearly did not buy Lewis' argument that exposure to wrestling--with its seemingly violent yet carefully choreographed moves--led Lionel to "believe that he can be like the wrestlers, and no one gets hurt."

Lewis said that Lionel spent hours watching wrestling on television and that he considered the stars "his superheroes--like Superman, Batman. He loved to play." At the defense table, Lionel often doodled during the trial, at times spelling out the names of his favorite wrestlers using colored pencils.

"We've said all along this was a hoax, and we predicted that once this 'defense' was presented to a jury, they would recognize that," said attorney Jerry McDevitt, who represents the WWF.

Lionel's mother, Kathleen Grossett-Tate, walked out of the courtroom sobbing Thursday. Tiffany's mother, Duweese Eunick-Paul, was not present for the verdict. She and Grossett-Tate once had been close friends. Eunick-Paul later told MSNBC that she holds no anger. "I don't hold . . . any grudges, no animosity toward them because they are the ones that have to talk to God," she said.

Lewis appeared stunned at the verdict. "He was a playful kid," said

Tiffany Eunick died in 1999 after a beating that fractured her skull.
AP

Lewis, t...s in his eyes. "I exposed him to my kids. And I feel I've let h.. down."

Lewis said he would appeal, citing the judge's refusal to let him subpoena the wrestlers.

With Grossett-Tate's agreement, Lewis earlier turned down a prosecution offer in which Lionel would have pleaded guilty to second-degree murder. That would have sent him to a juvenile facility for three years and meant 10 years on probation.

Asked about that decision after the verdict, Lewis said, "You know, it was a very difficult choice that was made with his mother. His mother basically could not bear being without this child for three years."

Since Tiffany's death, Lionel had been allowed to live at home, wearing an electronic monitoring device while he attended private school.

Lazarus rejected Lewis' request that Lionel be allowed to remain at home until his March 2 sentencing. He instead ordered that the boy be held at a juvenile detention center.

Lionel, who turns 14 next week, does not face the death penalty because he is younger than 16. And a mandatory life sentence could be commuted by Florida Gov. Jeb Bush if so recommended by prosecutors. Padowitz declined to say Thursday what he would tell the governor.

"I had no expectations as to what this jury was going to do in this case," Padowitz said outside the courtroom. "My only hope was that they had an open mind; that they could overcome sympathy and emotion and follow the law to ensure that justice was done."

Psychologist Steinberg said the irony of the move toward tough juvenile justice "is that juvenile crime is now declining, and we do not know what the effects of this treatment are. Some of it is grandstanding, to show we're tough on crime. But it is not a deterrent, so it seems silly."

Under a MacArthur Foundation grant, Steinberg said, he is directing the first nationwide study to determine at what age children demonstrate an ability to understand charges against them or to help with their defense in such cases.

After the two-week-long trial, juror Pow-Sang had her own opinion. "I think that's where the system failed. It failed for all of us that a child was in that situation in the first place. But that was out of our hands. He was already indicted for first-degree murder."

---

Times researcher Anna M. Virtue contributed to this story.

01/26/2001

Wrestling Defense Fails; Boy, 13, Faces Life

**News**
**Politics**
**Entertainment**
music, movies, art,
TV, restaurants

**Business**
**Travel**
**Classifieds**
jobs, homes. cars,
rentals

**Sports**
**Commentary**
**Shopping**

Copyright 2001 Los Angeles Times



FunBook
Advertising Supplement
A Guide to Recreation in the Southland

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD, COUNTY

STATE OF FLORIDA                          CASE NO:  99-14401CF10A

     Plaintiff                                JUDGE JOEL T. LAZARUS

vs.

**LIONEL TATE**                  ,

     Defendant.
_____/

## O R D E R

Within sixteen hours of the verdict, opening statements were being made in a new forum:  the
court of public opinion.  Starting with the <u>Today</u> show on that date and continuing unabated,
there has been a barrage of appearances on talk shows, radio programs, pulpits in our houses
of worship, and in any and every other forum imaginable.  This was not the media doing their
job of reporting; this was a calculated effort to try this case for a second time in a court not
governed by its laws of the state of Florida but by the feelings of sympathy and compassion for
a fourteen year old convicted of the highest offense known to mankind.

And the effect was virtually immediate.  Letters arrived from the north and south, east and
west of this country.  And these letters were almost universal in their tenor:  have mercy on
Lionel Tate, have compassion on this fourteen year old.  The letters contained phrases such
as "horsing around," "boys will be boys," "playing" and "accident."  As recently as last
Thursday, one of the counsel was on television stating no punishment was warranted for this
"accident."

It is a truism that not one single letter writer or call maker was privy to the horrific facts brought
out during the trial; not one person sat through the pathetic testimony of the results of Lionel
Tate's deeds upon the body of Tiffany Eunick.   The emphasis since January  the 25th has
been on the defendant and how to bypass  what the law  apparently  requires, with hopes and
prayers and requests for mercy and leniency for this child.   Voices cry out for "justice",

**EXHIBIT** _16_

**State of Florida v. Lionel Tate**
**Sentencing Order**
**Page 2 of 18**

but not for justice for Tiffany Eunick.  Most letters and calls refer to this victim only as an afterthought.  In the court of public opinion, Lionel Tate has turned into the victim.

It is obvious what the purpose of these appearances in the studios and on the pulpits by participants in the trial has been, and to this very day continues to be.  If the purpose is to pressure this court to proceed with its heart rather than its mind, with all due respect, I decline.  The jury has defined the future of Lionel Tate; the jury has spoken, loudly, clearly, and unanimously.

Regardless of my rulings here this day, I assure all it will be based on my perception  of the law, a perception that I might add I am thoroughly convinced to be correct.  If I based my ruling on what the overwhelming majority of the public is requesting, I would be, perhaps, a hero to those who want me to act out of sympathy, but I would be disavowing the oath I have taken to uphold the laws of the state of Florida and our constitution.  Above all, we are a nation of laws.  The very last thing a jury is told is, "none of us have the right to violate rules we all share."

In the final analysis, the court of public opinion cannot be the body ruling on these motions and sentence; it must be by this judge following the laws of this land.  Justice Blackmun stated in his dissent in **Furman v. Georgia**, 408 US at 411:

> We should not allow our personal preferences as
> to the wisdom of legislative and congressional
> actions, or our distaste for such action, to guide
> our judicial decision in cases such as these.  The
> temptations to cross that policy line are very
> great.

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 3 of 18

## I. <u>Motion For a New Trial</u>

The indictment handed down by the Grand Jury has caused much criticism, and is also an integral part of the grounds in the Motion for a New Trial. The ability to indict is present within the laws of Florida, and there can be no challenge to the impaneling of this Grand Jury. The issue, though, is one of the applicability of the Felony Murder statute, F.S. 782.04(2)(h), in the instant case.

This court is being asked to grant a new trial, on the grounds that F.S. 827.03, Aggravated Child Abuse, was unconstitutionally applied at bar.

> "Aggravated child abuse", F.S. 827.03(2) occurs when a person:
> (a) commits aggravated battery on a child, or
>
> (c) knowingly or willfully abuses a child and in doing so causes great bodily harm, permanent disability, or permanent disfigurement to the child.

Aggravated Battery is defined as: Intentionally or knowingly causing great bodily harm, permanent disability, or permanent disfigurement.

Child Abuse means: intentional infliction of physical...injury upon a child or an intentional act that could reasonably be expected to result in physical...injury to a child.

The defense alleges that the Aggravated Child Abuse statute was never meant to apply to situations of one child hurting another. No cases are cited to support this position and a review of the legislative history of F.S. 827.03 does not support this contention. See, **Kama v. State**, 507 So.2d 154 (1 DCA 1987).

There have been cases in Florida that deal with child-upon-child Aggravated Child Abuse. See, for example: **KBS v. State**, 725 So.2d 448 (2 DCA 1999). **AJ v. State**, 721 So.2d 761

(2 DCA 1998).  This court finds no case wherein Aggravated Child Abuse, juvenile upon juvenile, was the underlying felony in a Murder in the First Degree prosecution.  While most Aggravated Child Abuse cases are concerned with familial or custodial situations, the mere fact that a defendant is not within that group does not preclude the charge from being prosecuted.  In the absence of case law to the contrary, the court is not in a position to grant a new trial because of an allegation of inapplicability.

In the case from a sister district, KBS, supra, the court asked for guidance on this very issue, but none was forthcoming.  In a *per curiam* decision affirming Judge Ramsberger, the Second District Court of Appeal questioned the prosecutorial decision of one juvenile being charged with Aggravated Child Abuse on another.  It said "...the legislature may well wish to review this issue."  Now this court also *requests guidance in the future as to the intent of the statute which undisputedly permits a prosecution of a juvenile under F.S. 827.03.*

Should the state have sought what they are legally empowered to do is not an issue for the court.  The policies of the State Attorney of the 17th Judicial Circuit should not and will not be praised or criticized, at least by this court.  But public opinion sends a message to what it believes is the appropriateness or lack of appropriateness of indicting a twelve year old for Aggravated Child Abuse resulting in death, the necessary elements of a Felony Murder in the First Degree charge.

Once the state chooses to seek an indictment for a crime punishable by death or life imprisonment, upon the return of the indictment, the child must be tried and handled in every respect as an adult.  Florida Statute 985.225 requires such action against..."a child of any age."  For crimes other than capital, the prosecutor can proceed in juvenile court, or, if permitted by F.S. 985.227, direct filing of an information.

Other cases similar in many respects to that of Lionel Tate's will appear in the future, unfortunately and without a doubt.  And the prosecuting authorities will be wise to heed the

voices being raised, and examine their criteria in prosecuting twelve year old boys and girls. Make no mistake: this judge does consider a twelve year old a boy or girl, regardless of the crime he or she commits. But it is not the court's consideration which dictates how a prosecutor proceeds.

This court was provided with a recent letter written on behalf of the international organization, Amnesty International, as well as taking testimony from its representative in attendance. The letter and the testimony details the organization's concerns with the treatment of children who are convicted of serious criminal offenses. There is a realization, though, that there is "severity and inflexibility of the sentence which the youngster now faces.......the relevant authorities' response 'shall always be in proportion not only to the circumstances and the gravity of the offences but also to the circumstances and the needs of the juvenile as well as to the needs of society.' "

The recognition of the "relevant authorities' response" is present:  these are legislative decisions that must be addressed, and not judicial decision.  Judges cannot and should not legislate from the bench.

The court has been implored to recognize the plea offer made in February, 2000, which was rejected by silence, in that there was no response from the defense.  Prior to commencement of trial, this court on its own, made inquiry as to the possibility of a negotiated plea.  At that time, there was no plea offer "on the table" but nevertheless inquiry was made to see if there could be a resolution without a trial.  Obviously, there was none.  Specifically, the defendant himself stated his desire to go to trial.

The prosecutor said that the defense merely had to approach him for the negotiations to commence; with no one approaching him, the prosecutor did not make any effort to initiate a resolution.  And even if he had, subsequent comments from the defense clearly show that a plea was unacceptable as a resolution.  There has not been any acknowledgment that  Lionel

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 6 of 18

Tate did anything wrong at any anytime, and he would never plea to what was, in his mind, an accident.

Should the government have taken the initiative?  If it had, perhaps, the result might have been different and we would not be here now.  The defense, it is reported, was interested in a resolution, but was steadfast in its insistence that no admission of guilt or incarceration would result.  Should the defense have been more realistic in its expectations?  If it had, perhaps the results would have been different and we might not be here now.

Testimony was received on March 2, 2001, and again today from Mrs. Grossett-Tate.  She testified that she never knew or made inquiry as to the penalty for Murder in the First Degree.  As a law enforcement officer, for her to say she did not know the penalty for Murder in the First Degree, a capital offense, is beyond credibility.  For her to state she did not ask, when a First Degree Murder charge subjects most defendants to the possibility of execution (not in this case, though), if Lionel Tate would be facing that potentially, is unbelievable.

To state that not one person, attorney, lay person or mental health specialist, ever mentioned a life sentence, casts doubts on her testimony, and as a basis for a new trial, is rejected.  In her own words, she stated that she could not tell her son he was facing life in prison, she never felt "it would go this far", implies she well knew.

Of course, the issue is whether her son, the defendant knew.  The court is satisfied that from early on, including his comments on the competency evaluation, he knew what he was facing.  But to bring this issue up after the verdict was received is irrelevant to the business at hand.

Additionally, these statements made to the world by Mrs. Grossett-Tate as recently as a week ago states that no plea would ever be accepted, even now, for, in her words, this was an accident.

State of Florida v. Lionel Tate
Sentencing Order
Page 7 of 18

This court does not know whether any deals were cut, or were not, as to post-conviction actions by the prosecutor in joining in with the trial attorney. Such has been repeated by the media and is a part of the motions filed in the case. It is totally immaterial at this point. Once the jury has spoken, the opportunity for negotiations has ceased. And whatever actions the attorney's choose to take here or in Tallahassee in the future, is their business and not the courts. If such becomes relevant in subsequent litigation, the courts will address it at that time.

If the state was surprised at the verdict, they should reread their arguments after the state's case was concluded, and again after the defense rested. And if the state now believes that a Murder in the First Degree verdict was inappropriate, I need not remind them that they had well over 500 days, from date of indictment to date of jury selection, to *nolle pros* their case and refile as Murder in the Second Degree or Manslaughter, the latter charge apparently the basis for the final plea negotiations. They got what they wanted; they now have to take responsibility for their actions in seeking it in the first instance.

The state chose not to deviate from what they sought in August, 1999. To talk about travel to the governor to seek a reduction in charge or sentence, if accurate, is of tremendous concern to this court. It not only casts the prosecutor in a light totally inconsistent with his role in the criminal justice system, but it makes the whole court process seem like a game where, if the results are unfavorable, they'll run to a higher source to seek a different result. A trial is not a test balloon, sent up to see what may happen. And if the results displease both sides, so be it: this is what our jury system is about.

This court has no authority to impose a plea that was rejected. The court had no obligation to accept a negotiation, if one had even been proposed, post verdict, to concoct a way outside of the jury's actions. This type of fiction is unacceptable, and quite possibly is violative of Florida laws. I add that this denigrates the very difficult and diligent job the twelve jurors did in this case, and, I am sure, make some question the jury system at all.

State of Florida v. Lionel Tate
Sentencing Order
Page 8 of 18

The defense has filed a motion requesting a **Cottle** hearing, based on **Cottle v. State**, 733 So.2d 963 (Fla. 1999). As stated previously, this court declines holding a **Cottle** hearing, not on the merits, but on the timing. Such a hearing might well be heard in the future; to do so now, as was stated, is untimely.

It has been suggested that if the jury had been informed of the potential punishment that accompanied a Murder in the First Degree conviction, the jury's deliberations might have concluded in a different result. The jury was not informed, correctly, that a guilty verdict would require a life sentence. The jurors are instructed they must disregard the consequences of their verdict. Since the mid-1980's, the law has not permitted the jury to be informed except in those cases where the jurors participate in the sentencing. See, F.Rule of Crim. Procedure 3.390(a). See, **Knight v. State**, 668 So.2d 596 (FLA 1996).

The jury's role is to be the trier of the facts; for a jury to exercise pardon power would fly in the face of our whole judicial system. There cannot be any acceptance of the concept of jury nullification, where a jury does not like a law, or like how it is to be applied. See, **Legette v. State**, 718 So.2d 878 (4 DCA 1998).

In a supplemental motion for a new trial, the defense claims error in the admission of certain statements by Dr. Michael Brannon. A full hearing was held on this issue, with Dr. Brannon testifying. At issue was whether the doctor violated the terms of both his employ and the agreement between the state and defense. It is in general agreement that Dr. Brannon would not talk about any admissions as to the events on the specific day.

It is this court's opinion that Dr. Brannon did not violate the agreement, in part or in whole. Specifically, the most damaging testimony from the doctor at trial concerned Lionel Tate's perception that professional wrestling was not real, the statement did not violate the agreement. A defense witness at the Motion for New Trial, Dr. John Spencer, while expressing consternation at Dr. Brannon's testimony, did not feel that Dr. Brannon violated

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 9 of 18

any of the ethical considerations all psychologists are subject to. Dr. Spencer admitted that he did not report Dr. Brannon to the appropriate governing body, and, that if he felt a violation occurred, he would have. Accordingly, the introduction of Dr. Brannon's testimony is not grounds for a new trial.

In its *Second Supplemental Motion for New Trial*, it is alleged that the actions of Dr. Sherri Bourg-Carter were egregious requiring a new trial. The court heard sufficient testimony from Dr. Bourg-Carter to find if any improprieties by the psychologist were present, they certainly did not approach a level of prejudice to the defendant which should result in a new trial. Additionally, the facts of the instant case are sufficiently dissimilar as to negate the relevancy of **Holland v. State**, 636 So.2d 1289 (Fla. 1994). Taking into consideration her actions at Dr. Spencer's office, her trial testimony, and her testimony at the motion on March 2, 2001, Dr. Carter's activities do not create a ground to reverse the jury.

It has been argued that sentencing a fourteen year old to life in prison is cruel and/or unusual punishment, violative of the Eighth Amendment of the U.S. Constitution or Art. 1 §17 of the Declaration of Rights of the Florida Constitution. In effect, the defense argues that such a sentence is disproportionate to the crime committed, specifically child abuse causing death. Also, it is argued that such a sentence in Eighth Amendment analysis does not reflect current standards.

Perhaps the leading case in Eighth Amendment analysis is **Trop v. Dulles**, 356 US 86 (1958)

> While the State has the power to punish, the Amendment stands to assume that this power be exercised within the limits of civilized standards.

It is not the court's role to act as a legislator or to reflect public opinion. While the court should look to objective indications of societal current values, the U.S. Supreme Court in **Gregg v. Georgia**, 428 U.S 153 (1976) stated:

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 10 of 18

> Courts are not representative bodies. They are
> not designed to be a good reflex of a
> democratic society. Their judgment is best
> informed, and therefore most dependable within
> narrow limits. Their essential quality is
> detachment, founded on independence. History
> teaches that the independence of the judiciary
> is jeopardized when courts become embroiled
> in the passions of the day and assume primary
> responsibility in choosing between competing
> political, economic and social pressures.

While the Eighth Amendment prohibits the infliction of cruel and unusual punishment,
recognizing the evolving standards of decency that mark the progress of a maturing society,
prevailing state and federal case law hold that life imprisonment for Murder in the First
Degree, even where the convicted is barely into his teens, is neither cruel nor unusual. See,
**Penry v. Lynaugh**, 492 U.S. 302 (1989).

The defense argued that the child abuse perpetrated by Lionel Tate merged with the killing of
Tiffany Eunick, and constitutes a single offense. In other words, there can be no crime of
Felony Murder in the First Degree with the predicate act of Aggravated Child Abuse. This
court notices the conflict with **Kansas v. Lucas**, 759 P.2d 90 (Kansas 1998). Florida law, on
the other hand, it is quite clear that Aggravated Child Abuse may sustain a Felony Murder First
Degree charge. Accordingly, the court denies the request to dismiss the charge of Felony
Murder in the First Degree. See, **Robles v. State**, 188 So.2d 789 (Fla. 1966), **Lukehart v.
State**, 762 So.2d 482 (Fla. 2000) and **Mapps v. State**, 520 So.2d 92, 93-94 (Fla. 4th DCA
1988).

The other issues raised by the defense in their motions and supplemental motions for new trial
are without legal basis. All of these grounds were addressed during the pre-trial motions or
during the trial itself. These include: impeachment of Mrs. Grossett-Tate, the State's
photographs admissions, the state's computer animation, the results of the **Frye** hearing which
limited "expert" testimony concerning professional wrestling, the inclusion of the third

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 11 of 18


statement of Lionel Tate to law enforcement after suppression of the first two, and, the disallowing of professional wrestlers to testify as either fact witnesses or reluctant expert witnesses.

Thus the Motion for New Trial as well as those Supplemental Motions on the grounds of the inapplicability of the felony murder laws, on the grounds of the inapplicability of the Aggravated Child Abuse statute and on the grounds reviewed above are **DENIED**.

## II. **Reduction of the Charge**

There is a provision in Florida law that permits courts to reduce the jury verdict to the lesser charge of Murder in the Second Degree or Manslaughter. Rule 3.620, F.R.Crim.Proc. states:

> When the offense is divided into degrees or necessarily includes lesser offenses, and the court, on a motion for new trial, is of the opinion that the *evidence does not sustain the verdict* but is sufficient to sustain a finding of guilt of a lesser degree or of a lesser offense necessarily included in the one charged, the court shall not grant a new trial but shall find or adjudge the defendant guilty of the lesser degree or lesser offense necessarily included in the charge, unless a new trial is granted by reason of some other prejudicial error. (emphasis added)

It should be noted that this opportunity to reduce the verdict was rejected by the jury. Over defense objection, this court instructed the jury on both lessers.

In analyzing the sufficiency of the evidence to sustain the verdict, the court reviewed the testimony and physical evidence introduced at trial. I cannot be any more direct than this: the evidence of guilt was overwhelming. The jury's verdict was totally consistent with the evidence.

**State of Florida v. Lionel Tate**
**Sentencing Order**
**Page 12 of 18**

Much talk has been made using the term of "accident". "Accident" is defined in Florida Statute 782 within the definition of Excusable Homicide:

> The killing of a human being is excusable, and therefore lawful, under any one of the following three circumstances:
>
> 1. When the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent

The defense states that the "accident" was simply Lionel Tate replicating what he saw being done by Sting, Hulk Hogan or The Rock, familiar names to professional wrestling aficionados. But this court is unaware of any wrestler plummeting an adversary that is half the size and one third the weight, let alone half the age. The argument is rejected that the thirty plus injuries discussed herein could have been inflicted by any "means with usual ordinary caution."

It has been suggested, and rejected by the jury listening intently to the testimony, that Lionel Tate could not appreciate what he was doing, that, in so many words, he could not and did not realize he was inflicting pain severe enough to result in death. But when a child years younger than Lionel Tate, accidentally hurts another, the child is cognizant enough of his or her actions to say "I'm sorry" and stop the offensive behavior.

Tiffany Eunick either had to cry out in major pain, a crying out that fell on Lionel Tate's deaf ears, or Tiffany Eunick was mercifully unconscious, a situation belied by Lionel Tate's reenactment. If the child was crying out, then further acts of Lionel Tate could not have been done with usual ordinary caution; the same can be said if Tiffany Eunick was unconscious.

Perhaps, and only perhaps, the first or second or even the third blow was inflicted, "by accident and misfortune in doing (a) lawful act by lawful means with usual ordinary caution," but that cannot explain the remaining number of significant and fatal injuries.

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 13 of 18

It was shown, without dispute, that Lionel Tate was a fan of professional wrestling. Perhaps, even zealous in his love for this type of "entertainment". But the facts of which the jury relied are deceptively simple in rejecting the involvement of professional wrestling replication; thus, by necessary implication, accident:

> 1.  In the two statements to the police, Lionel Tate's own words failed to indicate that wrestling played any part in Tiffany's brutal murder. The statements did not come close to explaining what happened in that townhouse.

> 2.  In statements made to EMS and the police by the defendant's mother, neither accident nor wrestling played any part in Tiffany's fatality.

Not until there was a defense-initiated reenactment did actions initiating professional wrestling start to emerge as a defense. This reenactment totally failed to explain to the jury during trial, and to this judge sitting as a thirteenth juror in the motion for new trial/reduction of charge, the extent and severity of the injuries to Tiffany Eunick. Even though the reenactment depicted a connection to professional wrestling, the testimony of Dr. Brannon shows that Lionel Tate disbelieved the authenticity of what he saw on television. The reenactment in all due respect, seemed to be trying to fit the facts, rather than a true depiction of the events.

Accordingly, the jury obviously then, and this court now, did not and does not accept that replicating what may or may not have been seen in various televised wrestling shows as a reason to call Lionel Tate's actions "accidental."

It should be noted that not only did the state's witnesses eliminate the possibility of accident, but the defense's own expert, Dr. John Marraccini, negated the argument of accident. Dr. Marraccini, in response to Mr. Padowitz's question affirmatively and reluctantly dispelled the notion of accident.

<u>State of Florida v. Lionel Tate</u>
**Sentencing Order**
**Page 14 of 18**

In analyzing the sufficiency of the evidence, I must reflect upon the in excess of thirty separate injuries, and determining whether they could have been inflicted accidentally: If the court finds that they were inflicted accidentally, then the court would be clearly bound to hold that Excusable Homicide as defined above was proven, and dismiss the charge or reduce it. These injuries were shown in vivid detail to the twelve jurors. They included:

- extensive and multiple lacerations of the liver
- a piece of the liver floating in the abdomen having been severed by extraordinary force
- a rib fracture
- a fracture to the skull
- brain swelling
- internal injuries, including a neck hemorrhage

And, tragically, many more.

It is inconceivable that such injuries, could be caused by "roughhousing," "horseplay" or by replicating professional wrestling moves. The number and seriousness of many of the injuries prove the state's case. This was not a death that should be classified as Excusable Homicide. It matters not which injury occurred in what order as to the ultimate culpability of Lionel Tate. But what is important, as to the timing of the injuries, is the severity of the two major injuries according to Dr. Flannagan and Dr. Kirschner. If one was to assume that the initial injury to Tiffany Eunick was the blow to the head, as depicted in the Klass reenactment, then the abdominal injuries which followed had to be a horrific stomping by foot or knee, or both on an unconscious little girl. And because of the nature of the injuries to the abdomen, Tiffany Eunick had either to be prone on the ground, or held up in a vertical position. If one assumes the blows to the abdomen preceded the others, then the injuries to the head and brain had to be caused in a way similar to swinging a limp object like a rag doll into the stair rails. Either way, the injuries could not be considered "accidental". In this court's opinion, an accidental infliction of the injuries is totally inconsistent with the testimony and with logic. Those not present in court who defend the actions of Lionel Tate as accidental simply did not see or hear the evidence of guilt.

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 15 of 18

With the concept of accident being rejected, the court must decide whether these injuries sustain the elements of Aggravated Child Abuse.

Aggravated Child Abuse occurs when the defendant commits Aggravated Battery, and death results; or commits Child Abuse, and death results. The difference between the two is that in the Aggravated Battery component, the defendant must have acted *intentionally* and *intended* to cause great bodily harm, permanent disability or permanent disfigurement (and if death results, felony murder by Aggravated Child Abuse). In the case of Child Abuse, the defendant must *knowingly* or *willfully* inflict physical injury which results in great bodily harm, permanent disability or permanent disfigurement **or** do an act *intentionally* that could reasonably be expected to result in physical injury to a child.

There is an element of intent in both subsections. Whether or not Lionel Tate had the requisite intent to commit Aggravated Battery or knowingly or willfully commit Child Abuse was presented to the jury, and the jury so found that he did. Lay and expert testimony as to the issue of Lionel Tate's maturity and by implication his ability to intend an act was admitted over the state's objection. A special jury instruction as to maturity level was given, over state's objection. The jury, through its verdict, has stated its findings as the trier of the facts.

The government relied more heavily on the Child Abuse component rather than the Aggravated Battery section. To say that Lionel Tate did not commit Child Abuse would be stating that he did not knowingly **or** willfully inflict physical injury. Note that the statue does not require that Lionel Tate knowingly **and** willfully inflict physical injury; either would suffice. Lionel Tate, even if one believes he may not have willfully inflicted physical injury, had to knowingly do so.

Additionally, the child abuse statute in the alternative states that Lionel Tate did an act intentionally. This is not in issue, in this court's mind. If that act or acts could reasonably be

State of Florida v. Lionel Tate
Sentencing Order
Page 16 of 18

expected to result in physical injury, then the charge is proved. Once again, the numbers and severity of the injuries prove these elements.

This judge has been asked to follow the example set by the Honorable Hiller B. Zobel, in the so-called "British Nanny" case: **Massachusetts v. Woodward**. It is unnecessary to state the facts of that case, other than what is necessary to further our analysis. On February, 1997, eight month old Matthew Eappen died of severe head injury; on March 5, 1997, a grand jury indicted nanny Louise Woodward for Murder in the First Degree. On October 30, 1997, the jury returned a guilty verdict of Murder in the Second Degree; the judge imposed a mandatory life sentence on Ms. Woodward. On November 10, 1997, Judge Zobel reduced the jury verdict from Murder in the Second Degree to Involuntary Manslaughter.

Judge Zobel rejected the granting of a new trial. To quote his words, applicable in all respects to this case;

> Thus a verdict of Guilty could not properly result from the jury's merely rejecting the defense's physiological explanation as inadequate or Defendant's version of the events as implausible. The jury could return a Guilty verdict only, if, in addition to an adverse assessment of the defense position, the jurors concluded, on all the evidence, that the prosecution's version was true, beyond a reasonable doubt.

In denying a new trial, Judge Zobel chose to reduce the charge. He did so by invoking a rule in the Commonwealth that does not have a corollary in Florida. Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979) reads:

> If a verdict of guilty is returned, the judge may on motion...order the entry of a finding of guilty of any offense included in the offense charged in the indictment.

State of Florida v. Lionel Tate
Sentencing Order
Page 17 of 18

In short, under Massachusetts law, the court may reduce the level of the conviction for any reason that justice may require.

If the Florida legislature in the future chooses to incorporate such a procedure in the Rules of Criminal Procedure, then, and only then, can the court embrace its concept. But until that time arrives, if ever, the singular and only ground for reduction has been discussed above.

It is requested by the defense for this court to find that the jury's verdict was contrary to the manifest weight of the evidence. This I decline to do. The evidence of Lionel Tate's guilt is clear, obvious and indisputable. And that evidence supports the jury's verdict. To find otherwise would be to invalidate each juror's decision in unanimously finding for a verdict of guilt.

### III. Ruling and Sentence

In the proceeding pages, the court has rejected the defendant's Motions for a New Trial. There are no grounds which exist permitting the court to so act.

In the proceeding pages, the court has rejected the defendant's motion to reduce the charge to Murder in the Second Degree or Manslaughter. There are no grounds which exist permitting the court to so act.

I am moved by the outpouring of concern for Lionel Tate. At the same time I am dismayed by the lack of concern for the child victimized by Lionel Tate. It is obvious that Tiffany Eunick will never have a second chance at life, and there are so many who plead for a second chance for the defendant.

Only those who sat through the days of testimony can appreciate the nature of the acts of Lionel Tate.

**State of Florida v. Lionel Tate**
**Sentencing Order**
**Page 18 of 18**

Only those who viewed the physical evidence can appreciate the gravity of the offense. To embrace the concept of accident one would have to ignore in its totality what was presented and accepted by the jurors.

The acts of Lionel Tate were not the playful acts of a child. The acts of Lionel Tate were not the acts borne out of immaturity. The acts of Lionel Tate were cold, callous and indescribably cruel.

It is therefore the sentence of the court, in accordance with the laws of the State of Florida, that you, Lionel Tate, having been found guilty of Murder in the First Degree in the death of Tiffany Eunick, be sentenced to incarceration for your natural life.

DONE AND ORDERED this _____ day of **March, 2001**, in Open Court, Fort Lauderdale, Broward County, Florida.

**JUDGE JOEL T. LAZARUS**

Copies furnished:

Ken Padowitz, Esquire
Assistant State Attorney

James S. Lewis, Esquire
Attorney for Defendant

Richard L. Rosenbaum, Esquire
Attorney for Defendant

```
1                           IN THE CIRCUIT COURT OF THE
                            SEVENTEENTH JUDICIAL CIRCUIT IN
2                           AND FOR BROWARD COUNTY, FLORIDA
3                           CRIMINAL JUSTICE DIVISION
4                           CASE NO. 99-14401 CF
5
6    State of Florida,
7             Plaintiff,
8    vs.
9    Lionel Tate,
10            Defendant.
     _____/
11
12   APPEARANCE
13            Kenneth Padowitz, Esquire
              Assistant State Attorney
14            State Attorney's Office
              Fort Lauderdale, Florida
15            On behalf of the plaintiff
16            James Lewis, Esquire
              Special Assistant Public Defender
17            Fort Lauderdale, Florida
              On behalf of the Defendant
18
19                          VOLUME XI
20
21            Transcript of Trial had before the Honorable
22   Joel T. Lazarus, as Judge of the above-styled Court, at
23   the Broward County Courthouse, Fort Lauderdale, Florida,
24   held on the 22nd day of January, 2001.
25
```

```
 1      A.    No, I do not.

 2            Mr. Lewis:  Your witness.

 3                      CROSS EXAMINATION

 4      Q.    (By Mr. Padowitz)  Good afternoon, doctor?

 5      A.    Good afternoon.

 6      Q.    If I ask a question too fast or you don't

 7   understand what I'm asking, please stop me and I'll

 8   repeat it.  Okay?

 9      A.    That's fine.

10      Q.    You agree with me that the defendant Lionel

11   Tate did not accidently kill Tiffany Eunick?

12      A.    Correct.

13      Q.    You classify this case from your review as a

14   homicide, correct?

15      A.    Correct.

16      Q.    This was not an accident in your opinion as a

17   forensic pathologist, correct?

18      A.    I would not classify it as an accident as a

19   medical examiner, correct.

20      Q.    Well in fact you were asked a question:  "Did

21   Lionel Tate accidently kill Tiffany Eunick?"

22            And your answer was, "No."

23      A.    Correct.  I think the term that's polite --

24      Q.    I'm sorry, doctor?  I haven't asked you a

25   question.  My question I want to ask you about, defense
```

STATEMENT OF:   **LIONEL TATE**                              CASE #: **PK99-07-921**

The following will be a sworn taped statement in reference to Case Number PK99-07-921. It's gonna be in reference to a death investigation of Juvenile Tiffany Eunick. The incident occurred on 7/28/99 at 3900 S.W. 52nd Avenue, apartment 805, Pembroke Park, Florida. This statement is gonna be taken from a juvenile, Lionel Tate, whose address is 3900 S.W. 52nd Avenue, Apartment 805 in Pembroke Park, Florida. He's a black male. His date of birth is January 30th, 1987. Todays date is July 30th, 1999. The time is now 8:28 p.m. by my ah pager. This statement is gonna be taken by Detectives Berrena, CCN 6949 and Detective Kaminsky, CCN 6523. Also present is Lionel's mother, Kathleen, last name G-R-O-S-S-E-T-T  hyphen T-A-T-E.

Q    Okay Lionel, before we ah start, what I'd like for you to do is just answer my questions about if you know what right and wrong is and what's truthful and what's a lie, okay?
A    Yes

Q    Alright, if today was Christmas, would that be the truth or a lie?
A    Lie

Q    Okay, ahm, if I said my shirt was ah florescent green, what..what would that be?
A    A lie.

Q    Okay, what color is my shirt?
A    Blue and white stripes.

Q    Okay, ah if I told you ah I was a police officer, would that be truth or a lie?
A    Truth.

Q    Okay, Lionel what I'd like for you to do is just tell me in your own words...when Tiffany was at your house on Wednesday, ah you Mom had ah gone shopping with both of you, correct?
A    Yes

Q    You went to Publix?
A    Yes

Q    And then you got home about four o'clock?
A    Yes



Q    Alright. Then your mom...
KK   .... where do you attend school?

Gan                          Page 1 of  18



**EXHIBIT____18____**

STATEMENT OF   **LIONEL TATE**                    CASE #  **PK99-07-921**

Q     Okay yeah, where do you go to school right now? (No answer) Okay, he don't..., he doesn't
      have a school right now?
MT    He just came back from Mississippi.

Q     Just came back from Mississippi.  Okay, what grade level is that?
A     I'm goin to six

Q     Okay.  Ah, then what I'd like for you to do is just...
KK    Let me..let me interrupt for just one second...also ahm, prior to the tape starting ah were you
      read ah from a form called Miranda Rights?  Did Detective Berrena read those things out
      loud to you?
A     Yes

KK    ...right here...
Q     Okay

KK    And did you also initial the form and sign the form?
A     Yes

KK    Is that your signature?
A     Yes

KK    And is that your...date and the time?
A     Yes

KK    Okay, also present in the room is ah Lionel's mother ah Kathleen ah did you also have a
      chance Kathleen to read this ah form?   Do you understand the form?
A     Yes

KK    Okay, and did you sign it down here as a witness?
A     (Unintelligible)

KK    I'm sorry, could you...
A     ...(unintelligible) as a witness

KK    Okay, and do you understand everything?  That ah..what this means...Miranda Rights?
A     Yes.

KK    Okay
A     You askin me, or...?

Gan                              Page 2 of  18

STATEMENT OF.   **LIONEL TATE**                         CASE # **PK99-07-921**

KK    Yeah, I was asking you.
A    Oh.

KK    Also ahm, anytime during this statement Lionel, if you do not understand something, please tell us that you do not understand whatever question that, that is posed to you. Ah, if ah..if your not sure of something, say your not sure and please don't guess at anytime forward, okay?
A    Yes

KK    Do you understand everything I've just said?
A    Yes

Q    Alright. Lionel ah, it's Wednesday, the 28th. You've just returned home from shopping with your Mom and Tiffany. Your Mom unpacks the groceries, then she's workin midnights, so she goes upstairs to get some rest. Is that correct?
A    Yes

Q    Okay. What..what..what do you and Tiffany do at that time?
A    Ah, at first when my Mom went upstairs, me and Tiffany went upstairs because she told my mom her stomach was hurtin and my mom toll her to go lay down.

Q    Okay
A    And Tiffany slep for about a hour...

Q    ...uh huh...
A    ...and she got up and she came downstairs with me. Ah, bout a couple minutes later...bout thirty minutes later, my Mom came downstairs and fixed her somethin to eat.

Q    Okay. After you ate, did you guys play?
A    We did, but we sat down about twenty minutes before we start playin.

Q    Uh huh
A    And we started to play after that twenty minutes.

Q    What'd you play?
A    Tag

Q    And what happened when you were playin tag?
A    Ah, she was taggin me and I tagged her back, and she had tagged me and I had grabbed her like dis...

Gan                         Page 3 of  18

STATEMENT OF:   **LIONEL TATE**                    CASE #  PK99-07-921

Q   Okay, when you say grabbed her like this, what do ya mean by that?
A   I grabbed her from behind.

Q   Okay, so is..did she looking at you, or looking away from you?
A   She was like tryin to get away from me.

Q   Okay
A   Like lookin...

Q   ...the other way?
A   Yes

Q   So her back is facing you?
A   Yes

Q   Her back is to you?  Then whatta you do, reach out around her?
A   I got like..grabbed her like dis.

Q   In a bear hug?
A   Kinda...call it a bear hug.

Q   Okay Lionel, I..I don't need kind ofs and stuff.  All I wants the truth to explain the injury.
A   Yes

Q   Okay.  You got her in a bear hug.
A   Yes

Q   And what'd you do?
A   And I had grabbed her like dis and picked her up.

Q   Okay, when you say like this, you had both hands like by her stomach?
A   Yes

Q   Okay, and you picked her up that way?
A   Yes

Q   Okay, and what happened when you did that?
A   I put her down and she..she had said ouch and I said what's wrong, and she said it was her ..her like stomach and..and she..and I axed did I do it and she said yeah, kinda, but she said it was the food that was messin up her stomach, cause she wasn't fillin well.

Gan                        Page 4 of  18

STATEMENT OF    LIONEL TATE                    CASE # PK99-07-921

Q    Now did she just say "ouch", like..?
A    She was like, she was like, "ouch", like dat.

Q    It was loud?
A    Yes

Q    Okay
A    And..

KK   Did she do something with her hands when she said that?
A    She was like "ouch".

KK   Okay, your takin both your hands and your puttin to your..your right side of your stomach,
     is that what she did?
A    Yes

KK   Okay, so your imitating...
A    ...and...

KK   ...what she...
A    Yes. And she...about five minutes later she went upstairs in my room...

Q    ...un huh...
A    ...into my bathroom and chuked in the ah toilet, because she said she wasn't feelin well and
     and five minutes had passed and I checked up on her and she said she was still throwin up,
     so I came...I went back downstairs and she had ke..a couple minutes had passed and she
     came downstairs with the pillow and she..she laid down and her head was like twisted..like
     she was movin around, like edgy...

Q    ...when you say she was movin around...
A    ...right...

Q    ...did she have her..her, was she holding her stomach moving around?
A    No, she was like movin. Like a squenchin or somethin.

Q    Did she look like she was in pain?
A    No. She was like move..ah, wigglin around and I had sought she was like ah off her pillow
     and over here on the stairs, so I just move..picked her up and moved her back over der where
     the pillow was. And I was removin my hand and..and as I was removin my hand, her head
     hit, hit the thing...

Gan                           Page 5 of  18

⊗

STATEMENT OF   **LIONEL TATE**                          CASE # PK99-07-921

Q       ...what thing?
A       And..hit the table

Q       Okay, about how high off the ground were you?  Just show me...
A       ...I'm not sure...

Q       ...my your (unintelligible) how far?
A       I picked her up and I was bout, bout right to my knees...

Q       ...you were, okay...
A       ...and I was holdin it and I put her down and I was movin my hands away and my hand had
        turned to hit the table and then she had her...then she had moved and her hand...she moved
        her hand  onto  her stomach and she was doin like dis and then she just made the sound...

Q       ...what sound?
A       Like yell, like Ow, like ow and my mom ca..ca..looked out the room and axed me what was
        that and I told her it was Tiffany, and she said, 'get her to stop'.  And I was like Tiffany,
        Tiffany, stop makin that noise, but she had stopped, and then I was standin..I had got back
        up, and sat down and started watchin TV again and then..and then when I looked back at her
        a couple minutes after I was watchin TV, her stomach wasn't movin up and down like it was
        suppose to, so I ran upstairs and got my mom and called her and toll her, her stomach wasn't
        movin up and down like it was suppose to.

Q       Lionel, how did she get the injury to her forehead?
A       She..that's when I had put her down and I moved my hand.

Q       Lionel, if she's facing up, she doesn't hit her forehead on the floor?
A       I tel..I was movin my hand away from her head...

Q       ,..right...
A       ...and it was like..it turned and hit the table, the side of the table.

Q       So, she hit her forehead on the table?
A       She was like dis and I moved my hand and just hit like she hit her head..on the side ah back
        of the table.

Q       Lionel, when you lift somebody up like this...
A       ...yes...

Q       ...okay and her head turns, and they hit the table, they get swung into the table.

Gan                          Page 6 of  18

STATEMENT OF   **LIONEL TATE**                    CASE #: PK99-07-921

A       No, I had her...I put her down and I was movin my hand, tryin to move her head...

Q       ...uh huh...
A       ...that's when her head just turnt and hit the table.

Q       Okay.  How did she hit the back of her head?
A       I never seen her hit the back of her head.

Q       She hit the back of her head.  She also hit the side of her head.
A       I never seen her hit the back or the side of her head.

Q       Was there any other time when you may have picked her up, or tried to move her, or she fell, or something, Lionel?
A       No, just the time she slipped when she was running, that was it.

Q       Yeah, yeah you can...
A       ...that may have been it.  I don't
MT      ...when Tiffany..when I came into the house and I first picked up Tiffany...?
A       ..yes...

MT      And she said that Aunt Seca (?), I hit ahm, my face, or the side of my face..where did she hit wit the table?
A       She was like, she threw it up...

MT      ...uh huh...
A       ... and she landed, because you seen her holdin ah, ah ice..

MT      ...yeah cause she had ice...
A       ...she had the ice on the side...

Q       ... (everyone talking at the same time) Okay, alright..
MT      ...or somthing...

Q       ...that explains that injury, thank you.
Mt      I, I don't know the exact spot, but it was somewhere like that.

Q       Okay.  Ahm, when..there was one point where you guys are..she's like teasing you by puttin her hand on you, what was that about?
A       Oh, she was..that's when she was asleep.  She wasn't teasin me, she was asleep.  I don't think she know what she was doin and she just kep movin her hand, cause my Mom heard

Gan                              Page 7 of  18

STATEMENT OF:   **LIONEL TATE**                    CASE #: PK99-07-921

 

   (Continued)   me ah sayin Tiffany get off me, get off me, stop doin at, because she was still sleepin and she just kep movin her hand back on me, and I kep sayin Tiffany stop and she just kep movin her hand back on.  I stood there a...

MT   ..I heard dat too.  I heard that because I, I, I said ahm, "what were you tellin Tiffany to ah move her hand off you", or somethin like that.  I remember that too.  Now I member that.

A   ...I was..I was der a couple of minutes tellin her..

MT   ...I was like shhh...

A   ...like move her hand off me, move her hand off..move your hand off me and she just kep..everytime I moved it off, she just put it back on.

Q   Okay

A   Like she wanted it in that position...

Q   ...when...

A   ...cause...that's when she was asleep.

Q   Okay.   Is there another time when you were pushing her or shaking her when she was on the ground?

A   Ah, when I was tellin her to stop makin the noise?  That my Mom tol..that my Mom axed me to ah..to ax..tell her to stop.  That's the only time I was pushin her.  Like Tiffany, wake up...

Q   ...you were touching..

A   ...tellin her...

Q   ...that lightly, or was it stronger?

A   I was like Tiffany, stop mo...ah stop making all that sound.  Stop yellin.

Q   Okay, where..what part of the body were you pushing?

A   Like right..like on her side like deep here.

Q   Okay.  Cause, I just wanna tell ya it, it..she has an injury right where you pointed.  So, were you pushing hard?

A   No, I was not pushing her hard, I was just like "Tiffany stop makin all that noise".

Q   Okay. ·When you were behind her and you gave her that bear hug and lifted her up?

A   Yes

Q   Did you do it more than once?

A   No, I only did it once.

Gan                          Page 8 of  18

STATEMENT OF   **LIONEL TATE**                                    CASE # **PK99-07-921**

Q    Did ya kinda bounce her when you had her like that?
A    No.  I just picked her up like dis and I had did like dis, had  put her down on her feet.

Q    Picked her up and moved her?
A    Yes

KK    Did you squeeze when you did that?
A    No, I just kinda like grabbed her...just like grabbed her and moved her...moved over, I didn't squeeze.

Q    Well, you had to squeeze...
MT    He probably squeezed because he tried to pick me up.

Q    Okay
MT    ...like that, and I'm sayin boy, I'm too heavy for you, you know.

KK    Umm, what, what area of the..the residence did this all occur?
Q    Where were you in the house?
A    In the livin room.

KK    When she was on the ah, on the ah floor...?
A    ...yes...
Q    (We'll have a (unintelligible)

KK    What floor ahm...
Q    Sorry bout that...
MT    ...that's the jacket (?)

KK    Oh sorry.  Ahm, on the floor when this happened, she was face up, and this is by the stairs that you (Unintelligible)?
A    Where she was?

KK    Yes sir.
A    I had moved her cause she was right by on the stepper thing.

KK    Okay
A    And I had just picked her up and put her back where she was..we were like, where she was layin at in the first place.

Gan                         Page 9 of  18

STATEMENT OF   **LIONEL TATE**                                    CASE #. PK99-07-921

KK    Okay, now when you..when you moved her, you said you had both hands underneath?
A     Yes

KK    You had both hands underneath what?  One hand was under what?
A     I had one hand like...

KK    ...point to me on your body where your...
A     ..right here...

KK    ...like this here...
A     ..like right here..

KK    ...okay, so your going behind the shoulder blade...
A     ..so her neck...

KK    ..area, behind your neck?
A     Like right there.

KK    And where was your other hand?
A     And I had the other hand like..like right here on the legs.

KK    ...underneath her legs...
A     ...had her like dis...

KK    And how were your hands positioned...
A     ...der was just...

KK    ...when you...
A     ...day was just like dis.

KK    Okay, you're showin me palms up this time?
A     Yeah

KK    Now, when you lifted her, you said you got knee high, is that correct?
A     Yes

KK    How was her body positioned when you were holding her at that point...
A     ..she...

STATEMENT OF    **LIONEL TATE**                    CASE # PK99-07-921

KK    ...was she...?
A     .she was, she was just like laying, laid out.

KK    Which way was her chest pointing when you were holding her at this position?
A     She was like pointing...like...

Q     ...straight up or down?
A     .in like.  It was  kinda like bend in a little bit.   It was like bended in some and then I just laid her down.

KK    Okay.  When did she hit the table thought, prior to you layin her down?
A     Ah, when I moved my hand...when I was releasin my hand from her.

KK    Okay, and were you moving at the time?  Forward, or were you moving backward, or were you...?
A     ...I was moving backward.

KK    And..and when you released her as you said, what part of her head, can you point to me on your body, hit the table?
A     Like right up here...

KK    ...okay...
A     ...on my forehead.

Q     By your forehead?
A     Yes

KK    Alright, did any other part of her head hit the table?
A     Not that I know of.

KK    What do you know?
A     Just know that when she..when I was releasin my hand from right der, her head turned and hit the table.

KK    Okay, her head turned?  Which part of the...which part turned?
A     ..like she had her face up like dis and I was comin from..movin from this side, comin back, and her head ja..just hit it like dit.

Gan                    Page 11 of  18

STATEMENT OF   **LIONEL TATE**                    CASE # PK99-07-921

KK    The side of her head? (Unintelligible)
A     The tables comin like this way and when I..I was comin from this way, backin up and I'm..and her head was like this kinda.

KK    Okay, your showin me your head bent over to the side is what your showin me. (Talking at the same time)...
A     ...no her head was kinda like straight up like dis and when I was removin my hands from right there, that's when her head just hit the table.

KK    Okay, can you...
A     ...sideways...

KK    Okay sideways. Can you tell me if it was the left side, or the right side, or do you not know?
A     Do not know

KK    Okay, so..but you do know that the side of her head...
A     ...yes...

KK    Okay, hit what portion of the table ah that we're just talking about?
A     The..the ah side that they stand up. Like the table like stands up.

KK    Okay, so the side. Was it the corner, or was it ah the table, or was it the flat side?
A     It was kinda like ah..it was the flat..kinda like the corner was right there...

KK    ...okay...
A     ...and the flat side.

KK    It was the side of her head...
A     ...kinda like...

KK    ..where did it contact?
A     It contacted ah, ah like the corner a little bit?

KK    ..corner of the (unintelligible)?
A     Yes

KK    The side that goes down?
MT    The table is all solid, and there's no...
A     ...yeah...
MT    ...in between the...

STATEMENT OF   **LIONEL TATE**                    CASE # PK99-07-921

KK     ah, okay...
MT     ...side...

KK     Okay
MT     All solid just like a top...

Q      ...okay...
MT     ...with the..it's like a wall.

Q      Lionel when..when Tiffany..when you gave her that bear hug and then put her down and
       was she other than the fact, that she then yelled and said her stomach hurt, was she tellin you
       throughout this that she didn't feel good, or that...
A      After I had put her down?  That's when she said "Ouch", and she said...I said, "did I do that",
       and she said, 'yeah, you did somethin, but ah my stomach was hurtin from the food that I
       ate'.  That's what she had toll me.

Q      How bout when she ah hit her head.  What'd she tell you then?
A      She was sleepin when she..when she had hit her head.

Q      Let me ask you Lionel, the only problem I'm having here is how is Tiffany sleeping through
       all of this?
A      She..I'm talking about when I had picked her up. She was already on the ground sleepin.

Q      Was she sleeping or was she...?
A      ..she was sleepin...

Q      ...hurt?
A      She was sleepin.

Q      Why did you move her?
A      I was movin her from in front of the stairs, because the step master, or whatever...

Q      ...uh huh...
A      ...it's right by the stairs and that's where she was, so I just picked her up and moved her, so

Q      ...why, were you, were you, were you...
A      ...she wouldn't be in the way...

Q      ...were you gonna use the stair thing?  Stair climber, or the stair master?
A      No sir

Gan                    Page 13 of  18

STATEMENT OF:  **LIONEL TATE**                                    CASE #: **PK99-07-921**

MT    (Unintelligible)

Q    Okay, correct. Did...Lionel, anything else you may have done..any other time you picked
      her up, any other game you may have been playing during this time?  You been straight wit
      us on, on this..
A    Yes

Q    What else?
A    Dat was it.

Q    Well, she's got a couple more bruises.
A    Well, I don't know about anything else.  That's all I know.

Q    Okay.
KK   Ahm, when was the first time that you realized something was wrong with, with Tiffany?
A    When she first came...ah after she had ah ate the ox tail and rice...

Q    ...uh hum...
A    ...that's she, she went upstairs in my bathroom and puked and said her stomach was hurtin.

Q    Wa..wait a minute, was that before the bear hug, or after the bear hug?
A    That was after the bear hug.

Q    Okay, so she ate, and then that's when you guys were playing and you...
A    ...she sat down about twenty minutes before we start playin.

Q    Okay
A    Because she wanted to let her food digest a little bit.

Q    Uh huh
A    And we start playin and then after this..after I had picked her up...

Q    ...the bear hug?
A    Yes

Q    That's when she went upstairs to puke?
A    Yeah, she toll me her stomach was hurtin from the food and what I had did.  She said I did
      some of it.

Gan                        Page 14 of  18

STATEMENT OF:   **LIONEL TATE**                    CASE # PK99-07-921

KK      Was anyone else present in the living room when this ah bear hug occurred?
A       No sir

KK      Was anyone else present in the living room when ah Tiffany's head hit the table?
A       No

KK      Okay.  Who else was in the house at the time of all this?
A       Me and my mother.

KK      Okay, where was your Mom during this?
A       Upstairs

KK      Okay, what was she doing?
A       Sleeping

KK      Did you ah, when she came back down after ahm as you described, before puking ah, when her head hit the table did you realize that at that point that there was a problem?
A       Who me?

KK      Yes
A       She just hit her head and, and I know she had put her hand on her stomach.  She was at..when I had first picked her up...

KK      ...did you believe at that time there was a problem?
A       No

KK      When did you realize after that, that there was a problem?
A       When her stomach was not moving at all.

KK      Then, and as a result of that, what'd you do next?
A       I went upstairs and told my Mom

KK      Okay, and then what happened next?
A       My Mom came down...

KK      ...Let me ask you this.  What'd you tell your Mom?
A       I toll my Mom that ah Tiffany stomach wasn't movin like it was suppose to...

Gan                             Page 15 of  18

⊕

STATEMENT OF:   **LIONEL TATE**                    CASE # PK99-07-921

KK    ...okay...
A     ...and she, and she was like what and I said her stomach wasn't movin, and she came down stairs. She was runnin down stairs and started to give Tiffany CPR.

KK    Okay
A     And nothin was happening but vomit was comin up and she toll me go get the phone and, and she pressed 911 and called the police.

KK    Okay, now did you tell your Mom ahm during that incident, or anytime after, about that bear hug?
A     No

KK    Did you tell your Mom about Tiffany ah hitting the table?
A     (no response)

KK    Did you tell...
A     ...I toll her that she had hit herself on the table.

KK    Okay
A     But, I just didn't tell her how.

KK    Okay. And ah, was that when all the paramedics were there, or after, when, when did you tell her about it?
A     After.

KK    After
MT    Ah, he said when she was rollin around, she hit her head on the table.
A     Yes, she was rollin.

Q     Okay. Did ahm, well why didn't you tell your Mom what happened?
MT    Answer him.
A     I was scared

Q     Why were you scared?
A     She  (?)

Q     Huh. (Mumbling) Huh. Why were you scared?
KK    Were you just scared of what the consequences could be?

Gan                    Page 16 of  18

STATEMENT OF:   **LIONEL TATE**                    CASE #: **PK99-07-921**

Q     Were you scared because of what happened?  Huh?  Your shaking your head yes.  Is that what you...because you thought of what happened?  Huh?
A     No

Q     What? (Unintelligible) Huh, how come you didn't tell your Mom?
A     (No answer)

Q     Huh?  Lionel, I want you to look at me, okay.  Why didn't you tell your Mom?
A     (no answer)

Q     How come?  Were you afraid of what you had done?
A     I was scared (unintelligible)

Q     You were scared?
KK    (Unintelligible)

KK    Okay.  Ahm, let me ask you this ahm, as far as ah tonight, being here and stuff like that, did you have opportunities to use the restroom this evening?
A     Yes

KK    Okay, how..did you use it, how many times?
A     Three

KK    Okay, and ah, did you have earlier..did you drink a Sprite?
A     Yes

KK    And did you eat some chips?
A     Yes

KK    And what were you doing just prior to us coming back here to this room?
A     Playing

KK    Okay, where were you playing at?
A     In your room, interview room, with the toys.

KK    Okay, so there's a room there and it has toys and stuff in it?
A     Yes

KK    Okay, have you been handcuffed tonight at all?
A     No

Gan                           Page 17 of  18

STATEMENT OF:   **LIONEL TATE**                         CASE #  **PK99-07-921**

Q       Were you mistreated in any way?
A       No

Q       Did anybody yell at you?
A       No

KK      Okay, did anyone here tell you what to say?
A       No
MT      (unintelligible) I told him what to do.

Q       Yes, did you...
A       (unintelligible)

Q       Did your  Mom tell you what to say?
A       No

Q       Okay.  No further questions Kathleen.  Detective?
KK      No more questions

Q       Okay, the time is now 8:52 by my pager and that will terminate the interview.



Gan                              Page 18 of  18

1

1                  IN THE CIRCUIT COURT OF THE 17th
                  JUDICIAL CIRCUIT, IN AND FOR
2                    BROWARD COUNTY, FLORIDA

3    - - - - - - - - - - - - - - - - -

4    STATE OF FLORIDA,          **ORIGINAL**

5    vs

6                    No. 99-14401CF
                    Judge Joel T. Lazarus

7    LIONEL TATE,

          Defendant.
8    - - - - - - - - - - - - - - -

9                    Fort Lauderdale, Florida
                    June 28, 2000
10                   8:30 a.m.

11

12        The above-entitled cause came on for hearing

13    before the Honorable JOEL T. LAZARUS, Presiding Judge,

14    at the Broward County Courthouse, 201 Southeast Sixth

15    Street, Fort Lauderdale, Florida, on the 28th day of

16    June, 2000.

17    APPEARANCES:

18        MICHAEL J. SATZ, State Attorney
        By:  KENNETH PADOWITZ, ESQ.,
19        Assistant State Attorney,
        appearing on behalf of the State of Florida
20

        By:  JAMES LEWIS, ESQ.,
21        appearing on behalf of the defendant

22

23

24                 DEFENSE MOTIONS

25

46

1    THE COURT:  You are not playing that are you?

2    MR. PADOWITZ:  I was.

3    THE COURT:  Do I need to hear the whole tape?

4    MR. LEWIS:  I would like you to hear the whole

5    tape.

6        (Thereupon, State's Exhibit 2 was published

7        to the Court.)

8    DETECTIVE BERRENA:  The following is a sworn taped

9    statement and a reference to case number PK99-07-921.

10   The statement is going to be in reference to an

11   unattended death of juvenile Tiffany Eunick,

12   E-U-N-I-C-K.  Date of occurrence is 7/28/99.  Incident

13   location is 3900 Southwest 52nd Avenue, Apartment 805,

14   Pembroke Park, Florida.  This statement is taken from

15   Lionel Tate, juvenile.  Date of birth of January 30th,

16   1987.  He lives at 3900 Southwest 52nd Avenue,

17   Apartment 805, Pembroke Park, Florida.  Phone number

18   964-8042.  Statement taken on 7/30/99, and it's now

19   approximately 7:13 p.m.  This statement is taken from

20   Detective Berrena CCN 6949.  Also present Detective

21   Kaminsky, CCN of 6523.  Also present is Lionel's

22   cousin.

23       State your name.

24   MR. HENRY:  Bradley Henry.

25   DETECTIVE BERRENA:  And your date of birth?

1          MR. HENRY:  Twenty-three of twelve, '65.

2          DETECTIVE BERRENA:  Prior to going on tape,

3     Lionel, you read that Rights Waver Form?

4          THE DEFENDANT:  Yes.

5          DETECTIVE BERRENA:  Did you understand it?

6          THE DEFENDANT:  Yes.

7          DETECTIVE BERRENA:  Okay.  You said Bradley,

8     right?

9          MR. HENRY:  Yeah.

10          DETECTIVE BERRENA:  You signed and he understood

11     it okay?

12          MR. HENRY:  Yes.

13          DETECTIVE BERRENA:  Okay.  All I want you to do

14     with this --

15          DETECTIVE KAMINSKY:  Let me, let me just also --

16     This is Detective Kaminsky.  Before we continue I just

17     want to read these things over, also.  Before Detective

18     Berrena or I ask you any questions, I want to advise

19     you of your constitutional rights.  You have the right

20     to remain silent.  Anything you say can be used against

21     you in a court of law.  You have the right to talk to a

22     lawyer and have a lawyer present before any

23     questioning.  If you cannot afford a lawyer, one will

24     be appointed to represent you before any questioning if

25     you wish.  Do you understand each of these rights that

48

1      I have read to you, Lionel?

2            THE DEFENDANT:  Yes.

3            DETECTIVE KAMINSKY:  And do you also understand

4      these rights, Bradley?

5            MR. HENRY:  Yeah, I understand them.

6            DETECTIVE BERRENA:  Is that your signature there?

7            THE DEFENDANT:  Yes.

8            DETECTIVE KAMINSKY:  And Bradley, did you also

9      sign the form here at the bottom in the witness

10     section?

11           MR. HENRY:  As a witness, yes.

12           DETECTIVE BERRENA:  Lionel, what I want you to do

13     is tell me that Wednesday starting from the time at 4

14     p.m. when you were at your house.  Okay.  Prior to, all

15     right.  That's what the statement is going to be about.

16     Before we do that, I'm just going -- Do you know right

17     from wrong?

18           THE DEFENDANT:  Yes.

19           DETECTIVE BERRENA:  Do you know truth from a lie?

20           THE DEFENDANT:  Yes.

21           DETECTIVE BERRENA:  Would the truth be my shirt is

22     green?

23           THE DEFENDANT:  Lie.

24           DETECTIVE BERRENA:  Okay.  If I said today --

25           THE DEFENDANT:  Lie.

49

1          DETECTIVE KAMINSKY:  Hold on, Lionel.  We talked

2     earlier before we went on tape, we talked about truths

3     and lies and stuff like that.

4          THE DEFENDANT:  Yes.

5          DETECTIVE KAMINSKY:  I know some of the questions

6     you are answering from prior, but let me ask you some

7     new questions.

8          If I said -- If I said today was Christmas Day,

9     would that be a truth or would that be a lie?

10         THE DEFENDANT:  Lie.

11         DETECTIVE KAMINSKY:  If I said we were at a police

12    station now, would that be a truth or lie?

13         THE DEFENDANT:  Truth.

14         DETECTIVE KAMINSKY:  Okay.  Let me ask you this,

15    what grade are you in?

16         THE DEFENDANT:  Going into sixth.

17         DETECTIVE KAMINSKY:  Okay.  You're going to sixth

18    grade?

19         THE DEFENDANT:  Yes.

20         DETECTIVE KAMINSKY:  What's your favorite class

21    and subject?

22         THE DEFENDANT:  Math.

23         DETECTIVE KAMINSKY:  What kind of grades do you

24    get in math?

25         THE DEFENDANT:  Ninety-seven average.

50

1      DETECTIVE KAMINSKY:  Ninety-seven average?

2      THE DEFENDANT:  Yes.

3      DETECTIVE KAMINSKY:  So you're doing real well in

4  math?

5      THE DEFENDANT:  Yes.

6      DETECTIVE KAMINSKY:  Okay.  How about reading?

7      THE DEFENDANT:  I'm good in reading.

8      DETECTIVE KAMINSKY:  Okay.  Everything that we

9  talk about here, if you don't understand something as

10  we talk about it I want you to say I don't understand,

11  is that okay?

12      THE DEFENDANT:  Yes.

13      DETECTIVE KAMINSKY:  And if you are not sure of

14  something, do not guess.

15      THE DEFENDANT:  Okay.

16      DETECTIVE KAMINSKY:  And if you're -- If the

17  question requires a yes or no, you can answer that.

18  And if you have to say something else after that, it's

19  okay to say that.  Do you understand that?

20      THE DEFENDANT:  Yes.

21      DETECTIVE KAMINSKY:  And if you do not understand

22  something, please say that you do not understand and

23  we'll make sure that is clear.

24      THE DEFENDANT:  Okay.

25      DETECTIVE BERRENA:  Four p.m. you, Tiffany and

51

1      your mom are at your house?

2           THE DEFENDANT:  Yes.

3           DETECTIVE BERRENA:  You just came back from

4      Publix?

5           THE DEFENDANT:  Yes.

6           DETECTIVE BERRENA:  Okay.  Then all I want you to

7      do is tell me what happens from that point on.

8           THE DEFENDANT:  My mom puts away the groceries.

9      She goes upstairs and goes to sleep.  Wait, all right.

10     Tiffany goes upstairs with me and my mom comes up after

11     she puts up groceries.  Tiffany tells my mom that her

12     stomach is hurting.  My mom tells Tiffany to go take a

13     nap.  Tiffany sleeps for about a hour.  Me and Tiffany

14     go downstairs and we start playing tag in the house.

15     And we were running in the house, tagging, and I

16     grabbed her like playing tag and --

17          DETECTIVE BERRENA:  How did you grab her?

18          THE DEFENDANT:  Like -- Well, like how do you grab

19     somebody.

20          DETECTIVE BERRENA:  Well, show --

21          MR. HENRY:  Demonstrate.  Demonstrate for me.

22          THE DEFENDANT:  Like how you grab like this?

23          DETECTIVE BERRENA:  No, stand up and show us.

24          MR. HENRY:  Stand up.

25          THE DEFENDANT:  Like this.

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

52

1          DETECTIVE BERRENA:  Oh, easy son.

2          MR. HENRY:  Take it easy, man.

3          DETECTIVE BERRENA:  Were you behind her?

4          THE DEFENDANT:  She said the same thing.  Yes.

5          DETECTIVE BERRENA:  Were you behind her?

6          MR. HENRY:  Yeah (inaudible).

7          THE DEFENDANT:  Yes.

8          DETECTIVE BERRENA:  Right.  Was it with that kind

9     of force you picked her up with?

10          THE DEFENDANT:  I'm not too sure.

11          DETECTIVE KAMINSKY:  Okay.  When you are showing

12     us both, both Bradley and Lionel are standing up and

13     Lionel is behind Bradley.  Lionel is placing his hands

14     around the waist area.  And without using force go

15     ahead and show us the hold that you had.

16          DETECTIVE BERRENA:  Yeah, slowly.

17          THE DEFENDANT:  Like that?

18          DETECTIVE KAMINSKY:  Okay.  You're showing both

19     your hands.

20          THE DEFENDANT:  And I picked her up like that.

21          DETECTIVE KAMINSKY:  Okay.  Hold on.  You are

22     showing both of your hands clinched around the front

23     area of the waist.

24          THE DEFENDANT:  Yeah.

25          DETECTIVE KAMINSKY:  Now, is this how you were

53

1    holding Tiffany at that time?

2         THE DEFENDANT:  I was like picking her up like

3    this, yes.

4         DETECTIVE KAMINSKY:  When you did that, what did

5    you do?

6         THE DEFENDANT:  I picked her up.

7         DETECTIVE KAMINSKY:  Did you squeeze or not?

8         THE DEFENDANT:  I like -- Like this, and I tried

9    to pick her up.

10        DETECTIVE KAMINSKY:  Okay.  Were you squeezing

11   when you did that?

12        THE DEFENDANT:  Not -- I would like squeezing her

13   like this.

14        DETECTIVE BERRENA:  Did you pick her up off the

15   ground?

16        THE DEFENDANT:  Yes.

17        DETECTIVE BERRENA:  Did you like bounce her up and

18   down a couple of times?

19        THE DEFENDANT:  No, I grabbed her like this.

20        DETECTIVE BERRENA:  Uh-huh.

21        THE DEFENDANT:  And picked her up.

22        DETECTIVE KAMINSKY:  When you did that, what was

23   Tiffany's reaction?

24        THE DEFENDANT:  When I put her she said ouch.

25        DETECTIVE KAMINSKY:  Okay.  And what did she do?

54

1        DETECTIVE BERRENA:  That softly or --

2        DETECTIVE KAMINSKY:  When she said --

3        DETECTIVE BERRENA:  Or how did she --

4        THE DEFENDANT:  She was like ouch.

5        DETECTIVE KAMINSKY:  Okay.  You can go ahead and

6   sit down.  Now, when she went ouch, let me ask you what

7   did - what did she do at that point?

8        THE DEFENDANT:  She -- After I put her down she

9   tagged me back again and I start --

10        DETECTIVE KAMINSKY:  Before you did, did she do

11   anything with her hands?

12        THE DEFENDANT:  Like what?

13        DETECTIVE KAMINSKY:  I mean, when she said ouch,

14   did she do anything?

15        THE DEFENDANT:  She did like ouch.

16        DETECTIVE KAMINSKY:  Okay.  You're pointing to

17   your right side of your stomach area.  What happened

18   after that?

19        THE DEFENDANT:  I put her down and she tagged me

20   again and that's when I --

21        DETECTIVE KAMINSKY:  Go ahead.

22        THE DEFENDANT:  That when we start running back

23   around, and she ran upstairs about halfway and hit her

24   leg.

25        DETECTIVE KAMINSKY:  What did she hit her leg on?

55

1          THE DEFENDANT:  The -- The bar.  There like the

2     thick bar.

3          DETECTIVE KAMINSKY:  Which thick bar?

4          THE DEFENDANT:  Thick bar on the stair.

5          DETECTIVE KAMINSKY:  Is in front of the stair.

6     Okay.  What part of her body touched the stair?

7          THE DEFENDANT:  Like her leg.

8          DETECTIVE KAMINSKY:  Which leg, do you remember?

9          THE DEFENDANT:  No.

10          DETECTIVE KAMINSKY:  What happened after that?

11     What happened next?

12          THE DEFENDANT:  That's when she told me she wasn't

13     playing anymore because she had hit her leg.

14          DETECTIVE KAMINSKY:  Okay.  Where did she go?

15          THE DEFENDANT:  She went upstairs after that and

16     puked in my bathroom.  And she came and I went upstairs

17     and checked on her.  And she said she was still puking.

18     And I came back downstairs and she said she was tired.

19     So like -- And then after that she went to sleep and I

20     saw her head was twisted.  Like her head was off the

21     pillow and I pick her and moved it back on the pillow.

22     And when I was moving my hands she had hit her head.

23          DETECTIVE KAMINSKY:  Okay.  Let me ask you.  When

24     you moved, she was on the ground.  Where was she at on

25     the ground?

56

1      THE DEFENDANT:  Yup.

2      DETECTIVE KAMINSKY:  Was she on the floor or on

3  the couch?

4      THE DEFENDANT:  On the floor.

5      DETECTIVE KAMINSKY:  In what room of the house?

6      THE DEFENDANT:  In the living room.

7      DETECTIVE KAMINSKY:  Where was she by on the

8  floor?

9      THE DEFENDANT:  Can't describe like -- We have the

10  stairs this way.

11      DETECTIVE KAMINSKY:  What kind of furniture?

12      THE DEFENDANT:  We have a sofa, stairs.  We have

13  the -- What's the thing that my mom got in the corner

14  that she got a tread mill.

15      MR. HENRY:  Stair stepper.

16      THE DEFENDANT:  The step, yeah, stair stepper.

17      DETECTIVE KAMINSKY:  Okay.

18      THE DEFENDANT:  Like that.  She was kind of by

19  that.

20      DETECTIVE KAMINSKY:  Okay.

21      THE DEFENDANT:  That's when I picked her up.

22      DETECTIVE KAMINSKY:  Okay.

23      THE DEFENDANT:  And moved her on the pillow.

24      DETECTIVE KAMINSKY:  When you went to pick her up,

25  where did you place your hands?

57

1      THE DEFENDANT:  I had my, my hand right here.  One

2  right here.

3      DETECTIVE KAMINSKY:  Would you show me?  You poke

4  both hands out with palms up?

5      MR. HENRY:  -- so he can demonstrate.

6      DETECTIVE KAMINSKY:  Well.

7      THE DEFENDANT:  Can I pick you up?  I was like --

8      DETECTIVE KAMINSKY:  No, no, that's all right.

9      THE DEFENDANT:  I had one hand like right here.

10      DETECTIVE BERRENA:  By your head?

11      DETECTIVE KAMINSKY:  One --

12      THE DEFENDANT:  Like right here.

13      DETECTIVE BERRENA:  Okay.

14      THE DEFENDANT:  And one leg right here.  My hand

15  right here.

16      DETECTIVE BERRENA:  When you picked her up was she

17  like, you know how you pick somebody up and you have

18  them like level, or did you pick her up where she's

19  hanging from one side?

20      THE DEFENDANT:  No, she was like, kind of like

21  level, but her head was hanging down.

22      DETECTIVE BERRENA:  Okay.

23      THE DEFENDANT:  Like that.

24      DETECTIVE BERRENA:  What happened?

25      THE DEFENDANT:  And I put her down on the pillow

58

1    and I was moving my hand right there and she hit it.

2         DETECTIVE BERRENA:  She -- That's when she hit her

3    head.

4         THE DEFENDANT:  She hit her head.

5         DETECTIVE BERRENA:  I didn't hear, I'm sorry.

6         THE DEFENDANT:  And she hit her head.  And --

7         DETECTIVE BERRENA:  All right.  Did she hit her

8    head on the floor, or where did she hit her head?

9         THE DEFENDANT:  No, she hit her head on like the -

10   what you call it.  The side of the table.

11        DETECTIVE BERRENA:  What?

12        THE DEFENDANT:  What you call it, thick thing

13   right here.  I can't --

14        DETECTIVE KAMINSKY:  This leg of the table?

15        THE DEFENDANT:  It's -- We don't have legs.

16        DETECTIVE KAMINSKY:  The side of the table?

17        THE DEFENDANT:  Side of the table, something like

18   that.  That's when I got up, sat down on the chair, and

19   I didn't see her stomach going up like this was

20   supposed to and I ran upstairs and got my mom.

21        DETECTIVE BERRENA:  All right.  Did at any time

22   when she was on the ground --

23        THE DEFENDANT:  Yes.

24        DETECTIVE BERRENA:  On the rig laying down, did

25   she hit her head any other time than that?

ESQUIRE DEPOSITION SERVICES, FORT LAUDERDALE, (954) 463-9505

59

1          THE DEFENDANT:  Not that I know of.

2          DETECTIVE BERRENA:  Just the one time when you

3     picked her up?

4          THE DEFENDANT:  Yes, and put her down.

5          DETECTIVE BERRENA:  There wasn't a time when she

6     rolled around?

7          THE DEFENDANT:  She was like moving like that.

8          DETECTIVE BERRENA:  Okay.  And what happened?  I'm

9     sorry.  Okay, Detective.

10         DETECTIVE KAMINSKY:  When she was on the floor and

11    you went to move her, why did you move her?

12         THE DEFENDANT:  I was moving her body getting it

13    where the pillow was.  Just like putting her over

14    there.

15         DETECTIVE KAMINSKY:  When you lifted her, how high

16    up off the ground did you lift her?

17         THE DEFENDANT:  I don't really -- I lift her like

18    right up.

19         DETECTIVE KAMINSKY:  Can you show me from the

20    floor here?

21         THE DEFENDANT:  All right.

22         DETECTIVE KAMINSKY:  Can you show me in your

23    hands?

24         THE DEFENDANT:  It's like this.

25         DETECTIVE KAMINSKY:  How high up.

60

1      THE DEFENDANT:  I picked her up like this.  About

2   right here.

3      DETECTIVE KAMINSKY:  Okay.  So you're showing this

4   is approximately three feet of distance from the floor

5   to your hand?

6      THE DEFENDANT:  I guess so.

7      DETECTIVE KAMINSKY:  Is that --

8      THE DEFENDANT:  I don't know.

9      DETECTIVE KAMINSKY:  Approximately correct.

10      MR. HENRY:  That's approximately correct.

11      DETECTIVE KAMINSKY:  Is that what -- That's what

12   Lionel is showing me.

13      When you moved her, how far did you move her that

14   she --

15      THE DEFENDANT:  I just like --

16      DETECTIVE KAMINSKY:  Hit the table.

17      THE DEFENDANT:  I just like moved her where the

18   pillow was.  It really wasn't that far from where I

19   was.  I got up and moved her right there.

20      DETECTIVE KAMINSKY:  What side of her head hit the

21   table?

22      THE DEFENDANT:  It was like right up here.

23      DETECTIVE KAMINSKY:  What part where?

24      THE DEFENDANT:  Her head just turned.

25      DETECTIVE BERRENA:  Point.

61

1      DETECTIVE KAMINSKY:  Yeah, point to your head and

2  show me.

3      THE DEFENDANT:  Like right here I guess.

4      DETECTIVE BERRENA:  Well, you're pointing to your

5  whole face.  Pick a spot where you think.

6      THE DEFENDANT:  Right here I guess.

7      DETECTIVE BERRENA:  Okay.  Right here.

8      THE DEFENDANT:  I'm not sure.  She just turned.

9      MR. HENRY:  You're pointing between your eyes, up

10  above your forehead.

11      THE DEFENDANT:  Well, yes.

12      DETECTIVE BERRENA:  Your forehead, right here in

13  front?

14      THE DEFENDANT:  Guess so.

15      DETECTIVE BERRENA:  Of your forehead?

16      THE DEFENDANT:  Yes.  And She moved.  Like when I

17  moved my hand she went like this and that's when she

18  made this sound.  And my mom heard it, and she asked me

19  what was it.  And I said Tiffany and she said tell her

20  to stop.  And I said, Tiffany, stop, and she just

21  stopped and her stomach is not moving.  And she said

22  like that and nothing came out.  When she did stop

23  breathing and her heart, I mean her stomach wasn't

24  moving I went upstairs to get my mom.  And my mom was

25  doing C.P.R on her and throw up came out of her mouth.

62

1        A lot just came out her mouth.

2            DETECTIVE KAMINSKY:  Let me ask you, when you went

3        to move her, how many times did her head hit the table?

4            THE DEFENDANT:  I saw her head hit once like when

5        I moved her over there and I lifted my hand from back

6        there, that's when her head hit the table.

7            DETECTIVE KAMINSKY:  What was the distance from

8        the floor to the side of the table when that happened?

9            THE DEFENDANT:  I'm not for sure.

10           DETECTIVE KAMINSKY:  Was it --

11           THE DEFENDANT:  Distance.

12           DETECTIVE KAMINSKY:  Yeah.  Can you show me from

13       the ground up with your hand how far up from the table

14       did her head hit the table?

15           THE DEFENDANT:  The table was about the table was

16       about five -- I think it was about this high.  The

17       table is -- The table is about that high or something.

18           DETECTIVE KAMINSKY:  What I'm asking you is this,

19       when her head hit the side of the table, was she

20       falling out of your hands, or did --

21           THE DEFENDANT:  No.

22           DETECTIVE KAMINSKY:  Okay.

23           THE DEFENDANT:  That's when I had already had --

24       it was like she was kind of like this off the ground

25       and I had put her down.  That's when I had removed my

63

1    hand from right there and that's when her head turned

2    and hit the table.

3        DETECTIVE KAMINSKY:  Were you turning her body

4    when this happened?

5        THE DEFENDANT:  No.

6        DETECTIVE KAMINSKY:  When she made these sounds,

7    let me ask you this, what sound did your mother hear?

8        THE DEFENDANT:  She heard like an ow, something

9    like that like she was in pain.

10       DETECTIVE KAMINSKY:  What time -- At what point

11   during the process did she go ow?  When did Tiffany go

12   ow?

13       THE DEFENDANT:  That's why --

14       DETECTIVE KAMINSKY:  After what?

15       THE DEFENDANT:  After I had put her down and it

16   was she had --

17       DETECTIVE KAMINSKY:  Was this after the hug that

18   you demonstrated before or is this after being hit in

19   the table?

20       THE DEFENDANT:  No, she was sleeping after I put

21   her down and then she had hit her head and she never

22   said nothing.  And then about two, three minutes later

23   that's when she said ow.  She just like yelled and then

24   she went after that.  My mom came out and asked me what

25   was that.  And I said it was Tiffany.  And she told me

64

1    to tell her to stop.  And that's when I went moved

2    Tiffany telling her to stop.  She's like moving her

3    hand, like move her, like that, kind of like pressing.

4    And she went like she was throwing up but nothing came

5    out.

6           DETECTIVE KAMINSKY:  What did you do at that

7    point?  What did you do at that point?

8           THE DEFENDANT:  What?

9           DETECTIVE KAMINSKY:  When she did that, what did

10   you do next?

11          THE DEFENDANT:  I had just moved away from her and

12   sat back down and watched T.V again.

13          DETECTIVE KAMINSKY:  What were you watching on

14   T.V?

15          THE DEFENDANT:  Cow and Chicken.

16          DETECTIVE KAMINSKY:  What time was this about, do

17   you know?

18          THE DEFENDANT:  I think 10:30 or something.  It

19   was right after the Flintstones came on.

20          DETECTIVE KAMINSKY:  Okay.  You were watching T.V,

21   and what happened next?

22          THE DEFENDANT:  I looked back at Tiffany a couple

23   minutes later and her stomach wasn't moving, like going

24   up and down.  That's when I ran up there and told my

25   mom that here stomach wasn't moving.

65

1       DETECTIVE KAMINSKY:  Okay.  When you went up there
2   you told your mom the stomach wasn't moving, what else
3   did you tell your mom?
4       THE DEFENDANT:  I just said her stomach wasn't
5   moving like it was supposed to and you need to come do
6   something.  And that's when she came downstairs and was
7   doing C.P.R on Tiffany.  And she still wasn't breathing
8   and my mom called the police.
9       DETECTIVE KAMINSKY:  Did you tell your mom what
10  happened?
11      THE DEFENDANT:  What?
12      DETECTIVE KAMINSKY:  Like you described to us?
13      THE DEFENDANT:  No.
14      DETECTIVE KAMINSKY:  Did you tell her the day it
15  happened?
16      THE DEFENDANT:  What?
17      DETECTIVE KAMINSKY:  The thing you just described
18  to us.  The process that you just described to us.  The
19  incident with Tiffany.  Did you tell her that day she
20  did C.P.R, Mom, this is what happened?
21      THE DEFENDANT:  I told her what happened except
22  for the one --
23      DETECTIVE KAMINSKY:  What did you tell your mom?
24      THE DEFENDANT:  I told her everything except when
25  I picked her up and moved her like that and when we

66

1    playing.

2        DETECTIVE KAMINSKY:  So what you are telling me is

3    that you didn't tell your mom about when you were

4    moving her with your hands and her head hit the table?

5        THE DEFENDANT:  No.

6        DETECTIVE KAMINSKY:  Okay.  Tell me, clarify, make

7    that clear so I understand.  What did you tell your mom

8    about what happened?

9        THE DEFENDANT:  I told her everything at like,

10   like when she wasn't breathing.  I told her like that

11   and --

12       DETECTIVE KAMINSKY:  Did you tell your mom that

13   her head hit the table?

14       THE DEFENDANT:  No.

15       DETECTIVE KAMINSKY:  Tiffany's head.

16       THE DEFENDANT:  No, I meant -- No.

17       DETECTIVE KAMINSKY:  Yes or no?

18       THE DEFENDANT:  No.

19       DETECTIVE KAMINSKY:  Okay.  Did you tell your mom

20   about the bear hug?

21       THE DEFENDANT:  No.  When we were playing?

22       DETECTIVE KAMINSKY:  Yes.

23       THE DEFENDANT:  No.

24       DETECTIVE KAMINSKY:  Is there anything other than

25   you didn't tell her -- What did you tell her?

67

1          THE DEFENDANT:  I told her like I just ran

2     upstairs and told my mom that Tiffany wasn't breathing.

3     And then after that I told her she went upstairs and

4     puked in bathroom and she came downstairs and told me

5     she was tired and she laid down on the floor and she

6     was like moving right and made that big sound.  And my

7     mom asked me what was it and I told her it was Tiffany.

8     And she said tell her to stop, that's because she said

9     she heard me to telling her to stop and Tiffany was

10    like moving her hand and my mom heard me from upstairs

11    telling her like move your hand off me, stuff like

12    that.  She kept moving her hand back up, and I kept

13    telling her to move off.  And my mom heard that and

14    that was it.

15         DETECTIVE BERRENA:  Okay.

16         THE DEFENDANT:  And I told her when her stomach

17    wasn't moving.

18         DETECTIVE KAMINSKY:  Now, that was Wednesday

19    night?

20         THE DEFENDANT:  Yes.

21         DETECTIVE KAMINSKY:  After Tiffany went to the

22    hospital, did you tell your mom any different story?

23         THE DEFENDANT:  My mom was really -- No, I didn't

24    tell her anything.

25         DETECTIVE KAMINSKY:  Thursday the following day,

68

1    did you tell your mom the story that you told us this

2    evening?

3          THE DEFENDANT:  No.

4          DETECTIVE KAMINSKY:  Any time since have you told

5    her, yes or no?

6          THE DEFENDANT:  No.

7          DETECTIVE KAMINSKY:  Okay.  So at this time, you

8    are telling me your mom does not know what you have

9    told us?

10          THE DEFENDANT:  When I moved her, no.  And played

11    with her, no.

12          DETECTIVE KAMINSKY:  What about the bear hug?

13          THE DEFENDANT:  When I was playing with her, no.

14          DETECTIVE KAMINSKY:  Detective Berrena?

15          DETECTIVE BERRENA:  I don't have any questions.

16          DETECTIVE KAMINSKY:  Okay.  Let me ask you,

17    everything we discussed here, has that been the truth

18    or has that been a lie?

19          THE DEFENDANT:  The truth.

20          DETECTIVE KAMINSKY:  Did Detective Berrena or

21    myself, did we tell you to say anything?

22          THE DEFENDANT:  No.

23          DETECTIVE KAMINSKY:  Did we force you to say

24    anything?

25          THE DEFENDANT:  No.

69

1         DETECTIVE KAMINSKY:  Has everything you said to us

2   been of your own free will?

3         THE DEFENDANT:  Yes.

4         DETECTIVE KAMINSKY:  Okay.  And while you are here

5   did you have an opportunity to use the restroom?

6         THE DEFENDANT:  Yes.

7         DETECTIVE KAMINSKY:  Did you also have an

8   opportunity to drink Sprite or eat chips that we have

9   here?

10        THE DEFENDANT:  Yes.

11        DETECTIVE KAMINSKY:  I have no more questions.

12        DETECTIVE BERRENA:  I have nothing further

13   Bradley.  This will then conclude the statement at 7:31

14   one p.m.

15        (Thereupon, the taped statement was

16        concluded.)

17        MR. PADOWITZ:  Would the Court like me to

18   continue?

19        THE COURT:  Sure.  I'm waiting for you.

20     Q.  (BY MR. PADOWITZ) Detective, prior to going on

21   tape when every one was assembled in the room, you and

22   Detective Kaminsky, Bradley Henry and the defendant, at

23   that point going on tape was the defendant under arrest?

24     A.  No, sir.

25     Q.  Was he being detained at all, at that point?



**SAFETY & EMERGENCY SERVICES DEPARTMENT**
Division of Medical Examiner and Trauma Services
5301 SW 31 Avenue
Fort Lauderdale, FL 33312
South Broward (954)964-0500  FAX (954)964-0212
North & Central Broward (954)765-4199  FAX (954)765-5193

August 5, 1999

## OPINION - RE:  TIFFANY EUNICK

## BY JOSHUA A. PERPER, MD., LL.B., M.SC.
## CHIEF MEDICAL EXAMINER OF BROWARD COUNTY

I reviewed the statement given by Lionel Tate on July 30th, 1999, in reference to the death investigation of juvenile, Tiffany Eunick.  It is my professional opinion, within a reasonable degree of medical certainty, that Lionel Tate's description of his physical contact with Tiffany Eunick and the description of the subsequent impact of Tiffany's head on the side of a table does not match the severity and multiplicity of injuries substantiated at the autopsy of the above deceased child.

Joshua A. Perper, M.D., LL.B., M.Sc.
Chief Medical Examiner of Broward County

EXHIBIT ___19___

## BROWARD COUNTY MEDICAL EXAMINER
### 5301 SW 31st Avenue
### FORT LAUDERDALE, FL 33312

NAME: Tiffany Eunick           AUTOPSY NO.: 99-0911
SEX: Female    RACE: Black     AGE: 6       DATE OF BIRTH: 8/26/92
DATE OF AUTOPSY: July 29, 1999          TIME: 11:30 a.m
PROSECTOR: Lisa M. Flannagan, M.D.
            Associate Medical Examiner

---

### FINAL PATHOLOGIC DIAGNOSIS:

I.     MULTIPLE BLUNT TRAUMATIC INJURIES
     A.    Extensive contusions of the frontal poles and left temporal pole of the brain
     B.    Contusions of the superior right and left frontal lobes of the brain
     C.    Contusions of right occipital lobe
     D.    Multiple scalp contusions
     E.    Extensive lacerations of the liver
     F.    Displaced fracture of right eleventh rib
     G.    Extensive soft tissue hemorrhage of right upper abdomen, right perinephric region, head of pancreas and posterior liver
     H.    Lacerations of lesser omentum
     I.    Hemoperitoneum (800 ml)
     J.    Multiple focal bruises involving face, chest, abdomen, and right elbow

II.     SICKLE CELL TRAIT

### OPINION:

Tiffany Eunick was a 6-year-old female who died as a result of multiple blunt traumatic injuries involving the head and abdomen. The injuries were sustained when the decedent was physically assaulted by another individual.

The manner of death is determined to be:     HOMICIDE

*Lisa M. Flannagan, M.D.*
Lisa M. Flannagan, M.D.
Associate Medical Examiner

LMF:medi:63

JUVENILE
CONFIDENTIAL

Tiffany Eunick          July 29, 1999          11:30 a.m.          99-0911

## EXTERNAL EXAMINATION:

The body is that of a well-developed and well-nourished female child, weighing 48 pounds, measuring 50 inches, and appearing to be the stated age of 6 years.

The decedent is wearing a hospital gown.

The temperature of the body is cold and rigor mortis is present to a moderate degree. Livor mortis is evident over the dorsal aspect of the body. The skin is smooth and dry.

Injury to the head will be described below. The head hair is black. It is secured in several pony tails. The eyes are brown with clear corneae. The conjunctivae are pale and no petechiae are seen. The pupils are round and equal, each measuring 5 mm in diameter. The external ears and external auditory canals are unremarkable. Injury to the nose will be described below. The skeleton of the nose is intact. The teeth are natural. The lips, oral mucosa and tongue reveal no evidence of trauma.

Injuries of the left shoulder and chest will be described below.

The abdomen is protuberant and moderately firm.

The back is symmetrical and unremarkable.

The external genitalia and anus are unremarkable. No traumatic injuries of the genitalia or anus are identified. The hymenal ring is intact.

The extremities are symmetrical. There is a small scar on the anterior surface of the right lower leg. Injuries of the right elbow will be described below.

Passive motion of the neck, shoulders, elbows, wrists, fingers, hips, knees and ankles fails to elicit any bony crepitus or abnormal motion.

## EVIDENCE OF RECENT MEDICAL INTERVENTION:

Electrocardiogram leads are attached to the anterior chest and abdomen. An intravenous line enters the right antecubital fossa. An iatrogenic puncture is noted on the left antecubital fossa. A nasogastric tube enters the nose and an endotracheal tube enters the mouth.

## EVIDENCE OF RECENT INJURY:

### HEAD AND NECK:

1.  There are multiple, small bruises and abrasions on the face. The upper forehead has a ½ inch abrasion just to the left of the midline. The left upper forehead has two areas of purple bruising, each of which measures about ¾ inch. The bridge of the nose has a ½ inch bruise. There are no palpable fractures of the nasal bone. The left cheek shows several small

2

Tiffany Eunick          July 29, 1999          11:30 a.m.          99-0911

       bruises that are 1 cm or less. The skin just anterior to the left ear has a 5 mm curved scratch. The left lower cheek has a 1 cm scratch with a 3 mm area of voiding. There are small bruises just above the left lateral eyebrow. The right cheek has a 2 mm scratch and focal mild bruising.

2.     The lower conjunctiva of the right eye has a focal area of hemorrhage.

3.     No traumatic injuries of the lips are identified and the upper and lower frenula are intact.

4.     Reflection of the scalp reveals several focal areas of hemorrhage. The areas of hemorrhage involve the frontal region, left parietal region and vertex of the head. Each area of hemorrhage is about 2 to 3 cm.

5.     The right side of the skull has a thin, linear fracture. There is slight separation of the squamosal suture along the right side of the head with a thin fracture line extending anteriorly along the inferolateral aspect of the right anterior fossa.

6.     There are multiple scattered hemorrhagic contusions and softening of both frontal poles and the left temporal pole of the brain.

7.     The left cerebral hemisphere shows a 2 to 3 cm cortical contusion with overlying subarachnoid hemorrhage of the superior frontal lobe. The adjacent superior right frontal lobe shows a smaller area of contusions with associated subarachnoid hemorrhage.

8.     The lateral right occipital lobe shows small scattered contusions.

9     The brain is swollen (1260 grams) with flattening of the cerebral gyri.

10.     Examination of the strap muscles of the neck reveals focal (about 4 mm) hemorrhage in each sternothyroid muscle. There are no fractures of the neck and no hemorrhage in the posterior soft tissues of the neck.

**TRUNK:**

1.     The anterior chest has a few scattered bruises. The skin just to the left of the midline, has a ½ inch bruise. The right lower chest has a ½ inch bruise just to the right of the midline. The left lower chest has a ¼ inch bruise.

2.     The right anterior abdominal wall has a ¾ inch bruise.

3.     The left anterior shoulder has a 3/8 inch bruise.

4.     The peritoneal cavity is filled with 800 ml of liquid blood. There are no fibrinopurulent adhesions and the lining surfaces of the peritoneal cavity are smooth.

5.     The liver shows extensive lacerations. The right lobe of the liver has a 6 cm transverse laceration that extends full-thickness through the liver from front to back. The edges of the laceration are irregular and focally pale. The posterior aspect of the liver, in the region of the hilum, shows several irregular lacerations with hemorrhage in the surrounding soft tissues. A 4 cm detached portion of the caudate lobe of the liver is recovered from the left lower abdominal quadrant.

6.     The right eleventh rib has a displaced fracture and there is hemorrhage in the surrounding soft tissues. The overlying parietal pleura has a 5 mm overlying tear.

7.     There is hemorrhage along the eighth intercostal space of the right posterior chest wall. No adjacent fractures are identified.

3

Tiffany Eunick          July 29, 1999          11:30 a.m.          99-0911

8.      There is acute hemorrhage around the inferior vena cava along the superior surface of the liver that tracks up to the pericardial sac. No hemorrhage is identified in the pericardial sac and the wall of the inferior vena cava is intact.

9.      The right perirenal soft tissues show about 20 ml of acute hemorrhage. No lacerations of the kidneys are identified.

10.     There is acute hemorrhage along the inferior surface of the right hemidiaphragm.

11.     The lesser omentum between the lesser curvature of the stomach and liver is torn. There is hemorrhage in the surrounding soft tissues and around the head of the pancreas. No lacerations of the pancreas are identified.

12.     There is focal serosal hemorrhage of the ascending and transverse colon. The bowel shows no evidence of perforation, ischemia or infarction.

13.     There is hemorrhage around the left adrenal gland.

## EXTREMITIES:

The medial and lateral aspects of the right elbow show purple bruises. Each area of bruising is about 1 inch. There is also bruising of the posterior right upper arm, just above the elbow.

## INTERNAL EXAMINATION:
## BODY CAVITIES:

Injuries of the chest and abdominal wall are described above. The organs are in their correct anatomic positions. The abdominal cavity is filled with blood, as described above. The right chest cavity holds 20 ml of blood-tinged serous fluid and the left chest cavity holds about 10 ml of similar fluid.

## NECK:

The hyoid bone, thyroid cartilage and cricoid cartilage are intact. Focal hemorrhage is noted in the strap muscles of the neck, as described above. The larynx is patent with no obstructive materials or masses. The laryngeal mucosa is smooth. The epiglottis and vocal folds are unremarkable.

## CARDIOVASCULAR SYSTEM:

The heart is 110 grams. The epicardial surface is smooth, and the heart has a normal configuration. The coronary arteries have the usual takeoff and distribution. The endocardium is smooth and the valves are unremarkable. The atrial and ventricular chambers are the expected size and shape. The outflow tracts of the heart are appropriately positioned. The myocardium is tan and homogeneous. No areas of scarring or other abnormalities are noted. The aorta and its major branches are intact. Hemorrhage along the inferior vena cava is described above.

## RESPIRATORY SYSTEM:

The right lung is 170 grams, and the left lung is 150 grams. The pleural surfaces are smooth. The lower trachea and major bronchi are patent and have a smooth mucosal lining. The pulmonary parenchyma is soft and pink. There are scattered small focal areas of hemorrhage. No areas of

4

Tiffany Eunick            July 29, 1999            11:30 a.m.            99-0911

consolidation or other abnormalities are noted. The intrapulmonary bronchi are unremarkable. The pulmonary arteries and veins are intact.

## HEPATOBILIARY SYSTEM:
The liver is 610 grams. Extensive injury to the liver is described above. The hepatic parenchyma is reddish-tan.

The gallbladder holds a sparse amount of liquid green bile and has a smooth mucosal lining.

## HEMOLYMPHATIC SYSTEM:
The spleen is 50 grams. The external surface is smooth. The parenchyma is dark red and homogeneous. No injuries of the spleen are identified.

The thymus is 40 grams. The tissue is pale and lobulated. No areas of hemorrhage or other abnormalities are noted.

## GASTROINTESTINAL SYSTEM:
The esophagus has a smooth mucosal lining. The stomach holds about 50 ml of greenish-tan, cloudy liquid with several fragments of soft, partially digested food. The food is light tan. Focal fragments of food show small, dark seeds. The gastric lining is intact and no ulcerations or other focal lesions are noted. The intestines are intact and show no areas of ischemia or perforation. Hemorrhage involving the ascending and transverse colon is described above. The appendix is thin.

## UROGENITAL SYSTEM:
The right kidney is 60 grams, and the left kidney is 60 grams. There is hemorrhage in the soft tissues around the kidneys, most extensively around the right kidney. The surfaces of each kidney are intact. The renal parenchyma is reddish-tan. The corticomedullary junctions are well defined. The ureters are thin and show no evidence of obstruction. The bladder holds no urine and has a smooth mucosal lining.

The ovaries, fallopian tubes and uterus are appropriately developed and show no abnormalities.

## ENDOCRINE SYSTEM:
The thyroid gland is unremarkable. There is hemorrhage around the pancreas and left adrenal gland, as described above.

## MUSCULOSKELETAL SYSTEM:
Injuries are described above.

No underlying bony abnormalities are noted. The sternum and ribs exhibit the expected bone density. The bone marrow is dark red.

5

Tiffany Eunick                July 29, 1999              11:30 a.m.              99-0911

CENTRAL NERVOUS SYSTEM:
Injury to the head is described above.

The brain is 1260 grams. No underlying pathologic abnormalities of the brain or skull are identified.

6

BROWARD COUNTY MEDICAL EXAMINER
5301 SW 31st AVENUE
FORT LAUDERDALE, FL 33312

BCME #:      99-0911                              NAME:    Tiffany Eunick

## MICROSCOPIC EXAMINATION

**HEART:**      Occasional sickled red blood cells.  Mild leukostasis.

**LUNGS:**      Aspirated foreign material that is consistent with food.   Leukostasis.
Occasional clusters of sickled red blood cells are noted.

**LIVER:**      Parenchymal hemorrhage with focal acute inflammation.   Pronounced
leukostasis.  Sickled red blood cells.

**SPLEEN:**      Normal architecture.  Diffusely sickled red blood cells.

**PANCREAS:**      Collections of sickled red blood cells.  Acute hemorrhage in surrounding
connective tissue with sickling of numerous red cells and no associated acute
inflammatory cell infiltrate.

**THYMUS:**      Unremarkable.

**RIGHT KIDNEY:**      Sickled red blood cells.   Acute hemorrhage in perirenal fat shows no
associated acute inflammatory cell infiltrate.

**LEFT KIDNEY:**      Sickled red blood cells.

**PERIRENAL CONNECTIVE
TISSUE:**      Acute hemorrhage with sickling of the red blood cells.  Scattered white blood
cells in the areas of hemorrhage.  No inflammatory cell response is noted.

**ABDOMINAL
WALL:**      Acute hemorrhage in subcutaneous fat with sickling of red blood cells.  No
associated inflammatory cell infiltrate.

**LEFT ADRENAL
GLAND:**      Acute hemorrhage in surrounding connective tissue.  Mild sickling of the red
blood cells.  No associated inflammatory cell infiltrate.

**RIB FRACTURE
SITE:**      Acute hemorrhage in the surrounding connective tissue with mild sickling of
red cells.  Scattered white blood cells in the areas of hemorrhage.  No noted
inflammatory cell infiltrate.

Tiffany Eunick                    Microscopic Examination - continued                    99-0911

STOMACH:              Sickled red blood cells in the vasculature.

DUODENUM:             Acute intramural hemorrhage with no associated inflammatory cell infiltrate.

MESENTERY:            Acute intramural hemorrhage with no associated inflammatory cell infiltrate.

ASCENDING
COLON:                Focal acute hemorrhage in the muscularis propria.   No associated
                      inflammatory cell infiltrate.

TRANSVERSE
COLON:                Acute serosal hemorrhage with no associated inflammatory cell infiltrate.

RIGHT HEMI-
DIAPHRAGM:            Extensive acute hemorrhage with no associated inflammatory cell infiltrate.

LEFT STERNOTHYROID
MUSCLE:               Acute hemorrhage with no associated inflammatory cell infiltrate.  Sickled red
                      blood cells.

LEFT SHOULDER:        Acute hemorrhage in the muscle with no associated inflammatory cell
                      infiltrate.  Sickled red blood cells.

RIGHT TEMPORALIS
MUSCLE:               Acute hemorrhage with no associated inflammatory cell infiltrate.  Sickled red
                      blood cells.

FRONTAL
SCALP:                Acute hemorrhage with no associated inflammatory cell infiltrate.  Sickled red
                      blood cells.

GALEA:                Acute hemorrhage with no associated inflammatory cell infiltrate.  Sickled red
                      blood cells.

LEFT PARIETAL
SCALP:                Acute hemorrhage in the subcutaneous fat with no associated inflammatory
                      cell infiltrate.

BRAIN:                Multiple foci of acute cortical and subarachnoid hemorrhage.

Lisa M. Flannagan, M.D.
Associate Medical Examiner

2



SAH c̄ contusions

brain swollen

contusion

Kennan MD

Cat. No. 44-1-019-00



1/2" abrasion

bruise

2mm scratch

focal hem.
® lower
conjunctiva

∅ trauma
of lips
frenulum intact

**Front**

**Back**

Decedent's Name _Tiffany Eunick_

Examined By _Slanny MD_ Date _7/29/99_

ASCP

Name _____ Tiffany _____ B _____

Age ___ 6 ___   Race ___ B ___   Sex ___ F ___   Date ___ 7/28/99



Scalp hemorrhages —
— frontal
— (L) parietal
— vertex
— (R) temporalis muscle hem.

focal (~4mm) hem.
(B) sternothyroid mm.
in neck
∅ fxs

Blanagan MD

P.12

BODY DIAGRAM - HEAD

Right



2 areas of bruising
purple - each ~3/4"

Left

bruises
(1 cm and less)

15 mm

2 small scratches

1 cm ē
3 mm void
area

Decedent's Name _Tiffany Eunick_

Examined
By _Flanagan MD_ Date _3/9/99_

BOARD OF COUNTY COMMISSIONERS
BROWARD COUNTY, FLORIDA

Name _Timmy Eurida_

Age _6_   Race _B_   Sex _F_

Autopsy No _99-0911_

Date _7-29-99_

CHILD

Several bruises on ant. chest and abd

3/8

⊘ 1/2

1/2 ◯   1"

~3/4"

U

⊘ trauma (hymen ring smooth & intact)

⊘ anal trauma

⊘ hem soft tissue of back or but or post

purple bruise 1"

purple bruise 1"

_L. Flanagan MD_

Full body, female, anterior and posterior

Reprinted by permission of the ASCP Press

FORM #302-32

Age _____ 6 _____ Race _____ B _____ Sex _____ D. 7/29/99



Sx (Him)

L. J. Flanagan MD

Cat. No. 44-1-016-00

BURRELLE'S NewsExpress

Page 1 of 2 Page Article (SSFL0HNV)

Sat March 25, 2000
Appears On Page 1B
Circulation: 272,258

Sun-Sentinel

Fort Lauderdale, Fl.

# Wrestler ordered to speak at trial

By PAULA McMAHON
and ALEX MARVEZ
STAFF WRITERS

Pro-wrestling star The Rock is expected to testify in Fort Lauderdale next week in the case of a 12-year-old Pembroke Park boy charged with first-degree murder in the death of a 6-year-old girl.

The so-called "People's Champion," whose real name is Dwayne Douglas Johnson, was subpoenaed this week by defense attorney Jim Lewis to give a deposition at 2 p.m. Thursday in the Broward County Courthouse.



Tate

Lionel Tate is charged as an adult with first-degree murder in the July 28 death of Tiffany Eunick.



Johnson

Prosecutors say Tiffany died after a severe beating. The defense says Tate was just mimicking what and thousands of other children, see pro wrestlers do on TV almost any day of the week.

Johnson, of the World Wrestling Federation, is being called to testify about the world of wrestling and how the pros put on highly rehearsed shows such as *Raw is War*, *Smackdown* and *Monday Nitro*, Lewis said Friday. Lewis also has subpoenaed a Sprite commercial that features World Championship Wrestling star, Sting.

Lewis said he needs to show jurors what pro wrestlers do and how they do it.

"I've got to be able to show the difference between what wrestlers appear to be doing and what they are actually doing — how it's designed to make people think it's real," Lewis said. "They're able to pull these punches, these guys just pummel each other and flip people over their heads and no one seems to get hurt.

"The problem is that kids and young adults can't differentiate between what they see on TV and reality," Lewis added. "They don't see any consequences attached to extreme violence."

If convicted, Tate could face life in prison, but the sentence imposed

■ **TRIAL** continues on 2B

would likely be considerably less for such a young person.

Johnson, the 6-foot-5-inch, 275-pound former University of Miami football player, is one of the most famous pro wrestlers in the country and his autobiography made No. 1 on the *New York Times* Bestsellers List. But Johnson was chosen, not for his particular wrestling moves but because he lives in South Florida, Lewis said.

"Unfortunately for The Rock, he lives in Miami and he's amenable to service [with a subpoena]," Lewis is said. WWF attorneys may also try to void the subpoena before Thursday, he said.

Jim Byrne, WWF vice president of marketing, said he was unaware that Johnson was subpoenaed and could not comment about it. Johnson could not be reached Friday.

The WCW recently began running public service announcements on its shows urging children not to perform wrestling moves at home.

The WWF has aired similar spots on its *Smackdown* telecasts on UPN since the show's onset last year and runs them occasionally on its USA Network programming.

Byrne said the WWF has aired public service announcements on UPN since the beginning of its programming to warn viewers not to try to imitate "thoroughly trained and conditioned athletes."

The spots began airing more heavily in recent months but that is not related to any one incident Byrne said. "We always felt it was a component of responsible broadcasting."

WCW spokesman Alan Sharp

EXHIBIT 20

2/3

said he hopes the messages help fans make the right choices.

"No one should attempt to imitate [pro wrestlers] any more than trying to perform a back flip after watching gymnastics," Sharp said.

"The proper training with the right equipment and supervision is always important."

Dave Meltzer, an expert on the wrestling industry and editor and publisher of the *Wrestling Observer Newsletter*, said he thinks the effectiveness of the spots depends on the age of the viewer. Younger children may not understand that what they are watching is what pro wrestlers call "a work" — staged violence with predetermined match results.

"I know kids of pro wrestlers that are told all the time that it's a work and they still think it's real," Meltzer said. "Young kids, I don't think they can conceptualize the difference."

Meltzer thinks pro wrestling is just one of many factors that may affect children.

"It can't be singled out as the only cause, but it can't be taken out of the list of causes, either," Meltzer said.

"Every incident is different. There may be cases where it's 100 percent wrestling-inspired, and there may be others where lawyers are trying to find a way to create an issue where none exists."

*Paula McMahon can be reached at pmcmahon@sun-sentinel.com or 954-356-4533.*

3

```
 1                            IN THE CIRCUIT COURT OF THE
                              SEVENTEENTH JUDICIAL CIRCUIT IN
 2                            AND FOR BROWARD COUNTY, FLORIDA
 3                            CRIMINAL JUSTICE DIVISION
 4                            CASE NO. 99-14401 CF
 5
 6   State of Florida,
 7            Plaintiff,
 8   vs.
 9   Lionel Tate,
10            Defendant.
     _____/
11
     APPEARANCE
12
             Kenneth Padowitz, Esquire
13           Assistant State Attorney
             State Attorney's Office
14           Fort Lauderdale, Florida
             On behalf of the plaintiff
15
             James Lewis, Esquire
16           Special Assistant Public Defender
             Fort Lauderdale, Florida
17           On behalf of the Defendant
18                 VOLUME V
19
20           Transcript of Motions in Limine and Opening
21   Statements had before the Honorable Joel T. Lazarus, as
22   Judge of the above-styled Court, at the Broward County
23   Courthouse, Fort Lauderdale, Florida, held on the 16th
24   day of January, 2001.
25                      - - - - -
```

EXHIBIT  21

 1          THE COURT:  I'm going to ask if you don't have

 2     to move around, please don't.  If you want to leave

 3     -- I find it distracting for the attorneys.

 4          Mr. Lewis, you may proceed.

 5          Mr. Lewis:  Judge, could -- everybody has been

 6     sitting.  Could we have a three-minute break?

 7          THE COURT:  Take a five-minute break.

 8          (Thereupon, the jury left the courtroom at

 9          eleven o'clock.)

10          (Thereupon, a short break was taken; afterwhich

11     the following proceedings were had inside the

12     presence of the jury.)

13          The Bailiff:   Jury is entering the courtroom.

14          (Thereupon, the jury reentered the courtroom at

15     11:10 a.m.)

16          THE COURT:  Mr. Lewis, you may proceed.

17          Mr. Lewis:  Thank you, your Honor.

18          Mr. Padowitz, ladies and gentlemen of the jury,

19     I know you're all nervous.  I'm nervous.  I know

20     Mr. Padowitz is nervous.  This courtroom has been

21     filled up with emotion, and probably you haven't

22     seen anything yet in terms of that emotion and that

23     grief.

24          The power of first impressions is a very strong

25     power.  When you hear something for the first time

 1   and a rendition of events, sometimes it sticks with

 2   you more than when somebody else gets up and talks

 3   about the same thing.

 4        It's going to be your responsibility, your duty

 5   as jurors to reserve judgment in this case until you

 6   hear everybody, everybody piece of evidence that

 7   comes from that witness stand, every piece of

 8   physical evidence, every argument that the lawyers

 9   make.  I'm going to ask you, please.

10        I mean this is a very experienced prosecutor

11   who gave you a very explicit, good, powerful opening

12   statement; but please remember it's just an opinion

13   of a lawyer who is doing his job.

14        You have to decide what the truth is in this

15   case.  You must decide whether or not the government

16   has proved it's case against this child beyond and

17   to the exclusion of every reasonable doubt; and in

18   doing that, please reserve judgment.

19        The judge will instruct you to do that, but I'm

20   asking you to do it now.

21        Boy, this -- you talk about a tragic situation.

22   A beautiful girl loses her life.  The only child of

23   a single mother.  There is something so unnatural

24   about a parent bearing a child, the emotional

25   heaviness of that, the grief of that, the horror of

 1    that.   It's not missed on anybody here.

 2         But before you now is another child; twelve

 3    years old then, now barely thirteen year old Lionel

 4    Tate.  And he looks, sitting there, that - he may

 5    look to you like a man because he's big for his age,

 6    but he is a child.

 7         In fact since about eighteen months ago when

 8    this happened, this child has grown nearly six

 9    inches, actually over six inches in height, gained

10    about thirty pounds.  He's much larger and bigger

11    than he was then.

12         Lionel finds himself charged with First Degree

13    Murder as an adult.  And that decision was made

14    outside this courtroom.  There is absolutely nothing

15    that any of us can do about it.

16         But this tragedy continues.  Does it help to

17    make two tragedies out of one?  There's already a

18    tragedy; this will be with Lionel for the rest of

19    his life.

20         You know, I felt that there was some blame by

21    the prosecutor because the defense went out and got

22    a psychiatrist to work with Lionel, to help with

23    Lionel after this accident.  And I would think

24    that's what a reasonable, responsible person would

25    do.

```
 1        Dr. Joel Klass, who's been practicing as a

 2   child psychiatrist, board certified over thirty

 3   years right here in Hollywood has seen Lionel weeks,

 4   sometimes biweekly, to help him through this.

 5        And I anticipate it appears the State

 6   Attorney's Office is going to call Joe Klass as a

 7   witness in this case, and that's good.

 8        And it appears the state attorney is going to

 9   present a video tape that we, the defense made in

10   order to try to give everyone here some

11   understanding about what happened on July 28, 1999.

12   Because the only people present are Lionel and

13   Tiffany; there were no other witnesses.

14        Now the State wants to already start casting

15   blame on Lionel mother.  She was upstairs sleeping,

16   okay?  This case isn't about what Lionel's mother

17   did or didn't do; it's not about whether she was a

18   good baby sitter because she went upstairs to lay

19   down and take a nap with the two children downstairs

20   below.

21        You know, particularly there is no hint of

22   violence in this child, none.

23        Mr. Padowitz:   Judge, I object.  That's not

24   correct.

25        THE COURT:   Okay, ladies and gentlemen of the
```

1  jury, Mr. Lewis is giving you his opinion of what

2  the testimony is going to show.

3      Mr. Lewis:  Let him get up here and show you

4  where he's ever beat some child or hurt some child.

5  Let him get up here and show you that if that

6  existed.

7      They want to find fault with the mother; she

8  wasn't a good baby sitter or that when she was

9  upstairs, that she didn't do all she should have

10 done or that she didn't tell the paramedics that

11 Lionel was in the house, when every other person

12 every other paramedic every other police officer and

13 EMT in that apartment that night knew Lionel was

14 there.  He's standing right next to the police

15 officer.

16     This mother - a Florida Highway Patrol trooper,

17 a Desert Storm veteran, was in the Army, currently

18 in the Army National Guard - they want to convict

19 her too; but this isn't her trial and it isn't her

20 place and that shouldn't be your concern.

21     You may hate Kathleen Grossett-Tate, Trooper

22 Tate before this case is over; but you have to be

23 careful to not let that bleed over on to her only

24 child Lionel.

25     Remember back in jury selection I asked you

1   who's an only child; and we didn't have a one in the

2   whole panel of forty, and I thought statistically

3   that was crazy.

4        You saw Trooper Tate, Kathleen Tate here in

5   this courtroom in jury selection.  But now she's

6   listed as a state witness, she's to wait outside for

7   the rest of the trial.

8        So now this child must place his trust in the

9   wisdom of strangers that you the jury will see

10  through the rhetoric and unlimited resources the

11  government --

12       Mr. Padowitz:   Judge, I object.

13       Mr. Lewis:  Animation.

14       Judge, I object.  I made no objection --

15       THE COURT:  If you're making objections you

16  make them to me, not to each other.  It sounds like

17  closing arguments.

18       Mr. Padowitz:   That's my objection.

19       THE COURT:  Cite the facts of what the

20  testimony might show.

21       Mr. Lewis:  Yes, judge.

22       State attorney went out and got doctors from

23  all over the country to come in and say we can look

24  at autopsy photographs and slides and say this is

25  child abused;

1   Went out, made computer animations, spent

2   thousands of dollars to try to show these injuries

3   to highlight them, to make them look more severe

4   than they are in order to convince you that this

5   wasn't an  accident.

6   Government has the ability to do that, and

7   that's their role to prosecute and that's why

8   they're created.  But what they're attempting to do

9   is blame this child for malice that he did not have

10  for intention, that he did not form premeditated

11  knowledge that he could not have possibly possessed.

12  The government wants to hold this child

13  criminally responsible as an adult for an accident,

14  something that happened in child's play.  And

15  sometimes child's play unfortunately does turn

16  dangerous.  Anybody who has siblings or see

17  children, know that they have physical contact with

18  each other.

19  And I am not saying that it's good judgment for

20  a twelve-year-old child who is 160 pounds or

21  sixty-some pounds to have physical interaction with

22  a forty-eight pound little six-year-old girl, who

23  was very frail, who was very thin, who had bouts of

24  anemia through her life.

25  I'm not saying it was good judgment for two of

1    them to be playing together as playmates, wrestling

2    or doing anything.  I'm not here to say that was

3    good judgment; that the adults did a good thing by

4    having them being baby-sat together, but again

5    that's not the issue.

6        The issue is what was his intent with this

7    little girl?  You're not going to find a motive

8    here.  The State's going to reach over backwards and

9    say he had something about her toys or she was nice

10   looking - talking about Daweese.

11       Somehow we're going to come up with this theory

12   he killed Tiffany in order to take her place; that's

13   not going to be consistent with the evidence; that's

14   what you call grasping for motives where no motive

15   existed.  It's not going to be a reason.

16       He had played with this little girl numerous

17   times before, unsupervised.  And I'm not saying that

18   that's a good or a bad thing.  But he had taken her

19   to library.  Daweese dropped them off at Lionel's

20   unsupervised.  They were actually left at Daweese's

21   house unsupervised while waiting for Kathleen

22   Grossett-Tate to come pick them up.

23       And why not?  Because there's no history of

24   violence.  There's no history that he did anything

25   except what he had done with Tiffany before, which

1   was treat her like a little sister; to bounce balls

2   or play on the computer or go to movies and have

3   physical interaction as well.

4       It's not a weapon in this case, and the law

5   will make a distinction when he starts talking about

6   excusable homicide.  The law makes an important

7   distinction when there is not a weapon involved, and

8   there's no testimony, there's not a gun, knife or

9   baseball bat, not a ball - there's nothing much.

10      There is not an intent to cause serious bodily

11  harm here.  What happened on July 28, 1999?  The

12  defense has done everything it can in terms of

13  including having the incident video taped, from

14  Lionel's perspective, to see it.

15      Does that mean that video is all encompassing;

16  that this child has a year later to give you every

17  detail, to make everything happen?  And does he have

18  the ability to do that, so we can tell everything

19  with absolutely perfect demonstration who was where

20  and what --

21      Mr. Padowitz:   Again, I apologize to

22  Mr. Lewis.  This is opening statements where

23  evidence is going to show, and I believe he's

24  arguing his point.

25      THE COURT:  Leave it to what you believe the

```
 1    evidence is going to show.
 2         Mr. Lewis:  I believe Mr. Padowitz made a lot
 3    of argument and made opportunity to make his case.
 4         THE COURT:  About what it may make.  It is what
 5    you believe the evidence is going to show.
 6         Mr. Lewis:  Yes.
 7         So what happened on July 28th of 1999?  I can
 8    tell you that when the police came and picked up
 9    Lionel to bring him down to the police station, they
10    find him watching professional wrestling.
11         When they arrest him, the public information
12    officer for Broward Sheriff's Office says it is a
13    wrestling related death; but now all of a sudden
14    it's some investigation of a theory, defense
15    attorney months down the road comes up with this
16    defense.
17         You have to go back to when Lionel was -- early
18    four years, five, six, seven years old.  And you're
19    going to hear testimony particularly from Nicole
20    Anderson, who is one of their neighbors who
21    baby-sat.
22         And she'll tell you that Lionel, from the early
23    - that early age loved to watch professional
24    wrestling on television, growing up knowing all the
25    names of professional wrestlers - The Rock, Stick,
```

```
 1    The Hulkster.  He practiced their moves on his

 2    friends.

 3         Nicole Anderson, a family friend will tell you

 4    how her little brother, who is about Lionel's size -

 5    maybe a little smaller than Lionel - and they used

 6    to mimic moves on each other.  And they'd be scolded

 7    about it, but they'd still do it.  They'd still play

 8    and wrestle, and that continued all the way as

 9    Lionel grew up.

10         Even for a brief period of time when he lived

11    with his father in Mississippi, Lionel continued to

12    be a wrestling fan.

13         You'll hear testimony when he came back and

14    lived with his mother here in Florida.

15         You'll hear from Bradley Henry, who is the

16    fiance of Daweese Eunick, the little girl's mother,

17    who basically will tell you that Lionel watched

18    wrestling all the time.  They were big fans and

19    talked about it.  They played wrestling.

20         Why is professional wrestling so alluring to a

21    little boy like Lionel, someone who quite frankly

22    probably fits the mold of what we call vulnerable

23    child, who did not have a male figure in his life?

24    Children need heros.

25         And when they see these very muscular guys walk
```

```
 1   into a ring with bright colored suits and painted

 2   faces and their hoods, to the cheers of thousands of

 3   fans loving these guys, and whether it's the cheers

 4   for good guys or boo's for bad guys, these

 5   professional wrestlers, they are on stage.  They are

 6   heros.

 7        Love to be loved or loved to be hated, it is

 8   the number one rated program on cable television.

 9   Professional wrestling that, by the way, has become

10   woman stars, women professional wrestlers who

11   compete against the men.  Professional wrestling

12   recognizes that child audience with slick marketing

13   campaign --

14        Mr. Padowitz:  I apologize.  May I have a

15   sidebar?

16        THE COURT:  I'm going to sustain the objection.

17        Mr. Padowitz:   Judge, there's not going to be

18   any testimony.

19        THE COURT:  Sustained.  Move on to what the

20   evidence is going to show.

21        Mr. Lewis:  Yes, judge.

22        The evidence is going to show that it's very

23   easy for a child like this to get caught up in the

24   fantasy world of professional wrestling.

25        The evidence is going to be that he was caught
```

```
 1   up; the evidence is going to be that he played and
 2   saw the little dolls that they have with wrestlers
 3   and toy stores; that he watched television
 4   advertising where caped professional wrestlers with
 5   face would come into a house with little boy and
 6   throw them around the room, drop him on the knee and
 7   ram his head into a fireplace.
 8         All in good fun.  Nobody gets hurt.
 9         This child was very susceptible to that.  And
10   what did Lionel - whether he knew it was fake or
11   not, children believe that they can do what they see
12   on TV; they believe they can imitate it.
13         The evidence is going to be that Lionel could
14   wrestle and do what he saw wrestlers do and nobody
15   would get hurt, just like nobody gets hurt on
16   television, professional wrestling.
17         And if they do, they keep it very quiet.
18         But children don't always understand what
19   they're seeing on television is not real; they do
20   not understand that professional wrestlers go to
21   school to try to teach them how to make their
22   violence - how to make punches look real, how to
23   make knee drops, body slams look real when in fact
24   they're not.
25         Some people call it violence without
```

1   consequences.  Wrestlers pound each other into steel

2   poles and all without anybody getting hurt, just

3   good clean wholesome fun.

4        And while you can look at it and laugh at it

5   and know that it's fake and that it means nothing to

6   you, put yourself in the world of a twelve-year old

7   child.  It can mean everything.

8        Very difficult case.

9        When you signed up for jury duty, you probably

10  never thought you'd end up in the middle of

11  something like this but you're here now.  You're

12  here with us and you're going to hear some very

13  disturbing testimony.

14       You're going to see, apparently, big blow ups

15  of autopsy photographs.  All autopsy photographs are

16  disturbing by nature, particular autopsy photographs

17  of children.  But you have to look at them because

18  they're part of the case.

19       And what's important to see, I think, again

20  from a defense perspective is that absent this type

21  of magnification, the external injuries to Tiffany

22  are minor to the point where the paramedics when

23  they went to her aid and took her to the hospital,

24  nobody noticed any injuries on this little girl.

25       Everyone at that point thought she had choked

1   on some type of food poisoning.  No one suspected

2   that she had been beaten to death.

3       Again, there's no weapon used.  It's only after

4   the autopsy is done and you have this magnification

5   and time to see bruising, do we realize that it

6   takes an autopsy really to tell us what the cause of

7   death is.

8       And, folks, I'm telling you we don't - we all

9   know what the cause of death is in this case.  It is

10  a given.  We don't need to bring doctors from all

11  over the country with credibility that drops to the

12  floor to tell us how this child died and that she

13  died at the hands of this child.  That's a given.

14      The State has an opportunity to go out and

15  acquire whatever experts and with whatever

16  qualifications they have to give.  And I have the

17  right to go out and do the same thing.

18      I have an expert.  His name is Dr. John

19  Marachino (phonetic) and he is the former chief

20  medical examiner in Palm Beach County and also

21  associate medical examiner in Miami for many years.

22  He's now in private practice.

23      He's going to tell you that a lot of these

24  injuries, it's possible even probably were caused

25  during the resuscitation efforts of the little girl

1  - whether Lionel mother's frantically when she came

2  downstairs found Tiffany not breathing, tried to do

3  CPR on this little child may have actually broken

4  her rib, may have actually aggravated some of the

5  injuries that Tiffany had already received.

6      Or, the other paramedics that were there,

7  everybody working feverishly hard to try to help

8  this little girl, may have actually caused some of

9  the bruising to her arms or to her head on this tile

10  hard floor, again where some of these injuries

11  occurred where they're trying to help this little

12  girl, to help bring her back.

13      Again the method of death is not at issue.  She

14  died at his hands.  The issue is going to be intent.

15  And again, ladies and gentlemen of the jury, the

16  State, the government must prove that he intended to

17  kill or cause great bodily harm to this little girl

18      Mr. Padowitz:   I object.  That's not the law.

19      THE COURT:  I'm going to tell you what the law

20  is at the conclusion of the trial.  The law will

21  come from here, not from there.

22      Mr. Lewis:  They must prove this case not by a

23  preponderance of evidence; not by probable cause,

24  which is why the police arrest you or someone gets

25  charged with a criminal case - that's way down here,

1  that's probable cause - but not by a preponderance

2  which is fifty-one percent, not by clear and

3  convincing evidence, by beyond and to the exclusion

4  of every reasonable doubt.

5      Now that again, that's not beyond all doubt,

6  not beyond a shadow of a doubt, but beyond and to

7  the exclusion of every reasonable doubt.  And that's

8  a very high standard in law, and that's the burden

9  of proof, burden they carry.

10     And that's why they get to go first and that's

11 why they get to put on witnesses first and get to

12 argue first, because as I said - their burden but it

13 is a high burden.

14     And the law says they have to prove each and

15 every element.  And the element where it's intent to

16 commit murder or intent to commit child abuse or

17 some type of intent to commit a manslaughter or some

18 type of theory where this child is criminally

19 negligent, that we're going to hold him responsible

20 and call that some type of negligent homicide; all

21 of that is their burden.

22     It's not mine.  It's not defenses'.  It's not

23 Lionel's.  It's their burden.  They have to prove

24 it.  And with all their resources and investigators

25 and police and experts and computer animations they

1  have to prove that one element to you, that he

2  intended to do it, that this wasn't child's play.

3      Again the issue is not good judgment.  We don't

4  subject twelve-year-old children to these types of

5  charges because they simply used poor judgment or

6  his mother or that the parent used poor judgment in

7  letting them play together.

8      The truth is that they had played together

9  unsupervised without any type of negative intent at

10  all.

11     Daweese, the mother in this case, I think will

12  tell you this, that she felt perfectly fine with

13  Lionel in terms of being around Tiffany and playing

14  with Tiffany and never saw a hint of any type of

15  disturbing or jealousy or anything between the

16  children.

17     Mr. Padowitz is right when he talks about how

18  Daweese Eunick and Kathleen Grossett-Tate knew each

19  others family in Jamaica.  They were brief

20  acquaintances there.  And for the last ten or

21  fifteen years they both lived in the United States,

22  but separately.

23     And the connection between the two of them is

24  Daweese's fiance.  Bradley Henry is actually a

25  cousin of Kathleen Grossett-Tate.  There's a

```
 1  familial relationship there.

 2       And actually the people that got together first

 3  was Kathleen and her cousin Bradley, and then

 4  basically the two single mother's got together and

 5  they natural hit it right off, almost like sisters,

 6  and started watching each other kids while they went

 7  to work and had responsibilities.

 8       And it was almost a God-send to these two

 9  families.  They were close.  And even though they

10  only really had from thirty to sixty days period,

11  they got together.  They became very close very

12  quickly.

13       And like I said there's more than enough

14  tragedy here to fill up this courtroom again and

15  again, but.

16       This tragedy here, this tragedy here for this

17  child's mother, this child - and that's what this

18  trial is about.

19       We're not going to try to right - we're not

20  going to change the world here.  We are not going to

21  change professional wrestling.  I mean that's just

22  given to you to explain how children will play and

23  play-fight; that's why that's given to you because

24  it's the truth and it didn't get invented with Jim

25  Lewis.  Long before I got the case people were
```

1  talking about wrestling in this case.

2       You're going to hear testimony in this case how

3  Lionel imagined himself as wrestling star, The Rock,

4  and Tiffany imagined herself as wrestling persona

5  named Chyna, very popular female wrestler;

6       How they basically were left alone and watching

7  videos and doing things down there to kill time,

8  they both agree to play wrestling.

9       You're going to hear testimony and see video

10 tape how they behave.  Tiffany first started

11 punching Lionel and then Lionel took turns punching

12 Tiffany play-fighting.

13      Apparently at one point Lionel took Tiffany by

14 the arm and would throw her into a couch like a

15 wrestler would throw someone in ring ropes.  They

16 did this on a couple of occasion.

17      Moved the coffee table back so he could throw

18 her into the couch.  And on one occasion - and we

19 shift you to the real act that caused the majority

20 of her injuries.

21      Apparently, as you'll see on the video tape,

22 when he stepped back, his foot actually touched the

23 coffee table and propelled her into an iron

24 staircase that was next to the couch.

25      And this child felt pain and he went to the

1   refrigerator and got her ice for her head because

2   she was hurt.

3        I submit to you this is not the action of a

4   killer.  He's a kid.  He didn't mean to do what he

5   did.

6        We'll never know with absolute certainty

7   exactly what happened between those two children

8   down there.  There are no witnesses.  Lionel has

9   done his best to tell his side of the story.

10       Did he minimize his involvement?

11       Mr. Padowitz:   Judge, I have an objection to

12   an argument on opening statements.

13       THE COURT:  I think it's what Mr. Lewis is

14   intending to show.

15       You may proceed.

16       Mr. Lewis:  What I believe the evidence will

17   show, when Lionel was scooped up by homicide

18   detectives of the Broward Sheriff's Office without

19   his mother being present; took him down to the

20   police station, again with Daweese and Daweese's

21   fiance Bradley; puts him in a room, just the

22   officers and Lionel, and they started asking him

23   what happened.

24       And did he minimize his involvement first

25   saying they were playing tag, and then more and more

```
 1   as they press him, admitted that there was a bear

 2   hug and that she hit her head?

 3        The officer led this child into giving a

 4   statement that now they want to hold up to you and

 5   say, look, this is all he said back in July 30th of

 6   1999; that he just played tag, hit her head, put her

 7   in bear hug.

 8        So now when he comes in months later and talks

 9   about all these wrestling moves, that must be some

10   kind of lie because he didn't tell the police

11   everything down at the police station.

12        That is where you have to use your common sense

13   as jurors.  You know there is a reason why we don't

14   have lawyers, judges decide guilt and innocence in

15   difficult cases like this.

16        Use your common sense and follow the law on

17   behalf of - this child wants you to follow the law

18   in this case.

19        And again, you may not agree with all the law,

20   you may not see the reason for it.  And again the

21   law is going to come out of this pink or gray book

22   or whatever the color the new book is, but it all

23   has the same law in it.

24        One of the particular parts of a law that the

25   judge is going to read to you is the law of
```

1  excusable homicide.

2        Mr. Padowitz:  Judge, I object.

3        THE COURT:  At this point you're getting into

4  closing argument, Mr. Lewis.  Move on, please.

5        Mr. Lewis:  Again, if I may just read the

6  excusable homicide instruction right out of the book

7  without argument, judge?  That's my case.

8        THE COURT:  I'm going to allow him.

9        Go ahead, without argument.

10       Mr. Lewis:  The law of excusable homicide.  The

11 killing of a human being is excusable and therefore

12 lawful under any one of the following three

13 circumstances.

14       I can't comment on it, but just generally the

15 first one is appropriate when killing is committed

16 by accident and misfortune in doing any lawful act

17 by lawful means with usually ordinary caution and

18 without any unlawful intent.

19       When the killing is committed by accident.

20 You're going to hear as you properly should, not

21 only is this child who is twelve years old at the

22 time, you're going to hear about his mental age;

23 you're going to hear about his maturity.

24       You're going to hear not only from Dr. Joel

25 Klass who will testify that in his months and months

1   of seeing this child, he notices many reliable

2   indicia that this child is very immature for his

3   age.

4       But you're also going to hear from a nationally

5   known board certified neuropsychologist who will

6   come in.  His name is Dr. Wiley Mittenberg, and he

7   doesn't come from Washington or California or

8   Atlanta.  He comes to us from Nova South Eastern

9   University, all the way in Davie, Florida.

10      But again nationally known board certified

11  neuropsychologist.  And he did some testing, days of

12  testing on this child.

13      And the evidence is going to be that in his

14  opinion and tests show that he has a reduced mental

15  age of somewhere between two and four years; that is

16  to say that his maturity level is two years to four

17  years delayed; that is to say this twelve-year-old

18  child thinks on the level of a nine year old or ten

19  year old.

20      Now I know it's very hard for you to look at

21  this child, as big as he sits here today, and to see

22  him as a nine year old or ten year old.  That's

23  going to be the evidence that's supported by

24  bonified psychological testing.

25      Now State may have other experts to dispute

1  that and say it doesn't mean this or that, but

2  you're going to have to weigh that.  That's your

3  ability, you as jurors are going to have to listen

4  to all testimony from experts in this case and make

5  a decision as to what's credible, what's believable,

6  what's reasonable, somebody tried to pull something

7  over on me here.

8      These are the kinds of things you as jurors are

9  - we're asking you to do, to listen to testimony, to

10 weigh it, to balance it, to determine whether the

11 government has proved it's case beyond a reasonable

12 doubt and to the exclusion of every reasonable

13 doubt.

14     And again this whole trial is about intent.

15 Intent.  I'm not going to be as long as

16 Mr. Padowitz, but I'm going to ask you to keep in

17 mind certain things, that the evidence is presented

18 to you.

19     There's not a weapon in this case.

20     He's not an adult in terms of judgment that

21 we're talking about.

22     It's not a motive for this crime.

23     There's not a reason for it.

24     There's not a history of any prior significant

25 violence on behalf of this child.

1       There's not an intent for this child to cause

2  great bodily harm to Tiffany.

3       This is not child abuse; it's not a murder;

4  it's not a manslaughter

5       Mr. Padowitz:   Judge, I apologize but I have

6  to object.  This is argument.

7       THE COURT:  Let him finish up.  I think he's

8  just wrapping up.

9       Mr. Lewis:  What it is, is not guilty; that's

10  what it is.  I'm going to ask you just -- you know,

11  I don't know how long we're going to be here,

12  whether it's four, five, six, seven days of

13  testimony.

14       I'm going to ask you to pay careful and close

15  attention to all of it.  And when it's over, you're

16  going to get a written instruction on this law, and

17  I'm going to ask you to follow it.

18       And I'm going to ask you to leave sympathy out

19  of this; to be empathetic for everybody here; to be

20  empathetic for the victim, for Tiffany; to be

21  empathetic to her family; to be empathetic to Lionel

22  and his mother - but not to show sympathy.  Nobody

23  is looking for sympathy.

24       When you look at these photographs, you're

25  going to be angry, you're going to look, maybe, for

1    somebody to punish.  But you got to know the law.

2    The law is put on the books to protect people like

3    Lionel, to protect a child who made a very tragic

4    mistake.

5        Thank you.

6        THE COURT:  Ladies and gentlemen of the jury,

7    it's real important, and I'm going to keep reminding

8    you two or three times a day, not to discuss the

9    case amongst yourselves or anybody else in your

10   presence, and not until you've heard testimony and

11   argument of counsel and law.  And do not read or

12   watch anything in the media.

13       I have a one o'clock docket, as I normally do

14   Tuesday, Wednesday and Thursday.  Be back here at

15   1:30 p.m. please.

16       (Thereupon, the jury left the courtroom at

17       11:50 a.m.)

18       THE COURT:  I wish I could tell you to leave

19   the stuff on the table, but I have regular docket.

20       On days that I don't have a docket, I have no

21   problem, but...

22       Mr. Padowitz:  There's a motion I'd like to

23   bring up to the court.

24       THE COURT:  Go ahead

25       Mr. Padowitz:  Prior to trial, State filed a

1  motion in limine, an extensive one, where I

2  indicated to the court that I wanted to prevent

3  Mr. Lewis from violating the current case law and

4  bringing up prior bad act or lack thereof by the

5  defendant's prior arrest or prior violent

6  incidences; which by the way, there are in fact

7  documented prior disruptions, behavioral problems,

8  violence and theft all the way back to kindergarten

9  on behalf of the defendant.

10      But be that as it may, I filed that motion and

11  it was granted by this court.  And only thing

12  discussed prior to openings is that defense counsel

13  had opportunity and be right to get to reputation

14  testimony.

15      And what counsel did, he flaunted the motion in

16  limine that was granted and ordered by this court

17  granted and got up before this jury, went into a

18  number of times about the fact that there's no

19  history of prior significant violence on behalf of

20  his client.

21      That's no contravention of this order

22  corroborating this State's motion in limine, your

23  Honor.

24      THE COURT:  And?

25      Mr. Padowitz:  Your Honor, I don't know what to

```
 1    do.  At this point counsel went over the line,

 2    violated that motion in limine.  And you can't

 3    unring the bell.  It's already before this jury.

 4        But I am concerned if counsel is willing to do

 5    that, and flagrantly disregard court orders to that,

 6    he may do so on other orders by this court that have

 7    been granted, as far as State's motion in limine.

 8        So I'm asking the court to impress upon

 9    Mr. Lewis that orders of this court should not be

10    taken lightly.

11        THE COURT:  I will take under advisement your

12    comments and sanctions, if any will be declared at

13    the conclusion of trial.

14        Mr. Lewis:  Do you want me to respond to it,

15    judge?

16        THE COURT:  Not now if you intend to go forward

17    with it, absolutely not.  Well, go right ahead,

18    Mr. Lewis.  It's up to you.

19        Mr. Lewis:  I say it's not an issue.  We have

20    enough issues to deal with.  We don't need that one

21    as well.

22        THE COURT:  If there's going to be any further

23    discussions or sanctions, we'll take care of it at

24    the end of the trial.

25        Mr. Padowitz:   Thank you, judge.
```

1    (Thereupon, a lunch break was taken.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        CERTIFICATE

2

3

4   STATE OF FLORIDA    )

                        :  SS
5   COUNTY OF BROWARD    )

6

7      I, MAUREEN SHATSWELL, certify that I was authorized

8   to and did stenographically report the foregoing

9   proceedings and that the foregoing transcript is a true

10  record.

11        Dated this 13th day of June, 2001.

12

13

                        MAUREEN SHATSWELL
                        Court Reporter
14

15

16

17

18

19

20

21

22

23

24

25
```

Case 0:01-cv-07913-DTKH   Document 46   Entered on FLSD Docket 03/26/2002   Page 624 of
677
01/28/00  08:45 FAX 1 203 359 30      WWF Entertainment, Inc.      ERRY MCDEVITT      002

Miami Herald: Boy's claim: Wrestling TV shows to blame                                Page 1 of 2



DEPOSITION
EXHIBIT
53

**NEWS**

*Published Friday, January 28, 2000, in the Miami Herald*

# Boy's claim: Wrestling TV shows to blame

**BY CAROLINE J. KEOUGH**
ckeough@herald.com

Professional wrestling could be put on trial this spring as the attorney for a 12-year-old Broward boy accused of fatally battering his 6-year-old playmate plans to argue that the boy was just mimicking what he saw on TV.

The attorney, Jim Lewis, this week subpoenaed a Sprite commercial in which wrestling star Sting materializes in a family's living room and performs a pile driver and other moves on a skinny youngster. Lewis says the commercial is strikingly similar to what his client, avid wrestling fan Lionel Tate, is alleged to have done to Tiffany Eunick.

``If you watch and believe professional wrestling, they beat the hell out of each other and then get up and walk away," Lewis said. ``Wrestling glorifies violence and breaks it down as entertainment. At this age, it's difficult for children to distinguish between fantasy and reality."

**Although Tiffany Eunick's death last July originally was thought to be the result of innocent horseplay gone awry, the severity of the girl's injuries -- including a skull fracture and lacerated liver -- led to the filing of first-degree murder charges.**

Blaming TV has been tried before, with limited success. The tactic was pioneered in the 1970s by Miami attorney Ellis Rubin, who argued that 15-year-old Ronny Zamora was imitating Kojak, his favorite TV character, when he gunned down his 82-year-old neighbor in Miami Beach.

Zamora is serving a life term.

In this case, it's televised professional wrestling -- the pop culture sensation steeped in cartoonish violence, sophomoric sex and maudlin drama — that's getting the blame.

Although Tiffany Eunick's death last July originally was thought to be the result of innocent horseplay gone awry, the severity of the girl's injuries -- including a skull fracture and lacerated liver -- led to the filing of first-degree murder charges.

Lionel, who will be tried as an adult, told police he grabbed the girl in a bear hug and slammed her head into a table. He later said that he swung the girl around

and her head struck a cast-iron railing at his home.

In the commercial Lewis subpoenaed, WCW wrestler Sting appears in the bedroom of a young boy after the boy takes a swig of Sprite. Lewis says Sting turns the boy upside down in a bear hug, appears to slam his head into the floor, and then drags the boy along a fireplace mantel.

The Coca-Cola company, which makes Sprite, had no comment. World Championship Wrestling, the Ted Turner-owned company that employs Sting, was also mum.

Representatives of the rival World Wrestling Federation said they broadcast public service announcements warning that wrestling moves should never be imitated at home.

``We believe any 12-year-old knows the difference between real-life consequences and television," said Jim Byrne, theWWF senior vice president of marketing and public relations.

``What gets watched in each individual home is up to the parents," he added.

Once limited to obscure time slots, professional wrestling has exploded in popularity over the past few years and become a staple of prime-time TV.

Shows like Monday Nitro, Raw is War and SmackDown! are seen nightly, especially by young boys. Lewis plans to play snippets of the shows for jurors.

Nationally, wrestling has been cited as a factor in incidents of youth violence in Texas, California and Georgia, said David Walsh, president of the National Institute on Media and the Family, a nonprofit group that studies the effects of television on children.

``For every case that grabs headlines, there are thousands of incidents of children taunting, putting down or making sexual insults to their peers," Walsh said.

``Lionel didn't mean to hurt this girl, he wasn't angry and he didn't have any reason to hurt her," Lewis said. ``He was just acting out what he'd seen on television, and unfortunately, he didn't know his own strength."



Contact Us
Copyright 2000 Miami Herald

Ex. A

Get a   **gift certificate** from GiftCertificates.com™* with   select AT&T Wireless Services plans online   *CLICK FOR DETAILS

## Sun-Sentinel

space

# NEWS



Home   News   Sports   Entertainment   Classified   Business   [ Shortcut to... ] [ GO! ]

space

## Innocence Lost:



**The State of Florida
vs. Lionel Tate**

### RELATED STORIES

● Tate's fate now in jury's hands (1/25/01)
● Tate's mom: 'I cannot protect my son' (1/24/01)
● Jurors shown wrestling videos (1/23/01)
● Psychiatrist says Tate knew wrestling was fake (1/19/01)
● Expert: injuries couldn't have been accidental (1/18/01)
● Defense focuses on Tate's youth (1/17/01)
● Attorneys finish jury selection in Tate trial (1/12/01)
● Jury selection begins (1/10/01)
● Legal strategies of prosecution, defense (12/26/00)
● Judge evaluates "wrestling defense" 2nd time (8/11/00)
● Fiance of Tate's mother regrets letting police question boy (8/4/00)
● Defense wants police interview thrown out (6/28/00)

## Boy, 13, convicted of murder in beating death of young girl

By PAULA McMAHON Sun-Sentinel
Web-posted: 10:53 p.m. Jan. 25, 2001

Five days before his 14th birthday, Lionel Tate became one of the youngest people in the nation to be convicted as an adult of first-degree murder, for the beating death of 6-year-old Tiffany Eunick when he was 12.

Tate, who said he accidentally killed Tiffany while imitating pro wrestlers, did not react at first but began to cry shortly after hearing the jury's verdict.

Some jurors said later the brutality of the attack and the severe injuries Tiffany received convinced them her death was no accident. Some expressed regret that Tate was charged as an adult but said they had no lawful choice but to find him guilty of the most serious charge.

"The injuries were so extensive we all felt that it wasn't an accident," said juror William Stevenson, 50, an insurance agent. "We had to abide by the law and the law spelled it out. It wasn't just wrestling."

Prosecution experts testified that the force used on Tiffany was equal to falling from the second- or third-floor of a building. They also said the attack lasted between one and five minutes and that she'd been crying and in pain as more than 30 injuries were inflicted on her. She died of a fractured skull and a



(Melissa Lyttle/Staff)

Lionel Tate is led away after his conviction for murdering Tiffany Eunick, 6, inset.

We'll understand if our furniture puts you to sleep



> reliable
We'll help find what you want

American Banc
Mortgage Corporation
Lowest Mortgage Rates



shopping@
sun-sentinel.com

**Pick a city and shop:**
Broward East
Fort Lauderdale
Lauderdale-by-the-Sea
Oakland Park
Wilton Manors
Broward Northeast
Deerfield Beach
Lighthouse Point
Pompano Beach
Broward Northwest
Coconut Creek
Coral Springs
Margate
North Lauderdale
Parkland
Tamarac
Broward Southeast
Dania Beach
Hallandale
Hollywood

EXHIBIT 23

• Judge stops defense subpoena for wrestling videos (6/15/00)
• Police suspect someone tampered with crime scene (5/19/00)
• Boy reenacts crucial moment on video (5/5/00)
• Judge excuses wrestlers from testifying (4/12/00)
• Tate indicted (8/12/99)

blow that detached part of her liver, experts said.

Broward County Judge Joel T. Lazarus recommended that Tate be held at a juvenile facility or with other juvenile offenders at the main jail until his sentencing March 2. He had been living at home, with electronic monitoring, since shortly after Tiffany's death, on July 28, 1999, in Pembroke Park.

"I am ordering the Sheriff to treat Mr. Tate as he would a 13-year-old," Lazarus said.

Sheriff Ken Jenne decided later to put Tate in the juvenile area of the main jail with other teens who are charged as adults.

Tate was treated very well by staff at the Broward County Jail, said his defense attorney Jim Lewis who visited him there Thursday evening. Tate was allowed to watch cartoons and talk with Lewis. He will be kept on his own for a few days before being mixed in with other teens who are older than him, Lewis said.

"I was very worried about him in the courtroom because he wasn't talking and I was afraid he was going into shock," Lewis said. "But he was doing better when I saw him at the jail. He's real hopeful the system will work for him eventually and he will be released before too long."

Lewis and Tate's mother, Florida Highway Patrol Trooper Kathleen Grossett-Tate, flew to New York Thursday night to appear on the *Today* show this morning.

Grossett-Tate was not allowed to visit her son at the jail Thursday but they spoke by phone.

It remains uncertain what sentence Tate will serve. Because he is younger than 16, he does not face the death penalty.

Technically, Tate could spend the rest of his life in prison with no parole but there are other possibilities. The judge could reduce the jury's verdict to a lower conviction and impose a lesser sentence. Or he could sentence Tate to life in prison, a decision which would be appealed to higher courts by the defense. In that event, Lewis would also ask the governor to hold a clemency hearing and pardon Tate.

Perhaps the best indicator that the state may be willing to accept a lesser sentence is the fact that prosecutor Ken Padowitz last year offered to let Tate plead guilty to second-degree murder in exchange for a sentence of three years in a juvenile facility followed by a year of house arrest and ten years of probation with psychological testing and counseling.

The defense team rejected the offer, saying they thought Tate was innocent, that the death was an accident and they thought a jury should decide his fate.

Padowitz said jurors followed the law and there will be opportunities in the future to decide what would be an appropriate sentence for Tate, one that takes into account his age and background. He would not say what he will recommend but hinted that eventually a

Pembroke Park
Broward Southwest
Cooper City
Davie
Miramar
Pembroke Pines
Weston
Broward West
Lauderdale Lakes
Lauderhill
Plantation
Sunrise
Palm Central
Boynton Beach
Greenacres
Lake Worth
Palm South
Boca Raton
Delray Beach
**Reference Map**

lesser sentence may be imposed.

"I don't think this is a win for anyone," Padowitz said. "I have two children and Tiffany Eunick's death to me was a horrible crime and a tragedy."

The jury of 10 women and two men took a little more than three hours to accept Padowitz's argument that Tate intentionally kicked, punched and stomped Tiffany to death in a brutal assault that they agreed was child abuse, not child's play. They informed the court they had reached a verdict about 10 minutes after returning from a lunch break.

Tate is the first juvenile in Florida to have been convicted as an adult of first-degree murder where the underlying felony was aggravated child abuse.

Under state law, the jury did not have to find that Tate intentionally murdered the first-grader but only that he intended to hit her and that he caused the death while beating her.

In a sometimes emotional question-and-answer session after the verdict, defense attorney Lewis publicly second-guessed himself and the decision to reject the plea offer which was made by Lionel, his mother and Lewis.

"We had talked about maybe going fishing this weekend. I've broken that promise to him now. I told him I'd do the best I could to make that come true some day," Lewis said as his voice cracked with emotion.

During six days of testimony and legal arguments, the jury saw greatly enlarged autopsy photos that showed each of the more than 30 severe and minor injuries Tiffany suffered. They also watched a computer animation that detailed many of those injuries.

The defense had wanted to force celebrity wrestlers to testify about how they fake moves and pull punches and how Lewis says the multimillion-dollar wrestling organizations market the over-the-top entertainment to children.

But Lazarus ruled that as expert witnesses, the wrestlers could not be forced to testify.

The defense also wanted to bring in experts who say TV violence has an impact on children. But the judge ruled that those opinions do not rise to the required legal standard.

Lewis was allowed to show the jurors a brief segment from a World Wrestling Federation show and a Sprite commercial featuring a World Championship Wrestling star tossing a young boy around.

Lewis was initially hired by Tate's mother as a private attorney but he continued to work for Tate at no cost when Grossett-Tate ran out of money to pay him. The attorney allowed Tate to play with his own children and said he never feared for their safety.

Lewis also appealed to Tiffany's mother, Deweese Eunick-Paul, and the jurors who decided the case to come to Tate's sentencing and ask the judge for a

Case 0:01-cv-07913-DTKH   Document 46   Entered on FLSD Docket 03/26/2002   Page 629 of 677
Page 4 of 4

lesser punishment than life in prison.

Eunick-Paul did not return to the courtroom to hear the verdict on Thursday on the advice of her pastor. She testified in the trial and attended closing arguments on Wednesday.

The single parent who lost her only child told jurors that her daughter was a happy, intelligent child. Tiffany loved school and regularly went to feed the homeless with a church group. Tiffany had returned from Bible study camp just days before her death and was scheduled to go to Walt Disney World.

Eunick-Paul testified that she had no reason to think Tate would hurt her daughter while Grossett-Tate was babysitting Tiffany. Grossett-Tate testified she was upstairs sleeping while the children played downstairs. The families, who met briefly in their native Jamaica years ago, had met again just three weeks before the incident.

In court Thursday afternoon, Grossett-Tate bit her lip when she heard the verdict and began to cry as she watched her son being handcuffed and fingerprinted.

Lewis said he thought the State Attorney's Office decision to present the case to a grand jury and seek an adult indictment of Tate was a miscarriage of justice and a misuse of the child abuse laws. Prosecutors could have decided to charge Tate as a child and let him face a non-jury trial before a judge and juvenile penalties.

But Padowitz said everyone, including the jury, which represents the community, followed the law.

In the main jail, Tate will attend classes during the day and go to group counseling sessions in the evenings, said Broward Sheriff's Office spokesman Kirk Englehardt.

The boy, who spent part of his murder trial composing a wish list of birthday presents, turns 14 on Tuesday.

*Staff writers Ardy Friedberg and John Holland contributed to this report.*

*Paula McMahon can be reached at pmcmahon@sun-sentinel.com or 954-356-4533*

**Sun-Sentinel.com**

Questions or comments? | Paid archives | Message boards
Copyright 2000, Sun-Sentinel Co. & South Florida Interactive, Inc.



Nope, ya can't get there from here!

Ex. B

 The World's Leading Environmental and Conservation
Charities are Working Together Under One Name...  Ad

Earth Share


 Broward

📧 **E-Mail this story to a friend**

*Published Friday, January 26, 2001, in the Miami Herald*

# `I wish there was another alternative. It's horrible.'

## *Jurors say they felt decision was imposed on them by unjust law*

**BY CAROLINE J. KEOUGH**
ckeough@herald.com

As they tried to decide the fate of 13-year-old Lionel Tate, jurors wept and prayed in the tiny room, some looking for a way out of a decision they felt was being forced on them by an unjust law.

``When you get called into jury selection, you never expect a case like this,'' said Steve Danker, a software systems analyst from Coral Springs and father of three small children. ``I don't think anybody there thought [Lionel] intended to kill her, but the state didn't have to prove that. I think it was too easy for them.''

Danker said he desperately wanted to factor Lionel's age into the verdict, but that wasn't an option. During jury selection, anyone who said they couldn't render a verdict without considering Lionel's age was dismissed.

Although charged with first-degree murder, Lionel was not charged with premeditated murder, so prosecutors didn't have to prove that he planned or meant to kill Tiffany Eunick.

Under Florida law, if someone is committing a crime -- like robbery or rape -- and kills another person in the process, it's felony first degree murder. In this case, Lionel was charged with aggravated child abuse, which led to Tiffany's death.

This meant prosecutor Ken Padowitz had to prove only that Lionel knowingly or willfully hurt Tiffany, not that he planned it.

The Broward state attorney's office could have tried Lionel as a juvenile, but instead took the case to the grand jury, which returned the first-degree murder indictment.

Prosecutor Ken Padowitz, however, noted that Lionel was given the option of pleading guilty and serving three years in a juvenile facility, followed by 10 years probation. Lionel's lawyer rejected that.

Herald: `I wish there was another alternative. It's horrible.`  Page 2 of 2

en Pow-Sang said she and other jurors ``were all annoyed'' that the case routed through juvenile court.

there was another alternative,'' said the music therapist from Pembroke ``It's horrible. It was horrible for everybody.''

said he didn't believe the defense's argument that Lionel was so re and caught up in wrestling that he didn't understand he was hurting

vhole wrestling thing just wasn't a big issue in this case,'' he said. ``I just elieve you can do that kind of damage to someone and not understand ou were doing.''

Padowitz: ``I don't think anyone is going to walk out of this courtroom that anyone won. But I think justice prevailed.''



The World's Leading Environmental and Conservation Charities are Working Together Under One Name...

are



Contact Us
Copyright 2001 Miami Herald

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

|                                        |                                        |
|----------------------------------------|----------------------------------------|
| Plaintiff,                             | CASE NO. 00-CIV-8616 (DC)              |
|                                        | (Southern District of New York)        |
| vs.                                    |                                        |
|                                        |                                        |
| L. BRENT BOZELL, III, an individual;   | CASE NO. 01-7913-CIV-HURLEY            |
| MEDIA RESEARCH CENTER, INC.,           | Magistrate Lynch                       |
| a Virginia non-profit corporation,     |                                        |
| d/b/a Parents Television Council;      |                                        |
| PARENTS TELEVISION COUNCIL, INC.,      |                                        |
| a Delaware non-profit corporation;     |                                        |

JAMES LEWIS, an individual; MARK
HONIG, an individual; CYNTHIA
DELORES TUCKER, an individual; and
Various John and Jane Does,

Defendants.

_____/

... BOX
FILED

EB 0 4 2002

LERK, USDC / SDFL / V

## MOTION TO COMPEL AND INCORPORATED MEMORANDUM OF LAW

World Wrestling Federation Entertainment, Inc. ("WWFE") files the following Motion to Compel and Incorporated Memorandum of Law against third-party, Joel Klass M.D. ("Klass"), pursuant to Rule 45 of the Federal Rules of Civil Procedure.

### INTRODUCTION

1.    On January 15, 2002, counsel for WWFE caused a third-party subpoena duces tecum ("Subpoena") to be served upon Joel Klass, M.D. ("Klass") of Hollywood, Florida. See Tab 1, Affidavit of Jason L. Richey ("Richey Aff.") at ¶ 2. The Subpoena commanded Klass to produce documents on January 29, 2002 at 10:00 a.m. at the offices of counsel for WWFE in Miami, Florida. See id. at ¶ 3. A true and correct copy of the subpoena and proof of service is attached at Tab 2.

PI-803705 v3 0149511-0963          **Kirkpatrick & Lockhart** LLP          EXHIBIT ___24___



2.     The deadline for production has now passed without any response from Klass or objection from the Defendants.  See Tab 1, Richey Aff. at ¶ 5.  Accordingly, WWFE now seeks an Order compelling Klass to produce documents in response to the Subpoena.  WWFE also seeks to recover its attorneys' fees in connection with this Motion.

## I.    FACTUAL BACKGROUND

3.     On November 9, 2000, WWFE filed suit against numerous Defendants, including attorney James Lewis ("Lewis").  The lawsuit arose out of, among other things, various false and defamatory public statements made by the Defendants about WWFE and its wrestling programs.

4.     Specifically, the Defendants have claimed that WWFE, and in particular its wrestling program "WWF Smackdown!," were responsible for the deaths of four children.  One of these children was Tiffany Eunick, a six-year-old girl from Florida who was savagely beaten to death by then-12-year-old Lionel Tate ("Tate").  Tate has since been convicted of first-degree murder in connection with the death of Tiffany Eunick and has been sentenced to life imprisonment.  See Tab 3, Tate Sentencing Order at 18.

5.     Lewis was Tate's defense attorney at trial.  As part of Tate's defense, Lewis claimed that Tiffany Eunick's tragic death was caused by Tate performing wrestling moves on her.  The trial court held that there was no factual support for this claim, declaring that it was "inconceivable" that wrestling played a role in the death of Tiffany Eunick.  See id. at 14.

6.     Prior to trial, Lewis hired Klass to testify as a defense expert, and to aid in the production of a videotape that supposedly reenacted the events leading up to the death of Tiffany Eunick.  This videotape was played at a pre-trial hearing, at trial and it has been widely disseminated to the media.  Notably, the trial court stated that this video "seemed to be trying to fit the facts, rather than a true depiction of the events."  See id. at 13.

## II.   THE SUBPOENA TO KLASS

7.      WWFE has sought from Klass documents concerning Klass's role in the defense of Tate and his participation in the videotape that purports to reenact the events leading to the death of Tiffany Eunick. See Tab 2, Subpoena.

8.      Documents related to the production of the videotape and the defense of Tate are relevant for the purpose of establishing both that the Defendant's statements about the role of wrestling in the deaths of children were false, and that the Defendants knew they were false.

9.      Counsel for WWFE has followed all requirements of Rule 45 of the Federal Rules of Civil Procedure in serving the subpoena on Klass. See Tab 1, Richey Aff. at ¶ 3.   The subpoena provided a reasonable time for compliance and required that the documents be produced well within 100 miles of Klass's place of business. See Fed. R. Civ. P. 45(c)(3)(A). Counsel for WWFE also complied with all other requirement of Rule 45, both as to form and service.

10.      Klass failed to respond in any way to the subpoena. See Tab 1, Richey Aff. at ¶ 5. He did not object, move to quash, claim a privilege or in any other way contact counsel for WWFE about the subpoena. See id. The Defendants also have not objected to the Subpoena. Id.

11.      The deadline for producing documents in response to the subpoena passed on January 29, 2002. See Tab 2, Subpoena.   On the morning of January 30, 2002, counsel for WWFE telephoned Klass in an attempt to determine why Klass had not responded to the subpoena. See Tab 1, Richey Aff. at ¶ 6.   Klass acknowledged that he received the subpoena, but stated that it was the "standard practice" of his office not to respond to subpoenas without a release or court order. See id. at ¶ 7.

### III.   FEES

12.     Because Klass has no "adequate excuse" for his failure to obey the subpoena, WWFE is entitled to have the attorneys' fees it incurred in connection with this Motion reimbursed.  See Fed. R. Civ. P. 45(e) (failure to obey subpoena without adequate excuse may be deemed contempt of court); Lipscher v. LRP Publ'ns, Inc., 266 F.3d 1305, 1323 (11th Cir. 2001) ("[A]ttorney's fees are proper upon a finding of contempt.").  Klass' standard office practice is no excuse for failing to abide by this Court's subpoena, and sanctions are appropriate.  See Fed. R. Civ. P. 37; Local Rule, Appendix A(I)(D)(4) of the Local Rules of the Southern District of Florida.

### IV.   CERTIFICATE OF CONSULTATION

On January 30, 2002, counsel for the WWFE telephoned Klass in an attempt to determine why Klass had not responded to the subpoena.  See Tab 1, Rechey Aff. at ¶ 6.  Klass acknowledged that he received the subpoenas but stated that it was his "standard practice" not to respond to subpoenas without a release or a court order.  See Id. At ¶ 7.

**WHEREFORE**, WWFE requests that this Court enter an Order, in the form of the Order attached hereto, granting the foregoing Motion to Compel, and ordering Joel Klass, M.D. to produce documents responsive to the Subpoena within seven (7) days from the date of the Order, and to pay the attorneys' fees incurred in connection with this Motion.

**KIRKPATRICK & LOCKHART LLP**
Attorneys for Plaintiff
Miami Center – 20th Floor
201 S. Biscayne Boulevard
Miami, Florida  33131
Tel: (305) 539-3300
Fax: (305) 358-7095

By_____
Daniel A. Casey

4

Jerry S. McDevitt, Esq.
Terry Budd, Esq.
Jason L. Richey, Esq.
Curtis B. Krasik, Esq.
KIRKPATRICK & LOCKHART LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, Pennsylvania  15222
Tel:  (412) 355-6500
Fax:  (412) 355-6501

Dated:  February *4*, 2002

Attorneys for Plaintiff World Wrestling
Federation Entertainment, Inc.

5

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Motion to Compel and

Incorporated Memorandum of Law was served this _4th_ day of February, 2002, via First-Class

U.S. Mail upon the following:

>**Joel Klass, M.D.**
>4700 G Sheridan Street
>Hollywood, Florida  33021-3416
>
>**Thomas A. Leghorn, Esquire**
>Wilson, Elser, Moskowitz, Edelman & Dicker LLP
>150 East 42nd Street
>New York, New York  10017-5639
>
>**Robert C. Buschel, Esquire**
>Buschel, Carter, Schwartzreich & Yates
>The West Wing
>201 S.E. 8th Street
>Fort Lauderdale, FL  33316
>
>**Robert R. Sparks, Jr., Esquire**
>Herge, Sparks & Christopher, LLP
>6862 Elm Street, Suite 360
>McLean, VA  22101

Daniel A. Casey

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

                    Plaintiff,                          CASE NO.  00-CIV-8616 (DC)
                                                        (Southern District of New York)
vs.

L. BRENT BOZELL, III, an individual;                   CASE NO.  01-7913-CIV-HURLEY
MEDIA RESEARCH CENTER, INC.,                               Magistrate Lynch
a Virginia non-profit corporation,
d/b/a Parents Television Council;
PARENTS TELEVISION COUNCIL, INC.,
a Delaware non-profit corporation;
JAMES LEWIS, an individual; MARK
HONIG, an individual; CYNTHIA
DELORES TUCKER, an individual; and
Various John and Jane Does,

                    Defendants.
_____/

## AFFIDAVIT OF JASON L. RICHEY

      1.      I am associated with the law firm of Kirkpatrick & Lockhart LLP, Henry W. Oliver Building, 535 Smithfield Street, Pittsburgh, Pennsylvania 15222.  I represent World Wrestling Federation Entertainment, Inc. ("WWFE") in litigation in the above-referenced litigation.

      2.      On January 15, 2002, I caused a third-party subpoena duces tecum ("Subpoena") to be served upon Joel Klass, M.D. ("Klass") of Hollywood, Florida.

      3.      The Subpoena commanded Klass to produce specified documents on January 29, 2002 at 10:00 a.m., at the offices of Kirkpatrick & Lockhart LLP in Miami, Florida.

EXHIBIT ____1____

4.      I have followed all requirements of Rule 45 of the Federal Rules of Civil Procedure in serving the Subpoena on Klass.  The Subpoena provided a reasonable time for compliance and required that the documents be produced well within 100 miles of Klass's place of business.  The Subpoena also complied with every other requirement of Rule 45, both as to form and service.

5.      The January 29, 2002 deadline for production passed without any response from Klass.  He did not object, move to quash, claim a privilege or in any other way contact me, or anyone else associated with my law firm, about the subpoena.  In addition, none of the Defendants in this litigation have objected to the Subpoena.

6.      On the morning of January 30, 2002, I telephoned Klass in an attempt to determine why Klass had not responded to the Subpoena.

7.      Klass acknowledged that he had received the Subpoena, but stated that it was the "standard practice" of his office not to respond to subpoenas without a release or court order.

8.      To date, neither I nor anyone associated with my law firm has received any response to the Subpoena.

Jason L. Richey
Kirkpatrick & Lockhart LLP
Henry W. Oliver Building
535 Smithfield Street
Pittsburgh, PA  15222
(412) 355-6260

Subscribed and sworn to before me
this _1_ day of _February_ 2002.

Beverly A. Drizos
Notary Public
My commission expires:

Notarial Seal
Beverly A. Drizos, Notary Public
Pittsburgh, Allegheny County
My Commission Expires June 4, 2002
Member, Pennsylvania Association of Notaries

# RETURN OF SERVICE

Case No: 00 CV 8616

| TO BE SERVED | COURT |
|---|---|
| JOEL KLASS, PH.D.<br>1150 N. 35TH AVE.<br>HOLLYWOOD, FL. | IN THE U.S. DISTRICT COURT IN AND FOR THE<br>SOUTHERN DISTRICT OF FLORIDA |

| STYLE | WRIT |
|---|---|
| WORLD WRESTLING FEDERATION ENTERTAINMENT,<br>INC.<br>VS.<br>L. BRENT BOZELL, III. | SUBPOENA IN A CIVIL CASE |

| SERVED FOR | INFORMATION |
|---|---|
| JASON L. RICHEY, ESQ.<br>535 SMITHFIELD ST.<br>PITTSBURGH, PA., 15222 | Court Date:     01/29/2002     Court Time:  10:00AM<br>Witness Fee:<br>Document Type:  Original<br>Atty File # |

I received this process 01/15/02 at 8:40 AM and it was served 01/15/02 at 1:00 PM in BROWARD
COUNTY, FLORIDA.

        JOEL KLASS, PH.D.
        4700 SHERIDAN ST.
        HOLLYWOOD, FL

**SERVICE ON DOCTOR: ()**
By serving the within named person a copy of this SUBPOENA IN A CIVIL CASE and a copy of the
complaint, petition or initial pleading on:
N. IVEY as SECRETARY

**OTHER RETURNS:**

4700 SHERIDAN ST.
HOLLYWOOD, FL

Under penalty of perjury, I declare that I have read the foregoing and that the facts stated in it are true, that I am a Certified Process
Server/Sheriff Appointed in the circuit in which this defendant was served and have no interest in the above action persuant to F.S.
92.525(2).

I hereby certify that I am not a party to the above action, am over 18
years of age, that the above affidavit is true and correct, and that
service was made in accordance with Rule 1.410(C) Florida R.C.P.,
and Rule 45 Federal R.C.P., and Rule 4(C), 50 U.S.C., and section
520 Et. Seq.

The foregoing instrument was acknowledged before me this
17 day of January, 2002 BY VICTOR F. RACEK, who is
personally known to me, or who was produced a D/L as
identification and who DID take an oath?

BRENDA TAYLOR
My Commission # CC 815909
Expires: March 8, 2003

    V. Racek

PROCESS SERVER: VICTOR F. RACEK (25)
CAPLAN, CAPLAN AND KAYE (305) 374-3426
CPS Number: 00920739-001

**EXHIBIT 2**

NOTARY PUBLIC OR PUBLIC OFFICER
AND TITLE OR RANK / CCN

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
# UNITED STATES DISTRICT COURT

SOUTHERN ——— DISTRICT OF ——— FLORIDA

World Wrestling Federation Entertainment, Inc., a Delaware corporation

Vs.

L. Brent Bozell, III, an individual; Media Research Center, Inc., a Virginia non-profit corporation, d/b/a Parents Television Council; Parents Television Council, Inc., a Delaware non-profit corporation; James Lewis, an individual; Mark Honig, an individual; Cynthia Delores Tucker, an individual; and Various John and Jane Does

**SUBPOENA IN A CIVIL CASE**

CASE NUMBER: 00 Civ. 8616
(Southern District of New York)

TO:   Joel Klass, Ph.D.
1150 N. 35th Ave.
Hollywood, FL 33021

☐   YOU ARE COMMANDED to appear in the United States District court at the place, date and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
|  | DATE AND TIME |

☐   YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒   YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects): See Attachment "A"

| PLACE | DATE AND TIME |
|---|---|
| Kirkpatrick & Lockhart LLP, Miami Center, 201 South Biscayne Boulevard, 20th Floor, Miami, Florida 33131-2399, Attention: Daniel A. Casey. | January 29, 2002 10:00 a.m. |

☐   YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person designated, the matters on which the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

| ISSUING OFFICER SIGNATURE AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) | DATE |
|---|---|
| *Jason L. Richey*   Counsel for Defendant World Wrestling Federation Entertainment, Inc. | January 14, 2002 |

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER

Jason L. Richey, Esq., Kirkpatrick & Lockhart LLP, Henry W. Oliver Bldg., 535 Smithfield St., Pittsburgh, PA 15222-2312 Telephone: (412) 355-6260

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

PI-791496 v1 0149511-0963

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| DATE | PLACE |
|---|---|
|  | Joel Klass, Ph.D.<br>1150 N. 35th Ave.<br>Hollywood, FL 33021 |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|

| SERVED BY (PRINT NAME) | TITLE |
|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
                        DATE

_____
SIGNATURE OF SERVER

_____
ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS SUBJECT TO SUBPOENAS.

(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings and a reasonable attorney's fee.

(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.

(3) Subject to paragraph (d)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.

(3) (A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it

(i) fails to allow reasonable time for compliance;

(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where

that person resides, is employed or regularly transacts business in person, except that, subject to the provisions of clause (c)(3)(B)(iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held,

(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or

(iv) subjects a person to undue burden.

(B) If a subpoena

(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or

(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or

(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial,

the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

(d) DUTIES IN RESPONDING TO SUBPOENA.

(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.

(2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

## ATTACHMENT "A"

The following definitions, instructions and document requests are a part and incorporated into the preceding subpoena as though the same were stated therein:

### DEFINITIONS

1.    The Uniform Definitions set forth in Southern District of New York Local Rule 26.3 shall be deemed incorporated by reference into these Requests.

2.    The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery requests all responses that might otherwise be construed to be outside of its scope.

3.    "Any" shall also mean "all" and vice versa.

4.    "Communication" shall mean the transmittal of information (in the form of facts, ideas, inquiries, or otherwise), whether in person, in writing, by telephone, electronically or any other method whereby knowledge, facts and/or information is imparted or transmitted from one person or entity to another or to a file.

5.    "Concerning" shall mean relating to, referring to, describing, evidencing or constituting.

6.    "Document" shall be defined to be synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a), including, without limitation, electronic (E-mail) or computer compilations, videos and film (both edited and unedited). A draft or non-identical copy is a separate document within the meaning of this term.

7.    "Lewis" shall mean and refer to Defendant James Lewis, and any other person who is aware of or in the possession, custody or control of any information, document or thing for or on his behalf.

8.    "Person" shall mean any natural person or any business, legal or governmental entity or association.

9.    "Tate" shall mean and refer to Lionel Tate.

10.    "WWFE" shall mean and refer to Plaintiff World Wrestling Federation Entertainment, Inc., formerly known as Titan Sports, Inc., and any officer, director, employee, associate, agent or attorney thereof.

11.    "You" or "Your" shall refer to Joel Klass, Ph.D., and any other person or entity who is aware of or in the possession, custody or control of any information, document or thing for or on his behalf.

## INSTRUCTIONS

1.    You are requested to furnish all documents in Your possession and all documents available to it, not merely such documents as it knows from its own personal knowledge or from business records, but also information and knowledge that is available to You, Your employees, officers and agents, attorneys, investigators, etc., by reasonable inquiry, including inquiry of Your employees, officers, agents, representatives, etc.

2.    Should You assert a privilege with respect to any document requested herein, You are requested to provide the following information per Rule 45(d)(2) as to each such document or item of information:

(i)    The type of document or information (e.g., letter, notebook, telephone conversation, etc.);

(ii)    The date of the document or transaction involving the information;

(iii)    Identification of the author and/or all participants with respect to the information;

(iv)    Identification of the signatory or signatories of the document, if any;

(v)    Identification of the document's current custodian;

(vi)    The present whereabouts of the document and/or the names of all persons with personal knowledge with respect to the information; and

(vii)    A statement of the grounds on which the claim of privilege rests with respect to each such document or piece of information withheld.

3.    All documents shall be produced as they are kept in the usual course of business or the documents shall be organized and labeled to correspond with the categories in the Document Requests.

4.    Whenever a document request is framed in the conjunctive, it also shall be taken in the disjunctive and vice versa.

5.    Whenever a term is framed in the singular, it also shall be considered to be plural and vice versa.

6.    The use of any tense of any verb shall be considered to include within its meaning all other tenses of the verb.

7.    You are obligated to conduct a reasonable inquiry in order to answer each document request and if, thereafter, You still are unable to respond, state all efforts made by You to obtain the requested documents.

8.      To the extent not otherwise expressed, interpretation of these requests herein shall be consistent with the Local Civil Rules of the United States District Court for the Southern District of New York.

## DOCUMENT REQUESTS

1.     Produce all communications between You, James Lewis and/or any other Person concerning Lionel Tate, any criminal matter involving Lionel Tate and/or the creation of a video of Lionel Tate reenacting how Tiffany Eunick was killed.

2.     Produce all documents, including but not limited to, reports, memoranda and notes, concerning any evaluation, analysis or diagnosis of Lionel Tate made by You or on Your behalf.

3.     Produce all documents concerning Your participation in any videotape produced in connection with the defense and/or trial of Lionel Tate, including but not limited to, any draft videotape that purports to reenact the events leading to the death of Tiffany Eunick.

4.     Produce all documents concerning Your participation in the defense and/or criminal trial of Lionel Tate.

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD, COUNTY

STATE OF FLORIDA

       Plaintiff

vs.

LIONEL TATE

       Defendant.

_____/

CASE NO: 99-14401CF10A

JUDGE JOEL T. LAZARUS

## O R D E R

Within sixteen hours of the verdict, opening statements were being made in a new forum: the court of public opinion. Starting with the Today show on that date and continuing unabated, there has been a barrage of appearances on talk shows, radio programs, pulpits in our houses of worship, and in any and every other forum imaginable. This was not the media doing their job of reporting; this was a calculated effort to try this case for a second time in a court not governed by its laws of the state of Florida but by the feelings of sympathy and compassion for a fourteen year old convicted of the highest offense known to mankind.

And the effect was virtually immediate. Letters arrived from the north and south, east and west of this country. And these letters were almost universal in their tenor: have mercy on Lionel Tate, have compassion on this fourteen year old. The letters contained phrases such as "horsing around," "boys will be boys," "playing" and "accident." As recently as last Thursday, one of the counsel was on television stating no punishment was warranted for this "accident."

It is a truism that not one single letter writer or call maker was privy to the horrific facts brought out during the trial; not one person sat through the pathetic testimony of the results ofLionel Tate's deeds upon the body of Tiffany Eunick. The emphasis since January the 25th has been on the defendant and how to bypass what the law apparently requires, with hopes and prayers and requests for mercy and leniency for this child. Voices cry out for "justice",

EXHIBIT ___3___

but not for justice for Tiffany Eunick.   Most letters and calls refer to this victim only as an afterthought.   In the court of public opinion, Lionel Tate has turned into the victim.

It is obvious what the purpose of these appearances in the studios and on the pulpits by participants in the trial has been, and to this very day continues to be.   If the purpose is to pressure this court to proceed with its heart rather than its mind, with all due respect, I decline. The jury has defined the future of Lionel Tate; the jury has spoken, loudly, clearly, and unanimously.

Regardless of my rulings here this day, I assure all it will be based on my perception  of the law, a perception that I might add I am thoroughly convinced to be correct.   If I based my ruling on what the overwhelming majority of the public is requesting, I would be, perhaps, a hero to those who want me to act out of sympathy, but I would be disavowing the oath I have taken to uphold the laws of the state of Florida and our constitution.   Above all, we are a nation of laws. The very last thing a jury is told is, "none of us have the right to violate rules we all share."

In the final analysis, the court of public opinion cannot be the body ruling on these motions and sentence; it must be by this judge following the laws of this land.   Justice Blackmun stated in his dissent in **Furman v. Georgia**, 408 US at 411:

> We should not allow our personal preferences as to the wisdom of legislative and congressional actions, or our distaste for such action, to guide our judicial decision in cases such as these.  The temptations to cross that policy line are very great.

State of Florida v. Lionel Tate
Sentencing Order
Page 3 of 18

## I. Motion For a New Trial

The indictment handed down by the Grand Jury has caused much criticism, and is also an integral part of the grounds in the Motion for a New Trial. The ability to indict is present within the laws of Florida, and there can be no challenge to the impaneling of this Grand Jury. The issue, though, is one of the applicability of the Felony Murder statute, F.S. 782.04(2)(h), in the instant case.

This court is being asked to grant a new trial, on the grounds that F.S. 827.03, Aggravated Child Abuse, was unconstitutionally applied at bar.

> "Aggravated child abuse", F.S. 827.03(2) occurs when a person:
>
> (a) commits aggravated battery on a child, or
>
> (c) knowingly or willfully abuses a child and in doing so causes great bodily harm, permanent disability, or permanent disfigurement to the child.

Aggravated Battery is defined as: Intentionally or knowingly causing great bodily harm, permanent disability, or permanent disfigurement.

Child Abuse means: intentional infliction of physical...injury upon a child or an intentional act that could reasonably be expected to result in physical...injury to a child.

The defense alleges that the Aggravated Child Abuse statute was never meant to apply to situations of one child hurting another. No cases are cited to support this position and a review of the legislative history of F.S. 827.03 does not support this contention. See, **Kama v. State**, 507 So.2d 154 (1 DCA 1987).

There have been cases in Florida that deal with child-upon-child Aggravated Child Abuse. See, for example: **KBS v. State**, 725 So.2d 448 (2 DCA 1999). **AJ v. State**, 721 So.2d 761

(2 DCA 1998). This court finds no case wherein Aggravated Child Abuse, juvenile upon juvenile, was the underlying felony in a Murder in the First Degree prosecution. While most Aggravated Child Abuse cases are concerned with familial or custodial situations, the mere fact that a defendant is not within that group does not preclude the charge from being prosecuted. In the absence of case law to the contrary, the court is not in a position to grant a new trial because of an allegation of inapplicability.

In the case from a sister district, **KBS**, supra, the court asked for guidance on this very issue, but none was forthcoming. In a *per curiam* decision affirming Judge Ramsberger, the Second District Court of Appeal questioned the prosecutorial decision of one juvenile being charged with Aggravated Child Abuse on another. It said "...the legislature may well wish to review this issue." Now this court also requests guidance in the future as to the intent of the statute which *undisputedly permits a prosecution of a juvenile under F.S. 827.03.*

Should the state have sought what they are legally empowered to do is not an issue for the court. The policies of the State Attorney of the 17th Judicial Circuit should not and will not be praised or criticized, at least by this court. But public opinion sends a message to what it believes is the appropriateness or lack of appropriateness of indicting a twelve year old for Aggravated Child Abuse resulting in death, the necessary elements of a Felony Murder in the First Degree charge.

Once the state chooses to seek an indictment for a crime punishable by death or life imprisonment, upon the return of the indictment, the child must be tried and handled in every respect as an adult. Florida Statute 985.225 requires such action against..."a child of any age." For crimes other than capital, the prosecutor can proceed in juvenile court, or, if permitted by F.S. 985.227, direct filing of an information.

Other cases similar in many respects to that of Lionel Tate's will appear in the future, unfortunately and without a doubt. And the prosecuting authorities will be wise to heed the

voices being raised, and examine their criteria in prosecuting twelve year old boys and girls. Make no mistake: this judge does consider a twelve year old a boy or girl, regardless of the crime he or she commits. But it is not the court's consideration which dictates how a prosecutor proceeds.

This court was provided with a recent letter written on behalf of the international organization, Amnesty International, as well as taking testimony from its representative in attendance. The letter and the testimony details the organization's concerns with the treatment of children who are convicted of serious criminal offenses. There is a realization, though, that there is "severity and inflexibility of the sentence which the youngster now faces.......the relevant authorities' response 'shall always be in proportion not only to the circumstances and the gravity of the offences but also to the circumstances and the needs of the juvenile as well as to the needs of society.' "

The recognition of the "relevant authorities' response" is present: these are legislative decisions that must be addressed, and not judicial decision. Judges cannot and should not legislate from the bench.

The court has been implored to recognize the plea offer made in February, 2000, which was rejected by silence, in that there was no response from the defense. Prior to commencement of trial, this court on its own, made inquiry as to the possibility of a negotiated plea. At that time, there was no plea offer "on the table" but nevertheless inquiry was made to see if there could be a resolution without a trial. Obviously, there was none. Specifically, the defendant himself stated his desire to go to trial.

The prosecutor said that the defense merely had to approach him for the negotiations to commence; with no one approaching him, the prosecutor did not make any effort to initiate a resolution. And even if he had, subsequent comments from the defense clearly show that a plea was unacceptable as a resolution. There has not been any acknowledgment that Lionel

Tate did anything wrong at any anytime, and he would never plea to what was, in his mind, an accident.

Should the government have taken the initiative?  If it had, perhaps, the result might have been different and we would not be here now.  The defense, it is reported, was interested in a resolution, but was steadfast in its insistence that no admission of guilt or incarceration would result.  Should the defense have been more realistic in its expectations?  If it had, perhaps the results would have been different and we might not be here now.

Testimony was received on March 2, 2001, and again today from Mrs. Grossett-Tate.  She testified that she never knew or made inquiry as to the penalty for Murder in the First Degree.  As a law enforcement officer, for her to say she did not know the penalty for Murder in the First Degree, a capital offense, is beyond credibility.  For her to state she did not ask, when a First Degree Murder charge subjects most defendants to the possibility of execution (not in this case, though), if Lionel Tate would be facing that potentially, is unbelievable.

To state that not one person, attorney, lay person or mental health specialist, ever mentioned a life sentence, casts doubts on her testimony, and as a basis for a new trial, is rejected.  In her own words, she stated that she could not tell her son he was facing life in prison, she never felt "it would go this far", implies she well knew.

Of course, the issue is whether her son, the defendant knew.  The court is satisfied that from early on, including his comments on the competency evaluation, he knew what he was facing.  But to bring this issue up after the verdict was received is irrelevant to the business at hand.

Additionally, these statements made to the world by Mrs. Grossett-Tate as recently as a week ago states that no plea would ever be accepted, even now, for, in her words, this was an accident.

This court does not know whether any deals were cut, or were not, as to post-conviction actions by the prosecutor in joining in with the trial attorney. Such has been repeated by the media and is a part of the motions filed in the case. It is totally immaterial at this point. Once the jury has spoken, the opportunity for negotiations has ceased. And whatever actions the attorney's choose to take here or in Tallahassee in the future, is their business and not the courts. If such becomes relevant in subsequent litigation, the courts will address it at that time.

If the state was surprised at the verdict, they should reread their arguments after the state's case was concluded, and again after the defense rested. And if the state now believes that a Murder in the First Degree verdict was inappropriate, I need not remind them that they had well over 500 days, from date of indictment to date of jury selection, to *nolle pros* their case and refile as Murder in the *Second* Degree or Manslaughter, the latter charge apparently the basis for the final plea negotiations. They got what they wanted; they now have to take responsibility for their actions in seeking it in the first instance.

The state chose not to deviate from what they sought in August, 1999. To talk about travel to the governor to seek a reduction in charge or sentence, if accurate, is of tremendous concern to this court. It not only casts the prosecutor in a light totally inconsistent with his role in the criminal justice system, but it makes the whole court process seem like a game where, if the results are unfavorable, they'll run to a higher source to seek a different result. A trial is not a test balloon, sent up to see what may happen. And if the results displease both sides, so be it: this is what our jury system is about.

This court has no authority to impose a plea that was rejected. The court had no obligation to accept a negotiation, if one had even been proposed, post verdict, to concoct a way outside of the jury's actions. This type of fiction is unacceptable, and quite possibly is violative of Florida laws. I add that this denigrates the very difficult and diligent job the twelve jurors did in this case, and, I am sure, make some question the jury system at all.

The defense has filed a motion requesting a **Cottle** hearing, based on **Cottle v. State**, 733 So.2d 963 (Fla. 1999). As stated previously, this court declines holding a **Cottle** hearing, not on the merits, but on the timing. Such a hearing might well be heard in the future; to do so now, as was stated, is untimely.

It has been suggested that if the jury had been informed of the potential punishment that accompanied a Murder in the First Degree conviction, the jury's deliberations might have concluded in a different result. The jury was not informed, correctly, that a guilty verdict would require a life sentence. The jurors are instructed they must disregard the consequences of their verdict. Since the mid-1980's, the law has not permitted the jury to be informed except in those cases where the jurors participate in the sentencing. See, F.Rule of Crim. Procedure 3.390(a). See, **Knight v. State**, 668 So.2d 596 (FLA 1996).

The jury's role is to be the trier of the facts; for a jury to exercise pardon power would fly in the face of our whole judicial system. There cannot be any acceptance of the concept of jury nullification, where a jury does not like a law, or like how it is to be applied. See, **Legette v. State**, 718 So.2d 878 (4 DCA 1998).

In a supplemental motion for a new trial, the defense claims error in the admission of certain statements by Dr. Michael Brannon. A full hearing was held on this issue, with Dr. Brannon testifying. At issue was whether the doctor violated the terms of both his employ and the agreement between the state and defense. It is in general agreement that Dr. Brannon would not talk about any admissions as to the events on the specific day.

It is this court's opinion that Dr. Brannon did not violate the agreement, in part or in whole. Specifically, the most damaging testimony from the doctor at trial concerned Lionel Tate's perception that professional wrestling was not real, the statement did not violate the agreement. A defense witness at the Motion for New Trial, Dr. John Spencer, while expressing consternation at Dr. Brannon's testimony, did not feel that Dr. Brannon violated

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 9 of 18

any of the ethical considerations all psychologists are subject to. Dr. Spencer admitted that he did not report Dr. Brannon to the appropriate governing body, and, that if he felt a violation occurred, he would have. Accordingly, the introduction of Dr. Brannon's testimony is not grounds for a new trial.

In its Second Supplemental Motion for New Trial, it is alleged that the actions of Dr. Sherri Bourg-Carter were egregious requiring a new trial. The court heard sufficient testimony from Dr. Bourg-Carter to find if any improprieties by the psychologist were present, they certainly did not approach a level of prejudice to the defendant which should result in a new trial. Additionally, the facts of the instant case are sufficiently dissimilar as to negate the relevancy of **Holland v. State**, 636 So.2d 1289 (Fla. 1994). Taking into consideration her actions at Dr. Spencer's office, her trial testimony, and her testimony at the motion on March 2, 2001, Dr. Carter's activities do not create a ground to reverse the jury.

It has been argued that sentencing a fourteen year old to life in prison is cruel and/or unusual punishment, violative of the Eighth Amendment of the U.S. Constitution or Art. 1 §17 of the Declaration of Rights of the Florida Constitution. In effect, the defense argues that such a sentence is disproportionate to the crime committed, specifically child abuse causing death. Also, it is argued that such a sentence in Eighth Amendment analysis does not reflect current standards.

Perhaps the leading case in Eighth Amendment analysis is **Trop v. Dulles**, 356 US 86 (1958)

> While the State has the power to punish, the Amendment stands to assume that this power be exercised within the limits of civilized standards.

It is not the court's role to act as a legislator or to reflect public opinion. While the court should look to objective indications of societal current values, the U.S. Supreme Court in **Gregg v. Georgia**, 428 U.S 153 (1976) stated:

> Courts are not representative bodies. They are not designed to be a good reflex of a democratic society. Their judgment is best informed, and therefore most dependable within narrow limits. Their essential quality is detachment, founded on independence. History teaches that the independence of the judiciary is jeopardized when courts become embroiled in the passions of the day and assume primary responsibility in choosing between competing political, economic and social pressures.

While the Eighth Amendment prohibits the infliction of cruel and unusual punishment, recognizing the evolving standards of decency that mark the progress of a maturing society, prevailing state and federal case law hold that life imprisonment for Murder in the First Degree, even where the convicted is barely into his teens, is neither cruel nor unusual. See, **Penry v. Lynaugh**, 492 U.S. 302 (1989).

The defense argued that the child abuse perpetrated by Lionel Tate merged with the killing of Tiffany Eunick, and constitutes a single offense. In other words, there can be no crime of Felony Murder in the First Degree with the predicate act of Aggravated Child Abuse. This court notices the conflict with **Kansas v. Lucas**, 759 P.2d 90 (Kansas 1998). Florida law, on the other hand, it is quite clear that Aggravated Child Abuse may sustain a Felony Murder First Degree charge. Accordingly, the court denies the request to dismiss the charge of Felony Murder in the First Degree. See, **Robles v. State**, 188 So.2d 789 (Fla. 1966), **Lukehart v. State**, 762 So.2d 482 (Fla. 2000) and **Mapps v. State**, 520 So.2d 92, 93-94 (Fla. 4th DCA 1988).

The other issues raised by the defense in their motions and supplemental motions for new trial are without legal basis. All of these grounds were addressed during the pre-trial motions or during the trial itself. These include: impeachment of Mrs. Grossett-Tate, the State's photographs admissions, the state's computer animation, the results of the **Frye** hearing which limited "expert" testimony concerning professional wrestling, the inclusion of the third

statement of Lionel Tate to law enforcement after suppression of the first two, and, the disallowing of professional wrestlers to testify as either fact witnesses or reluctant expert witnesses.

Thus the Motion for New Trial as well as those Supplemental Motions on the grounds of the inapplicability of the felony murder laws, on the grounds of the inapplicability of the Aggravated Child Abuse statute and on the grounds reviewed above are **DENIED**.

## II. Reduction of the Charge

There is a provision in Florida law that permits courts to reduce the jury verdict to the lesser charge of Murder in the Second Degree or Manslaughter. Rule 3.620, F.R.Crim.Proc. states:

> When the offense is divided into degrees or necessarily includes lesser offenses, and the court, on a motion for new trial, is of the opinion that the *evidence does not sustain the verdict* but is sufficient to sustain a finding of guilt of a lesser degree or of a lesser offense necessarily included in the one charged, the court shall not grant a new trial but shall find or adjudge the defendant guilty of the lesser degree or lesser offense necessarily included in the charge, unless a new trial is granted by reason of some other prejudicial error. (emphasis added)

It should be noted that this opportunity to reduce the verdict was rejected by the jury. Over defense objection, this court instructed the jury on both lessers.

In analyzing the sufficiency of the evidence to sustain the verdict, the court reviewed the testimony and physical evidence introduced at trial. I cannot be any more direct than this: the evidence of guilt was overwhelming. The jury's verdict was totally consistent with the evidence.

Much talk has been made using the term of "accident".   "Accident" is defined in Florida Statute 782 within the definition of Excusable Homicide:

> The killing of a human being is excusable, and therefore lawful, under any one of the following three circumstances:
>
> 1. When the killing is committed by accident and misfortune in doing any lawful act by lawful means with usual ordinary caution and without any unlawful intent

The defense states that the "accident" was simply Lionel Tate replicating what he saw being done by Sting, Hulk Hogan or The Rock, familiar names to professional wrestling aficionados. But this court is unaware of any wrestler plummeting an adversary that is half the size and one third the weight, let alone half the age.  The argument is rejected that the thirty plus injuries discussed herein could have been inflicted by any "means with usual ordinary caution."

It has been suggested, and rejected by the jury listening intently to the testimony, that Lionel Tate could not appreciate what he was doing, that, in so many words, he could not and did not realize he was inflicting pain severe enough to result in death.  But when a child years younger than Lionel Tate, accidentally hurts another, the child is cognizant enough of his or her actions to say "I'm sorry" and stop the offensive behavior.

Tiffany Eunick either had to cry out in major pain, a crying out that fell on Lionel Tate's deaf ears, or Tiffany Eunick was mercifully unconscious, a situation belied by Lionel Tate's reenactment. If the child was crying out, then further acts of Lionel Tate could not have been done with usual ordinary caution; the same can be said if Tiffany Eunick was unconscious.

Perhaps, and only perhaps, the first or second or even the third blow was inflicted, "by accident and misfortune in doing (a) lawful act by lawful means with usual ordinary caution," but that cannot explain the remaining number of significant and fatal injuries.

It was shown, without dispute, that Lionel Tate was a fan of professional wrestling. Perhaps, even zealous in his love for this type of "entertainment". But the facts of which the jury relied are deceptively simple in rejecting the involvement of professional wrestling replication; thus, by necessary implication, accident:

1. In the two statements to the police, Lionel Tate's own words failed to indicate that wrestling played any part in Tiffany's brutal murder. The statements did not come close to explaining what happened in that townhouse.

2. In statements made to EMS and the police by the defendant's mother, neither accident nor wrestling played any part in Tiffany's fatality.

Not until there was a defense-initiated reenactment did actions initiating professional wrestling start to emerge as a defense. This reenactment totally failed to explain to the jury during trial, and to this judge sitting as a thirteenth juror in the motion for new trial/reduction of charge, the extent and severity of the injuries to Tiffany Eunick. Even though the reenactment depicted a connection to professional wrestling, the testimony of Dr. Brannon shows that Lionel Tate disbelieved the authenticity of what he saw on television. The reenactment in all due respect, seemed to be trying to fit the facts, rather than a true depiction of the events.

Accordingly, the jury obviously then, and this court now, did not and does not accept that replicating what may or may not have been seen in various televised wrestling shows as a reason to call Lionel Tate's actions "accidental."

It should be noted that not only did the state's witnesses eliminate the possibility of accident, but the defense's own expert, Dr. John Marraccini, negated the argument of accident. Dr. Marraccini, in response to Mr. Padowitz's question affirmatively and reluctantly dispelled the notion of accident.

<u>State of Florida v. Lionel Tate</u>
Sentencing Order
Page 14 of 18

In analyzing the sufficiency of the evidence, I must reflect upon the in excess of thirty separate injuries, and determining whether they could have been inflicted accidentally: If the court finds that they were inflicted accidentally, then the court would be clearly bound to hold that Excusable Homicide as defined above was proven, and dismiss the charge or reduce it. These injuries were shown in vivid detail to the twelve jurors. They included:

- extensive and multiple lacerations of the liver
- a piece of the liver floating in the abdomen having been severed by extraordinary force
- a rib fracture
- a fracture to the skull
- brain swelling
- internal injuries, including a neck hemorrhage

And, tragically, many more.

It is inconceivable that such injuries, could be caused by "roughhousing," "horseplay" or by replicating professional wrestling moves. The number and seriousness of many of the injuries prove the state's case. This was not a death that should be classified as Excusable Homicide. It matters not which injury occurred in what order as to the ultimate culpability of Lionel Tate. But what is important, as to the timing of the injuries, is the severity of the two major injuries according to Dr. Flannagan and Dr. Kirschner. If one was to assume that the initial injury to Tiffany Eunick was the blow to the head, as depicted in the Klass reenactment, then the abdominal injuries which followed had to be a horrific stomping by foot or knee, or both on an unconscious little girl. And because of the nature of the injuries to the abdomen, Tiffany Eunick had either to be prone on the ground, or held up in a vertical position. If one assumes the blows to the abdomen preceded the others, then the injuries to the head and brain had to be caused in a way similar to swinging a limp object like a rag doll into the stair rails. Either way, the injuries could not be considered "accidental". In this court's opinion, an accidental infliction of the injuries is totally inconsistent with the testimony and with logic. Those not present in court who defend the actions of Lionel Tate as accidental simply did not see or hear the evidence of guilt.

With the concept of accident being rejected, the court must decide whether these injuries sustain the elements of Aggravated Child Abuse.

Aggravated Child Abuse occurs when the defendant commits Aggravated Battery, and death results; or commits Child Abuse, and death results. The difference between the two is that in the Aggravated Battery component, the defendant must have acted *intentionally* and *intended* to cause great bodily harm, permanent disability or permanent disfigurement (and if death results, felony murder by Aggravated Child Abuse). In the case of Child Abuse, the defendant must *knowingly* or *willfully* inflict physical injury which results in great bodily harm, permanent disability or permanent disfigurement **or** do an act *intentionally* that could reasonably be expected to result in physical injury to a child.

There is an element of intent in both subsections. Whether or not Lionel Tate had the requisite intent to commit Aggravated Battery or knowingly or willfully commit Child Abuse was presented to the jury, and the jury so found that he did. Lay and expert testimony as to the issue of Lionel Tate's maturity and by implication his ability to intend an act was admitted over the state's objection. A special jury instruction as to maturity level was given, over state's objection. The jury, through its verdict, has stated its findings as the trier of the facts.

The government relied more heavily on the Child Abuse component rather than the Aggravated Battery section. To say that Lionel Tate did not commit Child Abuse would be stating that he did not knowingly **or** willfully inflict physical injury. Note that the statue does not require that Lionel Tate knowingly **and** willfully inflict physical injury; either would suffice. Lionel Tate, even if one believes he may not have willfully inflicted physical injury, had to knowingly do so.

Additionally, the child abuse statute in the alternative states that Lionel Tate did an act intentionally. This is not in issue, in this court's mind. If that act or acts could reasonably be

State of Florida v. Lionel Tate
Sentencing Order
Page 16 of 18

expected to result in physical injury, then the charge is proved. Once again, the numbers and severity of the injuries prove these elements.

This judge has been asked to follow the example set by the Honorable Hiller B. Zobel, in the so-called "British Nanny" case; **Massachusetts v. Woodward**. It is unnecessary to state the facts of that case, other than what is necessary to further our analysis. On February, 1997, eight month old Matthew Eappen died of severe head injury; on March 5, 1997, a grand jury indicted nanny Louise Woodward for Murder in the First Degree. On October 30, 1997, the jury returned a guilty verdict of Murder in the Second Degree; the judge imposed a mandatory life sentence on Ms. Woodward. On November 10, 1997, Judge Zobel reduced the jury verdict from Murder in the Second Degree to Involuntary Manslaughter.

Judge Zobel rejected the granting of a new trial. To quote his words, applicable in all respects to this case;

> Thus a verdict of Guilty could not properly result from the jury's merely rejecting the defense's physiological explanation as inadequate or Defendant's version of the events as implausible. The jury could return a Guilty verdict only, if, in addition to an adverse assessment of the defense position, the jurors concluded, on all the evidence, that the prosecution's version was true, beyond a reasonable doubt.

In denying a new trial, Judge Zobel chose to reduce the charge. He did so by invoking a rule in the Commonwealth that does not have a corollary in Florida. Mass.R.Crim.P. 25(b)(2), 378 Mass. 896 (1979) reads:

> If a verdict of guilty is returned, the judge may on motion...order the entry of a finding of guilty of any offense included in the offense charged in the indictment.

In short, under Massachusetts law, the court may reduce the level of the conviction for any reason that justice may require.

If the Florida legislature in the future chooses to incorporate such a procedure in the Rules of Criminal Procedure, then, and only then, can the court embrace its concept. But until that time arrives, if ever, the singular and only ground for reduction has been discussed above.

It is requested by the defense for this court to find that the jury's verdict was contrary to the manifest weight of the evidence. This I decline to do. The evidence of Lionel Tate's guilt is clear, obvious and indisputable. And that evidence supports the jury's verdict. To find otherwise would be to invalidate each juror's decision in unanimously finding for a verdict of guilt.

### III. Ruling and Sentence

In the proceeding pages, the court has rejected the defendant's Motions for a New Trial. There are no grounds which exist permitting the court to so act.

In the proceeding pages, the court has rejected the defendant's motion to reduce the charge to Murder in the Second Degree or Manslaughter. There are no grounds which exist permitting the court to so act.

I am moved by the outpouring of concern for Lionel Tate. At the same time I am dismayed by the lack of concern for the child victimized by Lionel Tate. It is obvious that Tiffany Eunick will never have a second chance at life, and there are so many who plead for a second chance for the defendant.

Only those who sat through the days of testimony can appreciate the nature of the acts of Lionel Tate.

State of Florida v. Lionel Tate
Sentencing Order
Page 18 of 18

Only those who viewed the physical evidence can appreciate the gravity of the offense.  To embrace the concept of accident one would have to ignore in its totality what was presented and accepted by the jurors.

The acts of Lionel Tate were not the playful acts of a child.  The acts of Lionel Tate were not the acts borne out of immaturity.  The acts of Lionel Tate were cold, callous and indescribably cruel.

It is therefore the sentence of the court, in accordance with the laws of the State of Florida, that you, Lionel Tate, having been found guilty of Murder in the First Degree in the death of Tiffany Eunick, be sentenced to incarceration for your natural life.

DONE AND ORDERED this _____ day of **March, 2001**, in Open Court, Fort Lauderdale, Broward County, Florida.

JUDGE JOEL T. LAZARUS

Copies furnished:

Ken Padowitz, Esquire
Assistant State Attorney

James S. Lewis, Esquire
Attorney for Defendant

Richard L. Rosenbaum, Esquire
Attorney for Defendant

Received Time    Mar. 9. 1:32PM        Print Time    Mar. 9. 1:40PM

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

WORLD WRESTLING FEDERATION
ENTERTAINMENT, INC., a Delaware
corporation,

               Plaintiff,                              CASE NO.  00-CIV-8616 (DC)
                                                   (Southern District of New York)

vs.

L. BRENT BOZELL, III, an individual;            CASE NO. 01-7913-CIV-HURLEY
MEDIA RESEARCH CENTER, INC.,                 Magistrate Lynch
a Virginia non-profit corporation,
d/b/a Parents Television Council;
PARENTS TELEVISION COUNCIL, INC.,
a Delaware non-profit corporation;
JAMES LEWIS, an individual; MARK
HONIG, an individual; CYNTHIA
DELORES TUCKER, an individual; and
Various John and Jane Does,

               Defendants.

_____/

## ORDER

     AND NOW, this ___ day of _____, 2002, upon consideration of the foregoing Motion to Compel and Incorporated Memorandum of Law, it is hereby ORDERED that the Motion is GRANTED.  It is FURTHER ORDERED that, within seven (7) days from the date of this Order, Joel Klass, M.D. produce documents responsive to the subpoena duces tecum served upon him on January 15, 2002, and that he pay the attorney's fees of World Wrestling Federation Entertainment, Inc. which were incurred in connection with the Motion to Compel.

                                                           _____

                                                  United States District Judge

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Motion to Compel and Incorporated Memorandum of Law was served this ___ day of February, 2002, via First-Class U.S. Mail upon the following:

> Joel Klass, M.D.
> 4700 G Sheridan Street
> Hollywood, Florida  33021-3416
>
> Thomas A. Leghorn, Esquire
> Wilson, Elser, Moskowitz, Edelman & Dicker LLP
> 150 East 42nd Street
> New York, New York  10017-5639
>
> Robert C. Buschel, Esquire
> Buschel, Carter, Schwartzreich & Yates
> The West Wing
> 201 S.E. 8th Street
> Fort Lauderdale, FL   33316
>
> Robert R. Sparks, Jr., Esquire
> Herge, Sparks & Christopher, LLP
> 6862 Elm Street, Suite 360
> McLean, VA  22101

_____
Daniel A. Casey

2000 WL 1538003
(Cite as: 2000 WL 1538003 (S.D.N.Y.))
▷

Page 1

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

**A.I.A. HOLDINGS, S.A., et al., Plaintiffs,**
v.
**LEHMAN BROTHERS, INC. and BEAR STEARNS & CO., INC., Defendants.**

No. 97CIV4978(LMM)(HBP).

Oct. 17, 2000.

Peter N. Wang, Esq., Friedman, Wang & Bleiberg, P.C., New York.

K. Chris Todd, Esq., Kellogg Huber Hansen Todd & Evans P.L.L.C., Washington, D.C.

Jayant W. Tambe, Esq., Jones, Day, Reavis & Pogue, New York.

Robert W. Gaffey, Esq., Layton, Brooks & Hecht, New York.

Stephen L. Ratner, Esq., Rosenman & Colin, LLP, New York.

MEMORANDUM OPINION AND ORDER

PITMAN, Magistrate J.

**\*1** Currently pending are (1) plaintiffs' motion to compel defendants to produce (a) information concerning complaints against introducing brokers other than Daouk and his affiliated entities and (b) a May 17, 1995 audio tape that is being withheld on the basis of the work-product privilege and (2) Bear Stearns' motion for a protective order precluding the deposition of its chairman, Alan C. Greenberg. For the reasons set forth below, plaintiffs' motion is denied in part and granted in part. Bear Stearns' motion is denied.

*A. Introducing Broker Information*

Plaintiffs seek to compel defendants to answer the following interrogatory and document request concerning introducing brokers:

Identify any communication, whether oral or written, between [defendant] and any [self

regulatory organization], state, or federal regulatory organization regarding any complaints or inquiries concerning, referring or relating to [your] introducing brokers or entities alleged to be [your] introducing brokers; and identify for each such communication, the person(s) involved, and the date, place and content of the communication.

* * *

[Produce] [a]ll documents concerning, referring or relating to any warnings, complaints, reprimands, questionnaires, requests, compliance inquiries, or citations issued by any [self regulatory organization], federal, or state regulatory authority to [you], concerning or regarding [your] introducing brokers, including [your] response thereto.
(Letter of Antonia Apps, Esq., dated June 9, 2000, tab 1 at 2 and 4, tab 2 at 2 and 4). Plaintiffs contend that the information sought may constitute relevant "similar act" evidence. Defendants contend that the information sought is irrelevant and that even if it does have some relevance, the burden of compiling and producing the information outweighs any potential relevance that it may have.

An introducing broker is a securities or commodities broker that uses the services of another broker, usually referred to as a clearing broker, to execute and process securities and/or commodities transactions. *See generally Greenberg v. Bear, Stearns & Co.,* 220 F.3d 22, 29 (2d Cir.2000); *Gilman v. BHC Sec., Inc.,* 104 F.3d 1418, 1423 (2d Cir.1997); *Katz v. Financial Clearing & Servs. Corp.,* 794 F.Supp. 88, 90 (S.D.N.Y.1992); *Stander v. Financial Clearing & Servs. Corp.,* 730 F.Supp. 1282, 1285 (S.D.N.Y.1990). At oral argument, defendants represented that they have had relationships with several hundred introducing brokers and that complaints concerning introducing brokers are maintained only in the files of the complaining customer. Thus, in order to compile the complaints regarding introducing brokers, a search would have to be made of the files of all the customers of all the introducing brokers.

Although defendants' handling of complaints concerning introducing brokers *may* have some probative value, I conclude that the burden and expense of retrieving complaints against clearing brokers other than Daouk and his affiliated entities

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___A___

outweighs the likely benefit of the information. Based on the representations of defendants' counsel, it appears that defendants have had relationships with a large number of introducing brokers in many parts of the world. Presumably, the relationships of each of these introducing brokers with their customers are subject to local regulation or local custom and practice. Given this variety, complaints about an introducing broker in one jurisdiction may have little to do with an introducing broker in another jurisdiction. The relevance of the information sought is further attenuated by the fact that the request is unlimited in time and seeks information concerning complaints made both before and after May 1995. Finally, the relevance of the information sought is still further attenuated by the fact that the discovery requests do not seek proven instances of misconduct by introducing brokers, but rather mere complaints which may or may not have merit. Although the scope of relevance is extremely broad for discovery purposes, *see generally Daval Steel Prods. v. M/V Fakredine,* 951 F.2d 1357, 1367 (2d Cir.1991), the burden of recovering the information would be great and it appears that its potential probative value would be *de minimis.* Accordingly, I conclude that the potential relevance of the complaints concerning introducing brokers other than Daouk and his affiliated entities is substantially outweighed by the burden of compiling this information, and the motion to compel production of this information is denied. *See Food Lion, Inc. v. United Food & Commercial Workers Int'l Union,* 103 F.3d 1007, 10012-13 (D.C.Cir.1997); *Lemanik, S.A. v. McKinley Allsopp, Inc.,* 125 F.R.D. 602, 608 (S.D.N.Y.1989)

**B. May 17, 1995** *Audio Tape*

**\*2** Plaintiffs next seek to compel production of an audio tape being withheld by Bear Stearns on the basis of the work-product doctrine. The only information provided by Bear Stearns concerning the tape is the date on which it was recorded, the claim that it is a "[c]onversation in anticipation of litigation" and that the work-product doctrine is being asserted (Letter of Antonia Apps, Esq ., dated June 9, 2000, tab 7).

Fed.R.Civ.P. 26(b)(5) provides:
When a party withholds information otherwise discoverable under these rules by claiming that it

is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.
Rule 26(b)(5) is supplemented by Local Civil Rule 26.2, which provides:
(a) Where a claim of privilege is asserted in objecting to any means of discovery or disclosure, ... and an answer is not provided on the basis of such assertion,
(1) the attorney asserting the privilege shall identify the nature of the privilege (including work product) which is being claimed ...; and
(2) the following information shall be provided in the objection, unless divulgence of such information would cause disclosure of the allegedly privileged information:
(A) for documents: (i) the type of document; e.g., letter or memorandum; (ii) the general subject matter of the document; (iii) the date of the document; and (iv) such other information as is sufficient to identify the document for a subpoena *duces tecum,* including, where appropriate, the author of the document, the addressees of the document, and any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other;
(B) for oral communications: (i) the name of the person making the communication and the names of persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of the communication; and (iii) the general subject matter of the communication.
In order to satisfy these requirements, an index of documents withheld on the ground of privilege must, "as to each document, ... set[ ] forth specific facts that, if credited, would suffice to establish each element of the privilege or immunity that is claimed." *Golden Trade, S.r.L. v. Lee Apparel Co.,* 90 Civ. 6291(JMC), 1992 WL 367070 at *5 (S.D.N.Y. Nov. 20, 1992). *See also Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc.,* 707 F.Supp. 1429, 1439 (D.Del.1989) ("[A] party asserting work product protection must 'identify the withheld documents with sufficient particularity that

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the opposing counsel can intelligently argue that the privilege ought not to apply." '). *quoting Petz v. Ethan Allen, Inc.,* 113 F.R.D. 494, 497 (D.Conn.1985).

*3 Judged by these standards, Bear Stearns' description of the basis for the assertion of work product protection is inadequate. Neither the parties to nor the subject matter of the conversation are identified in any way. Rather, in describing the subject matter of the recording, the index listing merely states the definition of work product with no elaboration whatsoever. Since the definition of work product is implicit in Bear Stearns' assertion of work product, the description of the audio tape offered by Bear Stearns effectively provides no information at all and seems to have been designed with an intent to obfuscate rather than to illuminate.

Having concluded that Bear Stearns' index listing of the tape recording is deficient, the next issue is what consequence should result. On the facts of this case, I find that it is appropriate to conclude that Bear Stearns has waived whatever claim of work product it may have otherwise had. This is not a case where the record suggests that a good faith attempt was made to assert work product and that the index approaches, but does not quite meet, the requisite standard. The dearth of information in the index listing is so complete that the listing is the functional equivalent of no listing at all. *See Willemijn Houdstermaatschaapij BV v. Apollo Computer Inc., supra,* 707 F.Supp. at 1440 ("Because defendant's responses claiming the privilege are evasive and incomplete, they are the equivalent of a failure to answer for the purposes of a motion to compel."). Where a party has completely failed to provide an index of documents withheld on the ground of privilege, a finding of waiver is appropriate. *Hurst v. F.W. Woolworth Co.,* 95 Civ. 6584(CSH), 1997 WL 61051 at *6 (S.D.N.Y. Feb. 11, 1997); *John Labatt Ltd. v. Molson Breweries,* 93 Civ. 75004, 94 Civ. 71540(RPP), 1995 WL 23603 at *1 (S.D.N.Y. Jan. 20, 1995), *appeal transferred sub nom., Dorf & Stanton Communications, Inc. v. Molson Breweries,* 56 F.3d 13 (2d Cir.1995), *aff'd,* 100 F.3d 919 (Fed.Cir.1996); *Smith v. Conway Org., Inc.,* 154 F.R.D. 73, 76 (S.D.N.Y.1994); *Allstate Life Ins. Co. v. First Trust, N.A.,* 92 Civ. 4865 (SWK), 1993 WL 138844 at *3 (S.D.N.Y. Apr. 27, 1993); *Bank v. Manufacturers Hanover Trust Co.,* 89 Civ. 2946(MJL), 1990 WL 155591 at *2 (S.D.N.Y. Oct.

9, 1990); *Carte Blanche (Singapore) PTE., Ltd. v. Diners Club Int'l, Inc.,* 130 F.R.D. 28, 32 (S.D.N.Y.1990); *Jackson v. Edwards,* 99 Civ. 0982(JSR) (HBP), 2000 WL 782947 at *2 (S.D.N.Y. June 16, 2000); *Large v. Our Lady of Mercy Medical Center,* 94 Civ. 5986(JGK)(THK), 1998 WL 65995 at *4 (S.D.N.Y. Feb. 17, 1998); *PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp.,* 93 Civ. 5375(SAS)(HBP), 1996 WL 525862 at *3-*4 (S.D.N.Y. Sept. 17, 1996). [FN1] Since Bear Stearns' index listing concerning this audio tape is the equivalent of no listing at all, the consequence should be the same as if there had been a total failure to list the tape on the index of documents withheld on the ground of privilege.

> FN1. Although there is authority reaching a contrary result and limiting the remedy to the belated preparation of the index of withheld documents, I do not find those cases persuasive. "Limiting the remedy to the belated preparation of a privilege log effectively tells practitioners they can flout the Court's Rules and incur no sanction other than an Order directing compliance with the rules." *PKFinans Int'l Corp. v. IBJ Schroder Leasing Corp., supra,* 1996 WL 525862 at *4. *See* 2 Michael C. Silberberg, *Civil Practice in the Southern District of New York* § 22.11 at 22-28 (2d ed. 2000) ("[T]he cases imposing waiver appear to express the better view of the appropriate remedy in the event a party fails to timely provide the privilege list.").

*4 Accordingly, within ten (10) days of the date of this Order, Bear Stearns shall produce a copy of the May 17, 1995 audio tape to counsel for plaintiffs.

## C. Greenberg Deposition

Finally, Bear Stearns seeks a protective order precluding the deposition of its chairman Alan C. Greenberg. At a conference on September 1, 2000, plaintiffs claimed that it was appropriate to take Greenberg's deposition because a May 1995 Memorandum by Ron Hersch, the director of Bear Stearns' futures department, indicates that Greenberg himself made inquiry of Hersch in 1995 concerning one of Daouk's affiliated entities. Plaintiffs also argued that it is appropriate to depose Greenberg because two of the plaintiffs (Debs and Baalbaki) claim to have had some direct contact with Greenberg concerning the subject matter of this action. Greenberg has submitted an affidavit in

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

which he claims to have no recollection of any of the facts underlying this litigation, the subject matter of the Hersch memorandum and the alleged contacts with Debs and Baalbaki.

As I noted in *Holman v. ICN Pharmaceuticals, Inc.*, 98 Civ. 0674(AKH)(HBP), 1999 WL 1267459 at *1 (S.D.N.Y. Dec. 29, 1999):

"[A]n order to vacate a notice of taking [a deposition] is generally regarded as both unusual and unfavorable ...." *Investment Properties Int'l, Ltd. v. IOS, Ltd.*, 459 F.2d 705, 708 (2d Cir.1972). *Accord Speadmark, Inc. v. Federated Dep't Stores, Inc.*, 176 F.R.D. 116, 118 (S.D.N.Y.1997); *Naftchi v. New York Univ. Med. Ctr.*, 172 F.R.D. 130, 132 (S.D.N.Y.1997); *Arkwright Mut. Ins. Co. v. National Union Fire Ins. Co.*, 90 Civ. 7811(KC), 1993 WL 34678 at *2 (S.D.N.Y. Feb. 4, 1993); *Polycast Tech. Corp. v. Uniroyal, Inc.*, 87 Civ. 3297(CSH), 1990 WL 138968 at *3 (S.D.N.Y. Sept. 20, 1990). Although there is serious reason to doubt (1) whether [conducting the deposition in issue] will advance discovery on the case, and (2) whether taking [the deposition in issue] in California is the most prudent and economical way for an individual plaintiff to spend his litigation budget, I cannot conclude that [the witness in issue] is so completely without knowledge that his deposition should be precluded altogether .... In addition, the fact that [the witness] may have no personal knowledge of the [events in issue] and knows only what he was told by others does not affect the appropriateness of taking his deposition. *Naftchi v. New York Univ. Med. Ctr., supra,* 172 F.R.D. at 132-33. Even hearsay is fair ground in discovery. *See Litton Systems, Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 827 (2d Cir.1983). Moreover, [the witness's] testimony concerning the statements made to him by [defendant's] employees may well be admissible against [defendant] as admission testimony. Fed.R.Evid. 801(d)(2).

Although I have no reason to doubt the veracity of Greenberg's Affidavit, the Hersch memo supports an inference that, at least in 1995, Greenberg had actually considered at least some of the allegations that gave rise to this action and participated in internal discussions of those alleged facts. Defendants have cited no authority demonstrating

that plaintiffs are not entitled to an opportunity to refresh Greenberg's memory with respect to these events.

*5 Accordingly, no later than twenty (20) days from the date of this Order, Bear Stearns shall make Greenberg available for deposition by plaintiffs' counsel. It is, however, appropriate that guidelines be set to ensure that Greenberg's deposition is not used as an opportunity for harassment. Accordingly, unless Greenberg's testimony reveals that he has discoverable information relevant to this action, his deposition is limited to two (2) hours. In addition, unless Greenberg's testimony reveals that he has other discoverable information relevant to this action, the subject matter of the deposition shall be limited to the May 1995 Hersch memo and his putative contact with the plaintiffs Debs and Baalbaki. Plaintiffs shall start the deposition by questioning Greenberg concerning these subjects. Plaintiffs are not to start the deposition with background questions since such information has no relevance if Greenberg currently has no knowledge concerning the subject matter of this action. If Greenberg has no recollection of the May 1995 Hersch memo and his putative contact with the plaintiffs Debs and Baalbaki, and reasonable attempts to refresh his recollection concerning these subjects are unsuccessful, the deposition shall terminate. Counsel are again reminded that I accept telephonic applications for both protective orders and orders to compel in the event the deposition does not proceed amicably.

D. *Summary*

Accordingly, for all the foregoing reasons, (1) plaintiffs' application to compel responses to interrogatories and document requests concerning introducing brokers is denied; (2) Bear Stearns is directed to produce the May 17, 1995 audio tape to counsel for plaintiffs within ten (10) days of the date of this Order, and (3) Bear Stearns is directed to produce Alan C. Greenberg for deposition within twenty (20) days of the date of this Order.

SO ORDERED

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

100 F.3d 919                                                                                                    **Page 5**
36 Fed.R.Serv.3d 720, 40 U.S.P.Q.2d 1761
**(Cite as: 100 F.3d 919)**
▷

United States Court of Appeals,
Federal Circuit.

**DORF & STANTON COMMUNICATIONS,**
**INC. and Hill, Holliday, Connors, Cosmopulous,**
**Inc., Third-Party Respondents/Appellants,**
**and**
**John Labatt Limited, Labatt Brewing Company**
**Limited, Labatt's USA Inc., and**
**Labatt Importers, Inc., Plaintiffs,**
**v.**
**MOLSON BREWERIES, Molson Breweries**
**U.S.A. Inc., Miller Brewing Co., Martlett**
**Importing Co., and Molson Breweries of Canada**
**Ltd., Defendants-Appellees.**

**No. 95-1374.**

Nov. 8, 1996.
Rehearing Denied; Suggestion for Rehearing In
Banc Declined Jan. 10, 1997.

Beer company brought trademark and patent
infringement action against competitor, which
sought to compel discovery of documents from
public relations firm employed by beer company.
The United States District Court for the Southern
District of New York, Robert P. Patterson, Jr., J.,
1995 WL 23603, granted motion, and firm
appealed.   After appeal was transferred by the
Court of Appeals for the Second Circuit, 56 F.3d
13, the Court of Appeals, Rich, Circuit Judge, held
that: (1) finding that firm had failed to establish that
notes taken at meetings by its employees were
protected by attorney-client privilege was not abuse
of discretion, and (2) privilege had been waived.

Affirmed.

Pauline Newman, Circuit Judge, dissented and filed
opinion.

West Headnotes

**[1] Courts ⟨key⟩96(7)**
106k96(7)

Court of Appeals for the Federal Circuit applied law
of the Second Circuit in reviewing order of federal
district court in New York which required nonparty

to patent infringement action to produce certain
documents that nonparty asserted were protected by
attorney-client privilege.

**[2] Federal Civil Procedure ⟨key⟩1267.1**
170Ak1267.1

**[2] Federal Courts ⟨key⟩820**
170Bk820

Under Second Circuit law, trial court enjoys wide
discretion in its handling of pretrial discovery, and
its rulings with regard to discovery are reversed
only upon clear showing of abuse of discretion.

**[3] Patents ⟨key⟩292.4**
291k292.4

Under Second Circuit law, determination by district
court that handwritten notes made by public relations
firm which was employed by brewery which had
brought patent infringement action were not
protected from discovery in patent action by
attorney-client privilege was not abuse of discretion;
firm had multiple opportunities to bolster its claimed
privilege, but failed to comply with requirements of
valid local rule and failed to use its best efforts to
cure problems created by its failure to properly
assert privilege earlier until it was too late.

**[4] Federal Courts ⟨key⟩824**
170Bk824

Under Second Circuit law, district court's finding
that defendant has waived attorney-client privilege is
reviewed under abuse of discretion standard.

**[5] Witnesses ⟨key⟩219(3)**
410k219(3)

Under Second Circuit law, failure of public relations
firm employed by brewery which had brought patent
infringement action to provide complete privilege
log demonstrating sufficient grounds for assertion of
attorney-client privilege with respect to handwritten
notes of its employees constituted waiver of
privilege with respect to notes in patent action.
***920** Roger W. Wenthe, McDermott, Will &
Emery, Chicago, IL, argued, for third-party
respondents/appellants.   With him on the brief was

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

EXHIBIT ___B___

100 F.3d 919                                                         **Page 6**
**(Cite as: 100 F.3d 919, \*920)**

Byron L. Gregory.

Ethan Horwitz, Darby & Darby P.C., New York
City, argued, for defendants- appellees.   With him
on the brief were Ira Jay Levy, Amy J. Benjamin,
and Eric A. Prager.

Before RICH, NEWMAN, and CLEVENGER,
Circuit Judges.

Opinion for the court filed by Circuit Judge RICH.
Dissenting   opinion   filed   by   Circuit   Judge
NEWMAN.

RICH, Circuit Judge.

Dorf & Stanton Communications, Inc. (Dorf &
Stanton), the public relations firm for Labatt's USA,
Inc., appeals from the 19 January 1995 Order of the
United States District Court for the Southern District
of New York in M- 885, requiring Dorf & Stanton
to produce certain documents that it asserts are
protected by the attorney-client privilege.   1995
U.S. Dist. LEXIS 507, 1995 WL 23603 (S.D.N.Y.
19 January 1995).   We *affirm.*

## I
## BACKGROUND

This case originated when Molson Breweries,
Molson Breweries USA, Inc., Miller Brewing Co.,
Martlet Importing Co., and Molson Breweries of
Canada, Ltd. (collectively Miller) filed a motion in
the Southern District of New York, where Dorf &
Stanton is located, to compel the production of
"certain documents" by Dorf & Stanton.   In this
appeal, we must decide whether the district court
abused its discretion when it held that Dorf &
Stanton failed to establish that the documents are
protected by the attorney-client privilege and
ordered Dorf & Stanton to produce them.

**\*921** The documents consist of notes taken by three
Dorf & Stanton employees during a 9 May 1994
meeting attended by the following people:
  James Emmerton, General Counsel of John Labatt
  Limited;
  Bernard Beasley, the Intellectual Property Officer
  of John Labatt Limited;
  Rick Skawinski, Legal Compliance Officer of
  Labatt's USA, Inc.;
  Steven Hauser, Brand Manager of Labatt's USA,

  Inc.;
  Judy Cunningham, Brand Manager of Labatt's
  USA, Inc.;
  Alex Stanton, the President of Dorf & Stanton;
  Jock Soper of Dorf & Stanton;
  Beth Jabick, Account Supervisor of Dorf &
  Stanton; and
  Various   employees   of   Hill   Holliday   Connors
  Cosmopoulos Advertising, Inc.

The documents are ostensibly relevant to two
ongoing lawsuits, which have been consolidated for
discovery, between Labatt's and Miller pending in
the United States District Court for the Eastern
District of Michigan.   Dorf & Stanton is not a party
in either Michigan lawsuit.

At the hearing before the Federal Circuit, the panel
requested the documents from Dorf & Stanton's
attorneys and deferred action on the appeal.   After
several months of discussions with the Second
Circuit, the district court, and the attorneys, the
Chief Deputy Clerk of the Southern District of New
York sent 114 pages of material to us.   After sifting
through that material, we have determined that three
documents, totaling 13 pages, are at issue.   Miller,
however, mentions "four documents" at various
places in its brief, but its confusion undoubtedly
stems from changes that Dorf & Stanton made to the
description of a single document between two
versions of its privilege log, as discussed further
below.   Miller, not having the benefit of seeing this
document, is counting it twice.   We are confident
that Miller wants unredacted copies of the
handwritten notes taken by the three Dorf & Stanton
employees who attended the 9 May 1994 meeting.

The appendices to this opinion includes two
privilege logs.   Log 1 is a copy of Dorf & Stanton's
original privilege log at issue in Miller's motion to
compel.   Log 2 is a more recent, expanded version
of original Log 1.   We have added letters to the left
edge of each log to be able to readily identify key
documents in this opinion.

Looking first at Log 1, documents (a), (b), (d), and
(A) are the original four documents that Miller
wanted produced.   In response to Miller's motion to
compel production of these documents, Judge
Patterson of the Southern District of New York held
a hearing on 22 November 1994.   At the hearing,
Judge Patterson offered to review the four

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

documents in camera. Dorf & Stanton, however, had failed to bring the four documents to the hearing. Nevertheless, from his review of Log 1, the judge concluded that he did not need to see the documents to order them produced, stating, "From what 1 saw [Log 1] they were not entitled to privilege, period."

In accordance with Judge Patterson's 22 November Order, Dorf & Stanton produced documents (a), (b), and (d). It did not, however, produce document (A), which relates to the 9 May 1994 meeting. Instead, it filed a motion for modification of the 22 November 1994 Order to shield document (A) from production. In motion papers, Dorf & Stanton not only tried to justify withholding document (A) as privileged, but also wanted the court to go further and hold that documents (B) and (C) (see Log 2), which were not involved in the 22 November hearing and which were not listed on Log 1, but which relate to the same 9 May meeting, are also privileged. Documents (A), (B), and (C) are the handwritten notes taken by Alex Stanton, Jock Soper, and Beth Jabick, respectively, during that meeting. Apparently, while scrutinizing the four documents that Judge Patterson had ordered it to produce, Dorf & Stanton first realized the connection between documents (A), (B), and (C). Dorf & Stanton had previously produced documents (B) and (C) in redacted form several weeks before Miller filed its motion to compel production of the documents in Log 1.

On 8 December 1994, Miller received Log 2 from Dorf & Stanton. Log 2 includes *922 documents (A), (B), and (C), as well as six other documents not on original Log 1. It thus includes eight new documents and does not include the three documents Dorf & Stanton produced in response to Judge Patterson's 22 November Order (i.e., (a), (b), and (d)).

With its motion for modification of the 22 November 1994 Order, Dorf & Stanton gave documents (A), (B), and (C) to the district court under seal; this was the first time the court had actually seen any of these documents. In its memorandum supporting its motion, Dorf & Stanton made the following claim:

On grounds of privilege, [Dorf & Stanton] withheld from production all of the notes taken by all of its employees who attended the May 9

meeting: Alex Stanton, Beth Jabick, and Jock Soper.... However, Miller objected only to withholding Mr. Stanton's notes [document (A) ], not those of Ms. Jabick [document (C) ] or Mr. Soper [document (B) ].... [Dorf & Stanton] has provided the Court, under seal, copies of the unredacted versions of Ms. Jabick's and Mr. Soper's notes to demonstrate that all three sets of notes are privileged, and none should be produced.

On 4 January 1995, the district court conducted a hearing on Dorf & Stanton's motion for modification. In its resulting 19 January 1995 decision, the district court stated that it adhered to its original order. 1995 U.S. Dist. LEXIS, *4, 1995 WL 23603, *2. Part of the court's rationale for doing so included the following:

[Dorf & Stanton] still [has] not established that the privilege ever existed as to any of the documents sought to be protected.... There has been no showing that [Dorf & Stanton was] seeking legal advice at the [9 May] meeting. [[ [FN1]] ... The documents themselves do not indicate either the seeking of legal advice or the confidentiality of their contents.

FN1. It is clear from the Dorf & Stanton affidavits submitted with the documents under seal that Labatt's USA, Inc. organized the meeting, not Dorf & Stanton.

Id. at *3-*4, 1995 WL 23603 at *1 (footnote added). Somewhat confusingly, however, the district court made reference to documents (B) and (C) when it ordered "the documents submitted under seal ... unsealed for production to [Miller] by January 23, 1994 [sic, 1995]." Id. at *4, 1995 WL 23603 at *2. The "documents submitted under seal" were documents (A), (B), and (C). We conclude, therefore, that Judge Patterson not only adhered to his 22 November 1994 Order to produce document (A), but also expanded that order to include related documents (B) and (C). This view is consistent with the view of Dorf & Stanton's attorneys in their letter of 14 May 1996 to this court. In that letter, an attorney representing Dorf & Stanton described "[t]he three documents most relevant to this appeal." The descriptions correspond to documents (A), (B), and (C).

## II
## STANDARD OF REVIEW

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Dorf & Stanton asserts that, although the normal standard of review regarding discovery is an abuse of discretion standard, the application of the attorney- client privilege presents a mixed question of law and fact, which should be reviewed de novo. Dorf & Stanton also asserts that the Second Circuit must be looked to for the proper standard of review. Miller disagrees with the standard of review asserted by Dorf & Stanton and asserts that the abuse of discretion standard applies.

[1][2] Because an order compelling discovery is not unique to patent law, we agree that Second Circuit law must be considered for the proper standard of review.  Cf. American Standard Inc. v. Pfizer Inc., 828 F.2d 734, 739, 3 USPQ2d 1817, 1819 (Fed.Cir.1987) (regional circuit law applies to orders refusing to compel discovery) (citing Truswal Sys. Corp. v. Hydro-Air Eng'g, Inc., 813 F.2d 1207, 1209, 2 USPQ2d 1034, 1036 (Fed.Cir.1987); Heat & Control, Inc. v. Hester Indus., Inc., 785 F.2d 1017, 1022 n. 4, 228 USPQ 926, 929 n. 4 (Fed.Cir.1986)).  According to the Second Circuit, "A trial court enjoys wide discretion in its handling of pre-trial discovery, and its rulings with regard to discovery are reversed only upon a clear *923 showing of an abuse of discretion."  Cruden v. Bank of New York, 957 F.2d 961, 972 (2d Cir.1992) (citing Robertson v. National Basketball Ass'n, 622 F.2d 34, 35-36 (2d Cir.1980); Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93 (2d Cir.1975)).

### III
### FAILURE TO ESTABLISH PRIVILEGE

[3] We have reviewed documents (A), (B), and (C) and are not convinced that Judge Patterson clearly abused his discretion when he ordered them produced.   In response to Miller's motion to compel production of document (A) and other documents, Dorf & Stanton failed to convince the district court with either its written or oral arguments that document (A) was privileged.   Dorf & Stanton did not even take the documents in Log 1, including document (A), to the first hearing for the judge to review in camera.   Only after being ordered to produce document (A) did Dorf & Stanton scrutinize that document and only after scrutinizing that document did Dorf & Stanton realize that it had treated the production of related documents (B) and (C) differently.   Then, in its

motion for modification of the 22 November Order to produce document (A), Dorf & Stanton finally put forth both its best arguments and evidence for withholding document (A) as privileged and its first clear attempt to shield documents (B) and (C) from production as privileged. The district court was not, however, convinced by Dorf & Stanton's arguments.

Dorf & Stanton thus had multiple opportunities to bolster its claimed privilege in these three documents, but failed to do so.   This is not a case where a party inadvertently omitted documents from its privilege log and is getting "nailed" for its inadvertence.   It also is not a case where a party merely failed to comply with what it asserts are technicalities of a demanding local rule.   Rather, this is a case where a party failed to meet the requirements of a valid local rule, failed to treat related documents consistently, and then failed to use its best efforts to cure the problems created by its first two failures until it was too late, coming in with full throttle only after a crash was imminent.

### IV
### WAIVER OF PRIVILEGE

Judge Patterson's 22 November Order compelled production of document (A) on the ground that Dorf & Stanton had waived its claim to privilege by failing to satisfy Local Civil Rule 46(e) and Rules 45(d)(2) and 26(b)(5) of the Federal Rules of Civil Procedure.   In particular, Dorf & Stanton "fail[ed] to provide a complete privilege log demonstrating sufficient grounds for taking the privilege."  1995 U.S. Dist. LEXIS 507, *1, 1995 WL 23603, *1. At the 4 January 1995 hearing, Dorf & Stanton also sought to protect documents (B) and (C), which it had not listed on Log 1 that had been found legally insufficient to support the claim of privilege.   The district court's 19 January 1995 decision denied reconsideration of the earlier waiver ruling and concluded that the privilege had been similarly waived as to documents (B) and (C).

[4][5] The Second Circuit has held that "[a] district court's finding that a defendant has waived the attorney-client privilege is reviewed under the abuse of discretion standard."  United States v. Bilzerian, 926 F.2d 1285, 1293 (2d Cir.) (citing In re von Bulow, 828 F.2d 94, 101 (2d Cir.1987)), cert. denied, 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).   Since we perceive no error in the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

determination that the privilege has been waived on the facts of this case, we cannot say that the district court abused its discretion in its alternative ground for compelling production of documents (A), (B), and (C) on the grounds of waiver of the privilege.

V

CONCLUSION

We cannot say that the district court clearly abused its discretion in determining after in camera review that Dorf & Stanton's documents are not privileged. Similarly, we cannot say that the district court abused its discretion when it determined that Dorf & Stanton had waived any attorney- client privilege that it may have been able to claim for documents (A), (B), and (C) on attached Log *924 2. We must, therefore, affirm the district court's order of 19 January 1995 for Dorf & Stanton to produce documents (A), (B), and (C).

*AFFIRMED.*

PAULINE NEWMAN, Circuit Judge, dissents.

**\*925 APPENDIX 1 of 2**
LOG 1
< View image 1 on westlaw.com or print it using STP, NOW or FAX. >

**\*926 APPENDIX 2 of 2**
LOG 2
< View image 2 on westlaw.com or print it using STP, NOW or FAX. >

**\*927** PAULINE NEWMAN, Circuit Judge, dissenting.

The Miller Brewing Company served third party subpoenas, returnable in the Southern District of New York, on Dorf & Stanton Communications, Inc. and Hill, Holliday, Connors, Cosmopulous, Inc., the public relations and advertising agents of the Labatt companies. Labatt is engaged in patent and trademark litigation with Miller Brewing and the other appellees, in federal court in Michigan. The subpoenas seek discovery, document production, and testimony related to issues involved in the Michigan litigation.

This appeal concerns a claim of attorney-client privilege for certain records of a meeting among Labatt's lawyers and employees, representatives of Dorf & Stanton, and representatives of Hill, Holliday. The records are handwritten notes taken at the meeting by three Dorf & Stanton principals. Included in the notes are details of the issues in litigation, statements of Labatt's legal strategy in the litigation, legal advice concerning advertising use of the trademarks that are in litigation in view of the litigation positions, legal advice concerning public relations in view of the litigation positions, and other information concerning litigation issues as they relate to the advertising and public relations activities of Dorf & Stanton and Hill, Holliday on behalf of Labatt.

The panel majority holds that these notes and the meeting itself do not warrant the protection of the attorney-client privilege or work product immunity. I can not agree. The information recorded in the notes is directly concerned with litigation issues, is confidential legal advice and litigation information, and was exchanged between Labatt's counsel and agents of Labatt in order to protect Labatt's legal interests. Federal Rule of Civil Procedure 26(b)(3) requires the court to "protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation." The information here at issue involves mental impressions, conclusions, opinions, and legal theories of Labatt's attorneys concerning the ongoing litigation. Thus I respectfully dissent from the panel majority's holding that there is no privilege or that it has been waived or otherwise lost.

*The Agency Relationship*

It is well established that communications between the lawyer and agents of the client, concerning the client's legal interests as necessary and reasonable to the agency function, do not destroy the privileged nature of such communications. Applying Second Circuit law, *see United States v. Kovel,* 296 F.2d 918, 922 (2d Cir.1961) (communications between agent who assists client in his business and client's lawyer is privileged), a client that conducts its business through an agent does not thereby lose the attorney- client privilege for information that is exchanged between the client's attorney and agent. Communications concerning the client's legal and litigation interests as relevant to the agency's

function are no less privileged than if the exchanges were directly between attorney and client. *See U.S. v. Schwimmer,* 892 F.2d 237, 244 (2d Cir.1989) (protection afforded by privilege extends to communications made to agents assisting client or assisting client's attorney); *cf. In re Bieter Co.,* 16 F.3d 929 (8th Cir.1994) (presence of an outside consultant who is intimately involved with the client's business does not waive the privilege when it is clear that the communications with the consultant are for the purpose of legal advice on the client's behalf).

Privilege attaches to communications with agents in part because of their role in the client's ability to act upon and give effect to the legal advice that the privilege encouraged the client to obtain. *See* Paul R. Rice, ATTORNEY-CLIENT PRIVILEGE IN THE UNITED STATES § 5:7 at 334 (1993). Rice explains that agents who communicate with the client's counsel on legal and litigation matters within the scope of their agency represent the confidential interest of the client in such communications. *Id.* Further, the precedent of the Southern District of New York illustrates that the presence of a third-party agent does not destroy the attorney-client privilege. In *H.W. Carter & Sons, Inc. v. The William Carter Co.,* 1995 WL 301351 (S.D.N.Y.1995) the court held that the presence of a public relations consultant did not destroy the privilege.

*928 Thus the attorney-client privilege attaches to confidential communications to which agents are privy because of the client's employment of the agents to conduct the activities having legal and litigation import. The meeting of Labatt's advertising agent and public relations agent with Labatt's attorney, for the purpose of assuring that the agents take legally correct actions on the client's behalf, is fully within the safeguard of the attorney-client privilege.

### *Violation of Local Rule 46(e)*

The panel majority proposed the alternative ground of loss of the privilege based on the respondents' inadequate compliance with the district court's local rule. Again, I respectfully dissent. The procedures followed do not warrant this result.

Miller Brewing served a broad discovery subpoena

on Dorf & Stanton to take depositions of unnamed persons on broad subjects including: "Any work performed by Dorf & Stanton on behalf of Labatt in connection with (a) 'ice beer' including without limitation Labatt Ice; or (b) the Ice Litigation ...;" "Communication plans or publicity plans for (a) 'ice beer' including without limitation Labatt Ice; or (b) the Ice Litigation ...;" press releases, promotions and media tours for Ice Beer and "[a]ny instructions, objectives, or goals provided to Dorf & Stanton by Labatt concerning (a) 'ice beer' including without limitation Labatt Ice; (b) the Ice Litigation; or (c) the use of the term 'ice.' " In sum, the subpoena demanded all documents in Dorf & Stanton's possession relating to the deposition topics, including "the Ice Litigation."

Dorf & Stanton replied to the subpoena within the 14 days set in Fed.R.Civ.P. 45(c)(2)(B), and raised the issues of attorney-client privilege and work-product protection. Subsequently, Dorf & Stanton produced responsive non-privileged documents and filed a brief description of the four documents that had been withheld as privileged. *See* Fed.R.Civ.P. 45(d)(2). Miller Brewing moved to compel production of the documents listed on the first privilege log, without objecting to the description of the privileged documents. The trial judge ordered production of the documents. Dorf & Stanton produced three of the four documents, and provided a second, more detailed, privilege log to which was added two documents that had previously been produced in totally redacted form but that had not also been listed on the first log. The trial judge found this description insufficient under the court's Local Rule 46(e). Rule 46(e)(2)(ii)(A) lists the information that shall be included in the objection to a document request:

(A) for documents: (1) the type of document; (2) general subject matter of the document; (3) the date of the document; (4) such other information as is sufficient to identify the document for a subpoena duces tecum, including, where appropriate, the author of the document, the addressee of the document, and, where not apparent, the relationship of the author and addressee to each other;

The logs attached to the panel majority's opinion show how these requirements were met. Indeed, the panel majority does not mention any alleged deficiencies. Neither does Miller Brewing.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Miller Brewing argues that because Dorf & Stanton did not provide a complete privilege log within two weeks of the service of the subpoena, with all documents for which a claim of privilege was made, Dorf & Stanton failed to comply with the rules. The consequence, according to Miller Brewing, is loss of the privilege. The premise is incorrect. Dorf & Stanton responded to the subpoena within 14 days stating that it was claiming the attorney-client privilege, provided a privilege log at the time of responding, and corrected its minor errors without any assertion by Miller Brewing that it had been prejudiced. Local Rule 46 does not require that a complete privilege log be filed within 14 days of service of the discovery subpoena. *Cf. Ventre v. Datronic Rental Corp.,* 1995 WL 42345, *3-*5 (N.D.Ill. Feb.2, 1995) (privilege claims are asserted "at or before the time specified for compliance with the subpoena").

Even if there were inadequate initial compliance with the local rule, if the inadequacy was remedied and absent prejudice the consequence is not automatic loss of the privilege. *Cf. Ventre,* 1995 WL 42345 at *4 ("a failure to comply with [Federal] Rule 45(d)(2) does not automatically result in a waiver of *929 privilege claims"). Local rulings to this effect include *Hyundai Merchant Marine v. United States,* 1991 WL 190563, *4 (S.D.N.Y. Sept.16, 1991) (giving subpoenaed party time to comply with local rule); and *Grossman v. Schwarz,* 125 F.R.D. 376, 386 (S.D.N.Y.1989) (no waiver of privilege even when violation of Local Rule 46(e) was "particularly glaring").

In reviewing the denial of a claim of privilege it is always necessary to consider the nature of the proposed discovery and the content of the withheld documents. Dorf & Stanton provided five affidavits describing the basis of its privilege claims for the three documents at issue. The panel majority has not discussed the local rule, its reasonable compliance, the subject matter of the challenged documents, and the absence of prejudice. All of these factors should be considered before endorsing a blanket elimination of the attorney-client privilege on the ground of a local rule that was not, in fact, violated. Thus I can not agree that the privilege was correctly deemed waived in these circumstances.

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works